1  STEVEN T. GUBNER – Bar No. 156593
   JASON B. KOMORSKY – Bar No. 155677
2  JERROLD L. BREGMAN – Bar No. 149896
   JESSICA L. BAGDANOV – Bar No. 281020
3  **BRUTZKUS GUBNER**
   21650 Oxnard Street, Suite 500
4  Woodland Hills, CA  91367
   Telephone:  (818) 827-9000
5  Facsimile:  (818) 827-9099
   Emails:      jkomorsky@bg.law
6                jbregman@bg.law
                jbagdanov@bg.law
7
   Special Litigation Counsel for
8  Sarah L. Little, Chapter 7 Trustee

9              **UNITED STATES BANKRUPTCY COURT**

10     **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| 11  In re | Case No.:  4:19-bk-40193-RLE |
| 12  PACIFIC STEEL CASTING COMPANY LLC, | Chapter 7 |
| 13                          Debtor, | Adversary Case No. _ |
| 14 | **COMPLAINT FOR:** |
| 15  SARAH L. LITTLE, Chapter 7 Trustee, | 1.  **ILLEGAL DISTRIBUTIONS;** |
| 16                          Plaintiff, v. | 2.  **BREACH OF FIDUCIARY DUTY;** |
| 17  SPEYSIDE FUND, LLC, a Delaware limited liability company; THE ALCAST | 3.  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** |

11  In re

12  PACIFIC STEEL CASTING COMPANY
    LLC,

13                          Debtor,

14

15  SARAH L. LITTLE, Chapter 7 Trustee,

16                          Plaintiff,
    v.

17  SPEYSIDE FUND, LLC, a Delaware limited
    liability company; THE ALCAST
18  COMPANY, an Illinois corporation; UHY,
    LLP, a New York limited liability
19  partnership; KRISHNAN VENKATESAN,
    an individual; JEFFREY STONE, an
20  individual; ERIC WIKLENDT, an
    individual; JERRY JOHNSON, an
21  individual; BRIAN HOLT, an individual;
    STEVE WESSELS, an individual; KEVIN
22  DAUGHERTY, an individual;
    RATAXASCO LLC, a New York limited
23  liability company; SPEYSIDE EQUITY
    LLC, a Delaware limited liability company;
24  KEVIN DAUGHERTY, as Trustee of the
    TD 2011 Trust and PD 2011 Trust; ROBERT
25  C. SYLVESTER, an individual; and DOES 1
    through 10, inclusive,

26
                            Defendants.
27

28

Case No.:  4:19-bk-40193-RLE
Chapter 7

Adversary Case No. _

**COMPLAINT FOR:**

1.  **ILLEGAL DISTRIBUTIONS;**

2.  **BREACH OF FIDUCIARY DUTY;**

3.  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**

4.  **EQUITABLE SUBORDINATION;**

5.  **AVOIDANCE OF 2-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT);**

6.  **AVOIDANCE OF 2-YEAR FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD);**

7.  **AVOIDANCE OF 4-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT);**

8.  **AVOIDANCE OF 4-YEAR FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD);**

9.  **AVOIDANCE OF 7-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT);**

10. **AVOIDANCE OF PREFERENTIAL TRANSFERS;**

11. **RECOVERY OF AVOIDED TRANSFERS;**

12. **DECLARATORY RELIEF; and**

13. **CLAIM DISALLOWANCE.**

[11 U.S.C. §§544, 548, 550; Cal. Civ. Code
§§ 3439.04, 3439.05, 3439.07, 3439.09; 6 Del. C. §§
1304, 1305, 1307, 18-607]

2194390

Plaintiff, Sarah L. Little, the duly authorized and acting chapter 7 Trustee ("Trustee") of the bankruptcy estate of Pacific Steel Casting Company (the "Debtor" or "New Pacific Steel") hereby brings claims against the following defendants:

(A) SPEYSIDE FUND, LLC, a Delaware limited liability company ("Speyside Fund"); THE ALCAST COMPANY, an Illinois corporation ("Alcast"); KRISHNAN VENKATESAN, an individual ("Venkatesan"); JEFFREY STONE, an individual ("Stone"); ERIC WIKLENDT, an individual ("Wiklendt") (Speyside Fund, Alcast, Venkatesan, Stone, and Wiklendt collectively referred to as the "Owner Defendants");

(B) RATAXASCO LLC, a New York limited liability company ("RataxasCo"); SPEYSIDE EQUITY LLC, a Delaware limited liability company ("Speyside Equity"); KEVIN DAUGHERTY, in his capacity as Trustee of the TD 2011 Trust (the "TD Trust") and PD 2011 Trust (the "PD Trust"); ROBERT C. SYLVESTER, an individual ("Sylvester") (RataxasCo, Speyside Equity, TD Trust, PD Trust, and Sylvester collectively referred to as the "Subsequent Transferee Defendants");

(C) JERRY JOHNSON, an individual ("Johnson"); BRIAN HOLT, an individual ("Holt"); STEVE WESSELS, an individual ("Wessels"); KEVIN DAUGHERTY, an individual ("Daugherty") (Stone, Johnson, Holt, Wessels, and Daughtery referred to herein, collectively, as the "Management Defendants" and the Owner Defendants and Management Defendants, collectively, the "Defendants"); and

(D) UHY LLP (the "Accountants" or "UHY").

In support of the claims, the Trustee alleges as follows:

# I.    <u>NATURE OF PROCEEDING</u>

1. By this action, the Trustee seeks to avoid and recover for the benefit of the Debtor's estate (the "Estate") a series of illegal dividends, fraudulent conveyances and improper insider payments by which certain of the Defendants looted some $14.35 million from the Debtor, resulting in more than $40 million in damages tied to incremental and avoidable indebtedness that would not have arisen as claims against the Estate but for the Defendants' wrongful actions and omissions. The looted funds include approximate $10.75 million in illegal dividends, which the Management

1

2194390

Defendants caused the Debtor to distribute to the Owner Defendants beginning in September 2014 and continuing through early-2016 (collectively, the "Initial Illegal Distributions"), plus an additional $3.6 million that the Management Defendants caused the Debtor to distribute to the Owner Defendants in 2018 (the "2018 Illegal Distribution"), as purported repayment on loans but which were, in fact, capital contributions made in 2016 and 2017 (collectively, the "Capital Contribution"). The looted funds were received by the Owner Defendants, and by the Subsequent Transferee Defendants via distributions in respect of their membership interests in Speyside Fund, all while the Debtor was insolvent; the fair value of the Debtor's assets was significantly less than the fair value of its liabilities at all relevant times. The Trustee further seeks damages from the Management Defendants for their breaches of fiduciary duty which resulted in liabilities to the Debtor's Estate exceeding $40 million, as well as damages from UHY, who aided and abetted the Management Defendants and Owner Defendants in implementing their wrongful scheme.

2. The wrongful scheme, by which the Defendants impoverished the Debtor by looting its assets and increasing its indebtedness, has its origin in the leveraged buyout (the "LBO") by which the Owner Defendants purchased out of bankruptcy substantially all of the assets of the Debtor's predecessor, Second Street Properties, Inc. f/k/a Pacific Steel Casting Company ("Old Pacific Steel"), whose bankruptcy case was pending before the above-captioned United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") as Case No. 14-41045-RLE ("Old Pacific Steel"). Old Pacific Steel's case was jointly administered with that of Old Pacific Steel's wholly owned subsidiary, Berkeley Properties, LLC, whose case was pending before the Bankruptcy Court as Case No. 14-41048-RLE ("Berkeley Properties" and, together with Old Pacific Steel, the "Old Pacific Steel Debtors"). Through the LBO, the Owner Defendants acquired substantially all of the assets of Old Pacific Steel as a going concern, whose business operations included three separate plants on nine acres of land: a green sand plant, a shell mold plant and an air set plant. The business manufactured steel castings used mostly for customers in the oil drilling equipment sector (about 55% of its customers) and the heavy-duty truck manufacturing sector (about 33% of its customers), including products that were based on customers' specifications and were

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 3 of 150

typically shipped on a just-in-time basis, including carbon, low-alloy and stainless steel casting ranging from one to 7,000 pounds.

3.    Through the LBO, the Owner Defendants were able to acquire substantially all of Old Pacific Steel's business and operating assets with only $2.5 million of cash plus the assumption of certain liabilities (for which New Pacific Steel itself became obligated), including, without limitation, the contingent withdrawal liability that would arise from certain union pension plans to which Old Pacific Steel was a party, and would become fixed and due in the event New Pacific Steel withdrew from such pension plans or otherwise failed within five years after the closing of the LBO (the "Withdrawal Liabilities"), as specified in that certain asset purchase agreement (the "APA") approved by the Bankruptcy Court pursuant to its *Order Approving Motion to Approve Sale of Substantially All Assets Free and Clear of Liens and Related Relief*, entered July 31, 2014 in Case No. 14-41045 (the "Sale Order").  The APA provided that New Pacific Steel would be primarily obligated to pay any such Withdrawal Liabilities to the extent they arose as obligations of Old Pacific Steel, and Old Pacific Steel would be secondarily obligated therefor.  The APA determined the amount of the Withdrawal Liabilities were at that time in excess of $32 million.

4.    To advance their looting scheme, the Management Defendants for the benefit of themselves as well as the Owner Defendants and the Subsequent Transferee Defendants, caused the Debtor to declare a "bargain purchase gain" of $10.9 million within a couple weeks of the LBO's closing, thereby achieving an immediate, though illusory, 436% return on the Owner Defendants' $2.5 million initial capital contribution.  The Management Defendants caused the Debtor to declare this phantom gain notwithstanding that the acquired assets had been professionally marketed, so all relevant industry competitors were provided an opportunity to bid for them, thereby establishing market conditions that set the reasonable market price therefor reflected in the APA.  The Management Defendants caused the Debtor to ostensibly justify this fiat gain by wildly inflating on its books the value of the Debtor's inventory and by ignoring without justification various substantial and material liabilities, including the more than $32 million assumed contingent Withdrawal Liabilities.  On information and belief, the Management Defendants and the Accountants had actual knowledge that the Management Defendants' appraisal, stating that only 3% of the Debtor's

inventory acquired from Old Pacific Steel was slow moving and obsolete, was profoundly inaccurate. "Wildly" inflated, as used above, was meant literally: New Pacific Steel's carried inventory, much of which initially was intended for just-in-time uses on information and belief, was essentially worthless and ultimately written down before being written off, beginning in 2016 and continuing and increasing in magnitude through 2018. Admitting in essence that nothing had changed to justify a bargain purchase gain, Stone, who was both an Owner Defendant and Management Defendant, stated on September 11, 2014, shortly after the LBO closing, that he "expect[ed the Debtor] to struggle with profitability for the first few months – we have the same company issues as existed before." There was never a genuine bonanza attributable to the LBO; the bargain purchase gain was simply the product of "cooking" the Debtor's books.

5. The Debtor's books and records show that the Owner Defendants received almost $10.8 million from September 12, 2014 through April 19, 2016, of which approximately $9 million was received during the four-year period before the Debtor's filing of its voluntary bankruptcy on January 25, 2019 (the "Petition Date"). Most if not all of these payments were funded by collections of the Debtor's accounts receivable and financings that otherwise would have been available to the Debtor and without which the Debtor was left with inadequate working capital for its business operations, present and future.

6. On information and belief, the Management Defendants' initial scheme was simple: They wanted to keep the business alive just long enough to allow the three-year statute of limitations for illegal distributions to run on the Initial Illegal Distribution, at which time they would place New Pacific Steel into bankruptcy thereby shifting the losses to creditors. However, the severity of the Initial Illegal Distributions in light of the phantom income was felt by the Debtor's business by July 2016, when New Pacific Steel was in default of its loan with Wells Fargo. By October 2016, the Owner Defendants were forced to repatriate, by way of the Capital Contribution, approximately $4 million of the funds they had received from the Debtor, or face the Debtor's certain bankruptcy in 2016. The Owner Defendants disguised this Capital Contribution as subordinated loans. The Owner Defendants papering of the Capital Contribution as a subordinated secured loan served three purposes: first, it allowed the Owner Defendants to be treated as creditors so they could be repaid

4

2194390

before legitimate creditors (save for one senior secured lender); second, it allowed the Owner Defendants to receive interest on their capital, which the Debtor's operating agreement prohibited for equity infusions; and third, it avoided a claim of illegal distribution to the extent they could successfully assert that the payments were made on account of a bona fide loan (which, of course, it was not), rather than a return on equity (which it quite obviously was). The Management Defendants' conduct was willful, wanton, malicious, and in complete disregard for the rights of the Debtor, always elevating their own personal interests above those of the Debtor.

7.     Nevertheless, the amount of the Capital Contribution (less than half of the Initial Illegal Dividend) was insufficient to make New Pacific Steel solvent, and by October 2017 Management Defendants retained bankruptcy counsel.  New Pacific Steel advised certain vendors that it imminently was ceasing operations.  This was more than a year before the Petition Date.

8.     Rather than filing bankruptcy in 2017, which would have adversely affected the Owner Defendants' ability to recoup their Capital Contribution and would have exposed the Initial Illegal Distribution, Defendants kept New Pacific Steel's doors open through 2018—for the primary purpose of making the 2018 Illegal Distribution.  The Management Defendants caused the Debtor to repay to the Owner Defendants approximately $3.6 million (about 90%) of the Capital Contribution during 2018, during the run-up to the Petition Date.  In order to facilitate this further looting by the Owner Defendants—in the form of repayments on the purported loan, which was in fact equity in the first instance, *i.e.*, the 2018 Illegal Distribution—the Management Defendants allowed the Debtor to default on other payments and obligations that necessitated concessions from the Debtor's landlord and left other vendors without any payments.  Thus, the Management Defendants caused the Debtor to pay the Owner Defendants during a period after the Debtor had defaulted on its payment obligations to legitimate creditors, including the pension funds, vendors and other creditors, some if not all of whom had provided the Debtor with economic concessions.

9.     These legitimate creditors granted the Debtor such concessions in reliance on the Management Defendants' affirmative misrepresentations, including that the Capital Contribution would be infused as equity rather than debt, and that no repayments would be made to insiders (including the Owner Defendants) without prior notice to the unions who were forbearing from

2194390

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 6 of 150

perfecting and enforcing remedies in reliance on the Management Defendants' false promises. Audaciously, Speyside Fund now claims to have a further secured right to payment in the amount of $828,761, having filed two proofs of claim in the Debtor's bankruptcy case.

10.      By this action, the Trustee further seeks to have the purported loan re-characterized as equity, the 2018 Illegal Distribution deemed fraudulent conveyances and further illegal dividends, and Speyside Fund's proof of claim disallowed (or equitably subordinated to general non-priority unsecured claims).

11.      Most of the illegal and avoidable distributions described above as the Initial Illegal Distributions, were made before the Debtor's Accountants completed the Debtor's 2014 audited financial statement, which reflected the improper $10.9 million bargain purchase gain and was based on false information and material omissions for which the Management Defendants and the Accountants were responsible.  The Accountants also failed to perform reasonable diligence and to provide professional services consistent with their duty of care to the Debtor, and thereby facilitated the Management Defendants' scheme even though the Accountants had identified certain material audit risks.  While the APA accounted for the Withdrawal Liabilities to reduce the cash component of Speyside Fund's purchase price for Old Pacific Steel's assets (which were then assigned to and vested in the Debtor), the Management Defendants never accounted for these Withdrawal Liabilities on the Debtor's balance sheets nor did the Accountants ever identify these liabilities on any of New Pacific Steel's financial statements from 2014 through the Petition Date.  Even the Debtor's bankruptcy schedules and statement of financial affairs contain no mention of the Withdrawal Liabilities notwithstanding the fact that the Debtor received a default letter in December 2017 based upon the cancellation of a bond then-in-place to secure these Withdrawal Liabilities.  The Management Defendants and the Accountants also failed to schedule the Debtor's indemnification obligation to the Old Pacific Steel Debtors arising from the contingency (ultimately realized) that the Withdrawal Liabilities would materialize and perhaps be paid in part, if not in full, from security therefor that the Old Pacific Steel Debtors had provided to secure their secondary liability (after the Debtor's) for such Withdrawal Liability.  Indeed, the Old Pacific Steel Debtors have filed a $24 million proof of claim in the Debtor's bankruptcy case in respect of this claim.

2194390

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 7 of 150

12. The Accountants were complicit in masking New Pacific Steel's liabilities and inflating its assets. In turn, the Management Defendants used the accounting reports and documents to justify their conduct and in furtherance of their wrongful scheme, including using the materially misleading audited financial statements with the Debtor's lenders to secure more favorable lending terms. The illegal and avoidable distributions instigated by the Management Defendants were the Debtor's downfall. As the Accountants lamented in the Debtor's 2016 audited financials: "These conditions raise substantial doubt about the Company's ability to continue as a going concern." In 2017, the Debtor cancelled a then-in-place bond securing the Debtor's Withdrawal Liabilities, which bond was required under the APA to protect Old Pacific Steel and which made the Debtor liable for the full amount of the Withdrawal Liabilities.

13. Management Defendants' actions violated their fiduciary duties owed to the Debtor and its stakeholders, including to the creditor body given the Debtor's insolvency, which insolvency existed from before the Initial Illegal Distributions were made. On information and belief, the Management Defendants never intended to honor the material indemnification provisions of the APA and, instead, planned all along to pillage the Debtor's assets, including its accounts receivable and access to loans and concessions from unions and other creditors, for their personal benefit and the benefit of the Owner Defendants, creating millions of dollars in liabilities owed by this resulting chapter 7 bankruptcy estate (some of which liabilities are secondarily owed by the Old Pacific Steel Debtors). This wrongful scheme is further evidenced by the fact that the "ink was not yet dry" on the APA when the Initial Illegal Distributions began.

14. The debilitating and adverse impact on the Debtor of the Initial Illegal Distributions was exacerbated by the Debtor's overwhelming if not total loss of business from the Debtor's most substantial customers. On information and belief, the Management Defendants further breached their fiduciary duties to the Debtor by secretly diverting substantial business and customers of the Debtor to other entities with which the Management Defendants are affiliated, to the detriment of the Debtor and its stakeholders.

2194390

15. To make matters worse, the Management Defendants inexcusably cancelled before the Petition Date insurance coverage that might otherwise have been available to cover claims of breach of fiduciary duty.

16. Each of the transfers sought to be avoided and recovered hereby on the grounds of "actual intent," as indicated in the headings of the various claims for relief herein, was caused by the Management Defendants to be made by the Debtor with the actual intent to hinder, delay, or defraud one or more of the Debtor's creditors.

17. Each of the transfers sought to be avoided and recovered hereby on the grounds of "constructive fraud," as indicated in the headings of the various claims for relief herein, was caused by the Management Defendants to be made by the Debtor without the Debtor received reasonably equivalent value in exchange for such transfers, the Debtor (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (c) intended to incur, or believed that the Debtor would incur, or should have believed the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; or (d) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

18. There were no innocent insiders (officers, directors, or shareholders) of the Debtor – all were the Owner Defendants or the Management Defendants – who could have acted during the relevant period before the Petition Date. The looting was never disclosed to the public or anyone who had the authority or ability to act or to seek redress on behalf of the Debtor. Thus, the Debtor, as such, could not discover and did not discover its injuries and damages until after the Petition Date, when the Management Defendants were removed from their positions of control over and domination of the Debtor.

## II. JURISDICTION AND VENUE

19. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, because, among other things, the claims for relief arise in or are related to a case

2194390

pending under Title 11 of the *United States Code* ("Bankruptcy Code"). This adversary proceeding arises in or relates to the bankruptcy case *In re Pacific Steel Casting Company LLC*, 4:19-bk-40193-RLE. The claims alleged herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H), (K), and (O).

20. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151 and 157.

21. The Trustee has standing to bring this adversary proceeding pursuant to 11 U.S.C. § 323. Because the Trustee was not appointed until after the occurrence of the facts alleged in this Complaint, she has no personal knowledge of such facts. Accordingly, the Trustee alleges all such facts on information and belief based on a review of business records of the Debtor and other records obtained.

22. Pursuant to Local Rule 7008-1 of the United States Bankruptcy Court for the Northern District of California, The Trustee consents to entry of final judgment by the Bankruptcy Court.

## III. THE PARTIES

### A. Plaintiff

23. Plaintiff, Sarah L. Little, is the duly authorized and acting chapter 7 trustee for the Debtor (the "Plaintiff" or "Trustee"). The Plaintiff acts in this action not individually, but solely in her capacity as trustee of the Debtor's Estate.

### B. Defendants

24. Krishnan Venkatesan ("Venkatesan") is an individual residing in San Ramon, California, and is the President and managing member of the Debtor, holding an approximate 1.7%[1] Class B membership interest. Venkatesan also is a partner at Speyside Fund.

---

[1] The membership interest percentages disclosed in the Debtor's bankruptcy schedules and in internal documents appear to differ from the K-1s issued to members during the relevant period and it is possible that the Class A memberships were diluted, in part, and additional ownership interests provided to Venkatesan and Wiklendt.

9

2194390

25. Jeffrey Stone ("Stone") is an individual residing in Ann Arbor, Michigan, and is a manager of the Debtor, holding an approximate 10% Class C membership interest in the Debtor and is a manager/partner at Speyside Fund, and further holds an approximate 10.3% membership interest in Speyside Fund.

26. The Alcast Company ("Alcast") is a corporation organized under the laws of the State of Illinois, and holds an approximate 39.7% Class A membership interest in the Debtor. Alcast operates a low pressure permanent mold aluminum foundry and CNC machine shop that manufactures and supplies aluminum castings.

27. Speyside Fund, LLC ("Speyside Fund") is a limited liability company registered in Delaware, holding an approximate 39.7% Class A membership interest in the Debtor.

28. Defendant UHY LLP ("Accountants" or "UHY") is a limited liability partnership registered in New York with its principal place of business in Farmington Hills, Michigan.

29. Eric Wiklendt ("Wiklendt") is an individual residing in Carleton, Michigan, and is a member of the Debtor, holding an approximate 5% Class C membership interest in the Debtor, and is a partner at Speyside Fund.

30. Jerry Johnson ("Johnson") is an individual residing in Moraga, California, and was at all relevant times the Vice President of Finance of the Debtor.

31. Brian Holt ("Holt") is an individual residing in Peoria, Illinois, and was at all relevant times a manager of the Debtor, and he is an officer of Alcast.

32. Steve Wessels ("Wessels") is an individual residing in Peoria, Illinois, and was at all relevant times a manager of the Debtor, and is the President of Alcast.

33. Kevin Daugherty ("Daugherty") is an individual residing in Ann Arbor, Michigan, and was at all relevant times a manager of the Debtor, and is a partner at Speyside Fund.

34. Daugherty is also named as a defendant herein in his capacity as Trustee of the TD 2011 Trust, a revocable trust settled under the laws of New Jersey, which holds an approximate 5.8% membership interest in Speyside Fund.

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 11 of 150

35. Daugherty is also named as a defendant herein in his capacity as Trustee of the PD 2011 Trust, a revocable trust settled under the laws of New Jersey, which holds an approximate 5.8% membership interest in Speyside Fund.

36. Robert Sylvester ("Sylvester") is an individual residing in Plymouth, Michigan, and holds an approximate 15.4% membership interest in Speyside Fund.

37. RataxasCo LLC ("RataxasCo") is a limited liability company registered in New York, holding an approximate 15.4% membership interest in Speyside Fund.

38. Speyside Equity is a limited liability company registered in Delaware, holding an approximate 47.1% membership interest in Speyside Fund.

**C. Agency Allegations**

39. Plaintiff is informed and believes and based thereon alleges that each of the Management Defendants are and/or were the partners, principals, servants, employees, employers, agents, representatives, subsidiaries, affiliates, joint venturers, and/or the alter-egos of each other Defendant and each Defendant was otherwise acting in concert with, aided and abetted, and acting in furtherance of a civil conspiracy with each other Defendant, in doing all things herein alleged, and was acting within the purpose and scope of their authority as such partners, principals, servants, employees, employers, agents, representatives, subsidiaries, affiliates, joint venturers, and/or the alter-ego relationship with each other Defendant, and engaged in the conduct that was authorized, ratified, approved and/or otherwise sanctioned with advanced knowledge or subsequent ratification or acquiescence by each other Defendant.

40. Plaintiff is informed and believes, and based thereon alleges that each of the Management Defendants were responsible, negligently, intentionally and/or in some actionable manner, including as corporate successors liable for the acts of their predecessors, for the events referred to herein, and caused injuries and damages legally to Plaintiff, as alleged, either through each the Management Defendants' own conduct, or through the conduct of each the Management Defendants' agents, servants, employees, aiders and abettors, and co-conspirators, or due to the ownership, maintenance, or control of the instrumentality causing the injury to Plaintiff, or in some other actionable manner.

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 12 of 150

## IV. STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

### A. Background of Old Pacific Steel and Berkeley Properties

41. On March 10, 2014, the Old Pacific Steel Debtors filed for bankruptcy protection. Berkeley Properties LLC ("BP") was a wholly owned subsidiary of Old Pacific Steel, and their respective chapter 11 cases were jointly administered (Bankr. Case Nos. 14-41045-RLE and 14-41048-RLE).

42. Old Pacific Steel was a fourth generation family-owned steel foundry that manufactured carbon, low-alloy and stainless steel castings for U.S. and international customers. Old Pacific Steel operated three separate plants that were located on eight acres in Berkeley, California.

43. Most of the real property was owned by BP, which leased the real property to Old Pacific Steel. At the time of Old Pacific Steel Debtors' bankruptcy, the real property was BP's only significant asset, and Old Pacific Steel was the property's only tenant.

44. At the time of its bankruptcy in 2014, Old Pacific Steel had grown into one of the largest independent steel-casting companies in the U.S. Old Pacific Steel supplied numerous industries with a wide variety of castings used in oil and gas drilling equipment, heavy-duty truck parts, valves and fittings, and mining and construction equipment. Old Pacific Steel's plants incorporated some of the latest manufacturing technology, production capabilities and emissions controls which allowed Old Pacific Steel to remain competitive with domestic and international suppliers, and to maintain compliance with environmental regulations.

45. At the time of its bankruptcy filing, Old Pacific Steel employed approximately 365 hourly employees and 45 salaried employees. The majority of the hourly employees were represented by the *Glass, Molders, Pottery, Plastics, and Allied Workers International Union*, AFL-CIO, CLC Local No. 164B (the "Union"). Historically, Old Pacific Steel enjoyed a good working relationship with the Union, and the then-current collective bargaining agreement was set to expire in 2015.

46. Both prior to and after it filed for bankruptcy protection, Old Pacific Steel diligently investigated possible purchasers or investors. Prepetition and on January 29, 2014, Old Pacific Steel

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 13 of 150

retained the services of Cleary Gull Inc. ("Cleary Gull") to serve as its investment banker in connection with one or more possible sales, mergers or other business combinations or transactions. Cleary Gull assisted Old Pacific Steel by canvassing the marketplace for potential investors or buyers. Cleary Gull prepared a confidential memorandum describing Old Pacific Steel's business, history, financial position and results, and the investment opportunity, and prepared an electronic "data room" with significant financial and company records to allow potential investors and buyers to conduct due diligence. After filing bankruptcy, Old Pacific Steel and BP received Bankruptcy Court approval to allow Old Pacific Steel to employ Cleary Gull as a financial advisor in the bankruptcy cases. Within just one month after the petition date, Cleary Gull received 11 written initial indications of interest and five offers to purchase the assets of Old Pacific Steel and BP.

**B.    The APA and the New Pacific Steel's Assumption of the Withdrawal Liabilities**

47.    On or about June 19, 2014, the Old Pacific Steel Debtors entered into the APA with Speyside Fund, which agreement was presented to this Court in connection with Old Pacific Steel's motion to approve overbid procedures for the sale of substantially all of Old Pacific Steel's assets as a going concern, and related relief.

48.    The APA provided for Speyside Fund to acquire the following assets (the "Acquired Assets"): (i) all of Old Pacific Steel's inventory, (ii) all of Old Pacific Steel's tools, equipment, and other tangible personal property used in Old Pacific Steel's steel foundry business, (iii) Old Pacific Steel's right to prepaid expenses, advance payments and deposits (unless otherwise excluded), (iv) accounts receivable, notes, evidences of indebtedness of any kind arising from the foundry business, (v) all rights under assumed contracts, (vi) franchises, permits, licenses, etc., issued by any governmental entity used in the foundry business, (vii) intellectual property, (viii) books and records, (ix) promotional and advertising materials, (x) goodwill, (xi) rights and obligations under non-disclosure agreements, (xii) telephone, fax numbers, domain names and email addresses, (xiii) prior and current workers compensation insurance policies, and (xiv) all proceeds and products of the above acquired assets. **Exhibit 1.**[2]

---

[2]    The APA attached hereto as **Exhibit 1** was filed with this Court in connection with the Old Pacific Steel Debtors' motion to approve sale procedures, filed on June 19, 2014 in Case No. 14-41045 as Doc. #201.

2194390

49.     The APA also provided for Speyside Fund to assume the following liabilities (the "Assumed Liabilities"): (i) all liabilities arising from the ownership of the Acquired Assets, (ii) all liabilities under assumed contracts, (iii) the obligations to administer or to provide benefits, payments under the Benefit Plans that Speyside Fund assumed, which were listed on Schedule 2.03(b)(iii) (the "Assumed Plans") and all liability arising from Speyside's termination of or withdrawal from any Assumed Plan; (iv) all liabilities and obligations of Old Pacific Steel under transferable license, permits and governmental authorizations, (v) unpaid vacation obligations to Old Pacific Steel's employees, (vi) accounts payable and accrued expenses, and (vii) Old Pacific Steel's workers' compensation liabilities. *Id.*

50.     The Old Pacific Steel Debtors' chapter 11 plan and disclosure statement disclosed the LBO structure of the APA, and the Court approved the sale by its order entered July 31, 2014 (the Sale Order defined *supra*). Indeed, the APA was a fundamental cornerstone the Old Pacific Steel Debtors' reorganization. This Court confirmed the Old Pacific Steel Debtors' chapter 11 plan by its order entered July 1, 2015. As explained in post-confirmation status reports filed by the Old Pacific Steel Debtors, the conduct of the Management Defendants complained of herein—which ultimately resulted in the Debtor's chapter 7 filing—has raised serious doubt as to whether the Old Pacific Steel Debtors will be able to perform under their plan going forward. *See, e.g.*, Post-Confirmation Status Report for Quarter Ending June 30, 2019 [Bk. Doc. #945, Case No. 14-41045 RLE] ("Distributions to creditors have always been under the assumption that the bankruptcy estate would continue to receive rents from [New Pacific Steel] for the term of the lease as this is the bankruptcy estate's primary source of cash for creditor distributions. Due to its own financial difficulties and shut-down, [New Pacific Steel] vacated the premises on November 28th, 2018. This has created significant uncertainty for the [Old Pacific Steel] bankruptcy estate for future distributions.").

51.     The cash portion of the APA purchase price was $10,300,000 but the final amount was reduced to $7,976,362 as a result of an adjustment feature pegged to Old Pacific Steel Debtors' working capital on the closing date, namely, the difference between $26,853,679 and the Old Pacific Steel Debtors' net working capital on the closing date, which was determined to be $24,530,041. A significant component of the consideration constituting the purchase price was New Pacific Steel's

2194390

assumption of the Debtor's obligation to pay the Withdrawal Liabilities, which the Old Pacific Steel Debtors stated in the amount of approximately $32.1 million in their *Motion to Approve Overbid Procedures Re Sale of Debtors' Assets and Related Relief*, and which Speyside Fund valued for purposes of the APA at $22.2 million.

52.     The APA was structured as an LBO. While Speyside Fund infused $2,500,000 of cash (its $500,000 earnest money deposit plus $2,000,000 at closing), New Pacific Steel (rather than Speyside Fund) borrowed $3,384,271 of the purchase price under a revolving line of credit and $1,400,000 as a loan from Siena Lending Group LLC ("Siena") to fund the balance of the purchase price and certain closing costs.

53.     In August 2014, New Pacific Steel was registered with the California Secretary of State. Speyside Fund assigned the assets and liabilities it acquired in the APA from Old Pacific Steel to New Pacific Steel.

54.     At all material times, the Debtor was owned by Speyside Fund, Alcast, Venkatesan, Stone and Wiklendt. In turn, Speyside Fund was owned by Speyside Equity, TD Trust, PD Trust, Sylvester, Stone, and RataxasCo.

**C.      The Scheme to Create Phantom Income for the Purpose of Making Distributions to the Owner Defendants**

55.     A review of the Debtor's books and records reflects that, from its creation, the Management Defendants and New Pacific Steel's Accountants never accounted for the Debtor's Withdrawal Liabilities. The Debtor's 2014 audited financials reflected total assets of $26,250,278 and only $7,874,222 in total liabilities. These audited financials both did not include any liabilities associated with the Withdrawal Liabilities, and included as assets inventory valuations that were vastly inflated relative to their then market value.

56.     In point of fact, almost $11 million of the Debtor's 2014 reported net income came from the improper bargain purchase gain, another $1 million in net income came from an unsubstantiated favorable inventory variance adjustment, and the 2014 financial statement reflected that somehow New Pacific Steel was earning over $1 million per month even though Old Pacific

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 16 of 150

Steel had been losing approximately $1 million per month while in chapter 11. In total, the Debtor reported a 23% gross profit, which was over two times higher than the previous four years on record.

57.     The Management Defendants caused New Pacific Steel to recognize on its books a bargain purchase gain by ignoring and not accounting for the Withdrawal Liabilities New Pacific Steel had assumed, which failure did not conform with generally accepted accounting practices ("GAAP"). Rather, New Pacific Steel's Accountants, based upon the information provided by the Management Defendants and despite having the APA, simply added the cash on hand ($1,064,3313), accounts receivable ($10,624,099), inventory ($6,49,211), and property and equipment ($4,717,560), and subtracted assumed liabilities ($3,585,741 – which did not include the Withdrawal Liabilities) and determined that the Debtor had net assets of $18,951,442. The Accountants then subtracted $7,976,362, the cash sale price (as adjusted), resulting in bargain purchase gain of $10,975,080. To date, the Trustee has not seen any evidence that either the Management Defendants or the Accountants ever valued New Pacific Steel's obligations with respect to the Withdrawal Liabilities. Ignoring 100% of that liability resulted in the mirage of a $10,975,080 surplus obscuring the reality of the Debtor's $26 million negative net worth.

58.     Even had the Accountants discounted the Withdrawal Liabilities to account for the possibility that Old Pacific Steel would never become obligated therefor (New Pacific Steel assumed the obligation in the first instance to pay any amount that would be payable by the Old Pacific Steel Debtors), even a liberal 50% reduction would still have erased the entirety of the purported bargain purchase gain, even without further discounting the asset values in respect of the inflated inventory valuation. Evidencing bad faith, there was not even a footnote in the audited financials identifying the existence of this material liability. Moreover, it is clear from future actions by the Management Defendants that, even when the Withdrawal Liabilities were all but certain to arise and become fixed (such as in 2017, when the bond securing the Withdrawal Liabilities was cancelled), the indemnification obligation with respect to the Withdrawal Liabilities were never accounted for on New Pacific Steel's books.

59.     The Owner Defendants, and the Accountants on their behalf, ignored the contingent liabilities when it suited them, notwithstanding that the Owners Defendants has highlighted them

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 17 of 150

during the APA negotiations. In fact, during negotiations with Old Pacific Steel that ultimately resulted in the APA confirmed by this Court, the Owner Defendants themselves assigned a substantial valuation to the contingent liabilities. In other words, the Owner Defendants represented to Old Pacific Steel (and ultimately this Court) that their assumption of obligations associated with Old Pacific Steel's contingent liabilities were worth approximately $22.2 million in consideration, and reduced their cash offer accordingly.

60. Based upon the phantom income realized by ignoring the Withdrawal Liabilities and inflating the inventory and the value of the fixed assets, the Owner Defendants received $10,748,177 as the Initial Illegal Distributions, as set forth in **Exhibit 3** hereto and incorporated by reference.

61. The Trustee is informed that each of the Subsequent Transferee Defendants received certain of the transfers listed above by way of subsequent transfers from Speyside Fund based on the Subsequent Transferee Defendants' respective membership interests in Speyside Fund.

62. Of note, most of these funds were distributed *before* the auditors issued New Pacific Steel's 2014 audited financial statement. Thus, the Owner Defendants began to dissipate New Pacific Steel's assets without the benefit of audited financials to confirm (or to question) their calculations. On information and belief, the Owner Defendants knew from the outset that the Accountants would aid them in cooking New Pacific Steel's books. In turn, the Accountants knew that the Owner Defendants would rely on their misleading financial calculations as cover for the Initial Illegal Distributions and, further, that Management Defendants would rely on these misleading financials to secure loans and to secure acquiescence from New Pacific Steel's lender to at least some of the Initial Illegal Distributions. On information and belief, the Accountants were greatly enriched and motivated by the fees they earned from the Debtor and may have had a pre-existing relationship with certain of the Defendants.

63. Of great significance, the Management Defendants began making the bulk of the Initial Illegal Distributions to the Owner Defendants *after* oil prices had dropped precipitously, which drop in prices the Management Defendants have identified as the significant factor in the decline in New Pacific Steel's business. Oil prices, which were as high as $105 dollars per barrel in June 2014, were down to $93 dollars in September 2014 and further down to $59 by December 2014

2194390

1   and $47 by January 2015.  The Management Defendants knew no later than January 2015 that the

2   drop in oil prices would have an adverse impact on new Pacific Steel's revenues and long term

3   viability but, nevertheless, continued to funnel money from New Pacific Steel to the Owner

4   Defendants.  Thus, rather, than retaining the purported profits to navigate the anticipated financial

5   downturn that the Management Defendants believed was certain to result from the drop in the price

6   of oil (at least with respect to New Pacific Steel's customers that were in the oil and gas industry),

7   the Management Defendants took almost the entirety of the purported bargain purchase gain for the

8   Owner Defendants' personal benefit and that of the Subsequent Transferee Defendants.  Indeed, the

9   conduct of the Management Defendants reflects that they had no intention of keeping New Pacific

10  Steel's business alive for any significant length of time, despite their contrary representations to the

11  Old Pacific Steel Debtors and this Court in connection with negotiating and obtaining this Court's

12  approval of the APA.

13      **D.      The Management Defendants' Scheme to Inflate the Value of the Debtor's**

14              **Inventory and Fixed Assets**

15      64.      In addition to the failure to account for the Withdrawal Liabilities in determining the

16  Debtor's wherewithal to make distributions to the Owner Defendants, the Management Defendants

17  with the assistance of the Accountants also grossly inflated the true value of New Pacific Steel's

18  inventory and fixed assets in order to justify the purported bargain purchase gain.

19      65.      A December 2013 inventory analysis appraised Old Pacific Steel's inventory at

20  $2,010,000.  The $2 million figure was also used by Old Pacific Steel in its monthly operating

21  reports filed with the Court.  Yet, New Pacific Steel's 2014 audited financials increased the

22  inventory to $6,491,211.  Likewise, an October 2013 analysis appraised Old Pacific Steel's property

23  and equipment at $3,498,921. Yet, New Pacific Steel's 2014 audited financials inexplicably

24  increased the value to $4,717,560.  The Accountant's audit work papers reflect almost no due

25  diligence in ascertaining the fair market value of the inventory.  Rather, in large measure the

26  Accountants simply relied on the representations of the Management Defendants.

27      66.      The inflated inventory figures did not conform to GAAP.  GAAP required the

28  inventory to be valued at the lower of cost or market.  Moreover, inventory value needed to be

18

adjusted to account for slow moving or obsolete inventory.   In total, the inflated inventory and fixed assets accounted for approximately $6 million of the purported bargain purchase gain.

67.     The staggering value given to the inventory was especially suspect given that the Owner Defendants have blamed the precipitous drop in oil prices as the basis for the Debtor's loss of substantial business, notwithstanding that such drop occurred most notably in the latter half of 2014 (prior to the Initial Illegal Distributions).  Nevertheless, at the end of 2014, the Debtor's inventory was valued at a premium rather than adjusted to account for, among other things, the supposed shrinking of New Pacific Steel's market and the resulting adverse impact on the value of inventory.

68.     The Management Defendants knew that New Pacific Steel's inventory was materially overstated and, further, purposefully withheld adverse information from third parties, such as lenders regarding the true nature of said inventory.  As Stone wrote in April 5015, "we need to be mindful about what we choose to report to Siena [the lender].  The only advance we really have is on[] FG [finished goods], and I don't want to give them a report that tells them 50% of our FG is 'slow moving' – they would immediately decide they should not advance on it."  Stone concludes by noting that "[t]here is no way we have $12.7mm of FG, and it isn't explained by high selling prices for slow moving goods."

69.     Not surprisingly, by 2016, New Pacific Steel's management and the Accountants acknowledged that the inventory was overvalued by $1.9 million in 2016, and adjusted its value down accordingly.  In 2017, New Pacific Steel and its Accountants recognized that the inventory was overvalued by $2.1 million and further adjusted it down.  In 2018, the Accountants recorded a staggering $6.28 million downward adjustment to the value of New Pacific Steel's inventory.  Had the inventory been valued correctly at market, not cost, it would have been apparent that the inventory figures used in 2014 to help create the bargained purchase gain were wildly inflated.  The Debtor's accounting records reflect that its inventory was significantly overvalued by millions of dollars at all relevant times.  In fact, as New Pacific Steel's inventory became more and more inflated over time from 2014 through 2017, its financial ratios drifted farther from historical and industry norms.  Foundries of similar size typically have inventory as a percentage of assets of approximately 21.6%.  The Debtor's inventory as a percentage of assets grew to 28.2% as of

2194390

12/31/2014, and grew to a staggering 58.9% as of 12/31/2015. In comparison, Old Pacific Steel's ratio of inventory as a percentage of assets never exceeded 25.9% and was typically below 20%.

70. The Debtor's accounting records reflect that the Management Defendants and the Accountants provided misleading values for New Pacific Steel's inventory and continued to do so through 2018.

71. The Management Defendants and Accountants also improperly inflated the value of the Debtor's fixed assets by almost $1.5 million and, on information and belief, manipulated the Debtor's balance sheet by understating the cost of goods sold. By overstating inventory and assets and understating cost of goods sold, the Management Defendants and Accountants over-reported net income in 2014 and 2015. When the true value of the inventory and costs of goods sold was later accounted for (over time), the Management Defendants essentially were able to shift (i.e., paper) millions in net income from 2016 to 2018 to 2014 and 2015, while shifting their 2014 and 2015 losses to the later period from 2016 to 2018. Had the Management Defendants and Accountants used accurate numbers and followed GAAP standards, the net income in 2014 and 2015 would have been markedly lower, as would the net losses from 2016 to 2018, and the Debtor's business likely would have survived long enough to eliminate the Old Pacific Steel Debtor's Withdrawal Liabilities and New Pacific Steel's indemnification obligation thereof because the Management Defendants would never have been able to justify their looting of the Debtor's assets.

**E. The Management Defendants Looted Available Cash While New Pacific Steel's Income Was Plummeting, And Wrongfully Diverted Customers' Business**

72. On a month-to-month basis beginning in late 2014, New Pacific Steel's revenue dropped precipitously. New Pacific Steel's monthly sales dropped over the nine month period of January 2015 through September 2015, from $8,926,366 to $2,262,314, reflecting a staggering 75% drop in sales as between those two months. Had sales remained even from January to September 2015, New Pacific Steel sales would have been $80,337,294. Instead, sales were only $48,896,485 during that period; the "new normal" was a company with monthly sales of less than $2,000,000 per month.

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 21 of 150

73.     An analysis of sales to the Debtor's top customers in 2015 and 2016, illustrates this sharp decline in business while the Owner Defendants were looting New Pacific Steel's coffers for the benefit of the Owner Defendants.  The following chart reflects the drop in orders from 2015 to 2016 for five of New Pacific Steel's top twelve customers:

| Customer Code | 2015 Orders | 2016 Orders | Percentage Decline |
| --- | --- | --- | --- |
| NOVMEX | $10,653,382 | $902,514 | -92% |
| VARCOOR | $8,832,466 | $959,270 | -89% |
| FAIRFLD | $4,470,187 | $175,707 | -96% |
| MCKISSIC | $2,758,495 | $28,161 | -99% |
| VARCONE | $2,024,328 | $31,223 | -98% |

74.     These five customers almost completely stopped ordering from New Pacific Steel beginning in mid-2015.  In total, the decline in sales to the top 12 customers was over 75% year to year from 2015 and 2016, with the primary decline beginning at the start of 2015.  Two other top-12 customers, Kenworth and Peterbilt, for example, who were not in the oil and gas sector, had declines of 56% and 37%, respectively, from 2015 to 2016.

75.     If the driving force of the massive decline in New Pacific Steel's sales were the precipitous drop in oil prices (which would still not explain the precipitous decline of New Pacific Steel's income given only about half of its customers were in the oil sector), this does not explain or excuse the Defendants' wrongful conduct and omissions.  These market dynamics should have alerted the Management Defendants, and on information and belief it did alert them, that New Pacific Steel would have an increased need for its cash to weather the economic storm of the market challenges caused by the suddenly falling price of oil.  Moreover, to the extent the sharp drop in oil prices caused a downward shift in demand for New Pacific Steel's products, that reduced demand lowered the value of New Pacific Steel's inventory.  This was a "red flag" alert to the folly of the bargain purchase gain the Owner Defendants had erroneously identified to support the Initial Illegal Distributions.  Indeed, if the drop in the price of oil were an existential threat to the Debtor, as the Management Defendants have asserted, then the Owner Defendants should not have taken a penny

21

from New Pacific Steel until such time as the price of oil normalized and the negative impact on sales was corrected. In any event, the drop in oil prices militated against distributing cash to equity holders.

76.     Moreover, if the driving force in the massive decline in New Pacific Steel's sales was the precipitous drop in oil prices, the bulk of that drop took place largely in 2014. New Pacific Steel's monthly sales in October 2014 were $10,596,261, but fell to $7,222,273 in December 2014. The sharp drop in oil prices was known to market participants, including the Management Defendants, by no later than January 2015. Assuming the drop in the price of oil materially impacted sales, the Management Defendants and Owner Defendants were aware of that drop no later than January 2015, before Owner Defendants took for themselves the $14 million.

77.     Notwithstanding that New Pacific Steel's orders and revenues were plummeting, the Management Defendant's caused the Owner Defendants to receive most of the Initial Illegal Distributions during this period (not inclusive of the $3.6 million 2018 Illegal Distribution or the portions of the Initial Illegal Distributions paid in 2014 and 2016):

| Month | Sales | Decline | Initial Illegal Distributions |
|---|---|---|---|
| January 2015 | $8,926,366 | | $6,141,392 |
| February 2015 | $8,566,036 | ($360,330) | |
| March 2015 | $6,206,510 | ($2,359,526) | |
| April 2015 | $6,879,808 | $673,298 | $3,013,390 |
| May 2015 | $5,819,566 | ($1,060,242) | |
| June 2015 | $4,508,713 | ($1,310,583) | $1,197,228 |
| July 2015 | $2,815,570 | ($1,693,143) | |
| August 2015 | $2,911,602 | $96,032 | |
| September 2015 | $2,262,314 | ($649,288) | |
| October 2015 | $2,559,471 | $297,157 | |
| November 2015 | $2,302,353 | ($257,118) | |
| December 2015 | $1,805,538 | ($496,815) | |
| | | TOTAL: | $10,352,010 |

22

2194390

78.     Thus, from January 2015 through September 2015, monthly sales dropped from $8,926,366 to $2,262,314, reflecting a staggering 75% drop in sales as between those two months. Assuming that sales had remained even from January to September 2015, New Pacific Steel sales would have been $80,337,294.  Instead, sales were only $48,896,485 during that period, and the "new normal" was a company with monthly sales of less than $2,000,000 going forward.

79.     On information and belief, New Pacific Steel's top customers and others stopped doing business with New Pacific Steel, at least in part, because the Management Defendants diverted the business and customers to other foundries owned by, or affiliated with, the Management Defendants and/or the Owner Defendants.

80.     On information and belief, many of New Pacific Steel's customers stopped doing business with New Pacific Steel because the Management Defendants routed the Debtor's business to other foundries owned by the Management Defendants or for other reasons, and not simply because of any downturn in the price of oil.  In total, the decline in sales to the Debtor's top 12 customers was over 75% year over year, 2015 and 2016, with the primary decline beginning at the start of 2015.  Two other top-12 customers, Kenworth and Peterbilt, for example, who were not in the oil and gas sector, had declines of 56% and 37% from 2015 to 2016.

81.     If the drop in the price of oil was the existential threat to the Debtor, as the Management Defendants have asserted, the Owner Defendants should not have taken a penny from New Pacific Steel until such time as the price of oil normalized and the negative impact on sales was absorbed and, further, New Pacific Steel's inventory should have plummeted in light of the just-in-time nature of its production.  On information and belief, the Management Defendants caused New Pacific Steel to create more inventory than was reasonably necessary solely as part of its scheme.

82.     To this day, Speyside Fund's website continues to tout its acquisition of Pacific Steel, which it claims "generates close to $100 million (US) in revenue in three plants at the Berkeley site." This, despite that under its ownership, New Pacific Steel's annual sales fell by almost half (about $50 million) in 2015, its first full year of ownership.  Annual sales fell by more than half again the next year, 2016, to less than $20 million.

2194390

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 24 of 150

**F. The Management Defendants Wrongfully Characterized the Capital Contributions, Made After the Initial Illegal Distribution Had Left the Debtor Undercapitalized, as a Loan Rather Than Equity**

83. New Pacific Steel procured an asset-based loan from Wells Fargo Bank ("Wells Fargo") and a revolving line of credit in June 2015 with up to $13.6 million in available credit minus any usage on the Debtor's letter of credit (the "Wells Fargo Credit Agreement"). At the end of June 2015, New Pacific Steel had an outstanding loan amount of approximately $1,400,000 and net availability on the line of credit of $5,125,687. By October 31, 2016, the Debtor had a letter of credit balance of $1,175,000, an outstanding loan balance of $1,908,194, and only $195,751 in available funds.

84. Wells Fargo's borrowing base certificates reflect that the Owner Defendants' prior looting of the Debtor's coffers, combined with Management Defendants unsubstantiated and inflated inventory valuation numbers and the substantial loss of business, had a catastrophic effect on the health of the Debtor, and thus significantly impacted the amount of credit available under the Wells Fargo Credit Agreement.

85. By no later than July 31, 2016, thirteen months after securing the Wells Fargo Credit Agreement, New Pacific Steel was in default under its loan covenants. As of September 2016, New Pacific Steel already owed $1.8 million on the line of credit at LIBOR plus 3% interest and had no working capital to function as a cushion. The prior Initial Illegal Distributions thus foreclosed the possibility of increasing New Pacific Steel's borrowing under the Wells Fargo Credit Agreement for operating capital the Debtor desperately needed.

86. Given New Pacific Steel's dire predicament, which only served to increase the likelihood that it would fail in the latter part of 2016 and be liable in full for the Withdrawal Liabilities (as well as for the Initial Illegal Distributions), by no later than late-October 2016, the Owner Defendants had no choice but to later repatriate some of the monies they took.

87. On October 28, 2016, the Management Defendants and the Owners Defendants caused the Debtor to execute a subordinated secured note in the principal amount of $1 million in favor of Speyside Fund, Alcast, and Venkatesan, who are defined as "lenders" in the agreement.

24

Two months later, on December 30, 2016, the Debtor executed a second subordinated secured note in favor of Speyside Fund, Alcast, and Venkatesan in the principal amount of $4 million, increasing its purported "indebtedness" to its members to $5 million (the two notes are collectively referred to herein as the "Subordinated Notes"). Speyside Fund was designated as the administrative agent under the Subordinated Notes. On information and belief, New Pacific Steel's entry into each of the Subordinated Notes alone constituted a default under the Wells Fargo Credit Agreement.

88. Despite the fact that Owner Defendants purported to "loan" money back to the Debtor beginning in October 2016, the Owner Defendants did not enter into a subordination agreement with Wells Fargo until July 2017.

89. Internally, the Owner Defendants recognized the Capital Contribution for what it was—a repatriation of prior returns on investment. Not surprisingly, the funds provided by the Owner Defendants to the Debtors pursuant to the Subordinated Notes were in proportion to their Class A and Class B membership interests (as Class C members were not required to contribute), reflecting that the monies they transferred to Debtors were in fact intended as a Capital Contribution. In point of fact, the owners of Speyside Fund—the Subsequent Transferee Defendants—each returned their proportionate share of capital to Speyside Fund which, in turn, provided that returned capital to the Debtor. In total, Owner Defendants (save for Wiklendt who only had a Class C membership) infused the Debtor with capital contributions totaling $3,950,000, as set forth in **Exhibit 4** hereto and incorporated by reference (i.e., the Capital Contribution).

90. There is no indication from the Debtor's books and records that this was an arms-length transaction, that the terms of the purported loan were shopped to legitimate prospective lenders, or that any measures were taken to distinguish and protect the interest of the purposed lender from those of its alleged borrower. There is no evidence that New Pacific Steel sought a loan from any outside entity prior to turning to its members for assistance, nor is there any evidence that the Debtor ever made any determination as to whether it should take any sort of action to recover the Initial Illegal Distribution through any formal means, or to protect the Debtor's interest in its claims for such illegal dividends by a tolling agreement or any other mechanism to protect the Debtor's interests from the financial pillaging of its insiders. Rather, the purported loan was a transaction

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 26 of 150

between the Owner Defendants and New Pacific Steel necessitated by the Owner Defendants' wholesale looting of New Pacific Steel's assets the prior year. The control element suggests that Owner Defendants were in the position to contrive a fictional debt and they did so by essentially returning some of the money they improperly took in the first instance in direct proportion to the percentages in which such monies were distributed in connection with the Initial Illegal Distributions.

91. Thus, it is not surprising that internally, Owner Defendants referred to the repatriation of these monies as a "Capital Contribution," rather than a loan. On information and belief, Owner Defendants made the Capital Contribution on the belief that if they kept the Debtor's business alive long enough, they might escape liability for their initial disbursement of over $10 million of the Debtor's assets to themselves. By disguising it as a loan, the Owner Defendants further sought to insulate them from losing this capital infusion as New Pacific Steel hurdled towards bankruptcy.

92. The Management Defendants advised its unions, when New Pacific Steel was negotiating concessions in 2017 based on the Owner Defendants' contention that the Debtor was in financial difficulty because of the drop in the price of oil, that the "[s]hareholders **contributed** $2mm during 2016 to bolster the balance sheet" and "[s]hareholders have agreed to **contribute** an ADDITIONAL $2mm to support the business plan in 2017" if certain concessions from others was obtained. Of course, the Management Defendants not only misled the unions by suggesting that the shareholders were making a "contribution" to provide "adequate working capital," given that the Management Defendants had papered the transaction as a secured loan and not a capital contribution, but failed to mention the almost $11 million the Owner Defendants had siphoned from New Pacific Steel, let alone that this was the true cause of the Debtor's financial crisis. The Management Defendants also advised that [t]he issue is matching cost with sales, there is not a balance sheet problem here" when, in fact, the Debtor's balance sheet was exactly the problem since its inception.

93. New Pacific Steel also entered into a rent deferral agreement whereby the Debtor received a temporary deferral on its base rent for the months of February through July 2017 in the amount of $267,324. The Management Defendants also sought concessions with respect to its health

2194390

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 27 of 150

and welfare fund contributions.  In other words, the Management Defendants misrepresented to creditors the bona fides of their efforts and stopped paying legitimate debts of New Pacific Steel to ensure there would be sufficient funds to create a return on the Capital Contribution prior to a bankruptcy filing—again elevating their personal interests above their fiduciary obligations to New Pacific Steel and its creditor body.

94.     Despite the Capital Contribution, New Pacific Steel remained in default of the covenants in the Wells Fargo loan and entered into a forbearance agreement in July 2017 acknowledging that the New Pacific Steel was in default from July 2016 through May 2017.

**G.      Management Defendants' Conduct Ensured the Contingent Liability, Triggered by the Debtor Not Surviving Five Years, Would Arise, Which It Did.**

95.     The Management Defendants' own conduct, beginning with the Initial Illegal Distributions, ensured that New Pacific Steel would not survive as a going concern for the five year term required to eliminate Old Pacific Steel's liability for the Withdrawal Liabilities, which liability New Pacific Steel had assumed pursuant to the APA.  Indeed, the fact that sales fell off the proverbial "cliff" no later than mid-2015 indicated that New Pacific Steel would not have sufficient revenue to survive, including especially in light of the Owner Defendants' ongoing dissipation of the Debtor's assets to fund transfers to themselves.

96.     By no later than 2016, it became apparent that it would be difficult if not impossible for New Pacific Steel to survive as a going concern.  Notwithstanding the loss of a substantial part of its business, its need for a substantial cash infusion, and the Accountants' belief that New Pacific Steel would likely not survive as a growing concern, New Pacific Steel's 2016 audited financial statement does not reflect any liability with respect to the Withdrawal Liabilities.

97.     In 2017, several events occurred that should have caused a realization of the entirety of the Withdrawal Liabilities on New Pacific Steel's financial statements.  In addition to the rent deferral, by May 2017 New Pacific Steel had ceased paying bills timely, and in September 2017, New Pacific Steel announced that it would close within 60 days notwithstanding the Capital Contribution.  Trade payables more than tripled from approximately $600,000 as of May 30, 2017, to approximately $2.2 million by December 31, 2017, at which time over $1 million was over 120

27

days past due.  By September 2017, New Pacific Steel also indicated that it would route its business to another entity owned by or affiliated with the Management Defendants, Sawbrook Steel.  All of this was occurring on top of the fact that the bond posted for the Withdrawal Liabilities had been cancelled and New Pacific Steel had stopped making payments on the Pension Liabilities in 2017.  New Pacific Steel made no pension plan payments in 2018.

98.     By November 2017, the Management Defendants had received notice from New Pacific Steel's workers' compensation insurer that its workers' compensation insurance policy was being cancelled because it was $735,704 in arrears on premiums owed.  The Management Defendants also sought to approach New Pacific Steel's landlord to defer paying upcoming property taxes and the already deferred portion of the rent.  By November 2017, the Management Defendants primary goal was "to avoid the cash outlay" and to find "an opportunity to run longer [past February 28, 2018] and pay down the subordinated debt"—*i.e.,* keep New Pacific Steel open but without paying its legitimate creditors for the purpose of repaying the Owner Defendants for the Capital Contribution that had been disguised as a loan.  In other words, the Management Defendants kept New Pacific Steel's doors open in 2018 for the primary purpose of paying the Owner Defendants the 2018 Illegal Distribution.

**H.     The Owner Defendants Caused New Pacific Steel to Repay the Capital Contribution While the Company Was Insolvent,**

99.     Once the Management Defendants decided in the latter half of 2017 to cease New Pacific Steel's operations, they implemented a strategy to facilitate making the 2018 Illegal Distribution and funnel New Pacific Steel's remaining cash to the Owner Defendants to "pay off" the equity infusions they had disguised as loans.  As the "administrative agent" under the notes, Speyside Fund received the vast majority of the 2018 Illegal Distribution, as set forth on **Exhibit 5** and incorporated herein by this reference.  In total, the Management Defendants caused approximately $3.6 million to be distributed to the Owner Defendants.

100.     During this time, among other things, the Management Defendants entered into a forbearance agreement with Wells Fargo, which acknowledged that New Pacific Steel was in default

2194390

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 29 of 150

of the Wells Fargo loan. This default prohibited New Pacific Steel from paying any monies to the Owner Defendants under their purported loan.

101.    In turn, in 2018 Wells Fargo began sweeping New Pacific Steel's bank account on a daily basis to pay off the Wells Fargo loan. On information and belief, once the Wells Fargo loan was paid off in May 2018, the Management Defendants advised Wells Fargo that New Pacific Steel would no longer post a letter of credit necessary to insure its workers' compensation liability so as to eliminate any obligation owed to Wells Fargo and free up money for New Pacific Steel. The Owner Defendants then began a weekly sweep of their own of New Pacific Steel's bank accounts, for the benefit of the Owner Defendants, resulting in approximately $3.6 million in distributions to the Owner Defendants over four months, which the Trustee alleges constitutes the 2018 Illegal Distribution.

102.    On information and belief, the Subsequent Transferee Defendants received their share of the 2018 Illegal Distribution as subsequent transferees pro rata to their interests in Speyside Fund.

103.    Moreover, and in order to facilitate payment back to the Owner Defendants prior to the Petition Date, the Management Defendants caused New Pacific Steel to cease paying vendors or, at a minimum, delay such payments, and convince creditors to make concessions based on materially false representations by the Management Defendants (as discussed above) in order to free up monies to be distributed to the Owner Defendants. The Management Defendants also canceled insurance, and failed to fund their ongoing pension obligations and workers compensation obligations. In other words, New Pacific Steel was kept out of bankruptcy in 2018 despite the fact that it was not paying the vast majority of its bills on a timely basis, solely to enable the Owner Defendants to loot New Pacific Steel to recover, as much as possible, the Capital Contribution made in 2016 and 2017.

**I.    The Management Defendants' Wrongful Scheme Directly Caused The Debtor to Suffer Tens of Millions of Dollars in Liability**

104.    By October 2017, New Pacific Steel had retained the law firm of Wendel Rosen Black & Dean, LLP as bankruptcy counsel. Having prior to the APA expended "deep resources" to ensure there would be no successor liability, in 2017 the Owner Defendants allowed the bond posted to cover Old Pacific Steel's Withdrawal Liabilities to be cancelled and Old Pacific Steel was then

2194390

obligated for the full amount of the Withdrawal Liabilities. The APA imposed that primary liability on New Pacific Steel, as noted.

105. On information and belief, the Management Defendants negotiated with union representatives in late-2017 and early-2018, convincing them to not seek a lien against New Pacific Steel's assets, though the union had a right to such lien based upon New Pacific Steel's default on its pension obligations, by contending such lien would cause Wells Fargo to cancel its funding which would, in turn, deprive New Pacific Steel of any ability to pay its debts to the detriment of the union. At that time, the Management Defendants represented to and promised the union representative that no junior debt was being paid and that the union would be advised before any such payments were made. On information and belief, the union was not advised of the $3.6 million paid to the Owner Defendants, which payments began in June 2018. On information and belief, New Pacific Steel was kept out of bankruptcy in 2018 for the primary purpose of paying back the Owner Defendants on their Capital Contribution, notwithstanding the retention of bankruptcy counsel in October 2017 and the promise to advise the union if purported secured debt, other than that provided by Wells Fargo, were to receive New Pacific Steel funds.

106. By August 2018, New Pacific Steel ceased operations and paid each of its remaining employees a meager $500 in severance, while the Owner Defendants continued to line their pockets with portions of the 2018 Illegal Distribution through October 1, 2018.

107. On the Petition Date, the Debtor indicated that its estimated liabilities were between $1 million and $10 million and, specifically, $3,428,975 in purported secured and unsecured creditors.

108. Speyside Fund purports to have a secured claim against the Debtor in the amount of $823,963, based on the monies it "loaned" to the Debtor pursuant to the Subordinated Notes.

109. The Debtor also identified $1,024,224 in priority unsecured claims and $1,580,788 in nonpriority unsecured claims.

110. The priority claims identified on the Debtor's petition include claims for severance pay, unpaid taxes, and business license fees.

30

111.     The Debtor's landlord, Berkeley Properties, is also a creditor and has filed a proof of claim based upon a lease agreement with New Pacific Steel dated August 29, 2014, and for a rental term of 15 years through August 28, 2029.

112.     Of note, the reorganized Old Pacific Steel Debtors are not identified as creditors, nor are any of the pension trusts or funds, let alone is there any mention of the massive Withdrawal Liabilities or indemnification obligation thereon in the Debtor's schedules or statement of financial affairs.

113.     Those creditors, who were known to the Management Defendants (albeit unscheduled) at the time of the Petition Date, have filed proofs of claim, based on liabilities assumed by the Debtor as part of the APA in 2014.  Missing from the Debtor's schedules and statement of financial affairs, as it was throughout New Pacific Steel's existence, were pension liabilities, including those exceeding $15 million, and a claim by Old Pacific Steel for $24,294,699 arising from the Debtor's failure to pay the Withdrawal Liabilities.  The claims register in the Debtor's case reflects that, exclusive of duplicate claims, total claims are stated in the aggregate amount of $45,667,632 as of May 31, 2019.

114.     There are, at all times mentioned herein with respect to transfers from the Debtor to the Management Defendants and Subsequent Transferee Defendants, creditors holding unsecured claims that are allowable under 11 U.S.C. § 502.

**V.     CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**ILLEGAL DISTRIBUTIONS AND RECOVERY THEREOF**

**(As against Owner Defendants and Subsequent Transferee Defendants)**

**[6 Del. C. § 18-607]**

115.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

31

2194390

116.     The Initial Illegal Distributions and the 2018 Illegal Distribution were illegal dividends paid to the Owner Defendants in violation of Title 6 of the Delaware Code, section 18-607.

117.     At the time of each of the Initial Illegal Distributions, which transfers are set forth in **Exhibit 3** hereto, the liabilities of the Debtor exceeded the fair value of the Debtor's assets.

118.     At the time of each of the Initial Illegal Distributions, each Owner Defendant knew or should have known that at the time of such distribution, the Debtor's liabilities exceeded the fair value of the Debtor's assets, such that the distribution was improper and in violation of the Delaware Limited Liability Company Act as well as the Debtor's own operating agreement.

119.     Upon information and belief, no management of the Debtor (other than the Defendants) had or could have had knowledge of sufficient facts to put them on inquiry which, if pursued, would have led to discovery of the illegality of the Initial Illegal Distributions until no earlier than the appointment of the Trustee, after the Debtor's Petition Date, *i.e.*, January 25, 2019.

120.     Similarly, at the time of each of the 2018 Illegal Distributions, which transfers are identical to the "1-Year Insider Transfers" defined below and set forth in **Exhibit 5** hereto, the liabilities of the Debtor exceeded the fair value of the Debtor's assets.

121.     At the time of each of the 2018 Illegal Distributions, each Owner Defendant knew or should have known that at the time of such distribution, the Debtor's liabilities exceeded the fair value of the Debtor's assets, such that the distribution was improper and in violation of the Delaware Limited Liability Company Act as well as the Debtor's own operating agreement.

122.     Accordingly, the Trustee is entitled to recover the 2015 and 2018 Illegal Distributions, **Exhibits 3 and 5,** for the benefit of the Debtor's Estate and its creditors, from the Owner Defendants.  To the extent the Owner Defendants acted merely as a conduit for the Subsequent Transferee Defendants, the Trustee seeks recovery of the Initial Illegal Distributions and 2018 Illegal Distributions from the Subsequent Transferee Defendants as well.

///

///

///

2194390

## SECOND CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY

### (As against the Management Defendants)

123. Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

124. As a result of their positions as managers and/or officers of the Debtor, the Management Defendants, and each of them, owed a fiduciary duty to the Debtor, including but not limited to a duty of loyalty, good faith and fair dealing, and an obligation to perform his/her/its duties as a reasonable person would do as a fiduciary of a business, using his/her/its judgment in the best interests of the business.

125. Furthermore, in light of the fact that the Debtor was insolvent on a balance sheet basis at all times relevant to this Complaint, including, without limitation, as of September 12, 2014 (and through the Petition Date), the Management Defendants owed such duties to the Debtor's creditors individually and *en masse*, to avoid actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims. In this regard, the Management Defendants had a duty, among other things, to avoid self-dealing.

126. The Management Defendants, and each of them, acting in his/her/its capacity as managers and/or officers breached his/her/its fiduciary duties owed to the Debtor by, among other things,

    a. "cooking" the Debtor's books by improperly reflecting a bargain purchase gain and inflating the value of the Debtor's assets, in order to justify the Initial Illegal Distributions, which commenced prior to the Owner Defendants even receiving audited financial information from the accountants;

    b. authorizing and, as to the Owner Defendants and the Subsequent Transferee Defendants, receiving the Initial Illegal Distributions, which caused the Debtor to be substantially without assets to sustain its business during

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 34 of 150

downturns in the economy, among other things, and ensured that the Debtor would never be able viable in the long-term;

    c.    allowing the Owner Defendants to paper the Capital Contribution as a loan when it was in fact an infusion of equity capital;

    d.    authorizing payments to the Owner Defendants and the Subsequent Transferee Defendants via the Initial Illegal Distributions and 2018 Illegal Distributions at times when the Debtor was insolvent and unable to pay its debts on a current basis as they became due;

    e.    failing to act as reasonably careful managers and officers by misrepresenting the state of the Debtor's financial affairs in negotiations with unions and failing to pay the Debtor's debts as they became due in order to ensure there would be sufficient funds to make the 2018 Illegal Distribution; and

    f.    failing to protect against or otherwise allowing the diversion of the Debtor's business to companies affiliated with one or more of the Defendants to the Debtor's detriment, such as, for example, to Sawbrook Steel.

127. All of the within described wrongful actions and omissions of the Management Defendants occurred in the course of the Management Defendants' employment for the benefit of the Debtor.

128. As a direct and proximate result of the Management Defendants' breaches of fiduciary duty, including, but not limited to, authorizing the Initial Illegal Distributions and 2018 Illegal Distributions and favoring insides over legitimate creditors, and the dissipation of corporate assets, the estate and its creditors individually and *en masse*, have been harmed in an amount to be proved at trial, but presently estimated to be in excess of $40 million.

///
///
///
///
///

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 35 of 150

2194390

## THIRD CLAIM FOR RELIEF

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (As against UHY)

129.    Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

130.    For their part, the Accountants provided material assistance and aided the Management Defendants in breaching their fiduciary duties by providing materially false financial statements, which perpetuated the wholesale failure to account for known liabilities and the unsubstantiated inflation of assets.

131.    The Accountants were aware of the APA and the pension underfunded liability status reports.  Yet, the Accountants never accounted for the over $30 million in assumed pension withdrawal liabilities.

132.    The Accountants relied upon New Pacific Steel to conduct audits of inventory and, for their own part, conducted superficial and incomplete audits such that, in large measure the Accountants abdicated their responsibilities to the very Management Defendants who were responsible, with the Owner Defendants, for looting New Pacific Steel.  Indeed, while the Accountants correctly identified the potential for fraud and overvaluation in the context of private equity firms looking to increase reported earnings, the Accountants purposefully looked the other way with respect to these identified issues and perpetuated the understatement of liabilities and overstatement of assets without a reasonable basis to do so.  The Accountants' conduct cannot be attributed solely to mere gross negligence, but evidences an attempt to assist the Management Defendants and Owner Defendants in their scheme to loot the assets of New Pacific Steel.

133.    The Accountants' substantial assistance was evident in their financial papers, including but not limited to the Debtor's 2014 audited financial statement, which were relied upon after the fact by the Management Defendants to justify the Initial Illegal Distributions and, further, on information and belief, to secure acquiescence from others, such as lenders, vendors, to provide New Pacific Steel with additional loans and financial concessions and thereby increasing claims

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 36 of 150

against New Pacific Steel. On information and belief, these financial statements were provided by Management Defendants to Wells Fargo, among others, in furtherance of their scheme.

134. As a direct and proximate result of the Accountants' aiding and abetting of the Management Defendants, the estate and its creditors individually and *en masse*, have been harmed in an amount to be proved at trial, but presently estimated to be in excess of $40 million.

## FOURTH CLAIM FOR RELIEF

### EQUITABLE SUBORDINATION

### (As Against Defendant Speyside Fund, LLC)

### [11 U.S.C. § 510(c)(1)]

135. Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

136. In the event Proof of Claim Nos. 27 and 29 (a duplicate of No. 27), pursuant to which Speyside Fund asserts an approximate $828,762 secured claim against the Debtor (the "Speyside Claim") is deemed allowed in any amount, the Trustee seeks equitable subordination of such claim pursuant to 11 U.S.C. §510(c).

137. Speyside Fund has engaged in significant inequitable conduct as detailed in this Complaint and its purported "claim" is merely an alleged deficiency in Speyside Fund's capital account, as it arises from the purported "loan" that the Trustee hereby seeks, among other things, to be re-characterized as equity rather than debt.

138. Equitable subordination of the Speyside Claim is consistent with the provisions and purposes of the Bankruptcy Code because it is not fair or equitable for Speyside to be paid anything through this estate when its own wrongful conduct caused the demise of the Debtor in the first place, resulting in damages, including over $40 million in claims asserted in this case, including the Pension Liabilities, Withdrawal Liabilities and liability to the Old Pacific Steel Debtors.

139. By reason of the foregoing, the Speyside Claim, if allowed, should be subordinated for purposes of distribution, pursuant to Section 510(c)(1) of the Bankruptcy Code, to general non-priority unsecured claims.

2194390

## FIFTH CLAIM FOR RELIEF

### AVOIDANCE OF 2-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT)

### (As against Alcast, Venkatesan, Speyside Fund, and Subsequent Transferee Defendants)

### [11 U.S.C. §§ 548(a)(1)(A) and 550]

140.    Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

141.    Upon information and belief, during the two-year period immediately preceding the Petition Date, the Debtor made transfers of property to Alcast, Venkatesan, Speyside Fund as set forth in **Exhibit 6** attached hereto and incorporated by reference (collectively, the "2-Year Transfers") to or for the benefit of Alcast, Venkatesan, Speyside Fund, and each of them, on the dates and in the amounts set forth therein with the actual intent to delay, hinder or defraud the Debtor's creditors.  Each such transfer was made or incurred with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made, indebted.

142.    Upon information and belief, each of the Subsequent Transferee Defendants are subsequent transferees of the 2-Year Transfers to Speyside Fund, totaling approximately $3,434,250.00 identified in **Exhibit 6,** as that term is used in 11 U.S.C. § 550, in amounts according to proof at trial, based on their respective pro rata membership interests in Speyside Fund.

143.    Accordingly, the 2-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

## SIXTH CLAIM FOR RELIEF

### AVOIDANCE OF 2-YEAR FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)

### (As against all Owner Defendants and Subsequent Transferee Defendants)

### [11 U.S.C. §§ 548(a)(1)(B) and 550]

144.    Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

2194390

145.     Upon information and belief, during the two-year period immediately preceding the Petition Date, the Debtor made the 2-Year Transfers to or for the benefit of Alcast, Venkatesan, Speyside Fund on the dates and in the amounts set forth therein without the Debtor having received reasonably equivalent value in exchange for such transfers, and the Debtor (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (d) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

146.     Upon information and belief, each of the Subsequent Transferee Defendants are subsequent transferees of the 2-Year Transfers to Speyside Fund, totaling approximately $3,434,250 identified in **Exhibit 6,** as that term is used in 11 U.S.C. § 550, in amounts according to proof at trial, based on their respective pro rata membership interests in Speyside Fund.

147.     Accordingly, the 2-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

<div align="center">

**SEVENTH CLAIM FOR RELIEF**

**AVOIDANCE OF 4-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT)**

**(As against all Owner Defendants and Subsequent Transferee Defendants)**

**[11 U.S.C. § 544(B)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(1) and 3439.07;**

**6 Decl. C. §§ 1304(a)(1) and 1307]**

</div>

148.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

149.     Upon information and belief, during the four-year period immediately preceding the Petition Date, the Debtor made transfers of property to Alcast, Wiklendt, Stone, Venkatesan, and Speyside Fund as set forth in **Exhibit 7** attached hereto and incorporated by reference (collectively,

Case: 19-04057   Doc# 1   Filed: 11/04/19   Entered: 11/04/19 16:06:42   Page 39 of 150

2194390

the "4-Year Transfers") to or for the benefit of each of the Owner Defendants (Alcast, Wiklendt, Stone, Venkatesan, and Speyside Fund) on the dates and in the amounts set forth therein. Each of the 4-Year Transfers was made or incurred with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made, indebted.

150. Upon information and belief, each of the Subsequent Transferee Defendants are subsequent transferees of the 4-Year Transfers to Speyside Fund, totaling approximately $6,514,239 identified in **Exhibit 7,** as that term is used in 11 U.S.C. § 550, in amounts according to proof at trial, based on their respective pro rata membership interests in Speyside Fund.

151. Accordingly, the 4-Year Transfers are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code § 3439.04(a)(2) and 3439.07 / 6 Del. C. § 1304(a)(2) and 1307.

## EIGHTH CLAIM FOR RELIEF

**AVOIDANCE OF 4-YEAR FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)**

**(As against all Owner Defendants and Subsequent Transferee Defendants)**

**[11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07;**

**6 Del. C. §§ 1304(a)(2), 1305 and 1307]**

152. Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

153. Upon information and belief, each of the 4-Year Transfers set forth in **Exhibit 7** was made to Alcast, Wiklendt, Stone, Venkatesan, or Speyside Fund, as applicable, and, upon information and belief to the Subsequent Transferee Defendants without the Debtor receiving a reasonably equivalent value in exchange for such transfers; and the Debtor was insolvent at that time, or the Debtor became insolvent as a result of such transfers. Each of these transfers was made without the Debtor having received reasonably equivalent value in exchange for such transfers, and the Debtor (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (c) intended to incur, or believed that the debtor

2194390

would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (d) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

154. Accordingly, the 4-Year Transfers are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code § 3439.05 and 3439.07 / 6 Del. C. § 1305 and 1307.

**NINTH CLAIM FOR RELIEF**

**AVOIDANCE OF 7-YEAR FRAUDULENT TRANSFERS (ACTUAL INTENT)**

**(As against all Owner Defendants and Subsequent Transferee Defendants)**

**[11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code § 3439.04(a)(1) and 3439.07;**

**6 Del. C. §§ 1304(a)(1) and 1307]**

155. Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

156. Upon information and belief, during the seven-year period immediately preceding the Petition Date, the Debtor made transfers of property to Alcast, Wiklendt, Stone, Venkatesan, and Speyside Fund as set forth in **Exhibit 8** attached hereto and incorporated by reference (collectively, the "7-Year Transfers") to or for the benefit of the Owner Defendants (Alcast, Wiklendt, Stone, Venkatesan, and Speyside Fund) on the dates and in the amounts set forth therein with the actual intent to delay, hinder or defraud any of the Debtor's creditors.

157. Upon information and belief, each of the Subsequent Transferee Defendants are subsequent transferees of the 7-Year Transfers to Speyside Fund, totaling approximately $8,914,068 identified in **Exhibit 8,** as that term is used in 11 U.S.C. § 550, in amounts according to proof at trial, based on their respective pro rata membership interests in Speyside Fund.

158. Upon information and belief, no one (other than the Owner Defendants, and Subsequent Transferee Defendants, as applicable) had or could have knowledge of sufficient facts to put them on inquiry which, if pursued, would have led to discovery of the avoidability of the 7-Year Transfers until no earlier than the appointment of the Trustee, which after the Debtor's Petition Date, *i.e.*, January 25, 2019.

2194390

1     159.    Accordingly, the 7-Year Transfers are avoidable pursuant to 11 U.S.C. § 544 and Cal.

2 Civ. Code § 3439.04(a)(1) and 3439.07 / 6 Del. C. § 1304(a)(1) and 1307.

3 <div align="center">**TENTH CLAIM FOR RELIEF**</div>

4 <div align="center">**AVOIDANCE OF PREFERENTIAL TRANSFERS**</div>

5 <div align="center">**(As against Alcast, Venkatesan, Speyside Fund, and Subsequent Transferee Defendants)**</div>

6 <div align="center">**[11 U.S.C. §§ 547 and 550]**</div>

7     160.    Plaintiff realleges and incorporates herein by reference each and every one of the

8 foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

9 full.

10     161.    Upon information and belief, the Debtor made transfers of property to Alcast,

11 Venkatesan, Speyside Fund, and, upon information belief Speyside Fund made transfers to each of

12 the Subsequent Transferee Defendants, as set forth in **Exhibit 5** attached hereto and incorporated by

13 reference (collectively, the "1-Year Insider Transfers").

14     162.    Each of the defendants listed in **Exhibit 5**, Alcast, Venkatesan, and Speyside Fund,

15 constitutes an "insider" of the Debtor as that term is used in 11 U.S.C. §§ 101 and 547.

16     163.    Upon information and belief, as a result of the 1-Year Insider Transfers, Alcast,

17 Venkatesan, and Speyside Fund each received more than he/she/it would have received as a creditor

18 in the chapter 7 liquidation had the 1-Year Insider Transfers not been made.

19     164.    At all relevant times, the Debtor was insolvent.

20     165.    Accordingly, the 1-Year Insider Transfers are avoidable pursuant to 11 U.S.C.

21 § 547(b).

22 <div align="center">**ELEVENTH CLAIM FOR RELIEF**</div>

23 <div align="center">**RECOVERY OF AVOIDED TRANSFERS**</div>

24 <div align="center">**(As against all Owner Defendants and Subsequent Transferee Defendants)**</div>

25 <div align="center">**[11 U.S.C. §§ 544 and 550; Cal. Civ. Code § 3439.07]**</div>

26     166.    Plaintiff realleges and incorporates herein by reference each and every one of the

27 foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

28 full.

2194390

1    167.    By reason of the foregoing, the Trustee is entitled to recover for the benefit of the

2    estate the value of the 1-Year Insider Transfers, the 7-Year Transfers, the 4-Year Transfers, and the

3    2-Year Transfers, plus interest thereon at the maximum legal rate from and after the date of each of

4    such transfers, in sums according to proof but which the Trustee estimates to be the total sums listed

5    on **Exhibits 5 through 8,** respectively, from the Owner Defendants, as applicable, and the

6    Subsequent Transferee Defendants, as applicable, pursuant to 11 U.S.C. §§ 544, 550(a)(1) and/or

7    Cal. Civ. Code § 3439.07 / 6 Del. C. § 1307.

8                    **TWELFTH CLAIM FOR RELIEF**

9                          **DECLARATORY RELIEF**

10                    **(As against all Owner Defendants)**

11    168.    Plaintiff realleges and incorporates herein by reference each and every one of the

12    foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

13    full.

14    169.    An actual controversy exists between the Trustee, on the one hand, and the Owner

15    Defendants, on the other hand, with respect to the characterization of the Capital Contribution made

16    in 2016 and 2017.  Plaintiff contends that the monies provided by the Owner Defendants in 2016 and

17    2017, as set forth in **Exhibit 4** hereto and incorporated herein by this reference, in substance was a

18    Capital Contribution and was not a loan and, thus, should be re-characterized as equity, not a debt.

19    Although "papered" as a series of loans, this was merely the return of some of the profits the Owner

20    Defendants previously looted from the Debtor by way of the Initial Illegal Distribution, which

21    necessitated the Capital Contribution.  Among other things, Plaintiff contends that:

22            a.      There is no evidence that the transaction was arms-length.  The Debtors'

23    books and records do not evidence that the Debtor was in the market for or shopped for a loan,

24    received any competitive bids, or considered any other sources;

25            b.      The Debtor already had a conventional loan from Wells Fargo at a much

26    lower interest rate.  The Debtor was out of compliance with that loan because of its cash flow, which

27    was the result of the Owner Defendants' prior looting.  To the extent that the Debtor could not draw

28

2194390

Case: 19-04057    Doc# 1    Filed: 11/04/19    Entered: 11/04/19 16:06:42    Page 43 of
150

down further on the Wells Fargo loan flowed directly from the Owner Defendants' conduct in improperly depleting the Debtors' assets;

      c.     The Debtor was undercapitalized at the time of the loan because of the Defendants Owners' taking of over $10 million from the Debtor's coffers (i.e., the Initial Illegal Distributions);

      d.     The "lenders" were the owners of the Debtors. This was an insider transaction;

      e.     The Owner Defendants did not initially subordinate their "loan" to the Wells Fargo loan, and instead did so later than six months after they began to receive returns on some of the monies they took;

      f.     As insiders, the Owner Defendants manipulated payments to other creditors, including workers compensation, pension, rent, and other vendors in order to ensure repayment of their Capital Contribution;

      g.     The intent of the repatriation of funds appears to have been to keep the company alive long enough to cause the running of certain statute of limitations, which limitation periods did not run in any event; and

      h.     The Owner Defendants admitted in writing that this repatriation of funds beginning in late-2016 was a Capital Contribution, not a loan.

      170.     It would be inequitable to allow the Owner Defendants to take more than $10 million from the Debtor as purported "profits," return a portion of those monies to the Debtor within six months and then charge the Debtor for borrowing its own money. To the extent there was a "lender," it was the Debtor itself as these were the Debtor's funds simply being returned by the Owner Defendants. The need to return the funds to stave off bankruptcy for an additional period of time is evidence that the Owner Defendants should not have taken the Debtor's money, its vital working capital, in the first instance.

      171.     Plaintiff seeks a declaration that the monies returned by the Debtor Owners in 2016 and 2017, as reflected on **Exhibit 4** hereto, was not a loan but rather was equity which should be re-characterized as such.

2194390

## THIRTEENTH CLAIM FOR RELIEF

## CLAIM DISALLOWANCE

**(As Against All Management Defendants and Subsequent Transferee Defendants)**

**[11 U.S.C. § 502]**

172.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

173.     Upon information and belief, each Management Defendant and Subsequent Transferee Defendant is a transferee of transfers avoidable under either Section 544, 547 or 548 of the Bankruptcy Code and from whom property is recoverable under Section 550 of the Bankruptcy Code.

174.     As of the filing of this Complaint, only Speyside Fund has filed a claim in the Debtor's Estate, previously defined as the Speyside Claim.  Pursuant to Section 502 of the Bankruptcy Code, the Trustee objects to such Speyside Claim and such claim must be disallowed until such time as such Speyside Fund pays to the Trustee an amount equal to the aggregate amount of all transfers made to Speyside Fund, plus interest thereon and costs.

175.     To the extent any other Defendant later files a claim against the Debtor's Estate, the Trustee reserves objection rights under Section 502 of the Bankruptcy Code.  Specifically, pursuant to 11 U.S.C. § 502(d), any and all Claims of all Management Defendants and Subsequent Transferee Defendants and/or assignees of the Management Defendants and Subsequent Transferee Defendants, against the Debtor's Estate must be disallowed until such time as such defendant(s) pays to the Trustee an amount equal to the aggregate amount of all transfers, plus interest thereon and costs.

**WHEREFORE**, Plaintiff prays for a judgment hereon ordering the following relief:

**On the First Claim for Relief**:

1.     Return of the Initial Illegal Distributions from the Owner Defendants, as set forth in **Exhibit 3**, the exact amount according to proof at trial and the total amount presently alleged to be no less than $10,748,177;

44

2194390

2.      Return of the 2018 Illegal Distribution from Alcast, Venkatesan, and Speyside Fund, as set forth in **Exhibit 5**, the exact amount according to proof at trial and the total amount presently alleged to be no less than $3,600,000; and

3.      To the extent any of the Initial Illegal Distributions and/or the 2018 Illegal Distributions, or any portion thereof, was transferred from Speyside Fund to any of the Subsequent Transferee Defendants, return of same from the Subsequent Transferee Defendants in amount(s) according to proof at trial;

**On the Second Claim for Relief**:

1.      Compensatory damages from the Management Defendants, the exact amount of which to be proved at trial and presently alleged to be no less than $40,000,000;

2.      Disgorgement of salaries from the Management Defendants in amounts according to proof at trial;

**On the Third Claim for Relief:**

1.      Compensatory damages from UHY, the exact amount of which to be proved at trial and presently alleged to be no less than $40,000,000;

**On the Fourth Claim for Relief:**

1.      Equitable subordination of the claims submitted by Speyside Fund denominated as claim nos. 27 and 29 (a duplicate of 27) in the amount of $828,762, to all general unsecured nonpriority claims allowed in the Debtor's case;

**On the Fifth Claim for Relief**:

1.      Avoidance of the 2-Year Transfers set forth on **Exhibit 6,** the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $3,600,000;

**On the Sixth Claim for Relief**:

1.      Avoidance of the 2-Year Transfers as set forth on **Exhibit 6,** the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $3,600,000;

///

2194390

**On the Seventh Claim for Relief**:

      1.     Avoidance of the 4-Year Transfers as set forth on **Exhibit 7**, the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $9,066,804;

**On the Eighth Claim for Relief**:

      1.     Avoidance of the 4-Year Transfers as set forth on **Exhibit 7**, the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $9,066,804;

**On the Ninth Claim for Relief**:

      1.     Avoidance of the 7-Year Transfers as set forth on **Exhibit 8**, the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $14,410,199;

**On the Tenth Claim for Relief**:

      1.     Avoidance of the 1-Year Insider Transfers as set forth on **Exhibit 5**, the exact amount according to proof at trial and the total amount of which presently alleged to be no less than $3,600,000;

**On the Eleventh Claim for Relief**:

      1.     Recovery of the avoided transfers (**Exhibit 5-8**) from the Owner Defendants;

      2.     Recovery of the avoided transfers (**Exhibit 5-8**) from the Subsequent Transferee Defendants;

**On the Twelfth Claim for Relief**:

      1.     Re-characterization, from debt to equity, of the $3,950,000 provided by the Owner Defendants to the Debtor, as set forth in **Exhibit 4**;

**On the Thirteenth Claim for Relief**:

      1.     Disallowance of any and all claims submitted by the Management Defendants and/or the Subsequent Transferee Defendants, including, without limitation, proofs of claim nos. 27 and 29 (a duplicate of 27) submitted by Speyside Fund in the amount of $828,762; and

///

**As to All Claims for Relief**:

    1.    Pre-judgment interest and post-judgment interest;

    2.    Punitive and exemplary damages for all claims for which such damages may be awarded under applicable law;

    3.    Reasonable attorneys' fees and costs permitted under applicable law; and

    4.    Such other and further relief as is just and proper.

DATED: November 4, 2019

BRUTZKUS GUBNER

/s/ Jason B. Komorsky

By:_____

Steven T. Gubner
Jason B. Komorsky
Jerrold L. Bregman
Jessica L. Bagdanov
Special Litigation Counsel for Sarah L. Little,
Chapter 7 Trustee

47

2194390

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

SPEYSIDE FUND, LLC

AND

PACIFIC STEEL CASTING COMPANY

Dated as of June 19, 2014

**EXHIBIT "1"**



167478.001/594498v6

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.01 | Definitions | 1 |
| ARTICLE II PURCHASE AND SALE OF ASSETS | | 2 |
| 2.01 | Asset Acquisition | 2 |
| 2.02 | Excluded Assets | 3 |
| 2.03 | Liabilities | 4 |
| 2.04 | Assumption of Contracts; Cure Amounts | 5 |
| ARTICLE III PURCHASE PRICE | | 6 |
| 3.01 | Purchase Price | 6 |
| ARTICLE IV CLOSING AND TERMINATION | | 9 |
| 4.01 | Closing | 9 |
| 4.02 | Termination | 10 |
| 4.03 | Treatment of Good Faith Deposit Upon Termination | 10 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER | | 11 |
| 5.01 | Representations and Warranties of Seller | 11 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER | | 18 |
| 6.01 | Representations and Warranties of Buyer | 18 |
| ARTICLE VII COVENANTS OF THE PARTIES | | 19 |
| 7.01 | Cooperation of the Parties | 19 |
| 7.02 | Bankruptcy Court Matters | 19 |
| 7.03 | Break-up Fee | 20 |
| 7.04 | Notices and Consents | 20 |
| 7.05 | Full Access | 20 |
| 7.06 | Property Inspection and Testing | 20 |
| 7.07 | Name Change | 21 |
| 7.08 | Transfer Taxes | 21 |
| 7.09 | Bulk Sales Laws | 21 |
| 7.10 | Multiemployer Plan | 21 |
| 7.11 | Post-Closing Transition and Cooperation | 22 |
| 7.12. | Non-Union Pension Plan | 23 |
| ARTICLE VIII EMPLOYEE MATTERS | | 23 |
| 8.01 | Employees | 23 |
| ARTICLE IX CONDITIONS TO THE OBLIGATIONS OF THE PARTIES | | 24 |
| 9.01 | Conditions to Closing Applicable to All Parties | 24 |
| 9.02 | Conditions to the Obligations of S | 25 |

| | | | |
|---|---|---|---|
| 9.03 | Conditions to the Obligations of Buyer | ........................................................... | 25 |
| ARTICLE X MISCELLANEOUS | | ................................................................. | 27 |
| 10.01 | Survival of Representations, Warranties and Covenants | ...................................... | 27 |
| 10.02 | No Third-party Beneficiaries | .................................................................... | 28 |
| 10.03 | Entire Agreement | .................................................................................. | 28 |
| 10.04 | Succession and Assignment | ...................................................................... | 28 |
| 10.05 | Counterparts; Signatures | ......................................................................... | 28 |
| 10.06 | Headings | ............................................................................................... | 28 |
| 10.07 | Notices | ................................................................................................. | 28 |
| 10.08 | SUBMISSION TO JURISDICTION | ........................................................... | 30 |
| 10.09 | Governing Law | ...................................................................................... | 30 |
| 10.10 | Amendments and Waivers | ........................................................................ | 30 |
| 10.11 | Severability | ........................................................................................... | 30 |
| 10.12 | Fees and Expenses | ................................................................................. | 30 |
| 10.13 | Construction | .......................................................................................... | 31 |
| 10.14 | Fair Consideration | .................................................................................. | 31 |
| 10.15 | Incorporation of Schedules | ....................................................................... | 31 |
| 10.16 | Gender and Number | ................................................................................ | 31 |
| 10.17 | No Consequential or Punitive Damages | ........................................................ | 31 |
| 10.18 | Time of Essence | ..................................................................................... | 31 |
| 10.19 | Waiver | ................................................................................................... | 31 |

## SCHEDULES

| | |
|---|---|
| 2.02(g) | Deposits and Prepaid Amounts Funded by PS |
| 2.03(b)(iii) | Buyer assumed Benefit Plans |
| 2.03(b)(iv) | Transferable licenses, permits, etc. |
| 2.03(b)(v) | Employees With Accrued and Unpaid Vacation Benefits |
| 2.03(b)(vi) | Accounts payable assumed by Buyer |
| 2.04(a) | Executory contracts and Unexpired Leases to Assumed |
| 3.01(c)(ii) | Net Working Capital |
| 5.01(a) | Jurisdictions where Seller is qualfied |
| 5.01(h) | Problem Receivables (previously 5.01(g) |
| 5.01(i)(iii) | Agreements with tax authorities |
| 5.01(j) | Intellectual Property (previously 5.01(i)) |
| 5.01(k) | Real property used in the business |
| 5.01(l) | Litigation and Disputes |
| 5.01(m) | Compliance with Laws Exceptions |
| 5.01(n)(i) | Environmental Law Compliance Exceptions |
| 5.01(n)(ii) | Environmental , H&S reports (previously (n)(ii)(2) |
| 5.01(n)(iii) | Environmental, etc. permits |
| 5.01(o) | Insurance Policies |
| 5.01(p) | Brokers |
| 5.01(q) | Matters Relating to Benefit Plans |
| 6.01(a) | Jurisdicions where Buyer is qualfied to do buiness |
| 8.01(b) | Excluded Employees |

167478.001/594498v6

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into by and between Pacific Steel Casting Company, a California corporation (the "Debtor" or "Seller") and Speyside Fund, LLC (the "Buyer" including any assignee of Buyer) as of this 19th day of June, 2014 ("Agreement Date") (Seller and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".)

## Recitals

A. Seller is engaged in the steel foundry business (the "Business").

B. On March 10, 2014, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Bankruptcy Code") (such petition, the "Petition") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") initiating Case No. 14-41045 (the "Bankruptcy Case"). No Trustee has been appointed and Seller operates the Business as Debtor and Debtor in Possession pursuant to 11 U.S.C. 1107 et seq.

C. Subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order (as defined in Exhibit A) Seller desires to sell to Buyer and Buyer desires to acquire from Seller, substantially all of Seller's assets relating to the Business, in a transaction pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Transaction").

D. Seller's board of directors has determined that it is advisable and in the best interests of the Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, and it has approved the same.

In consideration of the foregoing and the covenants, representations, warranties, agreements and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS

**1.01 Definitions.** Capitalized terms used in this Agreement shall have the meanings ascribed to them in Exhibit A hereto or as may be set forth throughout this Agreement.

Case: 14-41045   Doc# 201   Filed: 06/19/15   Entered: 06/19/15 06:42:20   Page 53 of
150

52

# ARTICLE II

## PURCHASE AND SALE OF ASSETS

**2.01  Asset Acquisition.**

(a) Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry of the Sale Order and the terms and conditions of this Agreement, at the date this Transaction closes (the "Closing Date"), Seller shall sell, assign, transfer, convey and deliver to Buyer, free and clear of all Encumbrances and claims (except with respect to Assumed Liabilities), and Buyer shall purchase, and take assignment and delivery of, all right, title and interest in and to all of the assets, properties, goodwill and Business of every kind and description and wherever located, whether tangible or intangible, personal or mixed, directly or indirectly owned by Seller or to which it is directly or indirectly entitled and, in any case, belonging to or used or intended to be used in the Business, other than the Excluded Assets. The property to be acquired (all such assets, properties and rights purchased by Buyer being referred to herein as the "Acquired Assets") includes, without limitation, the following assets, properties and rights of Seller:

(i)    all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials, supplies, and components intended for sale wherever located ("Inventory");

(ii)    all of Seller's tools, equipment, vehicles and other tangible personal property that is used, held for use or intended for use in the Business, or which is being utilized or operated by Seller, wherever located, together with any transferrable warranty and service rights applicable to Seller with respect to said Acquired Assets;

(iii)    all of Seller's right, title and interest relating to prepaid expenses, advance payments and deposits other than those directly related to Excluded Assets;

(iv)    all accounts receivable, notes, evidences of indebtedness of any kind, from third parties arising from the conduct of the Business, whether or not in the ordinary course of business, together with any unpaid financing charges thereon, and all amounts which have been earned by Seller but which have not yet been invoiced;

(v)    all rights of Seller under the Assumed Contracts;

(vi)    all franchises, permits, licenses, agreements, waivers and authorizations issued by any Governmental Entity held or used by Seller in connection with, or required for, the Business, to the extent transferable (collectively "Permits");

(vii)    all of Seller's right, title and interest in, to and under all Intellectual Property owned, licensed or sublicensed by or to Seller to the extent transferable;

(viii)    books and records of Debtor other than those included in Excluded Assets, including customer lists, invoices, shipping records, supplier lists, equipment maintenance data, sales and sales promotional data and materials, cost and pricing information,

quality control records and manuals, blueprints, research and development files, records and laboratory books, patent disclosures, credit records, drawings, correspondence, and any other records and data, and all computer software and programs and any rights thereto that are used in, or relating to, the Business;

(ix)  all of Seller's promotional and advertising materials relating to the Business as presently conducted, including all catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, equipment and parts lists, and dealer and distributor lists;

(x)  any and all goodwill of Seller relating to the Business; and

(xi)  except to the extent excluded herein, all rights and obligations under non-disclosure or confidentiality and similar arrangements with or for the benefit of employees, independent contractors and agents of Seller or with third parties;

(xii)  any and all telephone and facsimile numbers, domain names and email addresses;

(xiii)  all prior and current workers compensation Insurance Policies of the Seller, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and rights to be indemnified and defended under such Insurance Policies; and

(xiv)  all proceeds and products of the Acquired Assets.

(b) All of the Acquired Assets are being sold to Buyer free and clear of all Liens, Encumbrances and claims to the fullest extent permissible under Section 363(f) of the Bankruptcy Code pursuant to an order by the Bankruptcy Court as described in Section 7.02 below (the "Sale Order").

(c) Except as specifically provided in this Agreement, Seller makes no representations or warranties whatsoever respecting the Acquired Assets. Except as specifically provided in this Agreement, the Acquired Assets are sold "as is" and "where is".

2.02  **Excluded Assets.**  Seller is not selling, assigning, or transferring to Buyer, and Buyer is not purchasing, and the term "Acquired Assets" does not include, any interest in the following (the "Excluded Assets"):

(a) corporate and financial books and records of Seller, including Seller's organization documents, minute and stock record books, tax returns, checkbook, cancelled checks, provided that upon request, Buyer may have reasonable access to such books and records and the opportunity to make copies thereof. Seller will retain a copy of the records of accounts receivable and payable.

(b) causes of action arising under Sections 544 through 552 of the Bankruptcy Code and all proceeds thereof;

(c) rights of Seller under Contracts not included within the Assumed Contracts;

(d) all documents and personnel records of Seller's employees that Seller is required by law to retain and is prohibited by law from providing a copy thereof to Buyer;

(e) all capital stock or other equity interests issued by Seller;

(f) all prior and current Insurance Policies of the Seller and/or of Berkeley Properties, LLC, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than workers compensation Insurance Policies;

(g) all those certain deposits or prepaid amounts funded by Seller for the purpose of the Bankruptcy Case including utility deposits, all as identified on in Schedule 2.02(g);

(h) all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) that are not assumed by Buyer;

(i) all claims that the Seller may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities:

(j) Seller's cash on hand or in bank or other depository accounts, money market funds and other liquid investments, the Good Faith Deposit, and any proceeds of Excluded Assets;

(k) Any asset of the Seller that otherwise would constitute an Acquired Asset but for the fact that it is sold or disposed of in the ordinary course of Seller's business during the time from the Agreement date until the Closing Date;

**2.03   Liabilities.**

(a)     Other than the Assumed Liabilities, Buyer shall not assume or agree to pay, perform or discharge, any debts, liabilities, obligations, claims, expenses, taxes, or commitments of any kind or character, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undetermined (collectively, "Liabilities") of Seller or become liable to Seller or any other Person, for any Liabilities of Seller. Liabilities include, without limitation, any Liability of Seller relating to or arising from: (i) any infringement by Seller on the rights of others in connection with the Business; (ii) any and all taxes of any nature with respect to the period prior to Closing; (iii) any liability arising from a violation by Seller of any laws governing employee relations, including anti-discrimination laws, wage and hour laws, labor relations laws, occupational safety and health laws or any other laws applicable to Seller or the Business or the Acquired Assets with respect to the period prior to Closing (other than Liabilities under Assumed Plans described in Section 2.03(b)(iii); or (v) liability arising from Seller's fraud, breach, malfeasance, misfeasance, negligence, strict liability in tort, injury to persons or property or under any other theory relating to the Business, the Acquired Assets or the conduct, performance or non-performance of Seller.

(b)     At Closing, Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy in accordance with their respective terms) the following liabilities (the "Assumed Liabilities"):

(i)     all Liabilities arising from the ownership of the Acquired Assets after the Closing Date;

(ii)    all Liabilities of Seller arising under the Assumed Contracts to the extent that such Liabilities first accrue on or after the Closing Date, and all obligation to demonstrate adequate assurance of future performance required by the Bankruptcy Court under 365(b)(1)(C) of the Bankruptcy Code;

(iii)   the obligations to administer or to provide benefits, payments under the Benefit Plans that Buyer assumes as listed on Schedule 2.03(b)(iii) (the "Assumed Plans") after the Closing Date, and all Liability arising from Buyer's termination of or withdrawal from any Assumed Plan; provided that with respect to any retiree under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011, and prior to the Closing Date or is listed on Schedule 2.03(b)(iii), Buyer shall not assume any liability for and Seller shall be solely responsible to pay any amounts in excess of the retirement benefit amounts previously determined to be due to such persons, all interest required to be paid to such persons in respect of unpaid benefits. Seller shall establish a reserve for any such retirement benefits amounts determined to be due by depositing $20,000 in the attorney trust account of Binder & Malter LLP which deposit shall be held and used to fund such amounts and held in such account until such benefit entitlement (or lack thereof) is definitely determined;

(iv)    all Liabilities and obligations of Seller arising under transferable licenses, Permits and governmental authorizations of Seller identified on Schedule 2.03(b)(iv), and Intellectual Property rights first accruing from and after the Closing Date;

(v)     any accrued but unpaid vacation obligations as of the Closing Date to Seller's employees listed on Schedule 2.03(b)(v) (the amount of such obligations as of May 31, 2014, total $1,032,441.83) whom Buyer elects to hire, except that Buyer shall not assume any such obligations resulting from accounting errors in the calculations of accrued or unpaid vacation obligations of Seller or Seller's agent pertaining to union employees whose vacation was not properly adjusted on anniversary dates and for which Seller shall be liable;

(vi)    accounts payable and accrued expenses in the aggregate amount of up to $1 million as listed on Schedule 2.03(b)(vi) and certain Liabilities for pending orders from customers arising out of the conduct of the Business after the Closing Date, expenses for customer rebates and for goods or materials received in transit but not yet invoiced as of the Closing Date, as listed on Schedule 2.03(b)(vi); and

(vii)   all of Seller's Liabilities for all claims made or asserted by any employee or former employee of Seller for workers compensation benefits for occurrences or claims made solely with respect to the policy years beginning April 1, 2012, April 1, 2013 and April 1, 2014.

**2.04    Assumption of Contracts; Cure Amounts.**

(a)     Assumption of Contracts. Seller shall assume, and assign to Buyer, any unexpired lease or executory contract (as those terms are used in Section 365 of the Bankruptcy Code) to which Seller is a party ("Executory Contract"), and that is designated in a motion to

assume and assign contracts filed by Seller with the Bankruptcy Court in conjunction with the Sale Motion, which motion shall be filed within the time described in Section 7.02(b) (such designated Executory Contracts are "Assumed Contracts"). Attached as Schedule 2.04(a) is a list of the Executory Contracts including the Collective Bargaining Agreement, that are expected to be Assumed Contracts, but the controlling designation of contracts, other than the Collective Bargaining Agreement which must be an Assumed Contract (subject to appropriate modifications agreed to by the parties), shall be in the order allowing and directing assumption and assignment of the Assumed Contracts to Seller. Seller shall also assume, and assign to Buyer, any other Executory Contracts related to the Business and designated by Buyer, in its sole discretion and by written notice to the Seller, for assumption and assignment at any time and from time to time after the Agreement Date and prior to the entry of an order rejecting such Executory Contract. Buyer shall have the sole discretion to remove any Assumed Contract (other than the Collective Bargaining Agreement) previously designated for assumption and assignment, at any time and from time to time prior to the effective date of the assumption by the Seller of such Executory Contract. The Seller shall not reject any Executory Contract without providing Buyer (i) prior written notice of its intent to reject such Executory Contract, (ii) a copy of such Executory Contract, and (iii) the prior opportunity to designate such Executory Contract as an Assumed Contract. If Buyer removes a contract from the "assumed" list after the sale hearing, Buyer shall reimburse the estate for any damages that the bankruptcy estate suffers resulting from the rejection of the contract.

(b)     Curing Defaults and Assignment. At Closing, the Seller shall assume each of the Assumed Contracts pursuant to Section 365(a) of the Bankruptcy Code, and sell and assign to Buyer each of the Assumed Contracts pursuant to Sections 363(b), (f) and (m) and 365(f) of the Bankruptcy Code. All amounts, as determined by the Bankruptcy Court, or as agreed between Seller and the non-debtor party, necessary to cure an Assumed Contract (the "Cure Amounts") shall be paid by Seller at or before the Closing, or credited against the Purchase Price. Buyer shall also provide each non-debtor party with adequate assurance of future performance. The Cure Amounts must be sufficient to relieve Seller from all obligations with respect to defaults arising or existing under the Executory Contracts prior to the Closing Date.

## ARTICLE III

## PURCHASE PRICE

**3.01    Purchase Price.**

(a)     Good Faith Deposit. Upon execution of this Agreement the Buyer shall pay $500,000 for deposit into the Binder & Malter LLP Client Trust Account in escrow on behalf of Seller and Buyer by delivery of a cashier's check to Binder & Malter LLP or wire transfer into said account. This is the "Good Faith Deposit."

(b)     The purchase price for the Acquired Assets (the "Purchase Price") shall consist of the following:

(i)     $10,800,000.00;

(ii)     the Good Faith Deposit; and

(iv)     any additional amount the Buyer chooses, in its sole discretion, to over-bid at the Auction.

The Parties agree that, as of the Agreement Date, not including any amount for overbid at the Auction, the Purchase Price is approximately $11,300,000.00.

(c)     Purchase Price Adjustments.

(i)     Determination of Amount. The Purchase Price shall be increased or decreased to account for the difference between $26,853,679 and the Net Working Capital on the Closing Date. If Net Working Capital is greater on the Closing Date, the Purchase Price shall be increased by the amount of such difference. If Net Working Capital is lower on the Closing Date, then the Purchase Price shall be reduced by such difference. Two (2) business days prior to the Closing Date, Seller shall deliver to Buyer an estimated calculation of Seller's Net Working Capital as of the Closing Date ("Estimated Closing Date Net Working Capital"). The amount of the Estimated Closing Date Net Working Capital shall be used to determine the Purchase Price payable by Buyer (subject to adjustment pursuant to this Agreement) on the Closing Date.

(ii)     Procedure. Buyer intends to conduct a physical count of inventory on hand at the Real Property on the Closing Date, and Seller may have representatives present during such count. The results of such physical count shall be binding on the parties as to the volume of inventory on hand at the plant, less damaged or otherwise unsaleable items. Inventory of domestic castings shall be valued for purposes of this Agreement at the amounts per ton set forth on Schedule 3.01(c)(ii). All other inventory elements shall be valued in accordance with GAAP. Accounts receivable shall be valued in accordance with GAAP, consistently applied. Within twenty (20) business days after the Closing Date, Buyer shall deliver to Seller a written and detailed calculation of the Net Working Capital as of the Closing Date as determined by the Buyer along with related work papers, together with a statement of the amount of the Purchase Price adjustment ("Purchase Price Adjustment Statement"). After the delivery of the Purchase Price Adjustment Statement, the Parties shall cooperate in connection with the review of the Purchase Price Adjustment Statement, including reasonable access to materials used in the preparation of the Purchase Price Adjustment Statement. Each Party shall then have thirty (30) days from receipt of the Purchase Price Adjustment Statement to formally notify the other Party of any objections to or disputes of the Purchase Price Adjustment Statement (the "Dispute Notice"). If either Party delivers a Dispute Notice, the Parties shall use reasonable, good-faith efforts to resolve any such objections within ten (10) days following receipt of such Dispute Notice, and if any such objections are so resolved within such ten (10) day period, the Purchase Price Adjustment, with such changes as may have been previously agreed in writing by the Parties, shall be final and binding to the extent of any items no longer in dispute. If all items of dispute are so resolved, the Purchase Price Adjustment Statement (as so modified) shall be conclusive and binding on all Parties. If the Parties fail to reach agreement with respect to all of the matters set forth in the Dispute Notice within the aforementioned ten (10) day period, then they shall, within seven (7) business days thereafter, retain a mutually acceptable national independent accounting firm (the "Independent Accountant"), subject to approval of the

Case 14-10457   Doc 201-2   Filed 11/06/14   Entered 11/06/14 16:42:26   Page 59 of 58

Bankruptcy Court, to resolve any amounts then remaining in dispute ("Disputed Items"), and any amounts not so disputed (the "Undisputed Items") shall be final and binding on the Parties. The Parties shall cooperate fully with the Independent Accountant so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Accountant shall have thirty (30) business days from its selection and appointment to resolve Disputed Items only in writing with an explanation of the basis for its determination, with a copy to all Parties. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Item must be within the range of values assigned to each such item in the Purchase Price Adjustment Statement and the Dispute Notice, respectively. The determination of the Independent Accountant shall be final and binding on the Parties, absent manifest error or willful misconduct, and the cost of the Independent Accountant shall be borne by the Party whose position is determined to be the least correct by the Independent Accountant. The Party owing the Purchase Price adjustment amount shall pay such amount to the other Party by wire transfer no later than ten (10) business days following (i) the delivery date of the Purchase Price Adjustment Statement to Seller, or (ii) the Independent Accountant's final determination with respect to the Purchase Price Adjustment Statement, as the case may be.

(d)     The Purchase Price shall be paid in part by release to Seller of the Good Faith Deposit, with the remainder paid in Cash (subject to the adjustments set forth herein) at or before the Closing Date.

(e)     Prorations.  Except for amounts that Buyer must pay with respect to the Assumed Liabilities, Seller shall be responsible for the expenses relating to the Acquired Assets and the Business up to and through the Closing Date, and Buyer shall be responsible for the expenses relating to the Acquired Assets and the Business after the Closing Date (for example *ad valorem* taxes and utilities).  Expenses relating to the Acquired Assets up to and through the Closing Date shall be paid by Seller at or before the Closing Date. To the extent that the time period for the assessment of any expenses falls both before and after the Closing Date, then those expenses shall be prorated as of the Closing Date, and, to the extent required, reconciled after the Closing Date.

(f)     Allocation of Purchase Price for Tax Purposes.  As promptly as practicable following the Agreement Date, Buyer shall deliver to the Seller a schedule, allocating the Purchase Price among the Acquired Assets for all tax and other reporting purposes, which schedule shall be subject to the Seller's consent, not to be unreasonably withheld.  After the Seller grants its consent to such schedule, the Seller and the Buyer shall be bound by such allocation (and if necessary, any adjusted allocation), and shall file an Internal Revenue Service Form 8594 and all applicable federal, state, local and foreign income, and excise tax returns in a manner that is consistent with such allocation. If the allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party concerning the existence of such dispute and the Parties shall consult with each other with respect to all issues related to the allocation in connection with such dispute.  If a different allocation proposed by the Internal Revenue Service (the "IRS") is finally determined, either Party may file amended returns based on such allocation or any other allocation.  An allocation shall be considered to be finally determined when such allocation cannot be contested in any court of competent jurisdiction.

(g)    Good Faith Deposit. If the Buyer makes a material breach of this Agreement before the Closing Date and such breach continues without cure ten days after Seller's written notice to Buyer of same, then Seller may terminate this Agreement in accordance with Sections 4.02 and 4.03, resulting in the Good Faith Deposit becoming Seller's property, which shall constitute the exclusive relief against Buyer in such event.  If any of Seller's representations or warranties were either untrue or inaccurate in a material respect when made or become untrue or inaccurate in a material respect on or before the Closing Date or if the Seller makes a material breach of this Agreement before the Closing Date, and such breach continues ten days after Buyer's written notice to Seller of same, then Buyer may terminate this Agreement in accordance with Sections 4.02 and 4.03 and the Seller shall immediately return the Good Faith Deposit in full.  The Good Faith Deposit will become non-refundable property of the Seller if Buyer is approved as the winning bidder by the Bankruptcy Court in the Sale Order, and this Agreement is not timely terminated in accordance with Sections 4.02 and 4.03.

## ARTICLE IV

## CLOSING AND TERMINATION

**4.01    Closing**.  The consummation of the Transaction (the "Closing") shall take place at a time and date of Buyer's choosing within fifteen (15) business days after the entry of the Sale Order, provided that the Sale Order has not been appealed or stayed, at the offices of Seller's counsel.

(a)    Buyer Deliveries.  At the Closing, Buyer shall deliver to Seller:

(i)    The Purchase Price, less the Good Faith Deposit, and any adjustments or credits against the Purchase Price, including the Purchase Price adjustment and any cure amounts owed with respect to the Assumed Contracts;

(ii)    To the extent necessary, assignment and assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Buyer (as necessary), in customary form and otherwise as counsel to Seller shall reasonably request to implement and evidence the Transaction;

(iii)    such other agreements, documents and instruments as Seller and its counsel may reasonably request.

(b)    Seller Deliveries.  At the Closing, Seller shall deliver to Buyer:

(i)    assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Seller, in customary form and otherwise as counsel to Buyer shall reasonably request to implement and evidence the Transaction;

(ii)    the required executed third party consents, if any;

(iii)    a certified copy of the Sale Order; and

(iv)    such other agreements, documents and instruments as Buyer and its counsel may reasonably request.

**4.02    Termination.**    This Agreement may be terminated at any time prior to the Closing Date:

(a)    by the mutual written consent of Buyer and Seller;

(b)    by Seller, if it is not in material breach of its obligations hereunder, upon a material breach by Buyer of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after delivery of written notice thereof;

(c)    by Buyer, if not in material breach of its respective obligations hereunder, upon a material breach by Seller of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after written notice thereof;

(d)    by Buyer, if not in material breach of its respective obligations hereunder, if, before the Closing, Seller's Bankruptcy is converted to a Chapter 7 case under the Bankruptcy Code or there is appointed an operating trustee or examiner with expanded powers;

(e)    by Buyer or Seller if any court of competent jurisdiction or other Governmental Entity issues, enacted, entered, promulgated or enforced any order, judgment, decree, injunction or ruling which restrains, enjoins or otherwise prohibits the transaction and such order, judgment, decree, injunction or becomes final and non-appealable;

(f)    by Buyer or Seller if the Bankruptcy Court fails to enter the Sale Order within four days of the conclusion of the Bankruptcy Court's sale hearing;

(g)    by Buyer or Seller if the Closing shall not have occurred on or before 15 days after entry of the Sale Order, provided the terminating Party is not otherwise in material breach of its representations, warranties or other obligations hereunder;

(h)    Automatically and without any action by either Buyer or Seller, if the Bankruptcy Court approves a Transaction with any Person other than Buyer (provided, however, that Buyer is not otherwise in material default under this Agreement);

(i)    By Buyer, if any of the conditions set forth in Section 9.03 are not satisfied on or prior to the dates designated in Section 9.03 for the satisfaction of such conditions (provided, however, that Buyer is not otherwise in material default under this Agreement or any other  agreement that are part of the Transaction);

**4.03    Treatment of Good Faith Deposit Upon Termination.**

(a)    In the event that this Agreement is terminated pursuant to Sections 4.02(a), (c), (d), (e), (f), (g), (h) or (i) above, then the Seller shall immediately return the Good Faith Deposit in full.

(b)     In the event that this Agreement is terminated pursuant to Section 4.02(b) above, then Buyer waives all claims to the Good Faith Deposit and it will become Seller's property.

(c)     In the event that this Agreement is terminated pursuant to Section 4.02(c) then the Breakup Fee provisions of Section 7.03 shall survive termination and the Breakup Fee shall be payable to Buyer from the proceeds of sale to a third party.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

**5.01    Representations and Warranties of Seller**.  Seller represents and warrants to Buyer that, except as set forth in the disclosure schedules being delivered by Seller contemporaneously herewith, but no later than five (5) business days  after the Agreement Date (the "Seller Disclosure Schedules"):

(a)  Organization and Qualification.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and is qualified to do business in all other jurisdictions in which the failure to so qualify would constitute a Material Adverse Effect, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law. The jurisdictions in which each Seller is so qualified are listed on Schedule 5.0l(a) hereto.

(b)  Authorization of Transaction.  Subject to the entry of the Sale Order, and unless obviated by the Bankruptcy Code and other applicable law, the Seller has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Seller of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Seller.  Subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable in accordance with its terms, and no other action by Seller is requisite to the valid and binding execution, delivery and performance by Seller of its obligations under this Agreement and the consummation of the Transaction, except as expressly set forth in this Agreement and/or the Sale Order, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforcement of specific remedies.

(c)  Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Seller of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create

Case 14-40007   Doc 201-2   Filed 11/06/14   Entered 11/06/14 15:42:26   Page 62 of 150 **62**

in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d) Title to Assets. Subject to the entry of the Sale Order, the Seller, as of the Agreement Date, has, or as of the Closing Date will have, good title to, valid leasehold interests in, or license or other valid rights to use, all of the Acquired Assets.

(e) Assets used in the Business. Except the Excluded Assets, the Acquired Assets are the only assets used by Seller to conduct the Business. Seller believes that the Acquired Assets include all rights, properties and other assets necessary to permit Buyer to conduct the Business after the Closing Date in materially the same manner as it has been conducted by Seller prior to the Agreement Date.

(f) Operation of Business. From the Agreement Date through the Closing Date, the Seller shall conduct the Business in accordance with the Bankruptcy Code, Bankruptcy Rules, Orders of the Bankruptcy Court and applicable local guidelines. Except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (such consent not be unreasonably withheld), or (iii) as required by the filing of the Bankruptcy Case or as approved by the Bankruptcy Court and with adequate written notice to Buyer, the Seller shall not amend, supplement, or terminate any of the Assumed Contracts; transfer any interest in any Acquired Asset, except in the ordinary course of business; bring, settle, compromise or waive any proceeding or legal right adversely affecting the validity or value of any Acquired Asset; or authorize or enter into an agreement to do any of the foregoing.

(g) Financial Statements. Seller has delivered to Buyer the Seller's audited consolidated balance sheet as of March 31, 2013, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2013, together with notes to such financial statements (the "2013 Year-end Financial Statements"). Seller has or within five (5) days of the Agreement Date shall deliver to Buyer Seller's unaudited consolidated balance sheet as of April 30, 2014, and the related statement of operations for the one-month period ended April 30, 2014 ("April 30, 2014 Interim Financial Statements"). On or before July 31, 2014, Seller shall deliver to Buyer: Seller's audited consolidated balance sheet as of March 31, 2014, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2014, together with notes to such financial statements (the "2014 Year-end Financial Statements"). On or before twenty (20) days after the end of each month, until the month in which the Closing Date occurs, Seller shall deliver to Buyer Seller's unaudited consolidated balance sheet as of the last day of the prior month, and the related statement of operations for such one-month period (the "Monthly Interim Financial Statements"). The 2013 Year-end Financial Statements, 2014 Year-end Financial Statements, April 30, 2014 Interim Financial Statements and Monthly Interim Financial Statements are herein collectively referred to as the "Financial Statements." Upon delivery, the respective Financial Statements shall have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied throughout the periods covered thereby, and be consistent with the books and records of the Seller.

Case 14-10457   Doc 201-2   Filed 11/06/14   Entered 11/06/14 16:42:26   Page 64 of 63

(h) <u>Accounts Receivable</u>.    Each Account Receivable is a true and correct statement of the account for goods delivered to or services actually performed for and accepted by, such account debtor in the ordinary course of business materially consistent with past practice.    Except as set forth in <u>Schedule 5.01(h)</u>, all receivables that are reflected on the Financial Statements (net of any reserves shown thereon) (i) are valid and existing, (ii) represent monies due for goods sold and delivered or services rendered in the ordinary course of business materially consistent with past practice, and (iii) are not subject to any refunds or adjustments or any defenses, rights of set-off, credits, discounts, assignment, restrictions, security interests or other Encumbrances.    Seller has not factored any of the receivables.

(i) <u>Taxes.</u>

(i) All federal, state, foreign, county, local and other Tax Returns required to be filed by or on behalf of Seller have been timely filed, or extensions of the time to file have been obtained, and when filed were true and correct in all material respects, and the taxes due and owing were paid or adequately accrued, except to the extent contested in good faith by proper proceedings. Seller has duly withheld and paid all Taxes required to have been withheld and paid relating to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed and distributed.

(ii) The provision made for taxes on the Financial Statements is sufficient for the payment of all material Taxes, whether or not disputed, at the date of such Financial Statements and for all years and periods prior thereto.

(iii) There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any Tax Return or report of Seller or the period of time within which any Tax Return of Seller must be filed.

(iv) Tri-Pacific, Inc., the majority shareholder of Seller, has received a notice from IRS that it will be auditing the income tax returns of Tri-Pacific, Inc., Seller and Berkeley Properties, LLC for the tax year ending March 31, 2012.  Neither Buyer nor any of the Acquired Assets shall be liable for any tax liability of Seller.

(j) <u>Intellectual Property</u>.  <u>Schedule 5.01(j)</u> provides a true and complete list of all Intellectual Property owned, used or held by Seller in the operation of the Business, in each case indicating whether such Intellectual Property is owned by or licensed to Seller.  Seller owns or possesses adequate licenses or other valid rights to use all Intellectual Property used or held for use in connection with Business and included in the Acquired Assets.   To the Seller's Knowledge, there is not been any assertion or claim challenging the validity of any Intellectual Property.  To the Seller's Knowledge, the operation of the Business by Seller does not conflict with or infringe on the rights of any other Person, and Seller has not received any claim or written notice, and has no reason to believe that there is any unasserted or potential claim, from any Person to such effect.  Seller has taken reasonable measures to protect the proprietary nature of each item of Intellectual Property and to maintain in confidence all trade secrets and confidential information that it owns or uses.

(k) Real Property.  Schedule 5.01(k) hereto lists the street address, the current owner and the current use of each parcel of Real Property which is related to, used, useful or held for use in the conduct of the Business (the "Real Property").  The Real Property constitutes all of the real property used in the operation of the Business as currently conducted.  Seller is in exclusive possession of the Real Property and the improvements thereon.  Seller is not a party to, and the Real Property is not subject to, any service contract or agreement other than those listed on Schedule 5.01(k).

(l) Litigation.  Except as described in Schedule 5.01(l), to the Seller's Knowledge as of the Agreement Date, there is no action, suit, investigation or proceeding pending or threatened against Seller or the Acquired Assets that is reasonably likely to have a Material Adverse Effect on the operation or use of the Business, the Real Property or the Transaction, and Seller has not received notice of any special assessment proceedings affecting the Real Property.

(m) Compliance.  Except as set forth on Schedule 5.01(m), to Seller's Knowledge Seller is and at all times within the time of applicable statute of limitations has complied in all material respects with applicable laws, rules, regulations, judgments, orders and decrees and Permits applicable to the Acquired Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect on the Business or the Real Property.  Except as provided on Schedule 5.01(m), within the time of the applicable statute of limitations, Seller has not received notice of any outstanding violation of any applicable law, ordinance, or restriction from any governmental authority with respect to the Business or the Real Property.  Seller holds all material Permits necessary or required to operate the Business as currently conducted.  Set forth on Schedule 5.01(m) is a list of all such Permits (and the status thereof), all of which are valid, effective and in good standing.  Each of such Permits is freely transferable to Buyer.

(n) Environmental Matters.

(i)       Except as set forth on Schedule 5.01(n)(i) hereto, (A) the current business operations of Seller are in material compliance with all Environmental Laws; (B) during the five years ending on the Closing Date there has been no Release at any of the properties owned or operated by Seller (including the Real Property) which could have a Material Adverse Effect; (C) during the five years ending on the Closing Date no Environmental Claim has been asserted against Seller nor does Seller have Knowledge or notice of any threatened Environmental Claim against Seller which could have a Material Adverse Effect; (D) during the five years ending on the Closing Date no Environmental Claims have been asserted against any facilities that may have received Hazardous Substances generated by Seller which could have a Material Adverse Effect; (E) no property now owned or operated by Seller (including the Real Property) has been used as a treatment or disposal site for any Hazardous Substance or contains any underground storage tanks; (F) during the five years ending on the Closing Date Seller has not failed to report to the proper Governmental Entity any Release which is required to be so reported by any Environmental Laws which could have a Material Adverse Effect; (G) Seller holds all licenses, Permits and approvals required under any Environmental Laws in connection with the current operation of the Business, except for such licenses, permits and approvals as to which Seller's failure to maintain or comply with could not have a Material Adverse Effect; (H)

during the five years ending on the Closing Date Seller has not received any notification pursuant to any Environmental Laws that (x) any work, repairs, construction or capital expenditures are required to be made as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (y) any license, permit or approval referred to above is about to be reviewed, made subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not have a Material Adverse Effect; (I) to Seller's Knowledge, no Hazardous Substance is migrating from or onto the Real Property that could reasonably be expected to give rise to any reporting, investigation, remediation, or other liabilities or obligations under any Environmental Laws; (J) to Seller's Knowledge, there are no conditions, circumstances, activities, practices, incidents, actions, omissions or plans which reasonably could be expected to materially interfere with or prevent compliance with the Environmental Laws as the Business is currently operated; and (K) Seller has not undertaken or assumed any liability or obligation for corrective or remedial action, or of any other Person relating to Environmental Laws.

(ii)     Schedule 5.01(n)(ii) hereto identifies all material written environmental, health and/or safety reports generated by or on behalf of Seller within the past five years immediately preceding the Agreement Date that have been provided to the applicable Governmental Entity as required by Environmental Law and/or Environmental Permits, and except where such reports could not reasonably be obtained or were not so provided, all as described in Schedule 5.01(n)(ii). Schedule 5.01(n)(ii) further includes all Phase I or Phase II environmental assessments or environmental audits relating to the Real Property obtained by Seller within the five years immediately preceding the Agreement Date, and true and complete copies of such reports have been provided to Buyer.

(iii)     Schedule 5.01(n)(iii) hereto identifies all material Environmental Permits, approvals or authorizations issued by any federal, state or local Government Entity to Seller in connection with the Business or the Real Property within the two years immediately preceding the Agreement Date, each such Environmental Permit is valid and enforceable and in full force and effect, and Seller is in compliance, in all material respects, with the terms and conditions of all such Environmental Permits, approvals or authorizations and no other Environmental Permits, approvals or authorizations are necessary for operating the Business or the Real Property as currently conducted.

(iv)     To Seller's Knowledge, there is currently no Release on the Property which could have a Material Adverse Effect regardless of whether the Release occurred before or after the five-year period ending on the Closing Date.

(o) Insurance. Schedule 5.01(o) hereto sets forth a summary of each insurance policy carried by Seller (including any self-insurance programs) (collectively "Insurance Policies"). All such insurance policies are valid and binding and in full force and effect, all premiums due thereunder have been paid in full and Seller has not received any notice of cancellation or termination in respect of any such policy nor is Seller in default thereunder.

(p) Brokers. Except as set forth on Schedule 5.01(p) hereto , Seller is not a party to any agreement, arrangement or understanding with any Person which will result in the

obligation of Buyer or Seller to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated by this Agreement.

(q) Employee Benefit Plans.

(i)  Seller has furnished or made available to Buyer: (1) a complete and accurate copy of the plan document (and any funding medium, including any trust agreement or annuity contract, if applicable) and summary plan description of each Benefit Plan (or other descriptions of such Benefit Plan provided to employees), including all amendments thereto; (2) a copy of the annual reports, financial statements and/or actuarial valuations, if any, with respect to each Benefit Plan for the three (3) year period immediately preceding the date of this Agreement; (3) a copy of each summary of material modification for each Benefit Plan; (4) a copy of IRS Form 5500 for each Benefit Plan for the three (3) plan years immediately preceding this Agreement, with all applicable schedules and accountants' opinions attached thereto; (5) the most recent determination or opinion letter received from the IRS for each Benefit Plan which is a 401(k) plan or pension plan; (6) a copy of the latest account statement, if any, reflecting the assets of any funded Benefit Plan; (7) a copy of the Summary Annual Report as distributed to the participants of the Benefit Plans, if applicable, for the three (3) year period immediately preceding the date of this Agreement; and (8) any correspondence from any governmental authority with respect to any Benefit Plan that threatens any litigation, claim, suit, investigation or other proceeding against the Seller or any Benefit Plan that refers to or alleges any fact or circumstance which could reasonably be expected to give rise to any such litigation, claim, suit, investigation or other proceeding, together with any response thereto by or on behalf of the Seller or the Benefit Plan.

(ii)  Except as disclosed in Schedule 5.01(q): (1) there are no pending, threatened, or to the Knowledge of the Seller, anticipated claims by any party, including any Governmental Entity, relating to any Benefit Plan, other than routine claims for benefits; (2) no Benefit Plan is currently under investigation or audit by the IRS, the U.S. Department of Labor, any state department of labor or any similar organization or entity; (3) since its respective inception or effective date, each of the Benefit Plans has complied in form and been operated and maintained in all material respects in accordance with its terms and the requirements of all applicable laws and regulations, and in accordance therewith, the plan document underlying any Benefit Plan has been amended and/or restated, to the extent necessary and required by law to have been amended and/or restated by the Agreement Date and the Closing Date, to comply with all applicable laws and regulations; (4) with respect to the Non-Union Pension Plan: a) all premiums (any interest, charges and penalties for late payment, if any applicable) due the PBGC for which premiums are required have been paid; b) the Non-Union Pension Plan has not been terminated under circumstances which would result in liability to the PBGC; c) the Non-Union Pension Plan is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended ("IRC"), has received a favorable determination or opinion letter from the IRS that it is so qualified, and any trust established in connection with the Non-Union Pension Plan is intended to be exempt from federal income taxation under Section 501(a) of the IRC has received a determination letter from the IRS that it is so exempt, and to Seller's Knowledge no fact or event has occurred since the date of such determination letter from the IRS that could reasonably be expected to result in the disqualification of the Non-Union Pension Plan or in the loss of the exempt status of any such trust; d) the Seller has not ceased operations at a facility so

as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions on or before the date of the Closing to any Benefit Plan or ERISA Affiliate Plan subject to Section 4064(a) of ERISA; e) the Seller has or will have, as of the Closing Date, made all required contributions and payment of all interest, penalties and other amounts owed with respect to the Non-Union Pension Plan; or f) in the last three years preceding the date hereof, there has been no "reportable event" for Seller as defined in Section 4043(b) of ERISA and the regulations under that Section other than those which have been reported in compliance with ERISA or which will be the subject of the Voluntary Corrective Program submission described in Section 7.12; (5) with respect to the Multiemployer Plan: a) the Seller has or will have, as of the Closing Date, made all required contributions; and b) the Seller has not incurred any liability under Title IV of ERISA, including any withdrawal liability for any period prior to the Closing Date; (6) no condition, agreement or plan provision limits the right of the Seller to amend, cut back or terminate any Benefit Plan that it sponsors (except to the extent such limitation arises under ERISA); (7) all contributions, premiums or payments required to be made with respect to any Benefit Plan through the date of this Agreement and all unpaid liabilities of any Acquired Seller with respect to any Benefit Plan that are not yet payable have been properly accrued in the Seller's financial reports in accordance with GAAP; (8) all annual reports required to be filed with any governmental agency or department have been filed on or before their respective due dates, or the due date for same has been properly and timely extended; (9) to Seller's Knowledge no individual associated with any of the Benefit Plans has engaged in any actions that constitute a "prohibited transaction" under the provisions of ERISA Section 406, and no actions have previously occurred which could reasonably be interpreted to be a prohibited transaction upon which excise taxes may be imposed; (10) no excise taxes have been imposed, incurred or paid under the provisions of IRC Section 4975 or any similar provision during such period, and no excise tax reports or liabilities are currently pending; (11) no Benefit Plan which is a 401(k) plan or pension plan has been determined to have been "top-heavy" under the provisions of IRC Section 416, and no such Benefit Plan has failed its required discrimination testing, during the three (3) year period immediately preceding the date of this Agreement, without corrective actions being taken to bring the plan back into compliance with discrimination testing; and (12) except as provided on Schedule 5.01(q), the Seller has no ERISA Affiliates. "ERISA Affiliate" mean an entity that would be considered a single employer with the Seller under ERISA Section 4001(b) or part of the same "controlled group" as the Seller for purposes of ERISA Section 302(d)(3) or Section 414 of the IRC.

(iii)    All current recipients of payments from Seller's Pension Plans are eligible to receive such payments.

(r)    Supplementing Schedules. Seller shall promptly supplement or amend any schedule with respect to any matter arising after the Agreement Date that, if it had existed on the Agreement Date, would have been required to be described in such schedule.   No matter disclosed in any such supplemental schedule shall be deemed accepted by Buyer, or to be a waiver by Buyer of any breach of a representation otherwise cured by such supplemental disclosure, unless Buyer expressly waives the same in writing.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

**6.01    Representations and Warranties of Buyer.**  Buyer represents and warrants to Seller that, except as set forth in the disclosure schedules being delivered by Buyer contemporaneously herewith, but no later than five (5) business days after the Agreement Date (the "Buyer Disclosure Schedules"):

(a)    Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. At Closing, Buyer or its assignee  is duly qualified to do business and is in good standing California, and in all jurisdictions in which the failure to so qualify would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transaction. The jurisdictions in which each Buyer is so qualified are listed on Schedule 6.01(a) hereto.

(b)    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Buyer of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Buyer.  This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies.

(c)    Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Buyer of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d)    Financial Statements.  Buyer has the financial wherewithal and ability to perform all of its obligations under this Agreement, including payment of the Purchase Price to Seller.   Buyer shall have on the Closing Date sufficient unrestricted funds or committed lines of credit on hand to pay the portion of the Purchase Price payable in cash at the Closing.

(e)    Litigation. There is no claim, action, lawsuit, or proceeding, or to the Knowledge of Buyer, any pending inquiry or investigation or any threatened claim, action, lawsuit, proceeding, inquiry or investigation, in each case, by or against or affecting Buyer which

has had or can be reasonably expected to have a material adverse effect on the ability of Buyer to consummate the Transaction.

(f)    Brokers.    Buyer is not a party to any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer or Seller thereof to pay any finder's fee, brokerage commission or similar payment.

## ARTICLE VII

## COVENANTS OF THE PARTIES

**7.01    Cooperation of the Parties.** Except as expressly required by this Agreement, each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to promptly consummate and make effective the Transaction.

**7.02    Bankruptcy Court Matters.**

(a)    Bidding Procedures.    Promptly, but in any event, within five (5) days, after the execution of this Agreement Seller will file a motion in the Bankruptcy Court for an order approving bidding procedures for the sale of the Acquired Assets (the "Bidding Procedures Order"), if such motion has not been filed previously.  The Bidding Procedures Motion, shall, among other things be in form and content reasonably acceptable to Buyer, and seek to designate the Buyer as the "Stalking Horse Bidder", i.e. the party submitting the highest and best bid for the Property prior to the auction to be conducted in accordance with bidding procedures subject to Buyer's reasonable approval (the "Bidding Procedures").  Seller will seek approval of Bidding Procedures that (i) approve the Break-Up Fee (as hereinafter defined), (ii) require that any competing bidder for the Seller's assets must purchase them on substantially the same terms and conditions as set forth in this Agreement (including the payment of the "Good Faith Deposit), but for an amount at least $600,000 greater than the Purchase Price (the "Minimum Overbid"), and (iii) that further bids must be made in increments of at least $100,000.

(b)    Sale Motion.    Promptly upon, but in any event, within five (5) days after the entry of the Bidding Procedures Order, Seller shall file in the Bankruptcy Court one or more motions seeking authorization of all relief required for the Sale Order, including, among other things approval of the sale of the Acquired Assets pursuant to this Agreement and the assumption and assignment of the Assumed Contracts (the "Sale Motion"), which Sale Motion shall be in form reasonably acceptable to Buyer..

(c)    Non-Assignment of Assets.    Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Acquired Asset if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a consent or approval required or necessary for such assignment or transfer, would constitute a violation of the Bankruptcy Code, as expressly determined by a final order of the Bankruptcy Court. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the Bankruptcy Court determines by a final order that such consent or approval is required but not obtained, and any Person refuses or fails to perform or to accept performance based on such non-assignability, then Seller shall, upon

Buyer's request and at Buyer's sole cost and expense, cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits and obligations of such Acquired Asset, including enforcement for the benefit of Buyer of any and all rights and remedies of Seller against a third party arising out of such third party's refusal or failure to perform or to accept performance based on such non-assignability, or any breach or cancellation. Any assignment to Buyer of any Acquired Asset that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any third party for such assignment as aforesaid as expressly determined by a final order of the Bankruptcy Court shall be made subject to such consent or approval being obtained. Any contract that would be an Assumed Contract but is not assigned in accordance with the terms of this Agreement shall not be considered an "Assumed Contract" for purposes hereof unless and until such contract is assigned to Buyer following the Closing Date upon receipt of the requisite consents or approvals to assignment and Bankruptcy Court approval.

7.03 **Break-up Fee.** In consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in consideration of the time, expense and risks associated with serving as the "Initial Bidder," including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, Buyer has provided a material benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee (as hereafter defined) is reasonable and appropriate in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and was necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement. Subject to the entry of the Bidding Procedures Order, if Buyer is not the successful bidder for the purchase of the Acquired Assets and the Acquired Assets are sold to another bidder, Seller will pay Buyer a break-up fee equal to five hundred thousand dollars ($500,000.00) (the "Break-up Fee").

7.04 **Notices and Consents.** Except as expressly required by this Agreement, each of the parties will promptly give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Entities to consummate and make effective the Transaction.

7.05 **Full Access.** From the Agreement Date through the Closing Date, the Seller will permit representatives of Buyer and its professionals to have full access at all reasonable times, and in a manner so as not to unreasonably interfere with the normal business operations of the Seller, to all books, records (including tax records), employees, contracts, and documents of or pertaining to the Seller.

7.06 **Property Inspection and Testing.** After the Agreement Date and prior to the Closing Date, Buyer shall be permitted at its sole expense, to inspect (with consultants of its choosing) the physical and environmental condition of the Real Property owned by Berkeley Properties LLC and used by the Seller. Buyer's inspection right shall include the right to test for

contamination, provided that Buyer shall restore such Real Property to the condition it was in prior to the conduct of any such inspection and testing.

**7.07    Name Change.**    As soon as practicable following the Closing, and subject to approval of the Bankruptcy Court, Seller shall discontinue the use of its current name (and any other trade names currently utilized by any Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Pacific Steel Casting Company" or any similar designation without the prior written consent of Buyer, and Seller shall cause the name of Seller in the caption of the Bankruptcy Case to be changed to the new name of Seller in accordance with this Section 7.06.  From and after the Closing, the Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by any of Seller in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. As soon as practicable following the Closing, Seller shall file all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each state in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

**7.08    Transfer Taxes.**    All taxes arising out of each transfer of the Acquired Assets and any transfer taxes required to effect any recording or filing with respect thereto shall be borne by Buyer.  Seller and Buyer shall cooperate to timely prepare and file any tax return relating to such transfer taxes, including, any claim for exempt or exclusion from the obligation or imposition of any transfer taxes.  Seller shall be solely liable for any income, capital gains or similar taxes arising from the transfer of the Acquired Assets.

**7.09    Bulk Sales Laws.**    To the extent the bulk sales laws of any state are applicable to the transactions contemplated by this Agreement, the parties hereby waive compliance with such bulk sales laws and the Buyer shall pay any Liabilities for any such noncompliance as a purchaser of assets pursuant to applicable law; provided, that Buyer shall in no case be deemed to assume any Liabilities which are not otherwise Assumed Liabilities under Section 2.03(b) by reason of such noncompliance, and Seller shall pay any Liabilities for any such noncompliance as a seller of assets pursuant to applicable law.

**7.10    Multiemployer Plan.**

(a)    The Parties intend to comply with the requirements of Section 4204 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") in order to ensure that the transactions contemplated by this Agreement shall not be deemed a complete or partial withdrawal from the CMTA – Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust (the "Multiemployer Plan").  Accordingly Seller and Buyer agree:

(i)    After the Closing Date, Buyer shall contribute to the Multiemployer Plan with respect to the Seller's Business operations acquired by Buyer for substantially the same number of "contribution base units" for which Seller had an "obligation to contribute" to the Multiemployer Plan (as those terms are defined in Sections 4001(a)(11) and 4212 of ERISA, respectively) pursuant to the Collective Bargaining Agreement. At or prior to

Case:14-44-41057   Doc#:201-2   Filed:11/06/19/14   Entered:11/06/19/14 06:42:20   Page 73 of 72   of 147

the Closing Date, Seller shall assume and assign to the Buyer the Collective Bargaining Agreement with the Union, effective as of the Closing.

(ii)     Buyer shall provide to the Multiemployer Plan, for a period of five consecutive plan years commencing with the first plan year beginning after the Closing Date, either a bond issued by a surety company that is an acceptable surety for purposes of Section 412 of ERISA or an amount held in escrow by a bank or similar financial institution satisfactory to the Multiemployer Plan. The amount of such bond or escrow deposit shall be equal to the greater of (A) the average annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of Seller's Business for the three plan years immediately preceding the plan year in which the Closing Date occurs, or (B) the annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of the Seller's Business for the last plan year immediately preceding the plan year in which the Closing Date occurs. Such bond or escrow shall provide that it will be paid to the Multiemployer Plan if Buyer withdraws from the Multiemployer Plan or fails to make a contribution to the Multiemployer Plan when due, at any time during the first five plan years beginning after the Closing Date. Buyer may, at its own cost and expense, seek any applicable waiver or exemption from the Multiemployer Plan or the applicable Governmental Entity from the requirement that it post a bond, as set forth in 29 C.F.R. Part 4204, and Seller shall cooperate with Buyer in seeking such waiver or exemption, provided, however that Buyer shall comply with all provisions of this Section 7.10(a)(ii) for the period of time after the Closing Date in which it is seeking but not yet obtained such a waiver or exemption.

(iii)     If Buyer completely or partially withdraws from the Multiemployer Plan prior to the end of the fifth plan year of the Multiemployer Plan beginning after the Closing Date, and Buyer's liability of the Buyer with respect to the Multiemployer Plan is not paid, then Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Multiemployer Plan with respect to Buyer's operations during such five-year period but for Section 4204 of ERISA. Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii).

(b)     Seller shall cooperate with Buyer if Buyer elects to prepare and submit to the Multiemployer Plan or the Pension Benefit Guarantee Corporation ("PBGC") a request for a variance or exemption from the bond/escrow requirement of Section 4204(a)(1)(B) of ERISA (as described in clause (ii) of this subsection). Unless and until such a variance or exemption is granted, Buyer shall comply with the bond/escrow requirement, except to the extent provided in PBGC Regulation Section 2643.11(d).

(c)     To the extent that this Section 7.10 (without regard to this subsection) fails to comply with the requirements of Section 4204 of ERISA such that the withdrawal liability exemption provided by Section 4204 would be unavailable to Seller, the Parties agree that this Section 7.109 shall be deemed to include any term (including the modification of any express term herein) that is reasonably necessary to invoke the withdrawal liability exemption resulting from the application of Section 4204 to the Transaction.

**7.11     Post-Closing Transition and Cooperation.**

(a)     The Parties agree that following the Closing of the Transaction, they shall cooperate to facilitate the ownership transition of the Business and the Acquired Assets to the Buyer by taking such actions and executing such documents as may be necessary and appropriate for such purpose.  Buyer shall cooperate with Seller by making available to Seller upon its reasonable request and upon reasonable notice and for reasonable time periods, former Seller personnel employed by Buyer who have specific and unique knowledge of Seller's pre-Closing operations such that their assistance would be reasonable and necessary to enable Seller to complete its disclosure statement and plan of reorganization in the Bankruptcy Case and to otherwise substantially comply with the requirements of the Bankruptcy Code. The Parties agree to negotiate a reasonable compensation arrangement pursuant to which Seller shall pay Buyer for the reasonable value of the time expended by such personnel for Seller's benefit.

(b)     Notwithstanding Seller's assignment of all its prior and current workers compensation Insurance Policies to Buyer, Buyer shall cooperate with Seller as necessary to facilitate the transition to Buyer the processing and administration of claims actually or potentially covered under such workers compensation Insurance Policies for acts or occurrences arising prior to the Closing Date.

**7.12.   Non-Union Pension Plan**. On or before the Closing Date, Seller shall file with the IRS a submission under the Voluntary Correction Program ("VCP") to correct errors identified in the 2011 restatement of the Non-Union Pension Plan.  To the extent the IRS disqualifies the Non-Union Pension Plan and seeks to impose taxes (including penalties and interest) or other costs by reason thereof, or discovers and asserts any other qualification issues arising from occurrences and circumstances prior to the Closing,  or seeks to impose penalties or costs on the Plan sponsor by reason thereof, Buyer shall assume and pay the same.

## ARTICLE VIII

## EMPLOYEE MATTERS

### 8.01   Employees.

(a) <u>Rehired Employees</u>.

(i)     From the Agreement Date and only so long as the Buyer is not in breach hereof, Seller shall cooperate with Buyer and permit Buyer to (i) meet with employees of the Seller at such times as Buyer shall reasonably request, (ii) speak with such employees who are being considered for employment by Buyer, (iii) distribute to such employees such forms and other documents relating to potential employment by Buyer (including an incentive compensation package to certain members of management) after the Closing Date as Buyer may reasonably request and (iv) permit Buyer to review personnel files and other relevant employment information regarding employees of the Seller.

(ii)     As of the Closing Date, Buyer will have arranged the ability to offer to rehire, in Buyer's sole discretion, all or part of the employees of Seller. Seller will provide a complete list of all of their current employees with an indication of which employees are represented by the Union. Without limiting Buyer's discretion,  one day after entry of the

Sale Order, Buyer shall provide Seller with approximate lists of the number and categories of employees to be offered employment. Any negotiations or discussions with members of the Union or the Union Representative after the Closing Date shall be conducted according to the requirements of the Collective Bargaining Agreement and applicable law. The employees who accept Buyer's offer are referred to as the "Rehired Employees".

(iii)     To the extent not prohibited under applicable law, following the Closing Date, Seller shall make available to Buyer such non-confidential data in personnel records of Rehired Employees as is reasonably necessary for Buyer to transition such Rehired Employees into Buyer's records.

(iv)     On the Closing Date, Seller shall pay to its employees, or reserve for payment, the portion of the payroll and such other amounts as Seller is liable (including, without limitation, applicable payroll taxes and amounts owed under Union Benefit Plans) that first comes due following the Closing Date that relates to services performed by its employees prior to the Closing Date. If reserved, such amount shall be paid in the next payroll coming due.

(v)     Effective immediately before the Closing, Seller shall terminate, at its sole cost and expense, the employment of the Rehired Employees. Each Rehired Employee who is not otherwise participating in the Union Benefit Plans shall be eligible to participate in all of Buyer's employee benefit plans in accordance with the terms of those plans to the same extent and in the same manner as new employees of Buyer, or Buyer may permit or require those Rehired Employees to continue to participate in the Assumed Plans.

(vi)     Except as otherwise specifically set forth herein, Seller shall have no responsibility whatsoever for any liabilities or obligations which relate in any way to such Rehired Employee's employment service with Buyer.

(b) Excluded Employees. Buyer shall have no obligation to offer employment to any employee listed on Schedule 8.01(b) (the "Excluded Employees"), but may hire them. Buyer may amend Schedule 8.01(b) from time to time on written notice to Seller; provided that such Schedule 8.01(b) shall be finalized no later than one day prior to the Closing Date. If an Excluded Employee is hired by Buyer, he or she is no longer an Excluded Employees and becomes a Rehired Employee. The Excluded Employees and all obligations to the Excluded Employees shall remain the sole responsibility of Seller, including, without limitation, all severance, constructive notice or other costs under any contract, agreement or understanding and any applicable federal, state, county, city, municipal or other laws, statutes, rules, regulations, orders, consent decrees, permits or licenses in connection with the Excluded Employees.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

### 9.01    Conditions to Closing Applicable to All Parties.

(a)     Order. As a condition to Closing, the Bankruptcy Court shall issue an order (the "Sale Order"), which order shall be final and non-appealable and not be subject to any

stay (unless the Parties waive the requirement that the Sale Order be final and non-appealable), and which shall confirm the sale of the Acquired Assets to the Buyer, the assignment of the Assumed Contracts to the Buyer, and authorization of the Transaction consistent with the terms of this Agreement, in form and content reasonably satisfactory to Buyer. In the event that entry of the Sale Order is appealed, Seller and Buyer shall use their respective reasonable efforts to defend such appeal.

(b)　　Conditions to the Obligations of Buyer and Seller. The obligations of Buyer and Seller to consummate the Transaction shall be subject to the satisfaction, or waiver by such Party, at or prior to the Closing Date, of the condition that there shall be no (i) suit, action or other proceeding threatened or brought by any Governmental Entity which seeks to restrain or prohibit in any material respect the consummation of the Transaction; or (ii) injunction, stay, order, judgment or decree in effect and issued by any Governmental Entity which restrains or prohibits in any material respect the consummation of the Transaction.

(c)　　Notice and Opportunity to Cure. If on the Closing Date any of the conditions set forth in this Article IX are not satisfied, then the Party whose obligation to perform hereunder is subject to such condition shall provide written notice to the other Party, and if such condition is not satisfied within three business days of receipt of such notice, then the Party giving notice shall have the right to terminate this Agreement by written notice given prior to the Closing. If such notice of termination is given by Buyer, the Good Faith Deposit shall be immediately refunded to Buyer.

**9.02　Conditions to the Obligations of Seller.** The obligations of Seller to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)　　Representations and Warranties; Covenants. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date. Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on Closing.

(b)　　Buyer Deliveries. Seller shall have received from Buyer the deliverables referred to in Section 4.01(a) in form and substance reasonably satisfactory to Seller;

(c)　　Sale Order. The Bankruptcy Court shall have entered the Sale Order which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.

**9.03　Conditions to the Obligations of Buyer.** The obligations of Buyer to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)　　Representations and Warranties; Covenants. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date. Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on the Closing Date.

(b)     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered each of the Bidding Procedures Order and the Sale Order in form and content reasonably acceptable to Buyer which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.  Among other things, the Sale Order must (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Acquired Assets to Buyer on the terms set forth here, including that such sale is free and clear of Encumbrances and claims (except with respect to the Assumed Liabilities), with such Liens, Encumbrances and claims to attach only to the proceeds of the sale; and (C) the performance by Seller of its obligations under this Agreement; (ii) authorize and direct Seller to assume and assign to Buyer the Assumed Contracts, and Intellectual Property Assignments pursuant to Section 365 of the Bankruptcy Code; (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and that the Buyer is entitled to have the protections afforded by that section; (iv) contains a finding that reasonable and adequate notice of the sale and transfer of the Acquired Assets to Buyer, and assumption and assignment of the Assumed Contracts to the Buyer, has been provided to all parties required to be given notice under the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of California; (v) contains a finding that neither Seller nor Buyer has engaged in any conduct that would cause or permit the sale of the Acquired Assets to be avoided under Section 363(n) of the Bankruptcy Code; (vi) bars any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), Liens or Encumbrances of any kind or nature against Buyer or the Acquired Assets that arose prior to Closing; and (vii) provides that the Sale Order is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Sections 701 or 702 of the Bankruptcy Code.  The Sale Order shall be in full force and effect.

(c)     Sale Order.  Seller shall have delivered to Buyer (A) a certified copy of the Sale Order and (B) copies of all affidavits of service of the Sale Motion seeking the Sale Order or notice of such motion filed by or on behalf of Seller;

(d)     Assumed Contracts.  All of the Assumed Contracts shall be in full force and assignable to, and assumable by, Buyer without the consent of the other party thereto, pursuant to Section 365 of the Bankruptcy Code, or the required consents with respect thereto shall have been obtained. Buyer shall exert reasonable efforts to obtain any third party consents required for the assignment of the Assumed Contracts to Buyer. Seller shall reasonably cooperate in Buyer's efforts to obtain such consents.

(e)     Seller Deliveries.  Buyer shall have received from Seller the deliverables referred to in Section 4.01(b) in form and substance reasonably satisfactory to Buyer.

(f)     No Material Changes In Business, Acquired Assets.  There shall have been no change in the operation or use of the Business, the Acquired Assets or the Real Property that is reasonably likely to have a Material Adverse Effect on the Business, the Acquired Assets or the Real Property.  Seller shall continue to operate in the ordinary course, including without limitation backlogs within ordinary levels, orders met with ordinary timeliness, working capital being maintained at ordinary levels, an absence of material customer order cancellation.

(g) **Import Castings In Transit.** Seller's import castings in transit as listed on the Accrued Expenses Breakdown in the Cleary Gull data room are not in the possession of Seller, have not already been sold, and have customer orders for 100% of the particular parts.

(h) **Lease Of Real Property.** Buyer shall have entered into a "triple net" lease of the Real Property with Berkeley Properties, LLC, including monthly rent of $89,544.00, a 15-year term with 5-year extension option in the form and on the terms and conditions described in Exhibit 9.03(h) hereto ("Lease"). All representations and warranties of the Landlord under the Lease shall be true and accurate in all material respects as of the Closing Date. Beginning on the Agreement Date to the Closing Date, Buyer shall reasonably cooperate with Seller's attempt to obtain all certificates of occupancy and zoning certificates necessary to take occupancy and continue operations as a steel foundry from and after the Closing Date.

(i) **Real Property Contamination.** In the event that testing is conducted on behalf of Buyer of the environmental condition of the Real Property owned by Berkeley Properties, LLC under Section 7.06, Buyer shall have received environmental testing results for the such Real Property which (i) conclude that such Real Property is not contaminated (other than any contamination identified in the Phase I or Phase II testing reports previously obtained by the Company and disclosed to Buyer), or (ii) concludes such Real Property is contaminated (other than contamination identified in such Phase I and Phase II testing reports) and the estimated costs of remediation are less than $750,000 provided in such case that Seller either assumes the obligation to remediate such contamination at Seller's expense, or reduces the Purchase Price in the amount of the estimated remediation costs.

(j) **Real Property Condition.** In the event that testing is conducted on behalf of Buyer of the physical condition of the Real Property owned by Berkeley Properties, LLC, under Section 7.06, Buyer shall have received inspection reports for the such Real Property which notes conditions in need of repair, rehabilitation or replacement and the aggregate amount thereof is less than $750,000. Any cost attributable to repair, rehabilitation or replacement of a condition identified in the Phase I or Phase II testing reports described in Section 9.03(i) shall be disregarded for purposes of determining the aggregate amount of required repair, rehabilitation or replacement costs. For purpose hereof any item of repair assumed by Berkeley Properties LLC under the Lease shall be excluded from the aggregate amount of estimated repair items.

(k) **Non-Union Pension Plan.** Seller shall pay to the Non-Union Pension Plan, all amounts necessary to meet the outstanding minimum contribution requirements for the Non-Union Pension Plan with respect to the plan ending March 31, 2014, the estimated amount of which is $760,000.

## ARTICLE X

## MISCELLANEOUS

**10.01 Survival of Representations, Warranties and Covenants.** The representations and warranties of Buyer and Seller contained in this Agreement and the covenants and agreements of Buyer and Seller contained in this Agreement shall survive for a period of ninety (90) days following the Closing Date and any claim of breach by either Party shall made in

Case 14-10457   Doc 201-2   Filed 11/06/14   Entered 11/06/14 16:42:26   Page 79 of 78

writing delivered to the breaching Party on or before the end of such ninety (90) day period. Any dispute arising out of a claimed breach shall be submitted to and resolved by the Bankruptcy Court pursuant to Section 10.08 hereof. Any amount determined to be due to Buyer (either by agreement of the Parties or by order of the Bankruptcy Court) on account of any breach of a representation, warranty or covenant by Seller shall be paid to Buyer through a reduction in the amount of rent otherwise payable by Buyer to Berkeley Properties LLC under the Lease until the amount of such rent abatement equals the amount determined to be due to Buyer, after which the rent under the Lease shall be fully payable pursuant to the Lease terms. Buyer's sole and exclusive remedy after the Closing Date for any Seller's breach of a representation, warranty or covenant shall be such rent abatement. The Lease shall provide for Berkeley Properties LLC's consent to and recognition of Buyer's rights of offset and rent abatement hereunder.

**10.02 No Third-party Beneficiaries.** This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

**10.03 Entire Agreement.** This Agreement (including the exhibits, schedules and Disclosure Schedules referred to herein) and the Sale Order constitutes the entire agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof or thereof.

**10.04 Succession and Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that nothing herein shall prohibit the assignment of Buyer's rights and obligations) to any direct or indirect subsidiary or affiliate (formed or to be formed). No such Buyer assignment shall relieve it of its obligations under this Agreement prior to the Closing. From and after the Closing and assuming payment in full of the Purchase Price, Speyside Fund, LLC is released from further liabilities and obligations hereunder, and its assignee subsidiary shall be solely liable for the obligations of the Buyer.

**10.05 Counterparts; Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures of the parties transmitted by facsimile or by electronic media or similar means shall be deemed to be their original signature for all purposes.

**10.06 Headings.** The section headings contained in this Agreement are inserted for convenience and reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**10.07 Notices.** All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two (2) Business Days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

167478.001/594498v6

<u>If to The Seller</u>:

Pacific Steel Casting Company
c/o Katie Delsol
85 Lakeside Drive
Corte Madera, CA 94925
Phone:
Facsimile:

<u>Copy to</u>:

Michael Malter, Esq.
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050
Phone: 408-295-1700
Facsimile: 408-295-1531
Email: michael@bindermalter.com

and

Stephen A. Dennis, Esq.
Thoits, Love, Hershberger & McLean
285 Hamilton Avenue, Suite 300
Palo Alto, CA 94301
Phone: 650-327-4200
Facsimile: 650-325-5572
Email: sdennis@thoits.com

<u>If to Buyer</u>:

Speyside Fund, LLC
Attn: Jeffrey Stone
55 Bridge St.
Lambertville, NJ 08530
Phone: 800-897-9721
Facsimile: 855-269-3979

<u>Copy to</u>:

Gary Kaplan, Esq.
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Phone:   415-954-4940
Facsimile:  415-954-4480
Email: gkaplan@fbm.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it is actually received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

**10.08 SUBMISSION TO JURISDICTION.** THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION,

**10.09 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, and where applicable, the Bankruptcy Code.

**10.10 Amendments and Waivers.** No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer, the Seller. No amendment of any provision of Section 7.10 affecting the treatment of the Multiemployer Plan hereunder, shall be made without the written consent of the Multiemployer Plan. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**10.11 Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

**10.12 Fees and Expenses.** Except as otherwise provided in the Agreement, each Party shall bear the fees, costs and expenses incurred by it, in connection with or in anticipation of this Agreement and the consummation of the Transaction. In the event of the bringing of any action, Bankruptcy Court proceeding or suit by a Party against another Party by reason of any breach of any of the covenants or agreements or any material inaccuracies in any of the representations and warranties on the part of the other Party arising out of this Agreement, the prevailing Party in such action, Bankruptcy Court proceeding or suit, shall be entitled to have and recover of and from the other Party all costs and expenses of suit, including reasonable attorneys' fees.

**10.13 Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

**10.14 Fair Consideration.** The Parties acknowledge and agree that the Purchase Price represents fair consideration and reasonable equivalent value for the sale and transfer of the Business and Acquired Assets, and the Transaction, covenants, and agreements set forth in this Agreement, which consideration was agreed upon as the result of arm's-length good-faith negotiations among the Parties and their respective representatives.

**10.15 Incorporation of Schedules.** The Schedules and the Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**10.16 Gender and Number.** When the context of this Agreement requires, the general of all words shall include the masculine, feminine, and neuter, and the number of all words shall include the singular and plural.

**10.17 No Consequential or Punitive Damages.** NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**10.18 Time of Essence.** Time is of the essence of each and every term, condition, obligation and provision hereof.

**10.19 Waiver.** Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such Party. No failure on the part of any Party to exercise, and no delay in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by any Party of any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _Katie Delsol_____

Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: _____

Title: _____

167478.001/594498v5

32

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _____

        Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: _Jeffrey A. Stone_

Title: _Managing Director, Member_

## Exhibit A

### Definitions

**Certain Definitions.** The following terms, as used in this Agreement, have the following meanings:

"2013 Year-end Financial Statements" is defined in Section 5.01(f).

"2014 Year-end Financial Statements" is defined in Section 5.01(f).

"Acquired Assets" is defined in Section 2.01(a).

"Agreement Date" is defined in the first paragraph of this Agreement.

"April 30, 2014 Interim Financial Statements" is defined in Section 5.01(f).

"Assumed Contracts" is defined in Section 2.04(a).

"Assumed Liabilities" is defined in Section 2.03(b).

"Assumed Plan" means a Benefit Plan assumed by the Buyer.

"Bankruptcy Case" is defined in Recital B.

"Bankruptcy Code" is defined in Recital B.

"Bankruptcy Court" is defined in Recital B.

"Benefit Plans" means all plans maintained, funded or administered by Seller for the benefit of Seller's employees, including health, dental, vision, long-term disability, life insurance policy, 401(k) plans, and pension plans.

"Bidding Procedures Order" is defined in Section 7.02(a).

"Break-up Fee" is defined in Section 7.03.

"Business" is defined in Recital A.

"Buyer" is defined in the first paragraph to this Agreement.

"Buyer's Audited Financial Statements" is defined in Section 6.01(d).

"Buyer's Financial Statements" is defined in Section 6.01(d).

"Buyer's Interim Financial Statements" is defined in Section 6.01(d).

"Cash" and "Cash Equivalents" means currency, coins, checks received but not yet deposited, checking accounts, petty cash, savings accounts, money market accounts, and short-term, highly liquid investments with a maturity of three months or less at the time of purchase such as U.S. treasury bills and commercial paper.

"Closing Date" is defined in Section 2.01(a).

"Collective Bargaining Agreement" means the Agreement between Pacific Steel Casting Company and Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union and establishes Seller's obligation to contribute to the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust during the period March 21, 2011 through March 15, 2015.

"Contracts" means all contracts, licenses, sublicenses, agreements, commitments, leases, arrangements, instruments, guaranties, bids and proposals to which the Seller is a party and relating to the Business.

"Cure Amounts" is defined in Section 2.04(b).

"Debtor" is defined in the first paragraph of this Agreement.

"Encumbrances" means any interest, claim, Lien, mortgage, pledge, security interest, obligation, encumbrance, lien (statutory or other), liability, charge, lease, covenant, easement, option, right of others, hypothecation, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise), whether imposed by agreement, understanding, law, equity, or otherwise. .

"Environmental Claim" means all liabilities, damages, obligations, claims or losses of any kind whatsoever imposed, incurred or arising from or under any Environmental Law or resulting from the presence of any Hazardous Substance.

"Environmental Laws" means any federal, state, local or foreign statute, law, ordinance or promulgated rule, regulation, code or directive, any duties imposed under common law, any judicial or administrative decree, order or judgment (whether or not by consent), any request or demand from a Governmental Entity, or any provision or condition of any permit, license or other operating authorization relating to (i) the protection of the environment or human, worker or public health and welfare, or the protection of the health and safety of any workers, employees, and the public or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling or actual or potential release, discharge or emission of any Hazardous Substance, including but not limited to the Clean Water Act, the Toxic Substances Control Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the River and Harbor Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Toxic Substances Control Act, the Federal Mine Safety and Health Act, the Occupational Safety and Health Act, and any state or local law, ordinance, rule, regulation, code or directive regulating the same or similar matters.

"Environmental Permits" means any and all Permits issued in accordance with or pursuant to any Environmental Law.

"ERISA" is defined in Section 7.10(a).

"Excluded Assets" is described in Section 2.02.

"Executory Contract" is defined in Section 2.04(a).

"Financial Advisor" is defined in Section 3.01(c)(ii).

"Financial Statements" is defined in Section 5.01(f).

"GAAP" is defined in Section 5.01(f).

"Good Faith Deposit" is defined in Section 3.01.

"Governmental Entity" means any federal, state, municipal, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental or quasi-governmental or regulatory authority, agency, commission body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"Hazardous Substances" means any substance, waste, contaminant, pollutant or material regulated or governed by any Environmental Law, including, but not limited to, (a) all substances, wastes, contaminants, pollutants and materials defined or designated as hazardous, dangerous or toxic pursuant to any applicable Environmental Law and (b) asbestos, mold, polychlorinated biphenyls ("PCBs") and petroleum.

"Initial Credit Bid" is defined in Section 3.01(b)(i).

"Insurance Policies" is defined in Section 5.01(o).

"Intellectual Property" means (i) inventions, ideas or conceptions of potentially patentable subject matter, whether or not reduced to practice, whether or not yet made the subject of a pending patent application or applications, (ii) patents and patent applications (including any continuations, continuations-in-part, divisionals, reissues, renewals and applications for any of the foregoing, (i) and (ii) collectively, "Patents"), (iii) trademarks, service marks, trade dress, designs, logos, trade names, corporate names, and any derivative, thereof, used by Seller in connection with the operation of the Business, and general intangibles of like nature whether or not registered, including all common law rights and registrations and applications for registration thereof, together with all goodwill relating to the foregoing (collectively, "Trademarks"), (iv) copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by multinational treaties or conventions (collectively, "Copyrights"), (v) computer software, including, without limitation, source code, operating systems and specifications, data, data bases, files, documentation and other materials related thereto, (vi) trade secrets and confidential, technical or business information (including, without limitation, ideas, inventions (whether or not patentable), formulas and compositions), (vii) technology (including, without limitation, know-how and show-how), production processes and techniques, research and development information, drawings, specifications, designs, sketches, design archives, plans, proposals, technical data, copyrightable works, financial, marketing, and business data, pricing and cost information, business and marketing plans and customer and

supplier lists and information, whether or not confidential, whether current or historical, (viii) all web sites, and domain names, and all content contained therein, (ix) all rights to obtain and apply for Patents, and to register Trademarks and Copyrights, (x) copies and tangible embodiments of all of the foregoing, in whatever form or medium, (xi) all rights to sue, recover and retain damages (and costs and attorneys' fees) for present and past infringement of any of the Intellectual Property hereinabove set out, and (xii) all common law rights with respect to the Intellectual Property hereinabove set out.

"Interim Financial Statements" is defined in Section 5.01(f).

"IRC" is defined in Section 5.01(q)(ii).

"Inventory" means all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials and components intended for sale wherever located.

"IRS" is defined in Section 3.01(f).

"Knowledge" means the actual knowledge of any executive officer of the Seller, or any executive officer of the Buyer, as the case may be.

"Lease" is defined in Section 9.03(h).

"Liabilities" is defined in Section 2.03(a).

"Liens" means any claim, lien (as defined in Section 101(37) of the Bankruptcy Code), condition, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, covenant, restriction, reservation, agreement of record, restriction on use or voting (in the case of any security interest) preference, tax (including foreign, federal, state or local income, gross receipts, sales, use, ad valorem, gains, profits, excise, franchise or other taxes, fees, levies, or other duties or assessments imposed by any Governmental Entity), or any other encumbrance of any nature whatsoever.

"Material Adverse Effect" shall mean any event, change, condition or effect which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or is reasonably likely to be, materially adverse to the Acquired Assets, the Real Property or the Business taken as a whole or to the Transaction, other than events, changes, conditions or effects (i) affecting the United States economy generally, (ii) the industry in which Seller operates, in each case without a disproportionate impact on the Business or (iii) arising from the commencement of the Chapter 11 case or any action ordered by the Bankruptcy Court and approved by Buyer.

"Minimum Overbid" is defined in Section 7.02(a).

"Multiemployer Plan" is defined in Section 7.10(a).

"Net Working Capital" means the sum of the values of Seller's trade accounts receivable, net of any allowances for doubtful accounts or unprocessed returns, and Inventory, net of reserves. Accounts receivable shall be valued in accordance with GAAP, consistently applied, and shall

Case 14-10357   Doc 201-2   Filed 11/06/14   Entered 11/06/14 16:42:26   Page 89 of 150

satisfy all of the representations and warranties in Section 5.01(h) in order to be included. To avoid doubt, inter company accounts and accounts receivable due from affiliates shall be excluded. Inventory of domestic castings (work in process and finished goods) shall be valued in accordance with the amounts per ton for each category identified on <u>Schedule 3.01(c)(ii)</u>, inventory of import castings and raw materials shall be determined in accordance with GAAP, consistently applied. All Inventory shall be undamaged and in condition for use or sale in the ordinary course. Inventory reserves shall be determined in accordance with GAAP, consistently applied. Goods which have been paid for but have not been delivered by the Closing Date constitute Inventory for purposes of calculating Net Working Capital.

"<u>Non-Union Pension Plan</u>" means the single employer defined benefit pension plan provided for certain of Seller's current and former non-union employees entitled the Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (Tax ID 94-6270646).

"<u>PBGC</u>" is defined in Section 7.10(b).

"<u>Party</u>" and "<u>Parties</u>" are defined in the first paragraph to this Agreement.

"<u>Pension Plans</u>" means collectively the Multiemployer Plan and the Non-Union Pension Plan.

"<u>Permits</u>" is defined in Section 2.01(a)(vi).

"<u>Person</u>" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity (or any department, agency, or political subdivision thereof).

"<u>Petition</u>" is defined in Recital B.

"<u>Petition Date</u>" is March 10, 2014.

"<u>Purchase Price</u>" is defined in Section 3.01(b).

"<u>Purchase Price Adjustment Statement</u>" is defined in Section 3.01(c)(ii).

"<u>Real Property</u>" is defined in Section 5.01(k).

"<u>Rehired Employees</u>" is defined in Section 8.01(a)(ii).

"<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Substance (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Substances through or in the ambient air, soil, surface or ground water, or property.

"<u>Sale Order</u>" is the order by the Bankruptcy Court as described in Section 9.01(a).

"<u>Seller</u>" is defined in the first paragraph of this Agreement.

"Seller Disclosure Schedules" is defined in Section 5.01.

"Taxes" all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental, custom duty, capital stock or other equity, excise, real property, personal property, water and sewer charges, municipal utility district, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"Tax Return" mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction" is defined in Recital C.

"Union Benefit Plans" means the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust and the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan.

"Union" means Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union.

# SCHEDULE 2.02(g)

## Deposits and Prepaid Amounts Funded by PS

| Vendor | Amount |
|---|---|
| Pacific Gas and Electric | $849,786 |
| Occidental Energy Marketing | 120,000 |
| Airgas USA | 20,000 |
| AT&T | 18,110 |
| EBMUD | 4,866 |
| Sprint | 4,118 |
| Cogent | 2,400 |
| Chang, Ruthenberg & Love, P.C | 4,524 |
| Binder & Malter | 450,000 |
| BPM | 50,000 |

164178.591857v4

## SCHEDULE 2.03(b)(iii)

## Buyer assumed Benefit Plans

MEDICAL
Anthem Blue Cross of California Preferred Direct Access
Policy #253089
Kaiser Permanente – Northern California
Policy Number: #37173

DENTAL
Reliance Standard
Policy Number: #136-4050-1

LONG-TERM DISABILITY
Reliance Standard
Policy Number: #120499

LIFE & ACCIDENTAL DEATH & DISMEMBERMENT
Reliance Standard
Policy Number: #146828

VISION
EyeMed Vision Care
Policy Number: 9681503

WELFARE PLAN
CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan

401(K) PLAN
Pacific Steel Casting Company Retirement Plan (TIN 94-1067684)

PENSION PLAN
Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (TIN 94-6270646)

CMTA - Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust, (TIN 94-6129501)

## SCHEDULE 2.03(b)(iii)

### Retirees under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011 and prior to the Closing Date:

| Payroll Name | Hire Date | Termination Date |
|---|---|---|
| Welch, Betty Jane | 04/06/1994 | 01/10/2012 |
| Yost, Steven | 05/12/1998 | 03/28/2013 |
| Dias, Fernando C. | 09/29/1980 | 03/31/2012 |
| Emmerichs, Horst Joe | 11/11/1963 | 03/31/2011 |
| Lee, Douglas M | 08/01/1975 | 01/15/2012 |
| Neely, Robert Ward | 03/12/1979 | 12/31/2013 |
| Patterson, John Carlton | 01/05/1970 | 12/31/2013 |
| Scott, Barry George | 06/10/1996 | 08/31/2013 |
| Soares, Richard S | 06/15/1964 | 12/31/2013 |
| Soto, Marco A. | 10/15/1990 | 03/31/2013 |

## SCHEDULE 2.03(b)(iv)

## Transferable licenses, permits, etc.

1. Air – 3 Bay Area Air Quality Management District permits; one for each plant

2. Storm water – General Industrial Storm Water Permit

3. Industrial Water – East Bay Municipal Utility District Discharge Permit

4. Hazardous Materials, Universal Waste, Hazardous Waste Generator – City of Berkeley Unified Program Consolidated Permit and Registration

5. Berkeley Business License

164178.591857v4

## SCHEDULE 2.03(b)(v)

## Employees With Accrued and Unpaid Vacation Benefits

**PACIFIC STEEL CASTING COMPANY**                              CHB
**Accrued Vacation**                                          6/17/2014
May 31, 2014                                                  4:50:00

| Name | | Vacation Liability |
|------|---|---|
| Ali, Rajak M | $ | 5,889.80 |
| Anand, Ajay K | | 4,663.76 |
| Anand, Lalit K. | | 18,034.50 |
| Anish, Thottathil V. | | 14,664.40 |
| Aragon, Robert Jess | | 5,620.31 |
| Benge, Ronald | | 3,606.00 |
| Bridges, Charles H | | 20,913.06 |
| Costa, Ryan Paul | | 4,642.87 |
| Davi, Fred Vincent | | 24,357.03 |
| Delsol, Catherine B | | 27,787.35 |
| Droesch, David C. | | 3,029.00 |
| Emmerichs, Mike G | | 23,293.71 |
| Emmerichs, Tom | | 13,019.45 |
| Ferreira, Jose A. | | 13,796.50 |
| Ferrell, Nettie | | 9,248.46 |
| Fortuna, Antonio F. | | 14,794.94 |
| Garcia, Armand Casenillo | | 5,275.35 |
| Garlieb, Christopher | | 14,783.37 |
| Hajiaghazadeh Marandi, Elmira | | 1,096.30 |
| Ledesma, Ericka C. | | 1,129.88 |
| Ledesma, Marc G. | | 6,931.90 |
| Lock, Steven R | | 12,056.68 |
| Pepe, Emmanuell F. | | 6,750.07 |
| Petersen, Ross T. | | 13,826.97 |
| Polvi, David | | 8,941.95 |
| Rivera, Vicky S | | 1,853.34 |
| Rodriguez, Paola P. | | 2,573.97 |
| Roytfeld, Rita | | 7,774.28 |
| Saeteum, Meuy C. | | 4,651.14 |
| Scott, Barry John | | 5,408.75 |
| Schroeder, Efrain | | 3,503.83 |
| Skeen, Steven E | | 2,928.24 |
| Silva, Paul Tony | | 11,467.66 |
| St. Andrew, David F. | | 5,582.25 |
| Standafer, David C. | | 28,404.82 |
| Stevens, David A. | | 11,171.80 |
| Thulasiraman, Thirumidi | | 9,042.68 |
| Wang, Cunmin | | 10,646.50 |
| Woodmansee, Joshua P | | 3,081.36 |
| Subtotal - Salaried | $ | 386,244.31 |
| Alvarenga, Jeneffer | $ | 2,600.00 |
| Bandy, Ronald S | | 3,771.36 |
| Bonini, Jason R. | | 843.78 |
| Diaz-Rivas, Jesus | | 3,105.00 |
| Davis, Tony J | | 8,123.43 |

| | | |
|---|---|---:|
| Doran, Paul M | | 2,240.00 |
| Ferguson, Gene E.. | | 1,277.50 |
| Franco, Ricardo G. | | 2,840.12 |
| Jimenez, Guadalupe | | 1,908.00 |
| Ling, John | | 1,540.00 |
| Lopez, Jessica | | 1,188.00 |
| Pacheco Cabanas, Veronica | | 1,152.00 |
| Pan, Baohua | | 6,292.44 |
| Rodriguez Yanez, Cristobal | | 6,309.26 |
| Roytfeld, Mark | | 3,581.46 |
| Sayavong, Connie B | | 6,308.46 |
| Silveira, Jason M | | 3,640.80 |
| | | |
| Subtotal - Non-Union Hourly | $ | 56,721.63 |
| | | |
| Acosta, Juan | $ | 1,783.39 |
| Acosta, Victor Sergio | | 568.52 |
| Aguilar De Amaya, Rosa | | 1,500.52 |
| Aguilar Ramos, Gonzalo | | - |
| Aguilar, Santiago | | 722.34 |
| Aguilera, Gonzalo V. | | 5,665.30 |
| Aguilera, Leonel A. | | 117.69 |
| Akauola, Ikahihifo | | 1,248.50 |
| Alvarez, James | | 315.60 |
| Alvarez, Jose R. | | 370.06 |
| Alvarez, Luis | | 705.16 |
| Alvarez, Marcus | | - |
| Amaral, Jose I. | | 5,154.52 |
| Amaya, Emerson | | 1,467.47 |
| Amaya, Julio C. | | - |
| Anglo, Marcelino D | | 752.42 |
| Applegate, William H. | | 5,202.27 |
| Aranda, Jose | | 2,062.05 |
| Aranda, Lorenzo | | 221.16 |
| Arevalo, Jose A. | | 2,633.19 |
| Arias Jr., Jose Luis | | 1,069.91 |
| Arias, Benito Navarro | | 4,005.94 |
| Arias, Vivian | | 693.37 |
| Arriola Valenzuela, Kikier | | - |
| Arroyo, Adrian | | 635.58 |
| Arroyo, Richard | | 1,145.43 |
| Asuncion, Isagani L. | | 1,684.91 |
| Ayala Jr., Ramon | | 491.14 |
| Ayala, Jose M. | | 8,072.56 |
| Baca, Nicolas | | 2,493.29 |
| Banda, Rudy H. | | 768.68 |
| Barajas, Bryan | | 1,090.60 |
| Bartolomeu, George C | | 3,346.67 |
| Baxter, Leonard L | | 1,378.42 |
| Bazan Mendoza, Jose L. | | 698.38 |
| Benson Sr., George | | 1,158.15 |
| Berber, Dionicio | | 2,132.46 |
| Blanco Escalante, Efrain | | 3,084.97 |
| Blaz Miranda, Pedro A | | 4,446.73 |
| Brasil, Artur | | 429.10 |

| | |
|---|---:|
| Brown, Monicqua | 616.53 |
| Buenrostro, Gabriel | 1,155.39 |
| Buggs, Steven J | 701.20 |
| Burke, Michael P. | 1,455.28 |
| Bustamante De Merino, Maria I. | 387.20 |
| Cabrera, Angel | 589.40 |
| Calderon Armenta, Cesar | 943.00 |
| Calderon, Jose I | 1,346.49 |
| Campos, Jose Luis | 575.30 |
| Campos-Hernandez, Armando | 3,446.25 |
| Carranza Soria, Edgar | 401.53 |
| Carreno Juarez, J Enrique | 2,978.48 |
| Carreno, Jose Francisco | 5,201.61 |
| Carrillo, Luis M. | 5,616.63 |
| Cassidy, Joseph | 584.83 |
| Castano, Alfonso | 4,305.82 |
| Castillo, Edgardo | 210.20 |
| Ceja, Guillermo | 378.18 |
| Chappelle, Kelly D. | 975.36 |
| Chavez A, Eric Jaime | 2,385.02 |
| Chen, Jia Hua | 2,440.35 |
| Contreras Saucedo, Hector M | 426.35 |
| Corena Perez, Jorge | 790.44 |
| Coria, Jose Manuel | 4,001.06 |
| Costa, Christopher D. | 108.55 |
| Costa, Edmundo R. | 2,782.51 |
| Costa, Nelson | 438.00 |
| Costa, Rui P. | 1,653.60 |
| Crouchet, Zepp | 673.07 |
| Cruz, Joel | 541.32 |
| De Leon, Hortensia | 474.12 |
| Debernardis, John M | 350.57 |
| Delacruz, Roberto | 6,310.58 |
| Delafuente, Xener | 786.64 |
| Denzler, Roland P | 2,256.79 |
| Diaz Guerra, Ma C | 2,238.16 |
| Diaz, Alfonso | 676.59 |
| Diaz, Samuel | 197.92 |
| Douglas, Christopher A. | 1,290.69 |
| Duarte, Manuel C. | 657.72 |
| Duenas, Martin | 2,837.66 |
| Duran Roman, Agustin | 869.32 |
| Duran, Javier | 1,122.33 |
| Elias Vazquez, Jorge | - |
| Equihua, Martin | 1,102.37 |
| Escalante, Manuel | 5,395.73 |
| Esparza Lopez, Salvador | 1,488.17 |
| Espinosa-Ruiz, Carlos Rafael | 388.57 |
| Espinoza, Armando | 852.48 |
| Farias Vasquez, Carlos | - |
| Faumui, Marcus | 754.92 |
| Fierro Aviles, Juan | 1,111.99 |
| Figueroa, James | 1,720.71 |
| Flores Pizano, Juan | 970.15 |
| Flores, Edward L | 3,545.44 |

| | |
|---|---:|
| Flores, Marco | - |
| Fonte, Mario R. | 4,388.30 |
| Fortune, Anthony C. | 437.47 |
| Frison, Phillip | 473.26 |
| Fuller, Marcus L. | - |
| Gallegos, Luis | 626.93 |
| Garay, Jose M. | 373.17 |
| Garcia Becerra, Francisco J. | 2,499.88 |
| Garcia Delgado, Jose | 634.13 |
| Garcia Delgado, Miguel A. | 3,105.41 |
| Garcia Rubio, Bulmaro | - |
| Garcia, Jaime | 554.72 |
| Garcia, Juan | 491.14 |
| Garcia, Leonel | 156.57 |
| Garcia, Luis M | - |
| Garcia, Marco | 242.61 |
| Garcia, Samuel N | 1,710.49 |
| Garcia-Maravilla, Esteban | 759.07 |
| Garcia-Rodriguez, Alfredo | 1,632.90 |
| Gaviola, Benjamin M. | - |
| Godinez, Robert Ray | 859.45 |
| Gomez M., Jorge A | 3,056.26 |
| Gomez, Francisco | 2,713.17 |
| Goncalves, Francisco L | 2,320.72 |
| Gonzalez Barboza, Guadalupe | - |
| Gonzalez Espinoza, Heriberto | 702.61 |
| Gonzalez Lopez, Cipriano | 918.58 |
| Gonzalez Sanchez, Jorge | 903.29 |
| Gonzalez, Adrian | 459.43 |
| Gonzalez, Fernando | 1,078.62 |
| Gonzalez, Lazaro | 2,536.02 |
| Gonzalez, Leandro | 2,538.04 |
| Gonzalez, Rafael | |
| Gray, Julis | 812.03 |
| Guerrero, Jose J. | 939.64 |
| Guerrero, Marcial | 1,918.45 |
| Guzman, Hendre | 380.05 |
| Haro, Arturo | 2,182.75 |
| Haro, Jaime M. | 1,634.98 |
| Harris, Charles | 204.93 |
| Hayag, Rahfael | 1,086.71 |
| He, Yuheng | 904.04 |
| Heaton, Jan J. | 391.37 |
| Hernandez Zuniga, Daniel | 1,151.94 |
| Hernandez, Gabriel | 2,014.09 |
| Hernandez, Jorge H. | 1,490.50 |
| Hernandez, Jose J | 781.87 |
| Hernandez, Jose Luis V. | 1,703.06 |
| Hernandez, Juan M | 449.00 |
| Hernandez, Ramon | 893.20 |
| Herrera Rodriguez, Heriberto | - |
| Ho, Kam Sang | 2,159.71 |
| Huerta Mora, Lorenzo | 3,593.80 |
| Huerta Telles, Jose A. | 2,526.26 |
| Huerta, Jesus | 216.45 |

164178.591857v4

| | |
|---|---:|
| Hughes, Natasha L | 621.48 |
| Hurtado, Roberto R | 2,665.19 |
| Ingram, Plez | 2,137.10 |
| Iraheta Alvarado, Gilberto | 753.54 |
| Islas, David | 606.58 |
| Jackson, Virgil | 709.62 |
| Juan, Ulysses | 680.36 |
| Keels, Byron E. | 1,155.98 |
| Kuo, Tung | - |
| Lankhamdaeng, Alounh | 4,879.29 |
| Lavanh, Von | 2,224.98 |
| Law, David T. | 3,416.26 |
| Leon, Alvaro | 452.39 |
| Leon, Jose Luis | 419.85 |
| Leon-Esparza, Abraham | 488.00 |
| Leyva Camacho, Cesar | 1,235.09 |
| Li, Bang Yang | 3,658.66 |
| Li, Ye Lian T | 5,825.49 |
| Lieu, Cuong N | 2,034.16 |
| Liong, Kie Lien | 3,226.70 |
| Loconte, Michael J. | 2,722.62 |
| Lomeli Barboza, Catalina | 1,849.85 |
| Lomeli Barboza, Federico | - |
| Lopez Jr., Jaime | 369.95 |
| Lopez Maldonado, Raul | - |
| Lopez Perez, Gabriel | 1,254.60 |
| Lopez, Refugio G. | 2,946.00 |
| Louang, Sonny | 449.09 |
| Loza Garcia, Arturo | 1,261.11 |
| Lozano, Juan A. | 3,007.58 |
| Madrigal Hernandez, Jepthe | 343.98 |
| Mafuahingano, Charles | 490.67 |
| Magana, Laura L. | 495.59 |
| Magdaleno Morales, Miguel | 335.89 |
| Maldonado Chavez, Yuritzia Aide | 1,435.16 |
| Maldonado, George P. | 763.91 |
| Maravilla, Jaime | 606.23 |
| Marcelin, Romel | 1,504.72 |
| Marrero Andujar, Jose: | 402.16 |
| Martinez, Carlos | 4,665.52 |
| Martinez, Pedro | 6,797.00 |
| Matts, Robert D. | 8,290.92 |
| Medina, Apolinar | 2,565.80 |
| Mejia, Eduardo | 1,048.97 |
| Melgoza, Antonio E | 3,081.90 |
| Mendoza, Jose Manuel | 29.15 |
| Miramontes-Guevara, Enrique | 2,496.68 |
| Mohamed, Kamal | 569.06 |
| Molell, Moelala | 1,323.54 |
| Montes De Oca Ruelas, Luis | 1,739.77 |
| Montes De Oca, Antonio | 1,479.09 |
| Montoy Martinez, Edgar Adrian | 2,087.77 |
| Montoya Jr., Jaime | 1,416.76 |
| Montoya Vazquez, Francisco | 419.74 |
| Montoya, Abel V | 2,323.66 |

164178.591857v4

| | |
|---|---:|
| Montoya, Jaime | 2,220.79 |
| Montoya, Juventino V | 1,514.92 |
| Montoya, Margarito | 1,558.99 |
| Montoya-Cruz, Carlos | 349.83 |
| Mora, Aldo | 1,298.92 |
| Morales De Monico, Gloria L | 574.11 |
| Morales, Andres | 1,109.60 |
| Morales, Andres M | 1,303.60 |
| Morales, Roman | 675.13 |
| Morales, Román | 1,261.61 |
| Moreno, Salvador | 2,578.75 |
| Moss Jr., Cecil | 325.04 |
| Munoz Lamas, Henri A. | 2,202.45 |
| Munoz, Manuel | 1,087.88 |
| Murphy Jr., Willie P. | 3,651.63 |
| Navarro Mendoza, Rafael | 2,313.79 |
| Nelum, Jumaane | - |
| Neri Jimenez, Miguel | 526.29 |
| Nivins, Mark H | 1,115.43 |
| Ochoa Rosas, Vicente | 589.19 |
| Ochoa, Antonio | 3,064.25 |
| Ochoa, Antonio | 1,672.01 |
| Ochoa, Salvador | 182.00 |
| Olmos Tarula, Guadalupe | 399.69 |
| Orozco, Michael | 761.70 |
| Ortega Aguilar, Marvin | 3,142.45 |
| Ortiz Gonzalez, Jose L | 3,584.84 |
| Ortiz, John | 1,371.22 |
| Ortiz, Jose | 2,193.13 |
| Ortiz, Jose Luis | - |
| Osborne, Jonathan A | 103.64 |
| Osborne, Tyrone E. | 1,057.27 |
| Osias, Rhay A. | 757.90 |
| Ouka, Brian J | 1,643.91 |
| Pacheco Pardo, Adrian | - |
| Pacheco, Raymond R | 1,320.88 |
| Padilla Maciel, Alfonso | 351.35 |
| Padilla Saldana, Ernesto | - |
| Padilla Saldana, Juan | - |
| Pajarito, Cruz | 2,477.79 |
| Pak, Henryk | 1,284.81 |
| Palos Lopez, Pedro Gerardo | 493.75 |
| Paredes-Rivera, Raul | 588.21 |
| Patterson, Daniel John | 3,368.84 |
| Pedroza, Ignacio | 802.74 |
| Pedroza, Sergio | 842.08 |
| Pena Jr., Jose | 294.97 |
| Pena, Edgar | 486.28 |
| Pena, Jorge H. | 8,350.41 |
| Pepe, Frank | 1,050.17 |
| Perez, Enrique | 7,252.67 |
| Perez, Gerardo M. | 1,673.23 |
| Perez, Jose | 845.17 |
| Perez, Juan Piceno | 700.25 |
| Perez-Diaz, Faustino | 2,853.44 |

| | |
|---|---:|
| Phanissay, Jason | 540.15 |
| Pimentel, Gustavo | 799.80 |
| Pineda, Manuel B. | 4,260.97 |
| Pires, Delio F. | 689.30 |
| Ponce, Jesus | 298.65 |
| Prado Contreras, Francisco | 738.03 |
| Quijada, Jose E. | 5,190.77 |
| Ramirez, Adrian | 592.94 |
| Ramirez, Adriana | 517.81 |
| Ramos Jr., Antonio G | 2,455.01 |
| Ramos, Jorge | 539.81 |
| Reyes Perez, Roxana A | 1,328.29 |
| Reyes, Angel | 2,471.57 |
| Reyes, Efren | 2,089.05 |
| Reyes, Fidencio S. | 111.15 |
| Reynoso Marquez, Francisco | 231.65 |
| Reynoso, Luis | 2,465.46 |
| Rivera, Andres | 3,010.06 |
| Rivera, Arnulfo | 6,525.11 |
| Roa, Eddy | 583.29 |
| Rodiles, Jose Orlando | 344.47 |
| Rodrigues, Marco P | 2,114.17 |
| Rodriguez Camacho, Armando | 947.71 |
| Rodriguez Mena, Roberto | 607.72 |
| Rodriguez, Abel | 2,407.04 |
| Rodriguez, Hernan | 264.86 |
| Rodriguez, Jesus | 3,836.85 |
| Rodriguez, Jose L. | 2,801.45 |
| Rodriguez, Jose R. | 944.88 |
| Rodriguez, Miguel A. | 2,470.61 |
| Rodriguez, Nicolas | 3,044.67 |
| Rodriguez, Roberto | 1,881.76 |
| Rojas Marroquin, Otman | 596.61 |
| Rojo Cortez, Jose Luis | 2,311.35 |
| Rojo, Jose G. | 4,186.08 |
| Romero Vargas, Hector | 2,693.00 |
| Romero, David | 203.63 |
| Romo Lopez, Arturo | - |
| Romo Martin, Araceli | 491.14 |
| Romo Penaloza, Jose | 174.54 |
| Romo, Alberto | 1,093.69 |
| Rubalcava, Frank | 1,111.23 |
| Rubio N, Martin | 928.25 |
| Ruelas Hernandez, Miguel A. | 614.29 |
| Ruiz, Juan | 2,590.23 |
| Sae Yang, Chan Khoun | 592.94 |
| Saechao, Chan Cheng | 758.64 |
| Saechao, Cheng Chieng | 3,466.72 |
| Saechao, Cheng Choy | 2,263.50 |
| Saechao, Kao Meuy | 3,838.12 |
| Saechao, San | 2,016.48 |
| Saechao, San Vang | 918.62 |
| Saenz, Jose G. | 498.88 |
| Saephanh, Kao C. | 726.21 |
| Saeyang, Nai Fong | 1,805.40 |

| | |
|---|---:|
| Salazar, Nicolas | 6,451.42 |
| Salvador, Agustin B. | 986.19 |
| San Juan, Marvin | 470.47 |
| Sanchez, Antonio | 2,926.89 |
| Sanchez, Fernando M. | 1,521.27 |
| Santibanez, Eusebio | 488.00 |
| Santoyo, Manuel | 2,911.19 |
| Sebastian, Gary | 696.31 |
| Sebastian, Wilfred E | 332.63 |
| Sermeno, Miguel A. | 898.98 |
| Silva Loera, Manuel | 2,092.31 |
| Silva, Tony R. | 2,158.77 |
| Silveira, Antonio F. | 4,876.58 |
| Simas, Robert M. | 2,791.47 |
| Sithideth, Bouniduam | 2,520.68 |
| Sivilay, Ngeun | 619.59 |
| Smith, Ivan H. | 647.55 |
| Smith, Stanley G. | 2,898.05 |
| Solano, Delfino | 2,931.09 |
| Somchith, Keurt | 7,911.71 |
| Souksamphanh, Kheun | 234.67 |
| Suares, Fortino J. | 1,291.12 |
| Suarez, Salvador | 3,520.31 |
| Tam, Wing Tim | 1,944.24 |
| Tamayo, Jose Q. | 4,632.97 |
| Tang, Desmond C. | 29.09 |
| Taylor, Fredrick H. | 118.05 |
| Teixeira, Albano P. | 4,001.40 |
| Terriquez-Hernandez, Dagoberto | 1,017.18 |
| Thomas, Manuel | 2,648.65 |
| Thornton, Morgan | 1,492.85 |
| Torres-Ochoa, Christopher | 228.24 |
| Torres, Ignacio | 5,830.35 |
| Trinh, Ryan | 1,176.10 |
| Urtiz, Romualdo | 1,821.76 |
| Vasquez Ayala, Jesus | - |
| Vasquez Montoya, Rene | - |
| Vasquez, Onofre | 2,015.68 |
| Vaughn, Dashawn L. | 1,053.16 |
| Vazquez, Erik | 489.04 |
| Vazquez, Pedro | 488.00 |
| Vega, Sergio | 810.38 |
| Velasco, Martin F | 2,294.55 |
| Velazquez Guevara, Pedro A | 1,924.92 |
| Vieira, Jose | 1,400.05 |
| Villanueva, Marcos A | 1,434.76 |
| Villasenor Pulido, Raul | 3,038.68 |
| Zandoval, Salvador Navarro | 5,166.60 |
| Zazueta, Noracell | 582.69 |
| Zurita, Pablo Martinez | 3,046.20 |
| | |
| Subtotal - Union Hourly | $ 589,475.89 |
| | |
| Total | $ 1,032,441.83 |

164178.591857v4

## SCHEDULE 2.03(b)(vi)

### Accounts payable assumed by Buyer

This to be populated with Accounts Payable to PACCAR of just under $1 million, details to follow later today from Speyside.

## SCHEDULE 2.04(a)

## Executory contracts and Unexpired Leases to Assumed

ADP, Inc. - Major Accounts Agreement dated 9/25/13 for payroll and tax related services

AT&T Corp. -Master Agreement for backup data circuits

B&L Information Systems - Software Services and Hosting Agreement

Cogent Communications -Internet Access Agreement

De Lage Landen Financial Services -Leased Komats, Combilift

GE Capital - Lease of Tennant Model S30, etc.

Glass, Molders, Pottery, Plastics & Allied Workers International Union, AFL-CIO, CLC Local #164B - Collective Bargaining Agreement

Howard Robinson – Real Property Lease for Plan 2 Yard

Ingram Micro, Inc. - Software License Agreement

Kaspersky Lab, Inc. - Software License

Komatsu Forklift LLC Oakland - leased forklifts

Marlin Leasing -lease of Genie Articulating electronic boom

Microsoft - Software license

Modern Instrument Controls, Inc. - Agreement for equipment collaboration

NMHG Financial Services - Lease of 2 Yale forklifts

Optimized Performance Technologies - Agreement for quality management system maintenance

Principal Life Insurance Co. – Real Property Lease of Oakland warehouse 725 85th Ave, Unit H, Oak, CA 94621

Ricardo E. Gomez, Inc. dba Professional Finishing  - Coating Agreement

Techordia, LLC - IT licenses, service agreements, etc.

Toyota Motor Credit Corporation – lease for forklifts

Tyco Integrated Security LLC - Alarm/security contract

VMware International Limited - Software license

164178.591857v4

# SCHEDULE 3.01(c)(ii)

## Net Working Capital

**PACIFIC STEEL CASTING COMPANY**
**Net Working Capital**
March 31, 2014 and May 31, 2014

CHB
6/17/2014
17:00:00

| | Tons at 3/31/2014 | | Notional Cost per Ton | | Total Notional Cost at 3/31/2014 |
|---|---|---|---|---|---|
| Domestic Castings - WIP | 1,187.904 | $ | 6,353 | $ | 7,546,754 |
| Domestic Castings - Finished Goods | 505.049 | $ | 7,975 | | 4,027,766 |
| Total | 1,692.953 | | | $ | 11,574,520 |

| | Tons at 5/31/2014 | | Notional Cost per Ton | | Total Notional Cost at 5/31/2014 |
|---|---|---|---|---|---|
| Domestic Castings - WIP | 1,303.594 | $ | 6,353 | $ | 8,281,733 |
| Domestic Castings - Finished Goods | 550.709 | $ | 7,975 | | 4,391,904 |
| Total | 1,854.303 | | | $ | 12,673,637 |

| | | 3/31/2014 | | 5/31/2014 | | Proposal | |
|---|---|---|---|---|---|---|---|
| Domestic Castings | $ | 11,574,520 | $ | 12,673,637 | $ | 12,673,637 | 5/31/2014 |
| Import Castings | | 529,890 | | 831,850 | | 831,850 | 5/31/2014 |
| Materials | | 276,193 | | 431,965 | | 431,965 | 5/31/2014 |
| Accounts Receivable | | 12,400,006 | | 12,627,309 | | 12,400,006 | 3/31/2014 |
| Vacation Adjustment | | | | | | 516,221 | |
| Net Working Capital | $ | 24,780,609 | $ | 26,564,761 | $ | 26,853,679 | |

Notes:
1. Import Castings - G/L accounts 14611000 and 14613000.
2. Materials - G/L accounts 14101000, 14102000, 14103000, 1410104000 and 14105000.
3. Accounts Receivable - G/L accounts 13001000, 13002000, 13003000 and 13029000. These accounts include the A/R detail less (1) unprocessed returns, (ii) the amounts identified and accrued at year end for quality adjustments but applied to individual accounts after the close, and (iii) the allowance for doubtful accounts.

164178.591857v4

# SCHEDULE 5.01(a)

## Jurisdictions where Seller is qualfied

California

164178.591857v4

**Problem Receivables**

All trade accounts receivable reflected in the Financial Statements are subject to the Seller's normal return and warranty policies and procedures.

The Seller's returns are warranty returns. A customer's right of return is not unconditional; a customer cannot return castings simply because it no longer wants them. If the amount of future returns can be reasonably estimated, then current GAAP calls for the current recognition of the costs or losses that may be expected in connection with any returns in accordance with ASC 450-20, the ASC section on loss contingencies. The estimates do not need to be made on a part-by-part basis, but can reflect meaningful levels of aggregation.

Under ASC 450-20, expected warranty costs or losses would need to be accrued if they were probable and reasonably estimable. Certainly, the Seller's experience indicates that warranty returns are probable. Given the Seller's changing customer product mix and the variety of casting technologies employed in the Seller's plants, the "reasonably estimable" criteria precludes the accrual of the Seller's warranty costs or losses at the time of sale."

As a result, Seller does not accrue for warranty returns, so the qualification is consistent with GAAP and Seller's financial statements.

The aggregate amount of warranty returns from customers for the 90 day period following the Closing Date shall not exceed $100,000. To the extent such returns exceeds $100,000, Seller shall pay to Buyer the full amount of such excess.

## SCHEDULE 5.01(j)

### Intellectual Property  (previously 5.01(i))

Trademark:  U. S. Trademark Registration No. 1193508 (PS – logo), owned by Seller

# SCHEDULE 5.01(k)

## Real property used in the business

The Seller leases the following parcels of Real Property from Berkeley Properties, LLC:

| | | |
|---|---|---|
| 1 | 640 Gilman | 59-2345-1 |
| 2 | 648 Page Street | 59-2323-1 |
| 3 | 1310 3rd Street | 59-2345-2-2 |
| 4 | 1333 2nd Street | 59-2345-9 |
| 5 | 1401 East Shore | 59-2341-4 |
| 6 | 1420 2nd Street | 59-2341-5 |
| 7 | 1421 2nd Street | 59-2340-8-2 |
| 8 | 1305 East Shore | 59-2344-1-2 |
| 9 | 1314 2nd Street | 59-2344-3-1 |
| 10 | 1320 2nd Street | 59-2344-4-1 |

The real property above is owned by BP, who leases it to PSC pursuant to a written lease agreement. This property is colloquially referred to by the Debtors as the "Berkeley Campus" and the lease between PSC and BP is referred to as the "Berkeley Campus Lease".

Seller leases the warehouse located at 725 85th Avenue, Unit H, Oakland, California 94621, from Principal Life Insurance Company. Seller leases a group of lots that border the Berkeley Campus at the corner of Second Street and Page Street, Berkeley, California, which Seller leases from Howard F. Robinson.

164178.591857v4

## SCHEDULE 5.01(l)

## Litigation and Disputes

Notice of Intent to Fine Pursuant to Section 274A of the Immigration and Nationality Act, U. S. Department of Homeland Security, served May 3, 2013.

Seller also refers to and incorporates by reference in this Schedule 5.01(l), all matters disclosed in Schedule 5.01(m).

164178.591857v4

## SCHEDULE 5.01(m)

## Compliance with Laws Exceptions

BAAQMD – Notice of Violation 8/11/2011, failure to meet permit condition #00486 1C, minimum pressure of 1, across the carbon bed. Settled.

DTSC – Violation 4/9/2009, CA H&S Code section 25189.5(a);CA Code of Regulations Title 22, section 66262.11 Entered into consent decree with DTSC 7/10/2010.

CA OSHA Notice of Proposed Penalties 9/19/2013, inspection #316438910 – 6 citations. Partially Settled.

CA OSHA Notice of Proposed Penalties 2/10/2013, inspection #316442185 – 3. Settled.

CA OSHA Notice of Proposed Penalties 7/15/2011, inspection #312362742 – 1. Settled.

CA OSHA Alleged Condition 7/29/2013 Title 8 CCR 3203(a)(6). Closed.

CA OSHA Notice of Proposed Penalties 4/07/2010, inspection #312358559 – 3 Settled.

CA OSHA Notice of Proposed Penalties 1/17/2012, inspection #315315580 – 2 Settled.

CA OSHA Notice of Proposed Penalties 11/10/2011, inspection #315315093 – 3 Settled.

Those items listed on Schedule 5.01(n)(i) and permits listed on Schedule 5.01(n)(iii)

## SCHEDULE 5.01(n)(i)

### Environmental Law Compliance Exceptions

In the Matter of: Pacific Steel Casting Co., California Dept. of Toxic Substances Control, Consent Order dated 7/28/2010, Docket No. HWCA 2010-2176. Entered into consent decree with DTSC 7/10/2010.

In the Matter of: Pacific Steel Casting Co., City of Berkeley Toxics Management Division Consent Order Docket No. TMD 11-006. Entered into consent decree with City of Berkeley1/20/2011.

Communities for a Better Environment v. Pacific Steel Casting Company, Case No. C-06-4184-BZ, Consent decree entered 3/16/2007.

Rosie Lee Evans et al. v. Pacific Steel Casting Company, Case No. RG08383068 and Settlement Agreement and General Release effective 6/28/2012.

Baykeeper v. Pacific Steel Casting Co., Civ. No. 3:12-CV-05955-JCS and Consent Decree dated 6/11/2013 and entered 8/5/2013.

PSC received from East Bay Municipal Utility District (EBMUD) a new industrial waste water permit October 2013. Prior to this permit PSC had a zero discharge permit with EBMUD.

Expanded Phase I Environmental Site Assessment, Anchor Environmental Consultants, Inc., November 3, 2002.

Phase II Environmental Site Assessment, Anchor Environmental Consultants, Inc., January 22, 2003.

Phase I Environmental Site Assessment, Partner Engineering and Science, Inc., November 26, 2012.

Limited Phase II Environmental Site Assessment, TRC Solutions, Inc., April 1, 2013.

164178.591857v4

## SCHEDULE 5.01(n)(ii)

## Environmental , H&S reports (previously (n)(ii)(2)

| Report Name | Applicable Statute/Reg./Rule/Permit Condition | Date(s) |
|---|---|---|
| Storm Water Report | NPDES Permit # CAS000001 | July 1 – 2009-2013 |
| Storm Water Report – Group Monitoring Plan | Metal Casting Stormwater Monitoring Group, Inc. | December 1 -- 2009-2013 |
| EBMUD Compliance Testing & Reporting | East Bay Municipal Utility District – Periodic Compliance Reports CCCSD Class IIU Permit | June 31, December 31, 2013 (New permit issued November 2013. Annual reporting require under old permit 2009-2012) |
| CARB Reporting – Truck and Bus Fleet (Registration and Filter Installation) | Title 13 CCR Sec. 2025 | July 1, 2014 - One time registration |
| Emissions Minimization Plan | BAAQMD Rule 12-13 | May 1, 2014 (New regulation) |
| Odor Test Summary Report | Permit Condition Nos. #7134 and #486 (BAAQMD) | Plant 2 January 31 2009-2013 Plant 1 April 30 2009-2013 |
| NESHAP Compliance Report | 40 CFR 63.7751 NESHAP (EPA and BAAQMD) | January 31 2010-2014 January 31 2009-2013 |
| HRA – Health Risk Assessment | Quarterly Notifications – Health & Safety Code Section 44300 et seq. | March, June, September, December, each year 2009-2013 |
| BAAQMD – Annual emission report | Synthetic Minor Operating Permit Cond. #20207 (BAQMD) | July 30 2009-2013 |
| BAAQMD – Annual data update | 40 CFR 70-71, H&SC 42300 et seq., BAAQMD Regulation 2 | Plant 3 – August 2009-2013 Plants 1 & 2 – September 2009-2013 |
| BAAQMD – Source Testing | Permit Condition # 23694 | Annual – October 2009-2013 |
| BAAQND/EPA – Opacity Testing | 40 CFR 63.7731 (b); NESHAP | Semi-annual - 2009-2013 |
| EPA Emergency Planning and Chemical Inventory Reporting – Hazardous Material Business Plan, submitted to Berkeley CUPA | 40 CFR 355; 40 CFR 370; H&SC 25503.5-25506; 19 CCR 2729 | March 1 - 2009-2013 |
| EPAToxic Release Inventory Reporting | 40 CFR 372 | July 1 - 2009-2013 |
| EBMUD Compliance Testing & Reporting | East Bay Municipal Utility District – Discharge log and TTO Compliance Report | December 1, 2013 (New permit issued November 2013. (No reporting required under old permit) |
| LQG – Biennial Report | 40 CFR 262.41, CCR 66262.41 | Submitted request for exemption March 1, 2014 - Currently exempt from reporting – Not LQG |
| Slug Discharge Plan | East Bay Municipal Utility District | Biennial submittal December 1, 2013 (New permit issued in 2013, first time required) |

Phase I Environmental Site Assessment, Partner Engineering and Science, Inc., November 26, 2012.

Limited Phase II Environmental Site Assessment, TRC Solutions, Inc., April 1, 2013.

164178.591857v4

## SCHEDULE 5.01(n)(iii)

## Environmental, etc. permits

Bay Area Air Quality Management District, Permit to Operate, Plant #187 (Co-Plant 1), expires December 1, 2014.

Bay Area Air Quality Management District, Permit to Operate, Plant #703 (Co-Plant 2), expires December 1, 2014.

Bay Area Air Quality Management District, Permit to Operate, Plant #1603 (Co-Plant 3), expires November 1, 2014.

East Bay Municipal Utility District, Wastewater Discharge Permit, expires November 7, 2018.

City of Berkeley, CUPA, Unified Program Consolidated Permit and Registration, expired March 1, 2014, renewal in process.

National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities NPDES # CAS0000001.

Storm Water Pollution Prevention Plan (SWPPP), dated February 21, 2014.

City of Berkeley Business License #14 00010043.

City of Berkeley Use Permit #7388 (1975) Plant #2.

City of Berkeley UP #01-70000007 (1996) Modification to UP#7388 to build Sand Recycling Unit.

City of Berkeley UP #8957 (1981) Plant #3.

City of Berkeley UP #06-10000045 (2006) Modification to UP#8957 to build carbon unit.

# SCHEDULE 5.01(o)

## Insurance Policies

| | |
|---|---|
| **Commercial Package**<br><br>Commercial Property<br>Inland Marine<br>General Liability<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Limits<br><br>Buildings: $26,738,908<br>Personal Property: $1,360,594<br>Stock: $6,990,000<br>Equipment: $24,276,530<br>Patterns: $17,200,000<br><br>Business Income and Extra Expense: $32,507,546<br><br>General Liability: $2,000,000/$1,000,000<br><br>ERISA: $2,000,000/$1,000,000 |
| **Commercial Automobile**<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Combined Single Limit: $1,000,000 |
| **Excess/Umbrella Liability**<br><br>St. Paul Fire and Marine Insurance Company<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Umbrella Liability: $20,000,000/$20,000,000 |
| **Equipment Breakdown (Boiler & Machinery)**<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Total Limit per Breakdown: $100,000,000 |
| **Commercial Crime**<br><br>Crime Coverage<br>Fiduciary Liability Coverage<br>D&O and Entity Liability Coverage<br>Employment Practices Liability Coverage<br><br>Chubb Group of Insurance Companies<br>Expires: October 31, 2014 | Subject to specific limits, exclusions and deductibles:<br><br>Maximum Aggregate Limits<br><br>Fiduciary Liability: $1,000,000<br>D&O and Entity Liability: $1,000,000<br>Employment Practices Liability: $1,000,000 |
| **Workers Compensation**<br><br>Sentry Casualty Company<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Statutory Limits |

## SCHEDULE 5.01(p)

### Brokers


The Seller has entered into an agreement with Cleary Gull Inc. ("Cleary Gull") whereby Cleary Gull will receive certain payments from the Seller upon completion of the transactions contemplated by this Agreement.  Agreement is attached.

164178.591857v4

## ADDENDUM TO ENGAGEMENT LETTER AGREEMENT

This Addendum to Engagement Letter Agreement (this "Addendum") amends that engagement letter dated January 29, 2014 (the "Engagement Letter") by and between Pacific Steel Casting Company ("Debtor") and Cleary Gull Inc. ("Cleary Gull"). All provisions of the Engagement Letter not altered or deleted by this Addendum shall remain in effect. In case of any conflict between the Engagement Letter and this Addendum, the terms and conditions of this Addendum shall prevail.

1.    Notwithstanding anything to the contrary in the Engagement Letter, the term "Aggregate Consideration," defined in Section 3.C of the Engagement Letter, does not include any withdrawal liability associated with Debtor's multi-employer pension plan, whether or not it is assumed directly or indirectly, or triggered and paid, by the buyer, unless it is liquidated in a settlement with the relevant union and paid by the buyer.

2.    Notwithstanding anything to the contrary in the Engagement Letter, the term "Aggregate Consideration," defined in Section 3.C. of the Engagement letter, does include the following amounts, up to a cap of $1,000,000 in the aggregate: (i) any amount the buyer is required to place in escrow in connection with the assumption of Debtor's multi-employer pension plan, and/or (ii) the amount of any letter of credit the buyer is required to obtain in connection with the assumption of Debtor's multi-employer pension plan.

"DEBTOR"                                    "CLEARY GULL"

PACIFIC STEEL CASTING COMPANY               CLEARY GULL INC.

By: _Cecil. B. ___        By: _____
Name: CHARLES H. BRIDGES, JR.          John R. Peterson, Managing Director
Title: CFO

SMRH:421275857.4

-1-



January 29, 2014

PRIVATE AND CONFIDENTIAL

Pacific Steel Casting Company
1333 Second Street
Berkeley, CA 94710

Attn.: Katie Delsol
Chief Executive Officer

Gentlemen:

This letter agreement will confirm our understanding of the terms and conditions under which Cleary Gull Inc. (referred to hereinafter as "Cleary Gull") is engaged (the "Engagement") by Pacific Steel Casting Company and/or any affiliate thereof (collectively, the "Company") as the Company's exclusive financial advisor in connection with the possible sale of all or part of the Company in one transaction or a series of transactions by means of a merger, spin-off, joint venture, partnership, sale of stock or assets, or other business combination or other transaction resulting in any change of control (whether voting, financial or otherwise) of the Company or the sale or transfer of any unit, subsidiary, division or line of business of the Company or any other material portion of the Company's business or assets (a "Transaction").

1.    **Advisory Services**

Cleary Gull's overall objective is to see a Transaction through to a successful conclusion. In this respect, Cleary Gull will provide financial advice and assistance to the Company which may include any or all of the following:

- Assistance in developing an overall strategy for a Transaction;

- Becoming familiar with the business, operations, properties, financial condition, prospects, and management philosophy of the Company;

- Reviewing the historical and projected financial performance and determining a current valuation of the Company;

- Assistance in the preparation of an information memorandum ("Information Memorandum") and other appropriate marketing materials designed to introduce potential buyers approved by the Company ("Interested Parties");

- Identification and screening of potential Interested Parties;

- Initiating contact at senior levels with potential Interested Parties and coordinating the review process of the Company by such parties;

- Assistance in the evaluation of any offer(s) made with regard to a Transaction;

- Conducting meetings between representatives of selected Interested Parties and the Company;

- Negotiating with potential buyers acceptable terms and conditions of a Transaction; and

- Rendering such other incidental services as are reasonably and customarily provided by investment banking firms in connection with similar assignments.

CLEARY GULL INC.
100 East Wisconsin Avenue, Suite 2100
Milwaukee, WI 53202
414-291-4500

2.  **Exclusivity**

To coordinate most effectively our efforts together to effect a Transaction satisfactory to the Company, the Company agrees, and agrees to cause any of its directors, officers, shareholders, advisors or agents, to refer to Cleary Gull any person who expresses to the Company (or any of them) an interest in a Transaction. The Company agrees that a representative of Cleary Gull may be present at all times during all negotiations related to any Transaction or shall be kept fully informed with respect to such negotiations. The Company warrants and represents that it has not granted any other person the right to act as a financial advisor, placement agent or underwriter with respect to the Transaction and that there is no other person that is entitled to a finder's fee or any type of brokerage or other commission in connection with the Transaction. Until the expiration of the Engagement, the Company will not solicit or negotiate with or retain any other financial advisor, placement agent or underwriter in connection with a Transaction. In any event, no fee payable to any other financial advisor by the Company or any other person in connection with the subject matter of this Engagement shall reduce or otherwise affect any amounts payable hereunder to Cleary Gull.

3.  **Compensation**

   A.  ISR Fee

   The Company is paying Cleary Gull a fee for initial advisory services rendered ("ISR Fee") in three (3) installments as follows:

   | Amount | Payable Upon |
   |--------|--------------|
   | $37,500 | Execution of this letter agreement |
   | $25,000 | Receipt of proposed initial indication of interest, letter of intent, memorandum of understanding or other proposal for a Transaction from an Interested Party |
   | $25,000 | Acceptance by the Company or the owner(s) of a majority of its outstanding shares of a letter of intent, memorandum of understanding or other agreement in principle or proposal for a Transaction from an Interested Party |

   Such ISR Fee will be non-refundable except that (i) Cleary Gull shall refund Twelve Thousand Five Hundred Dollars ($12,500) of the ISR Fee if the Information Memorandum is not ready for distribution to Interested Parties before the earlier of March 1, 2014 or the date the Company files for protection under Chapter 11 of the Federal bankruptcy laws, and (ii) any portion of the ISR Fee that is paid and not refunded shall be credited against the Transaction Fee as described below.

   B.  Transaction and Incentive Fees

   Cleary Gull's compensation for these services is largely dependent on the outcome of this assignment. If a Transaction is consummated, then the Company shall pay Cleary Gull a success fee (the "Transaction Fee"), in cash via wire transfer at consummation of the Transaction, of Four Hundred Thousand Dollars ($400,000), less the amount of the ISR Fee paid by the Company, plus an incentive fee (the "Incentive Fee") equivalent to Five percent (5%) of the Aggregate Consideration (as defined below) equal to or in excess of Eighteen Million Dollars ($18,000,000).

   C.  Definition of Aggregate Consideration

   For purposes of this letter agreement, the term "Aggregate Consideration" shall mean an amount computed in accordance with the following:

Case: 14-41045   Doc# 201   Filed: 11/04/19   Entered: 11/04/19 16:05:41   Page 121 of 150

(i)    Aggregate Consideration includes (a) the total consideration received or to be received directly or indirectly by the Company, its shareholders and any holders of stock options or other equity-linked contractual rights or securities of the Company ("Equity Interests") as a result of the Transaction, including cash, property, securities, and amounts placed in escrow; and (b) the total amount of indebtedness of the Company for money borrowed and similar non-trade liabilities and other long term obligations (including, without limitation or duplication, the amount that would be reflected in financial statements of the Company prepared in accordance with generally accepted accounting principles ("GAAP") as of the date of closing for a Transaction with respect to any liabilities for pension, retirement or deferred compensation plans, or any guarantees or capitalized leases) directly or indirectly assumed, forgiven, repaid, refinanced, restructured, retired, extinguished or acquired as a result of the Transaction or that otherwise remain outstanding as of the closing of a Transaction. Aggregate Consideration also includes (without duplication of amounts otherwise included in Aggregate Consideration) the aggregate amount by which any Equity Interests are "in-the-money" based on the consideration paid in the Transaction, as well as the amount payable as the result of a Transaction under any shadow stock, stock appreciation rights or other incentive compensation plan or agreement. Aggregate Consideration only includes any past due amounts with respect to leases which are not capitalized leases under GAAP.

(ii)    Aggregate Consideration includes (without duplication of amounts otherwise included in Aggregate Consideration) all cash or other dividends or other distributions declared, paid or distributed by the Company to its shareholders in contemplation or as a result of the Transaction other than normal quarterly or annual distributions to cover shareholder taxes on the Company's taxable income which is not due to a Transaction. For purposes of this letter agreement, if there is a transfer of capital stock of the Company (a) constituting a majority of the equity in the Company, or (b) possessing a majority of the voting power of the equity in the Company, then all of the equity in (including any Equity Interests of) the Company shall be deemed to have been acquired at an assumed price equivalent to the average per share price at which the controlling interest is acquired.

(iii)    Aggregate Consideration will also include (without duplication of amounts otherwise included in Aggregate Consideration) (a) any fees and expenses relating to the Transaction which are incurred by the Company, its shareholders before consummation of the Transaction, or their affiliates and paid by the Company or any other party to such Transaction, and (b) the maximum face amounts of all current or deferred payments and benefits to be made under non-competition, consulting, licensing, lease, royalty or similar agreements with any directors, executives or shareholders of the Company or under any employment contracts with such individuals to the extent payments thereunder are in amounts in excess of existing levels or, are due more than one (1) year after closing.

(iv)    If all or a portion of the consideration payable in connection with the Transaction includes contingent future payments, then Aggregate Consideration will include the present value of the reasonably expected maximum amount of such payments (as such amount is determined in good faith between the Company and Cleary Gull).

(v)    If the Transaction involves the disposition of assets, then Aggregate Consideration will include the fair market value of any assets of which the Company does not dispose in the Transaction.

(vi)    If Aggregate Consideration for the Transaction includes securities, then the fair market value of such securities will be (a) if there is a public trading market therefor, equal to the

average of the last sale prices on each of the ten trading days ending with the second trading day preceding the closing of the Transaction and (b) in the absence of a public trading market therefor, the fair market value thereof on the day preceding the closing of the Transaction. Consideration or assets other than cash or securities shall be valued at fair market value as of the date of consummation of the Transaction.

(vii)    The fair market value or present value of any component of Aggregate Consideration other than cash shall be such amount as may be agreed by the Company and Cleary Gull. However, if the parties are unable to agree upon a fair market value or present value, then each will select an investment banking firm respected in the mergers and acquisitions field to objectively determine a bona fide fair market value or present value. The midpoint between the two bona fide fair market values or present values established by such firms will be the fair market value or present value for purposes of this letter agreement. The fees of such investment bankers relating to such determination will be shared equally by the Company and Cleary Gull.

### 4.    Term and Termination

Upon ninety (90) days' written notice, the Company or Cleary Gull may terminate the Engagement effective at any time more than twelve (12) months after the date hereof (the earliest such a termination notice may be given is ninety (90) days prior to the end of this twelve (12) month period). Cleary Gull also may terminate the Engagement upon five (5) days' written notice after Cleary Gull has determined, in its sole discretion, that there has been a material adverse change in the business, prospects, market value or financial condition of the Company. Any such termination shall be without any continuing obligation of the Company or Cleary Gull except that: (a) the Company shall remain obligated to pay for any compensation earned and expenses incurred by Cleary Gull to the date of termination; (b) the Indemnification Provisions (as defined below) and the provisions of Paragraphs 3 through 8 will remain in effect, and (c) if the Company initiates any Transaction within eighteen (18) months following such termination with any party that prior to such termination: (i) Cleary Gull identified to the Company as a potential participant in a Transaction or (ii) contacted or was contacted by the Company or Cleary Gull with respect to a potential Transaction, then Cleary Gull shall be entitled to all fees payable under Paragraph 3 with respect to such Transaction regardless of whether Cleary Gull is involved in initiating or consummating the Transaction.

### 5.    Expenses

Whether or not a Transaction hereunder is consummated, in addition to the fees described above and exclusive of any amounts otherwise payable pursuant to the Indemnification Provisions, but subject to the limitation below, the Company agrees to reimburse Cleary Gull from time to time upon its request for all properly documented expenses incurred by Cleary Gull in connection with the performance of its services hereunder. Generally these expenses will represent travel, document procurement and delivery, other expenses reasonably allocable to Cleary Gull's performance of its services under this letter agreement and related matters, but they will also include the fees and expenses of Cleary Gull's attorneys and other professional advisors should Cleary Gull determine that their advice is required in connection with the Engagement or in order to complete a Transaction. Upon execution of this letter agreement the Company shall deposit with Cleary Gull Seven Thousand Five Hundred Dollars ($7,500) as a fund for payment of such expenses as incurred, which fund shall be replenished by the Company within ten (10) days of receipt of a monthly statement from Cleary Gull of expenses incurred until such time that the cumulative amount deposited by the Company with Cleary Gull is equal to Thirty Thousand Dollars ($30,000). The Company shall reimburse any such expenses of Cleary Gull in excess of Thirty Thousand Dollars ($30,000) at the same time, and only if, a Transaction fee is payable. For the sake of clarity, Cleary Gull's Engagement shall not include giving tax, legal, regulatory, accounting or other specialist or technical advice or

Case: 14-01055   Doc# 201-5  Filed: 11/04/19  Entered: 11/04/19 16:05:41  Page 123 of 122

associated services; instead, the Company will retain appropriate advisors experienced with this type of transaction, take their advice and be responsible for all fees and expenses, as well as all other costs and expenses associated with the Transaction.

6.  **Disclosure of Information**

The Company will furnish Cleary Gull with such information concerning the Company and its industry as Cleary Gull reasonably requests in connection with this Engagement. The Company will ensure, and hereby warrants and represents that such information will not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company further will ensure, and hereby warrants and represents that any financial forecasts and projections that it makes available or provides to Cleary Gull will be prepared in good faith and will be based upon assumptions that reflect the then best currently available estimates and judgments of the management of the Company as to the matters covered thereby and, in light of the circumstances under which they are made, are reasonable. In addition, the Company will keep Cleary Gull advised of all material developments affecting the Company or its financial position. The Company recognizes and agrees that Cleary Gull (a) will rely solely on such information and other information available from generally recognized public sources in performing the services contemplated hereunder; and (b) will not undertake independent verification of, and does not assume responsibility for the accuracy or completeness of, such information.

The Company acknowledges that all opinions and advice (written or oral) given by Cleary Gull to the Company in connection with Cleary Gull's Engagement will be treated by the Company as confidential, are intended solely for the use of the Board of Directors and senior management of the Company in considering the Transaction to which they relate and are not for the use of, and cannot be relied upon, by any other person or be used or relied upon for any other purpose. Without limitation, no such opinions or advice shall constitute a recommendation to any shareholder, creditor or creditors' committee of the Company concerning action that such persons might or should take in connection with the Transaction. Except as required by law or by order of a court of competent jurisdiction, the Company agrees that no such opinions or advice may be used to solicit shareholder, creditor or creditors' committee approval of any Transaction or for any other purpose or reproduced, disseminated, quoted or referred to at any time or otherwise disclosed to any third party, in any manner or for any purpose, nor shall any public references to Cleary Gull be made by the Company (or such persons), without the prior written consent of Cleary Gull. Without prior consultation with Cleary Gull, the Company shall not make any disclosure of such opinions or advice except as required by law or by order of a court of competent jurisdiction or make any announcement or filing that is so required in which Cleary Gull's name appears. Cleary Gull is not responsible or liable to any recipient of advice provided by Cleary Gull as a result of a court order requiring disclosure thereof.

7.  **Indemnification**

The Company agrees to the indemnification and contribution provisions set forth on Annex A attached to this letter agreement and incorporated herein in their entirety (the "Indemnification Provisions").

8.  **Miscellaneous**

Each of Cleary Gull and the Company represents that this letter agreement has in all respects been duly authorized, executed and delivered by and on behalf of itself. This letter agreement and the Indemnification Provisions embody the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, written and oral, relating to the subject matter hereof and may not be modified or amended, or any term or provision hereof waived or discharged, except in writing signed by the party against whom such modification, waiver or discharge is sought to be enforced. This letter

agreement, all rights and obligations in connection herewith and any claim related directly or indirectly to this letter agreement (including any claim concerning advice provided pursuant to this letter agreement) shall be governed and shall be interpreted, construed and enforced in accordance with and governed by the applicable laws of Wisconsin without regard to principles of conflict of laws.

The Company agrees to seek the appointment of Cleary Gull as its investment banker in any chapter 11 bankruptcy case filed by the Company under the standards permitted in 11 U.S.C. §327(a) and §328(a) pursuant to which the Incentive Fee is a contingent fee payable upon the closing of a sale of assets of the Company. The Company's fees and expenses shall be subject to review by the Bankruptcy Court only under the standard of review provided in 11 U.S.C. §328(a) and shall not be subject to review under 11 U.S.C. §330(a). Review shall be under the standard that provides that compensation awarded by the Court may differ from the compensation provided in this agreement only if, "the terms and conditions prove to have been improvident in light of development not capable of being anticipated at the time of the fixing of such terms and conditions." The Company shall not be required to adhere to the Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees promulgated in the Northern District of California Bankruptcy Courts.

Nothing in this letter agreement or Engagement shall limit Cleary Gull's ability to consult and conduct business for and with others, including competitors of the Company, and to engage in activities similar to those contemplated hereunder whether for its own account or for the account of others or buy, sell or hold securities in or for others.

Cleary Gull may refer to the Transaction and the Company, after it is otherwise public knowledge, in traditional "tombstone" announcements or any of its professional promotional materials. Further, if requested by Cleary Gull, the Company shall include a mutually acceptable reference to Cleary Gull in any press release or other public announcement made by the Company regarding the matters described in this letter agreement.

The Company acknowledges and agrees that (a) this letter agreement does not constitute a commitment or undertaking on the part of Cleary Gull to provide any financing and does not ensure the successful completion of the Transaction; (b) Cleary Gull is acting as an independent contractor hereunder, and neither anything in this letter agreement nor the nature of Cleary Gull's services shall be deemed to create a partnership or fiduciary relationship between Cleary Gull and the Company or any other party; and (c) Cleary Gull has no duties or obligations to the employees, equity holders or creditors of the Company by virtue of this letter agreement or the retention of Cleary Gull hereunder, and no such person shall be deemed a third party beneficiary of this letter agreement or have any rights by virtue of this letter agreement or the retention of Cleary Gull hereunder.

9.  **Signatures**

This letter agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same agreement. Facsimile, portable document format (a/k/a ".PDF") and any other electronic signature within the meaning of the Uniform Electronic Transactions Act, as amended (or any similar state law), or any counterpart hereof shall be deemed to be a true and legally binding signature with the same force and effect as an original. Upon the reasonable request of any party hereto, all parties hereto agree to execute and deliver to the requesting party an original of this Agreement.

Pacific Steel Casting Company
January 29, 2014
Page 7

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Cleary Gull the duplicate signed copy of this letter agreement enclosed herewith.

Regards,

CLEARY GULL INC.

By: _____
John R. Peterson
Managing Director

Accepted and agreed to, as of the date of this letter:

PACIFIC STEEL CASTING COMPANY

By: _____Katie Delsol_____

Name: _____Katie Delsol_____

Title: _____CEO_____

164178.591857v4

ANNEX A

**Indemnification Provisions**

In connection with the engagement of Cleary Gull by Pacific Steel Casting Company pursuant to a letter agreement dated January 29, 2014, between the Company and Cleary Gull as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

The Company agrees to indemnify Cleary Gull, its present and former controlling persons (as such term is defined in the Securities Act of 1933), affiliates, directors, officers, employees, agents and representatives (Cleary Gull and each such person being an "Indemnified Party") from and against any and all losses, claims, damages, judgments, assessments, liabilities, costs and expenses (including reasonable attorneys' fees and disbursements), joint or several, to which such Indemnified Party may become subject under any Federal or state law or otherwise (collectively, "Liabilities"), and will reimburse each Indemnified Party for all fees and expenses (including reasonable attorneys' fees and disbursements) (collectively, "Expenses") as they are incurred in investigating, preparing for (including preparing to present testimony or evidence), pursuing, presenting testimony or evidence relating to or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation, whether or not the Company has initiated such action and whether or not the Company or any Indemnified Party is a party (collectively, "Actions"), (a) caused by, or arising out of or in connection with, any untrue statement or alleged untrue statement of a material fact contained in any sale or offering memorandum provided to third parties or in any proxy statement or similar document, if any, provided to the Company's shareholders (including any amendments thereof and supplements thereto, collectively, the "Disclosure Documents") or by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (other than untrue statements or alleged untrue statements in, or omissions or alleged omissions from, information relating to an Indemnified Party furnished in writing by or on behalf of such Indemnified Party expressly for use in the Disclosure Documents) or (b) otherwise relating to, arising out of or in connection with the Letter Agreement or this Annex A (including the enforcement thereof), advice or services rendered or to be rendered by any Indemnified Party pursuant to the Letter Agreement, the transactions contemplated thereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions, except that, in the case of clause (b) only, the Company shall have no such obligation in respect of any Liabilities or Expenses of any Indemnified Party that are finally judicially determined to have arisen solely and directly out of the intentional misconduct, bad faith, gross negligence or recklessness of such Indemnified Party.

The Company also agrees that no Indemnified Party shall have any liability to the Company in connection with any matter relating to the engagement of Cleary Gull under the Letter Agreement, except to the extent finally judicially determined that such liability resulted solely and directly from the intentional misconduct, bad faith, gross negligence or recklessness of such Indemnified Party. Accordingly, Cleary Gull shall not be liable to the Company for its own negligence, if any, in the performance of the services related to or arising from this Letter Agreement.

The Company in its discretion may assume the defense of any Action. If the Company assumes the defense of an Action, then the Company shall not be liable for any Expenses subsequently incurred by an Indemnified Party in connection with such Action (other than Expenses incurred in investigation, to prepare to present testimony or evidence or to present testimony or evidence) unless (a) the Company has failed to provide legal counsel reasonably satisfactory to such Indemnified Party in a timely manner or (b) such Indemnified Party shall have reasonably concluded that the representation of such Indemnified Party by legal counsel selected by the Company would be inappropriate due to actual or potential conflicts of interest or that there may be legal defenses available to such Indemnified Party that are different from or additional to those available to the Company or any other Indemnified Party represented by such legal counsel. Cleary Gull also has the right to employ separate counsel and to participate in the defense thereof at its own expense. Whether or not Cleary Gull participates in such defense, the Company will not enter into any settlement agreement or compromise with respect to any such Action without the written consent of Cleary Gull, unless such settlement or compromise includes an unconditional release of Cleary Gull and all other Indemnified Parties from all Liabilities with respect to such Action.

If any Indemnified Party is requested or required to appear as a witness in any Action, then the Company agrees to pay the Indemnified Party's per diem fee of $1,500 per person for each half day of testimony and $750 per person

164178.591857v4

Case: 14-41055 Doc# 201 Filed: 11/06/15 Entered: 11/06/15 16:05:41 Page 127 of 126
Case: 19-01055 Doc# 201-5 Filed: 11/06/19 Entered: 11/06/19 16:05:41 Page 2 of 2

for each half day of preparation for any time such Indemnified Party expends in connection with appearing and/or preparing to appear as a witness in such Action.

If for any reason the foregoing indemnification is unavailable or insufficient, then the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Party to the extent such indemnification is unavailable or insufficient in such proportion as is appropriate to reflect (a) the relative benefits to the Company and its shareholders, on the one hand, and to Cleary Gull, on the other hand, of the matters contemplated by the Letter Agreement received, or sought to be received (whether or not a Transaction is consummated) or (b) if the allocation provided by the immediately preceding clause is not permitted by the applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Cleary Gull, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations; provided that in no event shall the Company contribute less than the amount necessary to ensure that all Indemnified Parties, in the aggregate, are not liable for any Liabilities and Expenses in excess of the amount of fees actually received by Cleary Gull pursuant to the Letter Agreement. For purposes of the foregoing, relative benefits to the Company and Cleary Gull (and any other Indemnified Party) shall be deemed to be in the same proportion that the total value paid or contemplated to be paid in connection with a Transaction bears to the fees paid to Cleary Gull pursuant to its engagement in respect of such Transaction.

If multiple claims are asserted against an Indemnified Party in any Action, and indemnification as to at least one of such claims is permitted under applicable law and provided for under this Annex A, then the Company agrees that any judgment or award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or award expressly states that the judgment or award, or any portion thereof, is based solely on a claim or claims as to which indemnification is not available.

Any dispute, controversy or claim arising out of or relating to this Indemnification Agreement and/or Engagement shall be submitted to and settled by binding arbitration held before FINRA. Cleary Gull and the Company shall use their respective best efforts to maintain complete confidentiality with respect to, and shall not disclose to any person, the existence of positions taken in or resolution of any such dispute, controversy or claim, except as authorized in writing by the other party or as necessary to the prosecution or defense thereof, provided, however, that the foregoing will not prevent either party from disclosing any such information, which would otherwise be confidential hereunder, to any regulatory or self regulatory body which regulates each party. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having in personam and subject matter jurisdiction.

## SCHEDULE 5.01(q)

### Matters Relating to Benefit Plans

1.     On or around May 8, 2014, Seller became aware of an error contained in the Adoption Agreement for the restated plan document for the Pension Plan for Employees of Pacific Steel Casting Company (referred to herein as "the Plan") effective as of April 1, 2011.  The error relates to an indication in the Adoption Agreement that the Plan provides an unreduced early retirement subsidy to all participants.  The Plan does not provide an early retirement benefit without reduction to the participants (except with respect to certain participants who commence benefits after attaining age 62) as indicated by the document in effect for the Plan immediately prior to the 2011 restatement.  Buyer is in the process of correcting this error, in addition to several other subsequently identified errors made by a third party in the preparation of the Adoption Agreement for the 2011 restatement.  A draft corrective amendment addressing these errors is attached.

2.     With respect to Seller's representation in Section 5.01(q)(ii)(12), Seller discloses that it has ERISA Affiliates which include (a) Tri-Pacific, Inc. and (b) Berkeley Properties, LLC.

**AMENDMENT TO THE**
**PENSION PLAN FOR EMPLOYEES OF**
<u>**PACIFIC STEEL CASTING COMPANY**</u>

This Amendment (Amendment) to the Pension Plan for Employees of Pacific Steel Casting Company (Plan) is adopted by Pacific Steel Casting Company (Employer) to be effective on and as of the date(s) set forth below.

<u>RECITALS</u>

Whereas:

A.   The Employer originally established the Plan effective as of August 28, 1961 as a defined benefit pension plan for the Employer's non-union employees who satisfy the Plan's eligibility requirements.

B.   The Plan is intended to be a tax qualified plan under section 401(a) of the Internal Revenue Code (Code) and a pension plan under the Employee Retirement Income Security Act of 1974 (ERISA).

C.   The Plan operates on a plan year ending on March 31 each year.

D.   The Employer relies on third party service providers to maintain the Plan in compliance with the requirements of both the Code and ERISA, including, but not limited to, the preparation of the plan and trust documents, the preparation of amendments to the plan and trust documents, the annual actuarial valuations, the administration of the benefits under the Plan, and the preparation and filing of the annual reports with the Internal Revenue Service and the Department of Labor.

E.   For many years, the Employer has used, and continues to use, the services of Nicholas & Hicks as the third party administrator for the Plan and Robert Haness of Haness & Associates as the actuary for the Plan.

F.   The Employer understands and believes that Nicholas & Hicks and Robert Haness are very experienced in assisting employers with plans such as the Plan.

G.   The Employer has amended the plan and trust documents and restated the plan and trust documents from time to time over the years since the Plan's inception.

H.   In 2003, Nicholas & Hicks prepared a restatement of the plan and trust document in order to update the Plan for changes in the Code and ERISA.

PA0051.011
21V305603
6/4/14

Case: 14-01055   Doc# 201  Filed: 11/04/19  Entered: 11/04/19 16:06:41   Page 130 of 150

I.     On December 19, 2003, Nicholas & Hicks sent the restatement of the plan and trust document to the Employer with an indication that it had been reviewed by Robert Haness as well.

J.     The Employer adopted the 2003 restatement in December 2003.

K.     On March 15, 2006, the Employer adopted an amendment, prepared by Nicholas & Hicks, that ceased all benefit accruals under the Plan effective as of March 31, 2006, and the Employer gave the notice, also prepared by Nicholas & Hicks, that is required to be given, by both the Code and ERISA, to all of the participants in the Plan regarding the cessation of future benefit accruals under the Plan.

L.     Between 2006 and 2011, the Employer adopted other amendments to the 2003 restatement of the plan and trust document, all prepared by Nicholas & Hicks.

M.     In 2011, Nicholas & Hicks prepared a restatement of the plan and trust document in order to update the Plan for changes in the Code and ERISA since the 2003 restatement, and sent the restatement of the plan and trust document to the Employer with an indication that the 2011 restatement made no substantive changes to the way in the Plan was operated.

N.     The Employer adopted the 2011 restatement in June 2011, effective as of April 1, 2011, in reliance on the representations made by Nicholas & Hicks regarding the restatement of the Plan.

O.     The Employer has just recently learned that Nicholas & Hicks made a number of errors when preparing the 2011 restatement of the plan and trust document as evidenced by communications from both Nicholas & Hicks and Robert Haness, which errors were not caught previously by the Employer because of the Employer's reliance on both Nicholas & Hicks and Robert Haness in the preparation of the 2011 restatement documents.

P.     The Employer has determined that these errors made changes to the terms of the Plan that were never intended by the Employer, never expected to be made by the participants, and never communicated to the participants in the summary plan description for the Plan, a summary of material modifications to the summary plan description for the Plan, or in any other manner.

Q.     The Employer has also determined that Robert Haness has been performing the actuarial valuations for the Plan and coordinating the administration of the Plan with Nicholas & Hicks in a manner that is consistent with the way in which the 2011 restatement should have been

PA0051.011
21V305609
6/6/14

prepared rather than in accordance with the erroneous documents prepared by Nicholas & Hicks.

R.      The Employer wishes to correct these errors in the plan and trust documents by the adoption of this corrective amendment so that (i) the plan and trust documents are worded as they should have been worded by Nicholas & Hicks when it prepared the 2011 restatement, (ii) the plan and trust documents are consistent with the understanding of the Plan by the Employer, the participants and Robert Haness, and (iii) the plan and trust documents are consistent with the manner in which the Plan has been administered by Nicholas & Hicks and Robert Haness on behalf of the Employer.

<u>OPERATIVE PROVISIONS</u>

Now, therefore, the Employer amends the Plan by correcting the following provisions in the Adoption Agreement that was signed on June 5, 2011, effective as of April 1, 2011:

1.      Part II Section D1, "Normal Form of Benefit," is amended and restated to read as follows:

*The benefits determined in this Section are payable at Normal Retirement Date as follows:*

*For Tier 1 Participants, an annuity guaranteed payable for one hundred twenty (120) monthly payments and continued thereafter for the life of the Participant. The first monthly payment shall be made as of the first day of the month coincident with or next following the Participant's Normal Retirement Date with the last payment as of the first day of the month in which the Participant's death occurs or the one hundred twenty (120) month payment period expires, whichever occurs later. Tier 1 Participants include Salaried Employees, Hourly Shipping Department Managers, Hourly Production Schedulers and Administrative Assistants.*

*For Tier 2 Participants, an annuity payable monthly for the life of the Participant. The first monthly payment shall be made as of the first day of the month coincident with or next following the Participant's Normal Retirement Date with the last payment as of the first day of the month in which the Participant's death occurs. Tier 2 Participants include Hourly Paid Employees other than those classified as Tier 1 Participants.*

2.      Part II Section D11, "Plan Actuarial Equivalence," item (a), "Plan/Code Section 415 Assumptions," is amended and restated to read as follows:

PA0051.011
21V305603.
6A/14

<div style="margin-left: 2em">

a.1  *Pre-retirement interest rate: eight percent (8%)*
a.2  *Pre-retirement mortality table: UP84 Unisex*
a.4  *Post-retirement interest rate: eight percent (8%)*
a.5  *Post-retirement mortality table: UP84 Unisex*

</div>

3.    Part II Section D13, "Determination of Top-Heavy Status," item (b) is amended and restated to read as follows:

> b.    *The actuarial assumptions to be used in determining the Top-Heavy Ratio shall be:*
>
> > b.1    *Pre-retirement interest rate: eight percent (8%)*
> > b.2    *Pre-retirement mortality table: UP84 Unisex*
> > b.4    *Post-retirement interest rate: eight percent (8%)*
> > b.5    *Post-retirement mortality table: UP84 Unisex*

4.    Part II Section F1, "Early Retirement Benefit," is amended and restated to read to read as follows:

> *For Tier 1 Participants, the Accrued Benefit is actuarially reduced for early commencement. For Tier 2 Participants, the Accrued Benefit is not actuarially reduced for early commencement if the Annuity Starting Date is on or after age sixty-two (62). For Tier 2 Participants, if the Annuity Starting Date is prior to age sixty-two (62), the Accrued Benefit is reduced for early commencement by zero and five tenths percent (0.50%) for each month that the Participant's Annuity Starting Date precedes the Participant's sixty-second (62nd) birthday. For all Participants, whether Tier 1 Participants or Tier 2 Participants, the Early Retirement Benefit shall commence as of the day of the month coincident with or next following the Participant's elected Annuity Starting Date.*

5.    Part II Section G1, "Method of Distribution," is amended and restated to read as follows:

| | Tier 1 Participants | Tier 2 Participants |
|---|---|---|
| *Lump Sum not to exceed $5,000* | Yes | Yes |
| *Life Annuity* | Yes | Yes |
| *50%/75%/100% Joint & Survivor Annuity* | Yes | Yes |

CHANG RUTHENBERG & LONG PC

- 4 -

PA0031.011
21V305693
64m4

|            | Life Annuity with a certain period of 10 years | Yes | No |
|------------|--------------------------|-----|-----|

6. Part II Section G9, "Required Minimum Distributions," is amended by unmarking items (k) and (k2), so that a joint and survivor annuity is not a form of payment for Required Minimum Distributions.

7. Part II Section H6, "Multiple Plan Provisions," is amended and restated to read as follows:

> The Employer which maintains a qualified defined contribution plan in which any Participant is, was, or could become a Participant adds the following provision which it deems necessary to satisfy section 416 of the Code because of the required aggregation of multiple plans:
>
> f. Other – Specify: a minimum contribution allocation of three percent (3%) of each non-key Participant's total Compensation shall be provided in a defined contribution plan of the Employer.

All other provisions of the Plan as in effect prior to this Amendment shall remain unchanged by this Amendment.

Executed this _____ day of June, 2014.

Pacific Steel Casting Company

By: _____

Title: _____

## SCHEDULE 6.01(a)

### Jurisdictions where Buyer is qualified to do business

**None.**

[Note of Explanation -  Speyside Fund LLC is a Delaware LLC,  with no offices , operations or assets in other states requiring foreign state qualification.  It will form a subsidiary, either domesticated in California, or qualified to do business in California, to take title to the assets and operations as Buyer at Closing.]

## SCHEDULE 8.01(b)

## Excluded Employees

**To be completed no later than one day prior to the Closing Date**

164178.591857v4

## SCHEDULES

| | |
|---|---|
| 2.02(g) | Deposits and Prepaid Amounts Funded by PS |
| 2.03(b)(iii) | Buyer assumed Benefit Plans |
| 2.03(b)(iv) | Transferable licenses, permits, etc. |
| 2.03(b)(v) | Employees With Accrued and Unpaid Vacation Benefits |
| 2.03(b)(vi) | Accounts payable assumed by Buyer |
| 2.04(a) | Executory contracts and Unexpired Leases to Assumed |
| 3.01(c)(ii) | Net Working Capital |
| 5.01(a) | Jurisdictions where Seller is qualfied |
| 5.01(h) | Problem Receivables (previously 5.01(g) |
| 5.01(i)(iii) | Agreements with tax authorities |
| 5.01(j) | Intellectual Property  (previously 5.01(i)) |
| 5.01(k) | Real property used in the business |
| 5.01(l) | Litigation and Disputes |
| 5.01(m) | Compliance with Laws Exceptions |
| 5.01(n)(i) | Environmental Law Compliance Exceptions |
| 5.01(n)(ii) | Environmental , H&S reports (previously (n)(ii)(2) |
| 5.01(n)(iii) | Environmental, etc. permits |
| 5.01(o) | Insurance Policies |
| 5.01(p) | Brokers |
| 5.01(q) | Matters Relating to Benefit Plans |
| 6.01(a) | Jurisdicions where Buyer is qualfied to do buiness |
| 8.01(b) | Excluded Employees |

164178.591857v4



1  MICHAEL W. MALTER, #96533
   JULIE H. ROME-BANKS, #142364
   WENDY W. SMITH, #133887
2  Binder & Malter, LLP
   2775 Park Avenue
3  Santa Clara, CA 95050
   Telephone: (408)295-1700
4  Facsimile: (408) 295-1531
   Email: michael@bindermalter.com
5  Email: julie@bindermalter.com
   Email: wendy@bindermalter.com
6

**The following constitutes
the order of the court. Signed July 31, 2014**

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

7  Attorneys for Debtors and Debtors-in-Possession
   PACIFIC STEEL CASTING COMPANY and
   BERKELEY PROPERTIES, LLC
8

9                **UNITED STATES BANKRUPTCY COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

11

12  In re                                    Case No. 14-41045-RLE
                                             Case No. 14-41048-RLE
13  PACIFIC STEEL CASTING COMPANY,
    a California corporation,                Chapter 11
14
               Debtor.                       Cases Jointly Administered
15

16  In re                                    Date:  July 28, 2014
                                             Time: 10:00 a.m.
17  BERKELEY PROPERTIES, LLC, a              Courtroom:  201
    California limited liability company,    1300 Clay Street, Oakland, CA 94612
18
19             Debtor.

20

21     **ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL
         ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF**
22

23        The MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE

24  AND CLEAR OF LIENS AND RELATED RELIEF ("Motion") of the Debtors Pacific Steel

25  Casting Company ("PSC") and Berkeley Properties, LLC ("BP") (together the "Debtors") came

26

27                          **EXHIBIT "2"**

28  ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND
    RELATED RELIEF                                                                          PAGE 1

on for hearing at the above-referenced date and time; Julie Rome-Banks and Michael W. Malter

of Binder & Malter LLP appeared on behalf of the Debtors and other appearances were as noted

in the Court's record; reasonable and adequate notice of the hearing on the Motion and the relief

sought therein having been provided to all parties required to be given notice under the Federal

Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of

California; the objections to the Motion having either been resolved or withdrawn on the record

for the reasons stated; the Court having considered the Motion, as well as any opposition to the

Motion, any reply thereto, the evidence presented, offers of proof and the arguments of counsel;

the Court having stated its findings of fact and conclusions of law on the record; and good cause

appearing:

IT IS HEREBY ORDERED that:

1. The Motion is granted.

2. PSC's sale of the Acquired Assets to Speyside Fund, LLC or its assignee

("Buyer") pursuant to the terms of the Asset Purchase Agreement ("APA") [1] attached to the

supporting Declaration of Charles H. Bridges, Jr., and pursuant to the terms set forth in the

Motion is approved pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.[2]  The

Acquired Assets do not include customer owned patterns.

3. The Debtors shall immediately provide notice by overnight mail to Sentry

Casualty Company ("Sentry") of the Motion, and the assignment to Buyer, pursuant to the APA,

of PSC's workers compensation insurance policies with Sentry.  Sentry shall have 14 days from

service of such notice to file and serve any objections thereto.  If the parties are unable to resolve

---

1 Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion, or the APA, as applicable.
2 All references to the Bankruptcy Code are to 11 U.S.C. §§ 101 *et seq.*

any objections to such assignment, then the parties may set the matter for hearing on shortened time.

4.     The sale to Buyer and the terms of this Order shall be binding on any and all parties in interest in this case and their respective successors and assigns, including any trustee appointed after entry of this order pursuant to Sections 701 or 702 of the Bankruptcy Code.

5.     PSC is authorized to execute, deliver and perform the terms of the APA.

6.     Subject to paragraph 9 below, the sale of the Acquired Assets shall be free and clear of Liens, Encumbrances and claims (except with respect to the Assumed Liabilities), including, without limitation, the Liens, Encumbrances and claims of (a) Joy Global Longview Operations, LLC, (b) Crane Tech, Inc., (c) United Rentals (North America), Inc. and (d) Bigge Crane and Rigging Company (the "Lien Claimants"), with such Liens, Encumbrances and claims, if any, of the Lien Claimants to attach only to the proceeds of the sale with the same force, effect, validity and priority that previously existed against the Acquired Assets and subject to any claims and defenses the Debtors and these estates may possess with respect thereto.

7.     The Court finds that the sale to Buyer is in good faith and in the best interest of creditors pursuant to 11 U.S.C. §363(m), so that the Buyer is entitled to the protections afforded by that section, and that neither PSC nor Buyer has engaged in any conduct that would cause or permit the sale to be avoided under 11 U.S.C. § 363(n).

8.     Third parties are barred from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), Liens or Encumbrances of any kind or nature against the Buyer or the Acquired Assets that arose prior to Closing except pursuant to Assumed Liabilities in accordance with the APA.

9. Notwithstanding anything herein to the contrary, the Debtors shall provide for the indefeasible payment in full in cash at closing of the sale for all amounts owed by the Debtors to Siena Lending Group, LLC ("Siena") under the Debtor in Possession Loan and Security Agreement dated as of April 10, 2014 (the "Loan Agreement") among Debtors, and Siena, including all principal, interest, fees, costs and expenses, together with cash collateral for any contingent obligations as required in the Loan Agreement, in each case as set forth in a payoff letter to be provided to the Debtors by Siena. The Debtors are authorized to deliver releases to Siena by the Debtors' estates as provided in the Siena Loan Agreement. Upon closing of the sale, Siena has no further obligation or commitment to make loans, advances or extend any credit to the Debtors and any obligations of Siena with respect to the Carve Out under the final financing order are terminated and satisfied. All indemnifications obligations and reimbursement obligations of the Debtors to Siena that survive termination of the Loan Agreement, as set forth therein, shall survive.

10. The Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the new lease with the Buyer, all amendments thereto, any waivers and consents thereunder, and each of the documents executed in connection therewith in all respects.

11. The stay of FRBP 6004(h) is hereby ordered waived.

APPROVED AS TO FORM:

Dated: July 30, 2014          BLANK ROME LLP


                   By: __/s/ Regina Stango Kelborn_____
                       Regina Stango Kelbon
                       Attorneys for Secured Creditor
                       Siena Lending Group LLC

Dated: July 30, 2014                    FARELLA BRAUN + MARTEL LLP


                                        By: ___Gary M. Kaplan_____
                                            Gary M. Kaplan
                                            Attorneys for Buyer

Dated: July 30, 2014                    SHEPPARD MULLIN RICHTER & HAMPTON LLP,


                                        By: ___Ori Katz_____
                                            Ori Katz
                                            Counsel to the Official Unsecured
                                            Creditors' Committee



                                        **END OF ORDER**

1

2   None.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF

PAGE 6

# EXHIBIT 3 - CHART REFLECTING INITIAL ILLEGAL DISTRIBUTIONS

| Bank Date | Payee / Payor | Amount |
|-----------|---------------|--------|
| 01/16/15 | Alcast Co. | 1,325,093.00 |
| 01/22/15 | Alcast Co. | 793,800.00 |
| 04/14/15 | Alcast Co. | 1,190,700.00 |
| 06/04/15 | Alcast Co. | 496,125.00 |
| | **Alcast Co. Total** | **3,805,718.00** |
| 01/16/15 | Eric Wiklendt | 77,823.00 |
| 01/22/15 | Eric Wiklendt | 100,000.00 |
| 04/14/15 | Eric Wiklendt | 104,036.00 |
| 06/04/15 | Eric Wiklendt | 58,125.00 |
| | **Eric Wiklendt Total** | **339,984.00** |
| 09/12/14 | Jeffrey Stone | 62,460.55 |
| 01/16/15 | Jeffrey Stone | 155,646.00 |
| 01/22/15 | Jeffrey Stone | 200,000.00 |
| 04/14/15 | Jeffrey Stone | 208,072.00 |
| 06/04/15 | Jeffrey Stone | 116,250.00 |
| | **Jeffrey Stone Total** | **742,428.55** |
| 01/21/15 | Krishnan Venkatesan | 116,344.00 |
| 01/22/15 | Krishnan Venkatesan | 112,400.00 |
| 04/14/15 | Krishnan Venkatesan | 109,688.00 |
| 06/04/15 | Krishnan Venkatesan | 65,332.50 |
| | **Krishnan Venkatesan Total** | **403,764.50** |
| 09/12/14 | Speyside Fund, LLC | 280,935.48 |
| 01/16/15 | Speyside Fund, LLC | 1,325,093.00 |
| 01/22/15 | Speyside Fund, LLC | 793,800.00 |
| 01/31/15 | Speyside Fund, LLC (on information and belief) | 1,141,392.58 |
| 04/14/15 | Speyside Fund, LLC | 648,247.00 |
| 04/30/15 | Speyside Fund, LLC (on information and belief) | 752,647.00 |
| 06/04/15 | Speyside Fund, LLC | 461,396.25 |
| 07/03/15 | Speyside Fund, LLC (on information and belief) | 52,771.00 |
| | **Speyside Fund, LLC Total** | **5,456,282.31** |
| | **Grand Total - Initial Illegal Distributions** | **10,748,177.36** |

EXHIBIT "3"

# EXHIBIT 4 - CAPITAL CONTRIBUTION

| Bank Date | Payee / Payor | Amount |
|---|---|---:|
| 10/28/16 | Alcast Co. | 294,000.00 |
| 12/15/16 | Alcast Co. | 196,000.00 |
| 12/30/16 | Alcast Co. | 73,500.00 |
| 12/30/16 | Alcast Co. | 73,500.00 |
| 01/05/17 | Alcast Co. | 171,500.00 |
| 01/13/17 | Alcast Co. | 171,500.00 |
| 01/26/17 | Alcast Co. | 196,000.00 |
| 02/14/17 | Alcast Co. | 196,000.00 |
| 03/13/17 | Alcast Co. | 147,000.00 |
| 03/21/17 | Alcast Co. | 196,000.00 |
| 05/23/17 | Alcast Co. | 122,500.00 |
| 07/27/17 | Alcast Co. | 98,000.00 |
| | **Alcast Co. Total** | **1,935,500.00** |
| 10/28/16 | Krishnan Venkatesan | 12,000.00 |
| 12/19/16 | Krishnan Venkatesan | 8,000.00 |
| 01/09/17 | Krishnan Venkatesan | 13,000.00 |
| 01/17/17 | Krishnan Venkatesan | 7,000.00 |
| 01/27/17 | Krishnan Venkatesan | 8,000.00 |
| 02/15/17 | Krishnan Venkatesan | 8,000.00 |
| 03/20/17 | Krishnan Venkatesan | 6,000.00 |
| 03/27/17 | Krishnan Venkatesan | 8,000.00 |
| 06/06/17 | Krishnan Venkatesan | 5,000.00 |
| | **Krishnan Venkatesan Total** | **75,000.00** |
| 10/28/16 | Speyside Fund, LLC | 294,000.00 |
| 12/16/16 | Speyside Fund, LLC | 196,000.00 |
| 12/30/16 | Speyside Fund, LLC | 73,500.00 |
| 12/30/16 | Speyside Fund, LLC | 73,500.00 |
| 01/05/17 | Speyside Fund, LLC | 171,500.00 |
| 01/17/17 | Speyside Fund, LLC | 171,500.00 |
| 01/27/17 | Speyside Fund, LLC | 196,000.00 |
| 02/16/17 | Speyside Fund, LLC | 196,000.00 |
| 03/13/17 | Speyside Fund, LLC | 147,000.00 |
| 03/21/17 | Speyside Fund, LLC | 196,000.00 |
| 05/23/17 | Speyside Fund, LLC | 122,500.00 |
| 07/28/17 | Speyside Fund, LLC | 98,000.00 |
| 08/04/17 | Speyside Fund, LLC (on information and belief) | 4,000.00 |
| | **Speyside Fund, LLC Total** | **1,939,500.00** |
| | **Grand Total - Capital Contribution** | **3,950,000.00** |

# EXHIBIT 5 - 2018 ILLEGAL DISTRIBUTIONS & ONE-YEAR TRANSFERS

| Transfer Date | Transferee | Amount |
|:---|:---|---:|
| 06/18/18 | Alcast Co. | 12,250.00 |
| 06/25/18 | Alcast Co. | 147,000.00 |
| | **Alcast Co. Total** | **159,250.00** |
| 06/18/18 | Krishnan Venkatesan | 500.00 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 |
| | **Krishnan Venkatesan Total** | **6,500.00** |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 |
| 08/03/18 | Speyside Fund, LLC | 100,000.00 |
| 08/06/18 | Speyside Fund, LLC | 300,000.00 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 |
| | **Speyside Fund, LLC Total** | **3,434,250.00** |
| | **Grand Total - 2018 Illegal Dist. & 1-Year Transfers** | **3,600,000.00** |

EXHIBIT "5"

# EXHIBIT 6 - 2-YEAR AVOIDABLE TRANSFERS

| Transfer Date | Transferee | Amount |
|---|---|---|
| 06/18/18 | Alcast Co. | 12,250.00 |
| 06/25/18 | Alcast Co. | 147,000.00 |
| | **Alcast Co. Total** | **159,250.00** |
| 06/18/18 | Krishnan Venkatesan | 500.00 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 |
| | **Krishnan Venkatesan Total** | **6,500.00** |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 |
| 08/03/18 | Speyside Fund, LLC | 100,000.00 |
| 08/06/18 | Speyside Fund, LLC | 300,000.00 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 |
| | **Speyside Fund, LLC Total** | **3,434,250.00** |
| | **Grand Total - 2 Year Avoidable Transfers** | **3,600,000.00** |

EXHIBIT "6"

# EXHIBIT 7 - 4 YEAR AVOIDABLE TRANSFERS

| Transfer Date | Transferee | Amount |
|---|---|---|
| 04/14/15 | Alcast Co. | 1,190,700.00 |
| 06/04/15 | Alcast Co. | 496,125.00 |
| 06/18/18 | Alcast Co. | 12,250.00 |
| 06/25/18 | Alcast Co. | 147,000.00 |
| | **Alcast Co. Total** | **1,846,075.00** |
| 04/14/15 | Eric Wiklendt | 104,036.00 |
| 06/04/15 | Eric Wiklendt | 58,125.00 |
| | **Eric Wiklendt Total** | **162,161.00** |
| 04/14/15 | Jeffrey Stone | 208,072.00 |
| 06/04/15 | Jeffrey Stone | 116,250.00 |
| 04/19/16 | Jeffrey Stone | 23,027.00 |
| | **Jeffrey Stone Total** | **347,349.00** |
| 04/14/15 | Krishnan Venkatesan | 109,688.00 |
| 06/04/15 | Krishnan Venkatesan | 65,332.50 |
| 04/19/16 | Krishnan Venkatesan | 15,459.00 |
| 06/18/18 | Krishnan Venkatesan | 500.00 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 |
| | **Krishnan Venkatesan Total** | **196,979.50** |
| 01/31/15 | Speyside Fund, LLC (on information and belief) | 1,141,392.58 |
| 04/14/15 | Speyside Fund, LLC | 648,247.00 |
| 04/30/15 | Speyside Fund, LLC (on information and belief) | 752,647.00 |
| 06/04/15 | Speyside Fund, LLC | 461,396.25 |
| 07/03/15 | Speyside Fund, LLC (on information and belief) | 52,771.00 |
| 01/31/16 | Speyside Fund, LLC (on information and belief) | 12,021.61 |
| 04/08/16 | Speyside Fund, LLC (on information and belief) | 11,514.00 |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 |
| 08/03/18 | Speyside Fund, LLC | 100,000.00 |
| 08/06/18 | Speyside Fund, LLC | 300,000.00 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 |
| | **Speyside Fund, LLC Total** | **6,514,239.44** |
| | **Grand Total: 4 Year Avoidable Transfers** | **9,066,803.94** |

EXHIBIT "7"

# EXHIBIT 8 - 7 YEAR AVOIDABLE TRANSFERS

| Transfer Date | Transferee | Amount |
|---|---|---|
| 01/16/15 | Alcast Co. | 1,325,093.00 |
| 01/22/15 | Alcast Co. | 793,800.00 |
| 04/14/15 | Alcast Co. | 1,190,700.00 |
| 06/04/15 | Alcast Co. | 496,125.00 |
| 06/18/18 | Alcast Co. | 12,250.00 |
| 06/25/18 | Alcast Co. | 147,000.00 |
| | **Alcast Co. Total** | **3,964,968.00** |
| 01/16/15 | Eric Wiklendt | 77,823.00 |
| 01/22/15 | Eric Wiklendt | 100,000.00 |
| 04/14/15 | Eric Wiklendt | 104,036.00 |
| 06/04/15 | Eric Wiklendt | 58,125.00 |
| | **Eric Wiklendt Total** | **339,984.00** |
| 09/12/14 | Jeffrey Stone | 62,460.55 |
| 01/16/15 | Jeffrey Stone | 155,646.00 |
| 01/22/15 | Jeffrey Stone | 200,000.00 |
| 04/14/15 | Jeffrey Stone | 208,072.00 |
| 06/04/15 | Jeffrey Stone | 116,250.00 |
| 04/19/16 | Jeffrey Stone | 23,027.00 |
| | **Jeffrey Stone Total** | **765,455.55** |
| 01/21/15 | Krishnan Venkatesan | 116,344.00 |
| 01/22/15 | Krishnan Venkatesan | 112,400.00 |
| 04/14/15 | Krishnan Venkatesan | 109,688.00 |
| 06/04/15 | Krishnan Venkatesan | 65,332.50 |
| 04/19/16 | Krishnan Venkatesan | 15,459.00 |
| 06/18/18 | Krishnan Venkatesan | 500.00 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 |
| | **Krishnan Venkatesan Total** | **425,723.50** |
| 09/12/14 | Speyside Fund, LLC | 280,935.48 |
| 01/16/15 | Speyside Fund, LLC | 1,325,093.00 |
| 01/31/15 | Speyside Fund, LLC (on information and belief) | 1,141,392.58 |
| 01/22/15 | Speyside Fund, LLC | 793,800.00 |
| 04/14/15 | Speyside Fund, LLC | 648,247.00 |
| 04/30/15 | Speyside Fund, LLC (on information and belief) | 752,647.00 |
| 06/04/15 | Speyside Fund, LLC | 461,396.25 |
| 07/03/15 | Speyside Fund, LLC (on information and belief) | 52,771.00 |
| 01/31/16 | Speyside Fund, LLC (on information and belief) | 12,021.61 |
| 04/08/16 | Speyside Fund, LLC (on information and belief) | 11,514.00 |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 |
| 08/03/18 | Speyside Fund, LLC | 100,000.00 |

**EXHIBIT "8"**

| | | |
|---|---|---|
| 08/06/18 | Speyside Fund, LLC | 300,000.00 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 |
| | **Speyside Fund, LLC Total** | **8,914,067.92** |
| | **Grand Total - 7 Year Avoidable Transfers** | **14,410,199.00** |