1  STEVEN T. GUBNER – Bar No. 156593
   JASON B. KOMORSKY – Bar No. 155677
2  JESSICA L. BAGDANOV – Bar No. 281020
   **BRUTZKUS GUBNER**
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone: (818) 827-9000
   Facsimile: (818) 827-9099
5  Emails:    sgubner@bg.law
              jkomorsky@bg.law
6              jbagdanov@bg.law

7  Special Litigation Counsel for
   Sarah L. Little, Chapter 7 Trustee
8
                     **UNITED STATES BANKRUPTCY COURT**
9
                     **NORTHERN DISTRICT OF CALIFORNIA**
10
                              **OAKLAND DIVISION**
11
   In re                                  | Case No. 4:19-bk-40193-RLE
12
   PACIFIC STEEL CASTING COMPANY LLC,     | Chapter 7
13
              Debtor,                      | Adv. No. 19-04057
14
   _____    |
15                                          | **REQUEST FOR JUDICIAL NOTICE IN**
   SARAH L. LITTLE, Chapter 7 Trustee,    | **SUPPORT OF THE TRUSTEE'S MOTION**
16                                          | **FOR PARTIAL SUMMARY JUDGMENT**
              Plaintiff,
17 v.                                       | **Hearing:**
18 SPEYSIDE FUND, LLC, a Delaware limited  |
   liability company, et al.,              | Date:   November 12, 2020
19                                          | Time:   11:00 a.m.
              Defendants.                   | Place:  Conducted by Court Call or Zoom
20                                          | Judge:  Hon. Roger L. Efremsky
21
22
23
24
25
26
27
28

2271163

Sarah L. Little, the duly appointed and acting chapter 7 trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of Pacific Steel Casting Company LLC (the "Debtor"), pursuant to Fed. R. Evid. 201, hereby requests that the Court take judicial notice of the following documents and attached public records, in connection with the hearing on the Trustee's Motion for Partial Summary Judgment.

Plaintiff respectfully requests that the Court take judicial notice of its own files and, specifically, the following documents:

1.      Exhibit 1: *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 201-2, Asset Purchase Agreement by and between Speyside Fund, LLC, and Pacific Steel Casting Company, attached as Exhibit A to the Declaration of Charles H. Bridges, Jr., in Support of Motion to Approve Overbid Procedures Re: Sale of Debtors' Assets and Related Relief.

2.      Exhibit 2: *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 1, Chapter 11 Voluntary Petition.

3.      Exhibit 3:  *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 201-1, Declaration of Charles H. Bridges, Jr., in Support of Motion to Approve Overbid Procedures Re: Sale of Debtors' Assets and Related Relief.

4.      Exhibit 4: *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 537, Disclosure Statement for Debtors' and Committee's Second Amended Joint Chapter 11 Plan of Reorganization dated April 30, 2015.

5.      Exhibit 5: *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 204, Errata to Motion to Approve Overbid Procedures re Sale of Debtors' Assets and Related Relief.

6.      Exhibit 6:  *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 201, Motion to Approve Overbid Procedures Re: Sale of Debtors' Assets and Related Relief.

7.      Exhibit 7:  *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 227, Declaration of Kevin Daugherty Regarding Good Faith by Speyside Fund, LLC in Proposed Purchase of Debtor's Assets [11 U.S.C. §363(m)].

8.      Exhibit 8:  *In re Second Street Properties*, Case No. 14-41045, Dkt. No.  220, Order Approving Overbid Procedures re Sale of Debtors' Assets and Related Relief.

9. Exhibit 9: *In re Second Street Properties*, Case No. 14-41045, Dkt. No. 269, Order Approving Motion to Approve Sale of Substantially All Assets Free and Clear of Liens and Related Relief.

10. Exhibit 10: *In re Pacific Steel Casting Company LLC*, Case No. 19-40193, Dkt. No. 1, Voluntary Petition for Non-Individuals Filing for Bankruptcy.

11. Exhibit 11: *In re Pacific Steel Casting Company LLC*, Case No. 19-40193, Claim 1-1 filed January 28, 2019 on behalf of Berkeley Properties, LLC.

12 Exhibit 12: *In re Pacific Steel Casting Company LLC*, Case No. 19-40193, Claim 2-1 filed January 28, 2019 on behalf of Second Street Properties.

13. Exhibit 13: *In re Pacific Steel Casting Company LLC*, Case No. 19-40193, Claims 4-1 filed on February 28, 2019, 10-1 and 11-1, filed on April 8, 2019, all on behalf of the Pension Benefit Guaranty Corporation.

14. Exhibit 14: *In re Pacific Steel Casting Company LLC,* Case No. 19-40193, Claim No. 27, filed on May 29, 2019, on behalf of Speyside Fund, LLC

DATED:  October 2, 2020                    BRUTZKUS GUBNER

By:_____
   Steven T. Gubner
   Jason B. Komorsky
   Jessica L. Bagdanov
   Special Litigation Counsel for Sarah L. Little,
   Chapter 7 Trustee

# EXHIBIT "1"

## ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

### SPEYSIDE FUND, LLC

#### AND

### PACIFIC STEEL CASTING COMPANY

Dated as of June 19, 2014

167478.001/594498v6



EXHIBIT "A"

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS** | | 1 |
| 1.01 | Definitions | 1 |
| | | |
| **ARTICLE II PURCHASE AND SALE OF ASSETS** | | 2 |
| 2.01 | Asset Acquisition | 2 |
| 2.02 | Excluded Assets | 3 |
| 2.03 | Liabilities | 4 |
| 2.04 | Assumption of Contracts; Cure Amounts | 5 |
| | | |
| **ARTICLE III PURCHASE PRICE** | | 6 |
| 3.01 | Purchase Price | 6 |
| | | |
| **ARTICLE IV CLOSING AND TERMINATION** | | 9 |
| 4.01 | Closing | 9 |
| 4.02 | Termination | 10 |
| 4.03 | Treatment of Good Faith Deposit Upon Termination | 10 |
| | | |
| **ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** | | 11 |
| 5.01 | Representations and Warranties of Seller | 11 |
| | | |
| **ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER** | | 18 |
| 6.01 | Representations and Warranties of Buyer | 18 |
| | | |
| **ARTICLE VII COVENANTS OF THE PARTIES** | | 19 |
| 7.01 | Cooperation of the Parties | 19 |
| 7.02 | Bankruptcy Court Matters | 19 |
| 7.03 | Break-up Fee | 20 |
| 7.04 | Notices and Consents | 20 |
| 7.05 | Full Access | 20 |
| 7.06 | Property Inspection and Testing | 20 |
| 7.07 | Name Change | 21 |
| 7.08 | Transfer Taxes | 21 |
| 7.09 | Bulk Sales Laws | 21 |
| 7.10 | Multiemployer Plan | 21 |
| 7.11 | Post-Closing Transition and Cooperation | 22 |
| 7.12. | Non-Union Pension Plan | 23 |
| | | |
| **ARTICLE VIII EMPLOYEE MATTERS** | | 23 |
| 8.01 | Employees | 23 |
| | | |
| **ARTICLE IX CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** | | 24 |
| 9.01 | Conditions to Closing Applicable to All Parties | 24 |
| 9.02 | Conditions to the Obligations of S | 25 |

Case: 14-41045   Doc# 251-2   Filed: 10/02/14   Entered: 10/02/14 13:49:20   Page 2 of 99

**6**

| | | | |
|---|---|---|---|
| 9.03 | Conditions to the Obligations of Buyer | ................................................................ | 25 |
| ARTICLE X MISCELLANEOUS | | ................................................................................. | 27 |
| 10.01 | Survival of Representations, Warranties and Covenants | .......................... | 27 |
| 10.02 | No Third-party Beneficiaries | ................................................................ | 28 |
| 10.03 | Entire Agreement | ................................................................................. | 28 |
| 10.04 | Succession and Assignment | ................................................................. | 28 |
| 10.05 | Counterparts; Signatures | ..................................................................... | 28 |
| 10.06 | Headings | ............................................................................................ | 28 |
| 10.07 | Notices | ............................................................................................... | 28 |
| 10.08 | SUBMISSION TO JURISDICTION | ................................................... | 30 |
| 10.09 | Governing Law | .................................................................................... | 30 |
| 10.10 | Amendments and Waivers | .................................................................... | 30 |
| 10.11 | Severability | ....................................................................................... | 30 |
| 10.12 | Fees and Expenses | .............................................................................. | 30 |
| 10.13 | Construction | ....................................................................................... | 31 |
| 10.14 | Fair Consideration | .............................................................................. | 31 |
| 10.15 | Incorporation of Schedules | .................................................................. | 31 |
| 10.16 | Gender and Number | ............................................................................ | 31 |
| 10.17 | No Consequential or Punitive Damages | ................................................ | 31 |
| 10.18 | Time of Essence | .................................................................................. | 31 |
| 10.19 | Waiver | ............................................................................................... | 31 |

# SCHEDULES

| 2.02(g) | Deposits and Prepaid Amounts Funded by PS |
| 2.03(b)(iii) | Buyer assumed Benefit Plans |
| 2.03(b)(iv) | Transferable licenses, permits, etc. |
| 2.03(b)(v) | Employees With Accrued and Unpaid Vacation Benefits |
| 2.03(b)(vi) | Accounts payable assumed by Buyer |
| 2.04(a) | Executory contracts and Unexpired Leases to Assumed |
| 3.01(c)(ii) | Net Working Capital |
| 5.01(a) | Jurisdictions where Seller is qualfied |
| 5.01(h) | Problem Receivables (previously 5.01(g)) |
| 5.01(i)(iii) | Agreements with tax authorities |
| 5.01(j) | Intellectual Property  (previously 5.01(i)) |
| 5.01(k) | Real property used in the business |
| 5.01(l) | Litigation and Disputes |
| 5.01(m) | Compliance with Laws Exceptions |
| 5.01(n)(i) | Environmental Law Compliance Exceptions |
| 5.01(n)(ii) | Environmental , H&S reports (previously (n)(ii)(2) |
| 5.01(n)(iii) | Environmental, etc. permits |
| 5.01(o) | Insurance Policies |
| 5.01(p) | Brokers |
| 5.01(q) | Matters Relating to Benefit Plans |
| 6.01(a) | Jurisdicions where Buyer is qualfied to do buiness |
| 8.01(b) | Excluded Employees |

Case: 14-01457   Doc# 351-2 Filed 10/02/14 Entered 10/02/14 13:49:20 Page 4 of 97

8

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into by and between Pacific Steel Casting Company, a California corporation (the "Debtor" or "Seller") and Speyside Fund, LLC (the "Buyer" including any assignee of Buyer) as of this 19th day of June, 2014 ("Agreement Date") (Seller and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".)

## Recitals

A.  Seller is engaged in the steel foundry business (the "Business").

B.  On March 10, 2014, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Bankruptcy Code") (such petition, the "Petition") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") initiating Case No. 14-41045 (the "Bankruptcy Case"). No Trustee has been appointed and Seller operates the Business as Debtor and Debtor in Possession pursuant to 11 U.S.C. 1107 et seq.

C.  Subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order (as defined in Exhibit A) Seller desires to sell to Buyer and Buyer desires to acquire from Seller, substantially all of Seller's assets relating to the Business, in a transaction pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Transaction").

D.  Seller's board of directors has determined that it is advisable and in the best interests of the Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, and it has approved the same.

In consideration of the foregoing and the covenants, representations, warranties, agreements and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS

**1.01  Definitions.**  Capitalized terms used in this Agreement shall have the meanings ascribed to them in Exhibit A hereto or as may be set forth throughout this Agreement.

# ARTICLE II

## PURCHASE AND SALE OF ASSETS

**2.01   Asset Acquisition.**

(a) Pursuant to Sections 105,363 and 365 of the Bankruptcy Code, subject to the entry of the Sale Order and the terms and conditions of this Agreement, at the date this Transaction closes (the "Closing Date"), Seller shall sell, assign, transfer, convey and deliver to Buyer, free and clear of all Encumbrances and claims (except with respect to Assumed Liabilities), and Buyer shall purchase, and take assignment and delivery of, all right, title and interest in and to all of the assets, properties, goodwill and Business of every kind and description and wherever located, whether tangible or intangible, personal or mixed, directly or indirectly owned by Seller or to which it is directly or indirectly entitled and, in any case, belonging to or used or intended to be used in the Business, other than the Excluded Assets. The property to be acquired (all such assets, properties and rights purchased by Buyer being referred to herein as the "Acquired Assets") includes, without limitation, the following assets, properties and rights of Seller:

(i)      all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials, supplies, and components intended for sale wherever located ("Inventory");

(ii)     all of Seller's tools, equipment, vehicles and other tangible personal property that is used, held for use or intended for use in the Business, or which is being utilized or operated by Seller, wherever located, together with any transferrable warranty and service rights applicable to Seller with respect to said Acquired Assets;

(iii)    all of Seller's right, title and interest relating to prepaid expenses, advance payments and deposits other than those directly related to Excluded Assets;

(iv)    all accounts receivable, notes, evidences of indebtedness of any kind, from third parties arising from the conduct of the Business, whether or not in the ordinary course of business, together with any unpaid financing charges thereon, and all amounts which have been earned by Seller but which have not yet been invoiced;

(v)     all rights of Seller under the Assumed Contracts;

(vi)    all franchises, permits, licenses, agreements, waivers and authorizations issued by any Governmental Entity held or used by Seller in connection with, or required for, the Business, to the extent transferable (collectively "Permits");

(vii)   all of Seller's right, title and interest in, to and under all Intellectual Property owned, licensed or sublicensed by or to Seller to the extent transferable;

(viii)  books and records of Debtor other than those included in Excluded Assets, including customer lists, invoices, shipping records, supplier lists, equipment maintenance data, sales and sales promotional data and materials, cost and pricing information,

quality control records and manuals, blueprints, research and development files, records and laboratory books, patent disclosures, credit records, drawings, correspondence, and any other records and data, and all computer software and programs and any rights thereto that are used in, or relating to, the Business;

(ix)    all of Seller's promotional and advertising materials relating to the Business as presently conducted, including all catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, equipment and parts lists, and dealer and distributor lists;

(x)    any and all goodwill of Seller relating to the Business; and

(xi)    except to the extent excluded herein, all rights and obligations under non-disclosure or confidentiality and similar arrangements with or for the benefit of employees, independent contractors and agents of Seller or with third parties;

(xii)    any and all telephone and facsimile numbers, domain names and email addresses;

(xiii)    all prior and current workers compensation Insurance Policies of the Seller, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and rights to be indemnified and defended under such Insurance Policies; and

(xiv)    all proceeds and products of the Acquired Assets.

(b) All of the Acquired Assets are being sold to Buyer free and clear of all Liens, Encumbrances and claims to the fullest extent permissible under Section 363(f) of the Bankruptcy Code pursuant to an order by the Bankruptcy Court as described in Section 7.02 below (the "Sale Order").

(c) Except as specifically provided in this Agreement, Seller makes no representations or warranties whatsoever respecting the Acquired Assets. Except as specifically provided in this Agreement, the Acquired Assets are sold "as is" and "where is".

    **2.02    Excluded Assets.** Seller is not selling, assigning, or transferring to Buyer, and Buyer is not purchasing, and the term "Acquired Assets" does not include, any interest in the following (the "Excluded Assets"):

(a) corporate and financial books and records of Seller, including Seller's organization documents, minute and stock record books, tax returns, checkbook, cancelled checks, provided that upon request, Buyer may have reasonable access to such books and records and the opportunity to make copies thereof. Seller will retain a copy of the records of accounts receivable and payable.

(b) causes of action arising under Sections 544 through 552 of the Bankruptcy Code and all proceeds thereof;

(c) rights of Seller under Contracts not included within the Assumed Contracts;

(d) all documents and personnel records of Seller's employees that Seller is required by law to retain and is prohibited by law from providing a copy thereof to Buyer;

(e) all capital stock or other equity interests issued by Seller;

(f) all prior and current Insurance Policies of the Seller and/or of Berkeley Properties, LLC, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than workers compensation Insurance Policies;

(g) all those certain deposits or prepaid amounts funded by Seller for the purpose of the Bankruptcy Case including utility deposits, all as identified on in Schedule 2.02(g);

(h) all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) that are not assumed by Buyer;

(i) all claims that the Seller may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities:

(j) Seller's cash on hand or in bank or other depository accounts, money market funds and other liquid investments, the Good Faith Deposit, and any proceeds of Excluded Assets;

(k) Any asset of the Seller that otherwise would constitute an Acquired Asset but for the fact that it is sold or disposed of in the ordinary course of Seller's business during the time from the Agreement date until the Closing Date;

**2.03    Liabilities.**

(a)    Other than the Assumed Liabilities, Buyer shall not assume or agree to pay, perform or discharge, any debts, liabilities, obligations, claims, expenses, taxes, or commitments of any kind or character, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undetermined (collectively, "Liabilities") of Seller or become liable to Seller or any other Person, for any Liabilities of Seller. Liabilities include, without limitation, any Liability of Seller relating to or arising from: (i) any infringement by Seller on the rights of others in connection with the Business; (ii) any and all taxes of any nature with respect to the period prior to Closing; (iii) any liability arising from a violation by Seller of any laws governing employee relations, including anti-discrimination laws, wage and hour laws, labor relations laws, occupational safety and health laws or any other laws applicable to Seller or the Business or the Acquired Assets with respect to the period prior to Closing (other than Liabilities under Assumed Plans described in Section 2.03(b)(iii); or (v) liability arising from Seller's fraud, breach, malfeasance, misfeasance, negligence, strict liability in tort, injury to persons or property or under any other theory relating to the Business, the Acquired Assets or the conduct, performance or non-performance of Seller.

(b)    At Closing, Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy in accordance with their respective terms) the following liabilities (the "Assumed Liabilities"):

(i)      all Liabilities arising from the ownership of the Acquired Assets after the Closing Date;

(ii)      all Liabilities of Seller arising under the Assumed Contracts to the extent that such Liabilities first accrue on or after the Closing Date, and all obligation to demonstrate adequate assurance of future performance required by the Bankruptcy Court under 365(b)(1)(C) of the Bankruptcy Code;

(iii)      the obligations to administer or to provide benefits, payments under the Benefit Plans that Buyer assumes as listed on Schedule 2.03(b)(iii) (the "Assumed Plans") after the Closing Date, and all Liability arising from Buyer's termination of or withdrawal from any Assumed Plan; provided that with respect to any retiree under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011, and prior to the Closing Date or is listed on Schedule 2.03(b)(iii), Buyer shall not assume any liability for and Seller shall be solely responsible to pay any amounts in excess of the retirement benefit amounts previously determined to be due to such persons, all interest required to be paid to such persons in respect of unpaid benefits. Seller shall establish a reserve for any such retirement benefits amounts determined to be due by depositing $20,000 in the attorney trust account of Binder & Malter LLP which deposit shall be held and used to fund such amounts and held in such account until such benefit entitlement (or lack thereof) is definitely determined;

(iv)      all Liabilities and obligations of Seller arising under transferable licenses, Permits and governmental authorizations of Seller identified on Schedule 2.03(b)(iv), and Intellectual Property rights first accruing from and after the Closing Date;

(v)      any accrued but unpaid vacation obligations as of the Closing Date to Seller's employees listed on Schedule 2.03(b)(v) (the amount of such obligations as of May 31, 2014, total $1,032,441.83) whom Buyer elects to hire, except that Buyer shall not assume any such obligations resulting from accounting errors in the calculations of accrued or unpaid vacation obligations of Seller or Seller's agent pertaining to union employees whose vacation was not properly adjusted on anniversary dates and for which Seller shall be liable;

(vi)      accounts payable and accrued expenses in the aggregate amount of up to $1 million as listed on Schedule 2.03(b)(vi) and certain Liabilities for pending orders from customers arising out of the conduct of the Business after the Closing Date, expenses for customer rebates and for goods or materials received in transit but not yet invoiced as of the Closing Date, as listed on Schedule 2.03(b)(vi); and

(vii)      all of Seller's Liabilities for all claims made or asserted by any employee or former employee of Seller for workers compensation benefits for occurrences or claims made solely with respect to the policy years beginning April 1, 2012, April 1, 2013 and April 1, 2014.

**2.04    Assumption of Contracts; Cure Amounts.**

(a)      Assumption of Contracts. Seller shall assume, and assign to Buyer, any unexpired lease or executory contract (as those terms are used in Section 365 of the Bankruptcy Code) to which Seller is a party ("Executory Contract"), and that is designated in a motion to

assume and assign contracts filed by Seller with the Bankruptcy Court in conjunction with the Sale Motion, which motion shall be filed within the time described in Section 7.02(b) (such designated Executory Contracts are "Assumed Contracts"). Attached as Schedule 2.04(a) is a list of the Executory Contracts including the Collective Bargaining Agreement, that are expected to be Assumed Contracts, but the controlling designation of contracts, other than the Collective Bargaining Agreement which must be an Assumed Contract (subject to appropriate modifications agreed to by the parties), shall be in the order allowing and directing assumption and assignment of the Assumed Contracts to Seller. Seller shall also assume, and assign to Buyer, any other Executory Contracts related to the Business and designated by Buyer, in its sole discretion and by written notice to the Seller, for assumption and assignment at any time and from time to time after the Agreement Date and prior to the entry of an order rejecting such Executory Contract. Buyer shall have the sole discretion to remove any Assumed Contract (other than the Collective Bargaining Agreement) previously designated for assumption and assignment, at any time and from time to time prior to the effective date of the assumption by the Seller of such Executory Contract. The Seller shall not reject any Executory Contract without providing Buyer (i) prior written notice of its intent to reject such Executory Contract, (ii) a copy of such Executory Contract, and (iii) the prior opportunity to designate such Executory Contract as an Assumed Contract. If Buyer removes a contract from the "assumed" list after the sale hearing, Buyer shall reimburse the estate for any damages that the bankruptcy estate suffers resulting from the rejection of the contract.

(b)  Curing Defaults and Assignment. At Closing, the Seller shall assume each of the Assumed Contracts pursuant to Section 365(a) of the Bankruptcy Code, and sell and assign to Buyer each of the Assumed Contracts pursuant to Sections 363(b), (f) and (m) and 365(f) of the Bankruptcy Code. All amounts, as determined by the Bankruptcy Court, or as agreed between Seller and the non-debtor party, necessary to cure an Assumed Contract (the "Cure Amounts") shall be paid by Seller at or before the Closing, or credited against the Purchase Price. Buyer shall also provide each non-debtor party with adequate assurance of future performance. The Cure Amounts must be sufficient to relieve Seller from all obligations with respect to defaults arising or existing under the Executory Contracts prior to the Closing Date.

## ARTICLE III

## PURCHASE PRICE

**3.01  Purchase Price.**

(a)  Good Faith Deposit. Upon execution of this Agreement the Buyer shall pay $500,000 for deposit into the Binder & Malter LLP Client Trust Account in escrow on behalf of Seller and Buyer by delivery of a cashier's check to Binder & Malter LLP or wire transfer into said account. This is the "Good Faith Deposit."

(b)  The purchase price for the Acquired Assets (the "Purchase Price") shall consist of the following:

(i)  $10,800,000.00;

167478.001/594498v6

6

(ii)     the Good Faith Deposit; and

(iv)     any additional amount the Buyer chooses, in its sole discretion, to over-bid at the Auction.

The Parties agree that, as of the Agreement Date, not including any amount for overbid at the Auction, the Purchase Price is approximately $11,300,000.00.

(c)     Purchase Price Adjustments.

(i)     Determination of Amount.  The Purchase Price shall be increased or decreased to account for the difference between $26,853,679 and the Net Working Capital on the Closing Date.  If Net Working Capital is greater on the Closing Date, the Purchase Price shall be increased by the amount of such difference.  If Net Working Capital is lower on the Closing Date, then the Purchase Price shall be reduced by such difference.  Two (2) business days prior to the Closing Date, Seller shall deliver to Buyer an estimated calculation of Seller's Net Working Capital as of the Closing Date ("Estimated Closing Date Net Working Capital").  The amount of the Estimated Closing Date Net Working Capital shall be used to determine the Purchase Price payable by Buyer (subject to adjustment pursuant to this Agreement) on the Closing Date.

(ii)     Procedure.  Buyer intends to conduct a physical count of inventory on hand at the Real Property on the Closing Date, and Seller may have representatives present during such count. The results of such physical count shall be binding on the parties as to the volume of inventory on hand at the plant, less damaged or otherwise unsaleable items. Inventory of domestic castings shall be valued for purposes of this Agreement at the amounts per ton set forth on Schedule 3.01(c)(ii). All other inventory elements shall be valued in accordance with GAAP.  Accounts receivable shall be valued in accordance with GAAP, consistently applied.  Within twenty (20) business days after the Closing Date, Buyer shall deliver to Seller a written and detailed calculation of the Net Working Capital as of the Closing Date as determined by the Buyer along with related work papers, together with a statement of the amount of the Purchase Price adjustment ("Purchase Price Adjustment Statement").  After the delivery of the Purchase Price Adjustment Statement, the Parties shall cooperate in connection with the review of the Purchase Price Adjustment Statement, including reasonable access to materials used in the preparation of the Purchase Price Adjustment Statement.  Each Party shall then have thirty (30) days from receipt of the Purchase Price Adjustment Statement to formally notify the other Party of any objections to or disputes of the Purchase Price Adjustment Statement (the "Dispute Notice").  If either Party delivers a Dispute Notice, the Parties shall use reasonable, good-faith efforts to resolve any such objections within ten (10) days following receipt of such Dispute Notice, and if any such objections are so resolved within such ten (10) day period, the Purchase Price Adjustment, with such changes as may have been previously agreed in writing by the Parties, shall be final and binding to the extent of any items no longer in dispute.  If all items of dispute are so resolved, the Purchase Price Adjustment Statement (as so modified) shall be conclusive and binding on all Parties.  If the Parties fail to reach agreement with respect to all of the matters set forth in the Dispute Notice within the aforementioned ten (10) day period, then they shall, within seven (7) business days thereafter, retain a mutually acceptable national independent accounting firm (the "Independent Accountant"), subject to approval of the

Bankruptcy Court, to resolve any amounts then remaining in dispute ("Disputed Items"), and any amounts not so disputed (the "Undisputed Items") shall be final and binding on the Parties. The Parties shall cooperate fully with the Independent Accountant so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Accountant shall have thirty (30) business days from its selection and appointment to resolve Disputed Items only in writing with an explanation of the basis for its determination, with a copy to all Parties. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Item must be within the range of values assigned to each such item in the Purchase Price Adjustment Statement and the Dispute Notice, respectively. The determination of the Independent Accountant shall be final and binding on the Parties, absent manifest error or willful misconduct, and the cost of the Independent Accountant shall be borne by the Party whose position is determined to be the least correct by the Independent Accountant. The Party owing the Purchase Price adjustment amount shall pay such amount to the other Party by wire transfer no later than ten (10) business days following (i) the delivery date of the Purchase Price Adjustment Statement to Seller, or (ii) the Independent Accountant's final determination with respect to the Purchase Price Adjustment Statement, as the case may be.

(d)     The Purchase Price shall be paid in part by release to Seller of the Good Faith Deposit, with the remainder paid in Cash (subject to the adjustments set forth herein) at or before the Closing Date.

(e)     Prorations. Except for amounts that Buyer must pay with respect to the Assumed Liabilities, Seller shall be responsible for the expenses relating to the Acquired Assets and the Business up to and through the Closing Date, and Buyer shall be responsible for the expenses relating to the Acquired Assets and the Business after the Closing Date (for example *ad valorem* taxes and utilities). Expenses relating to the Acquired Assets up to and through the Closing Date shall be paid by Seller at or before the Closing Date. To the extent that the time period for the assessment of any expenses falls both before and after the Closing Date, then those expenses shall be prorated as of the Closing Date, and, to the extent required, reconciled after the Closing Date.

(f)     Allocation of Purchase Price for Tax Purposes. As promptly as practicable following the Agreement Date, Buyer shall deliver to the Seller a schedule, allocating the Purchase Price among the Acquired Assets for all tax and other reporting purposes, which schedule shall be subject to the Seller's consent, not to be unreasonably withheld. After the Seller grants its consent to such schedule, the Seller and the Buyer shall be bound by such allocation (and if necessary, any adjusted allocation), and shall file an Internal Revenue Service Form 8594 and all applicable federal, state, local and foreign income, and excise tax returns in a manner that is consistent with such allocation. If the allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party concerning the existence of such dispute and the Parties shall consult with each other with respect to all issues related to the allocation in connection with such dispute. If a different allocation proposed by the Internal Revenue Service (the "IRS") is finally determined, either Party may file amended returns based on such allocation or any other allocation. An allocation shall be considered to be finally determined when such allocation cannot be contested in any court of competent jurisdiction.

Case: 14-01045   Doc# 351-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 16 of 997

16

(g) <u>Good Faith Deposit</u>. If the Buyer makes a material breach of this Agreement before the Closing Date and such breach continues without cure ten days after Seller's written notice to Buyer of same, then Seller may terminate this Agreement in accordance with Sections 4.02 and 4.03, resulting in the Good Faith Deposit becoming Seller's property, which shall constitute the exclusive relief against Buyer in such event. If any of Seller's representations or warranties were either untrue or inaccurate in a material respect when made or become untrue or inaccurate in a material respect on or before the Closing Date or if the Seller makes a material breach of this Agreement before the Closing Date, and such breach continues ten days after Buyer's written notice to Seller of same, then Buyer may terminate this Agreement in accordance with Sections 4.02 and 4.03 and the Seller shall immediately return the Good Faith Deposit in full. The Good Faith Deposit will become non-refundable property of the Seller if Buyer is approved as the winning bidder by the Bankruptcy Court in the Sale Order, and this Agreement is not timely terminated in accordance with Sections 4.02 and 4.03.

## ARTICLE IV

## CLOSING AND TERMINATION

**4.01    Closing**. The consummation of the Transaction (the "<u>Closing</u>") shall take place at a time and date of Buyer's choosing within fifteen (15) business days after the entry of the Sale Order, provided that the Sale Order has not been appealed or stayed, at the offices of Seller's counsel.

(a)    <u>Buyer Deliveries</u>. At the Closing, Buyer shall deliver to Seller:

(i)    The Purchase Price, less the Good Faith Deposit, and any adjustments or credits against the Purchase Price, including the Purchase Price adjustment and any cure amounts owed with respect to the Assumed Contracts;

(ii)    To the extent necessary, assignment and assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Buyer (as necessary), in customary form and otherwise as counsel to Seller shall reasonably request to implement and evidence the Transaction;

(iii)    such other agreements, documents and instruments as Seller and its counsel may reasonably request.

(b)    <u>Seller Deliveries</u>. At the Closing, Seller shall deliver to Buyer:

(i)    assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Seller, in customary form and otherwise as counsel to Buyer shall reasonably request to implement and evidence the Transaction;

(ii)    the required executed third party consents, if any;

(iii)    a certified copy of the Sale Order; and

(iv) such other agreements, documents and instruments as Buyer and its counsel may reasonably request.

**4.02 Termination.** This Agreement may be terminated at any time prior to the Closing Date:

(a) by the mutual written consent of Buyer and Seller;

(b) by Seller, if it is not in material breach of its obligations hereunder, upon a material breach by Buyer of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after delivery of written notice thereof;

(c) by Buyer, if not in material breach of its respective obligations hereunder, upon a material breach by Seller of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after written notice thereof;

(d) by Buyer, if not in material breach of its respective obligations hereunder, if, before the Closing, Seller's Bankruptcy is converted to a Chapter 7 case under the Bankruptcy Code or there is appointed an operating trustee or examiner with expanded powers;

(e) by Buyer or Seller if any court of competent jurisdiction or other Governmental Entity issues, enacted, entered, promulgated or enforced any order, judgment, decree, injunction or ruling which restrains, enjoins or otherwise prohibits the transaction and such order, judgment, decree, injunction or becomes final and non-appealable;

(f) by Buyer or Seller if the Bankruptcy Court fails to enter the Sale Order within four days of the conclusion of the Bankruptcy Court's sale hearing;

(g) by Buyer or Seller if the Closing shall not have occurred on or before 15 days after entry of the Sale Order, provided the terminating Party is not otherwise in material breach of its representations, warranties or other obligations hereunder.

(h) Automatically and without any action by either Buyer or Seller, if the Bankruptcy Court approves a Transaction with any Person other than Buyer (provided, however, that Buyer is not otherwise in material default under this Agreement);

(i) By Buyer, if any of the conditions set forth in Section 9.03 are not satisfied on or prior to the dates designated in Section 9,03 for the satisfaction of such conditions (provided, however, that Buyer is not otherwise in material default under this Agreement or any other agreement that are part of the Transaction);

**4.03 Treatment of Good Faith Deposit Upon Termination.**

(a) In the event that this Agreement is terminated pursuant to Sections 4.02(a), (c), (d), (e), (f), (g), (h) or (i) above, then the Seller shall immediately return the Good Faith Deposit in full.

(b)     In the event that this Agreement is terminated pursuant to Section 4.02(b) above, then Buyer waives all claims to the Good Faith Deposit and it will become Seller's property.

(c)     In the event that this Agreement is terminated pursuant to Section 4.02(c) then the Breakup Fee provisions of Section 7.03 shall survive termination and the Breakup Fee shall be payable to Buyer from the proceeds of sale to a third party.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

**5.01    Representations and Warranties of Seller**.  Seller represents and warrants to Buyer that, except as set forth in the disclosure schedules being delivered by Seller contemporaneously herewith, but no later than five (5) business days after the Agreement Date (the "Seller Disclosure Schedules"):

(a) Organization and Qualification.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and is qualified to do business in all other jurisdictions in which the failure to so qualify would constitute a Material Adverse Effect, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law. The jurisdictions in which each Seller is so qualified are listed on Schedule 5.0l(a) hereto.

(b) Authorization of Transaction.  Subject to the entry of the Sale Order, and unless obviated by the Bankruptcy Code and other applicable law, the Seller has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Seller of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Seller.  Subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable in accordance with its terms, and no other action by Seller is requisite to the valid and binding execution, delivery and performance by Seller of its obligations under this Agreement and the consummation of the Transaction, except as expressly set forth in this Agreement and/or the Sale Order, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforcement of specific remedies.

(c) Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Seller of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create

Case: 14-01057   Doc# 251-2   Filed: 10/02/14   Entered: 10/02/14 13:49:20   Page 19 of 997

19

in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d) Title to Assets. Subject to the entry of the Sale Order, the Seller, as of the Agreement Date, has, or as of the Closing Date will have, good title to, valid leasehold interests in, or license or other valid rights to use, all of the Acquired Assets.

(e) Assets used in the Business. Except the Excluded Assets, the Acquired Assets are the only assets used by Seller to conduct the Business. Seller believes that the Acquired Assets include all rights, properties and other assets necessary to permit Buyer to conduct the Business after the Closing Date in materially the same manner as it has been conducted by Seller prior to the Agreement Date.

(f) Operation of Business. From the Agreement Date through the Closing Date, the Seller shall conduct the Business in accordance with the Bankruptcy Code, Bankruptcy Rules, Orders of the Bankruptcy Court and applicable local guidelines. Except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (such consent not be unreasonably withheld), or (iii) as required by the filing of the Bankruptcy Case or as approved by the Bankruptcy Court and with adequate written notice to Buyer, the Seller shall not amend, supplement, or terminate any of the Assumed Contracts; transfer any interest in any Acquired Asset, except in the ordinary course of business; bring, settle, compromise or waive any proceeding or legal right adversely affecting the validity or value of any Acquired Asset; or authorize or enter into an agreement to do any of the foregoing.

(g) Financial Statements. Seller has delivered to Buyer the Seller's audited consolidated balance sheet as of March 31, 2013, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2013, together with notes to such financial statements (the "2013 Year-end Financial Statements"). Seller has or within five (5) days of the Agreement Date shall deliver to Buyer Seller's unaudited consolidated balance sheet as of April 30, 2014, and the related statement of operations for the one-month period ended April 30, 2014 ("April 30, 2014 Interim Financial Statements"). On or before July 31, 2014, Seller shall deliver to Buyer: Seller's audited consolidated balance sheet as of March 31, 2014, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2014, together with notes to such financial statements (the "2014 Year-end Financial Statements"). On or before twenty (20) days after the end of each month, until the month in which the Closing Date occurs, Seller shall deliver to Buyer Seller's unaudited consolidated balance sheet as of the last day of the prior month, and the related statement of operations for such one-month period (the "Monthly Interim Financial Statements"). The 2013 Year-end Financial Statements, 2014 Year-end Financial Statements, April 30, 2014 Interim Financial Statements and Monthly Interim Financial Statements are herein collectively referred to as the "Financial Statements." Upon delivery, the respective Financial Statements shall have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied throughout the periods covered thereby, and be consistent with the books and records of the Seller.

Case: 14-01045   Doc# 251-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 20 of 99

(h) <u>Accounts Receivable.</u>   Each Account Receivable is a true and correct statement of the account for goods delivered to or services actually performed for and accepted by, such account debtor in the ordinary course of business materially consistent with past practice.    Except as set forth in <u>Schedule 5.01(h)</u>, all receivables that are reflected on the Financial Statements (net of any reserves shown thereon) (i) are valid and existing, (ii) represent monies due for goods sold and delivered or services rendered in the ordinary course of business materially consistent with past practice, and (iii) are not subject to any refunds or adjustments or any defenses, rights of set-off, credits,  discounts, assignment, restrictions, security interests or other Encumbrances.   Seller has not factored any of the receivables.

(i) <u>Taxes.</u>

(i)   All federal, state, foreign, county, local and other Tax Returns required to be filed by or on behalf of Seller have been timely filed, or extensions of the time to file have been obtained, and when filed were true and correct in all material respects, and the taxes due and owing were paid or adequately accrued, except to the extent contested in good faith by proper proceedings. Seller has duly withheld and paid all Taxes required to have been withheld and paid relating to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed and distributed.

(ii)   The provision made for taxes on the Financial Statements is sufficient for the payment of all material Taxes, whether or not disputed, at the date of such Financial Statements and for all years and periods prior thereto.

(iii)   There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any Tax Return or report of Seller or the period of time within which any Tax Return of Seller must be filed.

(iv)   Tri-Pacific, Inc., the majority shareholder of Seller, has received a notice from IRS that it will be auditing the income tax returns of Tri-Pacific, Inc., Seller and Berkeley Properties, LLC for the tax year ending March 31, 2012.  Neither Buyer nor any of the Acquired Assets shall be liable for any tax liability of Seller.

(j) <u>Intellectual Property.</u>  <u>Schedule 5.01(j)</u> provides a true and complete list of all Intellectual Property owned, used or held by Seller in the operation of the Business, in each case indicating whether such Intellectual Property is owned by or licensed to Seller.  Seller owns or possesses adequate licenses or other valid rights to use all Intellectual Property used or held for use in connection with Business and included in the Acquired Assets.   To the Seller's Knowledge, there is not been any assertion or claim challenging the validity of any Intellectual Property.  To the Seller's Knowledge, the operation of the Business by Seller does not conflict with or infringe on the rights of any other Person, and Seller has not received any claim or written notice, and has no reason to believe that there is any unasserted or potential claim, from any Person to such effect.  Seller has taken reasonable measures to protect the proprietary nature of each item of Intellectual Property and to maintain in confidence all trade secrets and confidential information that it owns or uses.

Case: 14-01045   Doc# 251-2  Filed: 10/02/14  Entered: 10/02/14 13:49:20  Page 21 of 699

21

(k) <u>Real Property.</u> Schedule 5.01(k) hereto lists the street address, the current owner and the current use of each parcel of Real Property which is related to, used, useful or held for use in the conduct of the Business (the *"Real Property")*. The Real Property constitutes all of the real property used in the operation of the Business as currently conducted. Seller is in exclusive possession of the Real Property and the improvements thereon. Seller is not a party to, and the Real Property is not subject to, any service contract or agreement other than those listed on Schedule 5.01(k).

(l) <u>Litigation.</u> Except as described in Schedule 5.01(l), to the Seller's Knowledge as of the Agreement Date, there is no action, suit, investigation or proceeding pending or threatened against Seller or the Acquired Assets that is reasonably likely to have a Material Adverse Effect on the operation or use of the Business, the Real Property or the Transaction, and Seller has not received notice of any special assessment proceedings affecting the Real Property.

(m) <u>Compliance.</u> Except as set forth on Schedule 5.01(m), to Seller's Knowledge Seller is and at all times within the time of applicable statute of limitations has complied in all material respects with applicable laws, rules, regulations, judgments, orders and decrees and Permits applicable to the Acquired Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect on the Business or the Real Property. Except as provided on Schedule 5.01(m), within the time of the applicable statute of limitations, Seller has not received notice of any outstanding violation of any applicable law, ordinance, or restriction from any governmental authority with respect to the Business or the Real Property. Seller holds all material Permits necessary or required to operate the Business as currently conducted. Set forth on Schedule 5.01(m) is a list of all such Permits (and the status thereof), all of which are valid, effective and in good standing. Each of such Permits is freely transferable to Buyer.

(n) <u>Environmental Matters.</u>

(i) Except as set forth on Schedule 5.01(n)(i) hereto, (A) the current business operations of Seller are in material compliance with all Environmental Laws; (B) during the five years ending on the Closing Date there has been no Release at any of the properties owned or operated by Seller (including the Real Property) which could have a Material Adverse Effect; (C) during the five years ending on the Closing Date no Environmental Claim has been asserted against Seller nor does Seller have Knowledge or notice of any threatened Environmental Claim against Seller which could have a Material Adverse Effect; (D) during the five years ending on the Closing Date no Environmental Claims have been asserted against any facilities that may have received Hazardous Substances generated by Seller which could have a Material Adverse Effect; (E) no property now owned or operated by Seller (including the Real Property) has been used as a treatment or disposal site for any Hazardous Substance or contains any underground storage tanks; (F) during the five years ending on the Closing Date Seller has not failed to report to the proper Governmental Entity any Release which is required to be so reported by any Environmental Laws which could have a Material Adverse Effect; (G) Seller holds all licenses, Permits and approvals required under any Environmental Laws in connection with the current operation of the Business, except for such licenses, permits and approvals as to which Seller's failure to maintain or comply with could not have a Material Adverse Effect; (H)

Case: 14-01045   Doc# 251-2  Filed: 10/02/14  Entered: 10/02/14 13:49:20  Page 22
of 99                                                                        22

during the five years ending on the Closing Date Seller has not received any notification pursuant to any Environmental Laws that (x) any work, repairs, construction or capital expenditures are required to be made as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (y) any license, permit or approval referred to above is about to be reviewed, made subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not have a Material Adverse Effect; (I) to Seller's Knowledge, no Hazardous Substance is migrating from or onto the Real Property that could reasonably be expected to give rise to any reporting, investigation, remediation, or other liabilities or obligations under any Environmental Laws; (J) to Seller's Knowledge, there are no conditions, circumstances, activities, practices, incidents, actions, omissions or plans which reasonably could be expected to materially interfere with or prevent compliance with the Environmental Laws as the Business is currently operated; and (K) Seller has not undertaken or assumed any liability or obligation for corrective or remedial action, or of any other Person relating to Environmental Laws.

(ii)     Schedule 5.01(n)(ii) hereto identifies all material written environmental, health and/or safety reports generated by or on behalf of Seller within the past five years immediately preceding the Agreement Date that have been provided to the applicable Governmental Entity as required by Environmental Law and/or Environmental Permits, and except where such reports could not reasonably be obtained or were not so provided, all as described in Schedule 5.01(n)(ii). Schedule 5.01(n)(ii) further includes all Phase I or Phase II environmental assessments or environmental audits relating to the Real Property obtained by Seller within the five years immediately preceding the Agreement Date, and true and complete copies of such reports have been provided to Buyer.

(iii)     Schedule 5.01(n)(iii) hereto identifies all material Environmental Permits, approvals or authorizations issued by any federal, state or local Government Entity to Seller in connection with the Business or the Real Property within the two years immediately preceding the Agreement Date, each such Environmental Permit is valid and enforceable and in full force and effect, and Seller is in compliance, in all material respects, with the terms and conditions of all such Environmental Permits, approvals or authorizations and no other Environmental Permits, approvals or authorizations are necessary for operating the Business or the Real Property as currently conducted.

(iv)     To Seller's Knowledge, there is currently no Release on the Property which could have a Material Adverse Effect regardless of whether the Release occurred before or after the five-year period ending on the Closing Date.

(o) Insurance. Schedule 5.01(o) hereto sets forth a summary of each insurance policy carried by Seller (including any self-insurance programs) (collectively "Insurance Policies"). All such insurance policies are valid and binding and in full force and effect, all premiums due thereunder have been paid in full and Seller has not received any notice of cancellation or termination in respect of any such policy nor is Seller in default thereunder.

(p) Brokers. Except as set forth on Schedule 5.01(p) hereto , Seller is not a party to any agreement, arrangement or understanding with any Person which will result in the

obligation of Buyer or Seller to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated by this Agreement.

(q) Employee Benefit Plans.

(i) Seller has furnished or made available to Buyer: (1) a complete and accurate copy of the plan document (and any funding medium, including any trust agreement or annuity contract, if applicable) and summary plan description of each Benefit Plan (or other descriptions of such Benefit Plan provided to employees), including all amendments thereto; (2) a copy of the annual reports, financial statements and/or actuarial valuations, if any, with respect to each Benefit Plan for the three (3) year period immediately preceding the date of this Agreement; (3) a copy of each summary of material modification for each Benefit Plan; (4) a copy of IRS Form 5500 for each Benefit Plan for the three (3) plan years immediately preceding this Agreement, with all applicable schedules and accountants' opinions attached thereto; (5) the most recent determination or opinion letter received from the IRS for each Benefit Plan which is a 401(k) plan or pension plan; (6) a copy of the latest account statement, if any, reflecting the assets of any funded Benefit Plan; (7) a copy of the Summary Annual Report as distributed to the participants of the Benefit Plans, if applicable, for the three (3) year period immediately preceding the date of this Agreement; and (8) any correspondence from any governmental authority with respect to any Benefit Plan that threatens any litigation, claim, suit, investigation or other proceeding against the Seller or any Benefit Plan that refers to or alleges any fact or circumstance which could reasonably be expected to give rise to any such litigation, claim, suit, investigation or other proceeding, together with any response thereto by or on behalf of the Seller or the Benefit Plan.

(ii) Except as disclosed in Schedule 5.01(q): (1) there are no pending, threatened, or to the Knowledge of the Seller, anticipated claims by any party, including any Governmental Entity, relating to any Benefit Plan, other than routine claims for benefits; (2) no Benefit Plan is currently under investigation or audit by the IRS, the U.S. Department of Labor, any state department of labor or any similar organization or entity; (3) since its respective inception or effective date, each of the Benefit Plans has complied in form and been operated and maintained in all material respects in accordance with its terms and the requirements of all applicable laws and regulations, and in accordance therewith, the plan document underlying any Benefit Plan has been amended and/or restated, to the extent necessary and required by law to have been amended and/or restated by the Agreement Date and the Closing Date, to comply with all applicable laws and regulations; (4) with respect to the Non-Union Pension Plan: a) all premiums (any interest, charges and penalties for late payment, if any applicable) due the PBGC for which premiums are required have been paid; b) the Non-Union Pension Plan has not been terminated under circumstances which would result in liability to the PBGC; c) the Non-Union Pension Plan is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended ("IRC"), has received a favorable determination or opinion letter from the IRS that it is so qualified, and any trust established in connection with the Non-Union Pension Plan is intended to be exempt from federal income taxation under Section 501(a) of the IRC has received a determination letter from the IRS that it is so exempt, and to Seller's Knowledge no fact or event has occurred since the date of such determination letter from the IRS that could reasonably be expected to result in the disqualification of the Non-Union Pension Plan or in the loss of the exempt status of any such trust; d) Seller has not ceased operations at a facility so

as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions on or before the date of the Closing to any Benefit Plan or ERISA Affiliate Plan subject to Section 4064(a) of ERISA; e) the Seller has or will have, as of the Closing Date, made all required contributions and payment of all interest, penalties and other amounts owed with respect to the Non-Union Pension Plan; or f) in the last three years preceding the date hereof, there has been no "reportable event" for Seller as defined in Section 4043(b) of ERISA and the regulations under that Section other than those which have been reported in compliance with ERISA or which will be the subject of the Voluntary Corrective Program submission described in Section 7.12; (5) with respect to the Multiemployer Plan: a) the Seller has or will have, as of the Closing Date, made all required contributions; and b) the Seller has not incurred any liability under Title IV of ERISA, including any withdrawal liability for any period prior to the Closing Date; (6) no condition, agreement or plan provision limits the right of the Seller to amend, cut back or terminate any Benefit Plan that it sponsors (except to the extent such limitation arises under ERISA); (7) all contributions, premiums or payments required to be made with respect to any Benefit Plan through the date of this Agreement and all unpaid liabilities of any Acquired Seller with respect to any Benefit Plan that are not yet payable have been properly accrued in the Seller's financial reports in accordance with GAAP; (8) all annual reports required to be filed with any governmental agency or department have been filed on or before their respective due dates, or the due date for same has been properly and timely extended; (9) to Seller's Knowledge no individual associated with any of the Benefit Plans has engaged in any actions that constitute a "prohibited transaction" under the provisions of ERISA Section 406, and no actions have previously occurred which could reasonably be interpreted to be a prohibited transaction upon which excise taxes may be imposed; (10) no excise taxes have been imposed, incurred or paid under the provisions of IRC Section 4975 or any similar provision during such period, and no excise tax reports or liabilities are currently pending; (11) no Benefit Plan which is a 401(k) plan or pension plan has been determined to have been "top-heavy" under the provisions of IRC Section 416, and no such Benefit Plan has failed its required discrimination testing, during the three (3) year period immediately preceding the date of this Agreement, without corrective actions being taken to bring the plan back into compliance with discrimination testing; and (12) except as provided on Schedule 5.01(q), the Seller has no ERISA Affiliates. "ERISA Affiliate" mean an entity that would be considered a single employer with the Seller under ERISA Section 4001(b) or part of the same "controlled group" as the Seller for purposes of ERISA Section 302(d)(3) or Section 414 of the IRC.

(iii)     All current recipients of payments from Seller's Pension Plans are eligible to receive such payments.

(r)     Supplementing Schedules. Seller shall promptly supplement or amend any schedule with respect to any matter arising after the Agreement Date that, if it had existed on the Agreement Date, would have been required to be described in such schedule. No matter disclosed in any such supplemental schedule shall be deemed accepted by Buyer, or to be a waiver by Buyer of any breach of a representation otherwise cured by such supplemental disclosure, unless Buyer expressly waives the same in writing.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

**6.01    Representations and Warranties of Buyer.**  Buyer represents and warrants to Seller that, except as set forth in the disclosure schedules being delivered by Buyer contemporaneously herewith, but no later than five (5) business days after the Agreement Date (the "Buyer Disclosure Schedules"):

(a)    Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. At Closing, Buyer or its assignee   is duly qualified to do business and is in good standing California, and in all jurisdictions in which the failure to so qualify would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transaction. The jurisdictions in which each Buyer is so qualified are listed on Schedule 6.01(a) hereto.

(b)    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Buyer of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Buyer.  This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies.

(c)    Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Buyer of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d)    Financial Statements.  Buyer has the financial wherewithal and ability to perform all of its obligations under this Agreement, including payment of the Purchase Price to Seller.    Buyer shall have on the Closing Date sufficient unrestricted funds or committed lines of credit on hand to pay the portion of the Purchase Price payable in cash at the Closing.

(e)    Litigation. There is no claim, action, lawsuit, or proceeding, or to the Knowledge of Buyer, any pending inquiry or investigation or any threatened claim, action, lawsuit, proceeding, inquiry or investigation, in each case, by or against or affecting Buyer which

Case: 14-01045    Doc# 251-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 26 of 997

26

has had or can be reasonably expected to have a material adverse effect on the ability of Buyer to consummate the Transaction.

(f) Brokers. Buyer is not a party to any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer or Seller thereof to pay any finder's fee, brokerage commission or similar payment.

## ARTICLE VII

## COVENANTS OF THE PARTIES

**7.01 Cooperation of the Parties.** Except as expressly required by this Agreement, each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to promptly consummate and make effective the Transaction.

**7.02 Bankruptcy Court Matters.**

(a) Bidding Procedures. Promptly, but in any event, within five (5) days, after the execution of this Agreement Seller will file a motion in the Bankruptcy Court for an order approving bidding procedures for the sale of the Acquired Assets (the "Bidding Procedures Order"), if such motion has not been filed previously. The Bidding Procedures Motion, shall, among other things be in form and content reasonably acceptable to Buyer, and seek to designate the Buyer as the "Stalking Horse Bidder", i.e. the party submitting the highest and best bid for the Property prior to the auction to be conducted in accordance with bidding procedures subject to Buyer's reasonable approval (the "Bidding Procedures"). Seller will seek approval of Bidding Procedures that (i) approve the Break-Up Fee (as hereinafter defined), (ii) require that any competing bidder for the Seller's assets must purchase them on substantially the same terms and conditions as set forth in this Agreement (including the payment of the "Good Faith Deposit), but for an amount at least $600,000 greater than the Purchase Price (the "Minimum Overbid"), and (iii) that further bids must be made in increments of at least $100,000.

(b) Sale Motion. Promptly upon, but in any event, within five (5) days after the entry of the Bidding Procedures Order, Seller shall file in the Bankruptcy Court one or more motions seeking authorization of all relief required for the Sale Order, including, among other things approval of the sale of the Acquired Assets pursuant to this Agreement and the assumption and assignment of the Assumed Contracts (the "Sale Motion"), which Sale Motion shall be in form reasonably acceptable to Buyer..

(c) Non-Assignment of Assets. Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Acquired Asset if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a consent or approval required or necessary for such assignment or transfer, would constitute a violation of the Bankruptcy Code, as expressly determined by a final order of the Bankruptcy Court. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the Bankruptcy Court determines by a final order that such consent or approval is required but not obtained, and any Person refuses or fails to perform or to accept performance based on such non-assignability, then Seller shall, upon

Buyer's request and at Buyer's sole cost and expense, cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits and obligations of such Acquired Asset, including enforcement for the benefit of Buyer of any and all rights and remedies of Seller against a third party arising out of such third party's refusal or failure to perform or to accept performance based on such non-assignability, or any breach or cancellation. Any assignment to Buyer of any Acquired Asset that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any third party for such assignment as aforesaid as expressly determined by a final order of the Bankruptcy Court shall be made subject to such consent or approval being obtained. Any contract that would be an Assumed Contract but is not assigned in accordance with the terms of this Agreement shall not be considered an "Assumed Contract" for purposes hereof unless and until such contract is assigned to Buyer following the Closing Date upon receipt of the requisite consents or approvals to assignment and Bankruptcy Court approval.

      **7.03**    **Break-up Fee.** In consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in consideration of the time, expense and risks associated with serving as the "Initial Bidder," including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, Buyer has provided a material benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee (as hereafter defined) is reasonable and appropriate in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and was necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement. Subject to the entry of the Bidding Procedures Order, if Buyer is not the successful bidder for the purchase of the Acquired Assets and the Acquired Assets are sold to another bidder, Seller will pay Buyer a break-up fee equal to five hundred thousand dollars ($500,000.00) (the "Break-up Fee").

      **7.04**    **Notices and Consents.** Except as expressly required by this Agreement, each of the parties will promptly give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Entities to consummate and make effective the Transaction.

      **7.05**    **Full Access.** From the Agreement Date through the Closing Date, the Seller will permit representatives of Buyer and its professionals to have full access at all reasonable times, and in a manner so as not to unreasonably interfere with the normal business operations of the Seller, to all books, records (including tax records), employees, contracts, and documents of or pertaining to the Seller.

      **7.06**    **Property Inspection and Testing.** After the Agreement Date and prior to the Closing Date, Buyer shall be permitted at its sole expense, to inspect (with consultants of its choosing) the physical and environmental condition of the Real Property owned by Berkeley Properties LLC and used by the Seller. Buyer's inspection right shall include the right to test for

contamination, provided that Buyer shall restore such Real Property to the condition it was in prior to the conduct of any such inspection and testing.

**7.07   Name Change.**   As soon as practicable following the Closing, and subject to approval of the Bankruptcy Court, Seller shall discontinue the use of its current name (and any other trade names currently utilized by any Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Pacific Steel Casting Company" or any similar designation without the prior written consent of Buyer, and Seller shall cause the name of Seller in the caption of the Bankruptcy Case to be changed to the new name of Seller in accordance with this Section 7.06.  From and after the Closing, the Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by any of Seller in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. As soon as practicable following the Closing, Seller shall file all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each state in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

**7.08   Transfer Taxes.**   All taxes arising out of each transfer of the Acquired Assets and any transfer taxes required to effect any recording or filing with respect thereto shall be borne by Buyer.  Seller and Buyer shall cooperate to timely prepare and file any tax return relating to such transfer taxes, including, any claim for exempt or exclusion from the obligation or imposition of any transfer taxes.  Seller shall be solely liable for any income, capital gains or similar taxes arising from the transfer of the Acquired Assets.

**7.09   Bulk Sales Laws.**  To the extent the bulk sales laws of any state are applicable to the transactions contemplated by this Agreement, the parties hereby waive compliance with such bulk sales laws and the Buyer shall pay any Liabilities for any such noncompliance as a purchaser of assets pursuant to applicable law; provided, that Buyer shall in no case be deemed to assume any Liabilities which are not otherwise Assumed Liabilities under Section 2.03(b) by reason of such noncompliance, and Seller shall pay any Liabilities for any such noncompliance as a seller of assets pursuant to applicable law.

**7.10   Multiemployer Plan.**

(a)   The Parties intend to comply with the requirements of Section 4204 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") in order to ensure that the transactions contemplated by this Agreement shall not be deemed a complete or partial withdrawal from the CMTA – Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust (the "Multiemployer Plan").  Accordingly Seller and Buyer agree:

(i)   After the Closing Date, Buyer shall contribute to the Multiemployer Plan with respect to the Seller's Business operations acquired by Buyer for substantially the same number of "contribution base units" for which Seller had an "obligation to contribute" to the Multiemployer Plan (as those terms are defined in Sections 4001(a)(11) and 4212 of ERISA, respectively) pursuant to the Collective Bargaining Agreement. At or prior to

Case: 14-41045    Doc# 351-2  Filed: 10/02/14  Entered: 10/02/14 13:49:20  Page 29 of 99

the Closing Date, Seller shall assume and assign to the Buyer the Collective Bargaining Agreement with the Union, effective as of the Closing.

(ii)     Buyer shall provide to the Multiemployer Plan, for a period of five consecutive plan years commencing with the first plan year beginning after the Closing Date, either a bond issued by a surety company that is an acceptable surety for purposes of Section 412 of ERISA or an amount held in escrow by a bank or similar financial institution satisfactory to the Multiemployer Plan. The amount of such bond or escrow deposit shall be equal to the greater of (A) the average annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of Seller's Business for the three plan years immediately preceding the plan year in which the Closing Date occurs, or (B) the annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of the Seller's Business for the last plan year immediately preceding the plan year in which the Closing Date occurs. Such bond or escrow shall provide that it will be paid to the Multiemployer Plan if Buyer withdraws from the Multiemployer Plan or fails to make a contribution to the Multiemployer Plan when due, at any time during the first five plan years beginning after the Closing Date. Buyer may, at its own cost and expense, seek any applicable waiver or exemption from the Multiemployer Plan or the applicable Governmental Entity from the requirement that it post a bond, as set forth in 29 C.F.R. Part 4204, and Seller shall cooperate with Buyer in seeking such waiver or exemption, provided, however that Buyer shall comply with all provisions of this Section 7.10(a)(ii) for the period of time after the Closing Date in which it is seeking but not yet obtained such a waiver or exemption.

(iii)     If Buyer completely or partially withdraws from the Multiemployer Plan prior to the end of the fifth plan year of the Multiemployer Plan beginning after the Closing Date, and Buyer's liability of the Buyer with respect to the Multiemployer Plan is not paid, then Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Multiemployer Plan with respect to Buyer's operations during such five-year period but for Section 4204 of ERISA. Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii).

(b)     Seller shall cooperate with Buyer if Buyer elects to prepare and submit to the Multiemployer Plan or the Pension Benefit Guarantee Corporation ("PBGC") a request for a variance or exemption from the bond/escrow requirement of Section 4204(a)(1)(B) of ERISA (as described in clause (ii) of this subsection). Unless and until such a variance or exemption is granted, Buyer shall comply with the bond/escrow requirement, except to the extent provided in PBGC Regulation Section 2643.11(d).

(c)     To the extent that this Section 7.10 (without regard to this subsection) fails to comply with the requirements of Section 4204 of ERISA such that the withdrawal liability exemption provided by Section 4204 would be unavailable to Seller, the Parties agree that this Section 7.109 shall be deemed to include any term (including the modification of any express term herein) that is reasonably necessary to invoke the withdrawal liability exemption resulting from the application of Section 4204 to the Transaction.

**7.11    Post-Closing Transition and Cooperation.**

Case: 14-01045   Doc# 281-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 30 of 97

(a)     The Parties agree that following the Closing of the Transaction, they shall cooperate to facilitate the ownership transition of the Business and the Acquired Assets to the Buyer by taking such actions and executing such documents as may be necessary and appropriate for such purpose.  Buyer shall cooperate with Seller by making available to Seller upon its reasonable request and upon reasonable notice and for reasonable time periods, former Seller personnel employed by Buyer who have specific and unique knowledge of Seller's pre-Closing operations such that their assistance would be reasonable and necessary to enable Seller to complete its disclosure statement and plan of reorganization in the Bankruptcy Case and to otherwise substantially comply with the requirements of the Bankruptcy Code.  The Parties agree to negotiate a reasonable compensation arrangement pursuant to which Seller shall pay Buyer for the reasonable value of the time expended by such personnel for Seller's benefit.

(b)     Notwithstanding Seller's assignment of all its prior and current workers compensation Insurance Policies to Buyer, Buyer shall cooperate with Seller as necessary to facilitate the transition to Buyer the processing and administration of claims actually or potentially covered under such workers compensation Insurance Policies for acts or occurrences arising prior to the Closing Date.

**7.12.    Non-Union Pension Plan**.  On or before the Closing Date, Seller shall file with the IRS a submission under the Voluntary Correction Program ("VCP") to correct errors identified in the 2011 restatement of the Non-Union Pension Plan.  To the extent the IRS disqualifies the Non-Union Pension Plan and seeks to impose taxes (including penalties and interest) or other costs by reason thereof, or discovers and asserts any other qualification issues arising from occurrences and circumstances prior to the Closing,  or seeks to impose penalties or costs on the Plan sponsor by reason thereof, Buyer shall assume and pay the same.

## ARTICLE VIII

## EMPLOYEE MATTERS

**8.01     Employees.**

(a) Rehired Employees.

(i)     From the Agreement Date and only so long as the Buyer is not in breach hereof, Seller shall cooperate with Buyer and permit Buyer to (i) meet with employees of the Seller at such times as Buyer shall reasonably request, (ii) speak with such employees who are being considered for employment by Buyer, (iii) distribute to such employees such forms and other documents relating to potential employment by Buyer (including an incentive compensation package to certain members of management) after the Closing Date as Buyer may reasonably request and (iv) permit Buyer to review personnel files and other relevant employment information regarding employees of the Seller.

(ii)     As of the Closing Date, Buyer will have arranged the ability to offer to rehire, in Buyer's sole discretion, all or part of the employees of Seller. Seller will provide a complete list of all of their current employees with an indication of which employees are represented by the Union. Without limiting Buyer's discretion,  one day after entry of the

Case: 14-01045    Doc# 251-2  Filed: 10/02/14  Entered: 10/02/14 13:49:20  Page 31 of 97

**31**

Sale Order, Buyer shall provide Seller with approximate lists of the number and categories of employees to be offered employment. Any negotiations or discussions with members of the Union or the Union Representative after the Closing Date shall be conducted according to the requirements of the Collective Bargaining Agreement and applicable law. The employees who accept Buyer's offer are referred to as the "Rehired Employees".

(iii)    To the extent not prohibited under applicable law, following the Closing Date, Seller shall make available to Buyer such non-confidential data in personnel records of Rehired Employees as is reasonably necessary for Buyer to transition such Rehired Employees into Buyer's records.

(iv)    On the Closing Date, Seller shall pay to its employees, or reserve for payment, the portion of the payroll and such other amounts as Seller is liable (including, without limitation, applicable payroll taxes and amounts owed under Union Benefit Plans) that first comes due following the Closing Date that relates to services performed by its employees prior to the Closing Date. If reserved, such amount shall be paid in the next payroll coming due.

(v)    Effective immediately before the Closing, Seller shall terminate, at its sole cost and expense, the employment of the Rehired Employees. Each Rehired Employee who is not otherwise participating in the Union Benefit Plans shall be eligible to participate in all of Buyer's employee benefit plans in accordance with the terms of those plans to the same extent and in the same manner as new employees of Buyer, or Buyer may permit or require those Rehired Employees to continue to participate in the Assumed Plans.

(vi)    Except as otherwise specifically set forth herein, Seller shall have no responsibility whatsoever for any liabilities or obligations which relate in any way to such Rehired Employee's employment service with Buyer.

(b) Excluded Employees.  Buyer shall have no obligation to offer employment to any employee listed on Schedule 8.01(b) (the "Excluded Employees"), but may hire them. Buyer may amend Schedule 8.01(b) from time to time on written notice to Seller; provided that such Schedule 8.01(b) shall be finalized no later than one day prior to the Closing Date. If an Excluded Employee is hired by Buyer, he or she is no longer an Excluded Employees and becomes a Rehired Employee. The Excluded Employees and all obligations to the Excluded Employees shall remain the sole responsibility of Seller, including, without limitation, all severance, constructive notice or other costs under any contract, agreement or understanding and any applicable federal, state, county, city, municipal or other laws, statutes, rules, regulations, orders, consent decrees, permits or licenses in connection with the Excluded Employees.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

**9.01    Conditions to Closing Applicable to All Parties.**

(a)    Order. As a condition to Closing, the Bankruptcy Court shall issue an order (the "Sale Order"), which order shall be final and non-appealable and not be subject to any

Case: 14-01045    Doc# 351-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 32 of 99    32

stay (unless the Parties waive the requirement that the Sale Order be final and non-appealable), and which shall confirm the sale of the Acquired Assets to the Buyer, the assignment of the Assumed Contracts to the Buyer, and authorization of the Transaction consistent with the terms of this Agreement, in form and content reasonably satisfactory to Buyer. In the event that entry of the Sale Order is appealed, Seller and Buyer shall use their respective reasonable efforts to defend such appeal.

(b)     _Conditions to the Obligations of Buyer and Seller_.   The obligations of Buyer and Seller to consummate the Transaction shall be subject to the satisfaction, or waiver by such Party, at or prior to the Closing Date, of the condition that there shall be no (i) suit, action or other proceeding threatened or brought by any Governmental Entity which seeks to restrain or prohibit in any material respect the consummation of the Transaction; or (ii) injunction, stay, order, judgment or decree in effect and issued by any Governmental Entity which restrains or prohibits in any material respect the consummation of the Transaction.

(c)     _Notice and Opportunity to Cure_.     If on the Closing Date any of the conditions set forth in this Article IX are not satisfied, then the Party whose obligation to perform hereunder is subject to such condition shall provide written notice to the other Party, and if such condition is not satisfied within three business days of receipt of such notice, then the Party giving notice shall have the right to terminate this Agreement by written notice given prior to the Closing. If such notice of termination is given by Buyer, the Good Faith Deposit shall be immediately refunded to Buyer.

**9.02     Conditions to the Obligations of Seller.**     The obligations of Seller to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)     _Representations and Warranties; Covenants_.     The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date. Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on Closing.

(b)     _Buyer Deliveries_.   Seller shall have received from Buyer the deliverables referred to in Section 4.01(a) in form and substance reasonably satisfactory to Seller;

(c)     _Sale Order_.     The Bankruptcy Court shall have entered the Sale Order which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.

**9.03     Conditions to the Obligations of Buyer.**     The obligations of Buyer to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)     _Representations and Warranties; Covenants_.     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date.   Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on the Closing Date.

(b)     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered each of the Bidding Procedures Order and the Sale Order in form and content reasonably acceptable to Buyer which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.  Among other things, the Sale Order must (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Acquired Assets to Buyer on the terms set forth here, including that such sale is free and clear of Encumbrances and claims (except with respect to the Assumed Liabilities), with such Liens, Encumbrances and claims to attach only to the proceeds of the sale; and (C) the performance by Seller of its obligations under this Agreement; (ii) authorize and direct Seller to assume and assign to Buyer the Assumed Contracts, and Intellectual Property Assignments pursuant to Section 365 of the Bankruptcy Code; (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and that the Buyer is entitled to have the protections afforded by that section; (iv) contains a finding that reasonable and adequate notice of the sale and transfer of the Acquired Assets to Buyer, and assumption and assignment of the Assumed Contracts to the Buyer, has been provided to all parties required to be given notice under the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of California; (v) contains a finding that neither Seller nor Buyer has engaged in any conduct that would cause or permit the sale of the Acquired Assets to be avoided under Section 363(n) of the Bankruptcy Code; (vi) bars any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), Liens or Encumbrances of any kind or nature against Buyer or the Acquired Assets that arose prior to Closing; and (vii) provides that the Sale Order is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Sections 701 or 702 of the Bankruptcy Code.  The Sale Order shall be in full force and effect.

(c)     Sale Order.  Seller shall have delivered to Buyer (A) a certified copy of the Sale Order and (B) copies of all affidavits of service of the Sale Motion seeking the Sale Order or notice of such motion filed by or on behalf of Seller;

(d)     Assumed Contracts.  All of the Assumed Contracts shall be in full force and assignable to, and assumable by, Buyer without the consent of the other party thereto, pursuant to Section 365 of the Bankruptcy Code, or the required consents with respect thereto shall have been obtained. Buyer shall exert reasonable efforts to obtain any third party consents required for the assignment of the Assumed Contracts to Buyer.  Seller shall reasonably cooperate in Buyer's efforts to obtain such consents.

(e)     Seller Deliveries.  Buyer shall have received from Seller the deliverables referred to in Section 4.01(b) in form and substance reasonably satisfactory to Buyer.

(f)     No Material Changes In Business, Acquired Assets.  There shall have been no change in the operation or use of the Business, the Acquired Assets or the Real Property that is reasonably likely to have a Material Adverse Effect on the Business, the Acquired Assets or the Real Property.  Seller shall continue to operate in the ordinary course, including without limitation backlogs within ordinary levels, orders met with ordinary timeliness, working capital being maintained at ordinary levels, an absence of material customer order cancellation.

(g)  Import Castings In Transit.  Seller's import castings in transit as listed on the Accrued Expenses Breakdown in the Cleary Gull data room are not in the possession of Seller, have not already been sold, and have customer orders for 100% of the particular parts.

(h)  Lease Of Real Property.  Buyer shall have entered into a "triple net" lease of the Real Property with Berkeley Properties, LLC, including monthly rent of $89,544.00, a 15-year term with 5-year extension option in the form and on the terms and conditions described in Exhibit 9.03(h) hereto ("Lease").  All representations and warranties of the Landlord under the Lease shall be true and accurate in all material respects as of the Closing Date.  Beginning on the Agreement Date to the Closing Date, Buyer shall reasonably cooperate with Seller's attempt to obtain all certificates of occupancy and zoning certificates  necessary to take occupancy and continue operations as a steel foundry from and after the Closing Date.

(i)  Real Property Contamination.  In the event that testing is conducted on behalf of Buyer of the environmental condition of the Real Property owned by Berkeley Properties, LLC under Section 7.06, Buyer shall have received environmental testing results for the such Real Property which (i) conclude that such Real Property is not contaminated (other than any contamination identified in the Phase I or Phase II testing reports previously obtained by the Company and disclosed to Buyer), or (ii) concludes such Real Property is contaminated (other than contamination identified in such Phase I and Phase II testing reports) and the estimated costs of remediation are less than $750,000 provided in such case that Seller either assumes the obligation to remediate such contamination at Seller's expense, or reduces the Purchase Price in the amount of the estimated remediation costs.

(j)  Real Property Condition.  In the event that testing is conducted on behalf of Buyer of the physical condition of the Real Property owned by Berkeley Properties, LLC, under Section 7.06, Buyer shall have received inspection reports for the such Real Property which notes conditions in need of repair, rehabilitation or replacement and the aggregate amount thereof is less than $750,000.  Any cost attributable to repair, rehabilitation or replacement of a condition identified in the Phase I or Phase II testing reports described in Section 9.03(i) shall be disregarded for purposes of determining the aggregate amount of required repair, rehabilitation or replacement costs.   For purpose hereof any item of repair assumed by Berkeley Properties LLC under the Lease shall be excluded from the aggregate amount of estimated repair items.

(k)  Non-Union Pension Plan.  Seller shall pay to the Non-Union Pension Plan, all amounts necessary to meet the outstanding minimum contribution requirements for the Non-Union Pension Plan with respect to the plan ending March 31, 2014, the estimated amount of which is $760,000.

## ARTICLE X

## MISCELLANEOUS

**10.01  Survival of Representations, Warranties and Covenants.** The representations and warranties of Buyer and Seller contained in this Agreement and the covenants and agreements of Buyer and Seller contained in this Agreement shall survive for a period of ninety (90) days following the Closing Date and any claim of breach by either Party shall made in

Case: 14-01045   Doc# 261-2  Filed: 10/02/14  Entered: 10/02/14 13:49:20  Page 35 of 99

writing delivered to the breaching Party on or before the end of such ninety (90) day period. Any dispute arising out of a claimed breach shall be submitted to and resolved by the Bankruptcy Court pursuant to Section 10.08 hereof. Any amount determined to be due to Buyer (either by agreement of the Parties or by order of the Bankruptcy Court) on account of any breach of a representation, warranty or covenant by Seller shall be paid to Buyer through a reduction in the amount of rent otherwise payable by Buyer to Berkeley Properties LLC under the Lease until the amount of such rent abatement equals the amount determined to be due to Buyer, after which the rent under the Lease shall be fully payable pursuant to the Lease terms. Buyer's sole and exclusive remedy after the Closing Date for any Seller's breach of a representation, warranty or covenant shall be such rent abatement. The Lease shall provide for Berkeley Properties LLC's consent to and recognition of Buyer's rights of offset and rent abatement hereunder.

**10.02   No Third-party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

**10.03   Entire Agreement**.   This Agreement (including the exhibits, schedules and Disclosure Schedules referred to herein) and the Sale Order constitutes the entire agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof or thereof.

**10.04   Succession and Assignment.**   This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that nothing herein shall prohibit the assignment of Buyer's rights and obligations) to any direct or indirect subsidiary or affiliate (formed or to be formed).  No such Buyer assignment shall relieve it of its obligations under this Agreement prior to the Closing. From and after the Closing and assuming payment in full of the Purchase Price, Speyside Fund, LLC is released from further liabilities and obligations hereunder, and its assignee subsidiary shall be solely liable for the obligations of the Buyer.

**10.05   Counterparts; Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures of the parties transmitted by facsimile or by electronic media or similar means shall be deemed to be their original signature for all purposes.

**10.06   Headings.**   The section headings contained in this Agreement are inserted for convenience and reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**10.07   Notices.**   All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two (2) Business Days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

Case: 14-01047   Doc# 251-2   Filed: 10/02/14   Entered: 10/02/14 13:49:20   Page 36 of 997

36

If to The Seller:

Pacific Steel Casting Company
c/o Katie Delsol
85 Lakeside Drive
Corte Madera, CA 94925
Phone:
Facsimile:

Copy to:

Michael Malter, Esq.
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050
Phone: 408-295-1700
Facsimile: 408-295-1531
Email: michael@bindermalter.com

and

Stephen A. Dennis, Esq.
Thoits, Love, Hershberger & McLean
285 Hamilton Avenue, Suite 300
Palo Alto, CA 94301
Phone: 650-327-4200
Facsimile: 650-325-5572
Email: sdennis@thoits.com

If to Buyer:

Speyside Fund, LLC
Attn: Jeffrey Stone
55 Bridge St.
Lambertville, NJ 08530
Phone: 800-897-9721
Facsimile: 855-269-3979

Copy to:

Gary Kaplan, Esq.
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Phone: 415-954-4940
Facsimile: 415-954-4480
Email: gkaplan@fbm.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it is actually received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

**10.08 SUBMISSION TO JURISDICTION.** THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION,

**10.09 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California, and where applicable, the Bankruptcy Code.

**10.10 Amendments and Waivers.** No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer, the Seller. No amendment of any provision of Section 7.10 affecting the treatment of the Multiemployer Plan hereunder, shall be made without the written consent of the Multiemployer Plan. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**10.11 Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

**10.12 Fees and Expenses.** Except as otherwise provided in the Agreement, each Party shall bear the fees, costs and expenses incurred by it, in connection with or in anticipation of this Agreement and the consummation of the Transaction. In the event of the bringing of any action, Bankruptcy Court proceeding or suit by a Party against another Party by reason of any breach of any of the covenants or agreements or any material inaccuracies in any of the representations and warranties on the part of the other Party arising out of this Agreement, the prevailing Party in such action, Bankruptcy Court proceeding or suit, shall be entitled to have and recover of and from the other Party all costs and expenses of suit, including reasonable attorneys' fees.

**10.13 Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

**10.14 Fair Consideration.** The Parties acknowledge and agree that the Purchase Price represents fair consideration and reasonable equivalent value for the sale and transfer of the Business and Acquired Assets, and the Transaction, covenants, and agreements set forth in this Agreement, which consideration was agreed upon as the result of arm's-length good-faith negotiations among the Parties and their respective representatives.

**10.15 Incorporation of Schedules.** The Schedules and the Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**10.16 Gender and Number.** When the context of this Agreement requires, the general of all words shall include the masculine, feminine, and neuter, and the number of all words shall include the singular and plural.

**10.17 No Consequential or Punitive Damages.** NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**10.18 Time of Essence.** Time is of the essence of each and every term, condition, obligation and provision hereof.

**10.19 Waiver.** Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such Party. No failure on the part of any Party to exercise, and no delay in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by any Party of any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _Katie Delsol_____

Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _____

Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: Jeffrey A. Stone

Title: Managing Director, Member

## Exhibit A

## Definitions

**Certain Definitions.** The following terms, as used in this Agreement, have the following meanings:

"2013 Year-end Financial Statements" is defined in Section 5.01(f).

"2014 Year-end Financial Statements" is defined in Section 5.01(f).

"Acquired Assets" is defined in Section 2.01(a).

"Agreement Date" is defined in the first paragraph of this Agreement.

"April 30, 2014 Interim Financial Statements" is defined in Section 5.01(f).

"Assumed Contracts" is defined in Section 2.04(a).

"Assumed Liabilities" is defined in Section 2.03(b).

"Assumed Plan" means a Benefit Plan assumed by the Buyer.

"Bankruptcy Case" is defined in Recital B.

"Bankruptcy Code" is defined in Recital B.

"Bankruptcy Court" is defined in Recital B.

"Benefit Plans" means all plans maintained, funded or administered by Seller for the benefit of Seller's employees, including health, dental, vision, long-term disability, life insurance policy, 401(k) plans, and pension plans.

"Bidding Procedures Order" is defined in Section 7.02(a).

"Break-up Fee" is defined in Section 7.03.

"Business" is defined in Recital A.

"Buyer" is defined in the first paragraph to this Agreement.

"Buyer's Audited Financial Statements" is defined in Section 6.01(d).

"Buyer's Financial Statements" is defined in Section 6.01(d).

"Buyer's Interim Financial Statements" is defined in Section 6.01(d).

Case: 14-01057   Doc# 251-2 Filed: 10/02/14 Entered: 10/02/14 13:49:20 Page 42 of 97

42

"Cash" and "Cash Equivalents" means currency, coins, checks received but not yet deposited, checking accounts, petty cash, savings accounts, money market accounts, and short-term, highly liquid investments with a maturity of three months or less at the time of purchase such as U.S. treasury bills and commercial paper.

"Closing Date" is defined in Section 2.01(a).

"Collective Bargaining Agreement" means the Agreement between Pacific Steel Casting Company and Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union and establishes Seller's obligation to contribute to the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust during the period March 21, 2011 through March 15, 2015.

"Contracts" means all contracts, licenses, sublicenses, agreements, commitments, leases, arrangements, instruments, guaranties, bids and proposals to which the Seller is a party and relating to the Business.

"Cure Amounts" is defined in Section 2.04(b).

"Debtor" is defined in the first paragraph of this Agreement.

"Encumbrances" means any interest, claim, Lien, mortgage, pledge, security interest, obligation, encumbrance, lien (statutory or other), liability, charge, lease, covenant, easement, option, right of others, hypothecation, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise), whether imposed by agreement, understanding, law, equity, or otherwise. .

"Environmental Claim" means all liabilities, damages, obligations, claims or losses of any kind whatsoever imposed, incurred or arising from or under any Environmental Law or resulting from the presence of any Hazardous Substance.

"Environmental Laws" means  any federal, state, local or foreign statute, law, ordinance or promulgated rule, regulation, code or directive, any duties imposed under common law, any judicial or administrative decree, order or judgment (whether or not by consent), any request or demand from a Governmental Entity, or any provision or condition of any permit, license or other operating authorization relating to (i) the protection of the environment or human, worker or public health and welfare, or the protection of the health and safety of any workers, employees, and the public or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling or actual or potential release, discharge or emission of any Hazardous Substance, including but not limited to the Clean Water Act, the Toxic Substances Control Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the River and Harbor Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Toxic Substances Control Act, the Federal Mine Safety and Health Act, the Occupational Safety and Health Act, and any state or local law, ordinance, rule, regulation, code or directive regulating the same or similar matters.

"Environmental Permits" means any and all Permits issued in accordance with or pursuant to any Environmental Law.

"ERISA" is defined in Section 7.10(a).

"Excluded Assets" is described in Section 2.02.

"Executory Contract" is defined in Section 2.04(a).

"Financial Advisor" is defined in Section 3.01(c)(ii).

"Financial Statements" is defined in Section 5.01(f).

"GAAP" is defined in Section 5.01(f).

"Good Faith Deposit" is defined in Section 3.01.

"Governmental Entity" means any federal, state, municipal, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental or quasi-governmental or regulatory authority, agency, commission body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"Hazardous Substances" means any substance, waste, contaminant, pollutant or material regulated or governed by any Environmental Law, including, but not limited to, (a) all substances, wastes, contaminants, pollutants and materials defined or designated as hazardous, dangerous or toxic pursuant to any applicable Environmental Law and (b) asbestos, mold, polychlorinated biphenyls ("PCBs") and petroleum.

"Initial Credit Bid" is defined in Section 3.01(b)(i).

"Insurance Policies" is defined in Section 5.01(o).

"Intellectual Property" means (i) inventions, ideas or conceptions of potentially patentable subject matter, whether or not reduced to practice, whether or not yet made the subject of a pending patent application or applications, (ii) patents and patent applications (including any continuations, continuations-in-part, divisionals, reissues, renewals and applications for any of the foregoing), (i) and (ii) collectively, "Patents"), (iii) trademarks, service marks, trade dress, designs, logos, trade names, corporate names, and any derivative, thereof, used by Seller in connection with the operation of the Business, and general intangibles of like nature whether or not registered, including all common law rights and registrations and applications for registration thereof, together with all goodwill relating to the foregoing (collectively, "Trademarks"), (iv) copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by multinational treaties or conventions (collectively, "Copyrights"), (v) computer software, including, without limitation, source code, operating systems and specifications, data, data bases, files, documentation and other materials related thereto, (vi) trade secrets and confidential, technical or business information (including, without limitation, ideas, inventions (whether or not patentable), formulas and compositions), (vii) technology (including, without limitation, know-how and show-how), production processes and techniques, research and development information, drawings, specifications, designs, sketches, design archives, plans, proposals, technical data, copyrightable works, financial, marketing, and business data, pricing and cost information, business and marketing plans and customer and

supplier lists and information, whether or not confidential, whether current or historical, (viii) all web sites, and domain names, and all content contained therein, (ix) all rights to obtain and apply for Patents, and to register Trademarks and Copyrights, (x) copies and tangible embodiments of all of the foregoing, in whatever form or medium, (xi) all rights to sue, recover and retain damages (and costs and attorneys' fees) for present and past infringement of any of the Intellectual Property hereinabove set out, and (xii) all common law rights with respect to the Intellectual Property hereinabove set out.

"Interim Financial Statements" is defined in Section 5.01(f).

"IRC" is defined in Section 5.01(q)(ii).

"Inventory" means all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials and components intended for sale wherever located.

"IRS" is defined in Section 3.01(f).

"Knowledge" means the actual knowledge of any executive officer of the Seller, or any executive officer of the Buyer, as the case may be.

"Lease" is defined in Section 9.03(h).

"Liabilities" is defined in Section 2.03(a).

"Liens" means any claim, lien (as defined in Section 101(37) of the Bankruptcy Code), condition, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, covenant, restriction, reservation, agreement of record, restriction on use or voting (in the case of any security interest) preference, tax (including foreign, federal, state or local income, gross receipts, sales, use, ad valorem, gains, profits, excise, franchise or other taxes, fees, levies, or other duties or assessments imposed by any Governmental Entity), or any other encumbrance of any nature whatsoever.

"Material Adverse Effect" shall mean any event, change, condition or effect which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or is reasonably likely to be, materially adverse to the Acquired Assets, the Real Property or the Business taken as a whole or to the Transaction, other than events, changes, conditions or effects (i) affecting the United States economy generally, (ii) the industry in which Seller operates, in each case without a disproportionate impact on the Business or (iii) arising from the commencement of the Chapter 11 case or any action ordered by the Bankruptcy Court and approved by Buyer.

"Minimum Overbid" is defined in Section 7.02(a).

"Multiemployer Plan" is defined in Section 7.10(a).

"Net Working Capital" means the sum of the values of Seller's trade accounts receivable, net of any allowances for doubtful accounts or unprocessed returns, and Inventory, net of reserves. Accounts receivable shall be valued in accordance with GAAP, consistently applied, and shall

satisfy all of the representations and warranties in Section 5.01(h) in order to be included. To avoid doubt, inter company accounts and accounts receivable due from affiliates shall be excluded. Inventory of domestic castings (work in process and finished goods) shall be valued in accordance with the amounts per ton for each category identified on Schedule 3.01(c)(ii), inventory of import castings and raw materials shall be determined in accordance with GAAP, consistently applied. All Inventory shall be undamaged and in condition for use or sale in the ordinary course. Inventory reserves shall be determined in accordance with GAAP, consistently applied. Goods which have been paid for but have not been delivered by the Closing Date constitute Inventory for purposes of calculating Net Working Capital.

"Non-Union Pension Plan" means the single employer defined benefit pension plan provided for certain of Seller's current and former non-union employees entitled the Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (Tax ID 94-6270646).

"PBGC" is defined in Section 7.10(b).

"Party" and "Parties" are defined in the first paragraph to this Agreement.

"Pension Plans" means collectively the Multiemployer Plan and the Non-Union Pension Plan.

"Permits" is defined in Section 2.01(a)(vi).

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity (or any department, agency, or political subdivision thereof).

"Petition" is defined in Recital B.

"Petition Date" is March 10, 2014.

"Purchase Price" is defined in Section 3.01(b).

"Purchase Price Adjustment Statement" is defined in Section 3.01(c)(ii).

"Real Property" is defined in Section 5.01(k).

"Rehired Employees" is defined in Section 8.01(a)(ii).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Substance (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Substances through or in the ambient air, soil, surface or ground water, or property.

"Sale Order" is the order by the Bankruptcy Court as described in Section 9.01(a).

"Seller" is defined in the first paragraph of this Agreement.

"Seller Disclosure Schedules" is defined in Section 5.01.

"Taxes" all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental, custom duty, capital stock or other equity, excise, real property, personal property, water and sewer charges, municipal utility district, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"Tax Return" mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction" is defined in Recital C.

"Union Benefit Plans" means the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust and the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan.

"Union" means Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union.

## SCHEDULE 2.02(g)

## Deposits and Prepaid Amounts Funded by PS

| Vendor | Amount |
|---|---|
| Pacific Gas and Electric | $849,786 |
| Occidental Energy Marketing | 120,000 |
| Airgas USA | 20,000 |
| AT&T | 18,110 |
| EBMUD | 4,866 |
| Sprint | 4,118 |
| Cogent | 2,400 |
| Chang, Ruthenberg & Love, P.C | 4,524 |
| Binder & Malter | 450,000 |
| BPM | 50,000 |

164178.591857v4

## SCHEDULE 2.03(b)(iii)

### Buyer assumed Benefit Plans

MEDICAL
Anthem Blue Cross of California Preferred Direct Access
Policy #253089
Kaiser Permanente – Northern California
Policy Number: #37173

DENTAL
Reliance Standard
Policy Number: #136-4050-1

LONG-TERM DISABILITY
Reliance Standard
Policy Number: #120499

LIFE & ACCIDENTAL DEATH & DISMEMBERMENT
Reliance Standard
Policy Number: #146828

VISION
EyeMed Vision Care
Policy Number: 9681503

WELFARE PLAN
CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan

401(K) PLAN
Pacific Steel Casting Company Retirement Plan (TIN 94-1067684)

PENSION PLAN
Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (TIN 94-6270646)

CMTA - Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust, (TIN 94-6129501)

## SCHEDULE 2.03(b)(iii)

### Retirees under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011 and prior to the Closing Date:

| Payroll Name | Hire Date | Termination Date |
|---|---|---|
| Welch, Betty Jane | 04/06/1994 | 01/10/2012 |
| Yost, Steven | 05/12/1998 | 03/28/2013 |
| Dias, Fernando C. | 09/29/1980 | 03/31/2012 |
| Emmerichs, Horst Joe | 11/11/1963 | 03/31/2011 |
| Lee, Douglas M | 08/01/1975 | 01/15/2012 |
| Neely, Robert Ward | 03/12/1979 | 12/31/2013 |
| Patterson, John Carlton | 01/05/1970 | 12/31/2013 |
| Scott, Barry George | 06/10/1996 | 08/31/2013 |
| Soares, Richard S | 06/15/1964 | 12/31/2013 |
| Soto, Marco A. | 10/15/1990 | 03/31/2013 |

## SCHEDULE 2.03(b)(iv)

## Transferable licenses, permits, etc.

1. Air – 3 Bay Area Air Quality Management District permits; one for each plant

2. Storm water – General Industrial Storm Water Permit

3. Industrial Water – East Bay Municipal Utility District Discharge Permit

4. Hazardous Materials, Universal Waste, Hazardous Waste Generator – City of Berkeley Unified Program Consolidated Permit and Registration

5. Berkeley Business License

# EXHIBIT "2"

| **United States Bankruptcy Court**<br>**Northern District of California** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Pacific Steel Casting Company** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all)<br>**94-1067684** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all) |
| Street Address of Debtor (No. and Street, City, and State):<br>**1333 Second Street**<br>**Berkeley, CA**<br>ZIP Code **94710** | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP Code |
| County of Residence or of the Principal Place of Business:<br>**Alameda** | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP Code | Mailing Address of Joint Debtor (if different from street address):<br>ZIP Code |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

**Type of Debtor**
(Form of Organization) (Check one box)
- ☐ Individual (includes Joint Debtors)<br>See Exhibit D on page 2 of this form.
- ☑ Corporation (includes LLC and LLP)
- ☐ Partnership
- ☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.)

**Nature of Business**
(Check one box)
- ☐ Health Care Business
- ☐ Single Asset Real Estate as defined<br>in 11 U.S.C. § 101 (51B)
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker
- ☐ Clearing Bank
- ☑ Other

**Chapter of Bankruptcy Code Under Which**
**the Petition is Filed** (Check one box)
- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13
- ☐ Chapter 15 Petition for Recognition<br>of a Foreign Main Proceeding
- ☐ Chapter 15 Petition for Recognition<br>of a Foreign Nonmain Proceeding

**Chapter 15 Debtors**

Country of debtor's center of main interests:

Each country in which a foreign proceeding
by, regarding, or against debtor is pending:

**Tax-Exempt Entity**
(Check box, if applicable)
- ☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code).

**Nature of Debts**
(Check one box)
- ☐ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."
- ☑ Debts are primarily<br>business debts.

**Filing Fee** (Check one box)
- ☑ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the<br>debtor is unable to pay fee except in installments. Rule 1006(b). See Official<br>Form 3A.
- ☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B.

**Chapter 11 Debtors**

Check one box:
- ☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
- ☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates)<br>are less than $2,490,925 (amount subject to adjustment on 4/01/16 and every three years thereafter).

Check all applicable boxes:
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors,<br>in accordance with 11 U.S.C. § 1126(b).

**Statistical/Administrative Information**
- ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,<br>there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

Estimated Number of Creditors

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | OVER<br>100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |

| **Voluntary Petition** | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **Pacific Steel Casting Company** |

### All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet)

| Location Where Filed:  **- None -** | Case Number: | Date Filed: |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |

### Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet)

| Name of Debtor: **- None -** | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | (To be completed if debtor is an individual whose debts are primarily consumer debts.) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I delivered to the debtor the notice required by 11 U.S.C. §342(b). |
| ☐ Exhibit A is attached and made a part of this petition. | X_____ Signature of Attorney for Debtor(s)          (Date) |

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

■ No.

### Exhibit D

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐ Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐ Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

### Information Regarding the Debtor - Venue
(Check any applicable box)

■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐ Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

### Certification by a Debtor Who Resides as a Tenant of Residential Property
(Check all applicable boxes)

☐ Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐ Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐ Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐ Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

| Voluntary Petition | Name of Debtor(s): |
| --- | --- |
| *(This page must be completed and filed in every case)* | **Pacific Steel Casting Company** |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. §342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

**X** _____
Signature of Debtor

**X** _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

### Signature of Attorney*

**X** **/s/ Michael W. Malter**
Signature of Attorney for Debtor(s)

**Michael W. Malter #96533**
Printed Name of Attorney for Debtor(s)

**Binder & Malter, LLP**
Firm Name

**2775 Park Avenue**
**Santa Clara, CA 95050**

Address

**(408) 295-1700  Fax: (408) 295-1531**
Telephone Number

**March 10, 2014**
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

**X** **/s/ Charles H. Bridges, Jr.**
Signature of Authorized Individual

**Charles H. Bridges, Jr.**
Printed Name of Authorized Individual

**Chief Financial Officer and Director**
Title of Authorized Individual

**March 10, 2014**
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11. United States Code. Certified copies of the documents required by 11 U.S.C. §1515 are attached.

☐ Pursuant to 11 U.S.C. §1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

**X** _____
Signature of Foreign Representative

_____
Printed Name of Foreign Representative

_____
Date

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankrutpcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)

_____
Address

**X** _____

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person,or partner whose Social Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. §110; 18 U.S.C. §156.*

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Northern District of California

In re **Pacific Steel Casting Company**

Debtor(s)

Case No.

Chapter **11**

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or* chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| AIRGAS USA LLC<br>PO BOX 7423<br>PASADENA, CA 91109-7423 | AIRGAS USA LLC<br>PO BOX 7423<br>PASADENA, CA 91109-7423<br>909-987-6295 | Trade debt | | 144,959.72 |
| AMG RESOURCES CORPORATION<br>P.O.BOX 641321<br>PITTSBURGH, PA 15264-1321 | AMG RESOURCES CORPORATION<br>P.O.BOX 641321<br>PITTSBURGH, PA 15264-1321 | Trade debt | | 118,256.32 |
| CMTA - GLASS, MOLDERS, POTTERY, etc.<br>PENSION TRUST (LOCAL 164B)<br>c/o Assoc. Third Party Administrators<br>1640 South Loop Road<br>Alameda, CA 94502 | CMTA - GLASS, MOLDERS, POTTERY, etc.<br>PENSION TRUST (LOCAL 164B)<br>c/o Assoc. Third Party Administrators<br>Alameda, CA 94502 | Contingent withdrawal liabililty claims (calculated through June 30, 2013). | Contingent Unliquidated | 27,756,684.00 |
| CRANE TECH INC<br>3540 E. CARPENTER ROAD<br>STOCKTON, CA 95215 | Angela Darling<br>CRANE TECH INC<br>3540 E. CARPENTER ROAD<br>STOCKTON, CA 95215<br>209-824-4500 | Trade debt | | 154,595.99 |
| CRANE TECH INC.<br>3540 E. CARPENTER RD<br>STOCKTON, CA 95215 | Angela Darling<br>CRANE TECH INC.<br>3540 E. CARPENTER RD<br>STOCKTON, CA 95215<br>209-824-4500 | Trade debt | Disputed | 282,551.81<br><br>(0.00 secured) |
| ECKMAN INDUSTRIES INC.<br>PO BOX 1188<br>GENOA, NV 89411-1188 | ECKMAN INDUSTRIES INC.<br>98 Cygnet Drive<br>Carson City, NV 89706<br>775-246-1141 | Trade debt | | 419,281.20 |
| HICKMAN WILLIAMS & CO<br>8838 CALABASH AVENUE<br>FONTANA, CA 92335 | HICKMAN WILLIAMS & CO<br>8838 CALABASH AVENUE<br>FONTANA, CA 92335<br>909-822-5591 | Trade debt | | 138,779.80 |

In re **Pacific Steel Casting Company**        Case No. _____

_____

Debtor(s)

# LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
(Continuation Sheet)

| (1) | (2) | (3) | (4) | (5) |
|-----|-----|-----|-----|-----|
| *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | *Amount of claim [if secured, also state value of security]* |
| **MONTEREY MECHANICAL 8275 SAN LEANDRO STREET OAKLAND, CA 94621** | **MONTEREY MECHANICAL 8275 SAN LEANDRO STREET OAKLAND, CA 94621 510-632-3173** | **Trade debt** | | **176,993.72** |
| **NINGBO DAMING PRECISION CASTING CO. HEHUA BRIDGE INDUSTRIAL DISTRICT YUNLONG TOWN YIN COUNTY NINGBO P.R., CHINA 00031-5135** | **NINGBO DAMING PRECISION CASTING CO. HEHUA BRIDGE INDUSTRIAL DISTRICT YUNLONG TOWN YIN COUNTY NINGBO P.R., CHINA 00031-5135 86-574-88345377** | **Trade debt** | | **463,729.27** |
| **NINGBO WORLD-LINK INTERNATIONAL CORPORATION LIMITED H.K. Room L-1 Building Floor A-8 Ningbo CHINA 31500** | **NINGBO WORLD-LINK INTERNATIONAL CORPORATION LIMITED H.K. Room L-1 Building Floor A-8 CHINA 31500** | **Trade debt** | | **300,633.88** |
| **PACCAR INC. P.O. BOX 95003 BELLEVUE, WA 98009** | **PACCAR INC. P.O. BOX 95003 BELLEVUE, WA 98009 425-468-7400** | **Trade debt** | | **840,688.00** |
| **PACIFIC GAS AND ELECTRIC CO. P. O. BOX 997300 SACRAMENTO, CA 95899-7300** | **PACIFIC GAS AND ELECTRIC CO. P. O. BOX 997300 SACRAMENTO, CA 95899-7300** | **Trade debt** | | **369,413.42** |
| **PORTER WARNER INDUSTRIES PO BOX 2159 CHATTANOOGA, TN 37409** | **PORTER WARNER INDUSTRIES PO BOX 2159 CHATTANOOGA, TN 37409 423-266-4735** | **Trade debt** | | **433,322.93** |
| **PRAXAIR DISTRIBUTION INC ATTENTION: RODRIGO ROSA 1950 LOVERIDGED ROAD PITTSBURG, CA 94565** | **PRAXAIR DISTRIBUTION INC ATTENTION: RODRIGO ROSA 1950 LOVERIDGED ROAD PITTSBURG, CA 94565 925-439-0578** | **Trade debt** | | **149,671.76** |
| **PROFESSIONAL FINISHING PO BOX 742038 LOS ANGELES, CA 90074-2038** | **PROFESSIONAL FINISHING PO BOX 742038 LOS ANGELES, CA 90074-2038** | **Trade debt** | | **126,077.81** |
| **PYRO MINERALS 2510 WOOD STREET OAKLAND, CA 94607** | **PYRO MINERALS 2510 WOOD STREET OAKLAND, CA 94607 510-839-3900** | **Trade debt** | | **539,167.73** |

In re **Pacific Steel Casting Company**                    Case No. _____
_____
Debtor(s)

# LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
## (Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| S.L. FUSCO INC.<br>P.O. BOX 5924<br>COMPTON, CA 90224 | S.L. FUSCO INC.<br>P.O. BOX 5924<br>COMPTON, CA 90224<br>310-868-1010 | Trade debt | | 193,591.74 |
| SENTRY INSURANCE<br>1800 NORTH POINT DRIVE<br>P. O. BOX 88372<br>MILWAUKEE, WI 53288-0372 | SENTRY INSURANCE<br>1800 NORTH POINT DRIVE<br>P. O. BOX 88372<br>MILWAUKEE, WI 53288-0372<br>1-800-373-6879 | Trade debt | | 882,775.19 |
| U.S. Department of Homeland Security<br>Connie M. Cheung, Asst. Chief Counsel<br>Office of the Chief Counsel<br>120 Montgomery Street, Suite 200<br>San Francisco, CA 94104 | U.S. Department of Homeland Security<br>Connie M. Cheung, Asst. Chief Counsel<br>Office of the Chief Counsel<br>San Francisco, CA 94104<br>202-345-7778 | US Department of Homeland Security action. | | 401,255.25 |
| UNIVERSAL SERVICE RECYCLING LLC<br>3200 SOUTH EL DORADO STREET<br>STOCKTON, CA 95206 | UNIVERSAL SERVICE RECYCLING LLC<br>3200 SOUTH EL DORADO STREET<br>STOCKTON, CA 95206<br>209-944-9555 | Trade debt | | 181,566.19 |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the Chief Financial Officer and Director of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date **March 10, 2014**                    Signature **/s/ Charles H. Bridges, Jr.**
_____            _____
                                           **Charles H. Bridges, Jr.**
                                           **Chief Financial Officer and Director**

*Penalty for making a false statement or concealing property*: Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

# United States Bankruptcy Court
## Northern District of California

In re   **Pacific Steel Casting Company**

                                      Debtor

Case No. _____

Chapter        **11**

# LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| **CAMLEE CORPORATION**<br>**89 Alvarado Road**<br>**Berkeley, CA 94705** | **Common** | **6.522% or 27,000 shares** | |
| **DAVI ASSOCIATES**<br>**129 Sunnyglen Drive**<br>**Vallejo, CA 94591** | **Common** | **7.004% or 29,000 shares** | |
| **EMMERICHS ASSOCIATES**<br>**1674 Glazier Drive**<br>**Concord, CA 94521** | **Common** | **2.174% or 9,000 shares** | |
| **TRI-PACIFIC, INC.**<br>**85 Lakeside Drive**<br>**Corte Madera, CA 94925-1037** | **Common** | **82.126% or 340,000 shares** | |
| **WESTRIDGE CAPITAL**<br>**89 Alvarado Road**<br>**Berkeley, CA 94705** | **Common** | **2.174% or 9,000 shares** | |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

    I, the Chief Financial Officer and Director of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    **March 10, 2014**                        Signature  **/s/ Charles H. Bridges, Jr.**

                                                                        **Charles H. Bridges, Jr.**

                                                                     **Chief Financial Officer and Director**

*Penalty for making a false statement or concealing property*:  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C §§ 152 and 3571.

# United States Bankruptcy Court
## Northern District of California

In re   **Pacific Steel Casting Company**

                    Debtor(s)

Case No.

Chapter   **11**

## CREDITOR MATRIX COVER SHEET

       I declare that the attached Creditor Mailing Matrix, consisting of   **224**   sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

Date:  **March 10, 2014**

**/s/ Michael W. Malter**
Signature of Attorney
**Michael W. Malter #96533**
**Binder & Malter, LLP**
**2775 Park Avenue**
**Santa Clara, CA 95050**
**(408) 295-1700   Fax: (408) 295-1531**

Abbate, Anita J.
2933 E. 22nd St
Oakland, CA 94601


ABRAHAM LEON
109 CHALET WAY
NAPA, CA 94558


ACCOUNTING PRINCIPALS
DEPT CH 14031
Palatine, IL 60055


ACM MACHINING INC
11390 GOLD DREDGE WAY
RANCHO CORDOVA, CA 95742


Acosta, Jose
1966 Powel St.
San Pablo, CA 94806


Acosta, Juan
1801 Esmont Ave.
Richmond, CA 94801


Acosta, Victor  Sergio
2364 Downer Ave
Richmond, CA 94804


Acosta, Victor Sergio
2364 Downer Ave
Richmond, CA 94804

ADP, Inc.
P. O. Box 9001006
Louisville, KY 40290-1006


AEROTEK
COMMERCIAL STAFFING
PO BOX 198531
ATLANTA, GA 30384-8531


AFS Northern California Chapter
1333 Second Street
Berkeley, CA 94710


Aguilar De Amaya, Rosa
7621 Holly St.
Oakland, CA 94621


Aguilar De Amaya, Rosa
1826 39th Ave.
Oakland, CA 94601


Aguilar Ramos, Gonzalo
519 Chanslor Ave.
Richmond, CA 94801


Aguilar S, Eduardo
3719 Penniman Ave.
Oakland, CA 94619


Aguilar, Gustavo
115 E 74 St.
Los Angeles, CA 90003

Aguilar, Jose A.
29249 Albatross Rd.
Hayward, CA 94545


Aguilar, Rafaela
633 16th St. #d
Richmond, CA 94801


Aguilar, Santiago
1222 88th Ave.
Oakland, CA 94621


Aguilar-Ramos, Gonzalo
2641 E.16th St.
Oakland, CA 94601


Aguilera, Francisco
1025 Hawk Ln.
Fairfield, CA 94533


Aguilera, Gonzalo V.
2205 A Emeric Avenue
San Pablo, CA 94806


Aguilera, Leonel A.
1025 Hawk Lane
Fairfield, CA 94533


Aguirre Campos, Fernando
2524 98th Ave.
Oakland, CA 94603

Aguirre Ramirez, Martin
1259 91st Ave.
Oakland, CA 94603


Aguirre, Paul  David
16011 Via Conejo
San Lorenzo, CA 94580


AIR & TOOL ENGINEERING CO.
23520 FOLEY STREET
HAYWARD, CA 94545


AIRGAS DRY ICE
PO BOX 951873
Dallas, TX 75395-1873


AIRGAS USA LLC
PO BOX 7423
PASADENA, CA 91109-7423


Akauola, Ikahihifo
24035 2nd St.
Apt. 105
Hayward, CA 94541


Alafriz, Emilio B
2203 Eric Ct. #2
Union City, CA 94587


ALAMEDA ELECTRICAL DISTRIBUTORS INC
3875 BAY CENTER PLACE
HAYWARD, CA 94545

ALBANY HILL MINI MART
800 SAN PABLO AVENUE
Albany, CA 94706


ALBANY STEEL INC
536 CLEVELAND AVENUE
ALBANY, CA 94710


Alcantara, Jose
5213 Reedley Way
Castro Valley, CA 94546


Alejandre Corona, Jose
5478 Princeton St.
Oakland, CA 94601


Alejo, Miguel
609 Grove Way
Hayward, CA 94541


ALFERDO RODRIGUEZ-GARCIA
1427 CALIFORNIA AVENUE
SAN PABLO, CA 94806


ALFONSO CASTANO
2547 LYNN AVENUE #872
CONCORD, CA 94520


Ali, Rajak M
545 Hillary Dr
Tiburon, CA 94920

Case: 19-40057  Doc# 85  Filed: 03/09/20  Entered: 03/09/20 15:34:19  Page 65 of
Case: 19-41025  Doc# 5  Filed: 03/10/20  Entered: 03/10/20 13:52:32  Page 65 of
699
699

65

Allen, Edwin J
509 22nd St.
Richmond, CA 94801


Allen, Rahsaan
1612 McGuire Cir.
Suisun City, CA 94585


ALLIED BOX & EXCELSIOR COMPANY INC
1015 CHESLEY AVENUE
RICHMOND, CA 94801


Alonzo, Jesus
2923 Octavia St.
Oakland, CA 94619


ALPHA RESOURCES, INC.
3090 JOHNSON ROAD
STEVENSVILLE, MI 49127


Altamirano, Enrique
1815 108th Ave.
Oakland, CA 94603


Alvarado Sandoval, Aurelio
1603 Kearny St. #2
El Cerrito, CA 94530


Alvarado, Jose A.
25 Marguerite Dr.
San Pablo, CA 94806

Alvarenga, Jeneffer
2727 E. 17th Street
Apt. M
Oakland, CA 94601


Alvarez Banda, Francisco J.
216 21st St.
Richmond, CA 94801


Alvarez Banda, Juan A.
937 Channing Way #E
Berkeley, CA 94710


Alvarez L, Javier
1509 15th St.
San Pablo, CA 94806


Alvarez, Ignacio
1441 North Lane #512
Hayward, CA 94545


Alvarez, Ivan
1340 Pine Ave.
San Pablo, CA 94806


Alvarez, James
3838 Milton Ave.
El Sobrante, CA 94803


Alvarez, John M
1917 6th St. Apt. 3
Berkeley, CA 94710

Alvarez, Jose B.
1757 Gaynor Ave.
Richmond, CA 94801


Alvarez, Jose R.
2357 18th Street
San Pablo, CA 94806


Alvarez, Luis
39 Estabrook St.
Apt. 2
San Leandro, CA 94577


Alvarez, Martin
937 Channing Way #E
Berkeley, CA 94710


Alvarez, Salvador
505 S. 21st Street
Richmond, CA 94804


Alvarez, Sergio
1946 Foothill Blvd.
Apt. 12
Oakland, CA 94606


Amaral, Jose I.
1034 Hutchings Drive
San Leandro, CA 94577


Amaya, Emerson
1839 92nd Ave.
Oakland, CA 94603

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 68 of
Case: 19-41047   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 68 of
699

**68**

Amaya, Emerson
1839 92nd Ave.
Oakland, CA 94603


Amaya, Julio C.
601 Spooner Ct.
Patterson, CA 95363


Amaya, Marvin A
1826 39th Ave.
Oakland, CA 94601


AMERICAN LUMBER & PLYWOOD
P. O. BOX 960
GUNTERSVILLE, AL 35976


AMERICAN SUPPLY COMPANY
1108 BLAKE STREET
BERKELEY, CA 94702


AMG RESOURCES CORPORATION
P.O.BOX 641321
PITTSBURGH, PA 15264-1321


ANAMET, INC.
26102 EDEN LANDING ROAD, SUITE #3
HAYWARD, CA 94545


Anand, Ajay K
4489 Camstock Ct
Concord, CA 94521

Anand, Lalit K.
1224 Rebecca Drive
Suisun City, CA 94585


AND OTHERS
P.O. BOX 1874
SAN LEANDRO, CA 94577


Andrews, Christopher A.
18464 Center St.
Castro Valley, CA 94546


Anglo, Marcelino D
5205 Alderberry Way
Sacramento, CA 95835


Anguiano, Hector J.
1024 Trenton Blvd.
San Pablo, CA 94806


Anish, Thottathil V.
1114 Cottage Ln
Hercules, CA 94547


Anthem Blue Cross
SP. O. Box 54630
Los Angeles, CA 90054-0630


Antonio Sanchez
c/o William Hyndman, Esq.
24301 Southland Drive #420
Hayward, CA 94545

Antuna, Jose C.
1318 105th Ave.
Oakland, CA 94603


Applegate, William H.
131 Windward Court
Vallejo, CA 94591


APPLIED INDUSTRIAL TECHNOLOGIES
PO BOX 100538
PASADENA, CA 91189-0538


Aragon, Felisa
25275 Torman Ave.
Hayward, CA 94544


Aragon, Robert Jess
25275 Tarman Ave.
Hayward, CA 94544


ARAMARK UNIFORM SERVICES INC
PO BOX 5034
HAYWARD, CA 94545


Aranda Gutierrez, Armando
6103 Huntington Ave.
Richmond, CA 94804


Aranda, Jose
5027 Clinton Ave.
Richmond, CA 94805

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 71 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:32   Page 19 of
699
632

71

Aranda, Lorenzo
1419 Santa Clara St
Richmond, CA 94804


Araujo V, Marcelo
129 18th St.
Richmond, CA 94801


Ardds, Louis James
3301 Telegraph Ave.
Apt. 111
Oakland, CA 94609


Arellano, Jaime
2481 Skylark Dr. #1
San Jose, CA 95125


Arevalo Ramirez, Pedro
1725 96th Ave.
Oakland, CA 94603


Arevalo, Jose A.
2954 Howe Ave.
Stockton, CA 95206


Arias Jr., Jose Luis
14089 Reed Ave.
San Leandro, CA 94578


Arias Jr., Jose Luis
14089 Reed Street
San Leandro, CA 94578

Case: 19-04057   Doc#: 85   Filed: 03/09/20   Entered: 03/09/2015:52:49   Page 72 of
Case: 14-41045   Doc #: 85   Filed: 03/09/20   Entered: 03/09/20 15:52:49   Page 20 of
699

72

Arias, Benito Navarro
3800 Carrington St.
Oakland, CA 94601


Arias, Vivian
340 Industrial Pkwy
Apt. 103c
Hayward, CA 94544


Armijo, George
2868 12th St.
San Pablo, CA 94806


Armstrong, Ian
1263 Gilman Street
Berkeley, CA 94706


Arnold, Frank P.
2089 Allston Ct.
Fairfield, CA 94533


ARROW GLASS COMPANY
640 SAN PABLO AVENUE
ALBANY, CA 94706


Arroyo, Adrian
4310 Seven Hills Rd.
Castro Valley, CA 94546


Arroyo, Richard
2727 E 17th St. #m
Oakland, CA 94601

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 73 of
692
Case: 19-41057   Doc# 5   Filed: 03/09/20   Entered: 03/09/2015:52:32   Page 21 of
232

73

Asuncion, Isagani L
33721 3rd St.
Union City, CA 94587


AT&T
P. O. BOX 105068
Atlanta, GA 30348-5068


AT&T
P. O. BOX 5019
CAROL STREAM, IL 60197-5019


AT&T CORP.
795 Folsom Street
San Francisco, CA 94107


AT&T Corp.
One AT&T Way
Attn: Master Agreement Support Team
Bedminster, NJ 07921-0752


ATLAS/CONTRA COSTA WELDING SUPPLY
1224 SIXTH STREET
BERKELEY, CA 94710


Attorney General
US Dept. of Justice, Trial Section
West Region
P. O. Box 683
Washington, DC 20044


Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004


Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 74 of
Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:32   Page 22 of
699
232

74

Attorney General's Office
U.S. Department of Justice
Dept of Ins. Supervision & Compliance
950 Pennsylvania Avenue, NW #270
Washington, DC 20530-0001


Atwell, Brody
141 Flora Ave.
#1
Walnut Creek, CA 94595


Avalos, Edgar E
2011 Glenridge Dr.
Ceres, CA 95307


Avalos, Ismael
2011 Glen Ridge Dr.
Ceres, CA 95307


Avalos, Jose A.
1706 89th Ave.
Oakland, CA 94621


AVAYA FINANCIAL SERVICES
P. O. BOX 93000
CHICAGO, IL 60673


Avila Albarran, Jose B
873 Willow St
Oakland, CA 94621


Avila Gallardo, Juan
656 Baden Ave.
S. San Francisco, CA 94080

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:49   Page 75 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:49   Page 75 of
699
699

75

```
Avila, Reynaldo
512 Sycamore Dr.
Fairfield, CA 94533


Ayala Jr., Ramon
2112 Alfreda Blvd.
San Pablo, CA 94806


Ayala Lopez, Juan
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Ayala, Jaime
230 Chesley Ave.
Richmond, CA 94801


Ayala, Jose M.
27702 Pompano Avenue
Hayward, CA 94544


Ayala, Mario
28134 E. 11th St.
Hayward, CA 94544


Azevedo, Antonio E
497 Vinewood Dr.
Oakley, CA 94561


Azevedo, Heliodoro
1435 141st. Ave
San Leandro, CA 94578
```

Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:39   Page 76 of
699

B&L INFORMATION SYSTEMS
4707 RAMBO ROAD
BRIDGMAN, MI 49106


B2B INDUSTRIAL PRODUCTS LLC
PO BOX 3296
GLEN ELLYN, IL 60138-3296


Baca, Nicolas
1530 164 Ave.
Apt. 209
San Leandro, CA 94578


Baca, Nicolas
1515 53rd Ave.
Oakland, CA 94601


Balance Engineering Company
P. O. Box 2056
Castro Valley, CA 94546


Ballin Romo, Jose Luis
P.O. Box 7012
Oakland, CA 94601


Ballin Romo, Jose Luis
4620 Camden
Oakland, CA 94619


Baltazar, Janio
895 Delano Ave.
San Francisco, CA 94112

Banda, Rudy H.
2622 Hidden Ln.
Hayward, CA 94541


Bandy, Ronald S
2425 Church Lane
Sp. 50
San Pablo, CA 94806


Barajas F, Luis
689 3rd St.
Richmond, CA 94801


Barajas Morales, Felipe
2030 Costa Ave.
.
Richmond, CA 94806


Barajas, Bryan
73 Harbor Dr.
Bay Point, CA 94565


Barajas, Carlos
1818 Rheem Ave
Richmond, CA 94801


Barbieri, Jeffrey W
1486 Mezenen Pl.
Manteca, CA 95336


Barboza Robles, Jose C
2547 Lynn Ave.
Concord, CA 94520

Case: 19-04057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:49   Page 78 of
Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:49   Page 26 of
699
232

78

Barfield Jr., Michael
518 7th Street
Richmond, CA 94801


Barnes III, Henry
707 Nevada Street
Oakland, CA 94603


Barragan, Oscar
2330 Landcaster Dr. #5
Richmond, CA 94806


Barreno, Sergio
1844 39TH Ave.
Oakland, CA 94601


Barrera, Huby
1907 Hoffmand St.
Richmond, CA 94801


Barrientos, Angel
222 165th
Richmond, CA 94804


Bartolomeu, George C
2171 Sunhaven Circle
Fairfield, CA 94533


Bartolomeu, Helder A
785 Cement Hill Rd.
Fairfield, CA 94533

Case: 19-04057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:39   Page 79 of
Case: 19-41025   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:12   Page 79 of
699
699

79

Bauer, Richard
600 J St. #214
Martinez, CA 94553


Bauer, Richard
2210 Sweetwater
San Leandro, CA 94578


Baxter, Leonard L
324 Goldenrain Ave
Fremont, CA 94539


BAY AREA INDUSTRIAL FILTRATION
PO BOX 2071
SAN LEANDRO, CA 94577


BAY AREA MACHINE & MARINE REPAIR
2480 DIANE DRIVE
EL SOBRANTE, CA 94803


BAY SHIP & YACHT CO.
dba BAY MACHINE AND FABRICATION
2900 MAIN STREET, #2100
ALAMEDA, CA 94501-7739


BAYSHORE SUPPLY ALBANY
600 CLEVELAND AVENUE
BERKELEY, CA 94710


Bazak, Constantin
4812 San Pablo Dam Rd.
Apt. 4
El Sobrante, CA 94805

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 80 of
Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 80 of
699

80

Bazan Mendoza, Jose L.
2205 Hellings Ave.
Richmond, CA 94801


BEARCOM
P. O. BOX 200600
DALLAS, TX 75320


BEARING ENGINEERING COMPANY
667 McCORMICK STREET
SAN LEANDRO, CA 94577


BEAVER COMPRESSOR SERVICE COMPANY
PO BOX 1326
KANNAPOLIS, NC 28082


Becerra, Hernan
1821 El Serreno Ct.
Modesto, CA 95358


Becerra, Marcos
17 Collins Ct.
Richmond, CA 94801


BELL ELECTRICAL SUPPLY INC
PO BOX 742274
LOS ANGELES, CA 90074-2274


Bell, Christopher E
516 Harrison Dr.
Richmond, CA 94806

```
Bellow, Michael
P.O. Box. 3961
Oakland, CA 94609


Benge, Ronald
7588 Honey Ct
Dublin, CA 94568


BENITO NAVARRO
3800 CARRINGTON STREET
OAKLAND, CA 94601


Benson Sr., George
2632 Vale Rd.
San Pablo, CA 94806


Berber, Dionicio
1348 84th Ave.
Oakland, CA 94621


Berber, Dionicio
1348  84th Ave.
Oakland, CA 94621


BERKELEY FORGE AND TOOL
1331 EASTSHORE HIGHWAY
BERKELEY, CA 94710-1920


Berkeley Properties LLC
1333 Second Street
Berkeley, CA 94701
```

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 82 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 82 of
699

**82**

BERKELEY PROPERTIES, LLC
85 LAKESIDE DRIVE
Corte Madera, CA 94925-1037


Berkeley Properties, LLC
1333 Second Street
Berkeley, CA 94710


BERKELEY WAREHOUSE & DRAYING CO INC
1920 SECOND STREET
BERKELEY, CA 94710


Bermudez Santiago, Miguel A.
3400 Richmond Pkwy
Apt. 3511
San Pablo, CA 94806


Bernard, Meshach
3019 O'Brien Rd.
Richmond, CA 94806


BEST EQUIPMENT COMPANY
3101 SAN PABLO AVENUE
BERKELEY, CA 94702


Betancourt, Guillermo
1852 14th St. #4
San Pablo, CA 94806


BIGGE CRANE AND RIGGING COMPANY
PO BOX 1657
SAN LEANDRO, CA 94577

Case: 19-04057   Doc #85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 33 of
Case: 19-41045   Doc #85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 31 of
699
232

83

Blake, Twon
117 Simonton St.
Vallejo, CA 94589


Blanco Escalante, Efrain
2625 McArthur Ave.
San Pablo, CA 94806


BLASTCRETE EQUIPMENT COMPANY
PO BOX 1964
ANNISTON, AL 36202


Blaz Miranda, Pedro A
150 16th St.
Richmond, CA 94801


Boldware, Tenesha D
1229 McDonald Dr.
Pinole, CA 94546


Bonini, Jason R.
1196 Burkhart Ave.
San Leandro, CA 94579


BORDANARO AND SON
815 HARBOR WAY SOUTH UNIT #32
RICHMOND, CA 94804


Borja, Jose N
2205 E. 22nd St.
Oakland, CA 94606

BOWLIN EQUIPMENT COMPANY
1107 10TH STREET
BERKELEY, CA 94710


Boxer & Gerson, LLP


Boyce, Cory Christopher
953 40th Ave.
Oakland, CA 94601


Bradford, Deshawn
516 Webster Street
San Francisco, CA 94117


BRADLEY TANKS INC
402 HARTZ AVENUE
BUILDING C
DANVILLE, CA 94526


Branco, Bruce J
2920 Georgia Street
Vallejo, CA 94591


Brasil, Artur
2606 Alvin Ave
San Jose, CA 95121


Brasil, Artur
2606 Alvin Ave
San Jose, CA 95121

Case: 19-40057   Doc#85   Filed: 03/09/20   Entered: 03/09/20 15:24:19   Page 35 of
Case: 19-41065   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:39   Page 35 of
699
232

85

Breaux, Steven J.
821 Fleming Ct.
Vallejo, CA 94591


Brewer, Dontae
2220 Leland Ct.
Pittsburg, CA 94565


Bridges, Charles H
Po Box 355
Tracy, CA 95378-0355


Briones Hidalgo, Raul
14190 Rose Dr.
San Leandro, CA 94578


Broussard, Demetrius O
P.O. Box 1128
El Cerrito, CA 94530


Brown II, Eugene
128 Newton Street
Hayward, CA 94544


Brown, Monicqua
3200 Belmont Ave.
#1
El Cerrito, CA 94530


Brusatori, Anthony
123 S. 31st St.
Richmond, CA 94804

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:39   Page 36 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:39   Page 34 of
699
232

86

BRYAN BARAJAS
73 HARBOR DRIVE
BAYPOINT, CA 94565


Bryant, Dorian H.
135 Shoreline Circle
Apt. 362
San Ramon, CA 94582


Buenrostro, Gabriel
1245 105th Ave.
Oakland, CA 94603


Buggs, Steven J
716 Windward Dr.
Rodeo, CA 94572


BULBS.COM INC
243 STAFFORD STREET
WORCESTER, MA


Burke, Michael P.
2909 Bayview Dr.
Alameda, CA 94501


BURLINGAME ENGINEERS
1225 DAVID AVENUE
CONCORD, CA 94518


Burton Sourcing Solutions
Attn: William W. Burton, Jr., Owner
4626 Addison Drive
Charlotte, NC 28211

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 37 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 35 of
699
232

87

Burton, Bernard
288 Ebony Way
Hayward, CA 94544


Bustamante De Merino, Maria I.
1946 Foothill Blvd.
#14
Oakland, CA 94606


Bustamante De Merino, Maria I.
2205 E 22nd Street
Oakland, CA 94606


Bustamante Salgado, Pedro
2820 Garden St.
Apt. B
Oakland, CA 94601


Butler, Kelvin
3979 Prosser Street
West Sacramento, CA 95691


Butts, Derrick
3610 Auburn Blvd.
Sacramento, CA 95821


C A PICARD INC
3435 MOMENTUM PLACE
CHICAGO, IL 60689-5334


C.M.A.T. - GLASS, MOLDERS, POTTERY,
PLASTICS, PENSION TRUST (LOCAL 164B)
DEPT. 77840
P. O. BOX 77000
Detroit, MI 48277-0840

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 88 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:32   Page 38 of
699
232

88

```
CABLE MOORE, INC.
P. O. BOX 4067
OAKLAND, CA 94614


Cabrera, Angel
2966 Los Altos Way
Antioch, CA 94509


Cabrera, Juan
820 Johnson Dr.
Richmond, CA 94806


Cadenas, Juan M.
1925 1/2 Barrett Ave.
Richmond, CA 94801


Calderon Armenta, Cesar
1919 Manchester Rd.
Apt. 222
San Leandro, CA 94578


Calderon, Jose I
495 Castro St.
San Leandro, CA 94577


Calderon, Julio C.
1919 Manchester Rd.
Apt. 321
San Leandro, CA 94578


Calderon-Bautista, Brian
1919 Manchester Rd.
Apt. 222
San Leandro, CA 94578
```

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 39 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:32:49   Page 39 of
692

**89**

CALIFORNIA ELECTRIC STEEL
250 MONTE VERDE STREET
P. O. BOX 817
ANGELS CAMP, CA 95222


CALIFORNIA MILL EQUIPMENT COMPANY
213 C STREET
TURLOCK, CA 95380


CALPACIFIC EQUIPMENT COMPANY
865 MARINA BAY PKWY #40
RICHMOND, CA 94804


Camacho, Jose L.
1717 3rd St.
Richmond, CA 94801


Camacho-Hernandez, Jorge
902 Pool Side Pl.
San Leandro, CA 94578


CAMLEE CORPORATION
89 Alvarado Road
Berkeley, CA 94705


Campos A., Juan Pablo
933 37th St.
Richmond, CA 94805


Campos Serrato, Oscar
408 Jones Ave.
Oakland, CA 94603

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 90 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 38 of
699
232

90

Campos, Fernando
129 S. 16th St.
Richmond, CA 94801


Campos, Jose Luis
610 East D Street
Oakdale, CA 95361


Campos, Jose Luis
9936 D Street
Oakland, CA 94603


Campos-Hernandez, Armando
9005 Walnut Street
Oakland, CA 94603


Canela, Victor Manuel
1328 Sulter Ave. #2
San Pablo, CA 94806


Carbajal-G, Eusevio
1718 Truman St.
Richmond, CA 94801


Cardenas C., Gerardo
900 Trenton Blvd #3
San Pablo, CA 94806


Cardenas F., Cesar
900 Trenton Blvd #1
San Pablo, CA 94806

Cardoso, Alfredo A.
3548 Del Monte Way
San Leandro, CA 94578


Cardoso, Antonio F.
1123 Lassen Ave.
Modesto, CA 95358


Care, Fred
33017 Korbel St.
Union City, CA 94587


Carranza Soria, Edgar
56 Schuyler Ave.
Hayward, CA 94544


Carrasco Garcia, Marco A
1836 Rheem Ave.
Richmond, CA 94801


Carreno Juarez, J Enrique
1933 33rd Ave.
Oakland, CA 94601


Carreno, Jose Francisco
826 Lisbon Ave
Oakland, CA 94601


Carriedo P, Francisco J
2439 8th St. #D
Berkeley, CA 94710

Carrillo Monarrez, Modesta
2552 Foothill Blvd.
2e
Oakland, CA 94601


Carrillo, Benjamin
510 Chesley Ave.
Richmond, CA 94801


Carrillo, Jose De Jesus
1824 21st TR.
San Pablo, CA 94806


Carrillo, Luis M.
320 S 41st Street
Richmond, CA 94804


Carter, Scott G
1032 Santa Clara #A
Alameda, CA 94501


Carvajal, Hugo Huizar
1530 40th Ave.
Oakland, CA 94601


Casian, Jose
1135 58th Ave.
Oakland, CA 94621


Casimere, Jeff
3814 Shinglewood Ct.
Union City, CA 94587

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 93 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 91 of
699
232

93

CASS INC
PO BOX 24222
OAKLAND, CA 94623


Cassidy, Joseph
2018 101st Ave.
Oakland, CA 94603


Castaneda, Daniel
9885 Toler Ave.
Oakland, CA 94603


Castaneda, Jose Antonio
1333 Burbeck Ave.
Richmond, CA 94801


Castano Aguirre, Natalie
441 Marina Rd.
Bay Point, CA 94565


Castano S, Ana
99 Inlet Dr.
Bay Point, CA 94565


Castano, Alfonso
2547 Lynn Ave. #872
Concord, CA 94520


Castano, Daniel
441 Marina Rd.
Bay Point, CA 94565

Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 94 of
Case: 19-41057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:19   Page 94 of
699

94

Castano, Jose A
441 Marina Rd.
Bay Point, CA 94565


Castellanos, Daniel
22190 S. Garden
Hayward, CA 94544


Castellanos-Camparan, Julian
1941 48th Ave.
Oakland, CA 94601


Castillo J, Luis
2000 36th Ave.
Oakland, CA 94601


Castillo Ramos, Ruben
1340 64th Ave.
Oakland, CA 94621


Castillo, Edgardo
12200 Road 37 1/2
Madera, CA 93636


Castillo, Jose M.
12200 Road 37 1/2
Madera, CA 93636


Castillo-Ramos, Jose A.
1340 64th Ave.
Oakland, CA 94621

Castillon, Jorge
5125 Fairfax Ave.
Oakland, CA 94601


Castro, Jose G
5741 Lemke Pl
Fremont, CA 94538


Castro, Martin
33717 5th St.
Union City, CA 94587


CASTROL INDUSTRIAL NORTH AMERICA
12294 COLLECTIONS CENTER DRIVE
CHICAGO, IL 60093


Ceja Diaz, Salvador
27939 Ormond Ave.
Hayward, CA 94544


Ceja Morales, Johnny
538 16th Street
Richmond, CA 94801


Ceja Ortega, Francisco
1309 Burbeck Ave.
Richmond, CA 94801


Ceja, Armando
1441 85th Ave.
Oakland, CA 94621

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 96 of
Case: 19-41045   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:32   Page 96 of
699

96

Ceja, Carlos
2519 Begonia St.
Union City, CA 94587


Ceja, Gerardo
75 Geneva Ave.
Hayward, CA 94544


Ceja, Guillermo
1761 Esmond Ave
Richmond, CA 94801


Ceja, Ramiro
1939 83rd Ave.
Oakland, CA 94621


Cendejas Ceja, Jesus
14433 Bancroft Ave. #18
San Leandro, CA 94578


CERAMTECH
4875 EAST LA PALMA AVENUE #609
ANAHEIM, CA 92807


CERTIFIED TESTING & CONSULTING SVS.
3144 VENTURE DRIVE SUITE 100
LINCOLN, CA 95648


Cervantes Garcia, Juan
294 Marina Blvd #B
San Leandro, CA 94577

Cervantes V, Alfredo
1884 22nd St.
San Pablo, CA 94806


Cervantes, Enrique
2108 9th St. #A
Berkeley, CA 94710


Cervantes, Jesus
1975 22ND St #A
San Pablo, CA 94806


Cervantes, Raudel L.
1627 High St. #101
Oakland, CA 94601


Chao, Yao Chan
1905 Mesa Buena Ave.
San Pablo, CA 94806


Chapman, Joseph A
1061 Shady Brook Ln
Napa, CA 94558


Chappelle, Kelly D.
34232 Arizona St.
Union City, CA 94587


Chavarria Lopez, Nelson
2700 Humphrey Ave.
Richmond, CA 94804

Chaves-F, Febronio
633 16th St. #C
Richmond, CA 94801


Chavez A, Eric Jaime
296 W Chanslor Ave.
Richmond, CA 94801


Chavez A, Eric Jaime
1508 15th St.
San Pablo, CA 94806


Chavez Velazques, Saul
16075 Via Conejo
San Lorenzo, CA 94580


Chavez, David
1975 Mason Street
San Pablo, CA 94806


Chavez, Jesus
2153 Alameda Ave.
Apt. E
Alameda, CA 94501


Chavez, John A
1320 Silverado Dr.
Modesto, CA 95356


Chavez, Juan
2880 West Lane #1
San Pablo, CA 94806

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 99 of
Case: 19-41047   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:34:49   Page 97 of
699
232

99

Chavez, Julio Cesar
13325 Doolittle Dr.
San Leandro, CA 94577


Chavez, Lugarda Alicia
1314 Hellings Ave.
Richmonnd, CA 94801


Chavez, Marcos M.
1749 Kappa Ave.
San Leandro, CA 94579


Chavez, Primitivo
633 16th St. #D
Richmond, CA 94801


Chavez-Garcia, Catalina
2373 Eleepy Hollow
San Jose, CA 00094-5116


Chen, Jia Hua
625 10th St. Apt. 3
Oakland, CA 94607


Cheung, Sun Wing
2471 Park Blvd
Oakland, CA 94606


CHINA PACIFICARBIDE INC
14267 ALBERS WAY
CHINO, CA 91710

CHRISTOPHER BELL
516 HARRISON DRIVE
RICHMOND, CA 94806


CHRISTOPHER INGRAM
25816 FRANKLIN AVENUE
HAYWARD, CA 94544


CHRISTOPHER TORRES
2935 MONTEDIABLO #4
STOCKTON, CA 95203


CINTAS FIRST AID & SAFETY
LOC #156
PO BOX 636525
CINCINNATI, OH 45263-6525


CIPRIANO GONZALEZ
1416 ALCATRAZ AVENUE
BERKELEY, CA 94702


CITRIX ONLINE, LLC
FILE 50264
LOS ANGELES, CA 90074-0264


City of Berkeley
Business License Renewal
1947 Center Street 1st Fl.
Berkeley, CA 94704-1155


Clark, Cassaundra
175 Marie Ave.
Tracy, CA 95376

CLEARFLOW VALVES COMPANY
631 CAMELIA STREET
BERKELEY, CA 94710


CMAT - Glass, Molders, Pottery, etc.
Allied Workers (Local 164B)
c/o Assoc. Third Party Administrators
1640 South Loop Road
Alameda, CA 94502


CMTA - GLASS, MOLDERS, POTTERY, etc.
PENSION TRUST (LOCAL 164B)
c/o Assoc. Third Party Administrators
1640 South Loop Road
Alameda, CA 94502


Coello-O, Alfredo
404 Stannage St. #6
Albany, CA 94706


COGENT COMMUNICATIONS
1015 31st Street
Washington, DC 20007


COLE SUPPLY COMPANY INC
531 GETTY COURT SUITE A
BENICIA, CA 94510


Collins, Rickey
1114 Francisco St.
# A
Berkeley, CA 94702


Colmenero, Samuel
1500 94th Ave.
Oakland, CA 94603

CON-WAY WESTERN EXPRESS
PO BOX 5160
PORTLAND, OR 97208-5160


CONNOR MANUFACTURING SERVICES INC
1391 SHOREWAY ROAD #375
BELMONT, CA 94002


Contreras Saucedo, Hector M
2640 Oharte Rd.
San Pablo, CA 94806


Contreras Saucedo, Hector M
7073 Eton Ln.
Windsor, CA 94592


Contreras, Alicia
3821 Clinton Ave.
Richmond, CA 94805


Contreras, Fernando
612 21st Street
Richmond, CA 94801


Contreras, Raul
1096 Flemming Ave.
San Jose, CA 95127


Cooper, Lemarlin J.
1221 Ingalls St.
San Francisco, CA 94124

Cooper, Nathan
540 59th Street
Oakland, CA 94609


Cordova, Edwin
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Corea Jimenez, Irvin
25200 Santa Clara St.
Apt. 233
Hayward, CA 94544


Corena Perez, Jorge
1317 Liberty St.
Apt. 10
El Cerrito, CA 94530


Coria, Jose Manuel
27845 Mandarin Ave.
Hayward, CA 94544


Corral, Jose A
1153 Rumrill Blvd. #70
San Pablo, CA 94806


Cortez Nunez, Dionicio
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Cortez, Alberto
2554 E 16th Street
Oakland, CA 94601

Cortez, Gilberto
3927 Lyon Ave.
Oakland, CA 94602


Cortez, Juan
2746 E. 17th Street
Oakland, CA 94601


Costa, Christopher D.
3679 38th Ave.
Oakland, CA 94619


Costa, Edmundo R.
23972 2nd St. Apt. 3
Hayward, CA 94541


Costa, Eduardo M.
2144 Altamont Rd.
San Leandro, CA 94578


Costa, Jason
1486 Mezenen Pl.
Manteca, CA 95336


Costa, Jeremy Adam
508 Nancy Dr.
Ripon, CA 95366


Costa, Jonathan Michael
476 Cowell Ave.
Manteca, CA 95336

Costa, Jonathan Michael
476 Cowell Avenue
Manteca, CA 95336

Costa, Justin J
1486 Mezenen Pl.
Manteca, CA 95336

Costa, Nelson
1293 Gilmore Dr.
San Leandro, CA 94577

Costa, Nicholas J.
717 Arlington Way
Martinez, CA 94553

Costa, Rui P.
35929 Caxton Place
Fremont, CA 94536

Costa, Ryan Paul
22310 City Center Dr
Apt. 2220
Hayward, CA 94541

Cota Games, Tomas
10400 Pippin St.
Oakland, CA 94603

CRANE PRO PARTS
P.O. BOX 641807
PITTSBURGH, PA 15264

CRANE TECH INC
3540 E. CARPENTER ROAD
STOCKTON, CA 95215


CRANE TECH INC.
3540 E. CARPENTER RD
STOCKTON, CA 95215


Crane, Stephen Brian
15860 Walter Bretron Dr.
Morgan Hill, CA 94507


CRC CELLPHONE & RADIO COMPANY
627 SAN PABLO AVENUE
ALBANY, CA 94706


Crouchet, Zepp
3200 Belmont Ave. #1
El Cerrito, CA 94530


Cruz Acosta, Jesus
14700 Washington Ave. #213
San Leandro, CA 94578


Cruz Regalado, Carlos
740 7th St.
Richmond, CA 94801


Cruz, Joel
1445 31st Ave.
Oakland, CA 94601

Cunha, Carlos
3672 Figueroa Dr.
San Leandro, CA 94577


CURTIS & THOMPKINS LTD
2323 FIFTH STREET
BERKELEY, CA 94710


CUSTOM FREIGHT SYSTEMS INC
2484 BAUMANN AVENUE
SAN LORENZO, CA 94580


Daniels, Damien
2198 42nd St.
Oakland, CA 94601


DAVI ASSOCIATES
129 Sunnyglen Drive
Vallejo, CA 94591


Davi, Fred Vincent
129 Sunnyglen Drive
Vallejo, CA 94591


David F. Crutcher, Esq.
Attorney at Law
4040 Civic Center Drive, Suite 200
San Rafael, CA 94903


Davis, Devin Alan
1572 Rieger Ave.
Hayward, CA 94544

Davis, Tony J
32602 Lake Tana St
Fremont, CA 94555

De La Fuente, Marcos
9996 E 14th Street
Apt. 3
Oakland, CA 94605

De La Luz, Joseph
887 Serra Dr.
San Leandro, CA 94578

De La Mora Muniz, Jesus
36 1st St.
Richmond, CA 94801

De Lage Landen Financial Services
P. O. Box 41601
Philadelphia, PA 19101

De Leon, Hortencia
1532 Swarthout Ct.
Tracy, CA 95376

De Los Santos Lopez, Juan
2823 Tara Hills Dr.
San Pablo, CA 94806

Debernardis, John M
22774 4th St.
Hayward, CA 94541

Debernardis, John M
623 Longwood Ave.
Hayward, CA 94541


Del Rio, Ruben
9320 Olive St.
Oakland, CA 94603


Del Valle, Patrick J
730 Sandy Brook
Rodeo, CA 94752


Delacruz, Roberto
748 9th St.
Richmond, CA 94801


Delafuente, Xener
563 Spruce St.
Oakland, CA 94606


Delsol, Catherine B
85 Lakeside Drive
Corte Madera, CA 94925


Denzler, Roland P
1077 W-Cypress
Oakley, CA 94561


DEPARTMENT OF MOTOR VEHICLES
P. O. BOX 825339
SACRAMENTO, CA 94232-5339

DEPENDABLE FOUNDRY EQUIPMENT
REDROD-CARVER FOUNDRY PRODUCTS CO.
P. O. BOX 953
SPOKANE, WA 99210-0953


Desimas, Urbano A
1587 Magnolia Lane
San Leandro, CA 94577


DEVASCO INTERNATIONAL INC.
ATTN: PHILIP BADGER III
1626 SOUTH CHERRY STREET
TOMBALL, TX 77375


Dhami, Sandeep Singh
4518 Macbeth Ave.
Fremont, CA 94555


DHL GLOBAL FORWARDING
14076 COLLECTIONS CENTER DRIVE
CHICAGO, IL 60693


DIAGRAPH MSP GROUP
SUITE #3271
75 REMITTANCE DRIVE
CHICAGO, IL 60675-3271


Diaz De Leon, George
14744 Washington Ave
Apt. 236
San Leandro, CA 94578


Diaz De Leon, Marco A.
14744 Washington Ave. #236
San Leandro, CA 94578

Diaz Guerra, Ma C
2429 18th Street
San Pablo, CA 94806


Diaz Guerra, Ma C
1212 West Cente St.
Apt. 106
Manteca, CA 95337


Diaz Ramirez, Cesar
1454 36th Ave. #205
Oakland, CA 94601


Diaz Torres, Juventino
95 Shore Rd.
Bay Point, CA 94565


Diaz, Alfonso
1237 Delwood St.
Vallejo, CA 94591


Diaz, Samuel
1556 Santa Rosa St.
San Leandro, CA 94577


Diaz-Rivas, Jesus
16247 Bertero Ave.
San Lorenzo, CA 94580


DIMENSIONAL INSPECTION LABS
35481 DUMBARTON COURT
NEWARK, CA 94560

DLS WORLDWIDE
P. O. BOX 730440
DALLAS, TX 75373-0440


DONS TIRE SERVICE, INC.
820 GILMAN STREET
BERKEKEY, CA 94710


Doran, Paul M
252 Sunnyside Dr.
San Leandro, CA 94577


Douglas, Christopher A.
804 Danrose Dr.
American Canyon, CA 94503


Downs Jr., George
16022 Via Pinale
San Lorenzo, CA 94580


Droesch, David C.
247 River Pines Way
Vallejo, CA 94589


Duarte Jr., Manuel C.
338 S. 38th St.
Richmond, CA 94801


Duarte, Juan C.
1572 Valerie Lane
Tracy, CA 95376

Duarte, Manuel C.
15782 Maubert Ave.
San Leandro, CA 94578


Duenas, Martin
7105 Orral St.
Oakland, CA 94621


Dunn, Kevin S.
901 Fall River Dr.
Modesto, CA 95351


Duran Roman, Agustin
2020 Joan Dr.
San Leandro, CA 94578


Duran, Freddy
5020 E 10th St.
Oakland, CA 94601


Duran, Javier
817 4th Street
Modesto, CA 95351


Duran-Barrera, Jose
423 Ohio Ave.
Richmond, CA 94804


Duran-Sanchez, Ambrocio
1745 Chase St.
Oakland, CA 94607

Case: 19-40057   Doc# 85   Filed: 09/06/20   Entered: 09/06/20 18:04:49   Page 114 of
Case: 19-40057   Doc# 85   Filed: 09/06/20   Entered: 09/06/20 18:04:49   Page 114 of
699
232

114

Duszynski, Robert G.
1117 Walnut Street
Alameda, CA 94501


DYNA SYSTEMS
PO BOX 971342
DALLAS, TX 75397-1342


DYNAMIC AIR INC.
1125 WILLOW LAKE BLVD
ST PAUL, MN 55110-5193


ECKMAN INDUSTRIES INC.
PO BOX 1188
GENOA, NV 89411-1188


EHRET CO.
PLUMBING & HEATING
801 GILMAN STREET
BERKELEY, CA 94710


ELECTRICAL SERVICES CO.
9835 KITTY LANE
OAKLAND, CA 94603


Elias N, Isauro
6728 Lucille St.
Oakland, CA 94621


Elizalde, Julio
1820 8th St.
Berkeley, CA 94710

EMERYVILLE ADVANCED IMAGING
P. O. BOX 240086
LOS ANGELES, CA 90024


EMERYVILLE OCCUPATIONAL MED CNTR
P.O. BOX 99440
EMERYVILLE, CA 94662


EMMERICHS ASSOCIATES
1674 Glazier Drive
Concord, CA 94521


Emmerichs, Mike G
935 Bradford Way
Benicia, CA 94510


Emmerichs, Tom
Pmb 114
5100-B1 Clayton Road
Concord, CA 94521


Employment Development Department
State of California
P.O. Box 826880/MIC 4
Sacramento, CA 94280-0001


EMTRAIN
777 CAMPUS COMMONS ROAD #200
SACRAMENTO, CA 95825


Enciso, Ramon
9932 B St.
Oakland, CA 94603

Equihua, Martin
4462 Mines Rd.
Livermore, CA 94550


Equipco Rental
P. O. Box 5606
Concord, CA 94524


ERVIN INDUSTRIES
DEPT NO 77997
P. O. BOX 77000
DETROIT, MI 48277-0997


Escalante, Manuel
2625 MacArthur Ave
San Pablo, CA 94806


Escalante, Marvin
2625 MacArthur Ave.
San Pablo, CA 94806


Escalera, Alejandro
1648 15th St.
San Pablo, CA 94806


Escamilla, Agustin R
2811 Martin Luther
King, Jr. Ave.
Richmond, CA 94804


Escamilla, Agustin R.
2811 Martin Luther King
Richmond, CA 94804

Esmeria, Eric
4912 Summer Grove Cr
Fairfield, CA 94534


Esparza Lopez, Rodolfo
2018 West Ave. #135
San Leandro, CA 94577


Esparza Lopez, Salvador
15941 Via Arroyo
San Lorenzo, CA 94580


Espejel Lopez, Victor
179 Duran Ave.
San Leandro, CA 94577


Espejo R, Julio
533 4th St.
Richmond, CA 94801


Espino, Juan A
209 South 15th St.
Richmond, CA 94801


Espino, Ricardo
1318 California Ave. #4
San Pablo, CA 94806


Espino, Rogelio Reyes
3439 California St.
Oakland, CA 94602

Espinosa-Ruiz, Carlos Rafael
200 E. 17th Street
Pittsburg, CA 94565


Espinoza  Cervantes, Efren
1418 13th Ave.
Oakland, CA 94603


Espinoza Martinez, Fernando
9404 E St.
Oakland, CA 94603


Espinoza, Armando
1856 102nd Ave.
Oakland, CA 94603


Espinoza, Edgar
1509 15th St.
San Pablo, CA 94806


Espinoza, Manuel
3125 Ohio Ave.
Richmond, CA 94806


Esquivel, Ricardo
2024 W Grant Line Rd
Mountain House, CA 95391


Estrada, Juan A
2600 Brian Dr.
San Pablo, CA 94806

Estrada, Salomon
2361 McBryde Ave.
Richmond, CA 94804


EUROCAL TECHNICAL SERVICES
9384 NEVINS WAY
ORANGEVALE, CA 95662


Evans, James Richard
2436 Edwards St.
Berkeley, CA 94702


EVERGREEN ENVIRONMENTAL SER.
5000 BIRCH STREET
NEWPORT BEACH, CA 92660


EVERGREEN RECYCLING INC.
P.O. BOX 84364
SEATTLE, WA 98124-5664


EXAMINETICS INC
P. O. BOX 410047
KANSAS CITY, MO 64141-0047


EXPEDITORS INTL SFO
425 VALLEY DRIVE
BRISBANE, CA 94005


F&F ENTERPRISE
33772 SINSBURY WAY
UNION CITY, CA 94587

Fagundes, Benildo C
1338 Maria Drive
San Leandro, CA 94577


Fagundes, Luis
5211 Crestline Way
Pleasanton, CA 94566


FAIRFIELD
P. O. BOX 7940
LAFAYETTE, IN 47903-7940


Fanaika, John
537 S. 30th Street
Richmond, CA 94804


Farias V, J Trinidad
1919 14th St.
San Pablo, CA 94806


Farias, Antonio
3875 Vista Oaks Dr.
Apt. 201
Martinez, CA 94553


Farias, Arturo
668 3rd St.
Richmond, CA 94801


Farias, Emiliano
530 Ripley Ave. #8
Richmond, CA 94801

Farias, Jose A.
2672 Merritt Ave.
San Pablo, CA 94801


Farias, Juan A.
629 21st.
Richmond, CA 94801


Farias, Pantaleon
221 Gertrude Ave.
Richmond, CA 94801


Farias, Rafael
1551 2nd St.
Richmond, CA 94801


Farias-Vasquez, Carlos
1919 14th St.
San Pablo, CA 94806


Farinha, Frank A
28415 Jack Godwin Ct.
Tracy, CA 00094-5304


FASTENAL COMPANY
P.O.BOX 978
WINONA, MN 05598-7978


Faumui, Marcus
916 7th Street
Richmond, CA 94801

FEDERAL EXPRESS CORPORATION
PO BOX 7221
PASADENA, CA 91109-7321


FERGUSON ENTERPRISES INC #795
FILE #56809
LOS ANGELES, CA 90074-6809


Ferguson, Amir-Aman
155 Fox Hollow Cir.
Vacaville, CA 95687


Ferguson, Gene E.
1760 Pine Street
Apt. 12
Concord, CA 94520


Fernandes, Robert L.
1243 Terra Ave.
San Leandro, CA 94578


Fernandez Martinez, Jonathan
1056 Ernst Way
Concord, CA 94518


Ferreira, David
4458 Fall Lane
Oakley, CA 94561


Ferreira, Jose A.
943 Kilkenny Way
Pinole, CA 94564

Ferreira, Nicandra
35025 Hollyhock St.
Union City, CA 94587

Ferrell, Nettie
3711 Solano Ave
Richmond, CA 94805

Ferron, Shayne
501 Main Street
#j
Suisin City, CA 94585

FESIL SALES SA
SPECIALTY SUPER ALLOYS INC
393 VANADIUM ROAD
PITTSBURGH, PA 15243

Fick & Associates, Inc.
Attn: Theodora J. Fick, Owner
7406 27th Street, Ssuite 5
Tacoma, WA 98466

Fields, Benjamin
33865 7th Street
Union City, CA 94587

Fierro Aviles, Juan
337 S. 26th Street
Richmond, CA 94804

Fierro, Arturo
2612 Lowell Ave.
Richmond, CA 94804

Fierro, Daniel
2612 Lowell Ave.
Richmond, CA 94804


Figueroa, Carlos Rivera
9340 Sunnyside St.
Oakland, CA 94603


Figueroa, James
15886 Via Del Sol
San Lorenzo, CA 94580


Fitzgerald, Andrew
787 Horizon Dr.
Marrtinez, CA 94553


Flores Avalos, Pedro
2000 19th St.
San Pablo, CA 94806


Flores Pizano, Juan
2488 Ramona St.
Pinole, CA 94564


Flores, Anthony
2824 Del Camino Dr.
San Pablo, CA 94806


Flores, Braxton
3901 La Cresenta Rd.
El Sobrante, CA 94803

Flores, Edward L
3820 Canon Ave.
Oakland, CA 94602


Flores, Francisco
1830 Lincoln Ave
Richmond, CA 94801


Flores, Jorge
1434 89th Ave. #A
Oakland, CA 94621


Flores, Jose Luz
1432 Sutter Ave.
Apt. #1
San Pablo, CA 94806


Flores, Juan
2488 Ramona St.
Pinole, CA 94564


Flores, Juan Manuel
16028 Via Segundo
San Lorenzo, CA 94580


Flores, Marco
249 Willard Ave.
Richmond, CA 94801


Flores, Miguel P.
1318 Bush Ave. #1
San Pablo, CA 94806

Flores, Pedro
2488 Ramona Street
Pinole, CA 94564


Flores, Primitivo
1256 W. Victoria Ct.
San Pablo, CA 94806


Flores, Roberto
9515 A Street
Oakland, CA 94603


Flores-Pimentel, Jose G.
1548 18th Ave.
Oakland, CA 94606


FLYNN AND ENSLOW
PO BOX 77366
SAN FRANCISCO, CA 94107


Fong, Jim K
5230 Cypress Ave. #A
El Cerrito, CA 94530


Fonte, Mario R.
1281 Rieger Avenue
Hayward, CA 94544


Foreman, Cory
2944 Carmona Way
Antioch, CA 94509

Fortuna, Antonio F.
710 Santa Maria Rd
El Sobrante, CA 94803


Fortuna, Antonio F.
4912 Cache Peak Dr.
Antioch, CA 94531


Fortune, Anthony C.
3504 Humphrey Ave.
Richmond, CA 94804


Fortune, Brian A.
1201 Club Ct.
Richmond, CA 94803


Foster, Terrance
3701 Maybelle Ave.
Apt. 5
Oakland, CA 94619


Fragoso, Genaro
2134 20th St. #28
San Pablo, CA 94806


Franchise Tax Board
(Bankruptcy Code section 505 Requests)
P. O. Box 1673
Sacramento, CA 95812


FRANCISCO PRADO
248 E. THIRD STREET
PITTSBURG, CA 94565

Franco Casio, Rodrigo
10734 Pearman St.
Oakland, CA 94603


Franco, Javier
2764 Niobrara Ave.
Stockton, CA 95206


Franco, Ricardo G.
32205 Mercury Way
Union City, CA 94587


Franklin, Stewart
2454 San Miguel Dr.
Walnut Creek, CA 94596


Freeman, James
1735 11th St.
Oakland, CA 94607


Freitas, Manuel E Da Silva
921 Frederick Road
San Leandro, CA 94577


Frison, Phillip
2050 Harrington Ave.
Apt. 4
Oakland, CA 94601


FRONTIER PERFORMANCE LUBRICANTS
P. O. BOX 1777
LODI, CA 95241

Fuentes Alfaro, Ulises
938 Virginia St.
Berkeley, CA 94710


Fuentes, Martin
1325 Coalinga Ave.
Richmond, CA 94801


Fuentes, Yovani
1717 Sutter Ave.
San Pablo, CA 94806


Fuller, Bertram
849 W. Orange Ave.
2019
S. San Francisco, CA 94080


Fuller, Marcus L.
2522 35th Ave.
Apt. 17
Oakland, CA 94601


Furtado, Antonio J.
120 Stoakes Ave. #4
San Leandro, CA 94577-1758


G.D.C. Enterprise
Attn: Des O'Sullivan, Owner
P. O. Box 1509
Chino Hills, CA 91709


Galeana S., Eduardo
1318 Bush Ave. #12
San Pablo, CA 94806

Galeana Salas, Rafael
828 Morse Ave. #49
Sunnyvale, CA 94085


Galeana Tinoco, Manuel
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Galindo, Francisco
1751 Liberty St. #107
El Cerrito, CA 94530


Gallardo, Oscar
24381 Thomas Ave.
Hayward, CA 94544


Gallardo-V, Victor M
102 Christine Dr.
San Pablo, CA 94806


Gallegos, Luis
800 8th Street
#c
Richmond, CA 94801


Galvan Lara, Jose
1328 Hellings Ave.
Richmond, CA 94801


Galvao, Jacinto V.
1339 Castro St.
San Leandro, CA 94577

Gaona, Bernardo
2430 Dober Ave.
San Jose, CA 95116


Garay, Jose M.
1399 Pacific Ave.
Apt. 106
San Leandro, CA 94577


Garcia Becerra, Francisco J.
4203 Santa Rita St.
Oakland, CA 94601


Garcia Delgado, Jose
5031 E 10th Street
Oakland, CA 94601


Garcia Delgado, Miguel A.
1901 6th St.
Richmond, CA 94801


Garcia Navarro, Gerardo
27872 Andrea St.
Hayward, CA 94544


Garcia Osorno, Victor
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Garcia Perez, Roberto
1228 61st Ave.
Oakland, CA 94621

Garcia Rubio, Bulmaro
16097 Mateo St.
San Leandro, CA 94578

Garcia Sosa, Francisco
2328 Seminary Ave. #315
Oakland, CA 94605

Garcia, Alicia
3020 El Cerrito Plaza #213
El Cerrito, CA 94530

Garcia, Armand Casenillo
3942 Clay Bank Rd
Fairfield, CA 94533

Garcia, David
3001 Kodiak St. #205
Antioch, CA 94531

Garcia, David
4912 Cache Peak Dr.
Antioch, CA 94531

Garcia, Fermin
5356 Woodgate Ct.
Richmond, CA 94803

Garcia, Jaime
640 Tyler Street
Oakland, CA 94603

Garcia, Jermie
1957 Auseon Ave.
Oakland, CA 94621


Garcia, Jorge
2249 107th Ave.
Oakland, CA 94603


Garcia, Juan
2246 42nd Ave.
Oakland, CA 94601


Garcia, Julian
34 13th St. #2
Richmond, CA 94801


Garcia, Leonel
1551 Marivelle Ave.
San Leandro, CA 94577


Garcia, Leonel
533 Colorados Dr.
Oakland, CA 94603


Garcia, Luis M
515 La Prenda Dr.
Oakland, CA 94603


Garcia, Marco
555 Penitencia St.
Apt. #4
Milpitas, CA 95035

Garcia, Norma M
710 Santa Maria Rd.
El Sobrante, CA 94803


Garcia, Rene
1590 Oregon St. # 5
Berkeley, CA 94703


Garcia, Roberto
1228 61st Ave.
Oakland, CA 94621


Garcia, Samuel N
464 Stoneford Avenue
Oakland, CA 94603


Garcia-Maravilla, Esteban
1909 8th Street
Apt# D
Berkeley, CA 94710


Garcia-Rangel, Samuel
2033 85th Ave. #D
Oakland, CA 94621


Garcia-Rodriguez, Alfredo
1427 California Ave.
San Pablo, CA 94806


Garibay, Agustin
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313

Garlieb, Christopher
312 Camaritas Way
Danville, CA 94526


GARNER HEAT TREAT INC.
10001 DENNY STREET
OAKLAND, CA 94603


Garsa, Ramon
9909 D St.
Oakland, CA 94603


Gaspar, Juan Carlos
659 8th St.
Richmond, CA 94801


Gaviola, Benjamin M.
1703 Third Street
Apt. A
Alameda, CA 94501


GE CAPITAL
P.O.BOX 31001-0275
PASADENA, CA 91110-0275


GENERAL KINEMATICS CORP.
P. O. BOX 345
CRYSTAL LAKE, IL 60039-0345


GEORGIA-PACIFIC CHEMICALS LLC
PO BOX 911343
DALLAS, TX 75391-1343

Gibson, Rozier
1274 Alcatraz Ave. #B
Berkeley, CA 94702


Giftgi, Ricardo
605 Berk Ave. #4
Richmond, CA 94804


Gilbert, Eric G.
4524 Pampas Circle
Antioch, CA 94531


Gill, Charles
2121 Nevin Ave. #A
Richmond, CA 94801


Gillespie, Samuel M
21303 Tyee St.
Castro Valley, CA 94546


Goda, John
2700 Central Ave.
Alameda, CA 94501


Godinez, Robert Ray
4102 Bramante Ct.
Antioch, CA 94509


Godoy, Edgardo
1320 7th Street
Rodeo, CA 94572

GOENGINEER, INC.
1787 EAST FT. UNION BLVD. #100
COTTONWOOD HEIGHTS, UT 84121


Gomez B., Marvin E.
557 20th St. #3
Richmond, CA 94801


Gomez Garcia, Jose
55 Pacifica Ave
Apt# Sp15
Bay Point, CA 94565


Gomez Islas, Eduardo
713 Sunset Blvd.
Hayward, CA 94541


Gomez M., Jorge A
2017 Cutting Blvd.
Richmond, CA 94804


Gomez Robledo, Mario
2726 20th St.
San Pablo, CA 94806


Gomez, Antonio
16138 Via Arriva
San Lorenzo, CA 94580


Gomez, Fernando
2044 E.14th St. #15
Oakland, CA 94601

Gomez, Francisco
1807 70th Ave.
Oakland, CA 94621


Gomez, Jesus
1507 57th Ave.
Oakland, CA 94621


Goncalves, Francisco L
1218 Silvertrail Ln.
Manteca, CA 95336


Gonsalves, Travis
1218 Silvertrail Ln.
Manteca, CA 95336


Gonzales, Michael J
35630 Dee Pl
Fremont, CA 94536


Gonzalez Camacho, Jorge H
1750 104th Ave.
Oakland, CA 94603


Gonzalez Espinoza, Heriberto
370 Burlwood Ave.
Oakland, CA 94603


Gonzalez Jorge, Valentin
426 S. 17th St.
Richmond, CA 94804

Gonzalez Lopez, Cipriano
1416 Alcatraz Ave.
Berkeley, CA 94702


Gonzalez Martinez, Jose
612 19th St.
Richmond, CA 94801


Gonzalez Moreno, Juan
6927 Morken St.
Oakland, CA 94621


Gonzalez Reges, Miguel
2882 Valencia Way
San Pablo, CA 94806


Gonzalez Sanchez, Israel
881 9th St.
Richmond, CA 94801


Gonzalez Sanchez, Jorge
3926 Foothill Blvd.
Oakland, CA 94601


Gonzalez, Adrian
546 18th Street
Richmond, CA 94801


Gonzalez, Allan
753 Santa Maria
El Sobrante, CA 94803

Gonzalez, Angel M.
9311 Olive St.
Oakland, CA 94603


Gonzalez, Daniel
2231 Balboa Street
San Francisco, CA 94121


Gonzalez, Fernando
2578 E. 27th St.
Oakland, CA 94601


Gonzalez, Gerardo
5453 San Pablo Dam Rd.
El Sobrante, CA 94803


Gonzalez, Israel
1836 92nd Ave.
Oakland, CA 94603


Gonzalez, Joel
534 4th Street
Richmond, CA 94801


Gonzalez, Jose
923 Warden Ave.
San Leandro, CA 94577


Gonzalez, Juan C.
222 4th St.
Richmond, CA 94801

```
Gonzalez, Juan Carlos
P.O. Box 2804
Berkeley, CA 94702


Gonzalez, Lazaro
449 Mobile Ln.
Vallejo, CA 94589


Gonzalez, Leandro
1131 Victory Lane
Concord, CA 94520


Gonzalez, Luis
1425 100th Ave.
Oakland, CA 94603


Gonzalez-B, Jose
381 Smalley Ave.
Hayward, CA 94541


Gonzalez-Mesa, Alexandro
1839 92nd Ave.
Oakland, CA 94603


GRAINGER INC
DEPT 560 - 807665344
PALATINE, IL 60038-0001


Granadino, Juan
2661 17th Street
San Pablo, CA 94806
```

Grappo, Brian
3311 Willis Lane
Alameda, CA 94502


Grate, Kareem Ali
675 44th Street
Oakland, CA 94609


Gray, Julis
2876 15th Street
San Pablo, CA 94806


Grayson, Yvesly S
Po Box 231
Rodeo, CA 94572


Green, Calvin W
31 Tioga Ave.
San Francisco, CA 94134


Gregory, Edward A.
221 Peralta
San Leandro, CA 94578


GRING PEST CONTROL
741 FOLGER STREET
BERKELEY, CA 94710


GSOLUTIONZ INC.
ACCOUNTS RECEIVABLE
625 E. SANTA CLARA STREET
VENTURA, CA 93001

Guerra Ochoa, Rafael
326 Aloha Dr.
San Leandro, CA 94578

Guerra, Christopher David
21212 Garden Ave
Hayward, CA 94541

Guerrero J., David
2208 Florida Ave.
Richmond, CA 94801

Guerrero, Christian
3400 Richmond Pkwy.
#1415
Richmond, CA 94806

Guerrero, Hector D
1018 Pomona Ave.
Albany, CA 94706

Guerrero, Jose J.
9933 B St.
Oakland, CA 94603

Guerrero, Marcial
77 Estabrook St.
Apt#321
San Leandro, CA 94577

Guillen, Basilio
555 32nd St.
Richmond, CA 94804

GUILLERMO CASTENEDA
2451 CHURCH LANE #76
SAN PABLO, CA 94806


Guillermo Zambrano
c/o William Hyndam, Esq.
24301 Southland Drive #420
Hayward, CA 94545


Guiza Servin, Miguel
2019 7th St. #B
Berkeley, CA 94710


Guthery, Terrance S.
1131 Bella Vista Ave. #4
Oakland, CA 94610


Gutierres Villagomez, Alan
2601 Center Ave. #114
Richmond, CA 94801


Gutierrez, Jaime
4763 Appiant Way
#5
El Sobrante, CA 94803


Gutierrez, Jorge F.
134 5th St.
Richmond, CA 94801


Gutierrez, Juan M
2084 Marina Blvd.
Apt. D
San Leandro, CA 94577

Gutierrez, Sergio
1711 Hellings Ave.
Richmond, CA 94801


Guzman, Hendre
940 Torthon St.
San Leandro, CA 94577


Guzman, Hendre
1462 159th Ave. #4
San Leandro, CA 94578


Guzman, Omar
1759 26th Ave.
Oakland, CA 94601


Hajiaghazadeh Marandi, Elmira
2301 Stewart Ave
Walnut Creek, CA 94596


Hardison, Kevin
875 Nicholas Ct.
Brentwood, CA 94513


Haro, Arturo
2470 Frieda Court
San Pablo, CA 94806


Haro, Jaime M.
2085 Roper Cir.
Brentwood, CA 94513

Haro, Jesus
16401 San Pablo Ave #232
San Pablo, CA 94806


Harp II, Mike
3800 Don Way
Richmond, CA 94806


Harris, Bobby
1734 Middlefreld Ave.
Stockton, CA 92504


Harris, Charles
216 Marlin Ct.
Rodeo, CA 94572


Harris, Jason C.
5635 Springhouse Dr.
Apt. 33
Pleasanton, CA 94588


Hasan, Eidluqman
2630 77th Ave.
Oakland, CA 94605


Hayag, Rahfael
1917 6th Street
#4
Berkeley, CA 94710


HAYWARD PIPE & SUPPLY COMPANY
3218 DIABLE AVENUE
HAYWARD, CA 94545

He, Yuheng
1941 Irving Ave. #a
Oakland, CA 94601


He, Yuheng
1418 4th Ave.
Oakland, CA 94606


He, Yuxing
1418 4th Ave.
Oakland, CA 94606


Healer, Willie Lee
101 Kreuzer Ln.
Napa, CA 94559


Heaton, Jan J.
2861 E. 10th St.
Oakland, CA 94601


Henderson Jr., Arthur
3027 Shane Dr.
Richmond, CA 94806


Henderson, Arthur
3027 Shane Dr.
Richmond, CA 94806


Henderson, Roderick D.
221 Grove Ave. #5B
Richmond, CA 94801

Henriques, Tyler J
1262 Fetzer Ln.
Oakley, CA 94561


Hernandez Alvarado, Jose D.
712 Griffin Dr.
San Pablo, CA 94806


Hernandez Cortez, Ignacio
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Hernandez Cuevas, Juan M
1008 W. 3rd St.
Antioch, CA 94509


Hernandez Jacobo, Oswaldo
1933 3rd Ave.
Oakland, CA 94601


Hernandez Lozano, Alejandro
1719 8th Street
Berkeley, CA 94710


Hernandez Lozano, Jose A.
1505 Julia St. #A
Berkeley, CA 94703


Hernandez Lozano, Raymundo
3055 Judith Court
San Pablo, CA 94806

```
Hernandez Morales, J. Luis
2429 18th Street
San Pablo, CA 94806


Hernandez N., Brenda T.
1510 Alamo Dr.
Vacaville, CA 95687


Hernandez Ochoa, Luis
774 Paradise Blvd.
Hayward, CA 94541


Hernandez R., Miguel A.
2201 California Ave.
San Pablo, CA 94806


Hernandez Zuniga, Daniel
495 Castro St.
San Leandro, CA 94577


Hernandez, Alberto
6141 Rockrose Dr.
Newark, CA 94560


Hernandez, Alvaro
153 N. La Fayette St.
Mountain House, CA 95391


Hernandez, Antonio
2119 Pine Ave.
San Pablo, CA 94806
```

Hernandez, Cesar
1647 Swallow Way
Hercules, CA 94547


Hernandez, Enrique
1222 38TH Ave.
Oakland, CA 94601


Hernandez, Gabriel
605 2nd St.
Richmond, CA 94801


Hernandez, J Antonio
2119 Pine Ave.
San Pablo, CA 94806


Hernandez, Jesus M
1923 101st Ave.
Oakland, CA 94603


Hernandez, Jesus R.
605 2nd Street
Richmond, CA 94801


Hernandez, Jorge
2981 Clearland Cir.
Bay Point, CA 94565


Hernandez, Jorge H.
774 Paradise Blvd.
Hayward, CA 94541

Hernandez, Jose J
1315 Filbert St.
Richmond, CA 94801


Hernandez, Jose Luis V.
1239 Allston Way
Berkeley, CA 94702


Hernandez, Juan M
2143 Pheasant Dr.
Hercules, CA 94547


Hernandez, Manuel
1305 Dover Ave.
San Pablo, CA 94806


Hernandez, Osbaldo
5938 Bromley Ave.
Oakland, CA 94621


Hernandez, Ramon
605 2nd Street
Richmond, CA 94801


Hernandez, Salvador
605 2nd Street
Richmond, CA 94801


Hernandez-Garnica, Enrique
1309 Blue Oak Ct.
Pinole, CA 94564

Case: 19-04057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 152 of
Case: 19-41675   Doc# 5   Filed: 09/19/19   Entered: 09/19/19 13:52:32   Page 150 of
699
232

152

Hernandez-Mora, Ricardo
2777 Ecreems Ct.
Oakland, CA 94605


Hernandez-Ruiz, Agustin
2979 Clearland Cir.
Bay Point, CA 94565


Herrera Garfias, David
99 Inlet Dr.
Bay Point, CA 94565


HERTZ EQUIPMENT RENTAL (BIG 4)
PO BOX 650280
DALLAS, TX 75265-0280


HICKMAN WILLIAMS & CO
8838 CALABASH AVENUE
FONTANA, CA 92335


HIGH TEMP INC
14025 NORTH RIVERGATE BLVD
PORTLAND, OR 97203-6514


Hirt, Roland
49 Brasero Lane
Walnut Creek, CA 94596


Ho, Kam Sang
1979 Fairbanks St.
San Leandro, CA 94577

HOFFMEYER
P.O. BOX 2359
SAN LEANDRO, CA 94577


Horta J, Carlos
2109 Dunn Ave.
Richmond, CA 94801


HOWARD ROBINSON
7 SARAH DRIVE
Mill Valley, CA 94941-1224


Huerta Mora, Lorenzo
560 105th Ave.
Oakland, CA 94603


Huerta Telles, Jose A.
4116 Potrero Ave.
Richmond, CA 94804


Huerta, Jesus
2409 Hooftrail Way
Antioch, CA 94531


Huerta, Ramiro
5037 Longhorn Way
Antioch, CA 94561


Hughes, Natasha L
P.O. Box 21314
El Sobrante, CA 94820

HUND WELDING & MACHINING
939 87TH STREET
OAKLAND, CA 94621


Hunter, Johnny
8603 Hillside Street
Apt. 103
Oakland, CA 94605


Hurtado, Roberto R
1353 Gilmore Dr.
San Leandro, CA 94577


HYDRAULIC HOSE SERVICE
P. O. OBX 8561
EMERYVILLE, CA 94662


Indalecio Toscano, Servando
1300 Costa Ave. #15
Richmond, CA 94806


Indalecio, Alfredo
13613 San Plabo Ave.
San Pablo, CA 94806


INDUSTRIAL DISTRIBUTION GROUP
P. O. BOX 671555
DALLAS, TX 75267


INDUSTRIAL ELECTRICAL COMPANY
1417 COLDWELL AVENUE
P.O. BOX 3806
MODESTO, CA 95350

INDUSTRIAL WHOLESALE LUMBER
FORMERLY SOLANO LUMBER
PO BOX 10090
AMERICAN CANYON, CA 94503-0090


INDUSTRIAL WIPER
1851 SOUTH SEVENTH STREET
SAN JOSE, CA 95112


Ingram, Christopher
3095 Grand Lake Dr.
Fremont, CA 94555


Ingram, Christopher
25816 Franklin Avenue
Hayward, CA 94544


Ingram, Plez
6400 MacArthur Blvd.
#1
Oakland, CA 94605


INLAND INDUSTRIAL TIRE INC.
30900 SAN ANTONIO STREET
HAYWARD, CA 94544


INLAND WATER, INC.
P. O. BOX 2925
DUBLIN, CA 94568


INSTRON CORPORATION
75 REMITTANCE DRIVE #6826
CHICAGO, IL 60675-6826

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346


INTERSTATE EXPRESS INC.
4632 WOODHAWK WAY
SACRAMENTO, CA 95843


Iraheta Alvarado, Gilberto
1701 Seminary Ave.
Oakland, CA 94621


ISAGANI ASUNCION
33721 3RD STREET
UNION CITY, CA 94587


Islas, David
4005 Gagos Dr.
Modesto, CA 95356


Islas, Manuel A.
4080 Santa Rita St.
Oakland, CA 94601


J & J PATTERN
418 MOUNTAIN VIEW AVENUE
SANTA ROSA, CA 95407


J.C. Production
1086 Martin Avenue
Santa Clara, CA 95050

J.K. ENTERPRISES
2031 PREISKER LANE #A
SANTA MARIA, CA 93454


J.S. & P.ENTERPRISES
14950 AVENIDA ANITA
CHINO HILLS, CA 91709


J.T. THORPE & SON, INC.
1060 HENSLEY STREET
RICHMOND, CA 94801


Jackson, Virgil
8642 Hillside Street
Oakland, CA 94605


Jauregui Garcia, Francisco
722 B Sreet Apt#6
Hayward, CA 94541


Jessica Lazarus
c/o 2604 Totana Court
San Ramon, CA 94583


Jesus Rodriguez
c/o William Hyndman, Esq.
24301 Southland Drive #420
Hayward, CA 94545


JIA H. CHEN
625 10 STREET #3
OAKLAND, CA 94607

Jimenez Barragan, Rigoberto
1314 100th Ave.
Oakland, CA 94603


Jimenez Bonilla, Juan Carlos
1015 15th St.
Richmond, CA 94801


Jimenez Guzman, Leopoldo
18950 Palton Dr.
Castro Valley, CA 94546


Jimenez, Dionel
5220 Fresno Ave.
Richmond, CA 94804


Jimenez, Guadalupe
23052 Hopper Rd.
Hayward, CA 94541


Jimenez, Ismael
9619 C St.
Oakland, CA 94621


Jimenez, Jose M.
230 Chesley Ave.
Richmond, CA 94801


Johnson, Alassandro Nehemiah
929 Filbert St.
Apt. 929
Oakland, CA 94612

Johnson-Edgley, Deandre
4321 Nelson Dr.
Richmond, CA 94803


Jones, Charles C.
433 Ranker Pl. #2
Hayward, CA 94544


Jones, Patrick
264 S. 46th St.
Richmond, CA 94804


Jose Alvarado
c/o Bridges Law Firm
2729 Mission Street #203
San Francisco, CA 94110


Jose Hernandez
c/o Edwin Bridges, Esq.
2729 Mission Street #203
San Francisco, CA 94110


Joshua Watkins
c/o Josh Watkins
The Arns Law Firm
515 Folsom 3rd Floor
San Francisco, CA 94105


JUAN HERNANDEZ
2143 PHEASANT DRIVE
HERCULES, CA 94547


Juan J. Ramirez Gonzalez
1935 18th Street
San Pablo, CA 94806

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 160 of
Case: 19-40057   Doc# 85   Filed: 09/10/20   Entered: 09/10/20 13:52:32   Page 160 of
699
232

160

Juan, Ulysses
2078 Lara Lane
Tracy, CA 95377


Juarez C, Santiago
9611 Walter Ave.
Oakland, CA 94603


Juszcze, Krysztof A
5114 Foothill Blvd.
Oakland, CA 94601


KACEE COMPANY
3570 HIAWATHA WAY
ANTELOPE, CA 95843


KBA DOCUSYS INC
32950 ALVARADO NILES ROAD #505
UNION CITY, CA 94587


Keels, Byron E.
3013 Roslyn Dr.
Modesto, CA 95355


KELLEY ANN BURG, ESQ.
P. O. BOX 70231
RICHMOND, CA 94807-0231


Kelsey Manufacturing
Attn: Shaun Kelsey, President
6 Cedar Lane
Lenox, MA 01240

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 161 of 699
Case: 19-41675   Doc# 5   Filed: 03/09/12   Entered: 03/09/12 13:52:19   Page 109 of 232

161

KENNIE C. KNOWLES INC
P.O. BOX 994732
REDDING, CA 96099-4732


Keys Sr., Darrell J.
30 Buss Ave.
Vallejo, CA 94590


Kiely, Ryan
2109 Wilbeam Ave.
#8
Castro Valley, CA 94546


King Jr., Calvin
4304 Ohio Ave.
Richmond, CA 94804


Knox, Vincent
6575 Cottonwood Cir. #A
Dublin, CA 94568


KOMATSU FORKLIFT LLC OAKLAND
PO BOX 742171
LOS ANGELES, CA 90074-2171


Kuo, Tung
2488 Harborview Dr.
San Leandro, CA 94577


L & D PRINTING INC.
45 HEGENBERGER PLACE
OAKLAND, CA 94621

```
LAB SAFETY SUPPLY
PO BOX 5004
JANESVILLE, WI 53547-5004


Lam, Stephen Shu
1531 Shattuck Ave.
Berkeley, CA 94709


Lankhamdaeng, Alounh
P.O. Box 824
Elcerrito, CA 94530


Lara Ceja, Alejandro
1322 Carlson Blvd
Richmond, CA 94806


Lara, Abel
160 18th St.
Richmond, CA 94801


Lara, Daniel
160 18th St.
Richmond, CA 94801


Lara, David A
3719 Penniman Ave.
Oakland, CA 94619


Larios, Miguel Angel
1249 95th Ave.
Oakland, CA 94603
```

Laurens, Jorge A
815 W. Sunset Blvd #C
Hayward, CA 94541


Lavallis, Timothy
1427 Campbell
Oakland, CA 94607


Lavanh, Von
5014 Creely Ave.
Richmond, CA 94804


Lavulo, Mohenoa
524 S. 29th Street
Richmond, CA 94804


LAW OFFICES  OF JOHN E. HILL
333 HEGENBERGER ROAD #500
OAKLAND, CA 94621


Law, David T.
3245 Arkansas St. #d
Oakland, CA 94602


Leal Diaz, Adrian
721 Shannon Dr.
Suisun, CA 94585


Leal Diaz, Gerardo
721 Shannon Dr.
Suisun, CA 94585

Lechuga, Cesar
17438 Via Segundo
San Lorenzo, CA 94580


LECO CORPORATION
3000 LAKEVIEW AVENUE
ST. JOSEPH, MI 49085-2396


Ledesma, Ericka C.
7070 Buckingham Blvd
Berkeley, CA 94705


Ledesma, Marc G.
33912 Capulet Circle
Fremont, CA 94555


Lemmons, Darien Mario
1807 Minnesota St.
Fairfield, CA 94533


Lemus, Antoni
1646 Rumrill Blvd #D
San Pablo, CA 94806


Leon, Alvaro
2190 Sanford Ave.
San Pablo, CA 94806


Leon, Jose Luis
1425 100 Th Ave.
Oakland, CA 94603

Leon-Esparza, Abraham
109 Chalet Way
Napa, CA 94558


Lewis, David Duane
201 Maine Street
G-9
Vallejo, CA 94590


Lewis, Joe
1177 Maple Ave.
Vallejo, CA 94594


Leyva Camacho, Cesar
1133 75th Ave.
Oakland, CA 94621


Li, Bang Yang
2338 M.L.K. Jr. Way
Berkeley, CA 94704


Li, Guo Guang
15081 Beatty St.
San Leandro, CA 94679


Li, Jianyang
1062 Potrero Ave.
San Francisco, CA 94110


Li, Ye Lian T
2338 M.L.K. Jr. Way
Berkeley, CA 94704

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 13:52:39   Page 166 of
Case: 19-41025   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 13:54:19   Page 166 of
699
232

166

Lieu, Cuong N
5928 E17th Street
Oakland, CA 94621


Ling, John
1034 Sandhurst Dr.
Vallejo, CA 94591


Liong, Kie Lien
778 Yuba Street
Richmond, CA 94805


Lobatos, Saul
2005 Burbeck Ave.
Richmond, CA 94801


Loconte, Michael J.
843 Arguello Drive
San Leandro, CA 94578


Loera, Antonio
1207 Granada St.
Vallejo, CA 94591


Loera, Miguel
2620 Hinkley Ave.
Richmond, CA 94804


Loggins, Laron Lee
1900 Ascot Way #616
Vallejo, CA 94591

Lomeli Barboza, Catalina
2451 Church Ln. #c
San Pablo, CA 94806


Lomeli, Catalina
2451 Church Ln. #C
San Pablo, CA 94806


Lomeli, Jose M.
748 Treasure Dr.
Bay Point, CA 94565


Look, Steven R
423 Dohrmann Ln
Pinole, CA 94564


Lopez Aguirre, Gilberto
2129 Seminary Ave.
Oakland, CA 94621


Lopez Carrillo, Audomar
1835 28th Ave.
Apt. 206
Oakland, CA 94601


Lopez Hernandez, Jesus
1086 Carlson Blvd
Richmond, CA 94804


Lopez Jr., Jaime
1648 Elm Ave.
Apt. 3
Modesto, CA 95358

Lopez Jr., Jaime
2912 Peachtree Dr.
Apt. 3
Stockton, CA 95203


Lopez Perez, Gabriel
100 Hunter Ave.
Oakland, CA 94603


Lopez Puertas, Mariano
14355 Elm St.
San Leandro, CA 94579


Lopez R, Luis Eduardo
1854 Truman St.
Richmond, CA 94801


Lopez Roten, Brittany Deann
745 26th St.
Oakland, CA 94612


Lopez, Audomar
2552 Foothill Blvd. #2E
Oakland, CA 94601


Lopez, Heriberto
1227 Filbert St.
Richmond, CA 94801


Lopez, Jessica
7439 Lockwood Street
Apt. 1
Oakland, CA 94621

Lopez, Jonathan
9940 D Street
Oakland, CA 94603


Lopez, Rafael
1118 Blake St.
Berkeley, CA 94702


Lopez, Refugio G.
533 S. 28th Street
Richmond, CA 94804


Lopez, Ricardo H.
7007 Arthur St.
Oakland, CA 94605


LORENZO HUERTA
560 105TH AVENUE
OAKLAND, CA 94603


Louang, Sonny
1529 Coalinga Avenue
Richmond, CA 94801


Lowe, Rico
301 South 9th Street
Richmond, CA 94801


Loza Garcia, Arturo
1923 Cardiff Dr.
Pittsburg, CA 94565

Loza Garcia, Arturo
5015 12th St.
Oakland, CA 94601


Lozano, Juan A
935 34th St.
Richmond, CA 94805


LUIS GALLEGOS
800 8TH STREET #C
RICHMOND, CA 94801


LUIS HERNANDEZ
774 PARADISE BLVD.
HAYWARD, CA 94541


Lupian, Sergio
2324 E19th St.
Apt. 1
Oakland, CA 94601


M. BRASHEM INC.
14023 NE 8TH STREET #C
BELLEVUE, WA 98036


MAC BEATH HARDWOOD COMPANY
2150 OAKDALE AVENUE
SAN FRANCISCO, CA 94124-1516


Machado Gonzalez, Jose J
8219 Holly St.
Oakland, CA 94621

Macias G., Maricela
1002 15th St.
Richmond, CA 94801


Macias Gonzalez, Teresa
1758 Esmons Ave.
Richmond, CA 94801


Macias Zamora, Guadalupe
13613 San Plabo Ave #93
San Pablo, CA 94806


Madera Sosa, Ricardo
2229 8th St. #B
Berkeley, CA 94710


Madrigal Hernandez, Jepthe
18547 Via Jose
San Lorenzo, CA 94580


Madrigal, Manuel
434 19th Street
Richmond, CA 94801


Madrueno, Felix
211 S 39th St.
Richmond, CA 94804


Maes, Gary
6118 International Blvd.
Oakland, CA 94621

Mafuahingano, Charles
523 S. 26th Street
Richmond, CA 94804


Mafuahingano, Pitasoni
9 Hahn St.
San Francisco, CA 94134


Magana, Juvenal
2132 Browning ST. #D
Berkeley, CA 94702


Magana, Laura L.
2451 Church Ln.
Sp# 117
San Pablo, CA 94806


Magdaleno Morales, Miguel
2635 Lancaster Dr.
San Pablo, CA 94806


Magdaleno Morales, Miguel
1509 Haye Street
Richmond, CA 94806


Magdaleno, Miguel A.
1509 Hayes St.
Richmond, CA 94804


Maldonado Aguilar, Prisciliano
633 16th St. #A
Richmond, CA 94801

Maldonado Chavez, Yuritzia Aide
248 S 7th Street
Richmond, CA 94804


Maldonado Chavez, Yuritzia Aide
633 16th St. Apt. A
Richmond, CA 94801


Maldonado Jr., Gustavo
1310 Hellings Ave.
Richmond, CA 94801


Maldonado, Antonio
1002 15th St.
Richmond, CA 94801


Maldonado, George P.
2792 Pineridge Rd.
Castro Valley, CA 94546


Maldonado, Gustavo
633 16th St. #A
Richmond, CA 94801


Maldonado, Juan
2620 Hinkley Ave.
Richmond, CA 94804


Maldonado, Maria T.
633 16th St. #A
Richmond, CA 94801

MALLORY SAFETY & SUPPLY LLC
PO BOX 2068
LONGVIEW, WA 98632


Mandujano, David
1454 36th Ave. #105
Oakland, CA 94601


Mannion, John Peter
222 Pacific Ave.
Alameda, CA 94501


MANUEL ISLAS
4080 SANTA RITA STREET
OAKLAND, CA 94601


Manzano Trujillo, Ricardo
25 Collins Ct.
Richmond, CA 94801


Manzo P, Jose H.
1722 27th Ave. #43
Oakland, CA 94601


Manzo Reyes, Jose Antonio
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Manzo Reyes, Roberto
33957 10th Street
Union City, CA 94587

Maravilla, Francisco
361 Lake Ave.
Rodeo, CA 94572

Maravilla, Jaime
1416 Alcatraz Ave.
Berkeley, CA 94702

MARC TERBEEK, ESQ.
2648 INTERNATIONAL BLVD. #115
OAKLAND, CA 94601-1569

Marcelin, Romel
5318 Wentworth Ave.
Oakland, CA 94601

Marchen, Jesus
1417 Pacific Ave. #5
`
San Leandro, CA 94577

MARCIAL GUERRERO
77 ESTABROOK STREET #321
SAN LEANDRO, CA 94577

Marcos Reyes
1016 Sheridan Street
Vallejo, CA 94590

MARCOS VILLANUEVA
4964 WESTWOOD WAY
ANTIOCH, CA 94531

MARCUS FAUNUI
916 7TH STREET
RICHMOND, CA 94801


Marin Bustamante, Clemente
2338 International Blvd #201
Oakland, CA 94601


Marin, Mateo
318 E Eaton Ave.
Tracy, CA 95376


MARIO MEDINA
165 DUTTON AVENUE
SAN LEANDRO, CA 94577


Mariscal, Emmanuel H
8847 Carnation Ln.
Gilroy, CA 95020


Marlin Leasing
300 Fellowship Road
Mount Laurel, NJ 08054


Marlin Leasing
300 Fellowship Rd.
Mount Laurel, NJ 08054


Marques, Jorge M
120 Stoakes Ave. #2
San Leandro, CA 94577

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 127 of
Case: 19-40057   Doc# 5   Filed: 03/01/19   Entered: 03/01/19 15:52:32   Page 125 of
232
699

177

Marquez, Eduardo
150 Madoline St. #D
Pittsburg, CA 94565


Marquez, Jose A
2205 Market Ave.
San Pablo, CA 94806


Marquez, Ricardo
2473 Kennedy Ave.
Union City, CA 94587


Marquez, Ricardo
37142 Dutra Way
Fremont, CA 94536


Marquez, Roberto
37142 Dutra Way
Fremont, CA 94536


Marrero Andujar, Jose
2370 Landcaster Dr.
#3
Richmond, CA 94806


Martin, John
15696 Cristwood Dr.
San Pablo, CA 94806


Martinez Cabrera, Ismael
881 9th St.
Richmond, CA 94801

Martinez Fernandez, Maria
2328 Rheem Ave.
Richmond, CA 94804


Martinez Pacheco, Jose
2715 Coolidge Ave.
Oakland, CA 94601


Martinez, Angel R.
1010 D Street
Union City, CA 94587


Martinez, Carlos
1964 21st Street
San Pablo, CA 94806


Martinez, Eduardo
209 Gannon Rd.
Oakland, CA 94603


Martinez, Juan
1716 40th Ave.
Oakland, CA 94601


Martinez, Juan Carlos
1964 21st St.
San Pablo, CA 94806


Martinez, Juan R.
1311 159th Ave. #304
San Leandro, CA 94578

Case: 19-04057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:49   Page 179 of
699
Case: 19-41675   Doc# 5   Filed: 09/19/19   Entered: 09/19/19 13:52:32   Page 177 of
232

179

```
Martinez, Luis
27648 Havana Ave.
Hayward, CA 94544


Martinez, Mario J.
1414 Pine Ave.
San Pablo, CA 94806


Martinez, Pedro
1528 Bush Ave.
San Pablo, CA 94806


Martinez, Peter B
1125 87th Ave.
Oakland, CA 94621


Martinez, Porfirio
1726 Magnolia Way
Antioch, CA 94509


Martinez-Fuentes, Jesus
611 Colorados Dr.
Oakland, CA 94603


MARVIN SAN JUAN
2039 SHEA DRIVE
PINOLE, CA 94564


Matagi, Dennis
506 Teasdale Pl.
Hayward, CA 94544
```

Matos, Luis M.
491 Vine Wood Dr.
Oakley, CA 94561


Matts, Robert D.
36 Hillcrest Ave.
Benicia, CA 94510


Matus, Harold
656 Foster Ct. #2
Hayward, CA 94544


Maxwell, Huey T
2915 Lone Tree Way
Antioch, CA 94509


MC KEOWN INTERNATIONAL, INC.
1106 SOUTH MAYS STREET #100
ROUND ROCK, TX 78664


MC MASTER CARR SUPPLY COMPANY
PO BOX 7690
CHICAGO, IL 60680-7690


McMILLAN DATA COMMUNICATIONS
1515 SOUTH VAN NESS AVENUE
SAN FRANCISCO, CA 94110


Mechanical Component Sales, Inc.
Attn: Steve Holzricher
561 North Wolfe Road
Wheeling, IL 60090-3027

Medina Pineda, Jorge
2756 Gamble Ct.
Hayward, CA 94542


Medina Ramos, Mario
165 Dutton Ave.
San Leandro, CA 94577


Medina S, Fernando
2140 Stone Ave. #17
San Pablo, CA 94806


Medina, Apolinar
1258 Marionola Way
Pinole, CA 94564


Medina, Lorenzo
2876 13th St.
San Pablo, CA 94806


Medina, Lorenzo
2876 13th Street
San Pablo, CA 94806


Medina, Luis
411 Hacienda Ave.
San Lorenzo, CA 94580


Medrano Muniz, Valentin
5233 Columbia Ave. #3
Richmond, CA 94804

Medrano, Cesar
1631 100th Ave.
Oakland, CA 94603


Medrano, Juan L.
9221 D Street
Oakland, CA 94603


Mejia Henriquez, Kevin
2548 Franklin Ave.
Union City, CA 94587


Mejia Olivera, Martin
2121 Sharon Way
Modesto, CA 95350


Mejia Soto, Emmanuel
2451 Church Lane #118
San Pablo, CA 94806


Mejia, Eduardo
609 Maud Ave.
San Leandro, CA 94577


Mejia, Leonides
2921 88th Ave.
Oakland, CA 94603


Melgar, Jesus A.
3719 Penniman Ave.
Oakland, CA 94619

Melgar, Jorge A.
655 3rd St/
Richmond, CA 94801


Melgar, Jose M
2531 26th Ave. #C
Oakland, CA 94601


Melgar, Marvin O
800 Chesley Ave.
Richmond, CA 94801


Melgoza, Ana L
319 Gramercy Pl.
Oakland, CA 94603


Melgoza, Antonio E
328 Stoneford Avenue
Oakland, CA 94603


Melgoza, Esteban
2100 High St.
Oakland, CA 94601


Melgoza, Joel
328 Stoneford Ave.
Oakland, CA 94603


MELROSE METAL PRODUCTS INC.
44533 SOUTH GRIMMER BLVD.
FREMONT, CA 94538

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 184 of
Case: 19-40575   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 15:52:19   Page 184 of
699
232

184

Membreno, Nefer E.
325 Lexington Ave.
San Leandro, CA 94577


Mendosa, Severo
7630 Lockwood St #8
Oakland, CA 94621


Mendoza A, Marcelino
1940 21st St.
San Pablo, CA 94806


Mendoza Barrera, Miguel A.
1940 21st St.
San Pablo, CA 94806


Mendoza Diaz, Raul
125 N. Claremont St
San Mateo, CA 94401


Mendoza Moreno, Juan Carlos
1751 Diane Ct.
#6
Concord, CA 94520


Mendoza Munoz, Daniel
1456 Cherry Street
Richmond, CA 94801


Mendoza N, Francisco R
125 N. Claremont St
San Mateo, CA 94401

Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 185 of
Case: 19-40457   Doc# 85   Filed: 03/09/21   Entered: 03/09/21 13:52:19   Page 185 of
699
232

185

Mendoza, Jose A.
2321 Clinton Ave.
Richmond, CA 94801


Mendoza, Jose Manuel
3 Gold Crest Ct.
Pittsburg, CA 94565


Mendoza, Lorenzo
2566 Camara Cir.
Apt. C
Concord, CA 94520


Mendoza-Garcia, Francisco
125 W. Claremont
San Mateo, CA 94401


Meza, Jimmy
21908 Victory Dr.
Hayward, CA 94549


Michaelis, Jason Alexander
3025 Ferndown Lane
Tracy, CA 95377


Michel-Rodriquez, Lev Y.
9903 Gibraltar Rd.
Oakland, CA 94603


Miguel Flores
c/o Law Offices of Edwing Bridges
2729 Mission Street
San Francisco, CA 94110

Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 186 of
Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 186 of
699
232

186

Miguel Loera
c/o Kelly Burg, Esq.
999 W. Cutting Blvd. #16
Richmond, CA 94804


MIGUEL N. JIMENEZ
699 LINDEN STREET APT. 2
DALY CITY, CA 94014


Miguel, Randy C
178 Spikerush Circle
American Canyon, CA 94503


MILLER & COMPANY
35239 EAGLE WAY
CHICAGO, IL 60678-1352


Miller, Clifford
136 Frisbie St.
Vallejo, CA 94590


Miramontes-Guevara, Enrique
1347 Battery St.
Richmond, CA 94801


Miranda-Sanchez, Jose A
56 Santa Clara Ave.
Oakland, CA 94610


Mireles, Jose G
1936 21st St.
San Pablo, CA 94806

Mireles, Jose I
2508 Maine Ave.
Richmond, CA 94804


Mitchell, Brittney
201 Maine St
Apt #g11
Vallejo, CA 94591


Mitchell, Richard G.
4505 McGlothen Way
Richmond, CA 94806


MOBILE FLEETCARE
P. O. BOX 7354
BERKELEY, CA 94707-0354


MODERN INSTRUMENT CO
(FORMERLY AMERICAN BURNERS)
PO BOX 5133
PLEASANTON, CA 94566-0633


Mohamed, Kamal
2740 Euclid Ave.
Richmond, CA 94804


Mohamed, Kamal
845 S 45th Street
Richmond, CA 94804


Moises Orellana
c/o The Nielsen Firm

Moleli, Moelala
1920 Ricky Ave.
Modesto, CA 95350


Molina Hernandez, Melvin
2645 Illinois St.
East Palo Alto, CA 94303


Montano, Anthony
794 Button Ave.
Apt. 26
Manteca, CA 95336


Montazem, Mehrdod
5324 Ridgeview Circle
Stockton, CA 95219


MONTEREY MECHANICAL
8275 SAN LEANDRO STREET
OAKLAND, CA 94621


Montero Salas, Salvador
877 Sybil Ave.
San Leandro, CA 94577


Montes De Oca Ruelas, Luis
600 Woodbury Place
Oakley, CA 94561


Montes De Oca, Antonio
1832 14 Street
San Pablo, CA 94806

Montes, Luis
3400 Richmond Pkway
San Pablo, CA 94806


Montgomery, Arlene M
385 Drouin Dr.
Rio Vista, CA 94571


Montoy Martinez, Edgar Adrian
610 19th St.
Richmond, CA 94801


Montoy, Edgar Adrian
610 19th St. #B
Richmond, CA 94801


Montoya Jr., Jaime
9302 Plymouth St.
Oakland, CA 94603


Montoya Jr., Manuel
319 Gramercy Pl.
Oakland, CA 94603


Montoya Vazquez, Francisco
1715 104 Ave.
Oakland, CA 94603


Montoya, Abel V
47 Via Linares
San Lorenzo, CA 94580

Montoya, Esequiel
9637 C St.
Oakland, CA 94603

Montoya, Francisco M
1715 104th Ave.
Oakland, CA 94603

Montoya, Jaime
9302 Plymouth St.
Oakland, CA 94603

Montoya, Juan
27770 La Porte Ave.
Hayward, CA 94545

Montoya, Juventino V
1723 88th Ave.
Oakland, CA 94621

Montoya, Margarito
9272 D Street
Oakland, CA 94603

Montoya, Mauricio
1725 96th Ave.
Oakland, CA 94603

Montoya-Cruz, Carlos
1842 Fruitvale Ave.
Oakland, CA 94601

Moore III, Jesse
7448 Lockwood St. #D
Oakland, CA 94621


Moore, Delano A.
6118 International
Blvd.
Oakland, CA 94621


Mora P, Osvaldo
4329 Wall Ave.
Richmond, CA 94804


Mora, Aaron
1643 88th Ave.
Oakland, CA 94621


Mora, Aldo
3112 Castilla Court
Modesto, CA 95355


Mora-Salazar, Cuauhtemoc  A.
1319 Sonoma Blvd. #6
Vallejo, CA 94590


Morales Aguilar, Mirna
2026 96th Ave.
Oakland, CA 94603


Morales Cruz, Jorge A
3830 International Blvd.
Oakland, CA 94601

Case: 19-40057   Doc# 85   Filed: 03/02/20   Entered: 03/02/20 13:52:19   Page 192 of
699
Case: 19-40057   Doc# 85   Filed: 03/02/20   Entered: 03/02/20 13:52:19   Page 192 of
232

**192**

Morales De Monico, Gloria L
2026 96th Ave.
Oakland, CA 94603


Morales G., Sergio
3478 Baumberg Ave.
Hayward, CA 94545


Morales Lopez, Saul E.
2129 Seminary Ave.
Oakland, CA 94621


Morales Maldonado, Alexis
1507 Folsom Ave.
San Pablo, CA 94806


Morales, Andres
2364 Downer Avenue
Richmond, CA 94804


Morales, Andres M
2373 Downer Ave.
Richmond, CA 94804


Morales, Christian
3478 Baumberg Ave.
Hayward, CA 94545


Morales, Richard
36 Grand Canyon Cir.
Oakley, CA 94561

Case: 19-40577   Doc# 85   Filed: 03/02/20   Entered: 03/02/20 13:54:49   Page 193 of 692

```
Morales, Roman
2364 Downer Avenue
Richmond, CA 94804


Morales, Roman
36 Grand Canyon Circ
Oakley, CA 94561


Morales-Mejia, Hector
555 32nd St.
Richmond, CA 94804


Moreno Pedroza, Ignacio
530 Porter St.
Vallejo, CA 94590


Moreno, Armando
1005 Delaware St.
Berkeley, CA 94710


Moreno, Guillermo
1035 Addison St.
Berkeley, CA 94710


Moreno, Jose Antonio
15747 Via Lunado
San Lorenzo, CA 94580


Moreno, Jose L
1941 Boca Raton St.
Hayward, CA 94545
```

```
Moreno, Jose L.
1234 Yellowhammer Dr.
Patterson, CA 95363


Moreno, Salvador
309 El Dorado Dr.
Pittsburg, CA 94565


Moreno, Salvador
27946 Pompano Ave.
Hayward, CA 94544


Moreno, Samuel A.
911a Virginia Street
Berkeley, CA 94710


Moss Jr., Cecil
P.O. Box 801
El Cerrito, CA 94530


Moss Jr., Cecil
23 Sheffield Ct.
San Pablo, CA 94806


MOTION INDUSTRIES INC
FILE 57463
LOS ANGELES, CA 90074-7463


Mottram, Michael W.
6377 Zulmida Ave.
Newark, CA 94560
```

MSC INDUSTRIAL SUPPLY
DEPT. CH 0075
PALANTINE, IL 60055-0075


Mujica C, J Concepcion
2341 Valley St. #7
Oakland, CA 94612


Munguia, Fernando
201 Grove Ave. #B
Richmond, CA 94801


Muniz Castellanos, Jose
4233 Center Ave.
Richmond, CA 94804


Munoz Flores, Jesus
1970 21st St.
San Pablo, CA 94806


Munoz Garcia, Ariel
2919 Lowell Ave.
San Pablo, CA 94804


Munoz Lamas, Henri A
23695 Nevada Rd.
Hayward, CA 94541


Munoz Lopez, Ronnier
820 9th St.
Richmond, CA 94801

Munoz, Efrain
1315 Filbert St.
Richmond, CA 94801


Munoz, Henry
23695 Nevada Rd.
Hayward, CA 94541


Munoz, Jaime
1643 81st Ave.
Oakland, CA 94621


Munoz, Javier
23695 Nevada Rd.
Hayward, CA 94547


Munoz, Juan Jose Perez
264 E 17th St.
Pittsburg, CA 94565


Munoz, Juventino
5731 E. 15th St.
Oakland, CA 94621


Munoz, Manuel
9814 Birch Street
Oakland, CA 94603


Munoz, Oscar
1911 15th St.
San Pablo, CA 94806

Munoz, Rena M.
1746 Gaynor Ave.
Richmond, CA 94801


Murillo Andrade, Edgar J.
5005 Wagon Wheel Way
Antioch, CA 94531


Murphy Jr., Willie P.
2700 Best Avenue
Oakland, CA 94610


MX INDUSTRIAL DISTRIBUTORS
181 RAILROAD DRIVE
IVYLAND, PA 18974


Najarro Renderos, Felix
1331 Pine Ave.
San Pablo, CA 94806


Najera Rivas, Jesus J
1524 40 Th Ave.
Oakland, CA 94601


Najera, Juan
2605 26th Ave. #A
Oakland, CA 94601


NATIONAL GRAPHITE & SUPPLY LLC
15 OFFICE PARK
SUITE 209A
BIRMINGHAM, AL 35223

Navarro Arias, Juan Carlos
3800 Carrington St.
Oakland, CA 94601


Navarro M, Pedro
9332 E. St
Oakland, CA 94605


Navarro Mendoza, Rafael
233 Willard Ave.
Richmond, CA 94801


Navarro, Benito
3800 Carrington St.
Oakland, CA 94601


Navarro, Cesar
3821 Clinton Ave.
Richmond, CA 94805


Navarro, Jesus Gonzalez
2443 77th Ave.
Oakland, CA 94605


Navarro, Jose
4534 Florida Ave. #1
Richmond, CA 94804


Navarro, Ruben
490 Estudillo Ave.
Apt. 5
San Leandro, CA 94577

Necker, Anthony
36627 Beutke Dr.
Newark, CA 94560


Nelum, Jumaane
93 Arlington Dr.
Pittsburg, CA 94565


Neri Jimenez, Miguel
699 Linden St.
Daly City, CA 94014


NERI SANCHEZ
9934 D STREET
OAKLAND, CA 94603


NEW PIG
ONE PARK AVENUE
TIPTON, PA 16684-0304


Newman, Dwayne Allen
762 Redhaven St.
Brentwood, CA 94513


NGEUN SIVILAY
2607 OHIO AVENUE, APT #C
RICHMOND, CA 94804


NH HICKS
2580 SIERRA SUNRISE TERRACE #230
CHICO, CA 95928

Nhingsavath, Phouthalong
319 Snipley Ave.
Daly City, CA 94015


NICOLAS BACA
1515 53RD AVENUE
OAKLAND, CA 94601


NINGBO DAMING PRECISION CASTING CO.
HEHUA BRIDGE INDUSTRIAL DISTRICT
YUNLONG TOWN YIN COUNTY
NINGBO P.R., CHINA 00031-5135


NINGBO LIONWAY INTL TRADING CO.LTD
21F BLDG 3 SHANGDONG INTL CENTER
NO 1926 CANGHAI ROAD
NINGBO P.R., CHINA 00031-5000


NINGBO WORLD-LINK INTERNATIONAL
CORPORATION LIMITED H.K.
Room L-1 Building Floor A-8
Ningbo
CHINA 31500


NIST
P. O. BOX 301505
LOS ANGELES, CA 90030-1505


Nivins, Mark H
1924 Church Lane
Apt. 222
San Pablo, CA 94806


NMHG Financial Services
P. O. Box 643749
Pittsburgh, PA 15264-3749

NORTH BAY CONTAINER
NBC TRANSPORTATION & WAREHOUSE
5901 SAN LEANDRO STREET
OAKLAND, CA 94621


NOVO SOLUTIONS
516 SOUTH INDEPENDENCE BLVD #205
VIRGINIA BEACH, VA 23452


Novoa, Miguel
26825 Colette St. #7
Hayward, CA 94544


NRC ENVIRONMENTAL SERVICES INC
P.O. BOX 749929
LOS ANGELES, CA 90074-9929


Nunes, David Brazil
2344 E. 15th St.
Oakland, CA 94601


NUTECH SYSTEMS
2976 IVANREST #200
GRANDVILLE, MI 49418


OAKLAND PALLET COMPANY INC
2500 GRANT AVENUE
SAN LORENZO, CA 94580


Obannon, Anthony B
P.O. Box 939
Suisun City, CA 94588

Ocampo Lopez, Martin
1629 Garvin Ave.
Richmond, CA 94801


Ochoa P, Everardo
2690 Parker Ave.
Oakland, CA 94605


Ochoa Rodriguez, Yesenia
21368 Oak Street
#5
Castro Valley, CA 94546


Ochoa Rosas, Vicente
347 Stoneford Ave.
Oakland, CA 94603


Ochoa, Antonio
1425 100th Ave.
Oakland, CA 94603


Ochoa, Antonio
347 Stoneford Ave.
Oakland, CA 94603


Ochoa, Salvador
812 E. 23rd Street
Oakland, CA 94606


OFFICE EQUIPMENT FINANCE SERVICES
P. O. BOX 790448
SAINT LOUIS, MO 63179-0448

OHIO BELTING & TRANSMISSION COMPANY
PO BOX 404
300 NORTH WESTWOOD AVENUE
TOLEDO, OH 43697


Ohyoung, Wade
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


OLD DOMINION FREIGHT LINE INC.
PO BOX 742296
LOS ANGELES, CA 90074-2296


Olmos Tarula, Guadalupe
1541 96th Ave.
Oakland, CA 94603


OMCO GROUP
445 MCKENZIE DRIVE
MUKWONAGO, WI 53149


OMNI LOGISTIC INC
15912 INTERNATIONAL PLAZA DRIVE
HOUSTON, TX 77032


ON-SITE HEALTH & SAFETY
520 6TH STREET
RODEO, CA 94572


OPTIMIZED PERFORMANCE TECHNOLOGY
7056 ARCHIBALD AVE
#102-455
CORONA, CA 92880

Orellana-Hernandez, Moises
2112 East St.
Tracy, CA 95376


Orozco, Michael
2421 Greenwood Dr.
San Pablo, CA 94806


Orozco, Tomas
697 Nevada Street
Oakland, CA 94603


Ortega Aguilar, Marvin
3735 Waller Ave.
Richmond, CA 94804


Ortega V., Martin Alberto
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Ortega, Francisco Ceja
1244 97th Ave.
Oakland, CA 94603


Ortega, Luis
314 105th Ave. #D
Oakland, CA 94603


Ortega, Phillip L
4254 Gibraltar Dr.
Fremont, CA 94536

Ortega, Rafael
5027 Clinton Ave.
Richmond, CA 94805


Ortiz  Jr, Jose
2508 Downer  Ave
Richmond, CA 94804


Ortiz Gonzalez, Jose L
1825 Fruitvale Ave
Apt 7
Oakland, CA 94601


Ortiz Munoz, Ramon
2645 Airport Way.
Manteca, CA 95337


Ortiz Rojas, Cesar Mauricio
340 Industrial Pwky #103C
Hayward, CA 94544


Ortiz Torres, Renato
1136 Dwight Way
Berkeley, CA 94702


Ortiz V, Maurilio
131 Robinson Ave.
Pittsburg, CA 94565


Ortiz, Jaime L.
6187 Castillon Dr.
Newark, CA 94560

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:39   Page 206 of
Case: 19-40057   Doc# 5   Filed: 03/19/19   Entered: 03/19/19 13:52:39   Page 206 of
699
232

206

Ortiz, Jeferson Andres
436 Ramos Ave.
Hayward, CA 94544


Ortiz, John
842 Stonewood Dr.
Brentwood, CA 94513


Ortiz, Jose
1610 Sanford Avenue
Apt. #2
San Pablo, CA 94806


Ortiz, Jose Luis
3802 Shasta Cir.
Pittsburg, CA 94565


Ortiz, Luis M.
29683 Dixon St. #4
Hayward, CA 94544


Osborne, Jonathan A
250 S 9th St.
Richmond, CA 94804


Osborne, Jonathan A
732 First St.
Rodeo, CA 94572


Osborne, Tyrone E.
765 Starfish Dr.
Vallejo, CA 94591

Osborne, Tyrone E.
501 Wellfleet Dr.
Vallejo, CA 94591


Osejo, Orlando
2555 International B
Apt. 320
Oakland, CA 94601


Osias, Rhay A.
29835 Clearbrook Cir
#26
Hayward, CA 94544


Osuna Avila, Enrique
1231 Elgis St.
San Leandro, CA 94578


OTTO H. ROSENTRETER CO.
13039 E. FLORENCE AVENUE
SANTA FE SPRINGS, CA 90670


OTTO SYSTEMS
12010 BLOOMFIELD AVENUE
SANTA FE SPRINGS, CA 90670


Ouka, Brian J
716 Greystone Dr.
Antioch, CA 94509


OXYLANCE INC.
P.O. BOX 310280
BIRMINGHAM, AL 35231

PACCAR INC.
P.O. BOX 95003
BELLEVUE, WA 98009


Pacheco Cabanas, Veronica
2829 Butters Dr.
Oakland, CA 94602


Pacheco Pardo, Adrian
2903 Nicol Ave.
Oakland, CA 94602


Pacheco Pardo, Adrian
24586 Sybil Ave. #2
Hayward, CA 94542


Pacheco Pardo, Samuel N.
3030 35th Ave. #11
Oakland, CA 94619


Pacheco, Nelson S.
2200 Standiford Ave. #135
Modesto, CA 95350


Pacheco, Ramon
9526 Sunnyside St.
Oakland, CA 94603


Pacheco, Raymond R
5519 Bordeaux Ct.
Vallejo, CA 94591

PACIFIC COAST CHEMICALS COMPANY
DEPT 34748
P.O. BOX 39000
SAN FRANCISCO, CA 94139


PACIFIC GAS AND ELECTRIC CO.
P. O. BOX 997300
SACRAMENTO, CA 95899-7300


PACIFIC MATERIAL HANDLING SOLUTIONS
3428 ARDEN ROAD
HAYWARD, CA 94545-3906


PACIFIC RIM SECURITY
3414 MORAGA BLVD.
LAFAYETTE, CA 94549


PACIFIC STATES PETROLEUM
P.O. BOX 2389
PLEASANT HILL, CA 94523


Padilla Maciel, Alfonso
1617 Pine Avenue
San Pablo, CA 94806


Padilla Saldana, Ernesto
1417 Pacific Ave.
Apt. 2
San Leandro, CA 94577


Padilla Saldana, Ernesto
1417 Pacific Ave. #25
San Leandro, CA 94577

Padilla Saldana, Juan
1417 Pacific Ave.
Apt. 2
San Leandro, CA 94577


Padilla, Jose M
121 Preda St. #1
San Leandro, CA 94577


Padilla, Juan D
1417 Pacific Ave. #25
San Leandro, CA 94577


Painter, Warren
1905 Blossom Dr.
Antioch, CA 94509


Pajarito, Cruz
1233 Plaza Ct.
Tracy, CA 95377


Pak, Henryk
274 Euclid Ave. # 12
Oakland, CA 94610


Palos Lopez, Pedro Gerardo
2005 Burbeck Ave.
Richmond, CA 94801


Pan, Baohua
452 41st Street
Richmond, CA 94805

PANGBORN CORPORATION
PO BOX 936006
ATLANTA, GA 31193-6006

Paniagua, Cayetano A.
13613 San Pablo Ave. Trailer #38
San Pablo, CA 94806

Panichelli, Mario
4541 Roebuck Way
Antioch, CA 94531

Pantoja Cruz, Jose
816 A Street
Hayward, CA 94541

Pantoja, Gerardo
1516 California Ave.
San Pablo, CA 94806

Paredes P, Ogilver
2364 21st St. #3
San Pablo, CA 94806

Paredes, Francisco
1641 Auseon Ave.
Oakland, CA 94621

Paredes-Rivera, Raul
860 Alta Loma Dr.
S San Francisco, CA 94080

Paredes-Rivera, Raul
1009 Bay View Farm R
# 115
Pinole, CA 94564


PARKER SERVICES, LLC
REMITTANCE PROCESSING 3X-3143
1800 NORTH POINT DRIVE
STEVENS POINT, WI 54481


Parks, Mathew
6950 Lancaster Rd.
Dublin, CA 94568


Parra, Eliseo
4080 Santa Rita St.
Oakland, CA 94601


Party Warehouse
1125 Park Street
Alameda, CA 94501


Patino, Jacob R
1514 Emerick Ave.
San Pablo, CA 94806


Patterson, Daniel John
2649 Alhambra Way
Pinole, CA 94564


Paz M, Jose
818 Bancroft Way #4
Berkeley, CA 94710

PEDRO G. VELAZQUEZ
2005 LINCOLN AVENUE
RICHMOND, CA 94801


Pedroza Vazquez, Carlos E
238 Beechnut Dr.
Hercules, CA 94547


Pedroza, Ignacio
19465 W. Grant Line
Tracy, CA 95391


Pedroza, Ricardo
1208 78th Ave.
Oakland, CA 94621


Pedroza, Sergio
1005 Delaware St.
Berkeley, CA 94710


Pena Jr., Jose
2828 11th Street
San Pablo, CA 94806


Pena Ramirez, Martha
P.O. Box 7614
Oakland, CA 94601


Pena, Edgar
1448 82nd Ave.
Oakland, CA 94621

Pena, Edgar
1448 82nd Ave.
Oakland, CA 94621


Pena, Jorge H.
2101 Road 20th #b
San Pablo, CA 94806


Peno, Ciro E
1962 83rd St.
Oakland, CA 94604


Pension Benefit Guaranty Corp.
c/o Israel Goldowitz, Esq. Chief Counsel
1200 K Street, NW, Suite 340
Washington, DC 20005-4026


Peon De Valle, Janice
608 20th Street
Richmond, CA 94801


Peon Del Valle, John M
608 20th St.
Richmond, CA 94801


Peondelvalle, Patrick J
730 Sandy Brook
Rodeo, CA 94752


Pepe, Emanuel F
2632 Dorset Lane
Tracy, CA 95377

Case: 19-40757   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:49   Page 165 of
232

Pepe, Frank
519 Chesterfield Dr.
Patterson, CA 95363


Perez  G., Jorge
5100 Kirk Ln #10
San Pablo, CA 94806


Perez Ramirez, Esteban
424 S. 38th St.
Richmond, CA 94804


Perez, Aurelio
8138 Dowling St.
Oakland, CA 94605


Perez, Carlos
1153 Rumrill Blvd.
San Pablo, CA 94806


Perez, Enrique
334 Caswell Ave
Oakland, CA 94603


Perez, Gerardo M.
500 E 12th St.
Pittsburg, CA 94565


Perez, Jose
1016 87th Ave.
Oakland, CA 94621

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 216 of
692
Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 216 of
692

216

Perez, Jose Alberto
1780 A Street
Castro Valley, CA 94546


Perez, Juan Piceno
447 Sycamore Ave.
Manteca, CA 95336


Perez-Diaz, Faustino
2810 Garden St.
Apt. C
Oakland, CA 94601


Perez-Lozano, Omar
34 Surfview Dr.
Baypoint, CA 94565


Petersen, Ross T.
598 Paradise Park
Santa Cruz, CA 95060


PETERSON
P.O. BOX 2218
SAN LEANDRO, CA 94577-0610


Phanissay, Jason
822 Chester St. #c
Oakland, CA 94607


Pheng, Thong
115 Secret Cove
Hercules, CA 94547

Philips, David
2463 Almaden Blvd.
Union City, CA 94587


Phy, Kolepa S
2839 Taraval
San Francisco, CA 94116


Piedra, Rodolfo
2030 22nd St. #4
San Pablo, CA 94806


Pimentel, Gustavo
1468 Grand Ave. #14
San Leandro, CA 94577


Pineda Landaverde, Jose
2649 Bartlett St.
Oakland, CA 94602


Pineda, Manuel B.
1648 15th Street
San Pablo, CA 94806


Pires, Delio F.
1175 D Street
Hayward, CA 94541


Pires, Jose F.
1175 D St.
Hayward, CA 94541

Pires, Michael C.
2146 Kelly St.
Hayward, CA 94541


Piza, Marvin
1534 4th Ave.
Apt. 1
Oakland, CA 94606


Pizano, Raul
21 16th St. #D
Richmond, CA 94801


PLASTIC FILM ENTERPRISE
1921 BELLAIRE AVENUE
ROYAL OAK, MI 48067


Polvi, David
6133 Forget Me Not
Livermore, CA 94551


POLY-TEK
POLYMETRIC TECHNOLOGY
1900 MARINA BLVD.
SAN LEANDRO, CA 94577


Ponce, Enrique
316 S. 9th St.
Richmond, CA 94804


Ponce, Jesus
1409 Dunn Ave.
Richmond, CA 94801

Ponce, Monica
P. O. Box 7614
Oakland, CA 94601


Pool, Ruben D.
557 20th St. #4
Richmond, CA 94801


Porrata, Jose R.
565 Rutgers Street
San Lorenzo, CA 94580


PORTER WARNER INDUSTRIES
PO BOX 2159
CHATTANOOGA, TN 37409


Prado Contreras, Francisco
248 E Third St.
Pittsburg, CA 94565


Prado, Francisco
248 E Third St.
Pittsburg, CA 94565


Prado, Jesus I
420 Phelan Ave.
Vallejo, CA 94590


Prado-Guerrero, Jaime
633 16th St.
Richmond, CA 94801

Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/20 13:52:42   Page 160 of 232
Case: 19-40057   Doc# 85   Filed: 03/09/20   Entered: 03/09/2013:52:42   Page 220 of 699

220

Prasad, Rawal J.
4351 Mowry Ave.
Fremont, CA 94538


PRAXAIR DISTRIBUTION INC
ATTENTION: RODRIGO ROSA
1950 LOVERIDGED ROAD
PITTSBURG, CA 94565


PRINCIPAL LIFE INSURANCE CO.
c/o HARVEST PROPERTIES, INC.
6475 CHRISTIE AVENUE, SUITE 550
Emeryville, CA 94608


Principal Life Insurance Co.
c/o Harvest Properties, Inc.
6475 Christie Ave., Suite 550
Emeryville, CA 94608


PRODUCTION PATTERN SHOP
4244 E. 12TH STREET
OAKLAND, CA 94601


PROFESSIONAL FINISHING
PO BOX 742038
LOS ANGELES, CA 90074-2038


PROMINENT SYSTEMS INC
13091 E. TEMPLE AVENUE
CITY OF INDUSTRY, CA 91741


Puertas, Rolando
14329 Elm Street
San Leandro, CA 94579

Pulido, Javier
28800 Venus St.
Hayward, CA 94544


PURCHASE POWER
P. O. BOX 371874
PITSSBURGH, PA 15250-7878


Pusi, Telley
1520 Harmon St.
Berkeley, CA 94703


PVT TRANSPORTATION INC
PO BOX 3010
ONTARIO, CA 91761


PYRO (FREIGHT)
2510 WOOD STREET
OAKLAND, CA 94607-1781


PYRO MINERALS
2510 WOOD STREET
OAKLAND, CA 94607


Q C SERVICES
23101 FOLEY STREET
HAYWARD, CA 94545


QC-NDT
1933 DAVIS STREET #206
SAN LEANDRO, CA 94577

Quach, Stanley
357 Somerset Rd.
Piedmont, CA 94611


QUALITY LIAISON SERVICES OF NO AMER
131 MAPLE ROW BLVD., # E-500
HENDERSONVILLE, TN 37075


QUALITY SCALES UNLIMITED
5401 BYRON HOT SPRINGS ROAD
BYRON, CA 94514


Quevedo, Noe
1709 89th Ave.
Oakland, CA 94621


Quijada, Jose E.
4311 Florida Ave.
Richmond, CA 94804


QUINCY COMPRESSOR LLC
DEPARTMENT LA 24110
PASADENA, CA 91185-4110


Quinn, Everett Lee
1591 Annie Way
Tracy, CA 95377


R&S ERECTION OF RICHMOND
P.O. BOX 6170
SAN PABLO, CA 94806

R+L CARRIERS INC
P.O. BOX 10020
PORT WILLIAM, OH 45164-2000


R.F. MACDONALD CO.
25920 EDEN LANDING ROAD
HAYWARD, CA 94545-3816


R.T. VANDERBILT
PO BOX 79399
CITY OF INDUSTRY, CA 91716-9399


RADLEY CORPORATION
23077 GREENFIELD ROAD
SOUTHFIELD, MI 48075


Ramirez Gonzalez, Juan J.
1935 18th Street
San Pablo, CA 94806


Ramirez Hernandez, Daniel
1452 65th Ave.
Oakland, CA 94608


Ramirez Montes, Alejandro
2364 21st St. #3
San Pablo, CA 94806


Ramirez Moreno, Hugo
353 40th St.
Richmond, CA 94805

Ramirez Obledo, Jose
8847 N. 37th Ave.
Phoenix, AZ 85051


Ramirez Robles, Raul
827 34th Ave. #C
Oakland, CA 94601


Ramirez Santiago, Ruben
2129 California Ave.
San Pablo, CA 94806


Ramirez Victorino, Jose Antonio
2220 89th Ave.
Oakland, CA 94605


Ramirez, Adrian
185 25th St.
Richmond, CA 94804


Ramirez, Adriana
1136 Alberdan Cir.
Pinole, CA 94564


Ramirez, Christian G
1566 33rd Ave.
Oakland, CA 94601


Ramirez, Douglas A
445 2nd St. #2
Richmond, CA 94801

Ramirez, Luis
338 S. 15th St.
Richmond, CA 94804


Ramirez, Manuel
270 Loveridge Cir.
Pittsburg, CA 94565


Ramirez, Ruben
P.O. Box 2381
Martinez, CA 94553


Ramirez-Gonzalez, Jose L.
1416 Oakmont Pl.
Pittsburg, CA 94565


Ramos Jr., Antonio G
403 Craven Ct.
Hayward, CA 94541


Ramos Jr., Antonio G
15181 Orion Rd.
San Leandro, CA 94579


Ramos, Antonio G.
15181 Orion Rd.
San Leandro, CA 94579


Ramos, Grace A
15776 Via Sonata
San Lorenzo, CA 94580

Ramos, Jorge
26030 Gading Rd.
Apt. 36
Hayward, CA 94544


Ramos, Michael
16166 Via Harriet
San Lorenzo, CA 94580


Ramos, Ramon
1419 Visalia Ave.
Richmond, CA 94801


Range, Jerone J.
3712 Redding St. #c
Oakland, CA 94619


RANSOME COMPANY
PO BOX 2177
SAN LEANDRO, CA 94577


Raygoza, Jorge M
2311 Cypress Ave.
San Pablo, CA 94806


Razo-Gomez, Maximiliano
243 Sherly Dr.
San Pablo, CA 94806


Real, Ricardo
4555 Thornton Ave.
Apt. 59
Fremont, CA 94536

RED WING SHOE STORE
12557 SAN PABLO AVENUE
RICHMOND, CA 94805-1405


RED-D-ARC INC/NESCO
635 GILMAN STREET
BERKELEY, CA 94710


REHAB WEST INC
277 RANCHEROS DRIVE
SUITE #190
SAN MARCOS, CA 92069-2976


Reliance Standard Life Ins. Co.
P. O. Box 82510
Lincoln, NE 68501-2510


Renteria Martinez, Rigoberto
1501 Purdue Ct.
Union City, CA 94587


Reta, David Salas
2648 Great Arbor Way
Union City, CA 94598


Reveles, Jose
531 El Paseo Drive
Oakland, CA 94603


Reyes Diaz, Pedro
1454 36th Ave. #205
Oakland, CA 94601

Reyes Murillo, Marcos
2375 Wendell Ave.
Richmond, CA 94804


Reyes Perez, Roxana A
2026 96th Ave.
Oakland, CA 94603


Reyes, Alberto
1232 E.12th St.
Oakland, CA 94606


Reyes, Angel
353 40th Street
Richmond, CA 94805


Reyes, Angel
353 40th Street
Richmond, CA 94805


Reyes, Efren
1524 Yuba Ave.
San Pablo, CA 94806


Reyes, Fidencio S
1394 Gilmore Dr.
San Leandro, CA 94577


Reyes, Juan N.
3246 Jeanette Cir.
Tracy, CA 95376

Reyes, Marcos
1016 Sheridan Street
Vallejo, CA 94590


Reyes, Victor
1825 Fruitvale Ave. #1
Oakland, CA 94601


Reyna Cruz, Jose L
5938 Bromley Ave.
Oakland, CA 94621


Reyna V., Roberto
550 20th St.
Richmond, CA 94801


Reynoso Marquez, Francisco
27702 Pompano Ave.
Hayward, CA 94544


Reynoso, Luis
2223 9th Street
Berkeley, CA 94710


RFC WIRELESS, INC.
2678 BISHOP DRIVE #110
SAN RAMON, CA 94583


Ricardo Giftgi
c/o Briles & Associates
505 N. Tustin Avenue #158
Santa Ana, CA 92705

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/2015:52:39   Page 230 of
Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:39   Page 230 of
699
232

230

Rich Lowe
c/o Levits Group
97 Plata Court
Novato, CA 94945


Richard A. Lapping, Esq.
Law Office of Richard A. Lapping
540 Pacific Avenue
San Francisco, CA 94133


Richard Mitchell
c/o Boxer & Gerson, LLP
300 Frank H Ogawa Plaza #500
Oakland, CA 94612


Rico, German
661 Nevada St.
Oakland, CA 94603


RIDGE CAST METALS CORP
1554 DOOLITTLE DRIVE
SAN LEANDRO, CA 94577


Riley, Keith Taylor
1971 Bridle Creek
Circle
Tracy, CA 95377


Rios Cruz, Hulber
1836 23rd Ave.
San Pablo, CA 94806


Rios, Eduardo
5233 Columbia Ave. #3
Richmond, CA 94804

Rivas-Gomez, Hugo
1106 86th Ave.
Oakland, CA 94621


Rivera, Andres
1251 Ashby Ave.
Berkeley, CA 94702


Rivera, Arnulfo
1521 15th St.
San Pablo, CA 94806


Rivera, Jose B
2208 Emeric Ave.
San Pablo, CA 94806


Rivera, Juan A.
199 Lynn Dr.
Brentwood, CA 94513


Rivera, Martin
335 Duboce Ave.
Richmond, CA 94801


Rivera, Vicky S
228 21st Street
Richmond, CA 94801


Roa, Eddy
4541 Roebuck Way
Antioch, CA 94531

Robertson, Michael J.
7515 International
Blvd.
Oakland, CA 94621


Robinson, Philipdaniel
39486 Sutter Dr.
Fremont, CA 94538


Rodiles, Jose Orlando
1024 Road 20
San Pablo, CA 94806


Rodrigues, Marco P
1739 Maubert Ct.
Apt. #b
San Leandro, CA 94578


Rodriguez Camacho, Armando
1945 Pine St.
San Pablo, CA 94806


Rodriguez Camacho, Armando
2451 Church Ln.
Sp. 96
San Pablo, CA 94806


Rodriguez Mena, Roberto
1220 E Victoria Ct
San Pablo, CA 94806


Rodriguez Mena, Roberto
536 19th Street
Richmond, CA 94801

Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:49   Page 233 of
692
Case: 19-40457   Doc# 85   Filed: 09/09/20   Entered: 09/09/20 13:54:19   Page 233 of
692

233

Rodriguez Morales, Marlon H.
2129 California Ave.
San Pablo, CA 94806


Rodriguez Moreno, Ignacio
1418 Alcatraz Ave.
Berkeley, CA 94702


Rodriguez Yanez, Cristobal
128 Carolyn Drive
Pittsburg, CA 94565


Rodriguez Zamora, Julio
1001 73rd Ave.
Oakland, CA 94621


Rodriguez, Abel
2855 E. 10th Street
Oakland, CA 94601


Rodriguez, Alejandro
210 Barrett Ave. #1
Richmond, CA 94801


Rodriguez, Gabriel
2367 Dover Ave.
San Pablo, CA 94806


Rodriguez, Hernan
618 Elmhurst Ave.
Oakland, CA 94603

Case: 19-40757   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 234 of
699
Case: 19-40757   Doc# 85   Filed: 03/09/21   Entered: 03/09/21 13:52:19   Page 234 of
699

234

Rodriguez, Israel
2765 Pleasant Street
Apt. 2
Oakland, CA 94602


Rodriguez, Jesus
2127 California Ave.
San Pablo, CA 94806


Rodriguez, Jose L.
1737 Via Lacqua
San Lorenzo, CA 94580


Rodriguez, Jose R
472 Michel Dr.
San Pablo, CA 94806


Rodriguez, Luis  A.
24930 Thomas Ave.
Hayward, CA 94544


Rodriguez, Miguel A.
1331 Cherry St.
Richmond, CA 94801


Rodriguez, Nicolas
618 S. Elmhurst Ave.
Oakland, CA 94603


Rodriguez, Paola P.
1331 Cherry Street
Richmond, CA 94801

Rodriguez, Roberto A
945 Allston Way
Berkeley, CA 94710

Rodriguez, Santiago
1309 52nd Ave.
Oakland, CA 94601

Rodriguez, Thomas S.
5318 Market St.
Emeryville, CA 94608

Rodriguez-Berrios, Mario
3400 Richmond Pkway
San Pablo, CA 94806

Rodriquez, Roberto
2127 California Ave.
San Pablo, CA 94806

Rojas Marroquin, Otman
17029 Melody Way
Hayward, CA 94847

Rojas Marroquin, Otman
4013 Loch Ln.
San Leandro, CA 94578

Rojas, Ernesto
1262 Ocen Ave.
Emeryville, CA 94608

Rojas, Jose
1621 Espanillo Ct.
San Pablo, CA 94806


Rojo Cortez, Jose Luis
109 William Way
Pittsburg, CA 94565


Rojo Peredo, Juan
109 William Way
Pittsburg, CA 94565


Rojo, Jose G
16 Willian Way
Pittsburg, CA 94565


Roman, Jeronimo
1826 39th Ave.
Oakland, CA 94601


Romero Vargas, Hector
P.O.Box 43661
Oakland, CA 94624


Romero Zurita, Juan C
1606 Sanford Ave.
San Pablo, CA 94806


Romero, David
20 Bonnie Dr.
San Pablo, CA 94806

Romero, Jimmy Ray
4920 Hilltop Dr.
El Sobrante, CA 94803


Romero, Jose Luis
2035 22nd Street
#4
San Pablo, CA 94806


Romo Diaz, Salvador
12137 Hare Lock St.
Culver City, CA 90230


Romo Martin, Araceli
228 South 8 St.
Richmond, CA 94804


Romo Penaloza, Jose
2166 48th Ave
Oakland, CA 94601


Romo, Alberto
10 Adobe Dr.
Concord, CA 94520


Romo, Hector
339 Lester Ave. #6
Oakland, CA 94606


Rosas, Omar D.
401 Evelyn Ave. #22
Albany, CA 94706

Rosen, John David
P.O. Box 1445
Alameda, CA 94501


ROTO MANUFACTURING
326 N STREET
P.O. BOX 1109
FRESNO, CA 93714-1109


ROYAL WHOLESALE ELECTRIC
P.O.BOX 14004
ORANGE, CA 92863


ROYCE DIGITAL SYSTEMS, INC.
2552 WHITE ROAD
IRVINE, CA 92614


Roytfeld, Mark
3768 Harrison St.
Apt. 302
Oakland, CA 94611


Roytfeld, Rita
3768 Harrison Street
#302
Oakland, CA 94611


Rubalcava, Frank
2081 West La Loma Dr
#108
Rancho Cordova, CA 95670


Rubalcava, Frank
10374 Mills Tower Dr
Rancho Cordova, CA 95670

Rubio N, Martin
508 Mayfair Ave.
Apt. #3
S. San Francisco, CA 94080


Rubio, Mario
25 Kingswood Pl.
Pittsburg, CA 94565


Rubio, Norberto
1615 Oriole Ave. #b
San Leandro, CA 94578


Ruelas Hernandez, Miguel A
453 19th St. Apt. #8
Richmond, CA 94801


Ruelas, Miguel Angel
453 19th St. #8
Richmond, CA 94801


Ruiz A., Pedro
9115 Empire Rd.
Oakland, CA 94603


Ruiz Munoz, Salvador Jair
1976 Powell St. #4
`San Pablo, CA 94806


Ruiz, Juan
1518 Sanfor Ave.
San Pablo, CA 94806

Ruiz, Sergio
369 Garcia Ave.
San Leandro, CA 94577


Ruiz-M, Mario
1976 Powel St.
San Pablo, CA 94806


Ruiz-Rivera, Juan
686 4th Street
Richmond, CA 94801


Ruvalcaba, Marco A
895 Coral Dr.
Rodeo, CA 94572


S.L. FUSCO INC.
P.O. BOX 5924
COMPTON, CA 90224


SA RECYCLING
FILE 51063
LOS ANGELES, CA 90074-1063


Sadler, Gregory
112 Oro Ct.
Vallejo, CA 94591


Sae Yang, Chan Khoun
1965 17th St.
San Pablo, CA 94806

Saechao, Chan Cheng
2433 Market Ave.
San Pablo, CA 94806


Saechao, Cheng Chieng
5135 Brookfield Ct.
Fairfield, CA 94534


Saechao, Cheng Choy
2831 Wendell Ave.
Richmond, CA 94804


Saechao, Kao Meuy
551 Vallejo Ave.
Rodeo, CA 94572


Saechao, Kow Nai
1193 Alberden Cir.
Pinole, CA 94564


Saechao, San
324 Hearher Dr.
San Pablo, CA 94806


Saechao, San Vang
1618 San Bruno Stree
Fairfield, CA 94533


Saechao, San Vang
324 Heather Dr.
San Pablo, CA 94806

Saefong, Sawang
2919 Humphrey Ave.
Richmond, CA 94804


Saelee, Lai T.
3910 Loma Vista Ave.
Oakland, CA 94619


Saelee, Sun Fou
2892 15th Street
San Pablo, CA 94806


Saelee, Yanchoy
118 Warwick Dr.
Apt. 44
Benicia, CA 94510


Saenz, Jose G.
1205 Virginia Ave.
Richmond, CA 94804


Saephanh, Fahm K
907 Sandy Core Dr.
Rodeo, CA 94572


Saephanh, Kao C.
1517 Beau Rivage
San Pablo, CA 94806


Saeteurn, Meuy C.
3169 Davis Street
Oakland, CA 94601

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 243 of 699

Saeyang, Nai Fong
230 Malcolm Dr.
Richmond, CA 94801


Saeyang, Nai Fong
4316 McGlothen Way
Richmond, CA 94806


Saffold, Robert
6118 International Blvd.
Oakland, CA 94621


SAIA MOTOR FREIGHT LINE, INC.
P. O. BOX 100816
PASADENA, CA 91189-0816


Salas, Alejandro
25891 Gading Rd.
#3
Hayward, CA 94544


Salas, Arjenis A
926 69th Ave.
Oakland, CA 94621


Salazar Siordia, Salvador
387 Laurel Ave. #8
Hayward, CA 94541


Salazar, Nicolas
1520 Valle Vista
Vallejo, CA 94589

Salgado, Juan Luis
2205 E. 22nd St.
Oakland, CA 94606


Salvador, Agustin B.
1330 Birmingham Dr.
San Pablo, CA 94806


Salvador, Agustin B.
2108 Dublin Dr.
San Pablo, CA 94806


Salvador, Eugene A
641 13th St.
Richmond, CA 94801


San Juan, Marvin
2039 Shea Dr.
Pinole, CA 94564


SAN PABLO AUTOMOTIVE
P. O. BOX 1709
MARTINEZ, CA 94553


Sanchez Lopez, Juan M.
27443 Tyrrell Ave. #3
Hayward, CA 94544


Sanchez Resendiz, Samuel
668 3rd St.
Richmond, CA 94801

Sanchez, Alejandro
1011 104th Ave.
Oakland, CA 94603


Sanchez, Antonio
1010 Allston Way
Berkeley, CA 94710


Sanchez, Arturo
2127 Barratt Ave.
Richmond, CA 94801


Sanchez, Bladimir
2262 Regent Way #2
Castro Valley, CA 94546


Sanchez, Eduardo
1535 Valley St.
San Leandro, CA 94577


Sanchez, Fernando M.
8721 D Street
Oakland, CA 94621


Sanchez, Henry J.
1105 Tern Way
Patterson, CA 95363


Sanchez, Ignacio
2425 Church Ln. Spc. 29
San Pablo, CA 94806

Sanchez, Neri A.
9934 D Street
Oakland, CA 94603


SANDERSON SAFETY SUPPLY COMPANY
1101 S.E. THIRD AVENUE
PORTLAND, OR 97214


Sandoval Jr., Ernesto
1032 McKeever Ave.
Hayward, CA 94541


Sandoval, Eduardo
1763 Auseon Ave.
Oakland, CA 94621


Santana, Arturo
2140 California Ave.
Apt. 4
San Pablo, CA 94806


Santana, Jose
1245 11th Ave.
Oakland, CA 94601


Santibanez, Eusebio
857 Alvarado St.
San Leandro, CA 94577


Santibanez, Eusebio
7652 Lisa Way
Sacramento, CA 95832

Santoyo, Manuel
1657 15th Street
San Pablo, CA 94806


Saucedo, Esteban
256 Alamo St.
Richmond, CA 94801


Saucedo, Jose
1306 Pine Ave.
San Pablo, CA 94806


Sayavong, Connie B
860 Fulton Way
El Sobrante, CA 94803


Schlect Genberg, Melissa M
41797 Sherwood Ave.
Fremont, CA 94538


Schroeder, Efrain
1352 Filbert St.
Richmond, CA 94801


Scott, Barry John
4671 Twin Oaks Ct.
Tracy, CA 95377


Seal, Rodney E.
1460 167th Ave.
San Leandro, CA 94578

Sebastian, Gary
46 Springs Road
Vallejo, CA 94590


Sebastian, Wilfred E
119 Ken Ct.
Vallejo, CA 94591


Sebastian, Wilfred E
918 Sacramento St.
Vallejo, CA 94590


Segundo, Diego A.
945 Kearny St. #5
El Cerrito, CA 94530


Segundo, Juan
945 Kearney Street
#5
El Cerrito, CA 94530


Segura, German Arellano
502 Clayton Ave.
El Cerrito, CA 94530


Sencion, Miguel A.
1717 Seminary Ave.
Oakland, CA 94621


SENTRY INSURANCE
1800 NORTH POINT DRIVE
P. O. BOX 88372
MILWAUKEE, WI 53288-0372

Sermeno, Miguel A.
3766 Patterson Ave.
Oakland, CA 94619


Serrano Vasquez, Oscar H
2339 8th St. #B
Berkeley, CA 94710


Servin, Luis
2355 Lincoln Ave.
Richmond, CA 94804


SERVMAX
11391 SORENTO VALLEY ROAD
SAN DIEGO, CA 92121


SHANAFELT MANUFACTURING COMPANY
P. O. BOX 7040
2633 WINFIELD WAY NE
CANTON, OH 44705


SHAPE PRODUCTS
1127-57TH AVENUE
OAKLAND, CA 94621


SHARP ELECTRONICS CORPORATION
DBA SHARP BUSINESS SYSTEM
DEPT. LA 21510
PASADENA, CA 91185-1510


Sharp, Andrew
824 7th St.
Rodeo, CA 94572

Shergill, Sargun
2522 Ridge Rd.
San Pablo, CA 94806


Shuaibu, Shaba  H.
2002 E 22nd Street
Apt # B
Oakland, CA 94606


SICHUAN Y&J INDUSTRIES CO. LTD
5TH FLOOR KEJIAN BUILDING NO. 10
JIUXING AVENUE
CHENGDU SICHUAN 610041


Silafau, Gideon
4470 Madrid Ct.
Union City, CA 94578


Siliezar, Genaro De Jesus
5231 Belvedere St.
Oakland, CA 94601


Siller, Trevas Ladell
5314 Cypress Ave
El Cerrito, CA 94530


SILMAN CONSTRUCTION
P. O. BOX 1177
DANVILLE, CA 94526


Silva Herrera, Jose
3537 Leafwood Cir.
Antioch, CA 94531

Silva Loera, Manuel
2451 Church Lane
Apt. 96
San Pablo, CA 94806


Silva, Francisco M
1008 Miner Ave.
San Pablo, CA 94806


Silva, Joseph
2839 Sydney Way
Castro Valley, CA 94546


Silva, Manuel
2451 Church Ln. #96
San Pablo, CA 94806


Silva, Mark
400 Davis St. #311
San Leandro, CA 94577


Silva, Paul Tony
1560 Sayre St.
San Leandro, CA 94579


Silva, Ramon
3129 Hemlock St.
Antioch, CA 94509


Silva, Tony R.
6362 Ebensburg Lane
Dublin, CA 94568

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 252 of
Case: 19-40575   Doc# 85   Filed: 09/10/12   Entered: 09/10/12 13:52:19   Page 200 of
699
232

252

Silveira, Antonio F.
1147 Mersey Ave.
San Leandro, CA 94579


Silveira, Jason M
1812 Washington Ave.
Apt. 212
San Leandro, CA 94577


Silveira, Jason M
1812 Washington Ave. #212
San Leandro, CA 94577


Simas, Robert M.
708 Buriat St.
San Leandro, CA 94577


SIMPSON TECHNOLOGIES CORPORATION
39618 TREASURY CENTER
CHICAGO, IL 60694-9600


Singh, Sujit
1311 Liberty St. #F
El Cerrito, CA 94530


Sithideth, Bounlouam
1989 21st Street
San Pablo, CA 94806


Sivilay, Ngeun
175 Coalinga
Richmond, CA 94801

Sivilay, Ngeun
2607 Ohio Ave.
C
Richmond, CA 94804


SKASOL, INC.
1696 WEST GRAND AVENUE
OAKLAND, CA 94607-1607


Skeen, Steven E
1355 Mt Pisgah Rd
Apt 24
Walnut Creek, CA 94596


Smirni, Karl
512 Hayes Street
Richmond, CA 94804


Smith Jr., Sedrick C.
3813 Barrett Ave.
Richmond, CA 94805


SMITH PACIFIC STEEL CO., INC.
P. O. BOX 2628
SAN RAFAEL, CA 94912


Smith, Francois
4809 Bridle Ct.
Antioch, CA 94531


Smith, Ivan H.
1108 Brookside Ave.
Richmond, CA 94805

Smith, Ramon R.
1741 Pheasant Dr.
Hercules, CA 94547


Smith, Sedrick
3916 McGlothen Way
Richmond, CA 94806


Smith, Stanley G.
1108 Brookside Ave.
Richmond, CA 94805


Smith, Zachariah
1607 Beechwood Dr.
Martinez, CA 94553


SNOW AND GALGIANI COMPANY
380 SWIFT AVENUE UNIT 14
SOUTH SAN FRANCISCO, CA 94080


Soares Da Silva, Edilberto
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Soares, Bento G.
18001 Columbia Drive
Castro Valley, CA 94546


Solano, Delfino
936 37th Ave.
Oakland, CA 94601

Solis, Jose Luis
1150 Brookside Dr. #709
San Pablo, CA 94806


Solorio  Ortiz, Efrain
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Somchith, Keurt
2370 Market Avenue
#2
San Pablo, CA 94806


Soria Rosales, Sergio
2205 Arbol Ct.
Antioch, CA 94509


Soria, Salvador
37073 Magnolia St.
Apt. 108
Newark, CA 94560


Soriano Hernandez, Ulises
12732 San Pablo Ave.
Richmond, CA 94801


Sosa, Stephen
6606 Blake St.
El Cerrito, CA 94530


Soto Moreno, Joel
346 38th St.
Richmond, CA 94805

Souksamphanh, Kheun
3238 Ramona St.
Pinole, CA 94564


Sousa, Joe G.
1292 Gilmore Dr.
San Leandro, CA 94577


SPRINT PCS
P. O. BOX 4181
CAROL STREAM, IL 60197-4181


SPX FLOW TECHNOLOGY - LIGHNIN
C/O MILTON S FRANK CO.
180 A MASON CIRCLE
CONCORD, CA 94520


St. Andrew, David F.
33 Erin Lane
Half Moon Bay, CA 94019


St. John Associates
Attn: Jay St. John, Owner
P. O. Box 323
Diablo, CA 94528


Standafer, David C
737 Seville Lane
Vacaville, CA 95688


STANDARD IRON & METAL CO.
4525 SAN LEANDRO STREET
OAKLAND, CA 94601

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 257 of 699

STAPLES BUSINESS ADVANTAGE
DEPT LA 1368
PO BOX 83689
CHICAGO, IL 60696


State Board of Equalization
P. O. Box 942879
Sacramento, CA 94279-0001


STEEL BUILDING CONST. & SERV CO.
183 CALLE LA MESA
MORAGA, CA 94556


STEEL FOUNDERS SOCIETY OF AMERICA
780 McARDLE DRIVE, UNIT G
CRYSTAL LAKE, IL 60014


Stevens, David A.
2527 Kenney Dr.
San Pablo, CA 94806


STEWART TOOL CO. INC.
3647 OMEC CIRCLE
RANCHO CORDOVA, CA 95742


STREATOR DEPENDABLE MFG
17005 N. SHABBONA STREET
STREATOR, IL 61364


Stuart, Carter  James
5290 Blanca Way
Livermore, CA 94550

Case: 19-40057   Doc# 85   Filed: 03/02/20   Entered: 03/02/2015 52:49   Page 258 of
Case: 19-40575   Doc# 5   Filed: 03/02/20   Entered: 03/02/14 13:52:49   Page 258 of
692

258

```
Suares, Fortino J.
2584 61st Ave.
Oakland, CA 94605


Suarez, Salvador
1770 Birchwood Ln.
Tracy, CA 94376


Sumpter, Teryeon
106 Palomer Ln.
Vallejo, CA 94591


Tadeo, Tereso F
2987 Higuera Ave.
Pinole, CA 94564


Tam, Wing Tim
761 S 49th St.
Richmond, CA 94804


Tamayo, Jose Q.
617 Donna Mae Ct.
El Sobrante, CA 94803


Tamez, Mario
2929 Foothill Blvd.
Oakland, CA 94601


Tang, Desmond C.
1531 Shattuck Ave.
#303
Berkeley, CA 94709
```

Tanuwijaya, Kelvin
1925 Santiago St.
San Francisco, CA 94116


Tapia, Ivan E.
2613 Sage Ct.
Antioch, CA 94531


Tapia, Ruben D.
2435 Hilgard Ave.
Apt. 8
Berkeley, CA 94709


Tapia, Ruben D.
2613 Sage Ct.
Antioch, CA 94531


Tavira Morales, Rivelino
148 Saturn Ave.
Hayward, CA 94544


Taylor, Fredrick H.
2993 Deseret Dr.
Richmond, CA 94803


TECHNICAL EQUIPMENT SALES COMPANY
3309 GREEN PARK CIRCLE
CHARLOTTE, NC 28217


TECHORDIA
875-A ISLAND DRIVE, SUITE 239
ALAMEDA, CA 94502

TED L. RAUSCH CO.
P.O. BOX 1397
BURLINGAME, CA 94011


Teitgen, Stephen K
1859 Canyon Dr.
Pinole, CA 94564


Teixeira, Albano P.
1261 Belleau Street
San Leandro, CA 94579


Tellez Garcia, Jorge
2313 9st. #1
Berkeley, CA 94710


TENNANT SALES AND SERVICE COMPANY
PO BOX 71414
CHICAGO, IL 60694-1414


TERMINAL MANUFACTURING CO LLC
707 GILMAN STREET
BERKELEY, CA 94710


Terriquez-Hernandez, Dagoberto
1125 73rd Ave.
Oakland, CA 94621


THE AVOGADRO GROP, LLC
2825 VERNE ROBERTS CIRCLE
ANTIOCH, CA 94509

Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 261 of 699
Case: 19-40457   Doc# 85   Filed: 03/19/19   Entered: 03/19/19 13:52:19   Page 209 of 232

261

THE BOBCOCK & WILCOX COMPANY
POWER GENERATION GROUP, INC.
4400 COLLEGE BLVD.
OVERLAND PARK, KS 66211


Thirumudi, Yadhupirithivi
1620 Summer Lane
Richmond, CA 94806


Thomas Bock
Hagenmarkt 4a
Peine
D-31224
GERMANY


Thomas, Jamaal
2907 76th Ave.
Oakland, CA 94605


Thomas, Leduane
2479 Aberdeen Wy #13
Richmond, CA 94806


Thomas, Manuel
2301 17th St.
San Pablo, CA 94806-2909


THOMPSON CREEK METALS COMPANY
P.O. BOX 674080
DALLAS, TX 75267-4080


Thompson, Tyree Odell
650 15th St.
Oakland, CA 94612

```
Thornton, Morgan
1232 98th Ave.
Oakland, CA 94602



Thornton, Morgan
2815 Filbert St.
Oakland, CA 94608



Thulasiraman, Thirumudi
3406 Manchester Cmn
Fremont, CA 94536



Timmons, Michael N
P.O. Box 4685
Oakland, CA 94605



TIMOTHY P. RUMBERGER, ESQ.
LAW OFFICES OF TIMOTHY P. RUMBREGER
1339 BAY STREET
ALAMEDA, CA 94501



Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
1339 Bay Street
Alameda, CA 94501



TJM INSPECTION SERVICE
P. O. BOX 12105
PLEASANTON, CA 94588-9991



Tobar Tobar, Pedro
1759 Rheem Ave.
Richmond, CA 94801
```

Todd Dressell, Esq.
Chapman and Cutler LLP
595 Market Street, 26th Floor
San Francisco, CA 94105-2839


Toledo Valencia, Omar
9900 Elmo Dr.
Oakland, CA 94603


Toledo, Jose O.
1417 Pacific Ave. #1
San Leandro, CA 94577


Tomas, Mario Jorge
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


TOMS BARREL COMPANY
638 FRANKLIN LANE
EL SOBRANTE, CA 94803


Torres Ochoa, Christopher
2935 Monte Diablo #4
Stockton, CA 95203


Torres Ochoa, Christopher
2337 38th Ave.
Oakland, CA 94601


Torres, Alfredo Joel
2708 Oasis Ave.
Ceres, CA 95307

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:42   Page 264 of
Case: 19-40057   Doc# 85   Filed: 09/19/19   Entered: 09/19/19 13:52:42   Page 264 of
699
692

264

Torres, Francisco
1390 64th Ave.
Oakland, CA 94621


Torres, Ignacio
2623 Shamrock Drive
San Pablo, CA 94806


Torres, Jonathan
16049 Via Media
San Lorenzo, CA 94580


Torres, Jose Luis
230 Chesley Ave.
Richmond, CA 94801


Torres, Juan
2313 9th St. #2
Berkeley, CA 94710


Torres, Rafael
701 S. Elmhurst Ave.
Oakland, CA 94603


Torres, Victor
1436 Francis Rd.
San Pablo, CA 94806


Toya, Clarence
1511 Mono Ave.
#1
San Leandro, CA 94578

Case: 19-40457   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:54:19   Page 265 of 699

TOYOTA MATERIAL HANDLING
PO BOX 45333
SAN FRANCISCO, CA 94145-0333


TOYOTA MOTOR CREDIT CORP
COMMERCIAL FINANCE
DEPT 2431
CAROL STREAM, IL 60132-2431


Toyota Motor Credit Corporation
P. O. Box 2431
CAROL STREAM, IL 60132-2431


TRACY D. BRILES, ESQ.
LAW OFFICES OF BRILES & ASSOCIATES
505 N. TUSTIN AVENUE #150
SANTA ANA, CA 92705-3735


Tri-Pacific, Inc.
1333 Second Street
Berkeley, CA 94701


TRI-PACIFIC, INC.
85 Lakeside Drive
Corte Madera, CA 94925-1037


TRIANGLE COATINGS
1930 FAIRWAY DRIVE
SAN LEANDRO, CA 94577


Trinh, Ryan
2937 23rd Ave.
Oakland, CA 94606

TRINITY LOGISTICS
P. O. BOX 62702
BALTIMORE, MD 21264-2702


TRUITT AND WHITE LUMBER CO.
642 HEARST AVENUE
BERKELEY, CA 94710


Truong, Nam Q.
34872 Rumford Ter.
Union City, CA 94587


Tuda, Edward Joshua
2508 Maine Ave.
Richmond, CA 94804


TURNER ELECTRICAL CONSULTING
6472 WESTOVER DRIVE
OAKLAND, CA 94611


TYCO INTEGRATED SECURITY, LLC
P. O. BOX 371967
PITTSBURRGH, PA 15250-7967


TYCO VALVES & CONTROLS
DEPT. 0789
P. O. BOX 120001
DALLAS, TX 75312-0789


U.S. Department of Homeland Security
Connie M. Cheung, Asst. Chief Counsel
Office of the Chief Counsel
120 Montgomery Street, Suite 200
San Francisco, CA 94104

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 267 of 699
Case: 19-40057   Doc# 85   Filed: 09/19/19   Entered: 09/19/19 13:52:19   Page 267 of 232

267

Ubaldo-Lupian, Victor
1732 27th Ave.
Oakland, CA 94601


Ugalde Martinez, Jesus
5330 Monterey Rd. #K2
San Jose, CA 95111


ULINE
PO BOX 88741
CHICAGO, IL 60680-1741


Ulloa, Ruben
1078 Adason Dr.
San Leandro, CA 94578


Umana, Julio
1557 165th Ave. #18
San Leandro, CA 94578


United Rentals (North America), Inc.
3200 Harbor Lane N
Minneapolis, MN 55447


UNIVERSAL REFRACTORIES INC
P.O.BOX 644646
PITTSBURGH, PA 15264-4646


UNIVERSAL SERVICE RECYCLING LLC
3200 SOUTH EL DORADO STREET
STOCKTON, CA 95206

UPS
P. O. BOX 894820
LOS ANGELES, CA 90189-4820


UPS SUPPLY CHAIN SOLUTIONS INC
28013 NETWORK PLACE
CHICAGO, IL 60673-1280


Uriarte Avilez, Jesus A
1758 Esmons Ave.
Richmond, CA 94801


Urtiz, Romualdo
2110 Dover Ave.
San Pablo, CA 94806


US Bancorp
1310 Madrid Street
Marshall, MN 56258


Vado, Gerardo
1404 Garvin Ave.
Richmond, CA 94801


Valadez Garcia, Victor M
7408 Krause Ave.
Oakland, CA 94605


Valdez Moran, Noe
2451 Church Lane #106
San Pablo, CA 94806

Case: 19-40157   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 269 of
Case: 19-40157   Doc# 85   Filed: 09/09/14   Entered: 09/09/14 13:52:19   Page 269 of
692

269

Valdez Villegas, Noe
1325 Sanford Ave.
San Pablo, CA 94806


Valencia Maldonado, Jesus
2371 Dover Ave.
San Pablo, CA 94806


Valencia Rodriguez, Benito
11027 Apricot Street
Oakland, CA 94603


Valencia, Alfredo
1848 23rd St
San Pablo, CA 94806


Valencia, Delfino
1258 Terra Ave.
San Leandro, CA 94579


Valencia, Edgar
1848 23rd St.
San Pablo, CA 94806


Valencia, Francisco
1150 Berg Rd.
Tracy, CA 95377


Valencia, Jose A
2371 Dover Ave.
San Pablo, CA 94806

Valencia, Jose Luis
1150 Berg Rd.
Tracy, CA 95377


Valencia, Victor M.
2481 Skylark Dr. #1
San Jose, CA 95125


Valencia-Rodriguez, Manuel
2920 11th Street
San Pablo, CA 94806


Valentin A, Rogelio
22133 Peralta St.
Hayward, CA 94541


Valenzuela, Nicolas
4620 Camden St.
Oakland, CA 94619


VALLEY RUBBER & GASKET
A LEWIS-GOETZ COMPANY
P.O. BOX 31001-1893
PASADENA, CA 91110-1893


Vanegas, Gilberto
412 S.16 th St.
Richmond, CA 94804


Vargas A, Erick S
2929 Foothill Blvd. #B
Oakland, CA 94601

Vargas Pedroza, Ignacio
7007 Krause Ave.
Oakland, CA 94605


Vargas, Anthony
33457 Fourth Street
Union City, CA 94587


Vargas, Benito
201 Grove Ave. #B
Richmond, CA 94801


Vargas, Jose
1811 Visalia Ave.
Richmond, CA 94801


Vargas, Jose L
1354 Virginia St.
San Leandro, CA 94577


Vargas, Juan  Jose Z
1906 84th Ave.
Oakland, CA 94621


Vasquez L, Lorenso
13613 San Pablo Ave. Trailer #14
San Pablo, CA 94806


Vasquez P, Rigoberto
13613 San Pablo Ave. #181
San Pablo, CA 94806

Vasquez, Fidelina
1153 Rumrill Blvd. Spc. 71
San Pablo, CA 94806


Vasquez, Jaime
10505 Creekside
Oakland, CA 94603


Vasquez, Maria S
2451 Church Lane #118
San Pablo, CA 94806


Vasquez, Onofre
319 Gramercy Pl.
Oakland, CA 94603


Vasquez, Pedro
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Vasquez-Melgoza, Francisco
548 El Paseo Dr.
Oakland, CA 94603


Vaughn, Dashawn L.
8642 Hillside Street
Oakland, CA 94605


Vazquez Lua, Froylan
2358 Downer Ave.
Richmond, CA 94804

```
Vazquez, Alejandro
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Vazquez, Erik
1840 Acapulco Dr.
San Pablo, CA 94806


Vazquez, Ezequiel
2513 Illinois St.
East Palo Alto, CA 94303


Vazquez, Jose Angel
2321 Clinton Ave.
Richmond, CA 94801


Vazquez, Josue
1153 Rumrill Blvd. #67
San Pablo, CA 94806


Vazquez, Osvaldo V
1318 Bush Ave. #11
San Pablo, CA 94806


Vazquez, Pedro
26120 Underwood Ave.
Hayward, CA 94544


Vazquez, Ramon
27920 Manon Ave. #25
Hayward, CA 94544
```

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 274 of
Case: 19-40057   Doc# 85   Filed: 03/09/21   Entered: 03/09/21 13:52:19   Page 274 of
699
692

274

```
Vega Millan, Maria
1125 73rd Ave.
Oakland, CA 94621


Vega, Jorge
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Vega, Mario
1301 Roleen Dr.
Vallejo, CA 94589


Vega, Sergio
2424 19th Ave.
Oakland, CA 94606


Vega-Gil, Jose Francisco
1260 94th Ave.
Oakland, CA 94603


Velasco, Jesus I
7811 Hillside St.
Oakland, CA 94605


Velasco, Martin F
2021 88th Ave.
Oakland, CA 94621


Velasquez Jr., Wilson
919 Wheatley Ave.
Modesto, CA 95351
```

Velazquez Guevara, Pedro A
2005 Lincoln Ave.
Richmond, CA 94801


Velazquez, Carlos S
1878 16th St.
San Pablo, CA 94806


Veliz S, Jose Antonio
1611 Espanillo Ct.
San Pablo, CA 94806


Vera Vasquez, Jose I
219 19th St.
Richmond, CA 94804


VERIZON WIRELESS
P. O. BOX 660108
DALLAS, TX 75266-0108


Vernal Martinez, Eric
24103 Silva Ave.
Hayward, CA 94544


Victoriano, Melvin C.
1811 Espanola Dr.
Richmond, CA 94806


Vieira, Jose
4226 Minden Lane
Stockton, CA 95206

Vieira, Jose F.
27257 Gading Rd.
Hayward, CA 94544


Villagomez, Melesio
1324 88th Ave.
Oakland, CA 94621


Villagrana, Michael
4700 Tassajara Rd.
Dublin, CA 94568


Villalobos, Omar
1824 21st St. #7
San Pablo, CA 94806


Villalobos, Robert S.
551 Chaucer Ln.
American Canyon, CA 94503


Villanueva, Juan
2929 Lowell Ave.
Richmond, CA 94804


Villanueva, Marcos A
4964 Westwood Way
Antioch, CA 94531


Villasenor Pulido, Raul
2604 Pine Ave.
San Pablo, CA 94806

Villasenor, Raul
2604 Pine Ave.
San Pablo, CA 94806


VINCENT ELECTRIC MOTOR CO.
8383 BALDWIN STREET
OAKLAND, CA 94621-1978


Vong, Winson
5928 E 17th Street
Oakland, CA 94621


W.W. GRAINGER INC
DEPT 560 - 807665344
PALATINE, IL 60038-0001


Walker, Brian A.
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Wang, Cunmin
4608 Sun Down Place
Salida, CA 95368


Wanless, Sean
1435 Manuel Dr.
Hayward, CA 94544


Ward, Lorenzo
517 Banks Drive
San Pablo, CA 94806

```
WASTE MANAGEMENT OF ALAMEDA COUNTY
P. O. BOX 541065
LOS ANGELES, CA 90054-1065


Watkins, Joshua J.
760 Teton Ln.
Tracy, CA 95376


Wells Fargo Bank RETECHS
333 Market Street, 21st Floor
Berkeley, CA 94710


WESTERN STATES OIL COMPANY
P. O. BOX 1307
SAN JOSE, CA 95109


WESTERN STATES TOOL & SUPPLY CORP.
P.O. BOX 56574
23425 CABOT BLVD.
HAYWARD, CA 94545


WESTERN TOOL & SUPPLY COMPANY
P.O. BOX 2420
LIVERMORE, CA 94551


WESTRIDGE CAPITAL
89 Alvarado Road
Berkeley, CA 94705


WHIRL-AIR-FLOW
20055 177TH STREET
BIG LAKE, MN 55309
```

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:52:19   Page 279 of
Case: 19-40057   Doc# 85   Filed: 09/10/12   Entered: 09/10/12 13:52:19   Page 279 of
692

279

Whittington, Darrell Keith
2121 Vale Rd. Apt 19
San Pablo, CA 94806


WIEGMANN & ROSE
PO BOX 4187
OAKLAND, CA 94614-4187


WILINE NETWORKS INC.
15 ROSZEL ROAD #106
PRINCETON, NJ 08540-6248


WILLE ELECTRIC SUPPLY CO
PO BOX 3246
MODESTO, CA 95353


Williams, Darnell
9750 Bancroft Ave.
#112
Oakland, CA 94603


Wills, Dan E.
9632 Olive St.
Oakland, CA 94621


Wilson De Armas, Ricardo
335 43th Street
Richmond, CA 94805


Winston Jr., Hermon
1536 Venice Cir.
Stockton, CA 95206

WISCONSIN BOX COMPANY
P. O. BOX 718
WAUSAU, WI 54402-0718


Woodmansee, Joshua P
678 Via Aires
San Lorenzo, CA 94580


Wyatt, Jacob
3819 East Ave.
#31
Livermore, CA 94550


YOST METAL FAB
21000 CORSAIR BLVD
HAYWARD, CA 94545


Young, Michael
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313


Young, Stephen
1054 Santa Marie Ct
Oakland, CA 94601


YUSEN LOGISTICS
DEPT AT 952154
ATLANTA, GA 31192-2154


Zambrana Orozco, Julio
c/o Timothy P. Rumberger, Esq.
Law Offices of Timothy P. Rumberger
2161 Shattuck Avenue #200
Berkeley, CA 94704-1313

Zambrano, Gabriel
518 Klamath Ct.
Hayward, CA 94541


Zambrano-Mendez, Guillermo
2017 Warner Ave.
Oakland, CA 94003


Zamora, Adalberto
9410 Coral Rd.
Oakland, CA 94603


Zandoval, Salvador  Navarro
232a S 43rd St.
Richmond, CA 94804


Zandoval, Salvador Navarro
232a S 43rd St.
Richmond, CA 94804


Zaragoza Lopez, Jesus
3559 Crestview Dr.
Pittsburg, CA 94565


Zaragoza, Luis M.
2516 Lincoln Ave.
Richmond, CA 94804


Zaragoza, Ulises A
1906 84th Ave.
Oakland, CA 94621

Zarate, Antonio R
2451 Church Lane #96
San Pablo, CA 94806


Zarate, Israel
515 Lancaster Ln #240
Bay Point, CA 94565


Zarate, Marco A.
32379 Seneca St.
Hayward, CA 94544


Zavala Arista, Luis
4453 Yellowood Ln.
Pittsburg, CA 94565


Zavala Delgado, Ricardo
1836 23rd St.
San Pablo, CA 94806


Zavala Rivas, Hilario
622 20th St. #4
Richmond, CA 94801


Zazueta, Noraceli
24326 Silva Ave.
Apt. 76
Hayward, CA 94544


Zuloaga, Alfred
983 Cayuga Ave.
San Francisco, CA 94112

Zurita, Oliver
1964 21st St.
San Pablo, CA 94806


Zurita, Pablo Martinez
1335 Sanford Ave. #e
San Pablo, CA 94806

Case: 19-40757   Doc# 85   Filed: 03/02/20   Entered: 03/02/20 15:52:42   Page 284 of
699
Case: 19-40757   Doc# 5   Filed: 03/19/19   Entered: 03/19/19 13:34:19   Page 232 of
232

284

# EXHIBIT "3"

Michael W. Malter (SBN 96522)
Julie H. Rome-Banks (SBN 142364)
Wendy W. Smith (SBN 133887)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Fax: (408) 295-1531
Email: Michael@bindermalter.com
Email: Julie@bindermalter.com
Email: Wendy@bindermalter.com

Attorneys for Debtors and Debtors-in-Possession
PACIFIC STEEL CASTING COMPANY
and BERKELEY PROPERTIES, LLC

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>PACIFIC STEEL CASTING COMPANY,<br>a California corporation,<br><br>        Debtor. | Case No. 14-41045-RLE<br>Case No. 14-41048-RLE<br><br>Chapter 11<br><br>Cases Jointly Administered |
| In re<br><br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>        Debtor. | Date:<br>Time:<br>Courtroom: 201<br>1300 Clay Street, Oakland, CA 94612 |

## DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

I, Charles H. Bridges Jr., hereby declare:

1.      I am the Chief Financial Officer ("CFO") and a Director of the Debtor Pacific

Steel Casting Company ("PSC") and the proposed responsible individual.  I make this

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE
OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

286

Case: 14-41045   Doc# 301   Filed: 10/20/14   Entered: 10/20/14 13:45:41   Page 286 of
699

Declaration in support of the MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF ("Motion") filed by the Debtors herein.

2. I have personal knowledge of the matters set forth herein, except as to those matters alleged upon information and belief and as to those matters I believe them to be true. If called upon as a witness, I could and would testify as follows.

3. In my capacity as the CFO of PSC, I have access to, and I am familiar with, the books and records kept by PSC and its' wholly owned subsidiary Berkeley Properties, LLC ("BP", together with PSC, the "Debtors"). These books and records have been generated, recorded and compiled in the ordinary course of business of the Debtors. Further, these documents were prepared at the time, or near the time, that the information was received or the events and transactions actually took place. It is the standard operating procedure of the Debtors to preserve these documents in a place of safekeeping on its business premises. I have personal access to these books and records and their continued safekeeping is maintained under my direction and supervision.

4. The Debtors move for entry of an order approving certain sale procedures in connection with the proposed sale of substantially all of PSC's assets to Speyside Fund LLC (or its designee) ("Buyer") or a successful overbidder.

5. On March 10, 2014, PSC filed a voluntary Chapter 11 case in the United States Bankruptcy Court for the Northern District of California (the "PSC Bankruptcy Case"). BP is a wholly owned subsidiary of PSC. BP also filed a chapter 11 petition on March 10, 2014 (the "BP Bankruptcy Case"). The BP Bankruptcy Case was filed as a related case to the PSC Bankruptcy Case pursuant to BLR 1015-1. The cases have been ordered jointly administered. No trustee has been appointed and PSC and BP remain debtors-in-possession of their respective bankruptcy estates pursuant to 11 U.S.C. §§ 1107 and 1108.

6. PSC is a fourth-generation family-owned steel foundry that manufactures carbon, low-alloy and stainless steel castings for U.S. and international customers. PSC operates three separate plants that are located on eight-acres in Berkeley, California. Most of the real property

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE
OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Case: 14-41045   Doc# 301   Filed: 06/26/14   Entered: 06/26/14 13:45:41   Page 2 of 699

287

is owned by BP, who leases it to PSC.  This real property is BP's only significant asset[1].  PSC has grown into one of the largest independent steel-casting companies in the U.S.  PSC supplies numerous industries with a wide variety of castings used in oil and gas drilling equipment, heavy-duty truck parts, valves and fittings, and mining and construction equipment.  PSC's plants incorporate some of the latest manufacturing technology, production capabilities and emissions controls which has allowed PSC to remain competitive with domestic and international suppliers, and to maintain compliance with environmental regulations.  PSC presently employs approximately 365 hourly employees and 45 salaried employees.  The majority of the hourly employees are represented by the Glass, Molders, Pottery, Plastics, and Allied Workers International Union, AFL-CIO, CLC Local No. 164B (the "Union"). PSC currently enjoys a good working relationship with the Union.  The current collective bargaining agreement will not expire until 2015.

7.     When they filed their petitions, PSC and BP had only one large secured creditor, Wells Fargo Bank, N.A. ("Wells Fargo"), which was owed approximately $4.1 million collectively by the Debtors. Wells Fargo was not willing to provide the Debtors with post-petition financing.  As a result, the Debtors obtained Court approval of a post-petition secured loan facility from Siena Lending Group, LLC ("Siena"), which paid the Wells Fargo obligations in full and provides PSC with a revolving credit facility of up to $8.5 million.  The loan transaction closed on April 11, 2014.  As of June 19, 2014, the Debtors owed Siena approximately $4,192,023.13.  The amount of the Siena loan fluctuates daily.

8.     PSC has been diligently investigating possible purchasers or investors since October 2013.  On January 29, 2014, PSC retained the services of Cleary Gull Inc. ("Cleary Gull") to serve as its investment banker in connection with one or more possible sales, mergers or other business combinations or transactions.  Cleary Gull has assisted PSC by canvassing the marketplace for potential investors or buyers.  Cleary Gull prepared a confidential memorandum describing PSC's business, history, financial position and results, and the investment

---

[1]    The BP Bankruptcy Case is considered a single asset real estate case within the meaning of 11 U.S.C. §101(51B).

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Case 1:14-41045   Doc 260-1   Filed 06/20/14   Entered 06/20/14 15:44:20   Page 288 of 699

**288**

opportunity, and prepared an electronic "data room" with significant financial and company records to allow potential investors and buyers to conduct due diligence. After filing bankruptcy, the Debtors received Bankruptcy Court approval to allow PSC to continue to employ Cleary Gull. Cleary Gull subsequently received eleven written initial indications of interest and five offers to purchase the assets of the Debtors by April 30, 2014. As a result of Cleary Gull's efforts, PSC believes that there has been extensive marketing of the assets of the Debtors and that said marketing has been directed at the parties most likely to have an interest in making an offer to purchase substantially all of the Debtors' assets.

9.      Presently as many as five parties, including Buyer, may be interested in acquiring substantially all of the assets of the Debtors. The Debtors believes there may be as many as six additional interested parties. PSC intends to conduct an auction of its assets on a going concern basis, and to assume and assign those leases and executory contracts that are critical to the ongoing business operation. The proposed bid procedures described herein will provide a formal process for competing bidders to make offers and for the Court to conduct an auction. The Debtors believe that they have identified those persons who could be interested in presenting a bid, all of whom will be provided notice of the hearing on this Motion and of the auction.

10.      The Debtors believe the proposed sale to Buyer is in the best interest of creditors. It is anticipated that Buyer will offer employment to the vast majority of PSC's employees, including PSC's Union employees under the existing collective bargaining agreement. The assumption and assignment of many of PSC's unexpired leases and executory contracts, particularly the collective bargaining agreement with the Union and the related multi-employer pension plan, will substantially reduce potential and contingent claims against PSC's bankruptcy estate that could well exceed $30 million. The Debtors believe that a sale pursuant to the proposed bid procedures will allow the Debtors to maximize the value of their assets for the benefit of their creditors.

11.      Following several months of pre- and post-petition marketing by its appointed investment bankers Cleary Gull, PSC signed a letter of intent offered by Buyer, in which Buyer offered to buy substantially all of PSC's assets (subject to specific exceptions described below)

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Case 1:14-41045 Doc 3561 Filed 01/06/20 Entered 01/06/20 13:45:41 Page 4 of 4

289

to assume certain specified pre- and post-petition liabilities of the Debtors (the "Sale") pursuant to the terms of an asset purchase agreement (the "APA") and to lease the real property owned by BP pursuant to a long-term lease (the "Lease").[2] PSC and the Buyer have executed the APA and a true and correct copy of the executed APA is attached hereto as Exhibit A and incorporated herein by reference.

12.     The APA requires that Buyer pay $11,300,000 (the "Purchase Price") in cash for the assets being purchased, as well as assume certain liabilities (the "Assumed Liabilities") and to lease the real property pursuant to the Lease. Buyer has delivered a good-faith deposit of $500,000 concurrent with execution of the APA, with the remainder of the Purchase Price to be paid at closing.  The Purchase Price may be adjusted to reflect changes in PSC's working capital as more particularly described in the APA.  If Buyer chooses to pay any amounts necessary to cure (the "Cure Amounts") the defaults under any executory contracts or leases to be assumed and assigned by PSC to Buyer under the APA (the "Assumed Contracts"), then such Cure Amounts paid by Buyer will be credited against the Purchase Price.

13.     Under the APA, substantially all of PSC's operational assets will be included in the Sale (the "Purchased Assets") but the Sale excludes, among other things: (a) corporate and financial books and records of the Debtors, (b) utility deposits, cash on hand and in deposit accounts, (c) avoidance claims and causes of action arising under 11 U.S.C. §544 through §552, and, (d) PSC's membership interest in BP.  The real property owned by BP is not part of the sale, but as part of the APA the real property will be leased to the Buyer by BP pursuant to the Lease. The APA further provides for PSC to assume and assign to Buyer the Assumed Contracts, including the existing collective bargaining agreement between PSC and the Union. The sale of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowed by law except as expressly provided[3].  The post-petition secured loan of Siena shall be paid in full from the proceeds of the Sale at closing.  As a further term of

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the APA and Lease, as applicable.

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Case 1:19-41845 Doc 8231 Filed 02/20/19 Entered 02/20/19 13:45:41 Page 290 of 699

290

the Sale, PSC will continue its operations in the ordinary course of business until the closing date.

14. Subject to PSC's obligations to pay certain specified obligations pursuant to the APA, the Buyer will also assume significant liabilities of PSC, including: PSC's single employer defined benefit (non-Union) pension plan obligations; PSC's multi-employer pension plan obligations (with the Union pension trust); obligations of PSC under the collective bargaining agreement; accrued severance, bonus, holiday and vacation benefits for all workers being rehired by the Buyer; and, specified accounts payable and accrued expenses capped at $1 million.

15. As a condition to the Sale, Buyer must enter into a new triple-net lease with BP on mutually-agreeable terms including monthly rent of $89,544.00, and a 15-year term with a 5-year extension option. BP will bring a motion to approve the terms of the new triple-net lease with the Buyer at the same time as the motion to approve the Sale.

16. PSC believes that conducting the Sale pursuant to the bid procedures described here (the "Bid Procedures") will allow PSC to maximize the value of the assets for the benefit of its creditors. The Sale proceeds will pay PSC's obligation to Siena in full, and will result in a net benefit to the Debtors' Estates.

17. The Debtors intend to file the motions (i) to approve the sale (the "Sale Motion"), (ii) to approve the assumption and assignment of contracts and leases to the Buyer and to conditionally reject the existing real property lease whereby BP is the lessor and PSC is the lessee (the "Assumption Motion"), and (iii) to approve the terms of a new triple-net lease between BP and the Buyer (the "New Lease Motion"), together with any other relief related to the proposed sale transaction as soon as practicable after entry of the order on this motion (the "Bid Procedures Order"), so that the motions may be heard and the auction conducted on a specially set calendar on July 11, 2014 or such other date as the Court may specially set (the "Sale Hearing").

---

[3] Siena is the only party with a security interest in all of the Debtors' assets and Siena will be paid in full at closing. However, in the event any bidder wishes to purchase BP's real estate, then the sale will be free and clear of the disputed mechanic's liens of Crane Tech, Inc. and Bigge Crane and Rigging Company.

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Case: 14-41045 Doc# 351 Filed: 06/20/14 Entered: 06/20/14 15:49:41 Page 294 of 699

291

18.     The proposed timing is critical to the Debtors for two reasons.  First, the terms of the Debtors' secured loan with Siena require that the Debtors enter into an asset purchase agreement and file a bid procedures motion not later than June 16, 2014; Siena has provided the Debtors with a short extension of that deadline but only through June 19, 2014.  The Siena loan agreement also requires that the Debtors use their best efforts to schedule a hearing on the bid procedures motion and obtain an order by July 2, 2014 with an outside deadline for a bid procedures order of July 9, 2014 and to hold an auction within 30 days thereafter.  The Siena loan agreement further requires that the Debtors obtain an order approving the sale within 4 business days of the auction, and that the approved sale is consummated on or before fifteen days after entry of the sale order. The Debtors believe they can comply with this mandated schedule by holding an auction and hearing on the Sale Motion, Assumption Motion and New Lease Motion on July 11, 2014 or such other date as the Court may specially set within the timeframes required by the Siena loan agreement.  Second, the terms of the APA with Buyer require that PSC obtain an order approving the proposed sale not later than July 9, 2014.  The APA further provides that Buyer shall close the sale within 15 days of entry of an order authorizing the Sale to the Buyer.

19.     The proposed bid procedures include, among other things, a requirement that any competing bid must be to purchase the Purchased Assets and assume the Assumed Liabilities on terms at least as favorable to PSC as those in the APA.  The bid procedures also require a minimum initial over-bid of $11,900,000 (i.e. an initial minimum overbid of $600,000), with minimum subsequent overbids in increments of $100,000 in addition to assumption of the Assumed Liabilities.  The bid procedures also require that PSC pay Buyer a breakup fee of $500,000 (the "Breakup Fee") in the event a sale closes to another purchaser.

20.     The Sale Motion will also seek approval, consistent with the Siena Loan Agreement and the order approving the Siena loan agreement, that the sale order provide for "indefeasible payment in full in cash" at closing of all amounts owed to Siena under the post-petition loan as well as delivery of releases to Siena by the Debtors' estates.  Consistent with the Siena loan agreement, the Sale Motion also requests approval of a procedure allowing Siena to

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

292

Case 1:14-41045 Doc 8501 Filed 06/20/09 Entered 06/20/09 13:45:44 Desc Page 7 of 699

make a credit bid to acquire the Purchased Assets for an amount sufficient to pay PSC's obligations to Siena, but only if no one makes a bid to purchase PSC's assets for an amount sufficient to pay Siena in full, in cash, no later than 15-days after the date set to close the Sale.

21.     As an inducement to Buyer to agree to enter into the APA and act as the stalking horse subject to overbids and in order that the sale process will not be delayed by last minute offers, PSC believes that the Court should establish a competing bid procedure concerning bids by other prospective buyers. PSC submits that the proposed Bid Procedures described in Exhibit "A" attached to the Motion and incorporated herein by reference (the "Bid Procedures"), are reasonable and necessary under the circumstances, will facilitate the conduct of an orderly auction, and will maximize the value of the Purchased Assets for the benefit of creditors.

22.     If the Purchased Assets are sold to a purchaser other than Buyer, the APA obligates PSC to pay the Breakup Fee to Buyer at the closing. The Buyer has already incurred substantial expenses and it is expected that Buyer will continue to incur additional costs through the Sale Hearing.

Executed on June 19, 2014 at Berkeley, Alameda County, California. I declare under penalty of perjury that the foregoing is true and correct.


/s/ Charles H. Bridges, Jr.
Charles H. Bridges, Jr.

DECLARATION OF CHARLES H. BRIDGES, JR. IN SUPPORT OF MOTION TO APPROVE
OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

293

# EXHIBIT "4"

ORI KATZ, Cal. Bar No. 209561
okatz@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:     (415) 434.9100
Facsimile:     (415) 434.3947

Attorneys for the Official Committee of
Unsecured Creditors

MICHAEL W. MALTER,
Cal. Bar No. 96533
michael@bindermalter.com
JULIE H. ROME-BANKS,
Cal. Bar No. 142364
julie@bindermalter.com
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408) 295-1700
Facsimile: (408) 295-1531

Attorneys for the Debtors and Debtors-in-
Possession, SECOND STREET PROPERTIES
and BERKELEY PROPERTIES, LLC

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>SECOND STREET PROPERTIES,<br>a California corporation[1]<br>　　　　　　　Debtor. | Case No. 14-41045-RLE<br>Case No. 14-41048-RLE<br><br>Chapter 11<br><br>Cases Jointly Administered<br><br>**DISCLOSURE STATEMENT FOR DEBTORS' AND COMMITTEE'S SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED APRIL 30, 2015** |
| In re<br><br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>Debtor. | |

---

[1] Second Street Properties was formerly known as Pacific Steel Casting Company.

Case: 19-40045   Doc# 587   Filed: 10/28/15   Entered: 10/28/15 13:44:27   Page 295 of
691

# TABLE OF CONTENTS

**Page(s)**

ARTICLE I INTRODUCTION ...................................................................... 1
    A.   Purpose of the Disclosure Statement:........................................... 1
    B.   How to Vote:................................................................................ 1
    C.   Enclosures: ................................................................................. 1
    D.   Definitions: ................................................................................. 2
    E.   Plan Summary: ........................................................................... 2

ARTICLE II GENERAL BACKGROUND INFORMATION REGARDING THE DEBTORS .... 4

ARTICLE III REASONS FOR FINANCIAL DIFFICULTIES ......................................... 5
    A.   DHS Audit and Resulting Terminations in Workforce:............... 5
    B.   Litigation Spawned by Terminations, Including Class Action Suit and Settlement Thereof: 6
    C.   Lawsuit with Nearby Residents: ................................................. 6
    D.   Reduced Borrowing Capacity: .................................................... 7
    E.   Decision to Preserve Going Concern Value Through A Bankruptcy Sale Process: ............. 7

ARTICLE IV RELEVANT EVENTS DURING THE BANKRUPTCY CASES ......................... 8
    A.   Case Commencement: ................................................................. 8
    B.   Retention of Professional by the Debtors: .................................. 8
    C.   Formation of Creditors' Committee: .......................................... 8
    D.   First Day and Related Motions: .................................................. 8
    E.   Application to Appoint Responsible Individual: ......................... 9
    F.   Post-Petition Financing: ............................................................. 9
    G.   Approval of Bid Procedures: .................................................... 10
    H.   Approval of the Sale and Related Motions: .............................. 10
    I.   Closing of the Sale and Repayment of Siena: .......................... 11
    J.   Rejection of Leases and Executory Contracts:........................... 11
    K.   Objection to Claim of IRS:....................................................... 11
    L.   Final Approval of the Class Action Settlement:........................ 12
    M.   Operations After the Sale of Assets:......................................... 12
    N.   Claims Bar Dates:..................................................................... 13
    O.   Cranetech Adversary Proceeding: ............................................ 13
    P.   Summary of Monthly Operating Reports:.................................. 14
    Q.   Claims Related to the Defined Benefit Pension Plan:................ 14
    R.   Claims by the Buyer:................................................................ 14
    S.   Contingent Claim of Local 164B: ............................................ 15

ARTICLE V PLAN OF REORGANIZATION ....................................................... 16
    A.   Administrative Expense Claims ............................................... 16
        1.   Applicable Bar Dates for Administrative Expense Claims........................................ 17

| | | |
|---|---|---|
| | 2. Professional Fees. | 17 |
| | 3. Statutory U.S. Trustee Fees | 18 |
| B. | Priority Tax Claims: | 18 |
| C. | CLASSIFICATION OF CLAIMS AND INTERESTS - SUMMARY OF CLASSIFICATIONS: | 18 |
| D. | Classes Under the Plan: | 19 |
| E. | TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS: | 19 |
| | Class 1 – Priority Non-Tax Claims. | 19 |
| | 1. Impairment and Voting. | 19 |
| | 2. Treatment. | 19 |
| | Class 2 – Miscellaneous Secured Claims. | 20 |
| | 1. Impairment and Voting. | 20 |
| | 2. Alternative Treatment. | 20 |
| | a. Abandonment or Surrender. | 20 |
| | b. Cash Payment. | 20 |
| | c. Unimpairment. | 20 |
| | 3. Unsecured Deficiency Claim. | 20 |
| | Class 3 – Disputed CraneTech Claims. | 21 |
| | 1. Impairment and Voting. | 21 |
| | 2. Initial Treatment of Claim. | 21 |
| | 3. Treatment if Claim is Allowed by a Final Order. | 21 |
| | Class 4 – Local 164B Claim. | 22 |
| | 1. Impairment and Voting. | 22 |
| | 2. Treatment. | 22 |
| | Class 5 – General Unsecured Claims Against Berkeley Properties. | 24 |
| | 1. Impairment and Voting. | 24 |
| | 2. Treatment. | 24 |
| | Class 6 – General Unsecured Claims Against Second Street Properties. | 24 |
| | 1. Impairment and Voting. | 24 |
| | 2. Treatment. | 24 |
| | Class 7 – Interests in Second Street Properties | 25 |
| | 1. Impairment and Voting. | 25 |
| | 2. Treatment. | 25 |
| | Class 8 – Interests in Berkeley Properties | 26 |
| | 1. Impairment and Voting. | 26 |
| | 2. Treatment. | 26 |
| F. | PRELIMINARY ESTIMATES OF ALLOWED CLAIMS | 26 |
| ARTICLE VI ALTERNATIVES TO THE PLAN | | 28 |
| A. | General: | 28 |
| B. | Best-Interests–of-Creditors Test and Chapter 7 Liquidation Analysis: | 28 |

| | | |
|---|---|---|
| ARTICLE VII FEASIBILITY | .................................................. | 30 |
| ARTICLE VIII CONFIRMATION | .......................................... | 31 |
| A. | Voting: | ................................................................. 31 |
| B. | Confirmation Standards: | .......................................... 32 |
| C. | Modification: | .......................................................... 33 |
| ARTICLE IX FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS | .... | 33 |
| ARTICLE X CONCLUSION | ................................................. | 34 |
| A. | Effect of Confirmation: | ........................................... 34 |
| B. | Recommendation: | ..................................................... 34 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ARTICLE I

## INTRODUCTION

**A.**     **Purpose of the Disclosure Statement:**

Debtors and debtors in possession Second Street Properties (formerly known as Pacific Steel Casting Company) ("Second Street Properties") and Berkeley Properties LLC ("Berkeley Properties") (jointly, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee," and collectively with the Debtors, the "Proponents") prepared this Joint Disclosure Statement ("Disclosure Statement").  It is distributed to creditors to solicit acceptances of the Debtors' and Committee's Joint Chapter 11 Plan of Reorganization (the "Plan").  The Plan is served with the Disclosure Statement.  This Disclosure Statement's purpose is to provide all persons who hold claims against or interests in the Debtors ("Claimants") with information adequate to enable them to make informed judgments about the Plan in voting to accept or reject it.

**B.**     **How to Vote:**

The Debtors and the Committee will file a motion to establish the procedures for voting on the Plan which they will request the Court set at the same date and time as the hearing on the approval of this Disclosure Statement.  Detailed voting procedures will be set forth in that motion, and will be posted for free at under the Key Documents section at the following website: http://dm.epiq11.com/PSC.

**C.**     **Enclosures:**

Enclosed with this Disclosure Statement is a copy of the Plan, a ballot (if your claim or equity interest is to be impaired under the Plan), the order approving this Disclosure Statement, a notice advising creditors of information regarding the Plan confirmation hearing along with a letter from the Committee recommending that creditors vote to support confirmation of the Plan. Alternatively, if you are not entitled to vote on the Plan, you will receive a notice of non-voting status.

**D.**     **Definitions:**

This Disclosure Statement uses terms which are defined in the Plan.  A term used in this Disclosure Statement or the Plan that is defined in the Bankruptcy Code has the meaning given to that term in the Bankruptcy Code.  The rules of construction contained in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure apply in this Disclosure Statement.  To the extent that terms defined in the Plan or Disclosure Statement are inconsistent with definitions or meanings provided by the Bankruptcy Code or Rules, the Bankruptcy Code or Rules shall control.

**E.**     **Plan Summary:**

The Plan is a reorganization plan.  It provides for the replacement of the Debtors' current management with new management led or selected by a Plan Administrator, for the continuation of the Debtors' business of owning and leasing certain real property located in Berkeley, California to the buyer of its former steel casting business, and for treatment of the outstanding Allowed Claims against and Interests in the Debtors. The Plan does not provide for any substantive consolidation of the Debtors' estates.

Under the Plan, distributions are intended to be made to Holders of Allowed Administrative Expense Claims (Unclassified), Allowed Priority Tax Claims (Unclassified), Allowed Priority Non-Tax Claims (Class 1), Allowed Miscellaneous Secured Claims (Class 2), and Allowed General Unsecured Claims against Berkeley Properties (Class 5) and Allowed General Unsecured Claims against Second Street Properties (Class 6).  The Holder of the Disputed CraneTech Claims (Class 3) will receive one of the alternative forms of treatment set forth herein as a Secured Claim if and only if it obtains a Final Order in the CraneTech Adversary Proceeding providing that some or all of the Disputed CraneTech Claims are Allowed Secured Claims. Otherwise, the Disputed CraneTech Claims will be treated as a General Unsecured Claims Against Second Street Properties to the extent that they are Allowed.  The Holder of the Local 164B Claim (Class 4) will not receive a distribution of Cash in the Plan, but will receive a deed of trust encumbering the real property owned by the Berkeley Properties pursuant to an agreement with the Proponents.  Holders of Interests in Second Street Properties (Class 7) will receive new Interests in Reorganized Second Street Properties and shall be deemed to grant to the Post-

Confirmation Committee an irrevocable proxy to exercise all voting and approval rights represented by those Interests until such time as the Holders of Allowed Claims of Classes 5 and 6 have been paid in full with interest at the Legal Rate. Holders of Interests in Berkeley Properties (Class 8) shall retain their Interests. Second Street Properties is the sole interest holder of Berkeley Properties. After the proceeds produced by the assets of Berkeley Properties are used to pay the Holders of Allowed Class 5 Claims Against Berkeley Properties, said proceeds will be used to make distributions to the Holders of Allowed Class 6 Claims against Second Street Properties. Finally any remaining proceeds shall be distributed to the Class 7 Interest Holders.

Until the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the Debtors' businesses and their obligations under this Plan will be run primarily by a Plan Administrator to be identified in the notice of hearing on confirmation of the proposed Plan. If the Plan Administrator is an individual, the Plan Administrator will be the sole officer and one of the three directors of Second Street Properties, and shall select the other two directors, whose identities will also be revealed in the notice of hearing on confirmation of the proposed Plan. If the Plan Administrator is a corporate entity, the Plan Administrator will select one of its members, officers, employees or agents to be the sole officer and one of three directors of Second Street Properties, and shall select the other two directors, all of whose identities will be revealed in the notice of hearing on confirmation of the proposed Plan. The Plan Administrator will be subject to the oversight of the Post-Confirmation Committee as provided herein. Also, until the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the Interests in Reorganized Second Street Properties granted to Holders of Interests in Class 7 will be subject to an irrevocable proxy that gives all voting and approval rights to the Post-Confirmation Committee. Once the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the proxy shall terminate.

Certain documents implementing the terms of the Plan described above, including the deed of trust given to the Holder of the Local 164B Claim, the irrevocable proxy held by the Post-Confirmation Committee, and the amended and restated organizational documents for Reorganized Second Street Properties and Reorganized Berkeley Properties will be filed with the

Court by May 29, 2015 in a Plan Supplement. These documents may be obtained by contacting counsel for the Proponents at the addresses listed on the first page of this Disclosure Statement, or by visiting the Key Documents section at the following website: http://dm.epiq11.com/PSC

## ARTICLE II

## GENERAL BACKGROUND INFORMATION REGARDING THE DEBTORS

Second Street Properties, founded in 1934, was a privately-owned steel foundry based in Berkeley, California. Second Street Properties manufactured carbon, low-alloy and stainless steel castings ranging from one ounce to 7,000 pounds. Second Street Properties manufactured castings based on customer's specifications and shipped products on a just-in-time basis. Second Street Properties operated three separate plants on nine acres of land: a green sand plant, a shell mold plant and an air set plant. Second Street Properties' plants incorporated some of the latest manufacturing technology, production capabilities and emissions controls. This allowed Second Street Properties to remain competitive with domestic and international suppliers, and maintain compliance with environmental regulations.

The green sand plant, opened in 1934, was the company's original production facility. This plant produced castings ranging from one pound to 1,500 pounds. The shell mold plant, which opened in 1975, specialized in smaller, more complex castings, ranging from one ounce to 60 pounds. The air set plant opened in 1981 and is considered the world's most efficient, high volume producer of castings up to 7,000 pounds.

Second Street Properties earned an impressive reputation for quality. It specialized in the production of large, complex castings as well as providing design and engineering assistance on the front end and heat treating, machining and other processes on the back end. Primary end markets include oil drilling equipment and heavy-duty trucks.

Since its inception as a six-man partnership in 1934, Second Street Properties grew into a significant force in the steel casting industry. Second Street Properties was incorporated as a California C-corporation in March 1946 and at the time of bankruptcy employed over 500 hourly and 50 salaried employees at its production and administrative facilities. The majority of the hourly employees are represented by the CTMA - Glass, Molders, Potter, Plastics and Allied

Workers International Union (Local 164B) ("Local 164B").  Second Street Properties was operated by the family/owners since inception, along with a talented group of professionals.  This combined management team has been able to blend the latest technological developments in the industry with a plant modernization and expansion program to produce a rapidly growing company.  During its history of over 80 years, Second Street Properties became one of the leading steel casting companies in the United States.

In 2007, Second Street Properties created Berkeley Properties LLC, a wholly owned subsidiary of Second Street Properties.  The title to the 10 separate parcels of real property (where Second Street Properties operated in Berkeley, California) was transferred into this LLC.  Berkeley Properties continues to be 100% owned by Second Street Properties.

<div align="center">

**ARTICLE III**

**REASONS FOR FINANCIAL DIFFICULTIES**

</div>

In 2008, when the Great Recession hit, Second Street Properties' business slowed.  At the same time as its operations were suffering due to this general slowing, the company encountered a wave of significant obstacles that combined to constrain its ability to operate and necessitated the filing of the voluntary chapter 11 petitions for Second Street Properties and Berkeley Properties.

**A.**     **DHS Audit and Resulting Terminations in Workforce:**

In early 2011, agents of the Immigration and Customs Enforcement, U.S. Department of Homeland Security (DHS) began an audit of Second Street Properties' Employment Eligibility Verification Forms (commonly known as I-9 Forms). The DHS audit resulted in Second Street Properties terminating nearly 200 of its front-line manufacturing employees. Second Street Properties worked diligently to replace the employees lost as a result of the DHS audit and to train the new workers, but the loss of such a significant numbers of experienced workers severely affected productivity.  In addition, the DHS provided notice in May 2013 that it intended to assess Second Street Properties with a civil penalty of $401,255.25 in connection with the audit.  Second Street Properties was not in a financial position to pay the civil penalty and sought to negotiate a settlement agreement with the DHS.

Case: 19-40057   Doc# 587   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 308 of
441
SMRH:437127496.2                    DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

**B.    Litigation Spawned by Terminations, Including Class Action Suit and Settlement Thereof:**

In addition to reduced productivity, the terminations spawned litigation that further impacted Second Street Properties' ability to operate outside of bankruptcy.  Upon termination, many of the terminated employees immediately filed workers' compensation claims against the company, which resulted in a four-fold increase in the company's workers compensation insurance premiums.  The terminations done as a consequence of the DHS audit also precipitated the filing of a wage-and-hour class action lawsuit against Second Street Properties entitled Roberto Rodriguez et al. v. Pacific Steel Casting Co., filed in Alameda County Superior Court as case number RG11609595 on December 23, 2011 (the "Class Action").  Second Street Properties vigorously defended the Class Action.  A class of approximately 1,300 current and former employees of Second Street Properties was certified (the "Class Action Claimants").  The Class Action was scheduled for trial to commence in February, 2014.  Following two years of litigation, the parties participated in an all-day mediation session on January 24, 2014.  As a result of that mediation, the parties to the Class Action entered into a settlement agreement ("Class Action Settlement) which generally provided for a settlement of $5.4 million in full and complete settlement of the Class Action along with other pertinent terms.  The Class Action Settlement also provided that the settlement claims administrator for the Class Action Claimants would be Gilardi & Co., LLC ("Class Action Claims Administrator").  The Class Action Settlement received preliminary approval from the Superior Court by order entered on February 28, 2014.  Because of its financial difficulties Second Street Properties was not in a position to fund the Class Action Settlement, a fact which was fully disclosed during the mediation session.  Rather, Second Street Properties disclosed during the mediation its intention to shortly file for chapter 11 protection and the Class Action Settlement therefore provide that in the event the bankruptcy case were to convert to chapter 7, the amount of the Class Action Settlement would increase to $25 million.

**C.    Lawsuit with Nearby Residents:**

In addition to the lawsuits arising from the terminations done after the DHS audit, Second Street Properties faced lawsuits from its neighbors in Berkeley, CA as well. In April 2012, Second

1 Street Properties settled a lawsuit brought on behalf of nearby residents alleging, among other

2 things, negligence, battery and trespass. The settlement required a one-time payment of $190,000

3 which was made in June of 2012. The settlement also requires that Second Street Properties

4 identify one or more capital improvement projects that are intended to further identify, control,

5 reduce, or minimize emissions and/or odors (with a value of $585,000 including maintenance for

6 up to 10 years). Second Street Properties spent considerable time and money on legal support

7 during the years that let up to this settlement. However, because of the other financial challenges it

8 was facing, Second Street Properties has not yet funded the capital improvement projects.

9 **D.      Reduced Borrowing Capacity:**

10       Further, Second Street Properties' business was also endangered by new constraints

11 imposed by its pre-petition lender that severely limited Second Street Properties' ability to borrow

12 the funds necessary to finance its operations. Prior to the bankruptcy filing, Second Street

13 Properties and Berkeley Properties had only one large secured creditor, Wells Fargo Bank, N.A.

14 ("Wells Fargo"). Historically, Wells Fargo provided Second Street Properties with a line of credit

15 to finance its day-to-day operations. Wells Fargo also provided a term loan secured on the

16 Berkeley real estate owned by Berkeley Properties which loan was guaranteed by Second Street

17 Properties and Second Street Properties' majority shareholder. In the latter part of 2013, due to

18 failure to meet certain performance covenants, Wells Fargo informed Second Street Properties that

19 it would need to find an alternative source of financing. By agreement, Wells Fargo reduced the

20 funds available to Second Street Properties under the line of credit in the second half of 2013 and

21 eventually froze the line of credit in February, 2014.

22 **E.      Decision to Preserve Going Concern Value Through A Bankruptcy Sale Process:**

23       With all of the above challenges, Second Street Properties and Berkeley Properties realized

24 that in order to preserve Second Street Properties' steel casting business for the benefit of its

25 creditors, employees, and estate, they would need to file for chapter 11 bankruptcy protection and

26 seek to sell at least Second Street Properties' assets as a going concern. Second Street Properties

27 and Berkeley Properties began working with investment bankers at Cleary Gull to market their

28 assets for such a sale in February 2014 at the same time as they began to prepare for their chapter

7

11 bankruptcy filings with their chosen bankruptcy counsel. An electronic data room was established and the Debtors commenced marketing their assets for a going concern sale in February 2014. The Debtors then filed their voluntary chapter 11 bankruptcy petitions on March 10, 2014, commencing these Bankruptcy Cases.

<center>**ARTICLE IV**</center>

<center>**RELEVANT EVENTS DURING THE BANKRUPTCY CASES**</center>

**A.      Case Commencement:**

The Debtors separately filed their voluntary petitions under chapter 11 of title 11 of the United States Code on March 10, 2014 (the "Petition Date") and they continue to operate as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**B.      Retention of Professional by the Debtors:**

On April 1, 2014, the Court entered its order appointing Binder & Malter LLP as bankruptcy counsel to the Debtors in these cases. The Court subsequently also authorized the appointment of the following professionals to the Debtors: (i) Burr Pilger Mayer as financial advisors; (ii) Cleary Gull Inc. as investment bankers; (iii)  Mowat Mackie & Anderson LLP as accountants; (iv) Chang, Ruthenberg & Long P.C. as ERISA counsel; (v) Thoits, Love, Hershberger & McLean as transactional counsel; and, (vi) Littler Mendelson P.C. as labor counsel.

**C.      Formation of Creditors' Committee:**

The Office of the United States Trustee formed the Official Unsecured Creditors' Committee (the "Committee") on March 21, 2014. The Committee retained Sheppard, Mullin, Richter & Hampton LLP as counsel and Arch & Beam Global LLC as financial advisors.

**D.      First Day and Related Motions:**

Immediately following the filing of the voluntary petitions, the Debtors sought relief from the Court including: (i) a motion to approve a stipulation with secured creditor Wells Fargo Bank authorizing the Debtors to continue to use cash collateral for normal operations pursuant to an operating budget pending a final hearing; (ii) a motion authorizing the Debtors to continue to use their pre-petition cash management practices and existing bank accounts; (iii) a motion authorizing the Debtors to pay pre-petition employee compensation, benefits and Union obligations; (iv) a

<center>8</center>

motion for joint administration; and, (v) a motion to limit notice.  The Court approved the preliminary use of cash collateral and later also approved the final use of cash collateral following a fully noticed hearing.  The Court approved the Debtors' request to continue to utilize its existing cash management systems and to pay pre-petition employee compensation up to the priority limit, employee benefits and Union obligations in the ordinary course of business.  The cases were ordered jointly administered.  After a further hearing, the Court granted the request to limit notice, along with the appointment of Epiq Bankruptcy Solutions LLC ("Epiq") as the official claims, balloting and noticing agent in these cases and approved the form of a substitute notice of commencement of cases, of the first meeting of creditors and the initial claims bar date.

**E.** **Application to Appoint Responsible Individual:**

On March 13, 2014, the Court entered orders in both cases appointing Charles H. Bridges III, Chief Financial Officer of Second Street Properties, as the responsible individual for both Debtors.  Subsequently, following closing of the sale of assets described below, the Debtors obtained an Order on September 5, 2014 appointed Catherine Delsol, President and CEO of Second Street Properties and the Managing Member of Berkeley Properties as the successor responsible individual in these cases.

**F.** **Post-Petition Financing:**

Shortly after the Petition Date, the Debtors entered into a proposed debtor in possession credit agreement to provide the Debtors with post-petition financing for ongoing operations.  Although the Debtors had received authorization to use the cash collateral of Wells Fargo Bank, Wells Fargo Bank was unwilling to further extend any credit to the Debtors post-petition.  The Debtors knew based on anticipated cash flow projections including the annual renewal of their workers compensation insurance policy, that they could not continue normal operations in chapter 11 without access to a credit facility. The Debtors therefore sought approval of a new revolving line of credit from Siena Lending Group ("Siena") of up to $8.5 million for purposes of allowing the Debtors to repay the existing secured indebtedness owed to Wells Fargo Bank, as well as providing the Debtors with operating capital.  After negotiating resolution to objections raised by the Committee, the Court granted approval of the post-petition financing motion which provided

Siena with a senior security interest in the Debtors' assets and a superpriority administrative expense claim, as well as modification to the automatic stay and related relief.

**G.      Approval of Bid Procedures:**

Following extensive pre-petition and post-petition marketing of assets by their appointed investment bankers Cleary Gull Inc., the Debtors negotiated the terms of a comprehensive Asset Purchase Agreement (the "APA") with a stalking horse bidder, Speyside Fund LLC or its assignee ("Speyside"), subject to overbid.  The APA generally provided for the sale of Second Street Properties' foundry business on a going concern basis and included the assumption and assignment of specific executory contracts and leases, as well as entering into a new long term lease between Speyside and Berkeley Properties for the use of the real property where the foundry operates.  On June 19, 2014, the Debtors filed their MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF ("Bid Procedures Motion") which set forth the proposed schedule and process for approval of the sale of assets of the Debtors' assets and auction.  The relief requested in the Bid Procedures Motion was granted by order entered on June 30, 2014.

**H.      Approval of the Sale and Related Motions:**

On June 30, 2014, the Debtors filed their MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF, together with related motions to (i) approve the assumption and assignment of leases and executory contracts; and, (ii) to conditionally approve a new real property lease between Berkeley Properties and Speyside and rejection of the existing real property lease between Second Street Properties and Berkeley Properties (collectively the "Sale Motions").  Notice of the Sale Motions and the auction hearing scheduled for July 28, 2014 was provided to creditors and potentially interested bidders pursuant to the Court's order approving the Bid Procedures Motion.  No other potential overbidding parties came forward prior to or at the time of the hearing.  Based upon a resolution reached between the Debtors and Speyside, certain objections raised by the Committee and one of the affected landlords were resolved and the Sale Motions were approved.  The Court's orders approving the sale and related motions were thereafter entered on July 31, 2014.

Case: 19-04057    Doc# 85    Filed: 10/03/20    Entered: 10/03/20 13:34:49    Page 308 of
441

**I.        Closing of the Sale and Repayment of Siena:**

Following the hearing on July 28, 2014, the Debtors were ordered to give notice of the pending sale to Sentry Insurance ("Sentry") and certain other parties.  The Debtors and Speyside also used the intervening time to negotiate an amendment to the APA to clarify certain terms and conditions of the sale, including certain adjustments to the purchase price.  The Court approved an ex parte application to amend the APA, however Sentry objected to the amendment.  Ultimately, the parties were able to achieve a satisfactory resolution and the Court entered a further order that resolved Sentry's concerns.  The sale of substantially all assets closed on August 29, 2014 just prior to midnight to Pacific Steel Casting Company, a Delaware limited liability company ("Buyer" or "New Pacific Steel"), an assignee of Speyside.  Funding of the sale transaction occurred the following business day and resulted in the repayment in full of the Siena DIP loan facility.  Executory contracts and leases were assumed and assigned to the Buyer, including the collective bargaining agreement with the Union.  The Buyer assumed responsibility for both of Second Street Properties' pension plans.  Cure payments were made to the holders of those executory contracts and leases that were assumed and assigned to the Buyer.  The Buyer re-hired all but approximately 20 former employees of Second Street Properties.

**J.        Rejection of Leases and Executory Contracts:**

Following consummation of the sale of assets to the Buyer, the Debtors identified those remaining leases and executory contracts that Buyer had not agreed to be responsible for and for which Second Street Properties no longer had need for the personal property items being leased or the other services which were being provided to Second Street Properties as part of the operation of its steel foundry business that was sold to the Buyer.  The Debtors brought a motion to reject those unnecessary leases and executory contracts which was granted by the Court, with a rejection claims bar date of November 14, 2014 also established.

**K.        Objection to Claim of IRS:**

The United States Internal Revenue Service (the "IRS") filed claim #47 asserting a claim of $32,358,877 for corporate income taxes for the tax year ending March 31, 2012 (the "2011 Tax Year") and alleging that the entire claim is entitled to priority treatment under Bankruptcy Code §

507(a)(8).  Second Street Properties has filed an objection to claim #47 together with a motion to establish the amount of tax liability pursuant to 11 U.S.C. §505(a)(1).  The objection states that the IRS Claim is based upon taxes that have not been assessed and Second Street Properties has no information or reason to believe that it is obligated to the IRS to pay any income taxes for the 2011 Tax Year.  Second Street Properties is informed and believes, and thereon alleges, that the IRS Claim is not based on any obligation, but is the result of a random informational audit currently being conducted by the IRS of Debtor's business for the tax year in question as part of the "National Research Program" of the IRS.  In fact, during the year in question, the Debtor filed a timely tax return with the IRS, reflecting a significant loss. Bankruptcy Code §505(a)(1) provides that the court may determine the amount or legality of any tax, whether or not it has been previously assessed, whether or not paid, and whether or not previously contested.  The IRS has admitted that its claim is unliquidated.  The objection to the claim of the IRS remains pending at this time and the determination of the IRS proof of claim will affect the amount available for distribution to general unsecured non-priority creditors.  The Plan Proponents believe that the IRS claim should be estimated for purposes of plan confirmation at zero.  Notwithstanding, the Debtors may still be required to complete the audit.  The IRS has estimated that it would take until approximately July 31, 2015 to complete the audit.

**L.**  **Final Approval of the Class Action Settlement:**

Following Court approval of a stipulation for relief from stay, the Superior Court granted final approved to the Class Action Settlement on October 16, 2014.

**M.**  **Operations After the Sale of Assets:**

Following the closing of the sale of assets, the Debtors and the Committee have resolved issues related to the value of inventory and receivables with the Buyer, as well as overpayment of the Siena DIP loan.  The Buyer as the tenant of Berkeley Properties is obligated to make monthly rental payment according to a written lease which is for an initial term of 15 years.  As part of the First Amendment to the APA and Lease, monthly base rent is currently abated for a period of 11.1 months; however the Buyer must still pay triple net charges such as real property taxes.

After the sale of the foundry business, and until the appointment of the Plan Administrator pursuant to the Plan, Catherine Delsol has been the primary officer in charge the Debtors. Ms. Delsol joined Second Street Properties in 2003 and was the fourth generation of her family to lead Second Street Properties. Prior to Second Street Properties, she held positions in technical sales, financial management and real estate. Catherine has a Bachelor of Arts Degree in Communications from California State University, Chico. Catherine is now the sole person left supporting Second Street Properties and Berkeley Properties and is the appointed Responsible Individual and the managing member of Berkeley Properties. She has been involved in transition of all items following the close of the sale of Second Street Properties' assets, including assisting with banking needs, communications, budget and expense containment, claims analysis and other "wind-down" requirements. Ms. Delsol is being compensated $150 hour for her services.

**N.     Claims Bar Dates:**

The Court established July 14, 2014 as the bar date for non-governmental units to file claims in these bankruptcy cases with Epiq. Certain other claims bar dates have been established for limited groups of creditors, such as those whose creditors whose contracts have been rejected and administrative claims arising prior to the closing of the sale of assets.

**O.     Cranetech Adversary Proceeding:**

In the context of its steel casting foundry operations, Second Street Properties used heavy machinery including moving equipment. Second Street Properties engaged the services of CraneTech Inc. ("CraneTech") to service certain equipment. In February and March 2014, CraneTech recorded Mechanics' Liens against the real property owned by Berkeley Properties in the collective amount of $322,551.81 contending that the outstanding amounts constitute a lien for labor, services, equipment and/or materials that was furnished for the construction of a building, improvement or structures on the real property. Berkeley Properties disputes this contention maintains that the unpaid invoices are for the maintenance and repair of equipment and do not constitute a proper basis for a mechanics' lien against the real property. The Debtors filed a Complaint for Declaratory Relief, to Expunge Mechanics' Liens and Avoid Statutory Liens (Adversary Proceeding No. 14-41048) which matter remains pending at this time. Since the

1 | validity of the CraneTech mechanics' liens have not yet been settled or determined at this time,
2 | CraneTech's claims in these cases have been separately classified with the treatment of
3 | CraneTech's claims dependent upon the outcome of the pending adversary proceeding.

4 | **P.**     **Summary of Monthly Operating Reports:**

5 | Attached hereto as Exhibit "A" are summaries of the most recent Monthly Operating
6 | Reports filed by the Debtors.

7 | **Q.**     **Claims Related to the Defined Benefit Pension Plan:**

8 | During the course of due diligence in connection with the sale of assets, the Debtors
9 | discovered that errors were made in 2011 by the administrator of Second Street Properties' non-
10 | union pension plan, NH Hicks, Inc. and/or plan actuary Haness & Associates LLC.  In July 2014,
11 | the Debtors filed with the IRS a Voluntary Correction Program Application (the "VCP") to correct
12 | those errors as required by the asset purchase agreement.  The IRS has recently responded by
13 | requesting additional documents regarding the VCP and the Debtors are complying with that
14 | request.  Under the terms of the asset sale agreement, Debtors are responsible for any excess
15 | amount of retirement benefits (and any applicable interest) definitely determined by the IRS
16 | beyond that previously determined for any retiree whose termination date occurred after April 1,
17 | 2011 and prior to the Closing Date.  Pursuant to the terms of the asset sale agreement, $20,000
18 | remains on deposit in an attorney-client trust account as a reserve to be used to pay any such
19 | amounts until such benefit entitlement (or lack thereof) is definitively determined by the IRS.  In
20 | the event the IRS were to disqualify the non-union pension plan due to the errors, the Buyer is
21 | responsible for the consequences of such an occurrence.  The Debtors also reserve all rights and
22 | claims against plan administrator NH Hicks, Inc. and/or plan actuary Haness & Associates LLC
23 | for their actions which caused errors and caused the Debtors to incur damages, including filing
24 | fees and legal expenses, as well as future damages in an as yet unknown amount.

25 | **R.**     **Claims by the Buyer:**

26 | Under the terms of the asset purchase agreement as amended, the Buyer received a period
27 | of 90 days following the closing of the transaction during which time the Buyer could assert
28 | claims for alleged breaches of the representations and warranties made by Second Street

14

Properties in the asset purchase agreement. The sale transaction closed on August 29, 2014. On November 28, 2014 (the day after Thanksgiving), in an email communication the Buyer asserted a claim for returns of $256,000 and for uncollectable accounts receivable of $250,000. To date, the Buyer has provided no supporting details or documents to evidence such claims. The asset purchase agreement provides that such disputes shall be submitted to and resolved by the Bankruptcy Court (either by agreement or by order of the Court) and that the sole and exclusive remedy for any amounts ultimately payable by Second Street Properties as the Seller to the Buyer shall be paid through a reduction in the amount of rent otherwise payable by the Buyer to Berkeley Properties LLC under the real property Lease until the amount of such rent abatement equals the amount determined to be due to the Buyer.

**S.**     **Contingent Claim of Local 164B:**

The CMTA – Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust (the "Local 164B") has filed a claim in the amount of $26,702,858 against Second Street Properties based on contingent withdrawal liability under the multi-employer union pension plan which Second Street Properties participates in pursuant to the collective bargaining agreement between Second Street Properties and Local 164B. Although the Buyer has expressly assumed responsibility for Second Street Properties' obligations to Local 164B as part of the sale, by statute Second Street Properties remains secondarily liable to Local 164B on a contingent basis for a period of five (5) plan years following the closing of the sale through July 1, 2020 in the event that either (a) New Pacific Steel has not completely or partially withdrawn from Local 164B before July 1, 2020 or (b) New Pacific Steel has completely or partially withdrawn from Local 164B before July 1, 2020, and has completely satisfied all resulting withdrawal liability obligations to Local 164B when and as due, then, no later than 60 days following the occurrence of either (a) or (b) above . In lieu of posting a cash bond at the time of closing of the sale transaction, or withholding all distributions from unsecured creditors until the expiration of the 5 year period of contingent liability, the Plan Proponents and Local 164B have agreed to provide Local 164B with security for its contingent claim in the form of the Berkeley Deed of Trust. The Berkeley Deed of Trust is enforceable under its specific terms and conditions described in detail in the treatment of

the Class 4 Claim of Local 164B. Once the five year time period elapses and assuming there has been no ERISA triggering event, then Local 164B will be required to reconvey the Berkeley Deed of Trust and release its lien on the Berkeley real property.

**ARTICLE V**

**PLAN OF REORGANIZATION**

The Plan does not provide for any substantive consolidation of the Debtors' Estates. Claims against Second Street Properties shall be satisfied by the assets of Second Street Properties, and Claims against Berkeley Properties shall be satisfied by the assets of Berkeley Properties. Note however that because Berkeley Properties is a wholly owned subsidiary of Second Street Properties, once the Claims against Berkeley Properties are satisfied, the proceeds produced by the assets of Berkeley Properties (including, without limitation, the rental payments made to Berkeley Properties for use of the Berkeley Real Estate) shall be distributed to Second Street Properties, as Holder of 100% of the Interests in Berkeley Properties, and sole member of Class 8. Once such proceeds are distributed to Second Street Properties, they shall become assets of the Second Street Properties Estate and shall be used to satisfy Claims against and Interests in Second Street Properties in the manner set forth in this Plan.

**A.**     **Administrative Expense Claims**

As provided under Bankruptcy Code section 1123(a)(1), Administrative Expense Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Accordingly, holders of Administrative Expense Claims are not entitled to vote on this Plan.

To the extent that Allowed Administrative Expense Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash from either the Estate of Second Street Properties or the Estate of Berkeley Properties in an amount equal to such Allowed Claim, in full and final satisfaction, settlement and release and in exchange for such Claim, on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed

Administrative Expense Claim pursuant to a Final Order of the Bankruptcy Court, or as soon thereafter as reasonably practicable.

**1.     Applicable Bar Dates for Administrative Expense Claims.**

Except for applications for payment by Professionals under the Bankruptcy Code and fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, all requests for payment of outstanding Administrative Expense Claims incurred from the Petition Date through August 29, 2014 were required to be filed and served by no later than October 31, 2014, as set forth in the Order of the Bankruptcy Court entered on September 16, 2014 as Docket No. 329.

Except for applications for payment by Professionals under the Bankruptcy Code and fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, and except for taxes that arise after the Petition Date (which shall be paid as and when they come due), all requests for payment of outstanding Administrative Expense Claims incurred from August 30, 2014 through the Effective Date shall be filed and served on the Plan Administrator no later than thirty (30) calendar days after the Effective Date.

**2.     Professional Fees.**

All Professionals seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for expenses incurred through and including the Effective Date in accordance with section 503(b) of the Bankruptcy Code, to the extent not already paid as a result of interim applications for such payment, shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than that date that is thirty (30) calendar days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Such Professional fee and expense Claims shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (ii) upon such other terms as may be mutually agreed upon by such Holder of an Administrative Expense Claim and the Plan Administrator.

3. **Statutory U.S. Trustee Fees.**

All United States Trustee fees payable by each Estate pursuant to 28 U.S.C. § 1930 shall be paid in full by each Estate in accordance with the Plan without the need for the Office of the United States Trustee to file any request for payment.

**B.    Priority Tax Claims:**

As provided under Bankruptcy Code section 1123(a)(1), Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Accordingly, holders of Priority Tax Claims are not entitled to vote on this Plan.

To the extent that Allowed Priority Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, the Trustee shall pay to each Holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement and release and in exchange for such Claim, an amount in Cash equal to the unpaid amount of such Allowed Priority Tax Claim plus any interest that may be owing under Bankruptcy Code section 511, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties.

**C.    CLASSIFICATION OF CLAIMS AND INTERESTS - SUMMARY OF CLASSIFICATIONS:**

The Plan is intended to address all Claims and Interests against the Debtors and any property or assets of the Debtors or their Estates, of whatever character. Claims and Interests, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes including voting (unless otherwise specified), confirmation and distribution pursuant to the Plan as set forth below.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the

Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise satisfied prior to the Effective Date. Multiple Proofs of Claim filed by a Claim Holder which qualify for inclusion within the same Class shall be aggregated, and if Allowed, shall constitute a single Allowed Claim.

**D.     Classes Under the Plan:**

| Class 1 | Priority Non-Tax Claims | Unimpaired, deemed to accept |
| Class 2 | Miscellaneous Secured Claims (each secured creditor in a separate class identified as Class 2A, 2B, etc.) | Unimpaired, deemed to accept |
| Class 3 | Disputed CraneTech Claims | Unimpaired, deemed to accept |
| Class 4 | Local 164B Claim | Impaired, entitled to vote, but have consented to treatment by settlement |
| Class 5 | General Unsecured Claims Against Berkeley Properties | Impaired, entitled to vote |
| Class 6 | General Unsecured Claims Against Second Street Properties | Impaired, entitled to vote |
| Class 7 | Interests in Second Street Properties | Impaired, entitled to vote |
| Class 8 | Interests in Berkeley Properties | Unimpaired, not entitled to vote |

**E.     TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS:**

**Class 1 – Priority Non-Tax Claims.**

**1.     Impairment and Voting.**

Class 1 is unimpaired. Holders of Priority Non-Tax Claims are deemed to have accepted this Plan under Bankruptcy Code section 1126(f) and are not entitled to vote on the Plan.

**2.     Treatment.**

Each Holder of an Allowed Class 1 Claim, unless otherwise mutually agreed upon by the Holder of such Claim and the Debtor, will receive Cash in an amount equal to such Allowed Class 1 Claim on the later of (a) the Initial Distribution Date, or (b) the date such Claim becomes an Allowed Claim pursuant to a Final Order, or as soon thereafter as is practicable, from either the Estate of Second Street Properties or the Estate of Berkeley Properties, as applicable.

Case: 19-40057   Doc# 857   Filed: 10/03/25   Entered: 10/03/25 13:34:27   Page 317 of 691
SMRH:437127496.2                              DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

**Class 2 – Miscellaneous Secured Claims.**

**1.  Impairment and Voting.**

Class 2 is unimpaired under the Plan. Holders of Miscellaneous Secured Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.  For purposes of distributions under the Plan, each holder of a Miscellaneous Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan.

**2.  Alternative Treatment.**

On the Initial Distribution Date, the Plan Administrator shall select one of the following alternative treatments for each Allowed Miscellaneous Secured Claim in Class 2, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Miscellaneous Secured Claim:

a.  *Abandonment or Surrender.*

The Plan Administrator will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

b.  *Cash Payment.*

The Plan Administrator will pay to the holder of such Claim Cash equal to the amount of such Claim, or such lesser amount to which the holder of such Claim shall agree, in full satisfaction and release of such Claim, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties, as applicable.

c.  *Unimpairment.*

The Plan Administrator will leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

**3.  Unsecured Deficiency Claim.**

Any Unsecured Deficiency Claim asserted by a Holder of an Allowed Miscellaneous Secured Claim in Class 2 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the abandonment or surrender of such Creditor's collateral or such Creditor's

Case: 19-04057    Doc# 85    Filed: 10/03/25    Entered: 10/03/25 13:34:47    Page 318 of
441
SMRH:437127496.2                                                    DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT

receipt of its distribution under the Plan.  Any such Allowed Unsecured Deficiency Claim shall be treated as a Class 5 General Unsecured Claim against Berkeley Properties or a Class 6 General Unsecured Claim against Second Street Properties, as applicable.

**Class 3 – Disputed CraneTech Claims.**

**1.        Impairment and Voting.**

Class 3 is unimpaired under the Plan. The Holder of the Disputed CraneTech Claims is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

**2.        Initial Treatment of Claim.**

The Class 3 Disputed CraneTech Claims are not Allowed as the validity and priority of their asserted status as secured claims is subject to the CraneTech Adversary Proceeding.  Unless and until a Final Order is entered allowing the Disputed CraneTech Claims in any amount, the Plan Administrator shall reserve for the Disputed CraneTech Claims as if they were Class 5 General Unsecured Claims Against Berkeley Properties, as provided in Section VIII.I.2 of the Plan.

**3.        Treatment if Claim is Allowed by a Final Order.**

If the Bankruptcy Court enters a Final Order allowing the Disputed CraneTech Claims as Secured Claims, then the Plan Administrator shall pay to the holder of such Claims Cash equal to the amount of such Claims, or such lesser amount to which the Holder of such Claims shall agree, in full satisfaction and release of such Claims, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties, as applicable.

If the Bankruptcy Court enters a Final Order allowing the Disputed CraneTech Claims but only as General Unsecured Claims against either or both Estates, then the Disputed CraneTech Claims shall receive the treatment provided in this Article VI of the Plan for an Allowed General Unsecured Claim against the relevant Estate or Estates.

If the Disputed CraneTech Claims are Allowed, either as Secured Claims or General Unsecured Claims, they shall be limited to one recovery from the Debtors' Estates.  In other

words, the same Claim asserted against each Estate shall receive a distribution from only one Estate.

**Class 4 – Local 164B Claim.**

**1.  Impairment and Voting.**

Class 4, which is comprised of the Local 164B Claim, is impaired under the Plan.  The Holder of the Local 164B Claim is entitled to vote on the Plan, however the Holder of the Local 164B Claim has consented to its Claim's treatment in this Plan as described below.

**2.  Treatment.**

The Proponents and Local 164B have reached an agreement on the treatment of the Local 164B Claim, which is as follows.  On the Effective Date, the Plan Administrator on behalf of Berkeley Properties shall execute a deed of trust (the "Berkeley Deed of Trust") that encumbers the Berkeley Real Property and secures payment of the contingent Local 164B Claim in the full amount asserted by Local 164B – *i.e.*, $26,702,858.  The Berkeley Deed of Trust shall be in the form attached to the Plan Supplement.  If (a) New Pacific Steel has not completely or partially withdrawn from Local 164B before July 1, 2020, or (b) New Pacific Steel has completely or partially withdrawn from Local 164B before July 1, 2020, and has completely satisfied all resulting withdrawal liability obligations to Local 164B when and as due, then, no later than 60 days following the occurrence of either (a) or (b) above, Local 164B shall execute and deliver to the Plan Administrator a substitution of trustee and full reconveyance that reconveys the Berkeley Deed of Trust.

If New Pacific Steel completely or partially withdraws from Local 164B before July 1, 2020, then Local 164B shall promptly deliver written notice of the same to the Plan Administrator accompanied by notice of Local 164B's calculation of the amount of the withdrawal liability of Second Street Properties that may be triggered under ERISA § 4204, 29 U.S.C. §§ 1384 (and such notice shall satisfy any notice requirement to the Plan Administrator under ERISA § 4219(b), 29 U.S.C. § 1399(b)).  Thereafter, the Plan Administrator may request review of and contest Local 164B's calculation of the amount of Second Street Properties' withdrawal liability that may be triggered in accordance with ERISA §§ 4219(b) and 4221, 29 U.S.C. §§ 1399(b) and 1401.

Except as provided in the preceding sentence and notwithstanding any other provision hereof, neither the Plan Administrator, the Post-Confirmation Committee, nor any other party may, or shall have standing to, file or prosecute any objection to, seek review or reconsideration of, or request estimation of the Local 164B Claim.  If the withdrawal liability is uncontested and/or confirmed through the dispute resolution procedures of ERISA § 4221, 29 U.S.C. § 1401, then the Local 164B Claim shall be an Allowed Claim.

If New Pacific Steel, following a complete or partial withdrawal from Local 164B that occurs prior to July 1, 2020, fails to make any withdrawal liability payment when and as due, and such failure to pay is not cured by New Pacific Steel or the Plan Administrator in the 60-day period following receipt of written notification as provided in ERISA § 4219(c)(5)(A), 29 U.S.C. § 1399(c)(5); and the Plan Administrator subsequently fails to pay said Allowed Local 164B Claim as and when provided by law or the parties' agreement, then Local 164B shall become entitled to exercise any and all remedies available to it under the Berkeley Deed of Trust, including foreclosing on the Berkeley Real Property pursuant to the power of sale in the Berkeley Deed of Trust.

In the event that Local 164B conducts a non-judicial foreclosure on the Berkeley Real Property in order to collect on the Local 164B Claim, Local 164B shall not be entitled to any Claim against either Estate for any deficiency.  Such a deficiency claim shall be deemed fully and finally waived as of the date title to the Berkeley Real Property passes pursuant to such a non-judicial foreclosure sale. The Berkeley Deed of Trust and the foregoing provisions regarding the Berkeley Deed of Trust shall constitute the sole source of recovery against either Estate for the Local 164B Claim.  Local 164B also waives any and all existing or potential future claims for partial or complete withdrawal liability against the Class 7 Interest Holders, to the extent such claims may arise under applicable non-bankruptcy law.  For clarification, the distribution of the Initial Distributable Cash and the Periodic Distributable Cash made to holders of allowed Claims pursuant to the Plan from the payment of rents and other monies received during the term of this Plan shall not trigger withdrawal liability under ERISA because the Berkeley Deed of Trust

satisfies the requirement for the posting of a bond under 29 U.S.C. § 1384(a)(3) and Local 164B consents thereto.

**Class 5 – General Unsecured Claims Against Berkeley Properties.**

**1.     Impairment and Voting.**

Class 5 is impaired under the Plan.  Holders of General Unsecured Claims against Berkeley Properties are entitled to vote on the Plan.

**2.     Treatment.**

On or as soon as practicable following the Effective Date, each Holder of such an Allowed General Unsecured Claim against Berkeley Properties shall receive a Pro Rata share of the Initial Distributable Cash of the Berkeley Properties Estate on the Initial Distribution Date and a Pro Rata share of the Periodic Distributable Cash of the Berkeley Properties Estate on such Periodic Distribution Dates as are established by the Plan Administrator.  As set forth in the definition of Initial Distributable Cash, no part of the Speyside Sale Proceeds constitutes the Initial Distributable Cash of the Berkeley Properties Estate.  To the extent there are sufficient funds with which to pay it, Holders of Allowed General Unsecured Claims against Berkeley Properties are entitled to interest at the Legal Rate.

**Class 6 – General Unsecured Claims Against Second Street Properties.**

**1.     Impairment and Voting.**

Class 6 is impaired under the Plan.  Holders of General Unsecured Claims against Second Street Properties are entitled to vote on the Plan.

**2.     Treatment.**

On or as soon as practicable following the Effective Date, each Holder of such an Allowed General Unsecured Claim against Second Street Properties shall receive a Pro Rata share of the Initial Distributable Cash of the Second Street Properties Estate on the Initial Distribution Date and a Pro Rata share of the Periodic Distributable Cash of the Second Street Properties Estate on such Periodic Distribution Dates as are established by the Plan Administrator.  To the extent there are sufficient funds with which to pay it, Holders of Allowed General Unsecured Claims against Second Street Properties are entitled to interest at the Legal Rate.

**Class 7 – Interests in Second Street Properties**

**1.     Impairment and Voting.**

Class 7 is impaired under the Plan.  Holders of Interests in this Class are entitled to vote on the Plan.

**2.     Treatment.**

Holders of Class 7 Interests in Second Street Properties shall receive common stock in Reorganized Second Street Properties in an amount equal to the common stock held by such Interest Holders on the Petition Date, as follows:

| Interest Holder | Security Class | Number of Shares and % of Issued and Outstanding Shares |
|---|---|---|
| CAMLEE CORPORATION<br>89 Alvarado Road<br>Berkeley, CA 94705 | Common | 27,000 shares, or 6.522% |
| DAVI ASSOCIATES<br>129 Sunnyglen Drive<br>Vallejo, CA 94591 | Common | 29,000 shares, or 7.004% |
| EMMERICHS ASSOCIATES<br>1674 Glazier Drive<br>Concord, CA 94521 | Common | 9,000 shares, or 2.174% |
| TRI-PACIFIC, INC.<br>85 Lakeside Drive<br>Corte Madera, CA 94925-1037 | Common | 340,000 shares or 82.126% |
| WESTRIDGE CAPITAL<br>89 Alvarado Road<br>Berkeley, CA 94705 | Common | 9,000 shares or 2.174% |

Such newly issued common stock shall be represented by stock certificates issued by the Plan Administrator on behalf of Reorganized Second Street Properties on the Effective Date. Stock certificates representing the pre-petition Interests held by such Holders on the Petition Date shall be deemed cancelled as of the Effective Date of the Plan.

Holders of Class Interests shall also receive a Pro Rata share of the Periodic Distributable Cash, if any, remaining after payment of Class 5 General Unsecured Claims against Berkeley Properties and Class 6 General Unsecured Claims Against Second Street Properties in full with interest at the Legal Rate.  Such distributions, if any, shall be made by the Plan Administrator on such Periodic Distribution Dates as are established by the Plan Administrator.  Among other

Case: 19-40507   Doc# 857   Filed: 10/03/20   Entered: 10/03/20 13:34:49   Page 328 of 691

things, such distributions to Holders of Class 7 Interests may include distributions from the proceeds of a sale of the Berkeley Real Property after such proceeds are used to satisfy all Class 5 General Unsecured Claims against Berkeley Properties and Class 6 General Unsecured Claims Against Second Street Properties in full with interest at the Legal Rate. The Plan Administrator shall also give advance written notice to Holders of Allowed Class 7 Interests prior to listing the Berkeley Real Property for sale.

Holders of Class 7 Interests shall be deemed to grant to the Post-Confirmation an irrevocable proxy to exercise all voting and approval rights represented by the Interests under the Debtors' organizational documents until such time as all Holders of Allowed Claims in Classes 5 and 6 are repaid in full with interest at the Legal Rate. Upon such repayment, the proxy shall be automatically revoked.

**Class 8 – Interests in Berkeley Properties**

**1.      Impairment and Voting.**

Class 8 is unimpaired under the Plan. Holders of Interests in this Class are deemed to accept the Plan.

**2.      Treatment.**

Holders of Class 8 Interests in Berkeley Properties shall retain their Interests in Reorganized Berkeley Properties, which will be governed by an Amended and Restated Operating Agreement to be attached to the Plan Supplement. As described in Article III of this Plan, the sole Holder of Interests in Berkeley Properties is Second Street Properties. Thus, after the proceeds produced by the assets of Berkeley Properties are used to pay Holders of Allowed Class 5 Claims against Berkeley Properties, said proceeds will be used to make distributions to Holders of Allowed Class 6 Claims against Second Street Properties and Class 7 Interests in Second Street Properties in the manner described above.

**F.      PRELIMINARY ESTIMATES OF ALLOWED CLAIMS**

The Debtors and the Committee have done a very preliminary analysis of the claims filed in the Bankruptcy Cases in order to develop projections of the range of estimated allowed claims in each class for the purposes of this Disclosure Statement. Those estimates are set forth on the

chart below, and include estimates for both unclassified claims and classified claims.  Parties in interest must bear in mind when reviewing these estimates though that they _very preliminary_.  The asserted claims against the estates greatly exceed those set forth in the chart below, and therefore the chart represents a rough estimate of how claim objections commenced by the Plan Administrator following the confirmation of this Plan will be resolved.  Without the benefit of the further analysis and discovery that would be involved in those many claim objections, the estimates below are very preliminary and non-binding.  The actual allowed claims in each class may vary significantly from the estimates or ranges set forth below.  The estimates represent simply the best effort of the Debtors and the Committee to provide information to interested parties at this stage of the Bankruptcy Cases.  By providing these estimates, the Debtors and the Committee are in no way binding themselves or the Plan Administrator to the estimates or limiting their ability or the Plan Administrator's ability to object to any claims at a later point in time. With those caveats and limitations, the Debtors and the Committee currently estimate the Allowed unclassified and Classified claims to be as follows:

| Class No. | Description | Estimated Allowed Amount |
|---|---|---|
| N/A | Allowed Administrative Expense Claims | TBD[2] |
| N/A | Allowed Priority Tax Claims | $60,000[3] |
| 1 | Priority Non-Tax Claims | $124,650 |
| 2 | Miscellaneous Secured | $0 |

[2] The Allowed Administrative Expense Claims are comprised of Professional Fees, U.S. Trustee Fees, Administrative Expense Claims under Section 503(b)(9) of the Bankruptcy Code, and other Administrative Expenses.  The Plan Proponents currently estimate that the Allowed 503(b)(9) Claims will be ultimately be roughly $375,000 if all anticipated objections are sustained, with a maximum exposure of roughly $500,000.  The other large piece of this analysis consists of Professional Fee Claims.  The Estate Professionals indicated at the hearing on approval of the Disclosure Statement that they estimated Professional Fee Claims incurred and unpaid for the second interim period through March 31, 2015 to be approximately $630,000.  This is an estimate only, and is subject to change when applications are filed by the Estate Professionals.

[3] The Internal Revenue Service has filed a "protective claim" in excess of $32 million based on a random audit that would, if Allowed, constitute a Priority Tax Claim.  The audit is expected to be complete by July 31, 2015.  As explained elsewhere in this Disclosure Statement, given the significant losses suffered by Second Street Properties during the period of time in question, the Plan Proponents do not believe the audit will result in any Allowed Claim against the Estate of Second Street Properties.

Case: 19-04057   Doc# 85   Filed: 10/03/05   Entered: 10/03/05 13:04:49   Page 325 of 691

| | | |
|---|---|---|
| | Claims | |
| 3 | Disputed Crane Tech Claim | $0 |
| 4 | Local 164B Claim | Contingent Liability Up to $26,702,858, Secured by Berkeley Deed of Trust Which is the Sole Source of Recovery for this Claim |
| 5 | General Unsecured Claims Against Berkeley Properties | $183,000 |
| 6 | General Unsecured Claims Against Second Street Properties | $15,000,000 |

## ARTICLE VI

## ALTERNATIVES TO THE PLAN

**A.**     **General:**

The Debtors and Committee believe that the Plan provides their creditors with the greatest value that is likely to be obtained on their respective claims. The primary alternative to Confirmation of the Plan is liquidation of the estates under Chapter 7 of the Bankruptcy Code.

**B.**     **Best-Interests–of-Creditors Test and Chapter 7 Liquidation Analysis:**

The Bankruptcy Code requires as a condition to confirmation of any plan of reorganization that a plan provide that creditors will, as of the effective date of a plan on account of their claims, receive not less than the amount that the holder would receive if the

Debtors were liquidated in Chapter 7 on the same date.

There are three significant financial differences between the proposed chapter 11 Plan and liquidation in Chapter 7. First, under the terms of the approved settlement of the Rodriguez Class Action Settlement, if Second Street Properties case were to convert to chapter 7, then the amount of the Allowed unsecured claim held on behalf of the class of claimants in the Rodriguez Class Action would increase from $5.4 million to $25 million. This would adversely affect the pro-rata distribution received by all other creditors holding Class 6 Allowed unsecured Claims.

Second, conversion of either the Second Street Properties or Berkeley Properties bankruptcy cases to Chapter 7 would create in a "triggering event" under ERISA the result of

SMRH:437127496.2

which would mean that the Debtors would be liable for contingent withdrawal liability to the Pension Trust as part of a multi-employer pension plan of which Second Street Properties has participated. The Pension Trust has filed a proof of claim in the amount of $26,702,858 for such contingent withdrawal liability. If either bankruptcy case were to convert to chapter 7, that contingent claim would become a fixed and Allowed Claim, which together with the claim of the Rodriguez Class Action claimants would swamp the Class 6 unsecured creditor class and would adversely affect the pro-rata distribution received by all other Class 6 unsecured creditors holding Allowed Claims.

Last, in a Chapter 7 liquidation, a chapter 7 panel trustee is appointed. A Chapter 7 trustee is compensated based upon a commission set by statute. 11 U.S.C. §326(a) provides that a chapter 7 trustee's compensation is 25% of the first $5,000 disbursed or turned over to parties in interest, 10% of the next $45,000, 5% of the next $950,000, and reasonable compensation not to exceed 3% of any amounts in excess of $1 million. Such fees would constitute an additional expense born by the Debtors' estates in a chapter 7 case. On top of the chapter 7 trustee's commission, the Chapter 7 trustee would likely hire his own counsel, unfamiliar with the cases, whose fees and costs would add yet another layer of administrative expenses that would need to be paid before general unsecured creditors. The chapter 7 trustee's professionals would each need to learn about claims and avoidance actions that the Debtors' counsel has prepared to assert, as well as filing income tax returns. In a chapter 7, there would also be costs associated with noticing new claims bar dates which is significant in these cases due to there being over 1700 creditors. The reopened bar date would further increase the burden of reviewing and objecting to new claims or different claims filed after such a new bar date.

In addition to the above economics, there would be no interim distributions in a Chapter 7 case and a final distribution would likely not occur for several years after conversion. As a result, the best-interests-of-creditors test has been met.

SMRH:437127496.2

# ARTICLE VII

## FEASIBILITY

The Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by either liquidation or the need for further reorganization. The Proponents' ability to confirm a Plan in this case depends upon the availability of funds on hand and the future payment of cash through the rents received by Berkeley Properties from the Buyer and/or the sale of the Real Property. With the available cash on hand, the Debtors have sufficient funds to make all payments that will be due on the Effective Date.

The Debtors are obligated to pay, as expenses of administration, any taxes that became due and owing after the Petition Date. Prior to the closing of the asset sale, Second Street Properties utilized a payroll service and therefore all post-petition payroll related taxes have been paid in full at this time. Second Street Properties has also filed a final 2014 return with the California State Board of Equalization for Sales and Use Taxes and has paid all taxes due thereunder. The Debtors have consulted with their appointed CPAs regarding projected income taxes for the tax year April 1, 2014 through March 31, 2015 and have been advised that there will be zero income tax liability due as a result of (a) accumulated operating losses, (b) the sale of assets at a loss and (c) operating loss for the current tax year. Hence, the Plan is feasible.

Second Street Properties currently hold more than $2 million that is available for distribution to creditors following confirmation. Approximately $620,000 of this amount will be needed on the Effective Date to pay unclassified claims, including pre-petition priority wage claims under 11 U.S.C. §507(a)(7) and administrative claims under 11 U.S.C. §503(b)(9) for the value of goods delivered to Second Street Properties during the 20 day period immediately preceding the Petition Date. Following confirmation, Second Street Properties will also be required to pay for pre-confirmation professional fees subject to approval of the Court following one or more hearings on duly noticed applications for compensation by the professionals appointed in these cases.

There are several factors that will ultimately affect the amount and timing of distributions to general unsecured creditors. These factors include: (1) the outcome of the pending objection to

the $32 million priority tax claim of the Internal Revenue Service, (2) the ongoing performance of the Buyer under the (i) real property lease agreement and (ii) multi-employer union pension plan, and (3) the amount of proceeds received when the real property currently owned by Berkeley Properties is eventually sold.

If the claim of the IRS is valued at zero or some other nominal amount for purposes of confirmation the Plan, then an interim distribution to Class 6 Allowed Claims shortly after the Effective Date will be possible.

If the Buyer makes rental payments according to the terms of the real property lease, then following the second year after the Effective Date of the Plan, additional interim distributions to Class 6 Allowed Claimants would also be possible. Eventually when the Berkeley real property is sold following the fifth year after the Effective Date, the sale proceeds are expected to be more than sufficient to repay the balance owed to Class 6 and 7 Allowed Claims in full with interest. This also presumes that the real property, which value was estimated at $13,225,000 on the Petition Date, will not substantially decline in value before it is sold. The Debtors expect based on the advice of their CPA's that their operating losses for pre-petition years as well losses as for the post-petition period and losses on the sale of assets, will be upheld and provide the ability to offset potential tax gains realized on the future sale of the real property under Internal Revenue Code Section 1231 because the real property was used in the operation of a business.

<div align="center">

**ARTICLE VIII**

**<u>CONFIRMATION</u>**

</div>

**A.      <u>Voting:</u>**

In order to confirm the Plan, two-thirds in amount and a majority in number of Allowed Claims in each impaired class of creditors must vote in favor of the Plan. The majorities for each are determined by the number and amount of those who actually vote on the Plan and are entitled to vote on the Plan under Bankruptcy Rule 3018.

If a class which is impaired under the Plan does not vote in favor of the Plan, the Debtors may seek confirmation under 11 U.S.C. § 1129(b).

**B.** **Confirmation Standards:**

For the Plan to be confirmed and binding on all creditors and shareholders, the Court must determine that the following requirements under 11 U.S.C. §§ 1129(a)(1) through (16), as applicable in these cases, have been satisfied:

1. The Plan complies with the provisions of the Code;

2. The Proponents have complied with the provisions of the Code;

3. The Plan has been proposed in good faith and not by any means forbidden by law;

4. Any payment made or to be made by the Debtors for services or costs in connection with the Bankruptcy Case has been or will be subject to approval by the Court as reasonable;

5. The Proponents have disclosed the identity and affiliations of any individual to serve after Confirmation as an officer or director of the Debtors, an affiliate of the Debtors participating in a joint plan, or a successor to the Debtors under the Plan, and the identity of and compensation payable to any insider that will be employed by the reorganized debtor;

6. Any rate change provided for in the Plan has been approved or is subject to approval by the regulatory commission with jurisdiction over such rates, if any;

7. The holder of each claim or interest in each class of impaired claims or interests has accepted the Plan or will receive under the Plan not less than the holder would receive if the Debtors' estates were liquidated under Chapter 7 of the Code;

8. Each class of claims or interests has accepted or is not impaired by the Plan;

9. Holders of allowed administrative or priority claims under the Code will receive Cash in the full amount of their claims on the Effective Date, unless the holder thereof agrees to a different treatment;

10. At least one impaired class of claims has accepted the Plan;

11. Confirmation is not likely to be followed by liquidation or further reorganization of the debtor unless such liquidation or reorganization is proposed in the Plan;

12. All fees payable to the U.S. Trustee under 11 U.S.C. §1930 have been paid or the Plan provides for the payment of such fees;

13. The Plan provides after its Effective Date for the continuation of all retiree benefits, as and when required by 11 U.S.C. §1129(a)(13);

14. All transfers of property under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law; and

15. The principal purpose of the Plan is not avoidance of taxes or the avoidance of the security laws of the United States.

**C.** **Modification:**

Under the Code and the Bankruptcy Rules, the Proponents may, subject to the Code and Bankruptcy Rules and Bankruptcy Court approval, modify the Plan after the Plan has been submitted for acceptance or rejection. In addition, the Plan may be modified after Confirmation and at any time until the Plan has been substantially consummated by the Debtors or any creditor. The manner in which the Plan may be modified is set forth in 11 U.S.C. § 1127 and Bankruptcy Rule 3019. In general, the Court may approve a modification of the Plan without a re-solicitation, so long as (a) the Plan, as modified, continues to comply with the applicable provisions of the Bankruptcy Code, and (b) modification does not adversely change the treatment of creditors.

**ARTICLE IX**

**FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS**

Implementation of the Plan may result in federal income tax consequences to creditors. Tax consequences to a particular creditor may depend on the particular circumstances or facts regarding the claim of the creditor. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any person. Rather, the following disclosure is provided for informational purposes only.

The federal tax consequences of the Plan to a hypothetical creditor typical of the holders of claims or interests in this case depend to a large degree on the accounting method adopted by that hypothetical creditor. A "hypothetical creditor" in this case is defined as a general unsecured creditor. In accordance with federal tax law, a holder of such a claim that uses the accrual method and who has posted its original sale to one of the Debtors as income at the time of the product sold

or the service provided hypothetically should adjust any net operating loss to reflect the amounts paid by the Debtors under the Plan provided that holder previously deducted the liability owed by Second Street Properties as a "bad debt" for federal income tax purposes. Should that holder lack a net operating loss, then in accordance with federal income tax provisions, the holder should treat the dividend paid as ordinary income, again provided the holder previously deducted the liability of Second Street Properties as a "bad debt" for federal income tax purposes. If the accrual basis holder of the claim did not deduct the liability as a "bad debt" for federal income tax purposes, then the amount paid by the Debtors has no current income tax implication. A holder of a claim that uses a cash method of accounting would, in accordance with federal income tax laws, treat the amount paid as income at the time of receipt.

THE PROPONENTS MAKE NO REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR. EACH PARTY AFFECTED BY THE PLAN SHOULD CONSULT HER, HIS OR ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A CLAIM.

## ARTICLE X

## CONCLUSION

**A.** **Effect of Confirmation:**

If the Plan is confirmed, its terms and conditions will be binding on all creditors and shareholders.

**B.** **Recommendation:**

This Disclosure Statement has been presented for the purpose of enabling you to make an informed judgment to accept or reject the Plan. You are urged to read the Plan in full and consult with counsel if you have questions. The Debtors and the Committee believe that acceptance of the Plan is in the best interest of all creditors, and will provide the best recovery in these Bankruptcy Cases.

*[Signature Page Following]*

Dated: April 29, 2015

SECOND STREET PROPERTIES

*Catherine Delsol*

By: /s/ Catherine Delsol
Catherine Delsol
President and Responsible Individual

Dated: April 29, 2015

BERKELEY PROPERTIES LLC

*Catherine Delsol*

By: /s/ Catherine Delsol
Catherine Delsol
Managing Member and Responsible Individual

Dated: April ___, 2015

BINDER & MALTER, LLP


By: /s/ Julie H. Rome-Banks
Julie H. Rome-Banks
Attorneys for Debtors-in-Possession
Second Street Properties and Berkeley Properties LLC

Dated: April ___, 2015

OFFICIAL COMMITTEE OF UNSECURED CREDITORS'


By: /s/ Dawn White
Dawn White, its Chair

Dated: April ___, 2015

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP


By: /s/ Michael Lauter
Michael Lauter
Attorneys for Official Committee of Unsecured Creditors

Dated: April __, 2015          SECOND STREET PROPERTIES

                               By:    /s/ Catherine Delsol
                                      Catherine Delsol
                                      President and Responsible Individual

Dated: April __, 2015          BERKELEY PROPERTIES LLC

                               By:    /s/ Catherine Delsol
                                      Catherine Delsol
                                      Managing Member and Responsible Individual

Dated: April __, 2015          BINDER & MALTER, LLP

                               By:    /s/ Julie H. Rome-Banks
                                      Julie H. Rome-Banks
                                      Attorneys for Debtors-in-Possession
                                      Second Street Properties and Berkeley Properties LLC

Dated: April 28, 2015          OFFICIAL COMMITTEE OF UNSECURED CREDITORS'

                               By:    /s/ Dawn White
                                      Dawn White, its Chair

Dated: April __, 2015          SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

                               By:    /s/ Michael Lauter
                                      Michael Lauter
                                      Attorneys for Official Committee of Unsecured Creditors

-35-
DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

SMRH:437127496.2

| | |
|---|---|
| 1 | Dated: April 30, 2015 |

Dated: April 30, 2015           SECOND STREET PROPERTIES

By:     /s/ Catherine Delsol
          Catherine Delsol
          President and Responsible Individual

Dated: April 30, 2015           BERKELEY PROPERTIES LLC

By:     /s/ Catherine Delsol
          Catherine Delsol
          Managing Member and Responsible Individual

Dated: April 30, 2015           BINDER & MALTER, LLP

By:     /s/ Julie H. Rome-Banks
          Julie H. Rome-Banks
          Attorneys for Debtors-in-Possession
          Second Street Properties and Berkeley Properties LLC

Dated: April 30, 2015           OFFICIAL COMMITTEE OF UNSECURED CREDITORS'

By:     /s/ Dawn White
          Dawn White, its Chair

Dated: April 30, 2015           SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

By:     /s/ Michael Lauter
          Michael Lauter
          Attorneys for Official Committee of Unsecured Creditors

Case: 19-04057   Doc# 85-7   Filed: 10/03/05   Entered: 10/03/2013 13:34:49   Page 335 of
491
35
SMRH:437127496.2                      DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT   335

# EXHIBIT "5"

Michael W. Malter (SBN 96522)
Julie H. Rome-Banks (SBN 142364)
Wendy W. Smith (SBN 133887)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Tel: (408) 295-1700
Fax: (408) 295-1531
Email: Michael@bindermalter.com
Email: Julie@bindermalter.com
Email: Wendy@bindermalter.com

Attorneys for Debtors and Debtors-in-Possession
PACIFIC STEEL CASTING COMPANY
and BERKELEY PROPERTIES, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>PACIFIC STEEL CASTING COMPANY,<br>a California corporation,<br><br>        Debtor. | Case No. 14-41045-RLE<br>Case No. 14-41048-RLE<br><br>Chapter 11<br><br>Cases Jointly Administered |
| In re<br><br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>        Debtor. | Date:<br>Time:<br>Courtroom: 201<br>1300 Clay Street, Oakland, CA 94612 |

## ERRTA TO MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

Attached is Exhibit "A" to the Motion to Approve Overbid Procedure Re Sale of Debtors' Assets and Related Relief.

Dated: June 1, 2014                 BINDER & MATLER, LLP

                                By: <u>Julie H. Rome-Banks</u>

                                  Julie H. Rome-Banks

ERRTA TO MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF

# Bid Procedures[1]

These Bid Procedures have been approved by order of the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court") in connection with the jointly administered bankruptcy cases of Pacific Steel Casting Company ("PSC") and Berkeley Properties, LLC ("BP", and together with PSC, the "Debtors"), lead case number 14-41045-RLE, which order was entered on _____, 2014 [Doc. No. ___] (the "Bid Procedures Order").

These Bid Procedures describe the process by which the Debtors are authorized to conduct the sale (the "Sale") by auction of substantially all of the assets of PSC (the "Assets,") including, without limitation, that portion of the Assets defined as the "Acquired Assets" in the Asset Purchase Agreement dated June 19, 2014 (the "APA"), between the PSC and Speyside Fund, LLC ("Buyer"). Please take notice that all capitalized terms used but not otherwise defined here are defined in the APA. An electronic version of the APA and the Bid Procedures Order are available at http://dm.epiq11.com/PSC/Project

Please note that while the "Acquired Assets" in the APA with Buyer do not include the real estate owned by BP, the Debtors will, as part of the Auction process described herein, entertain offers for the Assets that include the real estate owned by BP.

These Bid Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction (defined below), thereby competing to make the highest or otherwise best offer for substantially all of the Assets.

Interested parties have until the Bid Deadline (two business days prior to the Sale Hearing) to conduct due diligence. Access to the estates' records may be obtained by contacting the Debtors' financial and restructuring advisor, Cleary Gull, c/o Ryan A. Olsta, Managing Director, 100 East Wisconsin Avenue, Suite 2400, Milwaukee, Wisconsin, 53202, Tel: (414) 291-4555, Fax (414) 291-4558, email: rolsta@clearygull.com. Interested parties will be required to execute a confidentiality agreement in order to obtain confidential information from the Debtors.

## A.     Stalking Horse Bidder

On June 19, 2014, PSC and Buyer entered into the APA for the acquisition of the Acquired Assets (excluding the real estate owned by BP) pursuant to which, Buyer agreed to pay eleven million and three-hundred thousand dollars ($11,300,000) of cash (the "Initial Bid"), plus the assumption of certain liabilities (the "Assumed Liabilities") including (i) PSC's multi-employer pension plan with contingent liability estimated at $27.8 million; (ii) PSC's non-union single-employer pension plan, with liability estimated at $4.3 million; (iii) specified accounts payable capped at $1 million; and (iv) a lease of real property with BP, providing for rent payments aggregating approximately $16 million. The APA provides that any Cure Costs paid

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR (Dkt. No. ___).

EXHIBIT "4"

Case: 14-41045    Doc# 254    Filed: 06/21/2014    Entered: 06/21/2014 18:40:17    Page 38 of 69

by the Buyer will reduce the cash paid at closing (the "Purchase Price") for the Acquired Assets, subject to the outcome of the Auction and the entry of an order of the Bankruptcy Court ("Sale Order") approving the sale of the Acquired Assets and the transfer of the Assumed Liabilities. PSC agreed that, if the Bankruptcy Court approves, and the assets are purchased by a party other than Buyer, the successful purchaser must also pay the bid protection approved by the Bankruptcy Court of $500,000 (the "Break-Up Fee").

### B.     Participation Requirements

To participate in the bidding process and to obtain access to any due diligence materials, a person (other than Buyer) (a "Potential Bidder") must deliver the following documents (unless previously delivered) to both Pacific Steel Casting Company c/o Binder & Malter, LLP, 2775 Park Avenue, Santa Clara, California, 95014-2548, Attn: Julie H. Rome-Banks, Esq., counsel for the Debtors, Tel: (408) 295-1700, Fax (408) 295-1531, email: Julie@bindermalter.com and Cleary Gull, c/o Ryan A. Olsta, Managing Director, 100 East Wisconsin Avenue, Suite 2400, Milwaukee, Wisconsin, 53202, Tel: (414) 291-4555, Fax (414) 291-4558, email: rolsta@clearygull.com (the "Preliminary Bid Documents") not later than June 30, 2014 [eleven days prior to the Sale Hearing]:

      1.    An executed confidentiality agreement (the "Confidentiality Agreement") in the form available at http://dm.epiq11.com/PSC/Project or by writing, emailing or faxing Debtors' bankruptcy counsel or Cleary Gull at the address, email address and fax number shown above; and,

      2.    Preliminary written proof by the Potential Bidder of its financial capacity to close and perform the proposed transaction, including, but not limited to, its ability to timely pay the purchase price and satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under section 365 of the Bankruptcy Code, which proof may include current audited financial statements or unaudited financial statements verified under penalty of perjury, and verified financial commitments (i.e. banking or capital references) obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be deemed satisfactory to the Debtors.

Within two (2) business days after a Potential Bidder delivers the Preliminary Bid Documents, the Debtors in the sole exercise of their reasonable business judgment after consultation with the Official Unsecured Creditors' Committee (the "Committee") and Siena Lending Group, LLC ("Siena"), shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. The Debtors may work with Potential Bidders during the two (2) business day period to attempt to correct or cure any deficiencies in any Preliminary Bid Documents. Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable by the end of such two (2) business day period (as it may be extended by the Debtors in the sole exercise of their reasonable business judgment after consultation with the Committee and Siena ) (each, an "Acceptable Bidder") may conduct

due diligence with respect to the Debtors or submit bids to acquire substantially all of the Assets and assume all of the Assumed Liabilities. Buyer is deemed an Acceptable Bidder.

### C.     Obtaining Due Diligence Access

After notification of Acceptable Bidder status, the Debtors shall provide each Acceptable Bidder reasonable due diligence information, as requested, including access to an electronic data room, as soon as reasonably practicable after such request. To the extent the Debtors gives any information to any Acceptable Bidder that they had not previously provided to Buyer, the Debtors shall make such information immediately available to Buyer.   All information provided to the Buyer shall be in the electronic data room.  The due diligence period will end on the Bid Deadline (defined below). The Debtors after consultation with the Committee  and Siena, shall be entitled to use their  business judgment in determining the extent to which any Acceptable Bidder is entitled to receive confidential competitive information as part of the due diligence process.

### D.     Bid Requirements

For an Acceptable Bidder to participate in the Auction (each a "Bidder"), such Bidder must submit a "Bid" as provided herein before 5:00 p.m. Pacific time on July 9, 2014 [or two business days before the Sale Hearing] (the "Bid Deadline"), which meets the following conditions:

1.     The Bid must identify the Bidder(s), i.e. including any party on whose behalf the Bid is made, any party otherwise participating in connection with such bid and the terms of any such participation,  and whether the Bidder or such other party is a party to any agreement limiting the Bidders or bidding at the Auction.

2.     The Bid must include a signed asset-purchase agreement in substantially the form of the APA (the "Competing Purchase Agreement"), and a comparison of such Competing Purchase Agreement marked to show all changes from the APA. If, like the APA with Buyer, the Bid does not contemplate purchase of the real estate owned by BP, then the Competing Purchase Agreement must include a proposed real estate lease marked to show all changes from the lease with Buyer ("Lease").   A Competing Purchase Agreement must:

(a) Provide for total compensation for the Assets equal to or exceeding $11,900,000 in cash (reflecting Buyer's cash consideration of $11,300,000 plus the $600,000 Initial Overbid), together with the aggregate value of the Assumed Liabilities.

(b)  Designate the executory contracts and leases that the Bidder wants to assume, the cure costs associated with those executory contracts and leases, and whether those designated executory contracts and leases are different than the contracts to be assumed by the Buyer.  The cure costs must be paid at closing.  In evaluating whether a Bid is considered higher and better than any other Bid, including the APA, any additional cure

costs, assumed liabilities and resulting adjustments to the purchase price will be considered.

(c) Provide that the Acceptable Bidder will forfeit the Sale Deposit (defined below), as liquidated damages if such Acceptable Bidder defaults under the Competing Purchase Agreement.

(d) Not be subject to any financing contingency, contingency relating to the completion of unperformed due diligence, contingency relating to the approval of the Acceptable Bidder's board of directors or other internal approvals or consents, contingency relating to approval by any Governmental Entity, or any conditions precedent to the Acceptable Bidder's obligation to purchase the Assets, consummate the Transaction and perform its obligations under the Competing Purchase Agreement other than those included in the Competing Purchase Agreement.

(e) Not require payment to the Acceptable Bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement.

(f) Provide for a Closing Date that is no later than the Closing Date in the APA.

3. The Bid must also include a deposit (the "Sale Deposit") in the form of either a wire transfer to an account specified by the Debtors or a certified check in the amount of Five-Hundred Thousand Dollars ($500,000) payable to the order of PSC. The Sale Deposit shall be held in escrow in a segregated account of PSC (or its bankruptcy counsel or investment banker) pending the closing of the asset sale. The full amount of the Sale Deposit shall be forfeited to PSC as liquidated damages if such Acceptable Bidder is the Successful Purchaser (defined below) and fails to close the transaction because of a breach or failure to perform the Competing Purchase Agreement on the part of the Successful Purchaser.

4. Each Acceptable Bidder must confirm in writing the Acceptable Bidder's agreement to accept and abide by the terms, conditions and procedures of the Bid Procedures Order and these Bid Procedures.

5. A Bid must provide that it is irrevocable until two (2) business days after the closing of the Sale. Each Acceptable Bidder that participates in the Auction (as defined below), at its option, further agrees that its final and best bid at the conclusion of the Auction, if not deemed the Successful Bid, shall serve, without modification, as a back-up bid as may be designated by the Debtors at the Sale Hearing, in the event the Successful Purchaser fails to close as provided by these Bid Procedures, the Bid Procedures Order and the Sale Order.

6. A Bid must be submitted to counsel for the Debtors so as to be received not later than the Bid Deadline. Counsel shall, as soon as practicable, send a copy of each Bid received, if any, to the following parties: (i) counsel to

Buyer, (ii) counsel to the Committee; (iii) counsel to Siena, and (iv) counsel to each Acceptable Bidder submitting a bid, or if an Acceptable Bidder does not have counsel, to any other Acceptable Bidder.

A Bid submitted by an Acceptable Bidder that meets these requirements in the Debtors' sole exercise of their reasonable business judgment after consultation with the Committee and Siena, is a "Qualified Bid" and the Acceptable Bidder for such Qualified Bid is a "Qualified Bidder." As soon as practical, counsel for the Debtors shall provide copies of all Qualified Bids to (i) counsel for Buyer; and, (ii) either counsel to each Acceptable Bidder submitting a bid, or if the Acceptable Bidder does not have counsel, to any other Acceptable Bidder. Once submitted, a Qualified Bidder may not amend, modify or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid is required to remain irrevocable and binding as provide herein.

### E.     Evaluation of Qualified Bids

Before the Auction, the Debtors after consultation with the Committee and Siena shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' sole exercise of their reasonable business judgment, the highest or otherwise best bid (the "Starting Bid"). No later than 5:00 p.m. Pacific time one business day prior to the Sale Hearing the Debtors shall notify Buyer and all parties who have submitted Qualified Bids as to whether there will be an Auction, and if so, which Qualified Bid is the Starting Bid.

### F.     "As Is, Where Is"

The sale of PSC's assets that are the subject of the Motion shall be on an "as is, where is" basis without representations or warranties of any kind or nature, except to the extent set forth in the definitive purchase agreement(s) with the Successful Purchaser. Except as may be set forth in the APA, any and all of PSC's assets shall be sold free and clear of any and all existing claims and encumbrances with such claims and encumbrances to attach to the net proceeds of sale in their order of validity and priority.

### G.     No Qualified Bids

If no Qualified Bids are received by the Bid Deadline, then the Debtors shall promptly notify the Bankruptcy Court and the Notice Parties of that fact, the Auction will not occur and Buyer will be deemed the Successful Purchaser. Subject to the termination rights under the APA, the Debtors will seek approval of the Sale to Buyer at the Sale Hearing, including approval of the APA and authorization for the sale of the Assets and the transfer of the Assumed Liabilities.

### H.     Auction and Sale Hearing

In the event one or more Qualified Bids is received by the Bid Deadline, then the Debtors (with the assistance of the Bankruptcy Court) will conduct the auction (the "Auction") at the Sale Hearing in the Bankruptcy Court to determine the highest and best bid for the Assets. All bids must be for cash and assumption of liabilities as provided for in Section D.2(a) of these Bid Procedures. Subject to Bankruptcy Court approval, the Debtors shall determine the highest and best bid in their reasonable business discretion.

Case: 19-40045   Doc# 254   Filed: 06/21/2014   Entered: 06/21/2014 18:43:17   Page 842 of 699
342

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

1. The Qualified Bidders, including Buyer, shall appear in person or through duly-authorized representatives at the Auction.

2. Only Qualified Bidders, including the Buyer, and their duly authorized representatives shall be entitled to bid at the Auction.

3. The Debtors and their advisors will direct the Auction, in consultation with the Committee and Siena, subject to the requirements of the Bankruptcy Court which will preside over the Auction.

4. Bidding at the Auction shall begin at the Starting Bid.

5. Subsequent bids at the Auction, including any bids by Buyer, shall be made in minimum increments of $100,000.

6. Each Qualified Bidder will be informed of the terms of the previous bids.

7. The bidding will be part of the official record of the Sale Hearing and be recorded to ensure an accurate recording of the bidding at the Auction.

8. At the Auction, all Qualified Bidders including the Buyer may submit further bids, provided that any bid by the Buyer will be credited with the full amount of the Break-Up Fee, for purposes of comparison with other bids. The Auction will be conducted in rounds. A bidder must participate in each round of bidding or it will forfeit its right to further participate in the Auction. At any time, a Qualified Bidder including the Buyer may request that the Debtors announce, subject to any potential new bids, the then current highest and best bid. If requested, the Debtors shall use reasonable efforts to clarify any and all questions any Qualified Bidder including the Buyer may have regarding the Debtors' announcement of the then current highest and best bid. If requested by the Debtors, all Qualified Bidders shall bid in the order determined by the Bankruptcy Court.

9. Each Bid made at the Auction must remain open and binding on the Qualified Bidder for (a) each round of bidding and, (b) if made by a Qualified Bidder not selected as the Successful Bid, for purposes of serving as a Back-up Bid as defined below, if such Qualified Bidder so elects.

10. Subject to the Bankruptcy Court's approval, the Debtors may announce at the Auction such additional rules for bidding at the Sale hearing that, in their reasonable business judgment, will better promote the goals of the bidding process and that are not inconsistent with the Bid Procedures, the Bid Procedures Order or any other order in the Debtors' chapter 11 cases.

11. No Qualified Bidder participating in the Auction shall engage in any collusion: (a) regarding the Bidding Procedures, (b) with any other Qualified Bidder, (c) with respect to the Auction or (d) with respect to any proposed transaction relating to the Assets.

12. Absent irregularities in the implementation of these Bid Procedures, the Bankruptcy Court will not consider bids made after the Auction is closed.

## J. Conclusion of the Auction and Sale Hearing

Upon the conclusion of the Auction, the Debtors, in the exercise of their reasonable business judgment and after consulting with their advisors, the Committee and Siena, shall identify the highest or otherwise best bid for approval by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code (the "Successful Bid"). The Qualified Bidder that submitted the Successful Bid will be the "Successful Purchaser." The Successful Purchaser and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

## K. Section 365(b)(1)(C) Finding

Before the Bankruptcy Court approves a Successful Bid, the Successful Bidder will supplement the Bankruptcy Court's record with evidence, to the extent necessary, establishing that the Successful Bidder's provision of adequate assurance of future performance of executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder.

## L. Section 363(m) Finding

Any Potential Bidder that intends to request that the Bankruptcy Court make a finding under Bankruptcy Code Section 363(m) that such bidder's purchase of the Assets shall in advance of the Sale Hearing file with the Bankruptcy Court and serve on the Notice Parties (defined below), a written declaration of a competent witness demonstrating the bidder's good faith, and the absence of fraud or collusion between the bidder and any other bidder, or between the bidder and the Debtors or the any agent or employees of the bankruptcy estates. The declaration must also disclose any facts material to the good faith determination, including:

1. The bidder's pre- and post-petition relationships with any other bidder, the Debtors or the Debtors' current or former officers, directors, agents or employees, and any of the Debtors' major creditors or equity security holders;

2. The bidder's anticipated relationship after the sale with any of the Debtors' current or former officers, directors, or agents;

3. Whether any offers of employment or compensation have been or will be made to any of the Debtors' current or former officers, directors, agents or employees; and

4. Whether the bidder has paid or contemplates paying consideration in connection with the sale to any person other than the Debtors.

## M.     Sale Hearing

A hearing to consider approval of the Sale of the Assets and the transfer of the Assumed Liabilities to the Successful Purchaser (or to approve the APA if no Auction is held) (the "Sale Hearing") is presently scheduled to take place immediately following the Auction, or as soon thereafter as counsel may be heard, before the Honorable Roger L. Efremsky, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of California, Oakland Division, at 1300 Clay Street, Courtroom No. 201, Oakland, CA 94612. The Debtors and the Successful Purchaser, once the Successful Purchaser has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of (i) the Sale Order (a) approving the APA and authorizing the sale of the Assets pursuant to section 363 of the Bankruptcy Code, free and clear of all claims and encumbrances (except with respect to the Assumed Liabilities), to the fullest extent allowed by applicable law including appropriate good faith findings and similar provisions; (b) authorizing the assumption and/or assignment of the executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code; and (c) if the Successful Purchaser does not purchase the real estate owned by BP, an order approving (i) BP's entry into a new Lease with the Successful Purchaser; and, (ii) the Debtors' reject of the existing lease between them with respect to the Real Property.

Subject to the terms of the APA, the Sale Hearing may be continued to a later date by the Debtors by sending appropriate notice to the Notice Parties and all prospective bidders, including the Buyer, to be received prior to the Sale Hearing, or making an announcement at the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## N.     Designation of Back -Up Bidder

Upon the conclusion of the Auction and the selection of the Successful Purchaser approved by the Bankruptcy Court, the Debtors may, in consultation with their advisors, the Committee and Siena, select the entity submitting the next highest or otherwise best Qualified Bid (the "Back-Up Bidder") subject to the Bankruptcy Court's approval. At the option of the Back-Up Bidder, the bid of the Back-Up Bidder shall remain open until the first business day following earlier of the closing or deadline for closing of a sale of the Assets to the Successful Purchaser. If for any reason the Successful Purchaser is unable or unwilling to timely consummate an approved sale because of breach or failure to perform on the part of the Successful Purchaser, it will forfeit its Sale Deposit to PSC, and the Back-Up Bidder shall be deemed to be the Successful Purchaser if it so elects. The purchase price will then be the amount of such Back-Up Bidder's last bid, and the Debtors shall be authorized to complete the sale to the Back-Up Bidder without further order of the Bankruptcy Court.

## O.     Break -Up Fee

At the closing of the sale to the Successful Purchaser, if the Successful Purchaser is not the Buyer, PSC shall pay to Buyer, by wire transfer in immediately available funds to an account

designated by Buyer, the Break-Up Fee in accordance with the applicable provisions of the Bid Procedures Order and the APA.

### P.    Return of Sale Deposit

The Sale Deposit of the Successful Purchaser, upon timely consummation of the purchase of substantially all of the Assets, shall be credited to the purchase price paid for the Assets. If the Successful Purchaser fails to timely consummate the purchase of the Assets for a reason other than the Debtors being in material breach of their obligations under the parties' Asset Purchase Agreement, or if the Successful Purchaser breaches or fails to timely perform under the Competing Purchase Agreement, then the Successful Purchaser shall be deemed a "Defaulting Buyer" without further order of the Bankruptcy Court, at which time the Successful Bid shall be deemed rejected and Sale Deposit of the Successful Purchaser shall be forfeited to, and be retained irrevocably by, PSC.

The Sale Deposit of any unsuccessful Qualified Bidders, except for the Back-up Bidder, will be returned within seven (7) days after entry of the Sale Order. The Sale Deposit of the Back-up Bidder shall be returned within seven (7) days following closing of the sale to the Successful Purchaser.

### Q.    Reservation of Rights to Modify Bid Procedures

Subject to approval of the Bankruptcy Court, the Debtors reserve the right, following consultation with their advisors, the Committee and Siena, to modify these Bid Procedures in any manner that is not inconsistent with the APA or the Bid Procedures Order and that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets and the transfer of the Assumed Liabilities. Subject to approval of the Bankruptcy Court, allowed modifications include, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bid Procedures, and adjourning the Auction or Sale Hearing in open court without further notice. Notwithstanding the foregoing, the Debtors may not accept any Qualified Bid that does not comply with these Bid Procedures, or does not equal or exceed the Overbid Amount. The Debtors may not impose any terms and conditions on Buyer that are contrary to or in breach of the terms of the APA other than any such terms or conditions set forth in these Bid Procedures or the Bid Procedures Order to which Buyer may agree.

### R.    Notice Parties

The Notice Parties hereunder are as follows: (i) Pacific Steel Casting Company c/o Binder & Malter, LLP, 2775 Park Avenue, Santa Clara, California, 95014-2548, Email: Michael W. Malter, Esq. and Julie H. Rome-Banks, Esq., counsel for the Debtors, Tel (408) 295-1700, Fax (408) 295-1531, Michael@bindermalter.com and Julie@bindermalter.com ; (ii) Cleary Gull, c/o Ryan A. Olsta, Managing Director, 100 East Wisconsin Avenue, Suite 2400, Milwaukee, Wisconsin, 53202, Tel: (414) 291-4555, Fax (414) 291-4558, Email: rolsta@clearygull.com ; (iii) Attn: Ori Katz Sheppard, Mullin, Richter & Hampton LLP Four Embarcadero Center, Seventeenth Floor, San Francisco, CA 94111, Tel: (415) 774-3238; Fax: (415) 434-3947; Email: okatz@sheppardmullin.com , counsel for the Committee; and (iv) Gary Kaplan, Farella Braun + Martel LLP, 235 Montgomery Street, 17th Floor, San Francisco, CA

94104, Tel: 415-954-4940; Facsimile: 415-954-4480; Email: gkaplan@fbm.com, counsel for Buyer.

# EXHIBIT "6"

1  Michael W. Malter (SBN 96522)
   Julie H. Rome-Banks (SBN 142364)
2  Wendy  W.  Smith (SBN 133887)
   BINDER & MALTER, LLP
3  2775 Park Avenue
   Santa Clara, CA 95050
4  Tel: (408) 295-1700
   Fax: (408) 295-1531
5  Email: Michael@bindermalter.com
   Email: Julie@bindermalter.com
6  Email: Wendy@bindermalter.com

7  Attorneys for Debtors and Debtors-in-Possession
   PACIFIC STEEL CASTING COMPANY
8  and BERKELEY PROPERTIES, LLC

9              UNITED STATES BANKRUPTCY COURT

10        NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

11
   | In re | Case No. 14-41045-RLE |
12 | | Case No. 14-41048-RLE |
   | PACIFIC STEEL CASTING COMPANY, | |
13 | a California corporation, | Chapter 11 |
14 | Debtor. | Cases Jointly Administered |
15

16 | In re | Date: |
   | | Time: |
17 | BERKELEY PROPERTIES, LLC, a | Courtroom: 201 |
   | California limited liability company, | 1300 Clay Street, Oakland, CA 94612 |
18 | | |
   | Debtor. | |
19

20 **MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS**
21                         **AND RELATED RELIEF**

22

23

24

25

26

27

Case: 14-41045   Doc# 351   Filed: 06/23/14   Entered: 06/23/14 15:44:20   Page 349 of
699

349

# TABLE OF CONTENTS

I.      FACTUAL BACKGROUND ................................................................. 4

II.     SUMMARY OF SALE ...................................................................... 6

III.    REQUESTED BID PROCEDURES ..................................................... 9

    A.  Breakup Fee ................................................................................. 9

    B.  Scheduling of Sale Hearing and Objection Dates ......................... 10

    C.  Cure Procedures .......................................................................... 12

IV.     LEGAL ARGUMENT .................................................................... 14

V.      CONCLUSION .............................................................................. 17

Case 1:14-01013 Doc# 351 Filed 06/23/14 Entered 06/23/14 13:54:20 Page 350 of 699

350

# TABLE OF AUTHORITIES

**Cases**

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), app. dism. on jurisdictional grounds at 3 F.3d 49 (2d Cir. 1993) ............................................................................................. 15

In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 ...................................................... 16

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) ............................................................................................. 15

In re Integrated Resources, Inc., 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992) .............................. 17

**Rules**

2002 ................................................................................................................ 4
6004 ................................................................................................................ 4
FRBP ............................................................................................................... 4
FRBP 2002(a)(2) ................................................................................................ 11
FRBP 6004 ....................................................................................................... 14
FRBP 6004(f)(1) ................................................................................................ 14

**Federal Statutes**

§ 1107 ............................................................................................................. 4

§ 363(b) .......................................................................................................... 14

§1108 ............................................................................................................. 4

§363 ........................................................................................................... 4, 14

§544 through §552 ............................................................................................... 7

11 U.S.C ........................................................................................................... 4

11 U.S.C. § 365(b)(1) ......................................................................................... 13

11 U.S.C. §365 ................................................................................................. 11

Pacific Steel Casting Company ("PSC") and Berkeley Properties, LLC ("BP") (together the "Debtors") hereby move for entry of an order approving certain sale procedures in connection with the proposed sale of substantially all of PSC's assets to Speyside Fund LLC (or its designee) ("Buyer") or a successful overbidder, including a breakup fee and establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases proposed to be assumed and assigned to the Buyer by the Debtors. This Motion is made

pursuant to 11 U.S.C. §363 and FRBP 2002, 6004 and 6006. The Motion is supported by the declarations of Charles H. Bridges Jr. and Julie H. Rome-Banks filed concurrently and such other evidence and argument as may be presented at the hearing on the Motion.

## I.  FACTUAL BACKGROUND

1.  On March 10, 2014, PSC filed a voluntary Chapter 11 case in the United States Bankruptcy Court for the Northern District of California (the "PSC Bankruptcy Case").  BP is a wholly owned subsidiary of PSC.  BP also filed a chapter 11 petition on March 10, 2014 (the "BP Bankruptcy Case").  The BP Bankruptcy Case was filed as a related case to the PSC Bankruptcy Case pursuant to BLR 1015-1.  The cases have been ordered jointly administered. No trustee has been appointed and PSC and BP remain debtors-in-possession of their respective bankruptcy estates pursuant to 11 U.S.C. §§ 1107 and §1108.

2.  PSC is a fourth-generation family-owned steel foundry that manufactures carbon, low-alloy and stainless steel castings for U.S. and international customers.  PSC operates three separate plants that are located on eight-acres in Berkeley, California.  Most of the real property is owned by BP, who leases it to PSC.  This real property is BP's only significant asset[1].  PSC has grown into one of the largest independent steel-casting companies in the U.S.  PSC supplies numerous industries with a wide variety of castings used in oil and gas drilling equipment, heavy-duty truck parts, valves and fittings, and mining and construction equipment.  PSC's plants incorporate some of the latest manufacturing technology, production capabilities and emissions controls which has allowed PSC to remain competitive with domestic and international suppliers, and to maintain compliance with environmental regulations.  PSC presently employs approximately 365 hourly employees and 45 salaried employees.  The majority of the hourly employees are represented by the Glass, Molders, Pottery, Plastics, and Allied Workers International Union, AFL-CIO, CLC Local No. 164B (the "Union"). PSC currently enjoys a good working relationship with the Union.  The current collective bargaining agreement will not expire until 2015.

---

[1]   The BP Bankruptcy Case is considered a single asset real estate case within the meaning of 11 U.S.C. §101(51B).

3.      When they filed their petitions, PSC and BP had only one large secured creditor, Wells Fargo Bank, N.A. ("Wells Fargo"), which was owed approximately $4.1 million collectively by the Debtors. Wells Fargo was not willing to provide the Debtors with post-petition financing. As a result, the Debtors obtained Court approval of a post-petition secured loan facility from Siena Lending Group, LLC ("Siena"), which paid the Wells Fargo obligations in full and provides PSC with a revolving credit facility of up to $8.5 million. The loan transaction closed on April 11, 2014. As of June 18, 2014, the Debtors owed Siena approximately $ 4,192,023.13. The amount of the Siena loan fluctuates daily.

4.      PSC has been diligently investigating possible purchasers or investors since October 2013. On January 29, 2014, PSC retained the services of Cleary Gull Inc. ("Cleary Gull") to serve as its investment banker in connection with one or more possible sales, mergers or other business combinations or transactions. Cleary Gull has assisted PSC by canvassing the marketplace for potential investors or buyers. Cleary Gull prepared a confidential memorandum describing PSC's business, history, financial position and results, and the investment opportunity, and prepared an electronic "data room" with significant financial and company records to allow potential investors and buyers to conduct due diligence. After filing bankruptcy, the Debtors received Bankruptcy Court approval to allow PSC to continue to employ Cleary Gull. Cleary Gull subsequently received eleven written initial indications of interest and five offers to purchase the assets of the Debtors by April 30, 2014. As a result of Cleary Gull's efforts, PSC believes that there has been extensive marketing of the assets of the Debtors and that said marketing has been directed at the parties most likely to have an interest in making an offer to purchase substantially all of the Debtors' assets.

5.      Presently as many as five parties, including Buyer, may be interested in acquiring substantially all of the assets of the Debtors. The Debtors believes there may be as many as six additional interested parties. PSC intends to conduct an auction of its assets on a going concern basis, and to assume and assign those leases and executory contracts that are critical to the ongoing business operation. The proposed bid procedures described herein will provide a formal process for competing bidders to make offers and for the Court to conduct an auction. The

Debtors believe that they have identified those persons who could be interested in presenting a bid, all of whom will be provided notice of the hearing on this Motion and of the auction.

6. The Debtors believe the proposed sale to Buyer is in the best interest of creditors. It is anticipated that Buyer will offer employment to the vast majority of PSC's employees, including PSC's Union employees under the existing collective bargaining agreement. The assumption and assignment of many of PSC's unexpired leases and executory contracts, particularly the collective bargaining agreement with the Union and the related multi-employer pension plan, will substantially reduce potential and contingent claims against PSC's bankruptcy estate that could well exceed $30 million. The Debtors believe that a sale pursuant to the proposed bid procedures will allow the Debtors to maximize the value of their assets for the benefit of their creditors.

## II.    SUMMARY OF SALE

7. Following several months of pre- and post-petition marketing by its appointed investment bankers Cleary Gull, PSC signed a letter of intent offered by Buyer, in which Buyer offered to buy substantially all of PSC's assets (subject to specific exceptions described below) to assume certain specified pre- and post-petition liabilities of the Debtors (the "Sale") pursuant to the terms of an asset purchase agreement (the "APA"), and to lease the real property owned by BP pursuant to a long-term lease (the "Lease").[2] PSC and the Buyer have executed the APA and a true and correct copy of the executed APA is attached as Exhibit A to the Declaration of Charles H. Bridges, Jr. filed with this Motion.

8. The APA requires that Buyer pay $11,300,000 (the "Purchase Price") in cash for the assets being purchased, as well as assume certain liabilities (the "Assumed Liabilities"), and to lease the real property pursuant to the Lease. Buyer has delivered a good-faith deposit of $500,000 concurrent with execution of the APA, with the remainder of the Purchase Price to be paid at closing. The Purchase Price may be adjusted to reflect changes in PSC's working capital as more particularly described in the APA. If Buyer chooses to pay any amounts necessary to

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the APA and Lease, as applicable.

Case 12-04365   Doc# 251   Filed 06/27/14   Entered 06/27/14 15:44:20   Page 54 of 699

cure (the "Cure Amounts") the defaults under any executory contracts or leases to be assumed and assigned by PSC to Buyer under the APA (the "Assumed Contracts"), then such Cure Amounts paid by Buyer will be credited against the Purchase Price.

9.     Under the APA, substantially all of PSC's operational assets will be included in the Sale (the "Purchased Assets") but the Sale excludes, among other things: (a) corporate and financial books and records of the Debtors, (b) utility deposits, cash on hand and in deposit accounts, (c) avoidance claims and causes of action arising under 11 U.S.C. §544 through §552, and, (d) PSC's membership interest in BP.  The real property owned by BP is not part of the sale, but as part of the APA the real property will be leased to the Buyer by BP pursuant to the Lease. The APA further provides for PSC to assume and assign to Buyer the Assumed Contracts, including the existing collective bargaining agreement between PSC and the Union. The sale of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowed by law except as expressly provided[3].  The post-petition secured loan of Siena shall be paid in full from the proceeds of the Sale at closing.  As a further term of the Sale, PSC will continue its operations in the ordinary course of business until the closing date.

10.     Subject to PSC's obligation to pay certain specified obligations pursuant to the APA, the Buyer will also assume significant liabilities of PSC, including: PSC's single employer defined benefit (non-Union) pension plan obligations; PSC's multi-employer pension plan obligations (with the Union pension trust); obligations of PSC under the collective bargaining agreement; accrued severance, bonus, holiday and vacation benefits for all workers being rehired by the Buyer; and, specified accounts payable and accrued expenses capped at $1 million.

11.     As a condition to the Sale, Buyer must enter into a new triple-net lease with BP on mutually-agreeable terms including monthly rent of $89,544.00, and a 15-year term with a 5-

---

[3]  Siena is the only party with a security interest in all of the Debtors' assets and Siena will be paid in full at closing. However, in the event any bidder wishes to purchase BP's real property, then the sale will be free and clear of the disputed mechanic's liens of Crane Tech, Inc. and Bigge Crane and Rigging Company.

MOTION TO APPROVE OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND
RELATED RELIEF

7

Case 12-04248-13 Doc#-351 Filed 06/22/14 Entered 06/22/14 13:44:20 Page 355 of 699

year extension option.  BP will bring a motion to approve the terms of the new triple-net lease with the Buyer at the same time as the motion to approve the Sale.

12.     PSC believes that conducting the Sale pursuant to the bid procedures described here (the "Bid Procedures") will allow PSC to maximize the value of the assets for the benefit of its creditors.  The Sale proceeds will pay PSC's obligation to Siena in full, and will result in a net benefit to the Debtors' estates.

13.     The Debtors intend to file the motions (i) to approve the sale (the "Sale Motion"), (ii) to approve the assumption and assignment of contracts and leases to the Buyer and to conditionally reject the existing real property lease whereby BP is the lessor and PSC is the lessee (the "Assumption Motion"), and (iii) to approve the terms of a new triple-net lease between BP and the Buyer (the "New Lease Motion"), together with any other relief related to the proposed sale transaction as soon as practicable after entry of the order on this motion (the "Bid Procedures Order"), so that the motions may be heard and the auction conducted on a specially set calendar on July 11, 2014 or such other date as the Court may specially set (the "Sale Hearing").

14.     The proposed timing is critical to the Debtors for two reasons.  First, the terms of the Debtors' secured loan with Siena require that the Debtors enter into an asset purchase agreement and file a bid procedures motion not later than June 16, 2014; Siena has provided the Debtors with a short extension of that deadline but only through June 19, 2014.   The Siena loan agreement also requires that the Debtors use their best efforts to schedule a hearing on the bid procedures motion and obtain an order by July 2, 2014 with an outside deadline for a bid procedures order of July 9, 2014 and to hold an auction within 30 days thereafter.  The Siena loan agreement further requires that the Debtors obtain an order approving the sale within 4 business days of the auction, and that the approved sale is consummated on or before fifteen days after entry of the sale order. The Debtors believe they can comply with this mandated schedule by holding an auction and hearing on the Sale Motion, Assumption Motion and New Lease Motion on July 11, 2014 or such other date as the Court may specially set within the timeframes required by the Siena loan agreement.  Second, the terms of the APA with Buyer require that

Case 1:14-04305 Doc #351 Filed 06/23/14 Entered 06/23/14 15:44:20 Page 356 of 699

PSC obtain an order approving the proposed sale not later than July 9, 2014.   The APA further provides that Buyer shall close the sale within 15 days of entry of an order authorizing the Sale to the Buyer.

15.     The proposed bid procedures include, among other things, a requirement that any competing bid must be to purchase the Purchased Assets and assume the Assumed Liabilities on terms at least as favorable to PSC as those in the APA.  The bid procedures also require a minimum initial over-bid of $11,900,000 (i.e. an initial minimum overbid of $600,000), with minimum subsequent overbids in increments of $100,000, in addition to assumption of the Assumed Liabilities.  The bid procedures also require that PSC pay Buyer a breakup fee of $500,000 (the "Breakup Fee") in the event a sale closes to another purchaser.

16.     The Sale Motion will also seek approval, consistent with the Siena Loan Agreement and the order approving the Siena loan agreement, that the sale order provide for "indefeasible payment in full in cash" at closing of all amounts owed to Siena under the post-petition loan as well as delivery of releases to Siena by the Debtors' estates.   Consistent with the Siena loan agreement, the Sale Motion also requests approval of a procedure allowing Siena to make a credit bid to acquire the Purchased Assets for an amount sufficient to pay PSC's obligations to Siena, but only if no one makes a bid to purchase PSC's assets for an amount sufficient to pay Siena in full, in cash, no later than 15-days after the date set to close the Sale.

## III.     REQUESTED BID PROCEDURES

A.     Breakup Fee

17.     As an inducement to Buyer to agree to enter into the APA and act as the stalking horse subject to overbids and in order that the sale process will not be delayed by last minute offers, PSC believes that the Court should establish a competing bid procedure concerning bids by other prospective buyers. PSC submits that the proposed Bid Procedures described in Exhibit "A" attached hereto and incorporated herein by reference (the "Bid Procedures"), are reasonable and necessary under the circumstances, will facilitate the conduct of an orderly auction, and will maximize the value of the Purchased Assets for the benefit of creditors.

18.     If the Purchased Assets are sold to a purchaser other than Buyer, the APA obligates PSC to pay the Breakup Fee to Buyer at the closing.  The Buyer has already incurred substantial expenses and it is expected that Buyer will continue to incur additional costs through the Sale Hearing.

B.     Scheduling of Sale Hearing and Objection Dates

19.     In furtherance of the Sale, the Debtors requests that the Sale Hearing and auction (including the Sale Motion, the Assumption Motion and the New Lease Motion) be specially scheduled by the Court on July 11, 2014 (or such other date that the Court may specifically set) . Based on the extensive marketing over the past months by Cleary Gull, the Debtors do not believe that additional time will yield any additional bids.  Because the APA contemplates PSC's assignment and assumption of various executory contracts and unexpired leases, there are also numerous third parties to executory contracts and unexpired leases who may be impacted by the requested relief.  If any particular issues arise regarding a request for adequate assurance of future performance or a dispute over cure amounts (which are not anticipated), PSC is confident that such issues can be addressed in a timely fashion in order that the Sale may close as contemplated.

20.     In connection with the Sale, PSC requests that the Court establish the dates and manner of service for various notices and establish certain objection deadlines including the date by which persons must object to PSC's proposed cure amounts in connection with the Assumption Motion.

21.     The Sale Motion (to the extent it seeks to sell free and clear of liens and interests) and the Assumption Motion require 28 days' notice pursuant to BLR 9014-1(c)(1) which provides that, "where relief is sought against an identified, named entity the motion, notice of the hearing, supporting declarations, memoranda, and all other papers shall be filed and served at least 28 days before the actual scheduled hearing date."  BLR 6006-1 requires that motions for relief pursuant to 11 U.S.C. §365 regarding leases and executory contracts shall be on notice to the other contracting parties, the creditors' committee, and parties who have requested special

Case: 13-04085    Doc# 261    Filed: 06/23/14    Entered: 06/23/14 13:34:20    Page 350 of 699

notice. As to general creditors, only 21 days' notice of the hearing on the Sale Motion is required to be given under BLR 9014-1(c)(2).

22. FRBP 2002(a)(2) provides that twenty-one (21) days' notice shall be given to all creditors and parties in interest regarding the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. This Court previously entered its Order Granting Motion For Order Limiting Notice in these cases on March 24, 2014 (docket # 90) ("Order Limiting Notice") which modified the requirements of FRBP 2002(a)(2). Therefore, the Debtors propose to serve notice of the Sale Motion, Assumption Motion and New Lease Motion pursuant to the Order Limiting Notice.

23. The Debtors therefore request approval of the Court to serve notice of the Sale Motion, Assumption Motion and New Lease Motion together with a copy of the Bid Procedures in the form substantially similar to that attached hereto as Exhibit "A", by first class mail (or through CM/ECF on those persons who have elected to receive electronic notice) within 48 hours after entry of the order approving this Bid Procedures Motion on the following parties:

A. the responsible individual;

B. the Committee and its appointed counsel;

C. the office of the U.S. Trustee;

D. parties who have requested special notice in these cases;

E. parties as to whom the Debtors seek to sell free and clear of liens;

F. counter-parties to those executory contracts and leases which the Buyer proposes be assumed and assigned and which are the subject of the Assumption Motion;

G. the Pension Benefit Guaranty Corporation (PBGC) through its counsel who has appeared in these cases;

H. the Union;

I. the trustees or counsel who have appeared in these cases for the (i) non-union defined benefit pension plan, and (ii) the multi-employer union pension plan.

J.     All government taxing authorities that have, or as a result of the sale of any assets may have, claims, contingent or otherwise, against the Debtors;

K.     Buyer's counsel and any persons designated by the Buyer; and,

L.     All persons and entities which within the last three months have expressed an interest to the Debtors, their counsel or Cleary Gull in purchasing any of the Purchased Assets. The Debtors request authorization to file the certificate of service of such persons under seal in order to preserve the integrity of the auction, with copy provided only to counsel for the Committee, and the U.S. Trustee.

24.     The Debtors requests that objections, if any, to the Sale, must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, Oakland Division, 1300 Clay Street, 3rd Floor, Oakland, California 94612, not later than seven days prior to the Sale Hearing, and (d) be served not later than seven days prior to the sale hearing upon (i) Debtor's counsel, Michael W. Malter and Julie H. Rome-Banks of Binder & Malter, LLP, 2775 Park Avenue, Santa Clara, California, 95050, facsimile (408) 295-1531, email: michael@bindermalter.com and julie@bindermalter.com; (2) counsel for Buyer, Gary Kaplan of Farella Braun + Martel LLP, 235 Montgomery Street, 17th Floor, San Francisco, California 94104, email: GKaplan@fbm.com; (3) the Office of the United States Trustee, Attn: Margaret H. McGee, 1301 Clay Street, Suite 690N, Oakland, CA 94612, facsimile (510) 637-3220; email: Maggie.mcgee@usdoj.gov; and (4) counsel for the Official Committee of Unsecured Creditors, Ori Katz and Michael Lauter, Sheppard, Mullin, Richter and Hampton, 4 Embarcadero Center, 17th Floor, San Francisco, California 94111, email: okatz@sheppardmullin.com and mlauter@sheppardmullin.com (the foregoing are collectively referred to as the "Service Parties").

C.     Cure Procedures

25.     PSC further requests that the non-debtor parties to the Assumed Contracts (each a "Counterparty" and collectively, the "Counterparties") have until seven days prior to the sale hearing to (a) object to the assumption and assignment of any of the Assumed Contracts, (b) object to the proposed amount of the Cure Amount contained in the Assumption Motion, (c) object that the Buyer has not provided adequate assurance of future performance of the Assumed Contract, or (d) assert that non-monetary defaults, conditions or pecuniary losses or other amounts must be cured or satisfied (including all compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts) under any of the Assumed Contracts in order for such Assumed Contracts to be assumed and assigned (such objection, a "Contract Objection").

26.     A Counterparty party must file with the Court and serve its Contract Objection upon the Service Parties setting forth the basis for the Contract Objection and if applicable, the amount the Counterparty asserts as the Cure Amount and the amount of all compensation for any actual pecuniary loss resulting from a default in respect of the Assumed Contract (with appropriate documentation in support thereof).   If no objection is timely filed and served, the Cure Amounts attached to the Assumption Motion shall be controlling as to the amount necessary to be paid to cure under 11 U.S.C. § 365(b)(1).   In such case, the Counterparty to the Assumed Contract shall be forever barred from asserting any claims for the Cure Amount including for compensation for losses that otherwise might have been asserted by the Counterparty against the Debtors, the Buyer or other purchaser of the Purchased Assets, through the closing. Absent a timely filed and served objection, each Counterparty to any Assumed Contracts shall be deemed to have consented to the assumption and assignment of the Assumed Contract to Buyer or any other purchaser of the Purchased Assets.

27.     To the extent the parties are unable to consensually resolve a Contract Objection prior to the Sale Hearing, then such objection will be heard at the Sale Hearing, or Buyer (or successful overbidder, as applicable), at its option, may remove the relevant contract from the schedule of Assumed Contracts.

## IV.    LEGAL ARGUMENT
### A.    This Court Should Approve the Proposed Bid Procedures Because the Procedures Are Fair, Reasonable And In The Best Interests of the Estates.

Bankruptcy Code § 363(b) and FRBP 6004 authorize a debtor to sell assets of the estate other than in the ordinary course of business after notice and a hearing. FRBP 6004(f)(1) provides that sales of property outside of the ordinary course of business may be by private sale or public auction.  Here, PSC believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

Among the bid procedures commonly approved by bankruptcy courts is the requirement that a competing bid exceed the initial offer by a specified minimum amount.  The initial bid by an Acceptable Bidder (defined in the Bid Procedures) must include the Purchase Price, plus an initial overbid increment of $600,000 cash (the "Initial Overbid"), in addition to assumption of the Assumed Liabilities. The Initial Overbid requirement protects the estate from the Breakup Fee of Buyer and costs associated with the transaction. The Court's Guidelines for Early Disposition of Assets, Pre-Packaged Plans and the Sale of Substantially All Assets under §363 ("Guidelines") provides that each overbid must be at least 5% more than the amount of the original offer.  The proposed Initial Overbid of $600,000 is 5% of the cash component being paid by the Buyer of $11,300,000.  When the proposed Initial Overbid is considered against the total consideration which includes assumption of $1 million of accounts payable and accrued expenses, assumption of the multi-employer union pension plan with contingent liability estimated at $27.8 million, assumption of the non-union frozen defined benefit pension plan, with liability estimated at $4.3 million, assumption of the collective bargaining agreement, and entry into the Lease providing for rent payments aggregating approximately $16 million among other, the proposed Initial Overbid is approximately 1% of the total consideration. The Debtors believe the Initial Overbid amount is reasonable and appropriate given the nature of the assets being sold.   The Court has discretion to modify the Guidelines and the Debtors believe this

minor modification is appropriate under the circumstances. The Bid Procedures also require further bids after the Initial Overbid be in cash increments of $100,000 at the Auction (the "Overbid Increment"). PSC believes the Overbid Increment is appropriate for this case and will encourage meaningful overbids. PSC has also reserved the right in the Bid Procedures to request that the Court modify the Overbid Increment during the Auction.

Sellers of assets often employ bidding protections in order to encourage the making of bids. Breakup fees can be "important tools to encourage bidding and to maximize the value of PSC's assets." Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), *app. dism. on jurisdictional grounds at* 3 F.3d 49 (2d Cir. 1993). Courts that limit or deny such breakup fees do so not because they lack statutory authority, but because they find the fee or amount is not in the best interests of the various parties and/or the estate. *See,* Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (denying § 503 claim for breakup fee for lack of showing of benefit to the estate).

An informal survey of Section 363 sales in the Northern District of California reveals allowance of a breakup fee and/or expense reimbursement to a stalking horse bidder have generally ranged between one and five percent depending on the size of the transaction[4]. The Breakup Fee proposed here is $500,000--which is 4% of the cash consideration being paid and less than 1% of the total consideration being by the Buyer--is consistent with the range of breakup fees typically approved, particularly in view of the nature and complexity of the Sale transaction.

---

[4] See, e.g., In re Impeva Labs, Inc., Case No. 10-53056 (purchase consideration of $2 million in cash and $690,000 in assumed liabilities, with expense reimbursement not to exceed $150,000 (representing 5.6% of the value of the transaction); In re Aviza Technology, Inc. et seq., Case No. 09-54511 (value of purchase price estimated at $50 million, with expense reimbursement not to exceed $1 million representing 2% of the estimated gross proceeds of sale; In re RedEnvelope, Case No. 08-30659 (stalking horse bid of $5.7 million, with breakup fee of $256,500 representing 4.5% of the purchase initial purchase price; In re Andronico's Markets, Inc., Case No. 11-48963 (purchase consideration approximately $20 million with breakup fee of $250,000).

The Breakup Fee is also fair and reasonable in view of the real and substantial benefits conferred by the Buyer upon the Debtors' estates by providing a minimum floor bid upon which the Debtors, their creditors and potential bidders may rely, and in consideration of the time, expense and risks associated with serving as the "stalking horse bidder," including legal fees and expenses, overhead costs, due diligence expenses and expenses related to the negotiation and preparation of the APA, Lease and related transactional documentation. The Breakup Fee benefits the Debtors because it assists in maximizing the value to the bankruptcy estates by facilitating a sale of PSC's business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of Buyer's offer. *See,* In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 (explaining that a breakup fee could be found to be a benefit to the estate where "assurance of a breakup fee promoted more competitive bidding").

PSC does not believe that the amount of the Breakup Fee is so substantial so as to chill other potential bidders from submitting competing bids. Rather, the amount of the Breakup Fee is reasonable compared to the total consideration under the APA, and will only be paid if the assets are sold to a bidder other than Buyer that must provide greater value for the Purchased Assets.

Further, the Breakup Fee has arguably already encouraged competitive bidding, in that Buyer would not have agreed to negotiate and execute the APA without this provision. The Breakup Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited.*" Id.* Similarly, Buyer's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." Id.

Protection of stalking horse bidders is the price paid for the Debtors' enjoyment of the best of both worlds - the assurance of a contractually bound purchaser at a fair price on the one hand, and at the same time the potential of an even better bid with the corresponding enhanced benefit to the estate at the auction. The Debtors' agreement to the Breakup Fee enables it to ensure the sale of PSC's assets to a contractually-committed bidder. Under the circumstances, the Debtors believes that the Breakup Fee is within their reasonable business judgment and

should be approved. *See, e.g.,. In re Integrated Resources, Inc.,* 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992)(applying business judgment standard to breakup fee).

## V.    **CONCLUSION**

The Debtors believes that the foregoing Bid Procedures and the Breakup Fee are fair, reasonable, and are appropriately structured to ensure that PSC will obtain the best price for the Purchased Assets. The proposed Bid Procedures allow PSC to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are received; and (b) any overbid is sufficient to cover the Breakup Fee required to be paid to Buyer if an overbid is accepted and the sale consummated.  PSC further believes, in its reasoned business judgment that the proposed sale (subject to the Bid Procedures) is in the best interests of the estate and creditors because it will maximize the value of PSC's assets.

WHEREFORE, the Debtors respectfully requests that the Court enter its order as follows:

1.      Granting the Motion;

2.      Designating the Buyer as the initial bidder;

3.      Approving the Bid Procedures as set forth on Exhibit "A" hereto;

4.      Approving the Breakup Fee as set forth herein;

5.      Scheduling the hearing on the Sale Motion, the Assumption Motion, the New Lease Motion and any other related relief together with the auction for July 11, 2014 (or such other date as the Court may specially set within the deadlines imposed under the Siena loan agreement and the availability of counsel);

6.      Providing for service of the motions, supporting pleadings and required notices as set forth herein and determining that such notice and manner of service is adequate and reasonable under the circumstances;

7.      To the extent necessary, shortening time with respect to service of notice of the hearing on the Sale Motion, Assumption Motion, New Lease Motion and any other related relief so that they may be heard on July 11, 2014 (or such other date as the Court may specially set within the deadlines imposed under the Siena loan agreement and the availability of counsel);

Case: 12-04095    Doc# 281    Filed: 06/23/14    Entered: 06/23/14 13:54:40    Page 365 of 699

8. Providing that the deadline for opposition to the Sale Motion, Assumption Motion and Lease Motion shall be seven days before the hearing date including any objections to the proposed Cure Amounts; and

9. For such other and further relief as the Court deems appropriate.

Date: June 19, 2014                                      BINDER & MALTER, LLP


                                                         By: /s/ Julie H. Rome-Banks
                                                             Julie H. Rome-Banks
                                                             Attorney for Debtors

# EXHIBIT "7"

Gary M. Kaplan (State Bar No. 155530)
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 18th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480
Email: gkaplan@fbm.com

Attorneys for Party In Interest
SPEYSIDE FUND, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br>PACIFIC STEEL CASTING COMPANY,<br>a California corporation,<br><br>Debtor. | Case No. 14-41045-RLE<br><br>Chapter 11<br><br>(Jointly Administered) |
| In re<br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>Debtor. | Case No. 14-41048-WJL<br><br>Chapter 11 |

**DECLARATION OF KEVIN DAUGHERTY REGARDING GOOD FAITH BY SPEYSIDE FUND, LLC IN PROPOSED PURCHASE OF DEBTOR'S ASSETS [11 U.S.C. §363(m)]**

I, Kevin Daugherty, declare:

1.      I am a principal of Speyside Fund, LLC, which is a party to that certain Asset Purchase Agreement (the "APA") with Pacific Steel Casting Company, a debtor in the above-captioned case ("PSC"), along with Berkeley Properties, LLC ("BP," and with PSC, the "Debtors").  I am authorized to make this Declaration in that capacity.  I have personal knowledge of the facts set forth below and if called upon to do so, could and would testify competently thereto.

2.      I make this Declaration in accordance with the Bid Procedures established by the Bankruptcy Court's Order Approving Overbid Procedures re Sale of Debtors' Assets and Related

Farella Braun + Martel LLP
Russ Building
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

K. DAUGHERTY DECL. RE SPEYSIDE
GOOD FAITH RE ASSET PURCHASE

Case: 14-41045   Doc# 827   Filed: 06/23/14   Entered: 06/23/14 18:49:12   Page 368 of
699

368

Relief.

3. I have been directly involved on behalf of Speyside in the negotiations of the APA with the Debtors' representatives and professionals. Subject to the Bankruptcy Court's approval, the APA provides for the purchase of specified assets of PSC (the "Assets") by Speyside or its assignee (collectively, "Buyer"), pursuant to the terms set forth therein.

4. I am informed and believe that Buyer has not had any pre- or post-petition relationships with: any other bidder for PSC's Assets; the Debtors; the Debtors' current or former officers, directors, agents or employees; or any of the Debtors' major creditors or equity security holders, except for the following:

Buyer communicated with the Debtor's representatives and professionals both pre-and post-petition regarding the potential purchase of the Debtors' assets.

5. Buyer does not anticipate any relationship after the purchase of the Assets with any of the Debtors' current or former officers, directors, or agents except for the following:

After consummating the purchase of the Assets, Buyer anticipates retaining certain of the Debtors' officers in operating the business in the ordinary course, as contemplated by the APA..

6. No offers of employment or compensation have been or will be made by Buyer to any of the Debtors' current or former officers, directors, agents or employees, except for the following:

After consummating the purchase of the Assets, Buyer anticipates retaining certain of the Debtors' officers and employees in operating the business in the ordinary course, as contemplated by the APA.

7. Buyer has not paid and does not contemplate paying consideration in connection with the purchase of the Assets to any person other than the Debtors, except for the following:

Pursuant to the APA, Buyer is undertaking certain obligations of the Debtors, including with respect to their multi-employer pension plan, non-union single-employer pension plan, employee collective bargaining agreement, other employee-related obligations (including accrued vacation liabilities), specified accounts payable and accrued expenses owed to the Debtors' creditors and obligations under specified executory contracts and unexpired leases being assumed

Farella Braun + Martel LLP
Russ Building
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, CA 94104
(415) 954-4400

K. DAUGHERTY DECL. RE SPEYSIDE
GOOD FAITH RE ASSET PURCHASE

- 2 -

Case: 14-41045    Doc# 327    Filed: 06/23/14    Entered: 06/23/14 18:42:12    Page 86 of
699

369

1    and assigned to Buyer pursuant to the APA.

2        8.    I am informed and believe that Buyer has acted in good faith with respect to its

3    proposed purchase of the Assets, and has not engaged in any fraud or collusion with any other

4    bidder, or the Debtors or any agent or employees of the bankruptcy estates.

5        I declare under penalty of perjury under the laws of United States that the foregoing is true

6    and correct.  Executed on this 26 day of June, 2014 in Lambeth, New Jersey.

7                                    /s/Kevin Daugherty
8                                    Kevin Daugherty

9    30224\4442005.1

Farella Braun + Martel LLP
Russ Building
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

K. DAUGHERTY DECL. RE SPEYSIDE
GOOD FAITH RE ASSET PURCHASE

- 3 -

# EXHIBIT "8"

1  Michael W. Malter (SBN 96522)
   Julie H. Rome-Banks (SBN 142364)
2  Wendy  W.  Smith (SBN 133887)
   BINDER & MALTER, LLP
3  2775 Park Avenue
   Santa Clara, CA 95050
4  Tel: (408) 295-1700
   Fax: (408) 295-1531
5  Email: Michael@bindermalter.com
   Email: Julie@bindermalter.com
6  Email: Wendy@bindermalter.com

The following constitutes
the order of the court. Signed June 27, 2014

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

7  Attorneys for Debtors and Debtors-in-Possession
   PACIFIC STEEL CASTING COMPANY
8  and BERKELEY PROPERTIES, LLC

9              UNITED STATES BANKRUPTCY COURT

10        NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

11

12  | In re | Case No. 14-41045-RLE |
                 Case No. 14-41048-RLE
13  PACIFIC STEEL CASTING COMPANY,
    a California corporation,            Chapter 11
14
             Debtor.                     Cases Jointly Administered
15

16

17  In re                               Date: June 25, 2014
                                        Time: 2:00 p.m.
    BERKELEY PROPERTIES, LLC, a         Courtroom: 201
18  California limited liability company, 1300 Clay Street, Oakland, CA 94612

19           Debtor.

20

21     ORDER APPROVING OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS
                          AND RELATED RELIEF

22

23         Pacific Steel Casting Company ("PSC") and Berkeley Properties, LLC ("BP") (together

24  the "Debtors") having filed a Motion for Order Approving Overbid Procedures re Sale of

    Debtors' Assets and Related Relief (the "Motion") in connection with the proposed sale of

25  substantially all of PSC's assets to Buyer Fund LLC (or its designee) ("Buyer") or a successful

26  overbidder; the Motion having come on for hearing before the Court pursuant to an order

27

28  ORDER APPROVING OVERBID PROCEDURES RE SALE OF DEBTORS' ASSETS AND
    RELATED RELIEF

shortening time; notice of the hearing on the Motion having been properly given; Julie H. Rome-Banks of Binder & Malter LLP having appeared on behalf of the Debtors and other appearances as noted in the Court's record; the Court having considered the Motion and the arguments of counsel; and good cause appearing,

IT IS HEREBY ORDERED that:

1. The Motion is approved.

2. The Buyer[1] is designated as the initial or stalking horse bidder.

3. The Bid Procedures set forth in Exhibit "A" to the Motion are approved as if fully set forth herein with the following modifications. The Debtors are authorized to serve a copy of the Bid Procedures which conform to this Order along with notices of hearing on the Sale Motion, the Assumption Motion, the New Lease Motion and any other related relief (the "Motions").

A. The hearing on the Motions shall be held together with the auction on July 28, 2014 commencing at 10:00 a.m. (the "Hearing Date").

B. The Preliminary Bid Documents (as defined in Section B of the Bid Procedures) shall be delivered to the required parties not later than July 17, 2014 at 5:00 p.m. California time. Copies of Preliminary Bid Documents delivered by any bidder to Debtors' counsel shall be promptly furnished to attorney Dennis D. Miller on behalf of his client and to any other lessor affected by the Assumption Motion who requests such documents from Debtors' counsel.

C. The Bid Deadline (as defined in Section D of the Bid Procedures) shall be July 24, 2014 at 5:00 p.m. California time.

D. Any counterparty to an executory contract or lease which is the subject of the Assumption Motion shall file and serve written objections as to all issues not later than July 14, 2014, except that objections by landlords and lessors as to adequate assurance of future performance may be filed as late as 48 hours prior to the Hearing Date. Any reply brief shall be

---

[1] Capitalized terms shall have the meaning set forth in the Motion and Bid Procedures exhibit unless otherwise indicated.

filed and served not later than July 21, 2014, except that parties may also reply to objections to adequate assurance of future performance at the hearing. Unless objections to adequate assurance of future performance are resolved prior to or at the hearing, the Court will treat the Hearing Date as a status conference as to such issues and order an expedited briefing and further hearing schedule.

        E.     Pursuant to B.L.R. 9014-1(c)(1), objections to any request of the Debtors to sell free and clear of liens and encumbrances shall be filed and served by any directly affected party not later than July 14, 2014. Any optional reply brief shall be filed and served not later than July 21, 2014.

        F.     Pursuant to B.L.R. 9014-1(c)(1), general objections to the Motions shall be filed and served not later than July 14, 2014. Any optional reply brief shall be filed and served not later than July 21, 2014.

        G.     Notwithstanding the Bid Procedures, the Debtors may request that the Court approve multiple backup bids at the hearing.

        H.     Notwithstanding the Bid Procedures or any request in the Sale Motion, any request that the Court make good faith findings pursuant to 11 U.S.C. §363(m) is waiveable by the Buyer and any bidder.

    4.     The Breakup Fee as set forth in the Motion and in the Asset Purchase Agreement with the Buyer is approved.

    5.     Pursuant to the Order Granting Motion for Order Limiting Notice in these cases on March 24, 2014 (docket #90) ("Order Limiting Notice"), notice of the Sale Motion, Assumption Motion and New Lease Motion together with a copy of the conformed Bid Procedures shall be served by email, first class mail or through CM/ECF on those persons who have elected to receive electronic notice within two business days after entry of this Order on the following parties:

        A.     the responsible individual;

        B.     the Committee and its appointed counsel;

C. the office of the U.S. Trustee;

D. parties who have requested special notice in these cases;

E. parties as to whom the Debtors seek to sell free and clear of liens;

F. counter-parties to those executory contracts and leases which the Buyer proposes be assumed and assigned and which are the subject of the Assumption Motion;

G. the Pension Benefit Guaranty Corporation (PBGC) through its counsel who has appeared in these cases;

H. the Union;

I. the trustees or counsel who have appeared in these cases for the (i) non-union defined benefit pension plan, and (ii) the multi-employer union pension plan.

J. All government taxing authorities that have, or as a result of the sale of any assets may have, claims, contingent or otherwise, against the Debtors;

K. Buyer's counsel and any persons designated by the Buyer; and,

L. All persons and entities which within the last three months have expressed an interest to the Debtors, their counsel or Cleary Gull in purchasing any of the Purchased Assets. The Debtors shall file the certificate of service of such persons under seal in order to preserve the integrity of the auction, with copy provided only to counsel for the Committee, and the U.S. Trustee.

6. Any order approving the sale of assets shall provide, consistent with the post-petition secured loan of Siena Lending Group, LLC ("Siena"), that Siena shall receive indefeasible payment in full in cash of all obligations (as defined in the post-petition secured loan agreement) from the proceeds of the sale at closing together with the releases mandated by the Siena post-petition secured loan agreement.

APPROVED AS TO FORM:

Dated: June 27, 2014 STEIN & LUBIN LLP

By: /s/ Dennis D. Miller
Dennis D. Miller
Attorneys for Lessor Principal Life Ins. Co.

**\*\*END OF ORDER\*\***

None.

# EXHIBIT "9"



MICHAEL W. MALTER, #96533
JULIE H. ROME-BANKS, #142364
WENDY W. SMITH, #133887
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408)295-1700
Facsimile: (408) 295-1531
Email: michael@bindermalter.com
Email: julie@bindermalter.com
Email: wendy@bindermalter.com

Attorneys for Debtors and Debtors-in-Possession
PACIFIC STEEL CASTING COMPANY and
BERKELEY PROPERTIES, LLC

**The following constitutes
the order of the court. Signed July 31, 2014**

Roger L. Efremsky
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>PACIFIC STEEL CASTING COMPANY,<br>a California corporation,<br><br>Debtor. | Case No. 14-41045-RLE<br>Case No. 14-41048-RLE<br><br>Chapter 11<br><br>Cases Jointly Administered |
| In re<br><br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>Debtor. | Date: July 28, 2014<br>Time: 10:00 a.m.<br>Courtroom: 201<br>1300 Clay Street, Oakland, CA 94612 |

## ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF

The MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE

AND CLEAR OF LIENS AND RELATED RELIEF ("Motion") of the Debtors Pacific Steel

Casting Company ("PSC") and Berkeley Properties, LLC ("BP") (together the "Debtors") came

ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF PAGE 1

on for hearing at the above-referenced date and time; Julie Rome-Banks and Michael W. Malter

of Binder & Malter LLP appeared on behalf of the Debtors and other appearances were as noted

in the Court's record; reasonable and adequate notice of the hearing on the Motion and the relief

sought therein having been provided to all parties required to be given notice under the Federal

Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of

California; the objections to the Motion having either been resolved or withdrawn on the record

for the reasons stated; the Court having considered the Motion, as well as any opposition to the

Motion, any reply thereto, the evidence presented, offers of proof and the arguments of counsel;

the Court having stated its findings of fact and conclusions of law on the record; and good cause

appearing:

IT IS HEREBY ORDERED that:

1.      The Motion is granted.

2.      PSC's sale of the Acquired Assets to Speyside Fund, LLC or its assignee

("Buyer") pursuant to the terms of the Asset Purchase Agreement ("APA")[1] attached to the

supporting Declaration of Charles H. Bridges, Jr., and pursuant to the terms set forth in the

Motion is approved pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.[2]  The

Acquired Assets do not include customer owned patterns.

3.      The Debtors shall immediately provide notice by overnight mail to Sentry

Casualty Company ("Sentry") of the Motion, and the assignment to Buyer, pursuant to the APA,

of PSC's workers compensation insurance policies with Sentry.  Sentry shall have 14 days from

service of such notice to file and serve any objections thereto.  If the parties are unable to resolve

---

1 Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion, or the APA, as applicable.
2 All references to the Bankruptcy Code are to 11 U.S.C. §§ 101 et seq.

ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF                                                                                    PAGE 2

any objections to such assignment, then the parties may set the matter for hearing on shortened time.

4. The sale to Buyer and the terms of this Order shall be binding on any and all parties in interest in this case and their respective successors and assigns, including any trustee appointed after entry of this order pursuant to Sections 701 or 702 of the Bankruptcy Code.

5. PSC is authorized to execute, deliver and perform the terms of the APA.

6. Subject to paragraph 9 below, the sale of the Acquired Assets shall be free and clear of Liens, Encumbrances and claims (except with respect to the Assumed Liabilities), including, without limitation, the Liens, Encumbrances and claims of (a) Joy Global Longview Operations, LLC, (b) Crane Tech, Inc., (c) United Rentals (North America), Inc. and (d) Bigge Crane and Rigging Company (the "Lien Claimants"), with such Liens, Encumbrances and claims, if any, of the Lien Claimants to attach only to the proceeds of the sale with the same force, effect, validity and priority that previously existed against the Acquired Assets and subject to any claims and defenses the Debtors and these estates may possess with respect thereto.

7. The Court finds that the sale to Buyer is in good faith and in the best interest of creditors pursuant to 11 U.S.C. §363(m), so that the Buyer is entitled to the protections afforded by that section, and that neither PSC nor Buyer has engaged in any conduct that would cause or permit the sale to be avoided under 11 U.S.C. § 363(n).

8. Third parties are barred from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), Liens or Encumbrances of any kind or nature against the Buyer or the Acquired Assets that arose prior to Closing except pursuant to Assumed Liabilities in accordance with the APA.

9.     Notwithstanding anything herein to the contrary, the Debtors shall provide for the indefeasible payment in full in cash at closing of the sale for all amounts owed by the Debtors to Siena Lending Group, LLC ("Siena") under the Debtor in Possession Loan and Security Agreement dated as of April 10, 2014 (the "Loan Agreement") among Debtors, and Siena, including all principal, interest, fees, costs and expenses, together with cash collateral for any contingent obligations as required in the Loan Agreement, in each case as set forth in a payoff letter to be provided to the Debtors by Siena.  The Debtors are authorized to deliver releases to Siena by the Debtors' estates as provided in the Siena Loan Agreement.  Upon closing of the sale, Siena has no further obligation or commitment to make loans, advances or extend any credit to the Debtors and any obligations of Siena with respect to the Carve Out under the final financing order are terminated and satisfied.   All indemnifications obligations and reimbursement obligations of the Debtors to Siena that survive termination of the Loan Agreement, as set forth therein, shall survive.

10.     The Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the new lease with the Buyer, all amendments thereto, any waivers and consents thereunder, and each of the documents executed in connection therewith in all respects.

11.     The stay of FRBP 6004(h) is hereby ordered waived.

APPROVED AS TO FORM:

Dated: July 30, 2014                    BLANK ROME LLP


                                        By:  __/s/ Regina Stango Kelborn_____
                                             Regina Stango Kelbon
                                             Attorneys for Secured Creditor
                                             Siena Lending Group LLC

1  Dated: July 30, 2014          FARELLA BRAUN + MARTEL LLP

2
                               By: ___Gary M. Kaplan_____
3                                    Gary M. Kaplan
                                     Attorneys for Buyer
4
   Dated: July 30, 2014          SHEPPARD MULLIN RICHTER & HAMPTON LLP,
5
6                              By:  ___Ori Katz_____
                                     Ori Katz
7                                    Counsel to the Official Unsecured
                                     Creditors' Committee
8

9

10                               **END OF ORDER**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COURT SERVICE LIST

1

2    None.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER APPROVING MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND
RELATED RELIEF

# EXHIBIT "10"

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

NORTHERN DISTRICT OF CALIFORNIA

Case number *(if known)* _____    Chapter    **7**

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy    4/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).
For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **Pacific Steel Casting Company LLC** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**  Include any assumed names, trade names and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **47-1342064** |

| | | |
|---|---|---|
| 4. | **Debtor's address** | **Principal place of business**  **1333 Second Street**  **Berkeley, CA 94710**  Number, Street, City, State & ZIP Code  **Alameda County**  County | **Mailing address, if different from principal place of business**  **P.O. Box 6486**  **Moraga, CA 94570**  P.O. Box, Number, Street, City, State & ZIP Code  **Location of principal assets, if different from principal place of business**  Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))  ☐ Partnership (excluding LLP)  ☐ Other. Specify: _____ |

Case: 19-40193    Doc# 85    Filed: 10/02/20    Entered: 10/02/20 15:24:49    Page 385 of 699

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

_3325_

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

■ Chapter 7

☐ Chapter 9

☐ Chapter 11. *Check all that apply*:

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☐ No.

■ Yes.

| | District | **Northern District of California** | When | **3/10/14** | Case number | **14-41045** |
| --- | --- | --- | --- | --- | --- | --- |
| | District | | When | | Case number | |

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

■ No

☐ Yes.

| | Debtor | | Relationship | |
| --- | --- | --- | --- | --- |
| | District | | When | Case number, if known |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

- ☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.
- ☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☐ No

☑ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

- ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

  What is the hazard? _____
- ☐ It needs to be physically secured or protected from the weather.
- ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).
- ☑ Other **PCB contamination in ground by prior tenant.**

**Where is the property?** **1333 Second Street
Berkeley, CA, 94710-0000**

Number, Street, City, State & ZIP Code

**Is the property insured?**

☑ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

■ **Statistical and administrative information**

**13. Debtor's estimation of available funds** .

*Check one:*

- ☐ Funds will be available for distribution to unsecured creditors.
- ☑ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☑ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☑ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☑ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | **Pacific Steel Casting Company LLC** | Case number (*if known*) |
|---|---|---|
| | Name | |

| **Request for Relief, Declaration, and Signatures** |
|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **January 25, 2019**
MM / DD / YYYY

**X** **/s/ Jerry Johnson**           **Jerry Johnson**
Signature of authorized representative of debtor      Printed name

Title    **Vice President of Finance**

**18. Signature of attorney**

**X** **/s/ Tracy Green**           Date **January 25, 2019**
Signature of attorney for debtor          MM / DD / YYYY

**Tracy Green 114876**
Printed name

**Wendel, Rosen, Black & Dean LLP**
Firm name

**1111 Broadway, 24th Floor**
**Oakland, CA 94607-4036**
Number, Street, City, State & ZIP Code

Contact phone   **(510) 834-6600**      Email address   **tgreen@wendel.com**

**114876 CA**
Bar number and State

**Fill in this information to identify the case:**

Debtor name    **Pacific Steel Casting Company LLC**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF CALIFORNIA

Case number (if known) _____

☐ Check if this is an
   amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.** Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ■ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ■ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ■ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ■ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ■ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule*
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **January 25, 2019**    X **/s/ Jerry Johnson**
                                       Signature of individual signing on behalf of debtor

                                       **Jerry Johnson**
                                       Printed name

                                       **Vice President of Finance**
                                       Position or relationship to debtor

Case: 19-40193   Doc# 85   Filed: 01/28/20   Entered: 01/28/20 15:24:49   Page 389 of 699

**Fill in this information to identify the case:**

Debtor name   **Pacific Steel Casting Company LLC**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF CALIFORNIA

Case number (if known)

☐ Check if this is an
amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals        **12/15**

| Part 1: | **Summary of Assets** |
|---|---|

1.   ***Schedule A/B: Assets-Real and Personal Property*** (Official Form 206A/B)

     1a. **Real property:**
         Copy line 88 from *Schedule A/B*................................................................ $             **0.00**

     1b. **Total personal property:**
         Copy line 91A from *Schedule A/B*........................................................... $     **1,904,841.67**

     1c. **Total of all property:**
         Copy line 92 from *Schedule A/B*............................................................. $     **1,904,841.67**

| Part 2: | **Summary of Liabilities** |
|---|---|

2.   ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
     Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*.................... $     **823,963.37**

3.   ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

     3a. **Total claim amounts of priority unsecured claims:**
         Copy the total claims from Part 1 from line 5a of *Schedule E/F*........................................ $     **1,024,223.70**

     3b. **Total amount of claims of nonpriority amount of unsecured claims:**
         Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*............................. +$     **1,580,788.24**

4.   **Total liabilities** ...............................................................................................
     Lines 2 + 3a + 3b          | $     **3,428,975.31** |

Case: 19-40193   Doc# 85   Filed: 01/23/20   Entered: 01/23/20 15:24:49   Page 390 of
699

**390**

**Fill in this information to identify the case:**

Debtor name     **Pacific Steel Casting Company LLC**

United States Bankruptcy Court for the:     NORTHERN DISTRICT OF CALIFORNIA

Case number (if known)

☐ Check if this is an
amended filing

# Official Form 206A/B
# Schedule A/B: Assets - Real and Personal Property          12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:      Cash and cash equivalents**

1. **Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
■ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | Current value of debtor's interest |
|---|---|---|---|
| 3. | **Checking, savings, money market, or financial brokerage accounts** *(Identify all)* | | |
| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number |
| 3.1. | **Bank of America** | **General Account** | **7282** | **$1,401.89** |
| 3.2. | **Bank of America** | **Disbursement Account** | **6395** | **$0.00** |

4. **Other cash equivalents** *(Identify all)*

5. **Total of Part 1.** | $1,401.89
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

**Part 2:      Deposits and Prepayments**

6. **Does the debtor have any deposits or prepayments?**

■ No. Go to Part 3.
☐ Yes Fill in the information below.

**Part 3:      Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.
■ Yes Fill in the information below.

11. **Accounts receivable**

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

| 11a. 90 days old or less: | **62,605.15** | - | **0.00** | = .... | **$62,605.15** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

| 11a. 90 days old or less: | **93,173.54** | - | **0.00** | = .... | **$93,173.54** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

**12.** **Total of Part 3.**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.

| **$155,778.69** |
|---|

**Part 4:** **Investments**

**13. Does the debtor own any investments?**

■ No. Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:** **Inventory, excluding agriculture assets**

**18. Does the debtor own any inventory (excluding agriculture assets)?**

■ No. Go to Part 6.
☐ Yes Fill in the information below.

**Part 6:** **Farming and fishing-related assets (other than titled motor vehicles and land)**

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No. Go to Part 7.
☐ Yes Fill in the information below.

**Part 7:** **Office furniture, fixtures, and equipment; and collectibles**

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39.** **Office furniture** **Desks, chairs, file cabinets** | **$0.00** | **Comparable sale** | **$1,000.00** |
| **40.** **Office fixtures** | | | |
| **41.** **Office equipment, including all computer equipment and communication systems equipment and software** **Computers, printers, Ring Central phones** | **$0.00** | **Comparable sale** | **$1,000.00** |

**42.** **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

**43.** **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

| **$2,000.00** |
|---|

44.    **Is a depreciation schedule available for any of the property listed in Part 7?**
       ■ No
       ☐ Yes

45.    **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

**Part 8:**    **Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

   ☐ No.  Go to Part 9.
   ■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 47.    **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 48.    **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors,<br>floating homes, personal watercraft, and fishing vessels | | | |
| 49.    **Aircraft and accessories** | | | |
| 50.    **Other machinery, fixtures, and equipment (excluding farm<br>machinery and equipment)** | | | |
| Foundry machinery & equipment | $0.00 | | $100,000.00 |

51.    **Total of Part 8.**                                                              $100,000.00
       Add lines 47 through 50.  Copy the total to line 87.

52.    **Is a depreciation schedule available for any of the property listed in Part 8?**
       ■ No
       ☐ Yes

53.    **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

**Part 9:**    **Real property**

54. **Does the debtor own or lease any real property?**

   ☐ No.  Go to Part 10.
   ■ Yes Fill in the information below.

55.    **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of<br>property<br>Include street address or other<br>description such as Assessor<br>Parcel Number (APN), and type<br>of property (for example,<br>acreage, factory, warehouse,<br>apartment or office building, if<br>available. | Nature and<br>extent of<br>debtor's interest<br>in property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

55.1. **Debtor leased property at 1333 Second Street, Berkeley, California, 94710 and vacated property on November 28, 2018. Personal property left in the premises.**          Unknown                    $0.00

---

56. **Total of Part 9.**          $0.00

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

57. **Is a depreciation schedule available for any of the property listed in Part 9?**
   ■ No
   ☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
   ■ No
   ☐ Yes

| Part 10: | Intangibles and intellectual property |
| --- | --- |

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No.  Go to Part 11.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
| --- | --- | --- | --- |
| 60. **Patents, copyrights, trademarks, and trade secrets** **Pacific Steel logo** | $0.00 | | Unknown |
| 61. **Internet domain names and websites** **Pacificsteel.com domain** | $0.00 | | Unknown |
| 62. **Licenses, franchises, and royalties** | | | |
| 63. **Customer lists, mailing lists, or other compilations** **Customer lists for Pacific Steel and Vancouver Iron & Steel** | $0.00 | | Unknown |
| 64. **Other intangibles, or intellectual property** **Emission Reduction Credits** | $0.00 | Quotes | $36,000.00 |
| 65. **Goodwill** **Reputation** | Unknown | | Unknown |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

66.    **Total of Part 10.**                                              | $36,000.00 |

       Add lines 60 through 65. Copy the total to line 89.

67.    **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107?
       ■ No
       ☐ Yes

68.    **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
       ■ No
       ☐ Yes

69.    **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

| Part 11: | All other assets |

70. **Does the debtor own any other assets that have not yet been reported on this form?**
     Include all interests in executory contracts and unexpired leases not previously reported on this form.

       ☐ No.  Go to Part 12.
       ■ Yes Fill in the information below.

                                                                         **Current value of debtor's interest**

71.    **Notes receivable**
       Description (include name of obligor)

72.    **Tax refunds and unused net operating losses (NOLs)**
       Description (for example, federal, state, local)

73.    **Interests in insurance policies or annuities**
       **Sentry Insurance**
       **Letter of Credit against future expenses related to
       workers' comp claims which Debtor estimates exceeds
       the value of future claims.**                                     $1,575,813.00

74.    **Causes of action against third parties (whether or not a lawsuit
       has been filed)**
       **Rigger spilled transformer fluid containing PCB.  Costs
       to clean up spill.**                                              $33,848.09
       Nature of claim
       Amount requested              $0.00

75.    **Other contingent and unliquidated claims or causes of action of
       every nature, including counterclaims of the debtor and rights to
       set off claims**
       **Property contaminated at the time Debtor took
       possession.  Set off rights against landlord and right to
       reimbursement for some clean up that Debtor
       performed.**                                                      Unknown
       Nature of claim
       Amount requested              $0.00

76.    **Trusts, equitable or future interests in property**

77.    **Other property of any kind not already listed** Examples: Season tickets,

Case: 19-41053    Doc# 85    Filed 01/25/20    Entered: 01/25/20 13:24:49    Page 395 of
                                        699

**395**

country club membership

| 78. | **Total of Part 11.** | $1,609,661.09 |
|-----|----------------------|---------------|

Add lines 71 through 77. Copy the total to line 90.

79.   **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

■ No
☐ Yes

Case: 19-44057   Doc# 85   Filed: 01/25/20   Entered: 01/25/19 13:24:49   Page 396 of 699

396

Debtor **Pacific Steel Casting Company LLC**
Name

Case number *(If known)*

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $1,401.89 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $155,778.69 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.**  *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $2,000.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $100,000.00 | |
| 88. **Real property.** *Copy line 56, Part 9.*......................................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $36,000.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $1,609,661.09 | |
| 91. **Total.** Add lines 80 through 90 for each column | $1,904,841.67 | + 91b. $0.00 |
| 92. **Total of all property on Schedule A/B**. Add lines 91a+91b=92 | | $1,904,841.67 |

Case: 19-44057   Doc# 85   Filed: 01/25/20   Entered: 01/25/20 13:24:49   Page 397 of 699

397

**Fill in this information to identify the case:**

Debtor name    **Pacific Steel Casting Company LLC**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF CALIFORNIA

Case number (if known) _____

☐ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

### Part 1:   List Creditors Who Have Secured Claims

| | |
|---|---|
| 2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. | **Column A**<br>**Amount of claim**<br>Do not deduct the value of collateral.    **Column B**<br>**Value of collateral that supports this claim** |

**2.1**   **Speyside Fund LLC, Agent**

Creditor's Name

**24 Frank Lloyd Wright Dr., Ste. 3225**
**P.O. Box 484**
**Ann Arbor, MI 48106**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**10/28/17**
**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

**Describe debtor's property that is subject to a lien**
**All assets**

**Describe the lien**
**Security Agreement and Recorded UCC Filing**

**Is the creditor an insider or related party?**
☐ No
☑ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Column A: **$823,963.37**

Column B: **$700,000.00\***

\*estimate

---

3.   **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    **$823,963.37**

### Part 2:   List Others to Be Notified for a Debt Already Listed in Part 1

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|

Case: 19-44057   Doc# 85   Filed: 01/25/20   Entered: 01/25/19 13:24:49   Page 398 of 699

**398**

# Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and
Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and
2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1:    List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ■ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors
   with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|

| 2.1 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$19,318.00** | **$0.00** |
|---|---|---|---|---|
|  | **Abel  Rodriguez** | Check all that apply. | | |
|  | **1444 154th Avenue, #107** | ☐ Contingent | | |
|  | **San Leandro, CA 94579** | ☐ Unliquidated | | |
|  | | ☐ Disputed | | |
|  | Date or dates debt was incurred | Basis for the claim: | | |
|  | | **Severance Pay** | | |
|  | Last 4 digits of account number | Is the claim subject to offset? | | |
|  | Specify Code subsection of PRIORITY | ■ No | | |
|  | unsecured claim: 11 U.S.C. § 507(a) (4) | ☐ Yes | | |

| 2.2 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$129,122.00** | **$129,122.00** |
|---|---|---|---|---|
|  | **Alameda County Tax Collector** | Check all that apply. | | |
|  | **1221 Oak Street** | ☐ Contingent | | |
|  | **Oakland, CA 94612** | ☐ Unliquidated | | |
|  | | ☐ Disputed | | |
|  | Date or dates debt was incurred | Basis for the claim: | | |
|  | **2018** | **Unsecured Property Taxes** | | |
|  | Last 4 digits of account number | Is the claim subject to offset? | | |
|  | Specify Code subsection of PRIORITY | ■ No | | |
|  | unsecured claim: 11 U.S.C. § 507(a) (8) | ☐ Yes | | |

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 399 of 699

**399**

| 2.3 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $17,012.20 | $0.00 |
|---|---|---|---|---|

**Aldo Mora**
**3112 Castilla court**
**Modesto, CA 95355**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.4 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $14,180.80 | $0.00 |
|---|---|---|---|---|

**Andres Morales**
**2346 Downer Avenue**
**Richmond, CA 94804**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.5 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $15,354.40 | $0.00 |
|---|---|---|---|---|

**Andres Rivera**
**1251 Ashby Avenue**
**Berkeley, CA 94702**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.6 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $16,891.30 | $0.00 |
|---|---|---|---|---|

**Angel Reyes**
**353 40th Street**
**Richmond, CA 94805**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 160 of 699

**400**

| | | | |
|---|---|---|---|
| 2.7 | Priority creditor's name and mailing address<br>**Antonio Ochoa**<br>**1425 100th Avenue**<br>**Oakland, CA 94603** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$6,634.50** $0.00 |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | |
| 2.8 | Priority creditor's name and mailing address<br>**Antonio Sanchez**<br>**1010 Allston Way**<br>**Berkeley, CA 94710** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$17,239.30** $0.00 |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | |
| 2.9 | Priority creditor's name and mailing address<br>**Antonio E Melgoza**<br>**328 Stoneford Avenue**<br>**Oakland, CA 94603** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$12,957.40** $0.00 |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | |
| 2.10 | Priority creditor's name and mailing address<br>**Armando Campos-Hernandez**<br>**9005 Walnut Street**<br>**Oakland, CA 94603** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$11,019.70** $0.00 |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | |

Case: 19-41057   Doc# 85   Filed: 01/25/20   Entered: 01/25/20 13:24:49   Page 401 of 699

**401**

| | | |
|---|---|---|
| 2.11 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: |

**2.11** Priority creditor's name and mailing address
**Barboza Catalina Lomeli**
**2451 Church Lane, Apt. 96**
**San Pablo, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$6,169.30    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.12** Priority creditor's name and mailing address
**Barboza Federico Lomeli**
**2451 Church Lane, Apt. 96**
**San Pablo, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$110.80    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.13** Priority creditor's name and mailing address
**Bounlouam  Sithideth**
**1989 21st Street**
**San Pablo, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$17,996.80    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.14** Priority creditor's name and mailing address
**Carlos  Martinez**
**1958 21st Street**
**San Pablo, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$12,484.30    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

Case: 19-41057    Doc# 85   Filed: 01/25/20   Entered: 01/25/19 13:24:49   Page 402 of
699

402

| 2.15 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $110.80 | $0.00 |
|---|---|---|---|---|

**Chan Cheng Saechao**
**2967 Oxford Avenue**
**Richmond, CA 94806**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.16 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $18,657.40 | $0.00 |
|---|---|---|---|---|

**Cheng Chieng Saechao**
**5135 Brookfield Court**
**Fairfield, CA 94534**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.17 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $49,356.00 | $49,356.00 |
|---|---|---|---|---|

**City of Berkeley**
**Finance Department**
**1947 Center Street**
**Berkeley, CA 94704**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**2017-2018**

Basis for the claim:
**Business License Fee**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.18 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,840.40 | $0.00 |
|---|---|---|---|---|

**Cuong N Lieu**
**5928 E. 17th Street**
**Oakland, CA 94621**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number
Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 403 of
699

403

| 2.19 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $13,372.60 | $0.00 |
| --- | --- | --- | --- | --- |

**David  Islas**
**4005 Gagos Drive**
**Modesto, CA 95356**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

---

| 2.20 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $18,049.00 | $0.00 |
| --- | --- | --- | --- | --- |

**Delfino  Solano**
**936 37th Avenue**
**Oakland, CA 94601**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

---

| 2.21 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,766.60 | $0.00 |
| --- | --- | --- | --- | --- |

**Edward L Flores**
**3820 Cannon Avenue**
**Oakland, CA 94602**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

---

| 2.22 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,063.80 | $0.00 |
| --- | --- | --- | --- | --- |

**Enrique  Miramontes-Guevara**
**1347 Battery Street**
**Richmond, CA 94801**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 404 of
699

404

| 2.23 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $16,015.00 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Enrique Perez**<br>**1727 Buena Vista Avenue**<br>**Alameda, CA 94501** | Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.24 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $10,730.20 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Escalante Efrain Blanco**<br>**2625 McArthur Avenue**<br>**San Pablo, CA 94806** | Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.25 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $5,858.50 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Fidencio S Reyes**<br>**1394 Gilmore Dr.**<br>**San Leandro, CA 94577** | Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.26 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $4,124.20 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Frank Pepe**<br>**519 Chesterfield Drive**<br>**Patterson, CA 95363** | Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

Case: 19-44057    Doc# 85    Filed: 01/25/20    Entered: 01/25/43 13:24:49    Page 21 of 88

699

405

| 2.27 | Priority creditor's name and mailing address **Gonzalez Jose Ortiz** 1825 Fruitvale Avenue, Apt. 7 Oakland, CA 94601 | As of the petition filing date, the claim is: *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $17,996.80 | $0.00 |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

| 2.28 | Priority creditor's name and mailing address **Hector Vargas** 9229 A Street, Apt. C Oakland, CA 94603 | As of the petition filing date, the claim is: *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $9,898.90 | $0.00 |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

| 2.29 | Priority creditor's name and mailing address **Hernandez Miguel Ruelas** 633 Stewart Street, Apt. 7 Manteca, CA 95336 | As of the petition filing date, the claim is: *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $8,063.80 | $0.00 |

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

| 2.30 | Priority creditor's name and mailing address **Ignacio Torres** 2623 Shamrock Drive San Pablo, CA 94806 | As of the petition filing date, the claim is: *Check all that apply.* ☐ Contingent ☐ Unliquidated ☐ Disputed | $19,318.00 | $0.00 |

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 22 of 88
699

**406**

| 2.31 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,507.20 | $0.00 |
|---|---|---|---|---|

**James Figueroa**
**15886 Via Del Sol**
**San Lorenzo, CA 94580**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.32 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $12,093.70 | $0.00 |
|---|---|---|---|---|

**Jesus Ortiz Rodriguez**
**2129 California Avenue**
**San Pablo, CA 94806**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.33 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $16,013.20 | $0.00 |
|---|---|---|---|---|

**John Ortiz**
**1302 Tuolumnne Way**
**Oakley, CA 94561**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.34 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,766.60 | $0.00 |
|---|---|---|---|---|

**Jose Aranda**
**5027 Clinton Avenue**
**Richmond, CA 94806**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

Case: 19-44057    Doc# 85    Filed: 01/25/20    Entered: 01/25/13 13:24:49    Page 23 of 88
699

**407**

| 2.35 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $10,510.60 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Jose Ortiz**<br>**2608 17th**<br>**San Pablo, CA 94806** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.36 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $10,730.20 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Jose Francisco Carreno**<br>**826 Lisbon Avenue**<br>**Oakland, CA 94601** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.37 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $17,336.20 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Jose G Rojo**<br>**16 Willian Way**<br>**Pittsburg, CA 94565** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| 2.38 | Priority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $8,675.50 | $0.00 |
| --- | --- | --- | --- | --- |
| | **Jose J Hernandez**<br>**1315 Fred Jackson Way**<br>**Richmond, CA 94801** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Severance Pay** | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 240 of 88
699

**408**

| | | | |
|---|---|---|---|
| 2.39 | Priority creditor's name and mailing address<br>**Jose Q Tamayo**<br>**1749 Lexington Avenue**<br>**El Cerrito, CA 94530** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$19,318.00** | **$0.00** |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.40 | Priority creditor's name and mailing address<br>**Juan A Lozano**<br>**935 34th Street**<br>**Richmond, CA 94805** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$18,462.70** | **$0.00** |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.41 | Priority creditor's name and mailing address<br>**Juan Piceno Perez**<br>**447 Sycamore Avenue**<br>**Manteca, CA 95336** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$6,840.40** | **$0.00** |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.42 | Priority creditor's name and mailing address<br>**Kao Meuy Saechao**<br>**551 Vallejo Avenu**<br>**Rodeo, CA 94572** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | **$7,537.90** | **$0.00** |

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 409 of
699
**409**

| 2.43 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,748.50 | $0.00 |
| --- | --- | --- | --- | --- |

**Lopez Salvador Esparza**
**15941 Via Arroyo**
**San Lorenzo, CA 94580**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.44 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $21,267.40 | $0.00 |
| --- | --- | --- | --- | --- |

**Lorenzo  Aranda**
**1419 Santa Clara St**
**Richmond, CA 94804**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.45 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $18,657.40 | $0.00 |
| --- | --- | --- | --- | --- |

**Luis  Reynoso**
**2223 9th Street**
**Berkeley, CA 94710**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.46 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $17,336.20 | $0.00 |
| --- | --- | --- | --- | --- |

**Manuel  Escalante**
**2625 Macarthur avenue**
**San Pablo, CA 94806**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
■ No
☐ Yes

Case: 19-41057   Doc# 85   Filed: 01/25/20   Entered: 01/25/20 13:24:49   Page 26 of 36
699

410

| 2.47 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $17,239.30 | $0.00 |
|---|---|---|---|---|

**Manuel Munoz**
**9814 Birch Street**
**Oakland, CA 94603**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.48 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $18,462.70 | $0.00 |
|---|---|---|---|---|

**Manuel Santoyo**
**1657 15th Street**
**San Pablo, CA 94806**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.49 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,063.80 | $0.00 |
|---|---|---|---|---|

**Martin Duenas**
**1187 61st Avenue**
**Oakland, CA 94621**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.50 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $15,354.40 | $0.00 |
|---|---|---|---|---|

**Martin F Velasco**
**2021 88th Avenue**
**Oakland, CA 94621**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

| 2.51 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $7,452.10 | $0.00 |
|---|---|---|---|---|

**Miguel A Rodriguez**
**1331 Cherry Street**
**Richmond, CA 94801**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.52 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $14,033.20 | $0.00 |
|---|---|---|---|---|

**Miranda Pedro Blaz**
**150 16th Street**
**Richmond, CA 94801**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.53 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $110.80 | $0.00 |
|---|---|---|---|---|

**Monarrez Modesta Carrillo**
**2233 E. 23rd Street, Apt. A**
**Oakland, CA 94606**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.54 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $3,125.20 | $0.00 |
|---|---|---|---|---|

**Nelson  Costa**
**1293 Gilmore Drive**
**San Leandro, CA 94577**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 412 of
699

412

| 2.55 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $22,018.00 | $0.00 |
|---|---|---|---|---|

**Nicolas Salazar**
**1520 Valle Vista**
**Vallejo, CA 94589**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.56 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,766.60 | $0.00 |
|---|---|---|---|---|

**Onofre Vasquez**
**319 Gramercy Place**
**Oakland, CA 94603**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.57 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $17,851.00 | $0.00 |
|---|---|---|---|---|

**Pablo Martinez Zurita**
**1335 Sanford Avenue, Apt. E**
**San Pablo, CA 94806**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.58 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $13,569.10 | $0.00 |
|---|---|---|---|---|

**Pedro Martinez**
**1528 Bush Avenue**
**San Pablo, CA 94806**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
☑ No
☐ Yes

Case: 19-41057    Doc# 35    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 413 of 699

**413**

| | | | |
|---|---|---|---|
| 2.59 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,919.60 | $0.00 |

**2.59** Priority creditor's name and mailing address

**Pulido Raul Villasenor**
**1541 Pine Avenue**
**San Pablo, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$6,919.60    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

**2.60** Priority creditor's name and mailing address

**Refugio G. Lopez**
**533 S. 28th Street**
**Richmond, CA 94804**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$16,015.90    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

**2.61** Priority creditor's name and mailing address

**Richard G Mitchell**
**4505 McGlothen Way**
**Richmond, CA 94806**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$9,840.40    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

**2.62** Priority creditor's name and mailing address

**Robert M Simas**
**708 Buriat Street**
**San Leandro, CA 94577**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$13,372.60    $0.00

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 16 of 88
699

414

| 2.63 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $19,978.60 | $0.00 |
|------|---|---|---|---|

**Rui P Costa**
**118 Boxwood Lane**
**Hercules, CA 94547**

Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
- ☑ No
- ☐ Yes

---

| 2.64 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,087.80 | $0.00 |
|------|---|---|---|---|

**Salvador  Moreno**
**183 Maureen Circle**
**Bay Point, CA 94565**

Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
- ☑ No
- ☐ Yes

---

| 2.65 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $13,372.60 | $0.00 |
|------|---|---|---|---|

**Salvador  Suarez**
**1770 Birchwood Lanue**
**Tracy, CA 94376**

Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
- ☑ No
- ☐ Yes

---

| 2.66 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,228.70 | $0.00 |
|------|---|---|---|---|

**Salvador Navarro Zandoval**
**232 South 43rd Street**
**Richmond, CA 94804**

Check all that apply.
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

Is the claim subject to offset?
- ☑ No
- ☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/19    Entered: 01/25/19 13:24:49    Page 115 of
699

415

| 2.67 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,363.20 | $0.00 |
|------|---|---|---|---|

**Sergio Pedroza**
**1005 Delaware St**
**Berkeley, CA 94710**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.68 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $14,339.20 | $0.00 |
|------|---|---|---|---|

**Sonny Louang**
**1529 Coalinga Avenue**
**Richmond, CA 94801**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.69 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $26,584.60 | $0.00 |
|------|---|---|---|---|

**Tony R. Silva**
**6362 Ebensburg Lane**
**Dublin, CA 94568**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

---

| 2.70 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $8,063.80 | $0.00 |
|------|---|---|---|---|

**Tyrone E. Osborne**
**77 Solano Square , #256**
**Benicia, CA 94510**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

■ No
☐ Yes

Case: 19-44057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 216 of 699

416

| 2.71 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,766.60 | $0.00 |
|---|---|---|---|---|

**Von Lavanh**
**5014 Creely Avenue**
**Richmond, CA 94804**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

---

| 2.72 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $3,729.40 | $0.00 |
|---|---|---|---|---|

**Yuheng He**
**412 International Blvd**
**Oakland, CA 94606**

Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:
**Severance Pay**

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (4)

---

**Part 2: List All Creditors with NONPRIORITY Unsecured Claims**

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | Amount of claim |
|---|---|---|

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $3,334.85 |
|---|---|---|---|

**Airgas USA LLC**
**P.O. Box 7423**
**Pasadena, CA 91109-7423**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $105.68 |
|---|---|---|---|

**Amprocorp USA Inc**
**4111 S.W. 47Th Avenue Suite 325**
**Ft Lauderdale, FL 33314**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $2,187.29 |
|---|---|---|---|

**Associated Flow Controls**
**30 Beta Court**
**San Ramon, CA 94583-1202**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

Case: 19-41057   Doc# 85   Filed: 01/25/20   Entered: 01/25/20 13:24:49   Page 35 of 88

417

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,278.40 |
|---|---|---|---|

**AT&T**
P.O. Box 5019
Carol Stream, IL 60197-5019

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.5 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $365.69 |
|---|---|---|---|

**AT&T**
P.O. Box 5025
Carol Stream, IL 60197-5025

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.6 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $413.39 |
|---|---|---|---|

**AT&T Mobility**
P.O. Box 6463
Carol Stream, IL 60197-6463

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.7 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $3,000.00 |
|---|---|---|---|

**Atwell LLC**
Two Town Square Suite 700
Attn: Tim Augustine
Southfield, MI 48076

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $12,776.45 |
|---|---|---|---|

**Bay Alarm Company**
P.O. Box 7137
San Francisco, CA 94120-7137

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.9 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $41,474.87 |
|---|---|---|---|

**Bcm Service & Engineering**
1418 Mariani Court
Suite 160
Tracy, CA 95376-2854

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.10 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $26,303.92 |
|---|---|---|---|

**Bearing Engineering Company**
667 Mccormick Street
San Leandro, CA 94577

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com       Best Case Bankruptcy

| 3.11 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $10,926.00 |
|---|---|---|---|

**Berkley Surety Group LLC**
**P.O. Box 9010**
**Westbrook, ME 04098**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.12 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $12,597.97 |
|---|---|---|---|

**Bordanaro And Son**
**1690 Riverlake Road**
**Discovery Bay, CA 94505**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.13 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $29.04 |
|---|---|---|---|

**California Janitorial Supply Co.**
**2040 Junction Avenue**
**San Jose, CA 95131**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.14 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $4,000.00 |
|---|---|---|---|

**California Metals Coalition**
**2971 Warren Lane**
**El Dorado Hills, CA 95762**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.15 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $49,085.64 |
|---|---|---|---|

**Castellon & Funderburk LLP**
**3201 Danville Boulevard**
**Suite 267**
**Alamo, CA 94507**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.16 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,045.90 |
|---|---|---|---|

**Caterpillar Financial Services Corp**
**P.O. Box 100647**
**Pasadena, CA 91189-0647**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.17 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $12,057.00 |
|---|---|---|---|

**City Of Berkeley**
**Finance-Treasury Division**
**P.O. Box 1910**
**Berkeley, CA 94701**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 21 of 88
699
419

| 3.18 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $37,299.00 |
|---|---|---|---|

**City Of Berkeley**
P.O. Box 23523
Oakland, CA 94623-0523

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.19 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $9,923.58 |
|---|---|---|---|

**Clark Pest Control**
P.O. Box 1480
Lodi, CA 95241-1480

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $15,608.00 |
|---|---|---|---|

**Conner Strong & Buckelew**
P.O. Box 989
Marlton, NJ 08053

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.21 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $14,456.25 |
|---|---|---|---|

**Core Security Solutions Inc**
2701 Telegraph Ave, Suite 200
Oakland, CA 94612

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $61,668.19 |
|---|---|---|---|

**Crestmark Equipment Finance**
P.O. Box 233756
3756 Momentum Place
Chicago, IL 60689-5337

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.23 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $4,029.81 |
|---|---|---|---|

**Cromer Equipment Company**
P.O. Box 14338
Oakland, CA 94614-2388

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.24 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $4.00 |
|---|---|---|---|

**Department Of Motor Vehicles**
P.O. Box 825339
Sacramento, CA 94232-5339

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

Case: 19-41057   Doc# 85   Filed: 01/25/20   Entered: 01/25/19 13:24:49   Page 420 of 699

420

| Debtor | **Pacific Steel Casting Company LLC** | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| 3.25 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$5,852.00** |
|---|---|---|---|

**DMV Renewal**
**P.O. Box 942894**
**Sacramento, CA 94294-0895**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.26 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$6,258.00** |
|---|---|---|---|

**DNV GI Maritime**
**Long Beach Station**
**3800 Kilroy Airport Way - Suite 410**
**Long Beach, CA 90806**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.27 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$14,127.85** |
|---|---|---|---|

**Dun & Bradstreet**
**P.O. Box 75434**
**Chicago, IL 60675-5434**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.28 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,100.60** |
|---|---|---|---|

**East Bay Propane**
**8255 San Leandro Street**
**Oakland, CA 94621**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.29 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$6,272.60** |
|---|---|---|---|

**EBMUD Payment Center**
**P.O. Box 1000**
**Oakland, CA 94649-0001**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.30 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$28,327.69** |
|---|---|---|---|

**EKI  Environment & Water Inc**
**577 Airport Blvd Suite 500**
**Burlingame, CA 94010**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.31 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$4,023.54** |
|---|---|---|---|

**Emerald Transformer**
**7850 Colin Mckinney Pkwy Suite 130**
**Mckinney, TX 75070**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

| 3.32 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $106.92 |
|---|---|---|---|

**Enthalpy Analytical LLC**
P.O. Box 741137
Los Angeles, CA 90074-1137

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.33 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,310.48 |
|---|---|---|---|

**Estes Express Lines**
P.O. Box 25612
Richmond, VA 23260-5612

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.34 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $395.10 |
|---|---|---|---|

**Farella Braun & Martel**
**Attorneys At Law**
235 Montgomery Street
San Francisco, CA 94104

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.35 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $406.77 |
|---|---|---|---|

**Fedex Freight**
Dept La P.O. Box 21415
Pasadena, CA 91185-1415

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.36 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,605.21 |
|---|---|---|---|

**Freeman Manufacturing & Supply Co.**
1101 Moore Road
Avon, OH 44011-1011

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.37 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $464.00 |
|---|---|---|---|

**G.E. Tennison Co.**
5761 Seneca St.
Elma, NY 14059

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.38 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $6,174.38 |
|---|---|---|---|

**GF Industries**
122 North Harbor Blvd
Suite 201
Fullerton, CA 92832

Date(s) debt was incurred _

Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No  ☐ Yes

---

Case: 19-41057   Doc# 85   Filed: 01/25/20   Entered: 01/25/20 13:24:49   Page 422 of
699

**422**

| 3.39 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $129,122.70 |
|---|---|---|---|

**Henry C. Levy**
**Treasurer And Tax Collector**
**1221 Oak Street Room 131**
**Oakland, CA 94612-4285**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.40 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $10,673.39 |
|---|---|---|---|

**Herc Rentals**
**P.O. Box 936257**
**Atlanta, GA 31193**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.41 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $235.98 |
|---|---|---|---|

**Hunter Foundry Machinery Corp**
**2222 Hammond Drive**
**Schaumburg, IL 60196-1094**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.42 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $978.33 |
|---|---|---|---|

**Image Business Solutions**
**28339 Beck Road Suite F2**
**Wixom, MI 48393**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.43 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $2,294.26 |
|---|---|---|---|

**Inland Water Inc**
**P.O. Box 2925**
**Dublin, CA 94568**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.44 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $13,613.52 |
|---|---|---|---|

**Intellichief**
**A Quadrant Software Company**
**13095 North Telecom Parkway**
**Tampa, FL 33637**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.45 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $640.00 |
|---|---|---|---|

**J.S. & P. Enterprises Corp**
**14950 Avenida Anita**
**Chino Hills, CA 91709**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

Case: 19-41017   Doc# 85   Filed: 10/02/20   Entered: 10/02/19 13:24:49   Page 25 of 88

699

423

| 3.46 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $2,184.00 |
|---|---|---|---|

**Kacee Company**
3570 Hiawatha Way
Antelope, CA 95843

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.47 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $288.99 |
|---|---|---|---|

**King Tester Corporation**
308 Schell Lane
Phoenixville, PA 19460

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.48 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,791.00 |
|---|---|---|---|

**L.J. Kruse Company**
P.O. Box 2900
Berkeley, CA 94702

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.49 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,970.00 |
|---|---|---|---|

**Linde LLC Los Angeles**
P.O. Box 100691
Pasadena, CA 91189-0691

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.50 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $2,137.50 |
|---|---|---|---|

**Linkedin Corporation**
1000 W. Maude Avenue
Sunnyvale, CA 94085

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.51 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,800.00 |
|---|---|---|---|

**Logistics Dynamics Inc**
155 Pineview Drive
Amherst, NY 14228

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.52 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $10,903.54 |
|---|---|---|---|

**M Cooper Consulting**
8309 Ne 147Th Place
Kenmore, WA 98028

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 424 of 699

424

| 3.53 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $47,175.00 |
|---|---|---|---|

**Marsh USA Inc.**
P.O. Box 846112
Dallas, TX 75284-6112

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.54 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $467.59 |
|---|---|---|---|

**Melrose Metal Products Inc.**
44533 South Grimmer Blvd.
Fremont, CA 94538

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.55 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $600.00 |
|---|---|---|---|

**Microsoft Corporation**
P.O. Box 842103
Dallas, TX 75282-2103

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.56 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $45.40 |
|---|---|---|---|

**Mobile Fleetcare**
P.O. Box 7354
Berkeley, CA 94707-0354

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.57 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $254.54 |
|---|---|---|---|

**Motion Industries Inc**
1605 Alton Road
Birmingham, AL 35210

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number **7463**

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.58 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $18,616.92 |
|---|---|---|---|

**Optimas Oe Solutions LLC**
P.O. Box 74008133
Chicago, IL 60674-8133

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.59 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $4,700.00 |
|---|---|---|---|

**Peerless Pattern Works**
3325 Nw Yeon Ave
Portland, OR 97210

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 125 of 699

425

| Debtor | **Pacific Steel Casting Company LLC** | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

| 3.60 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$517,591.49** |
|---|---|---|---|

**PG&E**
**P.O. Box 997300**
**Sacramento, CA 95899-7300**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.61 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$32.00** |
|---|---|---|---|

**Pitney Bowes Global Financial**
**Services LLC**
**P.O. Box 371887**
**Pittsburgh, PA 15250-7887**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.62 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$29.99** |
|---|---|---|---|

**Pitney Bowes Postage By Phone**
**P.O. Box 371874**
**Pittsburgh, PA 15250-7874**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.63 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$9,500.00** |
|---|---|---|---|

**Polymeric Technology Inc**
**Poly-Tek**
**1900 Marina Blvd. Suite A**
**San Leandro, CA 94577**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.64 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$6,500.00** |
|---|---|---|---|

**Portland Manufacturing**
**7715 Ne 21St Ave**
**Portland, OR 97211**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ☐ No ☐ Yes

---

| 3.65 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$734.49** |
|---|---|---|---|

**Posi-Flate**
**Jessie Howe**
**1125 Willow Lake Blvd**
**St Paul, MN 55110**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.66 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: Check all that apply. | **$2,991.85** |
|---|---|---|---|

**Praxair Distribution Inc**
**Dept La 21511**
**Pasadena, CA 91185-1511**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 426 of 699

**426**

| 3.67 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $5,339.53 |
|---|---|---|---|

**Professional Finishing**
P.O. Box 742038
Los Angeles, CA 90074-2038

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.68 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $912.00 |
|---|---|---|---|

**Q C Services & Associates**
23101 Foley Street
Hayward, CA 94545

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.69 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $4,328.35 |
|---|---|---|---|

**Quincy Compressor LLC**
Dept 3427 Lockbox 893427
P.O. Box 123427
Dallas, TX 75312-3427

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.70 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $14,814.02 |
|---|---|---|---|

**Rain For Rent**
File 52541
Los Angeles, CA 90074-2541

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.71 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $31,235.83 |
|---|---|---|---|

**Republic Services #851**
P.O. Box 78829
Phoenix, AZ 85062-8829

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.72 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $3,834.68 |
|---|---|---|---|

**Ridge Cast Metals Corp**
1554 Doolittle Drive
San Leandro, CA 94577

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.73 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $524.70 |
|---|---|---|---|

**RJMS Corporation**
Toyota Material Handling
P.O. Box 398526
San Francisco, CA 94139-8526

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| | | |
|---|---|---|
| 3.74 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $19,125.00 |

**Robert Half Management Resources**
P.O. Box 743295
Los Angeles, CA 90074-3295

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.75 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $3,025.15 |
|---|---|---|---|

**Rosemount Analytical - Pad Raio**
22737 Network Place
Chicago, IL 60673-1227

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.76 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $1,169.07 |
|---|---|---|---|

**Rotex Inc**
P.O. Box 630317
Cincinnati, OH 45263-0317

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.77 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $225.75 |
|---|---|---|---|

**S.L. Fusco Inc.**
P.O. Box 5924
Compton, CA 90224

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.78 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $1,162.36 |
|---|---|---|---|

**Saia Motor Freight Line LLC**
P O Box 730532
Dallas, TX 75373-0532

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.79 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $192,475.87 |
|---|---|---|---|

**Sentry Insurance**
P.O.Box 8045
Stevens Point, WI 54481-8045

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.80 | **Nonpriority creditor's name and mailing address** | As of the petition filing date, the claim is: *Check all that apply.* | $320.00 |
|---|---|---|---|

**Shell Core Specialties**
27640 Se Hwy 212 Suite A
Boring, OR 97009

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 428 of 699

428

| 3.81 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,371.38 |
|------|--|--|--|

**Shred-It USA**
**28883 Network Place**
**Chicago, IL 60673-1288**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.82 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,220.41 |
|------|--|--|--|

**Simpson Technologies Corporation**
**39618 Treasury Center**
**Chicago, IL 60694-9600**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.83 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $6,008.43 |
|------|--|--|--|

**Speyside Fund LLC**
**P.O. Box 530426**
**Livonia, MI 48153**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.84 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,800.00 |
|------|--|--|--|

**State Water Resources Control Board**
**Attn: Afrs**
**P.O. Box 1888**
**Sacramento, CA 95812-1888**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.85 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,585.94 |
|------|--|--|--|

**Talx Uc Express**
**4076 Paysphere Circle**
**Chicago, IL 60674-4076**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.86 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $8,000.00 |
|------|--|--|--|

**The Howard E Nyhart Company Inc**
**Attn: Finance Department**
**8415 Allison Pointe Blvd. Suite 300**
**Indianapolis, IN 46250**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.87 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $11,429.44 |
|------|--|--|--|

**Thermo Electron North America LLC**
**P.O. Box 742775**
**Atlanta, GA 30374-2775**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No  ☐ Yes

| | | |
|---|---|---|
| 3.88 | **Nonpriority creditor's name and mailing address** | $890.00 |

**Tomas Padilla Welding Services**
1241 Peach Place
Concord, CA 94518

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.89 | **Nonpriority creditor's name and mailing address** | $25,085.22 |

**Tyco Integrated Security LLC**
P.O. Box 371967
Pittsburgh, PA 15250-7967

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.90 | **Nonpriority creditor's name and mailing address** | $700.00 |

**Uhy LLP**
P.O. Box 8505
Carol Stream, IL 60197

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.91 | **Nonpriority creditor's name and mailing address** | $16,000.00 |

**United Contract Services Inc**
1161 Ringwood Court Suite 170
San Jose, CA 95131

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.92 | **Nonpriority creditor's name and mailing address** | $2,701.91 |

**Valley Rubber & Gasket**
A Lewis-Goetz Company
P.O. Box 31001-1893
Pasadena, CA 91110-1893

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.93 | **Nonpriority creditor's name and mailing address** | $7,041.88 |

**Vancouver Iron And Steel Inc**
1200 W 13Th St
Vancouver, WA 98660-2726

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| | | |
|---|---|---|
| 3.94 | **Nonpriority creditor's name and mailing address** | $2,025.62 |

**Wells Fargo Vendor Fin Serv**
P.O. Box 51043
Los Angeles, CA 90051-5353

Date(s) debt was incurred _

Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

Case: 19-41057    Doc# 85    Filed: 01/25/19    Entered: 01/25/19 13:24:49    Page 430 of
699

430

| 3.95 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $441.03 |
|---|---|---|---|

**Wille Electric Supply Co**
P.O. Box 3246
Modesto, CA 95353

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.96 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $8,670.01 |
|---|---|---|---|

**XPO Logistics Freight Inc**
P.O. Box 5160
Portland, OR 97208-5160

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.97 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $12,056.12 |
|---|---|---|---|

**XPO Logistics Inc**
27724 Network Place
Chicago, IL 60673-1277

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Basis for the claim: _

Last 4 digits of account number _

Is the claim subject to offset? ■ No ☐ Yes

---

## Part 3: List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

## Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims

5. Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. $ | 1,024,223.70 |
| 5b. Total claims from Part 2 | 5b. + $ | 1,580,788.24 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. $ | 2,605,011.94 |

Official Form 206 E/F     Schedule E/F: Creditors Who Have Unsecured Claims     Page 33 of 33

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

Case: 19-44057   Doc# 85   Filed: 01/25/20   Entered: 01/25/19 13:24:49   Page 431 of 88
699

431

☐ Check if this is an amended filing

# Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases 12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**
   ☐ No. Check this box and file this form with the debtor's other schedules.  There is nothing else to report on this form.
   ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| **2. List all contracts and unexpired leases** | | **State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease** |
|---|---|---|
| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | **Lease of 15 Forklifts** | |
| | State the term remaining | **2/22/2019** | **Returned 11/14/18**<br>**TIP Capital (Crestmark Bank)**<br>**40950 Woodward Ave., Ste. 201**<br>**Bloomfield Hills, CA 48304** |
| | List the contract number of any government contract | | |
| 2.2. | State what the contract or lease is for and the nature of the debtor's interest | **Lease of Sweeper** | |
| | State the term remaining | **7/2/2020** | **Returned 11/14/18**<br>**All-Lines Leasing**<br>**100 Prairie Center Drive**<br>**Eden Prairie, NM 55344** |
| | List the contract number of any government contract | | |
| 2.3. | State what the contract or lease is for and the nature of the debtor's interest | **Real Property Lease for facilities located at:**<br><br>**1333 Second St.**<br>**1310 Third St.**<br>**640 Gilman** | |
| | State the term remaining | **8/29/2029** | **Returned to Landlord 11/28/18**<br>**Berkeley Properties LLC**<br>**7 West 41st Ave., #523**<br>**San Mateo, CA 94403** |
| | List the contract number of any government contract | | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com  Best Case Bankruptcy

# Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

### 1. Do you have any codebtors?

■ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☐ Yes

### 2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G. Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: **Codebtor** | | Column 2: **Creditor** | |
|---|---|---|---|
| **Name** / **Mailing Address** | | **Name** | *Check all schedules that apply:* |
| 2.1 _____ Street _____ City    State    Zip Code | | _____ | ☐ D ☐ E/F ☐ G |
| 2.2 _____ Street _____ City    State    Zip Code | | _____ | ☐ D ☐ E/F ☐ G |
| 2.3 _____ Street _____ City    State    Zip Code | | _____ | ☐ D ☐ E/F ☐ G |
| 2.4 _____ Street _____ City    State    Zip Code | | _____ | ☐ D ☐ E/F ☐ G |

Case: 19-44057    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 433 of 699

433

Fimpimill in this information to identify the case:

Debtor name **Pacific Steel Casting Company LLC**

United States Bankruptcy Court for the: NORTHERN DISTRICT OF CALIFORNIA

Case number (if known) _____

☐ Check if this is an
amended filing

# Official Form 207

## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy       04/16

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).**

### Part 1:   Income

1. **Gross revenue from business**

☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|
| **For prior year:**<br>From **1/01/2018** to **10/31/2018** | ☑ Operating a business<br>☐ Other _____ | $21,362,708.00 |
| **For year before that:**<br>From **1/01/2017** to **12/31/2017** | ☑ Operating a business<br>☐ Other _____ | $23,421,793.00 |
| **For the fiscal year:**<br>From **1/01/2016** to **12/31/2016** | ☑ Operating a business<br>☐ Other _____ | $19,404,624.00 |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None.

| Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|
| | |

### Part 2:   List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| | | | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

| Debtor | Pacific Steel Casting Company LLC | | Case number *(if known)* | |
|---|---|---|---|---|

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| **3.1.** **Littler Mendelson**<br>P.O. Box 45547<br>San Francisco, CA 94145 | 11/30/18 | $7,208.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other **Legal Fees** |
| **3.2.** **McKissick**<br>2801 Dawson Road<br>Tulsa, OK 74101 | 11/30/18 | $6,461.22 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other **Refund on overpayment of casting invoice** |
| **3.2.** **Wendel, Rosen, Black & Dean LLP**<br>1111 Broadway, 24th Floor<br>Oakland, CA 94607 | 12/20/18 | $4,084.75 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☑ Other **Attorney Fees** |
| **3.4.** **NRC Environmental Services**<br>1605 Ferry Place<br>Alameda, CA 94501 | 1/3/19 | $17,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Unsecured loan repayments<br>☑ Services<br>☐ Other |
| **3.5.** **Wendel, Rosen, Black & Dean LLP**<br>1111 Broadway, 24th Floor<br>Oakland, CA 94607 | 1/9/19 | $5,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☑ Other **Attorney Fees** |
| **3.6.** **Hassle-Free Haulers**<br>2354 9th Ave.<br>San Francisco, CA  94116 | 1/23/19 | $10,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Unsecured loan repayments<br>☑ Services<br>☐ Other _____ |
| **3.7.** **Techordia**<br>1900 North Loop Road<br>Alameda, CA 94502 | 11/30/18<br>1/11/19 | $8,756.25<br>$10,054.16 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other **IT Services** |
| **3.8.** **See Attachment A**<br>Union Employees' Severance Pay | | $35,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other **Severance Pay** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                                    Best Case Bankruptcy

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. **Krishnan Venkatesan** **1631 Angsley Lane** **San Ramon, CA 94710** **President of Pacific Steel, LLC Member** | **12/31/17 -** **12/15/18** | **$283,652.65** | **Compensation** |
| 4.2. **Krishnan Venkatesan** **1631 Angsley Lane** **San Ramon, CA 94710** **President of Pacific Steel, LLC Member** | **1/22/18 -** **9/14/18** | **$6,272.02** | **Reimbursement of Expenses** |
| 4.3. **Jerry Johnson** **P.O. Box 6784** **Moraga, CA 94570** **VP Finance of Pacific Steel** | **1/15/18 -** **12/31/18** | **$281,948.32** | **Compensation** |
| 4.4. **Jerry Johnson** **P.O. Box 6784** **Moraga, CA 94570** **VP Finance of Pacific Steel** | **10/31/18** | **$50,000.00** | **Compensation** |
| 4.5. **Jerry Johnson** **P.O. Box 6784** **Moraga, CA 94570** **VP Finance of Pacific Steel** | **1/24/18** | **$1,000.00** | **Expense reimbursement** |
| 4.6. **Jerry Johnson** **P.O. Box** **Moraga, CA 94570** **VP Finance of Pacific Steel** | **3/27/18 -** **12/17/18** | **$3,100.88** | **Expense Reimbursement** |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:    Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case**.**

☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. **HFR Properties LP v. Pacfic Steel Casting Company LLC**<br>RG18915202 | **Unlawful Detainer** | **Alameda County Superior Court**<br>**1225 Fallon Street**<br>**Oakland, CA 94612** | ☐ Pending<br>☐ On appeal<br>☑ Concluded |
| 7.2. **Holt of California v. Pacific Steel Casting Company LLC**<br>STK-CV-LBC-2018-5344 | **Unpaid Invoices** | **San Joaquin County Superior Court**<br>**180 E. Weber Avenue**<br>**Stockton, CA 94612** | ☐ Pending<br>☐ On appeal<br>☑ Concluded |
| 7.3. **United Contract Services Inc. v. Pacific Steel Casting Company LLC**<br>RS18890288, RS18889992 | **Unpaid invoices** | **Alameda County Superior Court**<br>**1225 Fallon Street**<br>**Oakland, CA 94612** | ☐ Pending<br>☐ On appeal<br>☑ Concluded |
| 7.4. **Adobe Lumber Inc. dba Industrial Wholesale v. Jerry Johnson dba Pacific Steel Casting Co.**<br>18SC000252 | **Unpaid Invoices** | **Napa County Superior Court**<br>**825 Brown Street**<br>**Napa, CA 94559** | ☐ Pending<br>☐ On appeal<br>☑ Concluded |
| 7.5. **The Board of Trustees in their capacities as Trustee of the CMTA-Glass, Molders, Pottery, Plastics, et al. v. Pacific Steel Casting Company, et al.**<br>17-cv-04572-WHA | **Union Dispute** | **U.S. District Court - ND of California**<br>**400 Golden Gate Avenue**<br>**San Francisco, CA 94102** | ☐ Pending<br>☐ On appeal<br>☑ Concluded |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

---

**Part 4:    Certain Gifts and Charitable Contributions**

**9.** **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

---

**Part 5:    Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | Dates of loss | Value of property lost |
|---|---|---|---|

---

**Part 6:    Certain Payments or Transfers**

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| | Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | **Focus Management Group**<br>**P.O. Box 22127**<br>**Tampa, FL 33630** | | **9/2017 -**<br>**6/2018** | **$255,425.00** |
| | Email or website address | | | |
| | Who made the payment, if not debtor? | | | |
| 11.2. | **Wendel, Rosen, Black & Dean LLP**<br>**1111 Broadway, 24th Floor**<br>**Oakland, CA 94607-4036** | **Attorney Fees** | **10/19/17** | **$50,000.00** |
| | Email or website address<br>**tgreen@wendel.com** | | | |
| | Who made the payment, if not debtor? | | | |
| 11.3. | **Wendel, Rosen, Black & Dean LLP**<br>**1111 Broadway, 24th Floor**<br>**Oakland, CA 94607-4036** | **Attorney Fees** | **4/30/18** | **$10,000.00** |
| | Email or website address<br>**tgreen@wendel.com** | | | |
| | Who made the payment, if not debtor? | | | |
| 11.4. | **Wendel, Rosen, Black & Dean LLP**<br>**1111 Broadway, 24th Floor**<br>**Oakland, CA 94607-4036** | **Attorney Fees** | **10/22/18** | **$15,000.00** |
| | Email or website address<br>**tgreen@wendel.com** | | | |
| | Who made the payment, if not debtor? | | | |

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 438 of 699

**438**

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.5. | **Wendel, Rosen, Black & Dean LLP** **1111 Broadway, 24th Floor** **Oakland, CA 94607-4036** | **Attorney Fees** | **12/20/18** | **$4,084.75** |
| | Email or website address **tgreen@wendel.com** | | | |
| | Who made the payment, if not debtor? | | | |
| 11.6. | **Wendel, Rosen, Black & Dean LLP** **1111 Broadway, 24th Floor** **Oakland, CA 94607-4036** | **Attorney Fees** | **1/9/19** | **$5,000.00** |
| | Email or website address **tgreen@wendel.com** | | | |
| | Who made the payment, if not debtor? | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

| Part 7: | Previous Locations |
|---|---|

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | Dates of occupancy From-To |
|---|---|---|
| 14.1. | **1333 Second Street Berkeley, CA 94710** | **8/29/14 - 11/28/18** |

| Part 8: | Health Care Bankruptcies |
|---|---|

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

Case: 19-40193    Doc# 85    Filed: 01/25/20    Entered: 01/25/20 13:24:49    Page 439 of 699
**439**

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

## Part 9: Personally Identifiable Information

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.
☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☐ No. Go to Part 10.
☑ Yes. Does the debtor serve as plan administrator?

     ☐ No Go to Part 10.
     ☑ Yes. Fill in below:

Name of plan
**Pacific Steel Casting Company LLC 401(k) Plan**

Employer identification number of the plan
EIN: **47-1342064**

Has the plan been terminated?
☑ No
☐ Yes

     ☐ No Go to Part 10.
     ☑ Yes. Fill in below:

Name of plan
**CMTA Molders & Allied Workers Pension Trust**

Employer identification number of the plan
EIN:

Has the plan been terminated?
☑ No
☐ Yes

## Part 10: Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☐ None

| | Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | **Wells Fargo Bank NA**<br>**555 12th Street**<br>**Oakland, CA 94607** | **XXXX-7011** | ☑ Checking<br>☐ Savings<br>☐ Money Market<br>☐ Brokerage<br>☐ Other___ | **10/28/18** | **$44,024.00** |
| 18.2. | **Wells Fargo Bank NA**<br>**555 12th Street**<br>**Oakland, CA 94607** | **XXXX-7029** | ☑ Checking<br>☐ Savings<br>☐ Money Market<br>☐ Brokerage<br>☐ Other___ | **10/28/18** | **$0.00** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

| | Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.3. | **Wells Fargo Bank NA**<br>**555 12th Street**<br>**Oakland, CA 94607** | **XXXX-7037** | ☑ Checking<br>☐ Savings<br>☐ Money Market<br>☐ Brokerage<br>☐ Other___ | **10/28/18** | **$0.00** |
| 18.4. | **Wells Fargo Bank NA**<br>**555 12th Street**<br>**Oakland, CA 94607** | **XXXX-2028** | ☑ Checking<br>☐ Savings<br>☐ Money Market<br>☐ Brokerage<br>☐ Other___ | | **$1,000.00** |

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it<br>Address | Description of the contents | Do you still have it? |
|---|---|---|---|

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are a part of a building in which the debtor does business.

☐ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|
| **Richmond Warehouse**<br>**900 Brookline Drive**<br>**Richmond, CA 94801** | **Warehouse closed**<br>**4/28/18** | **Patterns and Castings** | ☑ No<br>☐ Yes |

**Part 11:    Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

**Part 12:    Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22.  Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

☑ No.
☐ Yes. Provide details below.

| Case title<br>Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:    Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**
   List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|

**26. Books, records, and financial statements**
   26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☑ None

| Name and address | Date of service<br>From-To |
|---|---|

   26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | Date of service<br>From-To |
|---|---|
| 26b.1.    **UHY LLP**<br>**27725 Stansbury Blvd., Ste. 200**<br>**Farmington Hills, MI 48334** | **8/2014 - 7/2017** |

   26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.    **Jerry Johnson**<br>**VP Finance of Debtor**<br>**P.O. Box 6486**<br>**Moraga, CA 94570** | |

   26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

Case: 19-41057    Doc# 85    Filed: 01/25/20    Entered: 01/25/19 13:24:49    Page 54 of 88
699

442

☐ None

| Name and address |
|---|
| 26d.1. **Wells Fargo Capital Finance**<br>2450 Colorado Ave., Ste. 300W<br>Santa Monica, CA 90404 |
| 26d.2. **GMP United Steelworkers Union**<br>608 East Baltimore Pike<br>Media, PA 19063-1735 |

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Jerry Johnson | P.O. Box 6784<br>Moraga, CA 94570 | Vice President of Finance | |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Krishnan Venkatesan | 1631 Angsley Lane<br>San Ramon, CA 94710 | President, Manager | 1.7% |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Jeffrey Stone | 24 Frank Lloyd Wright Dr.<br>Ann Arbor, MI 48106 | Manager | 10% |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Kevin Dougherty | 24 Frank Lloyd Wright Dr.<br>Ann Arbor, MI 48106 | Manager | |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Steve Wessels | 8821 N. University St.<br>Peoria, IL 61615 | Manager | |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Brian Holt | 8821 N. University Street<br>Peoria, IL 61615 | Manager | |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Alcast Company | 8821 North University Street<br>Peoria, IL 61615 | Class A Member | 41.65% |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|----------------------|
| Speyside Fund LLC | 24 Frank Lloyd Wright Drive Suite H3225 P.O. Box 484 Ann Arbor, MI 48106 | Class A Member | 41.65% |

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|----------------------|
| Eric Wiklendt | 8100 Reinhart Road Carleton, MI  48117 | Class C Member | 5% |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

30. **Payments, distributions, or withdrawals credited or given to insiders**
   Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
☑ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|-------------------------------|------------------------------------------------------|-------|--------------------------------|
| 30.1. Speyside Fund LLC 24 Frank Lloyd Wright Dr Suite H3225 P.O. Box 484 Ann Arbor, MI 48106 | 3,780,000.00 | 1/18/18 - 10/31/18 | Payments on Secured Debt |
| **Relationship to debtor** LLC Member | | | |
| 30.2. Krishnan Venkatesan 1631 Angsley Lane San Ramon, CA 94710 | 283,652.65 | 1/15/18 - 12/15/18 | Compensation |
| **Relationship to debtor** President of Pacific Steel, LLC Member | | | |
| 30.3. Krishnan Venkatesan 1631 Angsey Lane Suite H3225 P.O. Box 484 Ann Arbor, MI 48106 | 6,272.02 | 1/22/18 - 9/14/18 | Expense Reimbursement |
| **Relationship to debtor** President of Pacific Steel, LLC Member | | | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                    Best Case Bankruptcy

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.4. | **Jerry Johnson**<br>**P.O. Box 6784**<br>**Moraga, CA 94570** | **281,948.32** | **1/15/18 -**<br>**12/31/18** | **Compensation** |
| | **Relationship to debtor**<br>**VP Finance of Pacific Steel** | | | |
| 30.5. | **Jerry Johnson**<br>**P.O. Box 6784**<br>**Moraga, CA 94570** | **50,000** | **10/31/18** | **Compensation** |
| | **Relationship to debtor**<br>**VP Finance of Pacific Steel** | | | |
| 30.6. | **Jerry Johnson**<br>**P.O. Box 6784**<br>**Moraga, CA 94570** | **1,000** | **5/4/18** | **Expense reimbursement** |
| | **Relationship to debtor**<br>**VP Finance of Pacific Steel** | | | |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                              Best Case Bankruptcy

| 30.7 . | Jerry Johnson<br>P.O. Box<br>Moraga, CA 94570 | 3,100.88 | 3/27/18 -<br>12/17/18 | Expense<br>reimbursement |
|---|---|---|---|---|

**Relationship to debtor**
**VP Finance of Pacific Steel**

---

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

| **Name of the parent corporation** | **Employer Identification number of the parent corporation** |
|---|---|

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| **Name of the pension fund** | **Employer Identification number of the parent corporation** |
|---|---|

**Part 14:**    **Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __January 25, 2019__

__/s/ Jerry Johnson__        **Jerry Johnson**
Signature of individual signing on behalf of the debtor      Printed name

Position or relationship to debtor    **Vice President of Finance**

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**
☐ No
☑ Yes

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

# Exhibit A – Union Employees' Severance Pay

| First | Middle | Last Name | Severance Due | Severance Paid |
|-------|--------|-----------|---------------|----------------|
| JOSE | | ARANDA | $ 6,766.60 | $ 500.00 |
| LORENZO | | ARANDA | $ 21,267.40 | $ 500.00 |
| ESCALANTE | EFRAIN | BLANCO | $ 10,730.20 | $ 500.00 |
| MIRANDA | PEDRO | BLAZ | $ 14,033.20 | $ 500.00 |
| ARMANDO | | CAMPOS-HERNANDEZ | $ 11,019.70 | $ 500.00 |
| JOSE | FRANCISCO | CARRENO | $ 10,730.20 | $ 500.00 |
| NELSON | | COSTA | $ 3,125.20 | $ 500.00 |
| RUI | P | COSTA | $ 19,978.60 | $ 500.00 |
| MARTIN | | DUENAS | $ 8,063.80 | $ 500.00 |
| MANUEL | | ESCALANTE | $ 17,336.20 | $ 500.00 |
| LOPEZ | SALVADOR | ESPARZA | $ 8,748.40 | $ 500.00 |
| JAMES | | FIGUEROA | $ 8,507.20 | $ 500.00 |
| EDWARD | L | FLORES | $ 6,766.60 | $ 500.00 |
| YUHENG | | HE | $ 3,729.40 | $ 500.00 |
| JOSE | J | HERNANDEZ | $ 8,675.50 | $ 500.00 |
| DAVID | | ISLAS | $ 13,372.60 | $ 500.00 |
| VON | | LAVANH | $ 6,766.60 | $ 500.00 |
| CUONG | N | LIEU | $ 6,840.40 | $ 500.00 |
| BARBOZA | CATALINA | LOMELI | $ 6,169.30 | $ 500.00 |
| BARBOZA | FEDERICO | LOMELI | $ 110.80 | $ 500.00 |
| REFUGIO | G. | LOPEZ | $ 16,015.90 | $ 500.00 |
| SONNY | | LOUANG | $ 14,339.20 | $ 500.00 |
| JUAN | A | LOZANO | $ 18,462.70 | $ 500.00 |
| CARLOS | | MARTINEZ | $ 12,484.30 | $ 500.00 |
| PEDRO | | MARTINEZ | $ 13,569.10 | $ 500.00 |
| ANTONIO | E | MELGOZA | $ 12,957.40 | $ 500.00 |
| ENRIQUE | | MIRAMONTES-GUEVARA | $ 8,063.80 | $ 500.00 |
| RICHARD | G | MITCHELL | $ 9,840.40 | $ 500.00 |
| ALDO | | MORA | $ 17,012.20 | $ 500.00 |
| ANDRES | | MORALES | $ 14,180.80 | $ 500.00 |
| SALVADOR | | MORENO | $ 8,087.80 | $ 500.00 |
| MANUEL | | MUNOZ | $ 17,239.30 | $ 500.00 |
| ANTONIO | | OCHOA | $ 6,634.60 | $ 500.00 |
| GONZALEZ | JOSE | ORTIZ | $ 17,996.80 | $ 500.00 |
| JOHN | | ORTIZ | $ 16,013.20 | $ 500.00 |
| JOSE | | ORTIZ | $ 10,510.60 | $ 500.00 |
| TYRONE | E. | OSBORNE | $ 8,063.80 | $ 500.00 |
| SERGIO | | PEDROZA | $ 8,363.20 | $ 500.00 |
| FRANK | | PEPE | $ 4,124.20 | $ 500.00 |
| ENRIQUE | | PEREZ | $ 16,015.00 | $ 500.00 |
| JUAN | PICENO | PEREZ | $ 6,840.40 | $ 500.00 |
| ANGEL | | REYES | $ 16,891.30 | $ 500.00 |
| FIDENCIO | S | REYES | $ 5,858.50 | $ 500.00 |
| LUIS | | REYNOSO | $ 18,657.40 | $ 500.00 |
| ANDRES | | RIVERA | $ 15,354.40 | $ 500.00 |

# Exhibit A – Union Employees' Severance Pay

| First | Middle | Last Name | Severance Due | Severance Paid |
|-------|--------|-----------|---------------|----------------|
| ABEL |  | RODRIGUEZ | $ 19,318.00 | $ 500.00 |
| JESUS | ORTIZ | RODRIGUEZ | $ 12,093.70 | $ 500.00 |
| MIGUEL | A | RODRIGUEZ | $ 7,452.10 | $ 500.00 |
| JOSE | G | ROJO | $ 17,336.20 | $ 500.00 |
| HERNANDEZ | MIGUEL | RUELAS | $ 8,063.80 | $ 500.00 |
| CHAN | CHENG | SAECHAO | $ 110.80 | $ 500.00 |
| CHENG | CHIENG | SAECHAO | $ 18,657.40 | $ 500.00 |
| KAO | MEUY | SAECHAO | $ 7,537.90 | $ 500.00 |
| NICOLAS |  | SALAZAR | $ 22,018.00 | $ 500.00 |
| ANTONIO |  | SANCHEZ | $ 17,239.30 | $ 500.00 |
| MANUEL |  | SANTOYO | $ 18,462.70 | $ 500.00 |
| TONY | R. | SILVA | $ 26,584.60 | $ 500.00 |
| ROBERT | M | SIMAS | $ 13,372.60 | $ 500.00 |
| BOUNLOUAM |  | SITHIDETH | $ 17,996.80 | $ 500.00 |
| DELFINO |  | SOLANO | $ 18,049.00 | $ 500.00 |
| SALVADOR |  | SUAREZ | $ 13,372.60 | $ 500.00 |
| JOSE | Q | TAMAYO | $ 19,318.00 | $ 500.00 |
| IGNACIO |  | TORRES | $ 19,318.00 | $ 500.00 |
| ONOFRE |  | VASQUEZ | $ 6,766.60 | $ 500.00 |
| MARTIN | F | VELASCO | $ 15,354.40 | $ 500.00 |
| PULIDO | RAUL | VILLASENOR | $ 6,919.60 | $ 500.00 |
| SALVADOR | NAVARRO | ZANDOVAL | $ 6,228.70 | $ 500.00 |
| PABLO | MARTINEZ | ZURITA | $ 17,851.00 | $ 500.00 |
| Monarrez | Modesta | Carrillo | $ 110.80 | $ 500.00 |
| Hector |  | Vargas | $ 9,898.90 | $ 500.00 |
| **TOTAL** |  |  | $ 845,745.70 | $ 35,000.00 |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

In re

**Pacific Steel Casting Company LLC**

Case No.

_____     Debtor(s).     /

<u>CREDITOR MATRIX COVER SHEET</u>

I declare that the attached Creditor Mailing Matrix, consisting of __22__ sheets, contains the correct, complete and current names and addresses of all priority, secured and unsecured creditors listed in debtor's filing and that this matrix conforms with the Clerk's promulgated requirements.

DATED: **January 25, 2019**

**/s/ Tracy Green**
_____
Signature of Debtor's Attorney or Pro Per Debtor

Case: 19-40193   Doc# 85   Filed: 01/25/19   Entered: 01/25/19 13:24:49   Page 65 of 86
Case: 19-40193   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 449 of 699

449

Abel  Rodriguez
1444 154th Avenue, #107
San Leandro, CA 94579


Airgas USA LLC
P.O. Box 7423
Pasadena, CA 91109-7423


Alameda County Tax Collector
1221 Oak Street
Oakland, CA 94612


Aldo  Mora
3112 Castilla court
Modesto, CA 95355


Amprocorp USA Inc
4111 S.W. 47Th Avenue Suite 325
Ft Lauderdale, FL 33314


Andres  Morales
2346 Downer Avenue
Richmond, CA 94804


Andres  Rivera
1251 Ashby Avenue
Berkeley, CA 94702


Angel  Reyes
353 40th Street
Richmond, CA 94805

Antonio Ochoa
1425 100th Avenue
Oakland, CA 94603


Antonio Sanchez
1010 Allston Way
Berkeley, CA 94710


Antonio E Melgoza
328 Stoneford Avenue
Oakland, CA 94603


Armando Campos-Hernandez
9005 Walnut Street
Oakland, CA 94603


Associated Flow Controls
30 Beta Court
San Ramon, CA 94583-1202


AT&T
P.O. Box 5019
Carol Stream, IL 60197-5019


AT&T
P.O. Box 5025
Carol Stream, IL 60197-5025


AT&T Mobility
P.O. Box 6463
Carol Stream, IL 60197-6463

Case: 19-04057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 451 of
699
Case: 19-40193   Doc# 25   Filed: 01/25/19   Entered: 01/25/19 13:24:49   Page 451 of 86

451

Atwell LLC
Two Town Square Suite 700
Attn: Tim Augustine
Southfield, MI 48076


Barboza Catalina Lomeli
2451 Church Lane, Apt. 96
San Pablo, CA 94806


Barboza Federico Lomeli
2451 Church Lane, Apt. 96
San Pablo, CA 94806


Bay Alarm Company
P.O. Box 7137
San Francisco, CA 94120-7137


Bcm Service & Engineering
1418 Mariani Court
Suite 160
Tracy, CA 95376-2854


Bearing Engineering Company
667 Mccormick Street
San Leandro, CA 94577


Berkley Surety Group LLC
P.O. Box 9010
Westbrook, ME 04098


Bordanaro And Son
1690 Riverlake Road
Discovery Bay, CA 94505

Bounlouam  Sithideth
1989 21st Street
San Pablo, CA 94806


California Janitorial Supply Co.
2040 Junction Avenue
San Jose, CA 95131


California Metals Coalition
2971 Warren Lane
El Dorado Hills, CA 95762


Carlos  Martinez
1958 21st Street
San Pablo, CA 94806


Castellon & Funderburk LLP
3201 Danville Boulevard
Suite 267
Alamo, CA 94507


Caterpillar Financial Services Corp
P.O. Box 100647
Pasadena, CA 91189-0647


Chan Cheng Saechao
2967 Oxford Avenue
Richmond, CA 94806


Cheng Chieng Saechao
5135 Brookfield Court
Fairfield, CA 94534

City of Berkeley
Finance Department
1947 Center Street
Berkeley, CA 94704


City Of Berkeley
Finance-Treasury Division
P.O. Box 1910
Berkeley, CA 94701


City Of Berkeley
P.O. Box 23523
Oakland, CA 94623-0523


Clark Pest Control
P.O. Box 1480
Lodi, CA 95241-1480


Conner Strong & Buckelew
P.O. Box 989
Marlton, NJ 08053


Core Security Solutions Inc
2701 Telegraph Ave, Suite 200
Oakland, CA 94612


Crestmark Equipment Finance
P.O. Box 233756
3756 Momentum Place
Chicago, IL 60689-5337


Cromer Equipment Company
P.O. Box 14338
Oakland, CA 94614-2388

Case: 19-44057   Doc# 85   Filed 10/52/20   Entered 10/52/20 13:34:49   Page 454 of
Case: 19-44057   Doc# 85   Filed 01/25/20   Entered 01/25/20 13:24:49   Page 76 of 88
699

454

Cuong N Lieu
5928 E. 17th Street
Oakland, CA 94621


David  Islas
4005 Gagos Drive
Modesto, CA 95356


Delfino  Solano
936 37th Avenue
Oakland, CA 94601


Department Of Motor Vehicles
P.O. Box 825339
Sacramento, CA 94232-5339


DMV Renewal
P.O. Box 942894
Sacramento, CA 94294-0895


DNV Gl Maritime
Long Beach Station
3800 Kilroy Airport Way - Suite 410
Long Beach, CA 90806


Dun & Bradstreet
P.O. Box 75434
Chicago, IL 60675-5434


East Bay Propane
8255 San Leandro Street
Oakland, CA 94621

EBMUD Payment Center
P.O. Box 1000
Oakland, CA 94649-0001


Edward L Flores
3820 Cannon Avenue
Oakland, CA 94602


EKI  Environment & Water Inc
577 Airport Blvd Suite 500
Burlingame, CA 94010


Emerald Transformer
7850 Colin Mckinney Pkwy Suite 130
Mckinney, TX 75070


Enrique  Miramontes-Guevara
1347 Battery Street
Richmond, CA 94801


Enrique  Perez
1727 Buena Vista Avenue
Alameda, CA 94501


Enthalpy Analytical LLC
P.O. Box 741137
Los Angeles, CA 90074-1137


Escalante Efrain Blanco
2625 McArthur Avenue
San Pablo, CA 94806

Estes Express Lines
P.O. Box 25612
Richmond, VA 23260-5612


Farella Braun & Martel
Attorneys At Law
235 Montgomery Street
San Francisco, CA 94104


Fedex Freight
Dept La P.O. Box 21415
Pasadena, CA 91185-1415


Fidencio S Reyes
1394 Gilmore Dr.
San Leandro, CA 94577


Frank  Pepe
519 Chesterfield Drive
Patterson, CA 95363


Freeman Manufacturing & Supply Co.
1101 Moore Road
Avon, OH 44011-1011


G.E. Tennison Co.
5761 Seneca St.
Elma, NY 14059


GF Industries
122 North Harbor Blvd
Suite 201
Fullerton, CA 92832

Gonzalez Jose Ortiz
1825 Fruitvale Avenue, Apt. 7
Oakland, CA 94601


Hector  Vargas
9229 A Street, Apt. C
Oakland, CA 94603


Henry C. Levy
Treasurer And Tax Collector
1221 Oak Street Room 131
Oakland, CA 94612-4285


Herc Rentals
P.O. Box 936257
Atlanta, GA 31193


Hernandez Miguel Ruelas
633 Stewart Street, Apt. 7
Manteca, CA 95336


Hunter Foundry Machinery Corp
2222 Hammond Drive
Schaumburg, IL 60196-1094


Ignacio  Torres
2623 Shamrock Drive
San Pablo, CA 94806


Image Business Solutions
28339 Beck Road Suite F2
Wixom, MI 48393

Inland Water Inc
P.O. Box 2925
Dublin, CA 94568


Intellichief
A Quadrant Software Company
13095 North Telecom Parkway
Tampa, FL 33637


J.S. & P. Enterprises Corp
14950 Avenida Anita
Chino Hills, CA 91709


James  Figueroa
15886 Via Del Sol
San Lorenzo, CA 94580


Jesus Ortiz Rodriguez
2129 California Avenue
San Pablo, CA 94806


John  Ortiz
1302 Tuolummne Way
Oakley, CA 94561


Jose  Aranda
5027 Clinton Avenue
Richmond, CA 94806


Jose  Ortiz
2608 17th
San Pablo, CA 94806

Jose Francisco Carreno
826 Lisbon Avenue
Oakland, CA 94601


Jose G Rojo
16 Willian Way
Pittsburg, CA 94565


Jose J Hernandez
1315 Fred Jackson Way
Richmond, CA 94801


Jose Q Tamayo
1749 Lexington Avenue
El Cerrito, CA 94530


Juan A Lozano
935 34th Street
Richmond, CA 94805


Juan Piceno Perez
447 Sycamore Avenue
Manteca, CA 95336


Kacee Company
3570 Hiawatha Way
Antelope, CA 95843


Kao Meuy Saechao
551 Vallejo Avenu
Rodeo, CA 94572

King Tester Corporation
308 Schell Lane
Phoenixville, PA 19460


L.J. Kruse Company
P.O. Box 2900
Berkeley, CA 94702


Linde LLC Los Angeles
P.O. Box 100691
Pasadena, CA 91189-0691


Linkedin Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085


Logistics Dynamics Inc
155 Pineview Drive
Amherst, NY 14228


Lopez Salvador Esparza
15941 Via Arroyo
San Lorenzo, CA 94580


Lorenzo  Aranda
1419 Santa Clara St
Richmond, CA 94804


Luis  Reynoso
2223 9th Street
Berkeley, CA 94710

M Cooper Consulting
8309 Ne 147Th Place
Kenmore, WA 98028


Manuel  Escalante
2625 Macarthur avenue
San Pablo, CA 94806


Manuel  Munoz
9814 Birch Street
Oakland, CA 94603


Manuel  Santoyo
1657 15th Street
San Pablo, CA 94806


Marsh USA Inc.
P.O. Box 846112
Dallas, TX 75284-6112


Martin  Duenas
1187 61st Avenue
Oakland, CA 94621


Martin F Velasco
2021 88th Avenue
Oakland, CA 94621


Melrose Metal Products Inc.
44533 South Grimmer Blvd.
Fremont, CA 94538

Microsoft Corporation
P.O. Box 842103
Dallas, TX 75282-2103


Miguel A Rodriguez
1331 Cherry Street
Richmond, CA 94801


Miranda Pedro Blaz
150 16th Street
Richmond, CA 94801


Mobile Fleetcare
P.O. Box 7354
Berkeley, CA 94707-0354


Monarrez Modesta Carrillo
2233 E. 23rd Street, Apt. A
Oakland, CA 94606


Motion Industries Inc
1605 Alton Road
Birmingham, AL 35210


Nelson  Costa
1293 Gilmore Drive
San Leandro, CA 94577


Nicolas  Salazar
1520 Valle Vista
Vallejo, CA 94589

Onofre  Vasquez
319 Gramercy Place
Oakland, CA 94603


Optimas Oe Solutions LLC
P.O. Box 74008133
Chicago, IL 60674-8133


Pablo Martinez Zurita
1335 Sanford Avenue, Apt. E
San Pablo, CA 94806


Pedro  Martinez
1528 Bush Avenue
San Pablo, CA 94806


Peerless Pattern Works
3325 Nw Yeon Ave
Portland, OR 97210


PG&E
P.O. Box 997300
Sacramento, CA 95899-7300


Pitney Bowes Global Financial
Services LLC
P.O. Box 371887
Pittsburgh, PA 15250-7887


Pitney Bowes Postage By Phone
P.O. Box 371874
Pittsburgh, PA 15250-7874

Polymeric Technology Inc
Poly-Tek
1900 Marina Blvd. Suite A
San Leandro, CA 94577


Portland Manufacturing
7715 Ne 21St Ave
Portland, OR 97211


Posi-Flate
Jessie Howe
1125 Willow Lake Blvd
St Paul, MN 55110


Praxair Distribution Inc
Dept La 21511
Pasadena, CA 91185-1511


Professional Finishing
P.O. Box 742038
Los Angeles, CA 90074-2038


Pulido Raul Villasenor
1541 Pine Avenue
San Pablo, CA 94806


Q C Services & Associates
23101 Foley Street
Hayward, CA 94545


Quincy Compressor LLC
Dept 3427 Lockbox 893427
P.O. Box 123427
Dallas, TX 75312-3427

Rain For Rent
File 52541
Los Angeles, CA 90074-2541


Refugio G. Lopez
533 S. 28th Street
Richmond, CA 94804


Republic Services #851
P.O. Box 78829
Phoenix, AZ 85062-8829


Returned 11/14/18
TIP Capital (Crestmark Bank)
40950 Woodward Ave., Ste. 201
Bloomfield Hills, CA 48304


Returned 11/14/18
All-Lines Leasing
100 Prairie Center Drive
Eden Prairie, NM 55344


Returned to Landlord 11/28/18
Berkeley Properties LLC
7 West 41st Ave., #523
San Mateo, CA 94403


Richard G Mitchell
4505 McGlothen Way
Richmond, CA 94806


Ridge Cast Metals Corp
1554 Doolittle Drive
San Leandro, CA 94577

RJMS Corporation
Toyota Material Handling
P.O. Box 398526
San Francisco, CA 94139-8526


Robert Half Management Resources
P.O. Box 743295
Los Angeles, CA 90074-3295


Robert M Simas
708 Buriat Street
San Leandro, CA 94577


Rosemount Analytical - Pad Raio
22737 Network Place
Chicago, IL 60673-1227


Rotex Inc
P.O. Box 630317
Cincinnati, OH 45263-0317


Rui P Costa
118 Boxwood Lane
Hercules, CA 94547


S.L. Fusco Inc.
P.O. Box 5924
Compton, CA 90224


Saia Motor Freight Line LLC
P O Box 730532
Dallas, TX 75373-0532

Salvador  Moreno
183 Maureen Circle
Bay Point, CA 94565


Salvador  Suarez
1770 Birchwood Lanue
Tracy, CA 94376


Salvador Navarro Zandoval
232 South 43rd Street
Richmond, CA 94804


Sentry Insurance
P.O.Box 8045
Stevens Point, WI 54481-8045


Sergio  Pedroza
1005 Delaware St
Berkeley, CA 94710


Shell Core Specialties
27640 Se Hwy 212 Suite A
Boring, OR 97009


Shred-It USA
28883 Network Place
Chicago, IL 60673-1288


Simpson Technologies Corporation
39618 Treasury Center
Chicago, IL 60694-9600

Case: 19-04057   Doc# 85   Filed 10/02/20   Entered 10/02/20 13:34:49   Page 468 of
Case: 19-44057   Doc# 25   Filed 01/25/10   Entered 01/25/13 13:24:49   Page 468 86
699

468

Sonny Louang
1529 Coalinga Avenue
Richmond, CA 94801


Speyside Fund LLC
P.O. Box 530426
Livonia, MI 48153


Speyside Fund LLC, Agent
24 Frank Lloy Wright Dr., Ste. 3225
P.O. Box 484
Ann Arbor, MI 48106


State Water Resources Control Board
Attn: Afrs
P.O. Box 1888
Sacramento, CA 95812-1888


Talx Uc Express
4076 Paysphere Circle
Chicago, IL 60674-4076


The Howard E Nyhart Company Inc
Attn: Finance Department
8415 Allison Pointe Blvd. Suite 300
Indianapolis, IN 46250


Thermo Electron North America LLC
P.O. Box 742775
Atlanta, GA 30374-2775


Tomas Padilla Welding Services
1241 Peach Place
Concord, CA 94518

Tony R. Silva
6362 Ebensburg Lane
Dublin, CA 94568


Tyco Integrated Security LLC
P.O. Box 371967
Pittsburgh, PA 15250-7967


Tyrone E. Osborne
77 Solano Square , #256
Benicia, CA 94510


Uhy LLP
P.O. Box 8505
Carol Stream, IL 60197


United Contract Services Inc
1161 Ringwood Court Suite 170
San Jose, CA 95131


Valley Rubber & Gasket
A Lewis-Goetz Company
P.O. Box 31001-1893
Pasadena, CA 91110-1893


Vancouver Iron And Steel Inc
1200 W 13Th St
Vancouver, WA 98660-2726


Von  Lavanh
5014 Creely Avenue
Richmond, CA 94804

Wells Fargo Vendor Fin Serv
P.O. Box 51043
Los Angeles, CA 90051-5353


Wille Electric Supply Co
P.O. Box 3246
Modesto, CA 95353


XPO Logistics Freight Inc
P.O. Box 5160
Portland, OR 97208-5160


XPO Logistics Inc
27724 Network Place
Chicago, IL 60673-1277


Yuheng  He
412 International Blvd
Oakland, CA 94606

# United States Bankruptcy Court
## Northern District of California

In re    **Pacific Steel Casting Company LLC**

Debtor(s)

Case No.

Chapter    **7**

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for   **Pacific Steel Casting Company LLC**   in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

■ None [*Check if applicable*]

January 25, 2019

Date

**/s/ Tracy Green**

**Tracy Green 114876**

Signature of Attorney or Litigant

Counsel for   **Pacific Steel Casting Company LLC**

**Wendel, Rosen, Black & Dean LLP**

**1111 Broadway, 24th Floor**
**Oakland, CA 94607-4036**
**(510) 834-6600 Fax:(510) 834-1928**
**tgreen@wendel.com**

# EXHIBIT "11"

Fill in this information to identify the case:

Debtor 1     Pacific Steel Casting Company LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:     Northern     District of     CA
                                                                          (State)

Case number     19-40193 RLE

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---------|--------------------|

| | |
|---|---|
| 1. **Who is the current creditor?** | Berkeley Properties, LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes. From whom? |

| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| | Berkeley Properties, LLC c/o Michael Lauter<br>Name | Berkeley Properties, LLC, attn: Matthew English<br>Name |
| | 4        Embarcadero Center, 17th Floor<br>Number     Street | 7        West 41st Avenue - #523<br>Number     Street |
| | San Francisco     CA     94111<br>City     State     ZIP Code | San Mateo     CA     94403<br>City     State     ZIP Code |
| | Contact phone     (415) 434-9100 | Contact phone     (415) 839-8488 |
| | Contact email     mlauter@smrh.com | Contact email     ssp.bp.pa@arch-beam.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☒ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____<br>                                                                                          MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes. Who made the earlier filing? |

Official Form 410                    **Proof of Claim**                    page 1

American LegalNet, Inc.
www.FormsWorkFlow.com

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| 7. How much is the claim? | $ ___1,732,869.90___ . **Does this amount include interest or other charges?**<br>☒ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Breach of Lease (See Addendum) |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ _____<br>**Amount of the claim that is secured:** $ _____<br>**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☐ No<br>☒ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _N/A - Lease Terminated_ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☒ No<br>☐ Yes. Identify the property: _____ |

Case 19-40193 Doc#851-1 Filed 10/02/19 Entered 10/02/19 13:34:49 Page 475 of 699

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( _____ ) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it.
FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☒ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/28/2019
                   MM / DD / YYYY

Signature _____

**Print the name of the person who is completing and signing this claim:**

| Name | Matthew English |
|---|---|
| | First name       Middle name       Last name |
| Title | Manager of Arch & Beam Global, LLC, Court Appointed Plan Administrator |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 7        West 41st Avenue - #523 |
| | Number       Street |
| | San Mateo                    CA        94403 |
| | City                         State     ZIP Code |
| Contact phone | (415) 839-8488 |  Email ssp.bp.pa@arch-beam.com |

Case 19-04057   Doc 85-1   Filed 10/02/2019   Entered 10/02/20 13:34:49   Page 476 of 699
Case 19-40193   Claim 1-1   Filed 01/28/2019   Desc Main Document   Page 3 of 6

**Addendum to Proof of Claim Submitted by Creditor Berkeley Properties, LLC**

**In the Bankruptcy Case of Pacific Steel Casting Company LLC**

**Case No. 19-40193 RLE**

**United States Bankruptcy Court for the Northern District of California, Oakland Division**

This Addendum forms a part of and is incorporated into the proof of claim (the "Proof of Claim") submitted by creditor Berkeley Properties, LLC ("Berkeley Properties") in the bankruptcy case of debtor Pacific Steel Casting Company LLC ("PSCC"), pending in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court") as Case No. 19-40193 RLE (the "Bankruptcy Case").

Berkeley Properties and PSCC were parties to that certain lease agreement dated August 29, 2014 (as amended, the "Lease") pursuant to which PSCC leased the premises located at 1333 2nd Street, 1310 3rd Street, and 640 Gilman Street, Berkeley, CA (the "Premises") from Berkeley Properties. A copy of the Lease is attached hereto.

The Lease provided for, among other things, payment of monthly rent in the amount of $89,554 by PSCC to Berkeley Properties on the first of each month, and for a rental term that concluded on August 28, 2029.

PSCC breached the Lease by surrendering the Premises to Berkeley Properties and ceasing to pay rent over ten years in advance of the scheduled conclusion of the Lease term – on November 28, 2018. PSCC paid rent under the Lease for every month through October 2018. When PSCC did not pay rent for November 2018, and after receiving the appropriate notice under the Lease and failing to cure, Berkeley Properties applied the entirety of the $89,554 security deposit under the Lease to the November 2018 rent.

Berkeley Properties' claim for damages resulting from the breach of the Lease includes the lost future rent owed under the Lease, as capped by Section 502(b)(6) of the Bankruptcy Code. That capped future rent claim is $1,732,869.90, calculated as follows:

| | |
|---|---|
| December 2018 Rent | $89,554.00 |
| 2019 Rent | $1,074,648.00 |
| 2020 Rent | $1,074,648.00 |
| 2021 Rent | $1,074,648.00 |
| 2022 Rent | $1,074,648.00 |
| 2023 Rent | $1,074,648.00 |
| 2024 Rent | $1,074,648.00 |
| 2025 Rent | $1,074,648.00 |
| 2026 Rent | $1,074,648.00 |
| 2027 Rent | $1,074,648.00 |

| | |
|---|---|
| 2028 Rent | $1,074,648.00 |
| 2029 Rent (Through August) | $716,432.00 |
| Total Future Rent | $11,552,466.00 |
| | |
| ***15% of Future Rent (502(b)(6) Cap)*** | ***$1,732,869.90*** |

In addition, PSCC breached the Lease by surrendering the Premises to Berkeley Properties in poor condition. Among other things, the Premises were and still are contaminated by hazardous materials discharged onto the Premises by PSCC, and PSCC removed the sump pumps from the Premises prior to handing them over, which has led to flooding and additional damages flowing from such flooding. Berkeley Properties is in the process of calculating these additional damages, which are not subject to the cap of Bankruptcy Code section 502(b)(6), and will quantify them in an amendment to this Proof of Claim at a future date.

Berkeley Properties reserves the right to: (i) amend or supplement this proof of claim to the maximum extent permissible under applicable law, and (ii) file additional proofs of claim for additional claims which may be based on the same or additional documents. This proof of claim is made without prejudice to the filing by Berkeley Properties of additional proofs of claim with respect to any other indebtedness or liability of any of PSCC to Berkeley Properties. Filing this proof of claim is not a waiver or release of Berkeley Properties' rights against any person, entity or property.

By executing and filing this proof of claim, Berkeley Properties does not waive any right to any security or any other right or rights with respect to any claim it has or may have against any PSCC, or any other person, persons, entity or entities. Berkeley Properties expressly reserves all rights accruing to it and the filing of this proof of claim is not intended and should not be construed to be as an election of remedies, or a waiver or limitation of any Berkeley Properties' rights, claims, or causes of actions.

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
**STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET**
(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1.** **Basic Provisions ("Basic Provisions").**

1.1 **Parties:** This Lease ("Lease"), dated for reference purposes only _August 29, 2014_ ,
is made by and between _Berkeley Properties, LLC, a California limited liability company_
_____ ("Lessor")

and _Pacific Steel Casting Company LLC, a Delaware limited liability company_
_____ ("Lessee"),

(collectively the **"Parties,"** or individually a **"Party"**).

1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
and commonly known as _1333 2nd Street, 1310 3rd Street, and 640 Gilman Street, Berkeley_ ,
located in the County of _Alameda_ , State of _California_ ,
and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project)

_____
_____
_____ ("Premises"). (See also Paragraph 2)

1.3 **Term:** 15 years and 0 months ("Original Term") commencing _August 29, 2014_
("Commencement Date") and ending _August 28, 2029_ ("Expiration Date"). (See also Paragraph 3)

1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
_N/A_ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5 **Base Rent:** $89,554.00 per month ("Base Rent"), payable on the _first_ day of
each month commencing _on the Commencement Date_
_____ . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph 51

1.6 **Security Deposit:** $89,554.00 ("Security Deposit")

~~1.6~~ ~~Base Rent and Other Monies Paid Upon Execution:~~

~~(a)~~ ~~Base Rent: $0.00~~ ~~for the period~~ _____
_____ .

~~(b)~~ ~~Security Deposit: $270,884.00~~ ~~("Security Deposit"). (See also Paragraph 5)~~

~~(c)~~ ~~Association Fees: $0.00~~ ~~for the period~~ _____

~~(d)~~ ~~Other: $N/A~~ ~~for~~ _____ .

~~(e)~~ ~~Total Due Upon Execution of this Lease: $0.00~~ _____ .

1.7 **Agreed Use:** _cast steel foundry operation, related office functions and any other_
_legally permitted uses_ . (See also Paragraphs 6
and 55)

1.8 **Insuring Party:** ~~Lessor~~ Lessee is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

1.9 **Real Estate Brokers:** (See also Paragraph 15)
(a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):

☐ N/A _____ represents Lessor exclusively ("Lessor's Broker");

☐ N/A _____ represents Lessee exclusively ("Lessee's Broker"); or

☐ N/A _____ represents both Lessor and Lessee ("Dual Agency").

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to
in their separate written agreement (or if there is no such agreement, the sum of _N/A_ or _N/A_ % of the total Base Rent)
for the brokerage services rendered by the Brokers.

1.10 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
_____ ("Guarantor"). (See also Paragraph 37)

1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an ~~Addendum~~ Addendums consisting of Paragraphs 51 through 60 ;
☐ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☐ other (specify): _____
_____
_____ .

**PAGE 1 OF 18**

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

Case 19-40193 Doc 85-1 Filed 10/02/21 Entered 10/02/21 13:14:49 Page 471 of 699 (Claim 85-1 Part 2 of 3 - Entered 10/02/21 13:14:49 Lease (Part 1 of 3 - split up into 3 due to file size) Page 1 of 8

479

**2. Premises.**

2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2 **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs (**"Start Date"**), ~~and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that~~ Lessor makes no representation or warranty that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems (**"HVAC"**), loading doors, sump pumps, if any, and all other such elements in the Premises, ~~other than those constructed by Lessee,~~ shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the **"Building"**) shall be free of material defects, ~~or~~ and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. ~~If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.~~

2.3 **Compliance.** Lessor represents and warrants that use of the Premises as a foundry with related office and warehouse use is a permitted use within the zone wherein the Premises is located under the City of Berkeley ordinances. Lessor shall obtain and deliver to Lessee prior to occupancy a Zoning Research Letter from the City of Berkeley confirming that such use is permitted. If required by the City of Berkeley, Lessor shall also obtain a certificate of occupancy with respect to the Premises issued by the City of Berkeley in connection with Lessee's occupancy of the Premises, and shall at Lessor's expense address and correct any matters required by the City in order to obtain the Certificate of Occupancy. Except as provided above. Lessor makes no representation or warranty that ~~warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances (**"Applicable Requirements"**) that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.~~ **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** ~~If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.~~ If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building (**"Capital Expenditure"**), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, whether or not if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) ~~If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.~~

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4 **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor ~~and/or Brokers~~ to satisfy itself with respect to the size and condition of the Premises (including but not limited to the

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STN-11-8/08E

Case 19-40193   Doc 85-1   Filed 10/02/01   Entered 10/02/01 13:14:19   Page 2 of
(original Exhibit A Lease P.481 of 699 file size)   Page 2 of 8

480

electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation *regarding as to the size of* the Premises made by ~~Brokers or~~ Lessor, *except for the representations set forth in this Lease*, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, ~~nor~~ Lessor's agents, ~~nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.~~

2.5     **Lessee as Prior Owner/Occupant.** ~~The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.~~

3.     **Term.**

3.1     **Term.**  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2     **Early Possession.**  ~~Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.~~

3.3     **Delay in Possession.**  Lessor shall ~~agrees to use its best commercially reasonable efforts to~~ deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall ~~not~~ be subject to ~~any~~ liability therefor, ~~nor shall such failure affect the validity of this Lease.~~ *In addition to any other remedies available to Lessee, Lessee shall not,* however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing ~~within 10 days~~ after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. ~~If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.~~

3.4     **Lessee Compliance.**  Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.     **Rent.**

4.1.     **Rent Defined.**  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2     **Payment.**  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3     ~~**Association Fees.**  In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.~~

5.     **Security Deposit**.  Lessee shall deposit with Lessor *on or prior to the Commencement Date* ~~upon execution hereof~~ the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. ~~If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.~~  Lessor shall not be required to keep the



INITIALS



INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM STN-11-8/08E

Case 19-40053   Doc 85-1   Filed 10/02/01   Entered 10/02/20 18:34:19   Page 4 of
8
Case 19-40053   Doc 81-1   Filed 10/02/01   Entered 10/02/20 18:34:49   Page 491 of
699 - split up into 3 due to file size)     Page 3 of 8

481

Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.  **Use.**

    6.1  **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, ~~creates damage,~~ or waste ~~or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.~~ Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

    6.2  **Hazardous Substances.**

    (a) **Reportable Uses Require Consent.** The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit. Notwithstanding anything to the contrary in the foregoing, Lessor is deemed to consent to Reportable Uses of a kind and character made in the operation of the steel castings foundry business acquired by Lessee concurrently with this Lease, subject to Lessee's continuing obligations to comply with all Applicable Requirements in connection therewith.

    (b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

    (c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

    (d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party during the term hereof (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

    (e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from "Undisclosed Hazardous Substances" as defined below in paragraph 56. ~~Hazardous Substances which existed on the Premises prior to Lessee's occupancy~~ or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. Lessor shall be entitled to a credit against its indemnification obligations under this Paragraph 6.2(e) equal to the amount of any purchase price reduction or other economic benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's indemnification obligation.

---

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION       FORM STN-11-8/08E

Case 19-04053   Doc 85-1   Filed 10/02/20   Entered 10/02/20 18:34:49   Page 4 of 8
Case 19-04053   Doc 81-1 Filed 10/02/01/ Entered 10/02/20 18:34:49   Lease (Part 1 of 699 - split up into 3 due to file size)   Page 4 of 8

482

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Undisclosed Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities. Lessor shall be entitled to a credit against its payment obligations under this Paragraph 6.2(f) equal to the amount of any purchase price reduction or other economic benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's payment obligation.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition involving an Undisclosed Hazardous Substance (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor shall may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense., in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds ~~12~~ 18 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay for the remediation. If the estimated cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to ~~12~~ 18 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3     **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises. Notwithstanding anything to the contrary in the foregoing, Lessee shall not be required to remedy or to expend funds to correct any violation of Applicable Requirements existing on the Commencement Date insofar as such remedy or correction would require repair, alteration, or improvement of the Premises, which shall be Lessor's sole responsibility.

6.4     **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority as a result of Lessee's specific use of the Premises. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of a written request therefor.

7.     **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1     **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.1(d) (Replacement), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in good a first-class condition (including, e.g. graffiti removal) consistent with past practices and the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building. Notwithstanding anything to the contrary in the foregoing, Lessee has accepted the Premises without Lessor warranties as to condition and repair and intends to operate its steel castings business in the current condition and state of repair of the Premises. Lessee reserves discretion to conduct maintenance and repair in accordance with its own operating needs and practices and need not comply with any Lessor requests for repair, replacement or and maintenance of particular items as

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STN-11-8/08E

Case 19-04053   Doc 85-1  Filed 10/02/20  Entered 10/02/20 13:14:49   Page 49 of
Case 19-04053   Doc 85-1 Filed 10/02/20/ Entered 10/02/2018 (Early Lease - part 1 of
- split up into 3 due to file size)   Page 5 of 8

699

483

they exist on the Commencement Date, except to the extent the requested items are reasonably expected to adversely affect health and safety of occupants and invitees of the Premises.

(b) ~~Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.~~

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1 *after written notice and a reasonable opportunity to cure*, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to ~~115%~~ 100% of the cost thereof. Notwithstanding anything to the contrary in the foregoing, Lessor shall not have the right to make maintenance or repairs of any item which Lessee, in the proper exercise of its discretion under Section 7.1(a), chooses not to make or to defer to a later time.

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item ~~described in Paragraph 7.1(b)~~ cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2 **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 7.1(d) (Replacement), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3 **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term **"Utility Installations"** refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term **"Trade Fixtures"** shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term **"Alterations"** shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. **"Lessee Owned Alterations and/or Utility Installations"** are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, ~~will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year.~~ Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. ~~For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.~~

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. ~~If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.~~

7.4 **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** ~~Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all~~ All Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. ~~Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all~~ All Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) ~~Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of~~

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-11-8/08E

Desc Exhibit 1(a) - Lease (Part 1
Page 6 of 8

Case 19-40193 Claim 1-1 Part 2 Filed 01/28/19
- split up into 3 due to file size)

the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, *but no better than the condition and state of repair on the Commencement Date,* ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party *during the term hereof* (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) *to the extent required by Applicable Law* even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.     **Insurance; Indemnity.**

8.1        **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

8.2        **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an **"insured contract"** for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor may, *at its sole cost and expense,* shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3        **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor *and Lessee,* with loss payable to Lessor, *Lessee,* any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $125,000 *$250,000* per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) Adjacent Premises. If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4        **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $125,000.00 *$250,000* per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM STN-11-8/08E

Desc Exhibit 1(a) - Lease (Part 1
Page 7 of 8

Case 19-40193    Claim 1-1 Part 2    Filed 01/28/19
- split up into 3 due to file size)

Case: 19-04057    Doc# 85    Filed: 10/02/20    Entered: 10/02/20 13:34:49    Page 485 of
699

485

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

      8.5    **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders' Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

      8.6    **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

      8.7    **Indemnity.** Except for Lessor's ~~gross~~ negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

      8.8    **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

      8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. ~~Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.~~

9.    **Damage or Destruction.**

      9.1    **Definitions.**

          (a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

          (b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

          (c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event *covered by insurance or* required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

          (d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

          (e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires remediation.

      9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessee ~~Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations)~~ as soon as reasonably possible and this Lease shall continue in full force and effect.~~; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event,~~ Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance

INITIALS                                               INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                         FORM STN-11-8/08E

Case: 19-04057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 486 of 699

486

Case 19-40193   Claim 1-1 Part 2   Filed 01/28/19   Desc Exhibit 1(a) - Lease (Part 1 - split up into 3 due to file size)   Page 8 of 8

proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement-cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful misconduct act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessee Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's Lessee's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee Lessor within 30 days after receipt by Lessor Lessee of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor Lessee elects to terminate this Lease, Lessee Lessor shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor Lessee of Lessee's Lessor's commitment to pay for the repair of such damage without reimbursement from Lessee Lessee. Lessee Lessor shall provide Lessor Lessee with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor Lessee shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee Lessor does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, Lessee may elect to terminate this Lease shall terminate 60 days following a Premises Total Destruction such Destruction. If Lessee does not elect to terminate this Lease, Lessee shall repair and restore the Premises in accordance with Section 9.2. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee. Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessee Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee Lessor within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.    **Real Property Taxes.**

10.1    **Definition.** As used herein, the term **"Real Property Taxes"** shall mean all real property taxes and general, special district assessments, rental receipts tax or other governmental impositions imposed on the Premises or Project. Real Property Taxes shall not include any taxes imposed on the net income of Lessor, any franchise or corporate taxes imposed on Lessor, any business license fees imposed on Lessor or any transfer taxes assessed on a sale or transfer of the Premises or Project. include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM STN-11-8/08E

Case: 19-04057    Doc# 85    Filed: 10/02/20    Entered: 10/02/20 13:34:49    Page 487 of 699

Case 19-40193    Claim 1-1 Part 3    Desc Exhibit 1(b) - Lease (Part Two of Three)    Page 1 of 7    Filed 01/28/19    Page 1 of 7

**487**

of the Premises; and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

    10.2    **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

    10.3    **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

    10.4    **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

    12.1    **Lessor's Consent Required.**

    (a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

    (b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

    (c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

    (d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

    (e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

    f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

    (g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

    (h) Notwithstanding the foregoing, in the event of any proposal by Lessee to assign this Lease to (a) an entity controlling, controlled by or under common control with Lessee, (b) a successor entity related to Lessee by merger, acquisition, consolidation, reorganization, or (c) a purchaser of substantially all of Lessee's assets located in the Premises, Lessor may not withhold or condition its consent provided that, the net worth of the assignee shall be equal to or greater than 100% of the net worth of Lessee at the time of such assignment. Lessee shall provide the Lessor with not less than twenty (20) business days advance notice of any such proposed assignment and Lessee shall provide Lessor with reasonable financial information regarding the net worth of the Lessee and the proposed assignee.

    12.2    **Terms and Conditions Applicable to Assignment and Subletting.**

    (a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee, provided that upon an assignment of this Lease to an entity of equal or superior creditworthiness as Lessee at the time of such assignment, Lessee will be released from all further liability under this Lease.

    (b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or

_____
INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION        FORM STN-11-8/08E

disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

~~(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)~~

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3̶ 5 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, ~~act or acts constituting public or private nuisance,~~ and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3̶ 5 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, ~~(ii) the service contracts, (iii)~~ the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate ~~or financial statements,~~ (v) a requested subordination pursuant to this Lease, ~~(vi) evidence concerning any guaranty and/or Guarantor,~~ (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 1̶0̶ 30 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a **"debtor"** as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

~~(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.~~

~~(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.~~

13.2    **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within ~~10~~ _30_ days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

~~13.3    Inducement Recapture.  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.~~

13.4    **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within $10 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to ~~10%~~ _5%_ of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    **Breach by Lessor.**

(a) **Notice of Breach.**  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after

INITIALS _____

_____ INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, *provided, however, that all such offsets shall not cumulatively exceed an amount equal to three (3) times the initial month's Base Rent under this Lease, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.* ~~provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.~~ Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.      **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively **"Condemnation"**), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any Building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.      **Brokerage Fees.** N/A

~~15.1      **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.~~

~~15.2      **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

~~15.3      **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the Indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.~~

16.      **Estoppel Certificates.**

(a) Each Party (as **"Responding Party"**) shall within 10 days after written notice from the other Party (the **"Requesting Party"**) execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current **"Estoppel Certificate"** form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.      **Definition of Lessor.** The term **"Lessor"** as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                        FORM STN-11-8/08E

Case 19-40193   Claim 1-1 Part 3   Filed 01/28/19   Desc Exhibit 1(b) - Lease (Part Two of Three)   Page 5 of 7

Case: 19-04057    Doc# 85    Filed: 10/02/20    Entered: 10/02/20 13:34:49    Page 491 of 699

**491**

performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.    **Notices.**

    23.1    **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by ~~regular,~~ certified ~~or registered~~ mail or U.S. Postal Service Express Mail ~~or other nationally recognized overnight courier,~~ with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

    23.2    **Date of Notice.** Any notice sent by ~~registered or~~ certified mail, return receipt requested, U.S. Postal Service Express Mail ~~or other nationally recognized overnight courier~~ shall be deemed given on the date of delivery shown on the receipt card ~~or the delivery records of the Express Mail or other courier, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.~~ Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.**

    (a)    No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

    (b)    The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

    (c)    THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.    ~~Disclosures Regarding The Nature of a Real Estate Agency Relationship.~~

    ~~(a)~~    ~~When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:~~

    ~~(i)~~    ~~Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.~~

    ~~(ii)~~    ~~Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.~~

    ~~(iii)~~    ~~Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as~~

____
INITIALS

PAGE 14 OF 18

____
INITIALS

stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)     Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)     Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.     **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. So long as Lessor's current bankruptcy case remains open (Northern District of California, Oakland Division, Case No. 14-41048-RLE), any litigation between the Parties hereto concerning this Lease shall be initiated in the United States Bankruptcy Court for the Northern District of California, Oakland Division. Following such time as Lessor's current bankruptcy case has been closed, any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     Subordination; Attornment; Non-Disturbance.

30.1     **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, **"Security Device"**), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as **"Lender"**) shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2     **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor. (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3     **Non-Disturbance.** Lessor represents and warrants that no Security Devices currently affect the Premises. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a **"Non-Disturbance Agreement"**) from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4     **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.     **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.     **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers,

**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

**493**

lenders, or, during the last six months of the term hereof, tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor and Lessee agree are ~~may deem~~ necessary or desirable ~~and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises~~ as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    **Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.    **Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    **Consents.**  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.    **Guarantor.**

    37.1    **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

    37.2    **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.    **Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    **Options.**  If Lessee is granted an Option, as defined below, then the following provisions shall apply:

    39.1    **Definition.**  "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

    ~~39.2    Options Personal To Original Lessee.  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.~~

    39.3    **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

    39.4    **Effect of Default on Options.**

        (a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

        (b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

        ~~(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.~~

40.    ~~**Multiple Buildings.**  If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.~~

41.    **Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.    ~~**Reservations.**  Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents~~

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    **Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44.    **Authority; Multiple Parties; Execution.**

       (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

       (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

       (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.    **Conflict.**  Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.    **Offer.**  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.    **Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.    **Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.    **Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50.    **Americans with Disabilities Act.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: 10:00 am | Executed at: |
| On: 8/29/14 | On: |
| **By LESSOR:** | **By LESSEE:** |
| Berkeley Properties, LLC | Pacific Steel Casting Company LLC |
| A California limited liability company | A Delaware limited liability company |
| By: _Catherine Delsol_ | By: |
| Name Printed: Catherine Delsol | Name Printed: |
| Title: Manager | Title: |
| By: | By: |
| Name Printed: | Name Printed: |
| Title: | Title: |
| Address: | Address: |

_____ 
INITIALS

**PAGE 17 OF 18**

_(initials)_
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION      FORM STN-11-8/08E

reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restriction.

43      **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment

44      **Authority; Multiple Parties; Execution.**

      (a)      If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

      (b)      If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document

      (c)      This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.      **Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.      **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.      **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises

48      **Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.      **Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50.      **Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at:  _____           Executed at:  _____
On:  _____               On:  _____

By LESSOR:                     By LESSEE:
Berkeley Properties, LLC        Pacific Steel Casting Company LLC
A California limited liability company   A Delaware limited liability company

By: _____             By: _____
Name Printed: _____       Name Printed: Kevin Daugherty
Title: _____            Title: Manager
By: _____             By: _____
Name Printed: _____       Name Printed: _____
Title: _____            Title: _____
Address: _____       Address: _____

**PAGE 17 OF 18**

Telephone:(___) _____   Telephone:(___) _____
Facsimile:(___) _____   Facsimile:(___) _____
Federal ID No. _____    Federal ID No. _____

**BROKER:**                        **BROKER:**

_____   _____

Attn: _____   Attn: _____
Title: _____   Title: _____
Address: _____   Address: _____

Telephone:(___) _____   Telephone:(___) _____
Facsimile:(___) _____   Facsimile:(___) _____
Federal ID No. _____    Federal ID No. _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

Case 19-40193   Claim 1-1 Part 4   Filed 01/28/19   Desc Exhibit 1(c) - Lease (Part Three of Three)   Page 4 of 6

_____
**INITIALS**

**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                FORM STN-11-8/08E

# ADDENDUM

**Date:** August 29, 2014

**By and Between (Lessor)** Berkeley Properties, LLC, a California limited liability company
**(Lessee)** Pacific Steel Casting Company LLC, a Delaware limited liability company

**Address of Premises:** 1333 2nd Street, 1310 Third Street and 640 Gilman Street, Berkeley, CA

## Paragraphs 55-60

55.     Lessor agrees that any amount determined to be due to Lessee (as Buyer) under Section 10.01 (the "10.01 Amount") of that certain Asset Purchase Agreement  dated as of June 19, 2014 by and between Speyside Fund, LLC, and Pacific Steel Casting Company, a California corporation ("Seller"), as amended by the First Amendment to Asset Purchase Agreement dated August __, 2014 (as so  amended, the "Asset Purchase Agreement"), on account of any breach of a representation, warranty or covenant by Seller under the Asset Purchase Agreement shall be paid to Lessee through an abatement in the amount of base rent otherwise payable by Lessee to Lessor under this Lease.  The abatement shall commence on the later of (i) the end of the rent abatement provided for in Section 57 below or (ii) the final determination of the 10.01 Amount, and shall continue until the amount of such base rent abatement equals the 10.01 Amount., after which the rent under the Lease shall be fully payable pursuant to the terms of this Lease.

56.     Pursuant to the terms of the Asset Purchase Agreement, Seller provided to Lessee due diligence materials, including without limitation certain environmental reports identified in Schedule 5.01(n)(ii) thereto relating to the Premises (collectively "Asset Purchase Agreement Disclosures"), and Lessee has also had an opportunity to conduct its own physical and regulatory environmental investigations of the Premises ("Lessees's Environmental Due Diligence") prior to the closing of the transaction under the Asset Purchase Agreement. The Asset Purchase Agreement provides for a rent abatement in the event any contamination by Hazardous Materials not disclosed in the Asset Purchase Agreement Disclosures is discovered at any time up to ninety (90) days following the closing.  For purposes of this Lease, the term "Undisclosed Hazardous Substances" means any Hazardous Substances which (i) existed on the Premises prior to Lessee's occupancy, (ii) was not disclosed in any of the Asset Purchase Agreement Disclosures, and (ii) the existence of which was made aware to Lessee or any of Lessee's employees or agents as a result of Lessee's Environmental Due Diligence before the closing or within ninety (90) days thereafter.

Lessor shall have no responsibility or payment obligation for the investigation or remediation of any Hazardous Substances except with respect to Undisclosed Hazardous Substances as expressly provided in Paragraphs 6.2(e), 6.2(f), and 6.2(g), unless required by law or governmental authority.

57.     Lessee shall be entitled to an abatement in the amount of base rent otherwise payable by Lessee to Lessor under this Lease commencing on the Commencement Date of the Lease and continuing until the amount of such rent abatement equals $1,000,000, after which the rent under the Lease shall be fully payable pursuant to the terms of this Lease, subject to any other provisions hereof expressly permitting abatement of base rent.

58.     The Property Condition Assessment prepared by Atwell, LLC for Lessee identifies certain areas of possible current noncompliance of the Premises with the Americans With Disabilities Act ("Possible ADA Noncompliance").  Notwithstanding anything to the contrary in Sections 8.7 and 50 of this Lease, Lessor shall indemnify, protect, defend and hold harmless  Lessee, its members, managers, officers, agents and lenders from and against any and all claims, damages, judgments, penalties attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with (i) notices of

Case 19-40193   Claim 1-1 Part 4   Filed 01/28/19   Desc Exhibit 1(c) - Lease (Part Three of Three)   Page 5 of 6

violation or other regulatory compliance actions or proceedings relating to Possible ADA Noncompliance, and (ii) future private claims or legal proceedings under the ADA based in whole or in part on areas of Possible ADA Noncompliance. If Lessor defaults or unreasonably delays paying or peforming the indemnity in this Section, after written notice from Lessee, Lessee may pay or perform the liabilities and obligations for which indemnity is sought and recover the reasonable amounts so paid by Lessee., by means of an abatement of base rent hereunder, in addition to abatements described in Sections 55, 57 and 59 hereof. Notwithstanding the foregoing, Lessor shall have no obligation of indemnity and to the extent such liabilities arise from any application by Lessee to make changes to the Premises or changes made by Lessee to the Premises.

59.     The Property Condition Assessment prepared by Atwell, LLC for Lessee identifies certain areas of possible current noncompliance of the Premises with the Applicable Requirements with regards to fire prevention and safety ("Possible Fire Safety Noncompliance"). Notwithstanding anything to the contrary in Section 8.7 of this Lease Lessor shall indemnify, protect, defend and hold harmless Lessee, its members, managers officers, agents and lenders from and against any and all claims, damages, judgments, penalties attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with notices of violation or other regulatory compliance actions or proceedings relating to Possible Fire Safety Noncompliance. In the event that officials of the City of Berkeley require any repairs or alteration of the Premises to remedy any of the areas of Possible Fire Safety Noncompliance ("Required Work"), Lessor agrees to perform the Required Work in a timely fashion at Lessor's expense. If Lessor defaults or unreasonably delays in performing the Required Work or otherwise to indemnify Lessee hereunder after written notice from Lessee, Lessee may perform the Required Work and recover the reasonable amounts paid by Lessee to unaffiliated third parties to perform the Required Work, by means of an abatement of base rent hereunder, in addition to abatements described in Sections 55, 57 and 58 hereof. Notwithstanding the foregoing, Lessor shall have no obligation to make any repairs or alterations to the Premises if the requirement is related to any application by Lessee to make changes to the Premises, or changes made by Lessee to the Premises and this Section 59 in no way constitutes a representation or warranty by Lessor with respect to the safety of the Premises.

60.     The Premises  includes that certain real property, including all improvements thereon, owned by Lessor, commonly known as 648 Page Street, 1314, 1320, 1333, 1420 and 1421 2nd Street, 1310 3rd Street, 640 Gilman St. and 1305 and 1401 Eastshore Highway in the City of  Berkeley, located in Alameda County, State of California, more particularly described on Exhibit A, attached hereto.



**Berkeley Properties LLC**
7 West 41st Avenue - #523
San Mateo, CA 94403

November 16, 2018

*VIA EMAIL AND OVERNIGHT COURIER*

Jerry Johnson
Pacific Steel Casting Company LLC
1333 2nd Street, Berkeley, CA 94710
Email: jjohnson@pacificsteel.com

Re: <u>Notice of Application of Security Deposit under that certain Lease Agreement dated August 29, 2014 (the "Lease") between Berkeley Properties, LLC ("Berkeley Properties"), as lessor, and Pacific Steel Casting Company LLC ("PSCC"), as lessee</u>

Dear Jerry:

As set forth our letter to PSCC dated November 2, 2018, PSCC has not timely paid the rent owed for the month of November 2018 under Section 1.5 of the Lease in the amount of $89,554. PSCC has not paid the amount since receipt of the November 2nd letter, and thus the failure to pay November 2018 rent constitutes a Default under Section 13.1(b) of the Lease.

This letter serves as written notice that as a consequence of the above Default, Berkeley Properties has applied the security deposit in the amount of $89,554 under the Lease to the unpaid rent for November 2018.

Nothing contained herein nor any action, inaction or delay by Berkeley Properties in the exercise of any contractual, legal or equitable right, remedy, power or privilege under the Lease shall (a) operate as an amendment of the Lease or a waiver of any such right, remedy, power or privilege; (b) be construed as a consent to or forbearance with respect to any default under the Lease; (c) obligate Berkeley Properties to make any accommodation; or (d) otherwise impair any right, remedy, power or privilege of Berkeley Properties afforded to it by contract (including, without limitation, the Lease), law, equity or otherwise. Furthermore, neither the single nor partial exercise of any contractual, legal or equitable right, remedy, power or privilege with respect to any default shall preclude any other or further exercise thereof, or the exercise of any such other right, remedy, power or privilege. The rights, remedies, powers and privileges afforded to Berkeley Properties by contract (including, without limitation, the Lease), law, equity or otherwise are cumulative and not exclusive of one another or of any other right, remedy, power or privilege to which Berkeley Properties is otherwise entitled. No notice to or demand upon PSCC in any instance shall in itself entitle PSCC to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Berkeley Properties to take any other or further action in any circumstance without notice or demand.

Should you have any questions, please do not hesitate to contact the undersigned.

Jerry Johnson
November 16, 2018
Page 2

Very truly yours,

Berkeley Properties, LLC

By: Arch & Beam Global LLC, in its capacity as
Plan Administrator for Berkeley Properties, LLC

By: _____
       Matthew English
       its Managing Director

SMRH:488441112.1

cc:   Howard Bailey
      Brendan Cronin
      Michael Lauter
      Tracy Green

Case 19-04057 Doc# 85 Filed 10/02/20 Entered 10/02/20 13:24:49 Page 501 of
Case 19-70193 Claim 1-1 Part 2 Filed 01/28/19 Desc Exhibit 2 - Letter 5
Application of Security Deposit Page 2 of 2
699

501

# EXHIBIT "12"

**Fill in this information to identify the case:**

Debtor 1 ___Pacific Steel Casting Company LLC___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: ___Northern___ District of ___CA___
(State)

Case number ___19-40193 RLE_____

## Official Form 410
# Proof of Claim
04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1: Identify the Claim

**1. Who is the current creditor?**

Second Street Properties
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
- ☒ No
- ☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Second Street Properties c/o Michael Lauter
Name

4        Embarcadero Center, 17th Floor
Number   Street

San Francisco      CA         94111
City               State       ZIP Code

Contact phone   (415) 434-9100

Contact email   mlauter@smrh.com

Where should payments to the creditor be sent? (if different)

Second Street Properties, attn: Matthew English
Name

7        West 41st Avenue - #523
Number   Street

San Mateo      CA         94403
City           State       ZIP Code

Contact phone   (415) 839-8488

Contact email   ssp.bp.pa@arch-beam.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_____

**4. Does this claim amend one already filed?**
- ☒ No
- ☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
         MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
- ☒ No
- ☐ Yes. Who made the earlier filing? _____

Case 19-40193 Doc# 852-1 Filed 10/02/2019 Entered 10/02/2019 13:34:49 Page 508 of 699

503

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?** $ _____24,294,699.00_____ . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Indemnity Obligations in APA (See Addendum)

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

Annual Interest Rate (when case was filed) _____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

Case 19-40057 Doc 852-1 Filed 10/02/19 Entered 10/02/19 13:34:49 Page 504 of 699

504

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( _____ ) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/28/2019
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Matthew English |
|---|---|
| | First name          Middle name          Last name |
| Title | Manager of Arch & Beam Global, LLC, Court Appointed Plan Administrator |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 7          West 41st Avenue - #523 |
| | Number          Street |
| | San Mateo          CA          94403 |
| | City          State          ZIP Code |
| Contact phone | (415) 839-8488 |   Email ssp.bp.pa@arch-beam.com |

Case 19-40057   Doc 185-1   Filed 10/02/19   Entered 10/02/19 13:34:49   Page 505 of 699
Case 19-40193   Claim 2-1   Filed 02/28/19   Desc Main Document

505

**<u>Addendum to Proof of Claim Submitted by Creditor Second Street Properties</u>**

**<u>In the Bankruptcy Case of Pacific Steel Casting Company LLC</u>**

**<u>Case No. 19-40193 RLE</u>**

**<u>United States Bankruptcy Court for the Northern District of California,
Oakland Division</u>**

This Addendum forms a part of and is incorporated into the proof of claim (the "Proof of Claim") submitted by creditor Second Street Properties, f/k/a Pacific Steel Casting Company ("Second Street") in the bankruptcy case of debtor Pacific Steel Casting Company LLC ("PSCC"), pending in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court") as Case No. 19-40193 RLE (the "Bankruptcy Case").

Second Street, as seller, and Speyside Fund, LLC, as buyer, are parties to that certain Asset Purchase Agreement dated June 19, 2014 (as amended, the "APA"). Section 10.04 of the APA purports to assign all rights and obligations of Speyside Fund, LLC as buyer to its subsidiary, PSCC, following closing of the transactions contemplated in the APA. Closing under the APA occurred on August 29, 2014. Second Street is evaluating whether the indemnity claims that form the basis of this proof of claim are properly brought against Speyside Fund, LLC, PSCC, or both. Second Street files this proof of claim based on said indemnity claims against PSCC in order to preserve such claims against PSCC in the event that either (x) a reviewing court were to determine that PSCC were the sole party liable for such claims, or (y) a reviewing court were to determine that PSCC was jointly and severally liable for such claims with Speyside Fund, LLC.

In Section 7.10(a) of the APA, PSCC and/or Speyside Fund, LLC indemnify Second Street for all withdrawal liability under ERISA that may be triggered by PSCC and/or Speyside Fund, LLC. In particular, Section 7.10(a)(iii) provides in part that: "Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii)."

The liability of Second Street and Berkeley Properties to the multi-employer pension plan in question, CMTA-Glass, Molders, Pottery, Plastics and Allied Workers Local 164B Pension Trust (the "Pension Trust") is secured by a first position deed of trust recorded against all of the real property owned by Berkeley Properties, LLC (the "Deed of Trust").[1]

In October 2017, PSCC announced that it would be going out of business. On December 14, 2017, PSCC cancelled the bond required to be posted by PSCC under ERISA section 4204(a)(1)(B). On December 28, 2017, the Pension Trust send a default letter to Second

---

[1] Berkeley Properties, LLC is a wholly owned subsidiary of Second Street. The deed of trust was given under Section 4204 of ERISA as part of a confirmed chapter 11 plan in the bankruptcy cases of Second Street and Berkeley Properties, which were and are before this Court as Case Nos. 14-41045 and 14-41048.

Case: 19-40193   Doc# 852-1   Filed: 10/02/2019   Entered: 10/02/20 13:34:49   Page 506 of
699

**506**

Street and Berkeley Properties under the Deed of Trust, notifying them that PSCC's cancellation of its bond had triggered withdrawal liability under ERISA for Second Street in the amount of $24,294,699.00.

Second Street thus submits a claim against PSCC under the indemnity provisions of Section 7.10 of the APA for the amount of the withdrawal liability triggered by PSCC as asserted by the Pension Trust: $24,294,699.00.

Second Street reserves the right to: (i) amend or supplement this proof of claim to the maximum extent permissible under applicable law, and (ii) file additional proofs of claim for additional claims which may be based on the same or additional documents. This proof of claim is made without prejudice to the filing by Second Street of additional proofs of claim with respect to any other indebtedness or liability of any of PSCC to Second Street. Filing this proof of claim is not a waiver or release of Second Street's rights against any person, entity or property.

By executing and filing this proof of claim, Second Street does not waive any right to any security or any other right or rights with respect to any claim it has or may have against any PSCC, or any other person, persons, entity or entities. Second Street expressly reserves all rights accruing to it and the filing of this proof of claim is not intended and should not to be construed to be as an election of remedies, or a waiver or limitation of any Second Street's rights, claims, or causes of actions.

PACIFIC STEEL – 6/19/2014

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

SPEYSIDE FUND, LLC

AND

PACIFIC STEEL CASTING COMPANY

Dated as of June 19, 2014

167478.001/594498v6

Case: 19-40057   Doc# 95-5 Filed: 10/06/20   Entered: 10/06/20 18:24:49   Page 508 of 5 - Split up due to file size)   Page 1 of 29   699

508

## TABLE OF CONTENTS

                                                     **Page**

ARTICLE I DEFINITIONS ........................................................................ 1
    1.01    Definitions ................................................................................. 1

ARTICLE II PURCHASE AND SALE OF ASSETS ............................... 2
    2.01    Asset Acquisition ...................................................................... 2
    2.02    Excluded Assets ........................................................................ 3
    2.03    Liabilities .................................................................................. 4
    2.04    Assumption of Contracts; Cure Amounts .................................. 5

ARTICLE III PURCHASE PRICE ......................................................... 6
    3.01    Purchase Price .......................................................................... 6

ARTICLE IV CLOSING AND TERMINATION ..................................... 9
    4.01    Closing ....................................................................................... 9
    4.02    Termination ............................................................................. 10
    4.03    Treatment of Good Faith Deposit Upon Termination ............. 10

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 11
    5.01    Representations and Warranties of Seller ............................... 11

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 18
    6.01    Representations and Warranties of Buyer ............................... 18

ARTICLE VII COVENANTS OF THE PARTIES ................................... 19
    7.01    Cooperation of the Parties ....................................................... 19
    7.02    Bankruptcy Court Matters ....................................................... 19
    7.03    Break-up Fee ........................................................................... 20
    7.04    Notices and Consents .............................................................. 20
    7.05    Full Access ............................................................................... 20
    7.06    Property Inspection and Testing .............................................. 20
    7.07    Name Change .......................................................................... 21
    7.08    Transfer Taxes ......................................................................... 21
    7.09    Bulk Sales Laws ...................................................................... 21
    7.10    Multiemployer Plan ................................................................. 21
    7.11    Post-Closing Transition and Cooperation ............................... 22
    7.12.    Non-Union Pension Plan ......................................................... 23

ARTICLE VIII EMPLOYEE MATTERS ............................................... 23
    8.01    Employees ................................................................................ 23

ARTICLE IX CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ........................... 24
    9.01    Conditions to Closing Applicable to All Parties ..................... 24
    9.02    Conditions to the Obligations of S ......................................... 25

Case: 19-40057   Doc# 925   Filed: 10/08/20   Entered: 10/08/20 18:24:49   Page 509 of
5 - Split up due to file size)   Page 2 of 29   699

| | | |
|---|---|---|
| 9.03 | Conditions to the Obligations of Buyer | 25 |

ARTICLE X MISCELLANEOUS .................................................................................. 27

| | | |
|---|---|---|
| 10.01 | Survival of Representations, Warranties and Covenants | 27 |
| 10.02 | No Third-party Beneficiaries | 28 |
| 10.03 | Entire Agreement | 28 |
| 10.04 | Succession and Assignment | 28 |
| 10.05 | Counterparts; Signatures | 28 |
| 10.06 | Headings | 28 |
| 10.07 | Notices | 28 |
| 10.08 | SUBMISSION TO JURISDICTION | 30 |
| 10.09 | Governing Law | 30 |
| 10.10 | Amendments and Waivers | 30 |
| 10.11 | Severability | 30 |
| 10.12 | Fees and Expenses | 30 |
| 10.13 | Construction | 31 |
| 10.14 | Fair Consideration | 31 |
| 10.15 | Incorporation of Schedules | 31 |
| 10.16 | Gender and Number | 31 |
| 10.17 | No Consequential or Punitive Damages | 31 |
| 10.18 | Time of Essence | 31 |
| 10.19 | Waiver | 31 |

Case: 19-40057    Doc# 82-5    Filed: 10/08/20    Entered: 10/08/20 18:24:49    Page 510 of
5 - Split up due to file size)      Page 3 of 29
699
510

# SCHEDULES

| | |
|---|---|
| 2.02(g) | Deposits and Prepaid Amounts Funded by PS |
| 2.03(b)(iii) | Buyer assumed Benefit Plans |
| 2.03(b)(iv) | Transferable licenses, permits, etc. |
| 2.03(b)(v) | Employees With Accrued and Unpaid Vacation Benefits |
| 2.03(b)(vi) | Accounts payable assumed by Buyer |
| 2.04(a) | Executory contracts and Unexpired Leases to Assumed |
| 3.01(c)(ii) | Net Working Capital |
| 5.01(a) | Jurisdictions where Seller is qualfied |
| 5.01(h) | Problem Receivables (previously 5.01(g) |
| 5.01(i)(iii) | Agreements with tax authorities |
| 5.01(j) | Intellectual Property (previously 5.01(i)) |
| 5.01(k) | Real property used in the business |
| 5.01(l) | Litigation and Disputes |
| 5.01(m) | Compliance with Laws Exceptions |
| 5.01(n)(i) | Environmental Law Compliance Exceptions |
| 5.01(n)(ii) | Environmental , H&S reports (previously (n)(ii)(2) |
| 5.01(n)(iii) | Environmental, etc. permits |
| 5.01(o) | Insurance Policies |
| 5.01(p) | Brokers |
| 5.01(q) | Matters Relating to Benefit Plans |
| 6.01(a) | Jurisdicions where Buyer is qualfied to do buiness |
| 8.01(b) | Excluded Employees |

Case: 19-40057   Doc #: 22   Filed: 10/08/20   Entered: 10/08/20 18:24:49   Page 511 of
5 - Split up due to file size)   Page 4 of 29

511

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into by and between Pacific Steel Casting Company, a California corporation (the "Debtor" or "Seller") and Speyside Fund, LLC (the "Buyer" including any assignee of Buyer) as of this 19th day of June, 2014 ("Agreement Date") (Seller and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".)

## Recitals

A. Seller is engaged in the steel foundry business (the "Business").

B. On March 10, 2014, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Bankruptcy Code") (such petition, the "Petition") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") initiating Case No. 14-41045 (the "Bankruptcy Case"). No Trustee has been appointed and Seller operates the Business as Debtor and Debtor in Possession pursuant to 11 U.S.C. 1107 et seq.

C. Subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order (as defined in Exhibit A) Seller desires to sell to Buyer and Buyer desires to acquire from Seller, substantially all of Seller's assets relating to the Business, in a transaction pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Transaction").

D. Seller's board of directors has determined that it is advisable and in the best interests of the Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, and it has approved the same.

In consideration of the foregoing and the covenants, representations, warranties, agreements and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS

1.01 **Definitions.** Capitalized terms used in this Agreement shall have the meanings ascribed to them in Exhibit A hereto or as may be set forth throughout this Agreement.

Case: 19-44057   Doc#: 925   Filed: 10/08/20   Entered: 10/08/20 18:24:49   Page 512 of
5 - Split up due to filesize)   Page 5 of 29

512

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

**2.01    Asset Acquisition.**

(a) Pursuant to Sections 105,363 and 365 of the Bankruptcy Code, subject to the entry of the Sale Order and the terms and conditions of this Agreement, at the date this Transaction closes (the "Closing Date"), Seller shall sell, assign, transfer, convey and deliver to Buyer, free and clear of all Encumbrances and claims (except with respect to Assumed Liabilities), and Buyer shall purchase, and take assignment and delivery of, all right, title and interest in and to all of the assets, properties, goodwill and Business of every kind and description and wherever located, whether tangible or intangible, personal or mixed, directly or indirectly owned by Seller or to which it is directly or indirectly entitled and, in any case, belonging to or used or intended to be used in the Business, other than the Excluded Assets. The property to be acquired (all such assets, properties and rights purchased by Buyer being referred to herein as the "Acquired Assets") includes, without limitation, the following assets, properties and rights of Seller:

(i)    all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials, supplies, and components intended for sale wherever located ("Inventory");

(ii)    all of Seller's tools, equipment, vehicles and other tangible personal property that is used, held for use or intended for use in the Business, or which is being utilized or operated by Seller, wherever located, together with any transferrable warranty and service rights applicable to Seller with respect to said Acquired Assets;

(iii)    all of Seller's right, title and interest relating to prepaid expenses, advance payments and deposits other than those directly related to Excluded Assets;

(iv)    all accounts receivable, notes, evidences of indebtedness of any kind, from third parties arising from the conduct of the Business, whether or not in the ordinary course of business, together with any unpaid financing charges thereon, and all amounts which have been earned by Seller but which have not yet been invoiced;

(v)    all rights of Seller under the Assumed Contracts;

(vi)    all franchises, permits, licenses, agreements, waivers and authorizations issued by any Governmental Entity held or used by Seller in connection with, or required for, the Business, to the extent transferable (collectively "Permits");

(vii)    all of Seller's right, title and interest in, to and under all Intellectual Property owned, licensed or sublicensed by or to Seller to the extent transferable;

(viii)    books and records of Debtor other than those included in Excluded Assets, including customer lists, invoices, shipping records, supplier lists, equipment maintenance data, sales and sales promotional data and materials, cost and pricing information,

Case 19-44057    Doc 95-5    Filed 10/08/20    Entered 10/08/20 18:24:49    Page 513 of
5 - Split up due to file size)    Page 6 of 29                    **513**

quality control records and manuals, blueprints, research and development files, records and laboratory books, patent disclosures, credit records, drawings, correspondence, and any other records and data, and all computer software and programs and any rights thereto that are used in, or relating to, the Business;

(ix)    all of Seller's promotional and advertising materials relating to the Business as presently conducted, including all catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, equipment and parts lists, and dealer and distributor lists;

(x)    any and all goodwill of Seller relating to the Business; and

(xi)    except to the extent excluded herein, all rights and obligations under non-disclosure or confidentiality and similar arrangements with or for the benefit of employees, independent contractors and agents of Seller or with third parties;

(xii)    any and all telephone and facsimile numbers, domain names and email addresses;

(xiii)    all prior and current workers compensation Insurance Policies of the Seller, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, and rights to be indemnified and defended under such Insurance Policies; and

(xiv)    all proceeds and products of the Acquired Assets.

(b) All of the Acquired Assets are being sold to Buyer free and clear of all Liens, Encumbrances and claims to the fullest extent permissible under Section 363(f) of the Bankruptcy Code pursuant to an order by the Bankruptcy Court as described in Section 7.02 below (the "Sale Order").

(c) Except as specifically provided in this Agreement, Seller makes no representations or warranties whatsoever respecting the Acquired Assets. Except as specifically provided in this Agreement, the Acquired Assets are sold "as is" and "where is".

2.02    **Excluded Assets.**  Seller is not selling, assigning, or transferring to Buyer, and Buyer is not purchasing, and the term "Acquired Assets" does not include, any interest in the following (the "Excluded Assets"):

(a) corporate and financial books and records of Seller, including Seller's organization documents, minute and stock record books, tax returns, checkbook, cancelled checks, provided that upon request, Buyer may have reasonable access to such books and records and the opportunity to make copies thereof. Seller will retain a copy of the records of accounts receivable and payable.

(b) causes of action arising under Sections 544 through 552 of the Bankruptcy Code and all proceeds thereof;

(c) rights of Seller under Contracts not included within the Assumed Contracts;

Case 19-40057   Doc# 525   Filed 10/08/20   Entered 10/08/20 18:24:49   Page 514 of 699
5 - Split up due to file size)    Page 7 of 29
514

(d) all documents and personnel records of Seller's employees that Seller is required by law to retain and is prohibited by law from providing a copy thereof to Buyer;

(e) all capital stock or other equity interests issued by Seller;

(f) all prior and current Insurance Policies of the Seller and/or of Berkeley Properties, LLC, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than workers compensation Insurance Policies;

(g) all those certain deposits or prepaid amounts funded by Seller for the purpose of the Bankruptcy Case including utility deposits, all as identified on in Schedule 2.02(g);

(h) all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) that are not assumed by Buyer;

(i) all claims that the Seller may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities:

(j) Seller's cash on hand or in bank or other depository accounts, money market funds and other liquid investments, the Good Faith Deposit, and any proceeds of Excluded Assets;

(k) Any asset of the Seller that otherwise would constitute an Acquired Asset but for the fact that it is sold or disposed of in the ordinary course of Seller's business during the time from the Agreement date until the Closing Date;

**2.03    Liabilities.**

(a)    Other than the Assumed Liabilities, Buyer shall not assume or agree to pay, perform or discharge, any debts, liabilities, obligations, claims, expenses, taxes, or commitments of any kind or character, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undetermined (collectively, "Liabilities") of Seller or become liable to Seller or any other Person, for any Liabilities of Seller. Liabilities include, without limitation, any Liability of Seller relating to or arising from: (i) any infringement by Seller on the rights of others in connection with the Business; (ii) any and all taxes of any nature with respect to the period prior to Closing; (iii) any liability arising from a violation by Seller of any laws governing employee relations, including anti-discrimination laws, wage and hour laws, labor relations laws, occupational safety and health laws or any other laws applicable to Seller or the Business or the Acquired Assets with respect to the period prior to Closing (other than Liabilities under Assumed Plans described in Section 2.03(b)(iii); or (v) liability arising from Seller's fraud, breach, malfeasance, misfeasance, negligence, strict liability in tort, injury to persons or property or under any other theory relating to the Business, the Acquired Assets or the conduct, performance or non-performance of Seller.

(b)    At Closing, Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy in accordance with their respective terms) the following liabilities (the "Assumed Liabilities"):

Case: 19-40057    Doc# 525-5    Filed: 10/08/20    Entered: 10/08/20 18:24:49    Page 515 of
5 - Split up due to file size)    Page 8 of 29

515

(i)　　all Liabilities arising from the ownership of the Acquired Assets after the Closing Date;

(ii)　　all Liabilities of Seller arising under the Assumed Contracts to the extent that such Liabilities first accrue on or after the Closing Date, and all obligation to demonstrate adequate assurance of future performance required by the Bankruptcy Court under 365(b)(1)(C) of the Bankruptcy Code;

(iii)　　the obligations to administer or to provide benefits, payments under the Benefit Plans that Buyer assumes as listed on Schedule 2.03(b)(iii) (the "Assumed Plans") after the Closing Date, and all Liability arising from Buyer's termination of or withdrawal from any Assumed Plan; provided that with respect to any retiree under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011, and prior to the Closing Date or is listed on Schedule 2.03(b)(iii), Buyer shall not assume any liability for and Seller shall be solely responsible to pay any amounts in excess of the retirement benefit amounts previously determined to be due to such persons, all interest required to be paid to such persons in respect of unpaid benefits. Seller shall establish a reserve for any such retirement benefits amounts determined to be due by depositing $20,000 in the attorney trust account of Binder & Malter LLP which deposit shall be held and used to fund such amounts and held in such account until such benefit entitlement (or lack thereof) is definitely determined;

(iv)　　all Liabilities and obligations of Seller arising under transferable licenses, Permits and governmental authorizations of Seller identified on Schedule 2.03(b)(iv), and Intellectual Property rights first accruing from and after the Closing Date;

(v)　　any accrued but unpaid vacation obligations as of the Closing Date to Seller's employees listed on Schedule 2.03(b)(v) (the amount of such obligations as of May 31, 2014, total $1,032,441.83) whom Buyer elects to hire, except that Buyer shall not assume any such obligations resulting from accounting errors in the calculations of accrued or unpaid vacation obligations of Seller or Seller's agent pertaining to union employees whose vacation was not properly adjusted on anniversary dates and for which Seller shall be liable;

(vi)　　accounts payable and accrued expenses in the aggregate amount of up to $1 million as listed on Schedule 2.03(b)(vi) and certain Liabilities for pending orders from customers arising out of the conduct of the Business after the Closing Date, expenses for customer rebates and for goods or materials received in transit but not yet invoiced as of the Closing Date, as listed on Schedule 2.03(b)(vi); and

(vii)　　all of Seller's Liabilities for all claims made or asserted by any employee or former employee of Seller for workers compensation benefits for occurrences or claims made solely with respect to the policy years beginning April 1, 2012, April 1, 2013 and April 1, 2014.

**2.04　Assumption of Contracts; Cure Amounts.**

(a)　　Assumption of Contracts. Seller shall assume, and assign to Buyer, any unexpired lease or executory contract (as those terms are used in Section 365 of the Bankruptcy Code) to which Seller is a party ("Executory Contract"), and that is designated in a motion to

Case 19-44057　Doc 425　Filed 10/08/20　Entered 10/08/20 13:24:49　Desc Page 516 of
5 - Split up due to file size)　Page 9 of 29
**516**

assume and assign contracts filed by Seller with the Bankruptcy Court in conjunction with the Sale Motion, which motion shall be filed within the time described in Section 7.02(b) (such designated Executory Contracts are "Assumed Contracts"). Attached as Schedule 2.04(a) is a list of the Executory Contracts including the Collective Bargaining Agreement, that are expected to be Assumed Contracts, but the controlling designation of contracts, other than the Collective Bargaining Agreement which must be an Assumed Contract (subject to appropriate modifications agreed to by the parties), shall be in the order allowing and directing assumption and assignment of the Assumed Contracts to Seller. Seller shall also assume, and assign to Buyer, any other Executory Contracts related to the Business and designated by Buyer, in its sole discretion and by written notice to the Seller, for assumption and assignment at any time and from time to time after the Agreement Date and prior to the entry of an order rejecting such Executory Contract. Buyer shall have the sole discretion to remove any Assumed Contract (other than the Collective Bargaining Agreement) previously designated for assumption and assignment, at any time and from time to time prior to the effective date of the assumption by the Seller of such Executory Contract. The Seller shall not reject any Executory Contract without providing Buyer (i) prior written notice of its intent to reject such Executory Contract, (ii) a copy of such Executory Contract, and (iii) the prior opportunity to designate such Executory Contract as an Assumed Contract. If Buyer removes a contract from the "assumed" list after the sale hearing, Buyer shall reimburse the estate for any damages that the bankruptcy estate suffers resulting from the rejection of the contract.

(b) <u>Curing Defaults and Assignment.</u> At Closing, the Seller shall assume each of the Assumed Contracts pursuant to Section 365(a) of the Bankruptcy Code, and sell and assign to Buyer each of the Assumed Contracts pursuant to Sections 363(b), (f) and (m) and 365(f) of the Bankruptcy Code. All amounts, as determined by the Bankruptcy Court, or as agreed between Seller and the non-debtor party, necessary to cure an Assumed Contract (the "Cure Amounts") shall be paid by Seller at or before the Closing, or credited against the Purchase Price. Buyer shall also provide each non-debtor party with adequate assurance of future performance. The Cure Amounts must be sufficient to relieve Seller from all obligations with respect to defaults arising or existing under the Executory Contracts prior to the Closing Date.

<div align="center">

**ARTICLE III**

**PURCHASE PRICE**

</div>

**3.01   Purchase Price.**

(a) <u>Good Faith Deposit.</u> Upon execution of this Agreement the Buyer shall pay $500,000 for deposit into the Binder & Malter LLP Client Trust Account in escrow on behalf of Seller and Buyer by delivery of a cashier's check to Binder & Malter LLP or wire transfer into said account. This is the "Good Faith Deposit."

(b) The purchase price for the Acquired Assets (the "Purchase Price") shall consist of the following:

(i) $10,800,000.00;

Case 19-40193   Doc#225-5 Filed 10/03/20 11 Entered 10/02/20 13:46:49 B.R (Page 1 of 5 - Split up due to file size)   Page 10 of 29

517

(ii)     the Good Faith Deposit; and

(iv)     any additional amount the Buyer chooses, in its sole discretion, to over-bid at the Auction.

The Parties agree that, as of the Agreement Date, not including any amount for overbid at the Auction, the Purchase Price is approximately $11,300,000.00.

(c)     <u>Purchase Price Adjustments</u>.

(i)     <u>Determination of Amount</u>.  The Purchase Price shall be increased or decreased to account for the difference between $26,853,679 and the Net Working Capital on the Closing Date.  If Net Working Capital is greater on the Closing Date, the Purchase Price shall be increased by the amount of such difference.  If Net Working Capital is lower on the Closing Date, then the Purchase Price shall be reduced by such difference.  Two (2) business days prior to the Closing Date, Seller shall deliver to Buyer an estimated calculation of Seller's Net Working Capital as of the Closing Date ("<u>Estimated Closing Date Net Working Capital</u>").  The amount of the Estimated Closing Date Net Working Capital shall be used to determine the Purchase Price payable by Buyer (subject to adjustment pursuant to this Agreement) on the Closing Date.

(ii)     <u>Procedure</u>.  Buyer intends to conduct a physical count of inventory on hand at the Real Property on the Closing Date, and Seller may have representatives present during such count. The results of such physical count shall be binding on the parties as to the volume of inventory on hand at the plant, less damaged or otherwise unsaleable items. Inventory of domestic castings shall be valued for purposes of this Agreement at the amounts per ton set forth on Schedule 3.01(c)(ii). All other inventory elements shall be valued in accordance with GAAP.  Accounts receivable shall be valued in accordance with  GAAP, consistently applied.  Within  twenty (20) business days after the Closing Date, Buyer shall deliver to Seller a written and detailed calculation of the Net Working Capital as of the Closing Date as determined by the Buyer along with related work papers, together with a statement of the amount of the Purchase Price adjustment ("<u>Purchase Price Adjustment Statement</u>").  After the delivery of the Purchase Price Adjustment Statement, the Parties shall cooperate in connection with the review of the Purchase Price Adjustment Statement, including reasonable access to materials used in the preparation of the Purchase Price Adjustment Statement.  Each Party shall then have thirty (30) days from receipt of the Purchase Price Adjustment Statement to formally notify the other Party of any objections to or disputes of the Purchase Price Adjustment Statement (the "<u>Dispute Notice</u>").  If either Party delivers a Dispute Notice, the Parties shall use reasonable, good-faith efforts to resolve any such objections within ten (10) days following receipt of such Dispute Notice, and if any such objections are so resolved within such ten (10) day period, the Purchase Price Adjustment, with such changes as may have been previously agreed in writing by the Parties, shall be final and binding to the extent of any items no longer in dispute.  If all items of dispute are so resolved, the Purchase Price Adjustment Statement (as so modified) shall be conclusive and binding on all Parties.  If the Parties fail to reach agreement with respect to all of the matters set forth in the Dispute Notice within the aforementioned ten (10) day period, then they shall, within seven (7) business days thereafter, retain a mutually acceptable national independent accounting firm (the "<u>Independent Accountant</u>"), subject to approval of the

Case 19-40057   Doc 225-5   Filed 10/02/20   Entered 10/02/20 14:49:40   Page 518 of
5 - Split up due to file size)     Page 11 of 29

518

Bankruptcy Court, to resolve any amounts then remaining in dispute ("Disputed Items"), and any amounts not so disputed (the "Undisputed Items") shall be final and binding on the Parties. The Parties shall cooperate fully with the Independent Accountant so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Accountant shall have thirty (30) business days from its selection and appointment to resolve Disputed Items only in writing with an explanation of the basis for its determination, with a copy to all Parties. The Independent Accountants shall only decide the specific items under dispute by the Parties and their decision for each Disputed Item must be within the range of values assigned to each such item in the Purchase Price Adjustment Statement and the Dispute Notice, respectively. The determination of the Independent Accountant shall be final and binding on the Parties, absent manifest error or willful misconduct, and the cost of the Independent Accountant shall be borne by the Party whose position is determined to be the least correct by the Independent Accountant. The Party owing the Purchase Price adjustment amount shall pay such amount to the other Party by wire transfer no later than ten (10) business days following (i) the delivery date of the Purchase Price Adjustment Statement to Seller, or (ii) the Independent Accountant's final determination with respect to the Purchase Price Adjustment Statement, as the case may be.

(d)     The Purchase Price shall be paid in part by release to Seller of the Good Faith Deposit, with the remainder paid in Cash (subject to the adjustments set forth herein) at or before the Closing Date.

(e)     Prorations.  Except for amounts that Buyer must pay with respect to the Assumed Liabilities, Seller shall be responsible for the expenses relating to the Acquired Assets and the Business up to and through the Closing Date, and Buyer shall be responsible for the expenses relating to the Acquired Assets and the Business after the Closing Date (for example *ad valorem* taxes and utilities). Expenses relating to the Acquired Assets up to and through the Closing Date shall be paid by Seller at or before the Closing Date. To the extent that the time period for the assessment of any expenses falls both before and after the Closing Date, then those expenses shall be prorated as of the Closing Date, and, to the extent required, reconciled after the Closing Date.

(f)     Allocation of Purchase Price for Tax Purposes.  As promptly as practicable following the Agreement Date, Buyer shall deliver to the Seller a schedule, allocating the Purchase Price among the Acquired Assets for all tax and other reporting purposes, which schedule shall be subject to the Seller's consent, not to be unreasonably withheld. After the Seller grants its consent to such schedule, the Seller and the Buyer shall be bound by such allocation (and if necessary, any adjusted allocation), and shall file an Internal Revenue Service Form 8594 and all applicable federal, state, local and foreign income, and excise tax returns in a manner that is consistent with such allocation. If the allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party concerning the existence of such dispute and the Parties shall consult with each other with respect to all issues related to the allocation in connection with such dispute. If a different allocation proposed by the Internal Revenue Service (the "IRS") is finally determined, either Party may file amended returns based on such allocation or any other allocation. An allocation shall be considered to be finally determined when such allocation cannot be contested in any court of competent jurisdiction.

Case 19-40057   Doc 225-5 Filed 10/02/19 Entered 10/02/19 13:46:49   Page 12 of 29
5 - Split up due to file size)    Page 12 of 29
519

(g)    <u>Good Faith Deposit</u>. If the Buyer makes a material breach of this Agreement before the Closing Date and such breach continues without cure ten days after Seller's written notice to Buyer of same, then Seller may terminate this Agreement in accordance with Sections 4.02 and 4.03, resulting in the Good Faith Deposit becoming Seller's property, which shall constitute the exclusive relief against Buyer in such event. If any of Seller's representations or warranties were either untrue or inaccurate in a material respect when made or become untrue or inaccurate in a material respect on or before the Closing Date or if the Seller makes a material breach of this Agreement before the Closing Date, and such breach continues ten days after Buyer's written notice to Seller of same, then Buyer may terminate this Agreement in accordance with Sections 4.02 and 4.03 and the Seller shall immediately return the Good Faith Deposit in full. The Good Faith Deposit will become non-refundable property of the Seller if Buyer is approved as the winning bidder by the Bankruptcy Court in the Sale Order, and this Agreement is not timely terminated in accordance with Sections 4.02 and 4.03.

## ARTICLE IV

## CLOSING AND TERMINATION

**4.01**    **Closing**. The consummation of the Transaction (the "<u>Closing</u>") shall take place at a time and date of Buyer's choosing within fifteen (15) business days after the entry of the Sale Order, provided that the Sale Order has not been appealed or stayed, at the offices of Seller's counsel.

(a)    <u>Buyer Deliveries</u>. At the Closing, Buyer shall deliver to Seller:

(i)    The Purchase Price, less the Good Faith Deposit, and any adjustments or credits against the Purchase Price, including the Purchase Price adjustment and any cure amounts owed with respect to the Assumed Contracts;

(ii)    To the extent necessary, assignment and assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Buyer (as necessary), in customary form and otherwise as counsel to Seller shall reasonably request to implement and evidence the Transaction;

(iii)    such other agreements, documents and instruments as Seller and its counsel may reasonably request.

(b)    <u>Seller Deliveries</u>. At the Closing, Seller shall deliver to Buyer:

(i)    assumption agreements pertaining to the Assumed Contracts, and bills of sale, duly executed by Seller, in customary form and otherwise as counsel to Buyer shall reasonably request to implement and evidence the Transaction;

(ii)    the required executed third party consents, if any;

(iii)    a certified copy of the Sale Order; and

Case 19-44057 Doc#225-5 Filed 10/03/2011 Entered 10/03/2011 14:49 Page 52 of 69
Case 19-44057 Doc#225-5 Filed 10/03/2011 Entered 10/03/2011 14:49 BR (Page of 5 - Split up due to file size) Page 13 of 29

520

(iv)    such other agreements, documents and instruments as Buyer and its counsel may reasonably request.

**4.02    Termination.**    This Agreement may be terminated at any time prior to the Closing Date:

(a)    by the mutual written consent of Buyer and Seller;

(b)    by Seller, if it is not in material breach of its obligations hereunder, upon a material breach by Buyer of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after delivery of written notice thereof;

(c)    by Buyer, if not in material breach of its respective obligations hereunder, upon a material breach by Seller of any of its representations, warranties, covenants or other obligations hereunder which is not curable or, if curable, is not cured within 10 days after written notice thereof;

(d)    by Buyer, if not in material breach of its respective obligations hereunder, if, before the Closing, Seller's Bankruptcy is converted to a Chapter 7 case under the Bankruptcy Code or there is appointed an operating trustee or examiner with expanded powers;

(e)    by Buyer or Seller if any court of competent jurisdiction or other Governmental Entity issues, enacted, entered, promulgated or enforced any order, judgment, decree, injunction or ruling which restrains, enjoins or otherwise prohibits the transaction and such order, judgment, decree, injunction or becomes final and non-appealable;

(f)    by Buyer or Seller if the Bankruptcy Court fails to enter the Sale Order within four days of the conclusion of the Bankruptcy Court's sale hearing;

(g)    by Buyer or Seller if the Closing shall not have occurred on or before 15 days after entry of the Sale Order, provided the terminating Party is not otherwise in material breach of its representations, warranties or other obligations hereunder.

(h)    Automatically and without any action by either Buyer or Seller, if the Bankruptcy Court approves a Transaction with any Person other than Buyer (provided, however, that Buyer is not otherwise in material default under this Agreement);

(i)    By Buyer, if any of the conditions set forth in Section 9.03 are not satisfied on or prior to the dates designated in Section 9.03 for the satisfaction of such conditions (provided, however, that Buyer is not otherwise in material default under this Agreement or any other  agreement that are part of the Transaction);

**4.03    Treatment of Good Faith Deposit Upon Termination.**

(a)    In the event that this Agreement is terminated pursuant to Sections 4.02(a), (c), (d), (e), (f), (g), (h) or (i) above, then the Seller shall immediately return the Good Faith Deposit in full.

(b)    In the event that this Agreement is terminated pursuant to Section 4.02(b) above, then Buyer waives all claims to the Good Faith Deposit and it will become Seller's property.

(c)    In the event that this Agreement is terminated pursuant to Section 4.02(c) then the Breakup Fee provisions of Section 7.03 shall survive termination and the Breakup Fee shall be payable to Buyer from the proceeds of sale to a third party.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

**5.01    Representations and Warranties of Seller.**  Seller represents and warrants to Buyer that, except as set forth in the disclosure schedules being delivered by Seller contemporaneously herewith, but no later than five (5) business days after the Agreement Date (the "Seller Disclosure Schedules"):

(a) Organization and Qualification.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and is qualified to do business in all other jurisdictions in which the failure to so qualify would constitute a Material Adverse Effect, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law. The jurisdictions in which each Seller is so qualified are listed on Schedule 5.0l(a) hereto.

(b) Authorization of Transaction.  Subject to the entry of the Sale Order, and unless obviated by the Bankruptcy Code and other applicable law, the Seller has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Seller of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Seller.  Subject to the entry of the Sale Order, this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable in accordance with its terms, and no other action by Seller is requisite to the valid and binding execution, delivery and performance by Seller of its obligations under this Agreement and the consummation of the Transaction, except as expressly set forth in this Agreement and/or the Sale Order, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforcement of specific remedies.

(c) Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Seller of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create

Case: 19-40057    Doc# 225-5 Filed: 10/02/2019    Entered: 10/02/2019 14:49    Page 52 of
5 - Split up due to file size)    Page 15 of 29

522

in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d) <u>Title to Assets</u>. Subject to the entry of the Sale Order, the Seller, as of the Agreement Date, has, or as of the Closing Date will have, good title to, valid leasehold interests in, or license or other valid rights to use, all of the Acquired Assets.

(e) <u>Assets used in the Business</u>. Except the Excluded Assets, the Acquired Assets are the only assets used by Seller to conduct the Business. Seller believes that the Acquired Assets include all rights, properties and other assets necessary to permit Buyer to conduct the Business after the Closing Date in materially the same manner as it has been conducted by Seller prior to the Agreement Date.

(f) <u>Operation of Business</u>. From the Agreement Date through the Closing Date, the Seller shall conduct the Business in accordance with the Bankruptcy Code, Bankruptcy Rules, Orders of the Bankruptcy Court and applicable local guidelines. Except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (such consent not be unreasonably withheld), or (iii) as required by the filing of the Bankruptcy Case or as approved by the Bankruptcy Court and with adequate written notice to Buyer, the Seller shall not amend, supplement, or terminate any of the Assumed Contracts; transfer any interest in any Acquired Asset, except in the ordinary course of business; bring, settle, compromise or waive any proceeding or legal right adversely affecting the validity or value of any Acquired Asset; or authorize or enter into an agreement to do any of the foregoing.

(g) <u>Financial Statements</u>. Seller has delivered to Buyer the Seller's audited consolidated balance sheet as of March 31, 2013, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2013, together with notes to such financial statements (the "2013 Year-end Financial Statements"). Seller has or within five (5) days of the Agreement Date shall deliver to Buyer Seller's unaudited consolidated balance sheet as of April 30, 2014, and the related statement of operations for the one-month period ended April 30, 2014 ("April 30, 2014 Interim Financial Statements"). On or before July 31, 2014, Seller shall deliver to Buyer: Seller's audited consolidated balance sheet as of March 31, 2014, and the related statements of operations, stockholders' equity and cash flows (together with the auditors' report thereon) for the year ended March 31, 2014, together with notes to such financial statements (the "2014 Year-end Financial Statements"). On or before twenty (20) days after the end of each month, until the month in which the Closing Date occurs, Seller shall deliver to Buyer Seller's unaudited consolidated balance sheet as of the last day of the prior month, and the related statement of operations for such one-month period (the "Monthly Interim Financial Statements"). The 2013 Year-end Financial Statements, 2014 Year-end Financial Statements, April 30, 2014 Interim Financial Statements and Monthly Interim Financial Statements are herein collectively referred to as the "Financial Statements." Upon delivery, the respective Financial Statements shall have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied throughout the periods covered thereby, and be consistent with the books and records of the Seller.

Case: 19-40057    Doc# 225-5 Filed: 10/02/21    Entered: 10/02/21 14:49:18    Page 523 of
5 - Split up due to file size)    Page 16 of 29                                    523

(h) <u>Accounts Receivable</u>.  Each Account Receivable is a true and correct statement of the account for goods delivered to or services actually performed for and accepted by, such account debtor in the ordinary course of business materially consistent with past practice.  Except as set forth in <u>Schedule 5.01(h)</u>, all receivables that are reflected on the Financial Statements (net of any reserves shown thereon) (i) are valid and existing, (ii) represent monies due for goods sold and delivered or services rendered in the ordinary course of business materially consistent with past practice, and (iii) are not subject to any refunds or adjustments or any defenses, rights of set-off, credits, discounts, assignment, restrictions, security interests or other Encumbrances.  Seller has not factored any of the receivables.

(i) <u>Taxes.</u>

(i)  All federal, state, foreign, county, local and other Tax Returns required to be filed by or on behalf of Seller have been timely filed, or extensions of the time to file have been obtained, and when filed were true and correct in all material respects, and the taxes due and owing were paid or adequately accrued, except to the extent contested in good faith by proper proceedings. Seller has duly withheld and paid all Taxes required to have been withheld and paid relating to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed and distributed.

(ii)  The provision made for taxes on the Financial Statements is sufficient for the payment of all material Taxes, whether or not disputed, at the date of such Financial Statements and for all years and periods prior thereto.

(iii)  There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any Tax Return or report of Seller or the period of time within which any Tax Return of Seller must be filed.

(iv)  Tri-Pacific, Inc., the majority shareholder of Seller, has received a notice from IRS that it will be auditing the income tax returns of Tri-Pacific, Inc., Seller and Berkeley Properties, LLC for the tax year ending March 31, 2012.  Neither Buyer nor any of the Acquired Assets shall be liable for any tax liability of Seller.

(j) <u>Intellectual Property</u>.  <u>Schedule 5.01(j)</u> provides a true and complete list of all Intellectual Property owned, used or held by Seller in the operation of the Business, in each case indicating whether such Intellectual Property is owned by or licensed to Seller.  Seller owns or possesses adequate licenses or other valid rights to use all Intellectual Property used or held for use in connection with Business and included in the Acquired Assets.   To the Seller's Knowledge, there is not been any assertion or claim challenging the validity of any Intellectual Property.  To the Seller's Knowledge, the operation of the Business by Seller does not conflict with or infringe on the rights of any other Person, and Seller has not received any claim or written notice, and has no reason to believe that there is any unasserted or potential claim, from any Person to such effect.  Seller has taken reasonable measures to protect the proprietary nature of each item of Intellectual Property and to maintain in confidence all trade secrets and confidential information that it owns or uses.

167478.001/594498v6

13

Case: 19-40057   Doc #: 225-5   Filed: 10/02/2019   Entered: 10/02/2019 16:49:18   Page 524 of 699
5 - Split up due to file size)   Page 17 of 29

524

(k) Real Property.  Schedule 5.01(k) hereto lists the street address, the current owner and the current use of each parcel of Real Property which is related to, used, useful or held for use in the conduct of the Business (the "Real Property"). The Real Property constitutes all of the real property used in the operation of the Business as currently conducted. Seller is in exclusive possession of the Real Property and the improvements thereon. Seller is not a party to, and the Real Property is not subject to, any service contract or agreement other than those listed on Schedule 5.01(k).

(l) Litigation. Except as described in Schedule 5.01(l), to the Seller's Knowledge as of the Agreement Date, there is no action, suit, investigation or proceeding pending or threatened against Seller or the Acquired Assets that is reasonably likely to have a Material Adverse Effect on the operation or use of the Business, the Real Property or the Transaction, and Seller has not received notice of any special assessment proceedings affecting the Real Property.

(m) Compliance. Except as set forth on Schedule 5.01(m), to Seller's Knowledge Seller is and at all times within the time of applicable statute of limitations has complied in all material respects with applicable laws, rules, regulations, judgments, orders and decrees and Permits applicable to the Acquired Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect on the Business or the Real Property. Except as provided on Schedule 5.01(m), within the time of the applicable statute of limitations, Seller has not received notice of any outstanding violation of any applicable law, ordinance, or restriction from any governmental authority with respect to the Business or the Real Property. Seller holds all material Permits necessary or required to operate the Business as currently conducted. Set forth on Schedule 5.01(m) is a list of all such Permits (and the status thereof), all of which are valid, effective and in good standing. Each of such Permits is freely transferable to Buyer.

(n) Environmental Matters.

(i) Except as set forth on Schedule 5.01(n)(i) hereto, (A) the current business operations of Seller are in material compliance with all Environmental Laws; (B) during the five years ending on the Closing Date there has been no Release at any of the properties owned or operated by Seller (including the Real Property) which could have a Material Adverse Effect; (C) during the five years ending on the Closing Date no Environmental Claim has been asserted against Seller nor does Seller have Knowledge or notice of any threatened Environmental Claim against Seller which could have a Material Adverse Effect; (D) during the five years ending on the Closing Date no Environmental Claims have been asserted against any facilities that may have received Hazardous Substances generated by Seller which could have a Material Adverse Effect; (E) no property now owned or operated by Seller (including the Real Property) has been used as a treatment or disposal site for any Hazardous Substance or contains any underground storage tanks; (F) during the five years ending on the Closing Date Seller has not failed to report to the proper Governmental Entity any Release which is required to be so reported by any Environmental Laws which could have a Material Adverse Effect; (G) Seller holds all licenses, Permits and approvals required under any Environmental Laws in connection with the current operation of the Business, except for such licenses, permits and approvals as to which Seller's failure to maintain or comply with could not have a Material Adverse Effect; (H)

Case 19-40057   Doc 225-5 Filed 10/02/19 Entered 10/02/19 14:49:48   Page 25 of
5 - Split up due to file size)   Page 18 of 29

525

during the five years ending on the Closing Date Seller has not received any notification pursuant to any Environmental Laws that (x) any work, repairs, construction or capital expenditures are required to be made as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (y) any license, permit or approval referred to above is about to be reviewed, made subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not have a Material Adverse Effect; (I) to Seller's Knowledge, no Hazardous Substance is migrating from or onto the Real Property that could reasonably be expected to give rise to any reporting, investigation, remediation, or other liabilities or obligations under any Environmental Laws; (J) to Seller's Knowledge, there are no conditions, circumstances, activities, practices, incidents, actions, omissions or plans which reasonably could be expected to materially interfere with or prevent compliance with the Environmental Laws as the Business is currently operated; and (K) Seller has not undertaken or assumed any liability or obligation for corrective or remedial action, or of any other Person relating to Environmental Laws.

(ii)     Schedule 5.01(n)(ii) hereto identifies all material written environmental, health and/or safety reports generated by or on behalf of Seller within the past five years immediately preceding the Agreement Date that have been provided to the applicable Governmental Entity as required by Environmental Law and/or Environmental Permits, and except where such reports could not reasonably be obtained or were not so provided, all as described in Schedule 5.01(n)(ii). Schedule 5.01(n)(ii) further includes all Phase I or Phase II environmental assessments or environmental audits relating to the Real Property obtained by Seller within the five years immediately preceding the Agreement Date, and true and complete copies of such reports have been provided to Buyer.

(iii)     Schedule 5.01(n)(iii) hereto identifies all material Environmental Permits, approvals or authorizations issued by any federal, state or local Government Entity to Seller in connection with the Business or the Real Property within the two years immediately preceding the Agreement Date, each such Environmental Permit is valid and enforceable and in full force and effect, and Seller is in compliance, in all material respects, with the terms and conditions of all such Environmental Permits, approvals or authorizations and no other Environmental Permits, approvals or authorizations are necessary for operating the Business or the Real Property as currently conducted.

(iv)     To Seller's Knowledge, there is currently no Release on the Property which could have a Material Adverse Effect regardless of whether the Release occurred before or after the five-year period ending on the Closing Date.

(o) Insurance.  Schedule 5.01(o) hereto sets forth a summary of each insurance policy carried by Seller (including any self-insurance programs) (collectively "Insurance Policies"). All such insurance policies are valid and binding and in full force and effect, all premiums due thereunder have been paid in full and Seller has not received any notice of cancellation or termination in respect of any such policy nor is Seller in default thereunder.

(p) Brokers.  Except as set forth on Schedule 5.01(p) hereto , Seller is not a party to any agreement, arrangement or understanding with any Person which will result in the

Case: 19-40053   Doc#: 225-5 Filed: 10/02/2013 Entered: 10/02/2013 16:49:18   Page 526 of
5 - Split up due to file size)     Page 19 of 29
526

obligation of Buyer or Seller to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated by this Agreement.

(q) <u>Employee Benefit Plans</u>.

(i)    Seller has furnished or made available to Buyer: (1) a complete and accurate copy of the plan document (and any funding medium, including any trust agreement or annuity contract, if applicable) and summary plan description of each Benefit Plan (or other descriptions of such Benefit Plan provided to employees), including all amendments thereto; (2) a copy of the annual reports, financial statements and/or actuarial valuations, if any, with respect to each Benefit Plan for the three (3) year period immediately preceding the date of this Agreement; (3) a copy of each summary of material modification for each Benefit Plan; (4) a copy of IRS Form 5500 for each Benefit Plan for the three (3) plan years immediately preceding this Agreement, with all applicable schedules and accountants' opinions attached thereto; (5) the most recent determination or opinion letter received from the IRS for each Benefit Plan which is a 401(k) plan or pension plan; (6) a copy of the latest account statement, if any, reflecting the assets of any funded Benefit Plan; (7) a copy of the Summary Annual Report as distributed to the participants of the Benefit Plans, if applicable, for the three (3) year period immediately preceding the date of this Agreement; and (8) any correspondence from any governmental authority with respect to any Benefit Plan that threatens any litigation, claim, suit, investigation or other proceeding against the Seller or any Benefit Plan that refers to or alleges any fact or circumstance which could reasonably be expected to give rise to any such litigation, claim, suit, investigation or other proceeding, together with any response thereto by or on behalf of the Seller or the Benefit Plan.

(ii)    Except as disclosed in <u>Schedule 5.01(q)</u>: (1) there are no pending, threatened, or to the Knowledge of the Seller, anticipated claims by any party, including any Governmental Entity, relating to any Benefit Plan, other than routine claims for benefits; (2) no Benefit Plan is currently under investigation or audit by the IRS, the U.S. Department of Labor, any state department of labor or any similar organization or entity; (3) since its respective inception or effective date, each of the Benefit Plans has complied in form and been operated and maintained in all material respects in accordance with its terms and the requirements of all applicable laws and regulations, and in accordance therewith, the plan document underlying any Benefit Plan has been amended and/or restated, to the extent necessary and required by law to have been amended and/or restated by the Agreement Date and the Closing Date, to comply with all applicable laws and regulations; (4) with respect to the Non-Union Pension Plan: a) all premiums (any interest, charges and penalties for late payment, if any applicable) due the PBGC for which premiums are required have been paid; b) the Non-Union Pension Plan has not been terminated under circumstances which would result in liability to the PBGC; c) the Non-Union Pension Plan is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended ("IRC"), has received a favorable determination or opinion letter from the IRS that it is so qualified, and any trust established in connection with the Non-Union Pension Plan is intended to be exempt from federal income taxation under Section 501(a) of the IRC has received a determination letter from the IRS that it is so exempt, and to Seller's Knowledge no fact or event has occurred since the date of such determination letter from the IRS that could reasonably be expected to result in the disqualification of the Non-Union Pension Plan or in the loss of the exempt status of any such trust; d) the Seller has not ceased operations at a facility so

Case 19-40057 Doc 225-5 Filed 10/02/20 Entered 10/02/20 14:49:18 BK Page 52 of 8998
5 - Split up due to file size)   Page 20 of 29
527

as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions on or before the date of the Closing to any Benefit Plan or ERISA Affiliate Plan subject to Section 4064(a) of ERISA; e) the Seller has or will have, as of the Closing Date, made all required contributions and payment of all interest, penalties and other amounts owed with respect to the Non-Union Pension Plan; or f) in the last three years preceding the date hereof, there has been no "reportable event" for Seller as defined in Section 4043(b) of ERISA and the regulations under that Section other than those which have been reported in compliance with ERISA or which will be the subject of the Voluntary Corrective Program submission described in Section 7.12; (5) with respect to the Multiemployer Plan: a) the Seller has or will have, as of the Closing Date, made all required contributions; and b) the Seller has not incurred any liability under Title IV of ERISA, including any withdrawal liability for any period prior to the Closing Date; (6) no condition, agreement or plan provision limits the right of the Seller to amend, cut back or terminate any Benefit Plan that it sponsors (except to the extent such limitation arises under ERISA); (7) all contributions, premiums or payments required to be made with respect to any Benefit Plan through the date of this Agreement and all unpaid liabilities of any Acquired Seller with respect to any Benefit Plan that are not yet payable have been properly accrued in the Seller's financial reports in accordance with GAAP; (8) all annual reports required to be filed with any governmental agency or department have been filed on or before their respective due dates, or the due date for same has been properly and timely extended; (9) to Seller's Knowledge no individual associated with any of the Benefit Plans has engaged in any actions that constitute a "prohibited transaction" under the provisions of ERISA Section 406, and no actions have previously occurred which could reasonably be interpreted to be a prohibited transaction upon which excise taxes may be imposed; (10) no excise taxes have been imposed, incurred or paid under the provisions of IRC Section 4975 or any similar provision during such period, and no excise tax reports or liabilities are currently pending; (11) no Benefit Plan which is a 401(k) plan or pension plan has been determined to have been "top-heavy" under the provisions of IRC Section 416, and no such Benefit Plan has failed its required discrimination testing, during the three (3) year period immediately preceding the date of this Agreement, without corrective actions being taken to bring the plan back into compliance with discrimination testing; and (12) except as provided on Schedule 5.01(q), the Seller has no ERISA Affiliates. "ERISA Affiliate" mean an entity that would be considered a single employer with the Seller under ERISA Section 4001(b) or part of the same "controlled group" as the Seller for purposes of ERISA Section 302(d)(3) or Section 414 of the IRC.

        (iii)    All current recipients of payments from Seller's Pension Plans are eligible to receive such payments.

        (r)    <u>Supplementing Schedules.</u> Seller shall promptly supplement or amend any schedule with respect to any matter arising after the Agreement Date that, if it had existed on the Agreement Date, would have been required to be described in such schedule. No matter disclosed in any such supplemental schedule shall be deemed accepted by Buyer, or to be a waiver by Buyer of any breach of a representation otherwise cured by such supplemental disclosure, unless Buyer expressly waives the same in writing.

Case: 19-40057   Doc# 22-5 Filed 10/02/2019 Entered 10/02/2019 13:46:49 Page 528 of 5 - Split up due to file size)   Page 21 of 29   698

528

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

**6.01    Representations and Warranties of Buyer**.  Buyer represents and warrants to Seller that, except as set forth in the disclosure schedules being delivered by Buyer contemporaneously herewith, but no later than five (5) business days after the Agreement Date (the "Buyer Disclosure Schedules"):

(a)    Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware,  and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. At Closing,  Buyer or its assignee   is duly qualified to do business and is in good standing California, and in all jurisdictions in which the failure to so qualify would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transaction.  The jurisdictions in which each Buyer is so qualified are listed on Schedule 6.01(a) hereto.

(b)    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by Buyer of this Agreement and the consummation of the Transaction have been duly and validly authorized by all necessary corporate action on the part of Buyer.  This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium or other laws from time to time in effect which affect creditors' rights generally and by legal and equitable limitations on the enforceability of specific remedies.

(c)    Noncontravention.  Subject to the entry of the Sale Order, no filing with, and no permit, authorization, consent or approval of, any Governmental Entity is necessary for the consummation by Buyer of the Transaction.  Subject to the entry of the Sale Order, neither the execution and the delivery of this Agreement, nor the consummation of the Transaction, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its articles of organization or other organizational document or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(d)    Financial Statements.  Buyer has the financial wherewithal and ability to perform all of its obligations under this Agreement, including payment of the Purchase Price to Seller.   Buyer shall have on the Closing Date sufficient unrestricted funds or committed lines of credit on hand to pay the portion of the Purchase Price payable in cash at the Closing.

(e)    Litigation. There is no claim, action, lawsuit, or proceeding, or to the Knowledge of Buyer, any pending inquiry or investigation or any threatened claim, action, lawsuit, proceeding, inquiry or investigation, in each case, by or against or affecting Buyer which

Case: 19-40057    Doc# 225-5 Filed: 10/02/19  Entered: 10/02/19 14:49:18  Page 529 of
5 - Split up due to file size)    Page 22 of 29

**529**

has had or can be reasonably expected to have a material adverse effect on the ability of Buyer to consummate the Transaction.

(f)     Brokers.     Buyer is not a party to any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer or Seller thereof to pay any finder's fee, brokerage commission or similar payment.

## ARTICLE VII

## COVENANTS OF THE PARTIES

**7.01     Cooperation of the Parties.** Except as expressly required by this Agreement, each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to promptly consummate and make effective the Transaction.

**7.02     Bankruptcy Court Matters.**

(a)     Bidding Procedures.     Promptly, but in any event, within five (5) days, after the execution of this Agreement Seller will file a motion in the Bankruptcy Court for an order approving bidding procedures for the sale of the Acquired Assets (the "Bidding Procedures Order"), if such motion has not been filed previously.  The Bidding Procedures Motion, shall, among other things be in form and content reasonably acceptable to Buyer, and seek to designate the Buyer as the "Stalking Horse Bidder", i.e. the party submitting the highest and best bid for the Property prior to the auction to be conducted in accordance with bidding procedures subject to Buyer's reasonable approval (the "Bidding Procedures").  Seller will seek approval of Bidding Procedures that (i) approve the Break-Up Fee (as hereinafter defined), (ii) require that any competing bidder for the Seller's assets must purchase them on substantially the same terms and conditions as set forth in this Agreement (including the payment of the "Good Faith Deposit), but for an amount at least $600,000 greater than the Purchase Price (the "Minimum Overbid"), and (iii) that further bids must be made in increments of at least $100,000.

(b)     Sale Motion.     Promptly upon, but in any event, within five (5) days after the entry of the Bidding Procedures Order, Seller shall file in the Bankruptcy Court one or more motions seeking authorization of all relief required for the Sale Order, including, among other things approval of the sale of the Acquired Assets pursuant to this Agreement and the assumption and assignment of the Assumed Contracts (the "Sale Motion"), which Sale Motion shall be in form reasonably acceptable to Buyer..

(c)     Non-Assignment of Assets.     Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Acquired Asset if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a consent or approval required or necessary for such assignment or transfer, would constitute a violation of the Bankruptcy Code, as expressly determined by a final order of the Bankruptcy Court. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the Bankruptcy Court determines by a final order that such consent or approval is required but not obtained, and any Person refuses or fails to perform or to accept performance based on such non-assignability, then Seller shall, upon

Case: 19-40057   Doc# 225-5   Filed: 10/02/2019   Entered: 10/02/2019 14:46:49   Page 52 of
5 - Split up due to file size)          Page 23 of 29

530

Buyer's request and at Buyer's sole cost and expense, cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits and obligations of such Acquired Asset, including enforcement for the benefit of Buyer of any and all rights and remedies of Seller against a third party arising out of such third party's refusal or failure to perform or to accept performance based on such non-assignability, or any breach or cancellation. Any assignment to Buyer of any Acquired Asset that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any third party for such assignment as aforesaid as expressly determined by a final order of the Bankruptcy Court shall be made subject to such consent or approval being obtained. Any contract that would be an Assumed Contract but is not assigned in accordance with the terms of this Agreement shall not be considered an "Assumed Contract" for purposes hereof unless and until such contract is assigned to Buyer following the Closing Date upon receipt of the requisite consents or approvals to assignment and Bankruptcy Court approval.

      **7.03    Break-up Fee.**  In consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in consideration of the time, expense and risks associated with serving as the "Initial Bidder," including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, Buyer has provided a material benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee (as hereafter defined) is reasonable and appropriate in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and was necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement.  Subject to the entry of the Bidding Procedures Order, if Buyer is not the successful bidder for the purchase of the Acquired Assets and the Acquired Assets are sold to another bidder, Seller will pay Buyer a break-up fee equal to five hundred thousand dollars ($500,000.00) (the "Break-up Fee").

      **7.04    Notices and Consents.**  Except as expressly required by this Agreement, each of the parties will promptly give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Entities to consummate and make effective the Transaction.

      **7.05    Full Access.**  From the Agreement Date through the Closing Date, the Seller will permit representatives of Buyer and its professionals to have full access at all reasonable times, and in a manner so as not to unreasonably interfere with the normal business operations of the Seller, to all books, records (including tax records), employees, contracts, and documents of or pertaining to the Seller.

      **7.06    Property Inspection and Testing.**  After the Agreement Date and prior to the Closing Date, Buyer shall be permitted at its sole expense, to inspect (with consultants of its choosing) the physical and environmental condition of the Real Property owned by Berkeley Properties LLC and used by the Seller.  Buyer's inspection right shall include the right to test for

Case: 19-40057    Doc #: 225-5  Filed: 10/02/21  Entered: 10/02/21 14:49:28  Page 51 of
5 - Split up due to file size)    Page 24 of 29

**531**

contamination, provided that Buyer shall restore such Real Property to the condition it was in prior to the conduct of any such inspection and testing.

      **7.07   Name Change.**   As soon as practicable following the Closing, and subject to approval of the Bankruptcy Court, Seller shall discontinue the use of its current name (and any other trade names currently utilized by any Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Pacific Steel Casting Company" or any similar designation without the prior written consent of Buyer, and Seller shall cause the name of Seller in the caption of the Bankruptcy Case to be changed to the new name of Seller in accordance with this Section 7.06. From and after the Closing, the Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by any of Seller in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. As soon as practicable following the Closing, Seller shall file all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each state in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

      **7.08   Transfer Taxes.**   All taxes arising out of each transfer of the Acquired Assets and any transfer taxes required to effect any recording or filing with respect thereto shall be borne by Buyer. Seller and Buyer shall cooperate to timely prepare and file any tax return relating to such transfer taxes, including, any claim for exempt or exclusion from the obligation or imposition of any transfer taxes. Seller shall be solely liable for any income, capital gains or similar taxes arising from the transfer of the Acquired Assets.

      **7.09   Bulk Sales Laws.**   To the extent the bulk sales laws of any state are applicable to the transactions contemplated by this Agreement, the parties hereby waive compliance with such bulk sales laws and the Buyer shall pay any Liabilities for any such noncompliance as a purchaser of assets pursuant to applicable law; provided, that Buyer shall in no case be deemed to assume any Liabilities which are not otherwise Assumed Liabilities under Section 2.03(b) by reason of such noncompliance, and Seller shall pay any Liabilities for any such noncompliance as a seller of assets pursuant to applicable law.

      **7.10   Multiemployer Plan.**

         (a)    The Parties intend to comply with the requirements of Section 4204 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") in order to ensure that the transactions contemplated by this Agreement shall not be deemed a complete or partial withdrawal from the CMTA – Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust (the "Multiemployer Plan"). Accordingly Seller and Buyer agree:

            (i)    After the Closing Date, Buyer shall contribute to the Multiemployer Plan with respect to the Seller's Business operations acquired by Buyer for substantially the same number of "contribution base units" for which Seller had an "obligation to contribute" to the Multiemployer Plan (as those terms are defined in Sections 4001(a)(11) and 4212 of ERISA, respectively) pursuant to the Collective Bargaining Agreement. At or prior to

Case: 19-40193   Doc# 225-5   Filed: 10/02/2019   Entered: 10/02/2019 14:49:43   Page 52 of
5 - Split up due to file size)   Page 25 of 29

532

the Closing Date, Seller shall assume and assign to the Buyer the Collective Bargaining Agreement with the Union, effective as of the Closing.

(ii)     Buyer shall provide to the Multiemployer Plan, for a period of five consecutive plan years commencing with the first plan year beginning after the Closing Date, either a bond issued by a surety company that is an acceptable surety for purposes of Section 412 of ERISA or an amount held in escrow by a bank or similar financial institution satisfactory to the Multiemployer Plan.  The amount of such bond or escrow deposit shall be equal to the greater of (A) the average annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of Seller's Business for the three plan years immediately preceding the plan year in which the Closing Date occurs, or (B) the annual contribution that Seller was required to make under the Multiemployer Plan with respect to the operations of the Seller's Business  for the last plan year immediately preceding the plan year in which the Closing Date occurs.  Such bond or escrow shall provide that it will be paid to the Multiemployer Plan if Buyer withdraws from the Multiemployer Plan or fails to make a contribution to the Multiemployer Plan when due, at any time during the first five plan years beginning after the Closing Date.  Buyer may, at its own cost and expense, seek any applicable waiver or exemption from the Multiemployer Plan or the applicable Governmental Entity from the requirement that it post a bond, as set forth in 29 C.F.R. Part 4204, and Seller shall cooperate with Buyer in seeking such waiver or exemption, provided, however that Buyer shall comply with all provisions of this Section 7.10(a)(ii) for the period of time after the Closing Date in which it is seeking but not yet obtained such a waiver or exemption.

(iii)     If Buyer completely or partially withdraws from the Multiemployer Plan prior to the end of the fifth plan year of the Multiemployer Plan beginning after the Closing Date, and  Buyer's liability of the Buyer with respect to the Multiemployer Plan is not paid, then Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Multiemployer Plan with respect to Buyer's operations during such five-year period but for Section 4204 of ERISA.  Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii).

(b)     Seller shall cooperate with Buyer if Buyer elects to prepare and submit to the Multiemployer Plan or the Pension Benefit Guarantee Corporation ("PBGC") a request for a variance or exemption from the bond/escrow requirement of Section 4204(a)(1)(B) of ERISA (as described in clause (ii) of this subsection).  Unless and until such a variance or exemption is granted, Buyer shall comply with the bond/escrow requirement, except to the extent provided in PBGC Regulation Section 2643.11(d).

(c)     To the extent that this Section 7.10 (without regard to this subsection) fails to comply with the requirements of Section 4204 of ERISA such that the withdrawal liability exemption provided by Section 4204 would be unavailable to Seller, the Parties agree that this Section 7.109 shall be deemed to include any term (including the modification of any express term herein) that is reasonably necessary to invoke the withdrawal liability exemption resulting from the application of Section 4204 to the Transaction.

**7.11    Post-Closing Transition and Cooperation.**

Case: 19-40053    Doc #: 225-5 Filed: 10/02/2019 Entered: 10/02/2019 16:49:19  Page 53 of
5 - Split up due to file size)    Page 26 of 29

**533**

(a)     The Parties agree that following the Closing of the Transaction, they shall cooperate to facilitate the ownership transition of the Business and the Acquired Assets to the Buyer by taking such actions and executing such documents as may be necessary and appropriate for such purpose. Buyer shall cooperate with Seller by making available to Seller upon its reasonable request and upon reasonable notice and for reasonable time periods, former Seller personnel employed by Buyer who have specific and unique knowledge of Seller's pre-Closing operations such that their assistance would be reasonable and necessary to enable Seller to complete its disclosure statement and plan of reorganization in the Bankruptcy Case and to otherwise substantially comply with the requirements of the Bankruptcy Code. The Parties agree to negotiate a reasonable compensation arrangement pursuant to which Seller shall pay Buyer for the reasonable value of the time expended by such personnel for Seller's benefit.

(b)     Notwithstanding Seller's assignment of all its prior and current workers compensation Insurance Policies to Buyer, Buyer shall cooperate with Seller as necessary to facilitate the transition to Buyer the processing and administration of claims actually or potentially covered under such workers compensation Insurance Policies for acts or occurrences arising prior to the Closing Date.

**7.12.    Non-Union Pension Plan.** On or before the Closing Date, Seller shall file with the IRS a submission under the Voluntary Correction Program ("VCP") to correct errors identified in the 2011 restatement of the Non-Union Pension Plan. To the extent the IRS disqualifies the Non-Union Pension Plan and seeks to impose taxes (including penalties and interest) or other costs by reason thereof, or discovers and asserts any other qualification issues arising from occurrences and circumstances prior to the Closing, or seeks to impose penalties or costs on the Plan sponsor by reason thereof, Buyer shall assume and pay the same.

## ARTICLE VIII

## EMPLOYEE MATTERS

**8.01    Employees.**

(a) <u>Rehired Employees</u>.

(i)     From the Agreement Date and only so long as the Buyer is not in breach hereof, Seller shall cooperate with Buyer and permit Buyer to (i) meet with employees of the Seller at such times as Buyer shall reasonably request, (ii) speak with such employees who are being considered for employment by Buyer, (iii) distribute to such employees such forms and other documents relating to potential employment by Buyer (including an incentive compensation package to certain members of management) after the Closing Date as Buyer may reasonably request and (iv) permit Buyer to review personnel files and other relevant employment information regarding employees of the Seller.

(ii)     As of the Closing Date, Buyer will have arranged the ability to offer to rehire, in Buyer's sole discretion, all or part of the employees of Seller. Seller will provide a complete list of all of their current employees with an indication of which employees are represented by the Union. Without limiting Buyer's discretion, one day after entry of the

Case 19-40057   Doc 225-5 Filed 10/02/2019 Entered 10/02/2019 14:49 BR (Page 54 of
5 - Split up due to file Size)     Page 27 of 29                                        **534**

Sale Order, Buyer shall provide Seller with approximate lists of the number and categories of employees to be offered employment. Any negotiations or discussions with members of the Union or the Union Representative after the Closing Date shall be conducted according to the requirements of the Collective Bargaining Agreement and applicable law. The employees who accept Buyer's offer are referred to as the "Rehired Employees".

        (iii)     To the extent not prohibited under applicable law, following the Closing Date, Seller shall make available to Buyer such non-confidential data in personnel records of Rehired Employees as is reasonably necessary for Buyer to transition such Rehired Employees into Buyer's records.

        (iv)     On the Closing Date, Seller shall pay to its employees, or reserve for payment, the portion of the payroll and such other amounts as Seller is liable (including, without limitation, applicable payroll taxes and amounts owed under Union Benefit Plans) that first comes due following the Closing Date that relates to services performed by its employees prior to the Closing Date. If reserved, such amount shall be paid in the next payroll coming due.

        (v)     Effective immediately before the Closing, Seller shall terminate, at its sole cost and expense, the employment of the Rehired Employees. Each Rehired Employee who is not otherwise participating in the Union Benefit Plans shall be eligible to participate in all of Buyer's employee benefit plans in accordance with the terms of those plans to the same extent and in the same manner as new employees of Buyer, or Buyer may permit or require those Rehired Employees to continue to participate in the Assumed Plans.

        (vi)     Except as otherwise specifically set forth herein, Seller shall have no responsibility whatsoever for any liabilities or obligations which relate in any way to such Rehired Employee's employment service with Buyer.

    (b) Excluded Employees. Buyer shall have no obligation to offer employment to any employee listed on Schedule 8.01(b) (the "Excluded Employees"), but may hire them. Buyer may amend Schedule 8.01(b) from time to time on written notice to Seller; provided that such Schedule 8.01(b) shall be finalized no later than one day prior to the Closing Date. If an Excluded Employee is hired by Buyer, he or she is no longer an Excluded Employees and becomes a Rehired Employee. The Excluded Employees and all obligations to the Excluded Employees shall remain the sole responsibility of Seller, including, without limitation, all severance, constructive notice or other costs under any contract, agreement or understanding and any applicable federal, state, county, city, municipal or other laws, statutes, rules, regulations, orders, consent decrees, permits or licenses in connection with the Excluded Employees.

## ARTICLE IX

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

    **9.01**    **Conditions to Closing Applicable to All Parties.**

    (a)    Order. As a condition to Closing, the Bankruptcy Court shall issue an order (the "Sale Order"), which order shall be final and non-appealable and not be subject to any

Case 19-40053   Doc 225-5   Filed 10/02/2011   Entered 10/02/2011 14:49   Page 28 of
5 - Split up due to file size)   Page 28 of 29

535

stay (unless the Parties waive the requirement that the Sale Order be final and non-appealable), and which shall confirm the sale of the Acquired Assets to the Buyer, the assignment of the Assumed Contracts to the Buyer, and authorization of the Transaction consistent with the terms of this Agreement, in form and content reasonably satisfactory to Buyer. In the event that entry of the Sale Order is appealed, Seller and Buyer shall use their respective reasonable efforts to defend such appeal.

(b) <u>Conditions to the Obligations of Buyer and Seller</u>. The obligations of Buyer and Seller to consummate the Transaction shall be subject to the satisfaction, or waiver by such Party, at or prior to the Closing Date, of the condition that there shall be no (i) suit, action or other proceeding threatened or brought by any Governmental Entity which seeks to restrain or prohibit in any material respect the consummation of the Transaction; or (ii) injunction, stay, order, judgment or decree in effect and issued by any Governmental Entity which restrains or prohibits in any material respect the consummation of the Transaction.

(c) <u>Notice and Opportunity to Cure</u>. If on the Closing Date any of the conditions set forth in this Article IX are not satisfied, then the Party whose obligation to perform hereunder is subject to such condition shall provide written notice to the other Party, and if such condition is not satisfied within three business days of receipt of such notice, then the Party giving notice shall have the right to terminate this Agreement by written notice given prior to the Closing. If such notice of termination is given by Buyer, the Good Faith Deposit shall be immediately refunded to Buyer.

**9.02 Conditions to the Obligations of Seller.** The obligations of Seller to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a) <u>Representations and Warranties; Covenants</u>. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date. Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on Closing.

(b) <u>Buyer Deliveries</u>. Seller shall have received from Buyer the deliverables referred to in Section 4.01(a) in form and substance reasonably satisfactory to Seller;

(c) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.

**9.03 Conditions to the Obligations of Buyer.** The obligations of Buyer to consummate the Transaction shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties; Covenants</u>. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Agreement Date and on the Closing Date. Representations and warranties that are made as of an earlier date shall be true and correct as of such earlier date and on the Closing Date.

Case 19-40057 Doc 225-5 Filed 10/02/20 Entered 10/02/20 13:46:49 Page 536 of 698

5 - Split up due to file size)    Page 29 of 29

536

(b)    Bankruptcy Court Approval.    The Bankruptcy Court shall have entered each of the Bidding Procedures Order and the Sale Order in form and content reasonably acceptable to Buyer which as of the Closing Date shall be final and non-appealable and not subject to stay unless the Buyer waives the requirement that the Sale Order be final and non-appealable.    Among other things, the Sale Order must (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Acquired Assets to Buyer on the terms set forth here, including that such sale is free and clear of Encumbrances and claims (except with respect to the Assumed Liabilities), with such Liens, Encumbrances and claims to attach only to the proceeds of the sale; and (C) the performance by Seller of its obligations under this Agreement; (ii) authorize and direct Seller to assume and assign to Buyer the Assumed Contracts, and Intellectual Property Assignments pursuant to Section 365 of the Bankruptcy Code; (iii), find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and that the Buyer is entitled to have the protections afforded by that section; (iv) contains a finding that reasonable and adequate notice of the sale and transfer of the Acquired Assets to Buyer, and assumption and assignment of the Assumed Contracts to the Buyer, has been provided to all parties required to be given notice under the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of California; (v) contains a finding that neither Seller nor Buyer has engaged in any conduct that would cause or permit the sale of the Acquired Assets to be avoided under Section 363(n) of the Bankruptcy Code; (vi) bars any third parties from asserting claims (including any claims for successor liability, including, without limitation, claims arising from unassumed unexpired leases or executory contracts), Liens or Encumbrances of any kind or nature against Buyer or the Acquired Assets that arose prior to Closing; and (vii) provides that the Sale Order is binding on any and all successors and assigns, including any trustee appointed after entry of the Sale Order pursuant to Sections 701 or 702 of the Bankruptcy Code.    The Sale Order shall be in full force and effect.

(c)    Sale Order.    Seller shall have delivered to Buyer (A) a certified copy of the Sale Order and (B) copies of all affidavits of service of the Sale Motion seeking the Sale Order or notice of such motion filed by or on behalf of Seller;

(d)    Assumed Contracts.    All of the Assumed Contracts shall be in full force and assignable to, and assumable by, Buyer without the consent of the other party thereto, pursuant to Section 365 of the Bankruptcy Code, or the required consents with respect thereto shall have been obtained. Buyer shall exert reasonable efforts to obtain any third party consents required for the assignment of the Assumed Contracts to Buyer. Seller shall reasonably cooperate in Buyer's efforts to obtain such consents.

(e)    Seller Deliveries.    Buyer shall have received from Seller the deliverables referred to in Section 4.01(b) in form and substance reasonably satisfactory to Buyer.

(f)    No Material Changes In Business, Acquired Assets.    There shall have been no change in the operation or use of the Business, the Acquired Assets or the Real Property that is reasonably likely to have a Material Adverse Effect on the Business, the Acquired Assets or the Real Property.    Seller shall continue to operate in the ordinary course, including without limitation backlogs within ordinary levels, orders met with ordinary timeliness, working capital being maintained at ordinary levels, an absence of material customer order cancellation.

Case: 19-44057    Doc# 85-5    Filed: 10/02/20    Entered: 10/02/20 13:34:49    Page 37 of
of Five)    Page 1 of 42
537

(g)     <u>Import Castings In Transit.</u>  Seller's import castings in transit as listed on the Accrued Expenses Breakdown in the Cleary Gull data room are not in the possession of Seller, have not already been sold, and have customer orders for 100% of the particular parts.

(h)     <u>Lease Of Real Property.</u>  Buyer shall have entered into a "triple net" lease of the Real Property with Berkeley Properties, LLC, including monthly rent of $89,544.00, a 15-year term with 5-year extension option in the form and on the terms and conditions described in <u>Exhibit 9.03(h)</u> hereto ("<u>Lease</u>").  All representations and warranties of the Landlord under the Lease shall be true and accurate in all material respects as of the Closing Date.  Beginning on the Agreement Date to the Closing Date, Buyer shall reasonably cooperate with Seller's attempt to obtain all certificates of occupancy and zoning certificates necessary to take occupancy and continue operations as a steel foundry from and after the Closing Date.

(i)     <u>Real Property Contamination.</u>  In the event that testing is conducted on behalf of Buyer of the environmental condition of the Real Property owned by Berkeley Properties, LLC under Section 7.06, Buyer shall have received environmental testing results for the such Real Property which (i) conclude that such Real Property is not contaminated (other than any contamination identified in the Phase I or Phase II testing reports previously obtained by the Company and disclosed to Buyer), or (ii) concludes such Real Property is contaminated (other than contamination identified in such Phase I and Phase II testing reports) and the estimated costs of remediation are less than $750,000 provided in such case that Seller either assumes the obligation to remediate such contamination at Seller's expense, or reduces the Purchase Price in the amount of the estimated remediation costs.

(j)     <u>Real Property Condition.</u>  In the event that testing is conducted on behalf of Buyer of the physical condition of the Real Property owned by Berkeley Properties, LLC, under Section 7.06, Buyer shall have received inspection reports for the such Real Property which notes conditions in need of repair, rehabilitation or replacement and the aggregate amount thereof is less than $750,000.  Any cost attributable to repair, rehabilitation or replacement of a condition identified in the Phase I or Phase II testing reports described in Section 9.03(i) shall be disregarded for purposes of determining the aggregate amount of required repair, rehabilitation or replacement costs.   For purpose hereof any item of repair assumed by Berkeley Properties LLC under the Lease shall be excluded from the aggregate amount of estimated repair items.

(k)     <u>Non-Union Pension Plan.</u>  Seller shall pay to the Non-Union Pension Plan, all amounts necessary to meet the outstanding minimum contribution requirements for the Non-Union Pension Plan with respect to the plan ending March 31, 2014, the estimated amount of which is $760,000.

<div align="center">

**ARTICLE X**

**MISCELLANEOUS**

</div>

**10.01  Survival of Representations, Warranties and Covenants.** The representations and warranties of Buyer and Seller contained in this Agreement and the covenants and agreements of Buyer and Seller contained in this Agreement shall survive for a period of ninety (90) days following the Closing Date and any claim of breach by either Party shall made in

Case: 19-44057   Doc# 255-5 Filed: 10/02/20  Entered: 10/02/20 13:34:49   Page 538 of 699 (Part Two of Five)   of Five)   Page 2 of 42

**538**

writing delivered to the breaching Party on or before the end of such ninety (90) day period. Any dispute arising out of a claimed breach shall be submitted to and resolved by the Bankruptcy Court pursuant to Section 10.08 hereof. Any amount determined to be due to Buyer (either by agreement of the Parties or by order of the Bankruptcy Court) on account of any breach of a representation, warranty or covenant by Seller shall be paid to Buyer through a reduction in the amount of rent otherwise payable by Buyer to Berkeley Properties LLC under the Lease until the amount of such rent abatement equals the amount determined to be due to Buyer, after which the rent under the Lease shall be fully payable pursuant to the Lease terms. Buyer's sole and exclusive remedy after the Closing Date for any Seller's breach of a representation, warranty or covenant shall be such rent abatement. The Lease shall provide for Berkeley Properties LLC's consent to and recognition of Buyer's rights of offset and rent abatement hereunder.

**10.02  No Third-party Beneficiaries.**  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

**10.03  Entire Agreement.**  This Agreement (including the exhibits, schedules and Disclosure Schedules referred to herein) and the Sale Order constitutes the entire agreement between the parties and supersedes any prior understandings, agreements, or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof or thereof.

**10.04  Succession and Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that nothing herein shall prohibit the assignment of Buyer's rights and obligations) to any direct or indirect subsidiary or affiliate (formed or to be formed).  No such Buyer assignment shall relieve it of its obligations under this Agreement prior to the Closing. From and after the Closing and assuming payment in full of the Purchase Price, Speyside Fund, LLC is released from further liabilities and obligations hereunder, and its assignee subsidiary shall be solely liable for the obligations of the Buyer.

**10.05  Counterparts; Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Signatures of the parties transmitted by facsimile or by electronic media or similar means shall be deemed to be their original signature for all purposes.

**10.06  Headings.**  The section headings contained in this Agreement are inserted for convenience and reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**10.07  Notices.**  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two (2) Business Days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

Case: 19-44053    Doc# 355-5  Filed: 10/02/20  Entered: 10/02/20 13:34:49  Page 39 of
                                      (Part 4 of Five)  Page 3 of 42                                  **539**

If to The Seller:

Pacific Steel Casting Company
c/o Katie Delsol
85 Lakeside Drive
Corte Madera, CA 94925
Phone:
Facsimile:

Copy to:

Michael Malter, Esq.
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050
Phone: 408-295-1700
Facsimile: 408-295-1531
Email: michael@bindermalter.com

and

Stephen A. Dennis, Esq.
Thoits, Love, Hershberger & McLean
285 Hamilton Avenue, Suite 300
Palo Alto, CA 94301
Phone: 650-327-4200
Facsimile: 650-325-5572
Email: sdennis@thoits.com

If to Buyer:

Speyside Fund, LLC
Attn: Jeffrey Stone
55 Bridge St.
Lambertville, NJ 08530
Phone: 800-897-9721
Facsimile: 855-269-3979

Copy to:

Gary Kaplan, Esq.
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Phone: 415-954-4940
Facsimile: 415-954-4480
Email: gkaplan@fbm.com

Case: 19-44057   Doc# 355-5   Filed: 10/02/20   Entered: 10/02/20 13:44:49   Page 5 of
(Part 4 of Five)   Page 4 of 42

540

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it is actually received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

**10.08  SUBMISSION TO JURISDICTION.**  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION,

**10.09  Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California, and where applicable, the Bankruptcy Code.

**10.10  Amendments and Waivers.**  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer, the Seller.   No amendment of any provision of Section 7.10 affecting the treatment of the Multiemployer Plan hereunder, shall be made without the written consent of the Multiemployer Plan.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

**10.11  Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  To the extent legally permissible, any illegal, invalid or unenforceable provision of this Agreement shall be replaced by a valid provision that will implement the commercial purpose of the illegal, invalid or unenforceable provision.

**10.12  Fees and Expenses.**  Except as otherwise provided in the Agreement, each Party shall bear the fees, costs and expenses incurred by it, in connection with or in anticipation of this Agreement and the consummation of the Transaction.  In the event of the bringing of any action, Bankruptcy Court proceeding or suit by a Party against another Party by reason of any breach of any of the covenants or agreements or any material inaccuracies in any of the representations and warranties on the part of the other Party arising out of this Agreement, the prevailing Party in such action, Bankruptcy Court proceeding or suit, shall be entitled to have and recover of and from the other Party all costs and expenses of suit, including reasonable attorneys' fees.

Case: 19-44057   Doc# 225   Filed: 10/08/20   Entered: 10/08/20 14:49   Page 541 of
of Five)   of 42    Page 5 of 42

**541**

**10.13  Construction.**   The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

**10.14  Fair Consideration.**   The Parties acknowledge and agree that the Purchase Price represents fair consideration and reasonable equivalent value for the sale and transfer of the Business and Acquired Assets, and the Transaction, covenants, and agreements set forth in this Agreement, which consideration was agreed upon as the result of arm's-length good-faith negotiations among the Parties and their respective representatives.

**10.15  Incorporation of Schedules.**   The Schedules and the Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**10.16  Gender and Number.**   When the context of this Agreement requires, the general of all words shall include the masculine, feminine, and neuter, and the number of all words shall include the singular and plural.

**10.17  No Consequential or Punitive Damages.** NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**10.18  Time of Essence.**   Time is of the essence of each and every term, condition, obligation and provision hereof.

**10.19  Waiver.**   Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such Party. No failure on the part of any Party to exercise, and no delay in exercising any right, power or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by any such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by any Party of any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _Katie Delsol_

Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: _____

Title: _____

Case 19-44057 Doc# 215 Filed 10/06/20 Entered 10/06/20 12:04:49 Page 543 of 699
Case 19-44057 Doc# 221-5 Part 5 (Exhibit 21-2 Continued to Exhibit 22-9 (Page 2 of Five) of Five) Page 7 of 42
543

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _____

Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____

Name: Jeffrey A. Stone

Title: Managing Director, Member

Case: 19-44005   Doc# 9515  Filed: 10/06/20  Entered: 10/06/20 12:04:49   Page 544 of
of Five)  Page 8 of 42   699

**544**

## Exhibit A

### Definitions

**Certain Definitions.** The following terms, as used in this Agreement, have the following meanings:

"2013 Year-end Financial Statements" is defined in Section 5.01(f).

"2014 Year-end Financial Statements" is defined in Section 5.01(f).

"Acquired Assets" is defined in Section 2.01(a).

"Agreement Date" is defined in the first paragraph of this Agreement.

"April 30, 2014 Interim Financial Statements" is defined in Section 5.01(f).

"Assumed Contracts" is defined in Section 2.04(a).

"Assumed Liabilities" is defined in Section 2.03(b).

"Assumed Plan" means a Benefit Plan assumed by the Buyer.

"Bankruptcy Case" is defined in Recital B.

"Bankruptcy Code" is defined in Recital B.

"Bankruptcy Court" is defined in Recital B.

"Benefit Plans" means all plans maintained, funded or administered by Seller for the benefit of Seller's employees, including health, dental, vision, long-term disability, life insurance policy, 401(k) plans, and pension plans.

"Bidding Procedures Order" is defined in Section 7.02(a).

"Break-up Fee" is defined in Section 7.03.

"Business" is defined in Recital A.

"Buyer" is defined in the first paragraph to this Agreement.

"Buyer's Audited Financial Statements" is defined in Section 6.01(d).

"Buyer's Financial Statements" is defined in Section 6.01(d).

"Buyer's Interim Financial Statements" is defined in Section 6.01(d).

Case 19-44057   Doc# 225-5   Filed 10/06/20   Entered 10/06/20 14:49:27   Page 545 of
of Five)   Page 9 of 42
697

**545**

"Cash" and "Cash Equivalents" means currency, coins, checks received but not yet deposited, checking accounts, petty cash, savings accounts, money market accounts, and short-term, highly liquid investments with a maturity of three months or less at the time of purchase such as U.S. treasury bills and commercial paper.

"Closing Date" is defined in Section 2.01(a).

"Collective Bargaining Agreement" means the Agreement between Pacific Steel Casting Company and Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union and establishes Seller's obligation to contribute to the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust during the period March 21, 2011 through March 15, 2015.

"Contracts" means all contracts, licenses, sublicenses, agreements, commitments, leases, arrangements, instruments, guaranties, bids and proposals to which the Seller is a party and relating to the Business.

"Cure Amounts" is defined in Section 2.04(b).

"Debtor" is defined in the first paragraph of this Agreement.

"Encumbrances" means any interest, claim, Lien, mortgage, pledge, security interest, obligation, encumbrance, lien (statutory or other), liability, charge, lease, covenant, easement, option, right of others, hypothecation, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise), whether imposed by agreement, understanding, law, equity, or otherwise. .

"Environmental Claim" means all liabilities, damages, obligations, claims or losses of any kind whatsoever imposed, incurred or arising from or under any Environmental Law or resulting from the presence of any Hazardous Substance.

"Environmental Laws" means any federal, state, local or foreign statute, law, ordinance or promulgated rule, regulation, code or directive, any duties imposed under common law, any judicial or administrative decree, order or judgment (whether or not by consent), any request or demand from a Governmental Entity, or any provision or condition of any permit, license or other operating authorization relating to (i) the protection of the environment or human, worker or public health and welfare, or the protection of the health and safety of any workers, employees, and the public or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling or actual or potential release, discharge or emission of any Hazardous Substance, including but not limited to the Clean Water Act, the Toxic Substances Control Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the River and Harbor Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Toxic Substances Control Act, the Federal Mine Safety and Health Act, the Occupational Safety and Health Act, and any state or local law, ordinance, rule, regulation, code or directive regulating the same or similar matters.

"Environmental Permits" means any and all Permits issued in accordance with or pursuant to any Environmental Law.

Case 19-44053   Doc# 215-5 Filed 10/08/20   Entered 10/08/20 14:49:31   Page 546 of 699 (Volume Two of Five)   Page 10 of 42    546

"ERISA" is defined in Section 7.10(a).

"Excluded Assets" is described in Section 2.02.

"Executory Contract" is defined in Section 2.04(a).

"Financial Advisor" is defined in Section 3.01(c)(ii).

"Financial Statements" is defined in Section 5.01(f).

"GAAP" is defined in Section 5.01(f).

"Good Faith Deposit" is defined in Section 3.01.

"Governmental Entity" means any federal, state, municipal, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental or quasi-governmental or regulatory authority, agency, commission body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"Hazardous Substances" means any substance, waste, contaminant, pollutant or material regulated or governed by any Environmental Law, including, but not limited to, (a) all substances, wastes, contaminants, pollutants and materials defined or designated as hazardous, dangerous or toxic pursuant to any applicable Environmental Law and (b) asbestos, mold, polychlorinated biphenyls ("PCBs") and petroleum.

"Initial Credit Bid" is defined in Section 3.01(b)(i).

"Insurance Policies" is defined in Section 5.01(o).

"Intellectual Property" means (i) inventions, ideas or conceptions of potentially patentable subject matter, whether or not reduced to practice, whether or not yet made the subject of a pending patent application or applications, (ii) patents and patent applications (including any continuations, continuations-in-part, divisionals, reissues, renewals and applications for any of the foregoing, (i) and (ii) collectively, "Patents"), (iii) trademarks, service marks, trade dress, designs, logos, trade names, corporate names, and any derivative, thereof, used by Seller in connection with the operation of the Business, and general intangibles of like nature whether or not registered, including all common law rights and registrations and applications for registration thereof, together with all goodwill relating to the foregoing (collectively, "Trademarks"), (iv) copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by multinational treaties or conventions (collectively, "Copyrights"), (v) computer software, including, without limitation, source code, operating systems and specifications, data, data bases, files, documentation and other materials related thereto, (vi) trade secrets and confidential, technical or business information (including, without limitation, ideas, inventions (whether or not patentable) formulas and compositions), (vii) technology (including, without limitation, know-how and show-how), production processes and techniques, research and development information, drawings, specifications, designs, sketches, design archives, plans, proposals, technical data, copyrightable works, financial, marketing, and business data, pricing and cost information, business and marketing plans and customer and

Case 19-44057   Doc# 251   Filed 10/06/20   Entered 10/06/20 14:49:27   Page 547 of 699 (Volume Two of Five)   Page 11 of 42                                    547

supplier lists and information, whether or not confidential, whether current or historical, (viii) all web sites, and domain names, and all content contained therein, (ix) all rights to obtain and apply for Patents, and to register Trademarks and Copyrights, (x) copies and tangible embodiments of all of the foregoing, in whatever form or medium, (xi) all rights to sue, recover and retain damages (and costs and attorneys' fees) for present and past infringement of any of the Intellectual Property hereinabove set out, and (xii) all common law rights with respect to the Intellectual Property hereinabove set out.

"Interim Financial Statements" is defined in Section 5.01(f).

"IRC" is defined in Section 5.01(q)(ii).

"Inventory" means all of Seller's inventory, including products, works in process, processed parts, finished goods, raw materials and components intended for sale wherever located.

"IRS" is defined in Section 3.01(f).

"Knowledge" means the actual knowledge of any executive officer of the Seller, or any executive officer of the Buyer, as the case may be.

"Lease" is defined in Section 9.03(h).

"Liabilities" is defined in Section 2.03(a).

"Liens" means any claim, lien (as defined in Section 101(37) of the Bankruptcy Code), condition, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, covenant, restriction, reservation, agreement of record, restriction on use or voting (in the case of any security interest) preference, tax (including foreign, federal, state or local income, gross receipts, sales, use, ad valorem, gains, profits, excise, franchise or other taxes, fees, levies, or other duties or assessments imposed by any Governmental Entity), or any other encumbrance of any nature whatsoever.

"Material Adverse Effect" shall mean any event, change, condition or effect which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or is reasonably likely to be, materially adverse to the Acquired Assets, the Real Property or the Business taken as a whole or to the Transaction, other than events, changes, conditions or effects (i) affecting the United States economy generally, (ii) the industry in which Seller operates, in each case without a disproportionate impact on the Business or (iii) arising from the commencement of the Chapter 11 case or any action ordered by the Bankruptcy Court and approved by Buyer.

"Minimum Overbid" is defined in Section 7.02(a).

"Multiemployer Plan" is defined in Section 7.10(a).

"Net Working Capital" means the sum of the values of Seller's trade accounts receivable, net of any allowances for doubtful accounts or unprocessed returns, and Inventory, net of reserves. Accounts receivable shall be valued in accordance with GAAP, consistently applied, and shall

Case 19-04053   Doc# 2215 Filed 10/06/20   Entered 10/06/20 14:49:37   Page 13 of 42 (Page Two of Five)   548

satisfy all of the representations and warranties in Section 5.01(h) in order to be included. To avoid doubt, inter company accounts and accounts receivable due from affiliates shall be excluded. Inventory of domestic castings (work in process and finished goods) shall be valued in accordance with the amounts per ton for each category identified on Schedule 3.01(c)(ii), inventory of import castings and raw materials shall be determined in accordance with GAAP, consistently applied. All Inventory shall be undamaged and in condition for use or sale in the ordinary course. Inventory reserves shall be determined in accordance with GAAP, consistently applied. Goods which have been paid for but have not been delivered by the Closing Date constitute Inventory for purposes of calculating Net Working Capital.

"Non-Union Pension Plan" means the single employer defined benefit pension plan provided for certain of Seller's current and former non-union employees entitled the Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (Tax ID 94-6270646).

"PBGC" is defined in Section 7.10(b).

"Party" and "Parties" are defined in the first paragraph to this Agreement.

"Pension Plans" means collectively the Multiemployer Plan and the Non-Union Pension Plan.

"Permits" is defined in Section 2.01(a)(vi).

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a Governmental Entity (or any department, agency, or political subdivision thereof).

"Petition" is defined in Recital B.

"Petition Date" is March 10, 2014.

"Purchase Price" is defined in Section 3.01(b).

"Purchase Price Adjustment Statement" is defined in Section 3.01(c)(ii).

"Real Property" is defined in Section 5.01(k).

"Rehired Employees" is defined in Section 8.01(a)(ii).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Substance (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Substances through or in the ambient air, soil, surface or ground water, or property.

"Sale Order" is the order by the Bankruptcy Court as described in Section 9.01(a).

"Seller" is defined in the first paragraph of this Agreement.

Case 14-44053 Doc# 225 Filed 10/06/20 Entered 10/06/20 14:49 Desc Main Document (Part 1 of Five) Page 13 of 42

549

"Seller Disclosure Schedules" is defined in Section 5.01.

"Taxes" all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental, custom duty, capital stock or other equity, excise, real property, personal property, water and sewer charges, municipal utility district, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"Tax Return" mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction" is defined in Recital C.

"Union Benefit Plans" means the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust and the CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan.

"Union" means Local 164B of the Glass, Molders, Pottery, Plastics & Allied Workers International Union.

Case: 19-41053    Doc #: 255-1 Filed: 10/02/20   Entered: 10/02/20 13:34:49  Page 55 of
of Five)    Page 14 of 42
699

550

## SCHEDULE 2.02(g)

### Deposits and Prepaid Amounts Funded by PS

| Vendor | Amount |
|---|---|
| | |
| Pacific Gas and Electric | $849,786 |
| Occidental Energy Marketing | 120,000 |
| Airgas USA | 20,000 |
| AT&T | 18,110 |
| EBMUD | 4,866 |
| Sprint | 4,118 |
| Cogent | 2,400 |
| Chang, Ruthenberg & Love, P.C | 4,524 |
| Binder & Malter | 450,000 |
| BPM | 50,000 |

164178.591857v4

<u>**SCHEDULE 2.03(b)(iii)**</u>

**Buyer assumed Benefit Plans**

<u>MEDICAL</u>
Anthem Blue Cross of California Preferred Direct Access
Policy #253089
Kaiser Permanente – Northern California
Policy Number: #37173

<u>DENTAL</u>
Reliance Standard
Policy Number: #136-4050-1

<u>LONG-TERM DISABILITY</u>
Reliance Standard
Policy Number: #120499

<u>LIFE & ACCIDENTAL DEATH & DISMEMBERMENT</u>
Reliance Standard
Policy Number: #146828

<u>VISION</u>
EyeMed Vision Care
Policy Number: 9681503

<u>WELFARE PLAN</u>
CMTA-Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Welfare Plan

<u>401(K) PLAN</u>
Pacific Steel Casting Company Retirement Plan (TIN 94-1067684)

<u>PENSION PLAN</u>
Pacific Steel Casting Company Defined Benefit Pension Plan and Trust (TIN 94-6270646)

CMTA - Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust, (TIN 94-6129501)

## SCHEDULE 2.03(b)(iii)

**Retirees under the Non-Union Pension Plan, whose termination date occurred after April 1, 2011 and prior to the Closing Date:**

| Payroll Name | Hire Date | Termination Date |
|---|---|---|
| Welch, Betty Jane | 04/06/1994 | 01/10/2012 |
| Yost, Steven | 05/12/1998 | 03/28/2013 |
| Dias, Fernando C. | 09/29/1980 | 03/31/2012 |
| Emmerichs, Horst Joe | 11/11/1963 | 03/31/2011 |
| Lee, Douglas M | 08/01/1975 | 01/15/2012 |
| Neely, Robert Ward | 03/12/1979 | 12/31/2013 |
| Patterson, John Carlton | 01/05/1970 | 12/31/2013 |
| Scott, Barry George | 06/10/1996 | 08/31/2013 |
| Soares, Richard S | 06/15/1964 | 12/31/2013 |
| Soto, Marco A. | 10/15/1990 | 03/31/2013 |

## SCHEDULE 2.03(b)(iv)

## Transferable licenses, permits, etc.

1. Air – 3 Bay Area Air Quality Management District permits; one for each plant

2. Storm water – General Industrial Storm Water Permit

3. Industrial Water – East Bay Municipal Utility District Discharge Permit

4. Hazardous Materials, Universal Waste, Hazardous Waste Generator – City of Berkeley Unified Program Consolidated Permit and Registration

5. Berkeley Business License

## SCHEDULE 2.03(b)(v)

## Employees With Accrued and Unpaid Vacation Benefits

**PACIFIC STEEL CASTING COMPANY**      CHB
**Accrued Vacation**      6/17/2014
May 31, 2014      4:50:00

| Name | Vacation Liability |
|---|---|
| Ali, Rajak M. | $ 5,689.80 |
| Anand, Ajay K | 4,663.76 |
| Anand, Lalit K. | 18,034.60 |
| Anish, Thottathil V. | 14,664.40 |
| Aragon, Robert Jess | 5,620.31 |
| Benge, Ronald | 3,606.00 |
| Bridges, Charles H | 20,913.06 |
| Costa, Ryan Paul | 4,642.87 |
| Davi, Fred Vincent | 24,357.03 |
| Delsol, Catherine B | 27,787.35 |
| Droesch, David C. | 3,029.00 |
| Emmerichs, Mike G | 23,293.71 |
| Emmerichs, Tom | 13,019.45 |
| Ferreira, Jose A. | 13,796.50 |
| Ferrell, Nettie | 9,248.46 |
| Fortuna, Antonio F. | 14,794.94 |
| Garcia, Armand Casenillo | 5,275.35 |
| Garlieb, Christopher | 14,783.37 |
| Hajiaghazadeh Marandi, Elmira | 1,096.30 |
| Ledesma, Ericka C. | 1,129.88 |
| Ledesma, Marc G. | 6,931.90 |
| Look, Steven R | 12,056.88 |
| Pepe, Emmanuell F. | 6,750.07 |
| Petersen, Ross T. | 13,826.97 |
| Polvi, David | 8,941.95 |
| Rivera, Vicky S. | 1,853.34 |
| Rodriguez, Paola P. | 2,573.97 |
| Roytfeld, Rita | 7,774.28 |
| Saeteurn, Meuy C. | 4,651.14 |
| Scott, Barry John | 5,408.75 |
| Schroeder, Efrain | 3,503.83 |
| Skeen, Steven E | 2,928.24 |
| Silva, Paul Tony | 11,467.56 |
| St. Andrew, David F. | 5,582.25 |
| Standafer, David C | 28,404.82 |
| Stevens, David A. | 11,171.80 |
| Thulasiraman, Thirumudi | 9,042.66 |
| Wang, Cunmin | 10,646.50 |
| Woodmansee, Joshua P | 3,081.36 |
| | |
| Subtotal - Salaried | $ 386,244.31 |
| | |
| Alvarenga, Jeneffer | $ 2,600.00 |
| Bandy, Ronald S | 3,771.36 |
| Bonini, Jason R. | 843.78 |
| Diaz-Rivas, Jesus | 3,105.00 |
| Davis, Tony J | 8,123.43 |

164178.591857v4

| | |
|---|---:|
| Doran, Paul M | 2,240.00 |
| Ferguson, Gene E.. | 1,277.50 |
| Franco, Ricardo G. | 2,840.12 |
| Jimenez, Guadalupe | 1,908.00 |
| Ling, John | 1,540.00 |
| Lopez, Jessica | 1,188.00 |
| Pacheco Cabanas, Veronica | 1,152.00 |
| Pan, Baohua | 6,292.44 |
| Rodriguez Yanez, Cristobal | 6,309.28 |
| Roytfeld, Mark | 3,581.46 |
| Sayavong, Connie B. | 6,308.46 |
| Silveira, Jason M | 3,640.80 |
| | |
| Subtotal - Non-Union Hourly | $ 56,721.63 |
| | |
| Acosta, Juan | $ 1,783.39 |
| Acosta, Victor Sergio | 568.52 |
| Aguilar De Amaya, Rosa | 1,500.52 |
| Aguilar Ramos, Gonzalo | - |
| Aguilar, Santiago | 722.34 |
| Aguilera, Gonzalo V. | 5,665.30 |
| Aguilera, Leonel A. | 117.69 |
| Akauola, Ikahihifo | 1,246.50 |
| Alvarez, James | 315.60 |
| Alvarez, Jose R. | 370.06 |
| Alvarez, Luis | 705.16 |
| Alvarez, Marcus | - |
| Amaral, Jose I. | 5,154.52 |
| Amaya, Emerson | 1,467.47 |
| Amaya, Julio C. | - |
| Anglo, Marcelino D. | 752.42 |
| Applegate, William H. | 5,202.27 |
| Aranda, Jose | 2,062.05 |
| Aranda, Lorenzo | 221.18 |
| Arevalo, Jose A. | 2,633.19 |
| Arias Jr., Jose Luis | 1,069.91 |
| Arias, Benito Navarro | 4,005.94 |
| Arias, Vivian | 693.37 |
| Arriola Valenzuela, Kilder | - |
| Arroyo, Adrian | 635.58 |
| Arroyo, Richard | 1,145.43 |
| Asuncion, Isagani L. | 1,684.91 |
| Ayala Jr., Ramon | 491.14 |
| Ayala, Jose M. | 8,072.56 |
| Baca, Nicolas | 2,493.29 |
| Banda, Rudy H. | 766.68 |
| Barajas, Bryan | 1,000.60 |
| Bartolomeu, George C | 3,346.67 |
| Baxter, Leonard L | 1,378.42 |
| Bazan Mendoza, Jose L. | 698.38 |
| Benson Sr., George | 1,158.15 |
| Berber, Dionicio | 2,132.46 |
| Blanco Escalante, Efrain | 3,084.97 |
| Blaz Miranda, Pedro A. | 4,448.73 |
| Brasil, Artur | 429.10 |

164178.591857v4

Case: 19-44057   Doc# 255-1   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 556 of
699
Case: 19-44057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 20 of 42 (Part 1
of Five)   of 42

556

| | |
|---|---:|
| Brown, Moniqua | 616.53 |
| Buenrostro, Gabriel | 1,155.39 |
| Buggs, Steven J | 701.20 |
| Burke, Michael P. | 1,455.28 |
| Bustamante De Merino, Maria I. | 387.20 |
| Cabrera, Angel | 589.40 |
| Calderon Armenta, Cesar | 943.00 |
| Calderon, Jose I | 1,346.49 |
| Campos, Jose Luis | 575.30 |
| Campos-Hernandez, Armando | 3,446.25 |
| Carranza Soria, Edgar | 401.53 |
| Carreno Juarez, J Enrique | 2,978.48 |
| Carreno, Jose Francisco | 5,201.61 |
| Carrillo, Luis M. | 5,616.63 |
| Cassidy, Joseph | 584.93 |
| Castano, Alfonso | 4,305.82 |
| Castillo, Edgardo | 210.20 |
| Ceja, Guillermo | 378.18 |
| Chappelle, Kelly D. | 975.36 |
| Chavez A, Eric Jaime | 2,385.02 |
| Chen, Jia Hua | 2,440.35 |
| Contreras Saucedo, Hector M | 426.35 |
| Corena Perez, Jorge | 790.44 |
| Coria, Jose Manuel | 4,001.08 |
| Costa, Christopher D. | 108.55 |
| Costa, Edmundo R. | 2,782.51 |
| Costa, Nelson | 438.00 |
| Costa, Rui P. | 1,653.60 |
| Crouchet, Zepp | 673.07 |
| Cruz, Joel | 541.32 |
| De Leon, Hortensia | 474.12 |
| Debernardis, John M | 350.57 |
| Delacruz, Roberto | 6,310.58 |
| Delafuente, Xener | 786.64 |
| Denzler, Roland P | 2,256.79 |
| Diaz Guerra, Ma C | 2,238.16 |
| Diaz, Alfonso | 678.59 |
| Diaz, Samuel | 197.92 |
| Douglas, Christopher A. | 1,290.69 |
| Duarte, Manuel C. | 667.72 |
| Duenas, Martin | 2,837.66 |
| Duran Roman, Agustin | 869.32 |
| Duran, Javier | 1,122.33 |
| Elias Vazquez, Jorge | - |
| Equihua, Martin | 1,102.37 |
| Escalante, Manuel | 5,395.73 |
| Esparza Lopez, Salvador | 1,488.17 |
| Espinosa-Ruiz, Carlos Rafael | 388.57 |
| Espinoza, Armando | 852.48 |
| Farias Vasquez, Carlos | - |
| Faumui, Marcus | 754.92 |
| Fierro Aviles, Juan | 1,111.99 |
| Figueroa, James | 1,720.71 |
| Flores Pizano, Juan | 970.15 |
| Flores, Edward L. | 3,545.44 |

164178.591857v4

Case: 19-44053   Doc# 355   Filed 10/02/20   Entered 10/02/20 13:34:49   Page 557 of
699
Case: 19-44053   Doc# 255-1   Filed 10/02/20   Entered 10/02/20 13:34:49   (Page 557 of Five)   Page 21 of 42

557

| | |
|---|---:|
| Flores, Marco | - |
| Fonte, Mario R. | 4,388.30 |
| Fortune, Anthony C. | 437.47 |
| Frison, Phillip | 473.26 |
| Fuller, Marcus L. | - |
| Gallegos, Luis | 625.93 |
| Garay, Jose M. | 373.17 |
| Garcia Becerra, Francisco J. | 2,499.88 |
| Garcia Delgado, Jose | 634.13 |
| Garcia Delgado, Miguel A. | 3,105.41 |
| Garcia Rubio, Bulmaro | - |
| Garcia, Jaime | 554.72 |
| Garcia, Juan | 491.14 |
| Garcia, Leonel | 156.57 |
| Garcia, Luis M | - |
| Garcia, Marco | 242.61 |
| Garcia, Samuel N | 1,710.49 |
| Garcia-Maravilla, Esteban | 759.07 |
| Garcia-Rodriguez, Alfredo | 1,632.90 |
| Gaviola, Benjamin M. | - |
| Godinez, Robert Ray | 859.45 |
| Gomez M., Jorge A | 3,056.26 |
| Gomez, Francisco | 2,713.17 |
| Goncalves, Francisco L | 2,320.72 |
| Gonzalez Barboza, Guadalupe | - |
| Gonzalez Espinoza, Heriberto | 702.61 |
| Gonzalez Lopez, Cipriano | 918.58 |
| Gonzalez Sanchez, Jorge | 903.29 |
| Gonzalez, Adrian | 459.43 |
| Gonzalez, Fernando | 1,078.62 |
| Gonzalez, Lazaro | 2,536.02 |
| Gonzalez, Leandro | 2,538.04 |
| Gonzalez, Rafael | - |
| Gray, Julis | 812.03 |
| Guerrero, Jose J. | 939.64 |
| Guerrero, Marcial | 1,918.45 |
| Guzman, Hendre | 380.05 |
| Haro, Arturo | 2,182.75 |
| Haro, Jaime M. | 1,634.98 |
| Harris, Charles | 204.93 |
| Hayag, Rahfael | 1,086.71 |
| He, Yuheng | 904.04 |
| Heaton, Jan J. | 391.37 |
| Hernandez Zuniga, Daniel | 1,151.94 |
| Hernandez, Gabriel | 2,014.09 |
| Hernandez, Jorge H. | 1,490.50 |
| Hernandez, Jose J | 781.87 |
| Hernandez, Jose Luis V. | 1,703.06 |
| Hernandez, Juan M | 449.00 |
| Hernandez, Ramon | 893.20 |
| Herrera Rodriguez, Heriberto | - |
| Ho, Kam Sang | 2,169.71 |
| Huerta Mora, Lorenzo | 3,593.80 |
| Huerta Telles, Jose A. | 2,626.28 |
| Huerta, Jesus | 216.45 |

164178.591857v4

| | |
|---|---:|
| Hughes, Natasha L | 621.46 |
| Hurtado, Roberto R | 2,665.19 |
| Ingram, Piez | 2,137.10 |
| Iraheta Alvarado, Gilberto | 753.54 |
| Islas, David | 606.58 |
| Jackson, Virgil | 709.62 |
| Juan, Ulysses | 680.36 |
| Keels, Byron E. | 1,155.98 |
| Kuo, Tung | |
| Lankhamdaeng, Alounh | 4,879.29 |
| Lavanh, Von | 2,224.98 |
| Law, David T. | 3,416.26 |
| Leon, Alvaro | 452.39 |
| Leon, Jose Luis | 419.85 |
| Leon-Esparza, Abraham | 488.00 |
| Leyva Camacho, Cesar | 1,235.09 |
| Li, Bang Yang | 3,858.66 |
| Li, Ye Lian T | 5,825.49 |
| Lieu, Cuong N | 2,034.16 |
| Liong, Kie Lien | 3,226.70 |
| Loconte, Michael J. | 2,722.62 |
| Lomeli Barboza, Catalina | 1,849.85 |
| Lomeli Barboza, Federico | - |
| Lopez Jr., Jaime | 369.95 |
| Lopez Maldonado, Raul | - |
| Lopez Perez, Gabriel | 1,254.60 |
| Lopez, Refugio G. | 2,946.00 |
| Louang, Sonny | 449.09 |
| Loza Garcia, Arturo | 1,261.11 |
| Lozano, Juan A | 3,007.58 |
| Madrigal Hernandez, Jepthe | 343.98 |
| Mafuahingano, Charles | 490.67 |
| Magana, Laura L. | 495.59 |
| Magdaleno Morales, Miguel | 335.89 |
| Maldonado Chavez, Yuritzia Aide | 1,436.16 |
| Maldonado, George P. | 763.91 |
| Maravilla, Jaime | 806.23 |
| Marcelin, Romel | 1,504.72 |
| Marrero Andujar, Jose | 402.16 |
| Martinez, Carlos | 4,665.52 |
| Martinez, Pedro | 6,797.00 |
| Matts, Robert D. | 8,290.92 |
| Medina, Apolinar | 2,565.80 |
| Mejia, Eduardo | 1,048.97 |
| Melgoza, Antonio E | 3,081.90 |
| Mendoza, Jose Manuel | 29.15 |
| Miramontes-Guevara, Enrique | 2,496.88 |
| Mohamed, Kamal | 569.08 |
| Moleli, Moelala | 1,323.54 |
| Montes De Oca Ruelas, Luis | 1,739.77 |
| Montes De Oca, Antonio | 1,479.09 |
| Montoy Martinez, Edgar Adrian | 2,087.77 |
| Montoya Jr., Jaime | 1,416.76 |
| Montoya Vazquez, Francisco | 419.74 |
| Montoya, Abel V | 2,323.66 |

164178.591857v4

| | |
|---|---:|
| Montoya, Jaime | 2,220.79 |
| Montoya, Juventino V | 1,514.92 |
| Montoya, Margarito | 1,558.99 |
| Montoya-Cruz, Carlos | 349.83 |
| Mora, Aldo | 1,298.92 |
| Morales De Monico, Gloria L | 574.11 |
| Morales, Andres | 1,109.60 |
| Morales, Andres M | 1,303.60 |
| Morales, Roman | 675.13 |
| Morales, Roman | 1,261.61 |
| Moreno, Salvador | 2,578.75 |
| Moss Jr., Cecil | 325.04 |
| Munoz Lamas, Henri A | 2,202.45 |
| Munoz, Manuel | 1,087.88 |
| Murphy Jr., Willie P. | 3,651.63 |
| Navarro Mendoza, Rafael | 2,313.79 |
| Nelum, Jumaane | - |
| Neri Jimenez, Miguel | 526.29 |
| Niviris, Mark H | 1,115.43 |
| Ochoa-Rosas, Vicente | 589.19 |
| Ochoa, Antonio | 3,064.25 |
| Ochoa, Antonio | 1,672.01 |
| Ochoa, Salvador | 182.00 |
| Olmos Tarula, Guadalupe | 399.69 |
| Orozco, Michael | 761.70 |
| Ortega Aguilar, Marvin | 3,142.45 |
| Ortiz Gonzalez, Jose L | 3,584.84 |
| Ortiz, John | 1,371.22 |
| Ortiz, Jose | 2,193.13 |
| Ortiz, Jose Luis | |
| Osborne, Jonathan A | 103.64 |
| Osborne, Tyrone E | 1,057.27 |
| Osias, Rhay A. | 757.90 |
| Ouka, Brian J | 1,643.91 |
| Pacheco Pardo, Adrian | |
| Pacheco, Raymond R | 1,320.88 |
| Padilla Maciel, Alfonso | 351.35 |
| Padilla Saldana, Ernesto | - |
| Padilla Saldana, Juan | - |
| Pajarito, Cruz | 2,477.79 |
| Pak, Henryk | 1,284.81 |
| Palos Lopez, Pedro Gerardo | 493.75 |
| Paredes-Rivera, Raul | 588.21 |
| Patterson, Daniel John | 3,366.84 |
| Pedroza, Ignacio | 802.74 |
| Pedroza, Sergio | 842.08 |
| Pena Jr., Jose | 294.97 |
| Pena, Edgar | 486.28 |
| Pena, Jorge H. | 8,350.41 |
| Pepe, Frank | 1,050.17 |
| Perez, Enrique | 7,252.67 |
| Perez, Gerardo M. | 1,673.23 |
| Perez, Jose | 845.17 |
| Perez, Juan Piceno | 700.25 |
| Perez-Diaz, Faustino | 2,653.44 |

164178.591857v4

Case: 19-44057   Doc# 85-5   Filed: 10/03/20   Entered: 10/03/20 13:34:49   Page 560 of
699

Case: 19-44053   Doc# 255   Filed: 10/02/20   Entered: 10/02/20 13:15:31   (Page 1 of
Five)   Page 24 of 42

560

| | |
|---|---:|
| Phanissay, Jason | 540.15 |
| Pimentel, Gustavo | 799.80 |
| Pineda, Manuel B. | 4,260.97 |
| Pires, Delio F. | 689.30 |
| Ponce, Jesus | 298.65 |
| Prado Contreras, Francisco | 736.03 |
| Quijada, Jose E. | 5,190.77 |
| Ramirez, Adrian | 592.94 |
| Ramirez, Adriana | 517.81 |
| Ramos Jr., Antonio G | 2,455.01 |
| Ramos, Jorge | 539.81 |
| Reyes Perez, Roxana A | 1,328.29 |
| Reyes, Angel | 2,471.57 |
| Reyes, Efren | 2,089.05 |
| Reyes, Fidencio S | 111.15 |
| Reynoso Marquez, Francisco | 231.65 |
| Reynoso, Luis | 2,465.48 |
| Rivera, Andres | 3,010.08 |
| Rivera, Arnulfo | 6,525.11 |
| Roa, Eddy | 583.29 |
| Rodiles, Jose Orlando | 344.47 |
| Rodrigues, Marco P | 2,114.17 |
| Rodriguez Camacho, Armando | 947.71 |
| Rodriguez Mena, Roberto | 607.72 |
| Rodriguez, Abel | 2,407.04 |
| Rodriguez, Hernan | 264.86 |
| Rodriguez, Jesus | 3,835.85 |
| Rodriguez, Jose L. | 2,601.45 |
| Rodriguez, Jose R. | 944.88 |
| Rodriguez, Miguel A. | 2,470.61 |
| Rodriguez, Nicolas | 3,044.67 |
| Rodriquez, Roberto | 1,881.76 |
| Rojas Marroquin, Otman | 596.61 |
| Rojo Cortez, Jose Luis | 2,311.35 |
| Rojo, Jose G | 4,186.06 |
| Romero Vargas, Hector | 2,893.00 |
| Romero, David | 203.63 |
| Romo Lopez, Arturo | - |
| Romo Martin, Araceli | 491.14 |
| Romo Penaloza, Jose | 174.54 |
| Romo, Alberto | 1,093.69 |
| Rubalcava, Frank | 1,111.23 |
| Rubio N, Martin | 928.25 |
| Ruelas Hernandez, Miguel A | 614.29 |
| Ruiz, Juan | 2,590.23 |
| Sae Yang, Chan Khoun | 592.94 |
| Saechao, Chan Cheng | 758.64 |
| Saechao, Cheng Chieng | 3,466.72 |
| Saechao, Cheng Choy | 2,263.50 |
| Saechao, Kao Meuy | 3,838.12 |
| Saechao, San | 2,016.48 |
| Saechao, San Vang | 918.62 |
| Saenz, Jose G. | 498.88 |
| Saephanh, Kao C. | 726.21 |
| Saeyang, Nai Fong | 1,805.40 |

164178.591857v4

| | | |
|---|---|---|
| Salazar, Nicolas | | 6,451.42 |
| Salvador, Agustin B. | | 986.19 |
| San Juan, Marvin | | 470.47 |
| Sanchez, Antonio | | 2,926.89 |
| Sanchez, Fernando M. | | 1,521.27 |
| Santibanez, Eusebio | | 468.00 |
| Santoyo, Manuel | | -2,911.19 |
| Sebastian, Gary | | 696.31 |
| Sebastian, Wilfred E. | | 332.63 |
| Sermeno, Miguel A. | | 898.98 |
| Silva Loera, Manuel | | 2,092.31 |
| Silva, Tony R. | | 2,158.77 |
| Silveira, Antonio F. | | 4,876.58 |
| Simas, Robert M. | | 2,791.47 |
| Sithideth, Bounlouam | | 2,520.68 |
| Sivilay, Ngeun | | 619.59 |
| Smith, Ivan H. | | 647.55 |
| Smith, Stanley G. | | 2,898.05 |
| Solario, Delfino | | 2,931.09 |
| Somchith, Keurt | | 7,911.71 |
| Souksamphanh, Kheun | | 234.67 |
| Suares, Fortino J. | | 1,291.12 |
| Suarez, Salvador | | 3,520.31 |
| Tam, Wing Tim | | 1,944.24 |
| Tamayo, Jose Q. | | 4,632.97 |
| Tang, Desmond C. | | 29.09 |
| Taylor, Fredrick H. | | 118.05 |
| Teixeira, Albano P. | | 4,001.40 |
| Terriquez-Hernandez, Dagoberto | | 1,017.18 |
| Thomas, Manuel | | 2,646.65 |
| Thornton, Morgan | | 1,492.85 |
| Torres Ochoa, Christopher | | 228.24 |
| Torres, Ignacio | | 5,630.35 |
| Trinh, Ryan | | 1,176.10 |
| Urtiz, Romualdo | | 1,821.76 |
| Vasquez Ayala, Jesus | | - |
| Vasquez Montoya, Rene | | - |
| Vasquez, Onofre | | 2,015.66 |
| Vaughn, Dashawn L. | | 1,053.16 |
| Vazquez, Erik | | 489.04 |
| Vazquez, Pedro | | 468.00 |
| Vega, Sergio | | 810.38 |
| Velasco, Martin F. | | 2,294.55 |
| Velazquez Guevara, Pedro A | | 1,924.92 |
| Vieira, Jose | | 1,400.05 |
| Villanueva, Marcos A | | 1,434.76 |
| Villasenor Pulido, Raul | | 3,038.68 |
| Zandoval, Salvador Navarro | | 5,166.60 |
| Zazueta, Noraceli | | 582.69 |
| Zurita, Pablo Martinez | | 3,046.20 |
| | | |
| Subtotal - Union Hourly | $ | 589,475.89 |
| | | |
| Total | $ | 1,032,441.83 |

164178.591857v4

## SCHEDULE 2.03(b)(vi)

### Accounts payable assumed by Buyer

This to be populated with Accounts Payable to PACCAR of just under $1 million, details to follow later today from Speyside.

164178.591857v4

## SCHEDULE 2.04(a)

## Executory contracts and Unexpired Leases to Assumed

ADP, Inc. - Major Accounts Agreement dated 9/25/13 for payroll and tax related services

AT&T Corp. -Master Agreement for backup data circuits

B&L Information Systems - Software Services and Hosting Agreement

Cogent Communications -Internet Access Agreement

De Lage Landen Financial Services -Leased Komats, Combilift

GE Capital - Lease of Tennant Model S30, etc.

Glass, Molders, Pottery, Plastics & Allied Workers International Union, AFL-CIO, CLC Local #164B - Collective Bargaining Agreement

Howard Robinson – Real Property Lease for Plan 2 Yard

Ingram Micro, Inc. - Software License Agreement

Kaspersky Lab, Inc. - Software License

Komatsu Forklift LLC Oakland - leased forklifts

Marlin Leasing -lease of Genie Articulating electronic boom

Microsoft - Software license

Modern Instrument Controls, Inc.  - Agreement for equipment collaboration

NMHG Financial Services - Lease of 2 Yale forklifts

Optimized Performance Technologies - Agreement for quality management system maintenance

Principal Life Insurance Co. – Real Property Lease of Oakland warehouse 725 85th Ave, Unit H, Oak, CA 94621

Ricardo E. Gomez, Inc. dba Professional Finishing  - Coating Agreement

Techordia, LLC - IT licenses, service agreements, etc.

Toyota Motor Credit Corporation – lease for forklifts

Tyco Integrated Security LLC - Alarm/security contract

VMware International Limited - Software license

## SCHEDULE 3.01(c)(ii)

## Net Working Capital

**PACIFIC STEEL CASTING COMPANY**
**Net Working Capital**
March 31, 2014 and May 31, 2014

CHB
6/17/2014
17:00:00

| | Tons at 3/31/2014 | | Notional Cost per Ton | | Total Notional Cost at 3/31/2014 |
|---|---|---|---|---|---|
| Domestic Castings – WIP | 1,187.904 | $ | 6,353 | $ | 7,546,754 |
| Domestic Castings – Finished Goods | 505.049 | $ | 7,975 | | 4,027,766 |
| Total | 1,692.953 | | | $ | 11,574,520 |

| | Tons at 5/31/2014 | | Notional Cost per Ton | | Total Notional Cost at 5/31/2014 |
|---|---|---|---|---|---|
| Domestic Castings – WIP | 1,303.594 | $ | 6,353 | $ | 8,281,733 |
| Domestic Castings – Finished Goods | 550.709 | $ | 7,975 | | 4,391,904 |
| Total | 1,854.303 | | | $ | 12,673,637 |

| | | 3/31/2014 | | 5/31/2014 | | Proposal | |
|---|---|---|---|---|---|---|---|
| Domestic Castings | $ | 11,574,520 | $ | 12,673,637 | $ | 12,673,637 | 5/31/2014 |
| Import Castings | | 529,890 | | 831,850 | | 831,850 | 5/31/2014 |
| Materials | | 276,193 | | 431,965 | | 431,965 | 5/31/2014 |
| Accounts Receivable | | 12,400,006 | | 12,627,309 | | 12,400,006 | 3/31/2014 |
| Vacation Adjustment | | | | | | 516,221 | |
| Net Working Capital | $ | 24,780,609 | $ | 26,564,761 | $ | 26,853,679 | |

Notes:
1. Import Castings - G/L accounts 14611000 and 14613000.
2. Materials - G/L accounts 14101000, 14102000, 14103000, 1410104000 and 14105000.
3. Accounts Receivable - G/L accounts 13001000, 13002000, 13003000 and 13029000. These accounts include the A/R detail less (1) unprocessed returns, (ii) the amounts identified and accrued at year end for quality adjustments but applied to individual accounts after the close, and (iii) the allowance for doubtful accounts.

# SCHEDULE 5.01(a)

## Jurisdictions where Seller is qualfied

California

## SCHEDULE 5.01(h)

### Problem Receivables

All trade accounts receivable reflected in the Financial Statements are subject to the Seller's normal return and warranty policies and procedures.

The Seller's returns are warranty returns. A customer's right of return is not unconditional; a customer cannot return castings simply because it no longer wants them. If the amount of future returns can be reasonably estimated, then current GAAP calls for the current recognition of the costs or losses that may be expected in connection with any returns in accordance with ASC 450-20, the ASC section on loss contingencies. The estimates do not need to be made on a part-by-part basis, but can reflect meaningful levels of aggregation.

Under ASC 450-20, expected warranty costs or losses would need to be accrued if they were probable and reasonably estimable. Certainly, the Seller's experience indicates that warranty returns are probable. Given the Seller's changing customer product mix and the variety of casting technologies employed in the Seller's plants, the "reasonably estimable" criteria precludes the accrual of the Seller's warranty costs or losses at the time of sale."

As a result, Seller does not accrue for warranty returns, so the qualification is consistent with GAAP and Seller's financial statements.

The aggregate amount of warranty returns from customers for the 90 day period following the Closing Date shall not exceed $100,000. To the extent such returns exceeds $100,000, Seller shall pay to Buyer the full amount of such excess.

## SCHEDULE 5.01(j)

## Intellectual Property  (previously 5.01(i))

Trademark:  U. S. Trademark Registration No. 1193508 (PS – logo), owned by Seller

164178.591857v4

## SCHEDULE 5.01(k)

## Real property used in the business

The Seller leases the following parcels of Real Property from Berkeley Properties, LLC:

| | | |
|---|---|---|
| 1 | 640 Gilman | 59-2345-1 |
| 2 | 648 Page Street | 59-2323-1 |
| 3 | 1310 3rd Street | 59-2345-2-2 |
| 4 | 1333 2nd Street | 59-2345-9 |
| 5 | 1401 East Shore | 59-2341-4 |
| 6 | 1420 2nd Street | 59-2341-5 |
| 7 | 1421 2nd Street | 59-2340-8-2 |
| 8 | 1305 East Shore | 59-2344-1-2 |
| 9 | 1314 2nd Street | 59-2344-3-1 |
| 10 | 1320 2nd Street | 59-2344-4-1 |

The real property above is owned by BP, who leases it to PSC pursuant to a written lease agreement. This property is colloquially referred to by the Debtors as the "Berkeley Campus" and the lease between PSC and BP is referred to as the "Berkeley Campus Lease".

Seller leases the warehouse located at 725 85th Avenue, Unit H, Oakland, California 94621, from Principal Life Insurance Company. Seller leases a group of lots that border the Berkeley Campus at the corner of Second Street and Page Street, Berkeley, California, which Seller leases from Howard F. Robinson.

164178.591857v4

Case: 19-44053   Doc# 85   Filed: 10/03/20   Entered: 10/03/20 13:34:49   Page 57 of 699   (Part 3A (Page Two of Five)   Page 34 of 42

570

## SCHEDULE 5.01(l)

## Litigation and Disputes

Notice of Intent to Fine Pursuant to Section 274A of the Immigration and Nationality Act, U. S. Department of Homeland Security, served May 3, 2013.

Seller also refers to and incorporates by reference in this Schedule 5.01(l), all matters disclosed in Schedule 5.01(m).

164178.591857v4

## SCHEDULE 5.01(m)

## Compliance with Laws Exceptions

BAAQMD – Notice of Violation 8/11/2011, failure to meet permit condition #00486 1C, minimum pressure of 1, across the carbon bed. Settled.

DTSC – Violation 4/9/2009, CA H&S Code section 25189.5(a);CA Code of Regulations Title 22, section 66262.11   Entered into consent decree with DTSC 7/10/2010.

CA OSHA Notice of Proposed Penalties 9/19/2013, inspection #316438910 – 6 citations. Partially Settled.

CA OSHA Notice of Proposed Penalties 2/10/2013, inspection #316442185 – 3.  Settled.

CA OSHA Notice of Proposed Penalties 7/15/2011, inspection #312362742 – 1. Settled.

CA OSHA Alleged Condition 7/29/2013 Title 8 CCR 3203(a)(6). Closed.

CA OSHA Notice of Proposed Penalties 4/07/2010, inspection #312358559 – 3 Settled.

CA OSHA Notice of Proposed Penalties 1/17/2012, inspection #315315580 – 2 Settled.

CA OSHA Notice of Proposed Penalties 11/10/2011, inspection #315315093 – 3 Settled.

Those items listed on Schedule 5.01(n)(i) and permits listed on Schedule 5.01(n)(iii)

164178.591857v4

Case: 19-44053    Doc# 255    Filed: 10/02/20    Entered: 10/02/20 13:34:49    Page 572 of 699 (Part 3A (Page 37 of Five)   Page 36 of 42

572

## SCHEDULE 5.01(n)(i)

### Environmental Law Compliance Exceptions

In the Matter of: Pacific Steel Casting Co., California Dept. of Toxic Substances Control, Consent Order dated 7/28/2010, Docket No. HWCA 2010-2176. Entered into consent decree with DTSC 7/10/2010.

In the Matter of: Pacific Steel Casting Co., City of Berkeley Toxics Management Division Consent Order Docket No. TMD 11-006. Entered into consent decree with City of Berkeley1/20/2011.

Communities for a Better Environment v. Pacific Steel Casting Company, Case No. C-06-4184-BZ, Consent decree entered 3/16/2007.

Rosie Lee Evans et al. v. Pacific Steel Casting Company, Case No. RG08383068 and Settlement Agreement and General Release effective 6/28/2012.

Baykeeper v. Pacific Steel Casting Co., Civ. No. 3:12-CV-05955-JCS and Consent Decree dated 6/11/2013 and entered 8/5/2013.

PSC received from East Bay Municipal Utility District (EBMUD) a new industrial waste water permit October 2013. Prior to this permit PSC had a zero discharge permit with EBMUD.

Expanded Phase I Environmental Site Assessment, Anchor Environmental Consultants, Inc., November 3, 2002.

Phase II Environmental Site Assessment, Anchor Environmental Consultants, Inc., January 22, 2003.

Phase I Environmental Site Assessment, Partner Engineering and Science, Inc., November 26, 2012.

Limited Phase II Environmental Site Assessment, TRC Solutions, Inc., April 1, 2013.

## SCHEDULE 5.01(n)(ii)

## Environmental , H&S reports (previously (n)(ii)(2)

| Report Name | Applicable Statute/Reg./Rule/Permit Condition | Date(s) |
|---|---|---|
| Storm Water Report | NPDES Permit # CAS000001 | July 1 – 2009-2013 |
| Storm Water Report – Group Monitoring Plan | Metal Casting Stormwater Monitoring Group, Inc. | December 1 – 2009-2013 |
| EBMUD Compliance Testing & Reporting | East Bay Municipal Utility District – Periodic Compliance Reports CCCSD Class IIU Permit | June 31, December 31, 2013 (New permit issued November 2013. Annual reporting require under old permit 2009-2012) |
| CARB Reporting – Truck and Bus Fleet (Registration and Filter Installation) | Title 13 CCR Sec. 2025 | July 1, 2014 - One time registration |
| Emissions Minimization Plan | BAAQMD Rule 12-13 | May 1, 2014 (New regulation) |
| Odor Test Summary Report | Permit Condition Nos. #7134 and #486 (BAAQMD) | Plant 2 January 31 2009-2013 Plant 1 April 30 2009-2013 |
| NESHAP Compliance Report | 40 CFR 63.7751 NESHAP (EPA and BAAQMD) | January 31 2010-2014 July 31 2009-2013 |
| HRA – Health Risk Assessment | Quarterly Notifications – Health & Safety Code Section 44300 et seq. | March, June, September, December, each year 2009-2013 |
| BAAQMD – Annual emission report | Synthetic Minor Operating Permit Cond. #20207 (BAQMD) | July 30 2009-2013 |
| BAAQMD – Annual data update | 40 CFR 70-71, H&SC 42300 et seq., BAAQMD Regulation 2 | Plant 3 – August 2009-2013 Plants 1 & 2 – September 2009-2013 |
| BAAQMD – Source Testing | Permit Condition # 23694 | Annual – October 2009-2013 |
| BAAQND/EPA – Opacity Testing | 40 CFR 63.7731 (b); NESHAP | Semi-annual - 2009-2013 |
| EPA Emergency Planning and Chemical Inventory Reporting – Hazardous Material Business Plan, submitted to Berkeley CUPA | 40 CFR 355; 40 CFR 370; H&SC 25503.5-25506; 19 CCR 2729 | March 1 - 2009-2013 |
| EPAToxic Release Inventory Reporting | 40 CFR 372 | July 1 - 2009-2013 |
| EBMUD Compliance Testing & Reporting | East Bay Municipal Utility District – Discharge log and TTO Compliance Report | December 1, 2013 (New permit issued November 2013. (No reporting required under old permit) |
| LQG – Biennial Report | 40 CFR 262.41, CCR 66262.41 | Submitted request for exemption March 1, 2014 - Currently exempt from reporting – Not LQG |
| Slug Discharge Plan | East Bay Municipal Utility District | Biennial submittal December 1, 2013 (New permit issued in 2013, first time required) |

Phase I Environmental Site Assessment, Partner Engineering and Science, Inc., November 26, 2012.

Limited Phase II Environmental Site Assessment, TRC Solutions, Inc., April 1, 2013.

164178.591857v4

Case: 19-44053   Doc# 355   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 57 of 699 (Part 4 of Five)   of Five)   Page 38 of 42

574

## SCHEDULE 5.01(n)(iii)

## Environmental, etc. permits

Bay Area Air Quality Management District, Permit to Operate, Plant #187 (Co-Plant 1), expires December 1, 2014.

Bay Area Air Quality Management District, Permit to Operate, Plant #703 (Co-Plant 2), expires December 1, 2014.

Bay Area Air Quality Management District, Permit to Operate, Plant #1603 (Co-Plant 3), expires November 1, 2014.

East Bay Municipal Utility District, Wastewater Discharge Permit, expires November 7, 2018.

City of Berkeley, CUPA, Unified Program Consolidated Permit and Registration, expired March 1, 2014, renewal in process.

National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities NPDES # CAS0000001.

Storm Water Pollution Prevention Plan (SWPPP), dated February 21, 2014.

City of Berkeley Business License #14 00010043.

City of Berkeley Use Permit #7388 (1975) Plant #2.

City of Berkeley UP #01-70000007 (1996) Modification to UP#7388 to build Sand Recycling Unit.

City of Berkeley UP #8957 (1981) Plant #3.

City of Berkeley UP #06-10000045 (2006) Modification to UP#8957 to build carbon unit.

## SCHEDULE 5.01(o)

## Insurance Policies

| | |
|---|---|
| **Commercial Package**<br><br>Commercial Property<br>Inland Marine<br>General Liability<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Limits<br><br>Buildings: $26,738,908<br>Personal Property: $1,360,594<br>Stock: $6,990,000<br>Equipment: $24,276,530<br>Patterns: $17,200,000<br><br>Business Income and Extra Expense: $32,507,546<br><br>General Liability: $2,000,000/$1,000,000<br><br>ERISA: $2,000,000/$1,000,000 |
| **Commercial Automobile**<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Combined Single Limit: $1,000,000 |
| **Excess/Umbrella Liability**<br><br>St. Paul Fire and Marine Insurance Company<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Umbrella Liability: $20,000,000/$20,000,000 |
| **Equipment Breakdown (Boiler & Machinery)**<br><br>Travelers Property Casualty Company of America<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Total Limit per Breakdown: $100,000,000 |
| **Commercial Crime**<br><br>Crime Coverage<br>Fiduciary Liability Coverage<br>D&O and Entity Liability Coverage<br>Employment Practices Liability Coverage<br><br>Chubb Group of Insurance Companies<br>Expires: October 31, 2014 | Subject to specific limits, exclusions and deductibles:<br><br>Maximum Aggregate Limits<br><br>Fiduciary Liability: $1,000,000<br>D&O and Entity Liability: $1,000,000<br>Employment Practices Liability: $1,000,000 |
| **Workers Compensation**<br><br>Sentry Casualty Company<br>Expires: April 1, 2015 | Subject to specific limits, exclusions and deductibles:<br><br>Statutory Limits |

164178.591857v4

## SCHEDULE 5.01(p)

### Brokers

The Seller has entered into an agreement with Cleary Gull Inc. ("Cleary Gull") whereby Cleary Gull will receive certain payments from the Seller upon completion of the transactions contemplated by this Agreement. Agreement is attached.

164178.591857v4

## ADDENDUM TO ENGAGEMENT LETTER AGREEMENT

This Addendum to Engagement Letter Agreement (this "Addendum") amends that engagement letter dated January 29, 2014 (the "Engagement Letter") by and between Pacific Steel Casting Company ("Debtor") and Cleary Gull Inc. ("Cleary Gull"). All provisions of the Engagement Letter not altered or deleted by this Addendum shall remain in effect. In case of any conflict between the Engagement Letter and this Addendum, the terms and conditions of this Addendum shall prevail.

1.      Notwithstanding anything to the contrary in the Engagement Letter, the term "Aggregate Consideration," defined in Section 3.C of the Engagement Letter, does not include any withdrawal liability associated with Debtor's multi-employer pension plan, whether or not it is assumed directly or indirectly, or triggered and paid, by the buyer, unless it is liquidated in a settlement with the relevant union and paid by the buyer.

2.      Notwithstanding anything to the contrary in the Engagement Letter, the term "Aggregate Consideration," defined in Section 3.C. of the Engagement Letter, does include the following amounts, up to a cap of $1,000,000 in the aggregate: (i) any amount the buyer is required to place in escrow in connection with the assumption of Debtor's multi-employer pension plan, and/or (ii) the amount of any letter of credit the buyer is required to obtain in connection with the assumption of Debtor's multi-employer pension plan.

"DEBTOR"                                    "CLEARY GULL"

PACIFIC STEEL CASTING COMPANY        CLEARY GULL INC.

By: __Cecil B. B.O.___   By: _____
Name: _CHARLES A. BRIDGES JR._          John R. Peterson, Managing Director
Title: __CEO__

164178.591857v4

Case: 19-44053    Doc# 215-1  Filed: 10/06/20  Entered: 10/06/20 21:04:49  Page 573 of
                                            699
Case: 19-44053    Doc# 225  Filed: 10/06/20  Entered: 10/06/20 21:04:49  Page 573 of (Volume V of Five)   of 42   Page 42 of 42

578



January 29, 2014

PRIVATE AND CONFIDENTIAL

Pacific Steel Casting Company
1333 Second Street
Berkeley, CA 94710

Attn.:   Katie Delsol
         Chief Executive Officer

Gentlemen:

This letter agreement will confirm our understanding of the terms and conditions under which Cleary Gull Inc. (referred to hereinafter as "Cleary Gull") is engaged (the "Engagement") by Pacific Steel Casting Company and/or any affiliate thereof (collectively, the "Company") as the Company's exclusive financial advisor in connection with the possible sale of all or part of the Company in one transaction or a series of transactions by means of a merger, spin-off, joint venture, partnership, sale of stock or assets, or other business combination or other transaction resulting in any change of control (whether voting, financial or otherwise) of the Company or the sale or transfer of any unit, subsidiary, division or line of business of the Company or any other material portion of the Company's business or assets (a "Transaction").

1.   **Advisory Services**

Cleary Gull's overall objective is to see a Transaction through to a successful conclusion. In this respect, Cleary Gull will provide financial advice and assistance to the Company which may include any or all of the following:

- Assistance in developing an overall strategy for a Transaction;

- Becoming familiar with the business, operations, properties, financial condition, prospects, and management philosophy of the Company;

- Reviewing the historical and projected financial performance and determining a current valuation of the Company;

- Assistance in the preparation of an information memorandum ("Information Memorandum") and other appropriate marketing materials designed to introduce potential buyers approved by the Company ("Interested Parties");

- Identification and screening of potential Interested Parties;

- Initiating contact at senior levels with potential Interested Parties and coordinating the review process of the Company by such parties;

- Assistance in the evaluation of any offer(s) made with regard to a Transaction;

- Conducting meetings between representatives of selected Interested Parties and the Company;

- Negotiating with potential buyers acceptable terms and conditions of a Transaction; and

- Rendering such other incidental services as are reasonably and customarily provided by investment banking firms in connection with similar assignments.

CLEARY GULL INC.
100 EAST WISCONSIN AVENUE, SUITE 2400
MILWAUKEE, WI 53202
414-291-4500

2. **Exclusivity**

To coordinate most effectively our efforts together to effect a Transaction satisfactory to the Company, the Company agrees, and agrees to cause any of its directors, officers, shareholders, advisors or agents, to refer to Cleary Gull any person who expresses to the Company (or any of them) an interest in a Transaction. The Company agrees that a representative of Cleary Gull may be present at all times during all negotiations related to any Transaction or shall be kept fully informed with respect to such negotiations. The Company warrants and represents that it has not granted any other person the right to act as a financial advisor, placement agent or underwriter with respect to the Transaction and that there is no other person that is entitled to a finder's fee or any type of brokerage or other commission in connection with the Transaction. Until the expiration of the Engagement, the Company will not solicit or negotiate with or retain any other financial advisor, placement agent or underwriter in connection with a Transaction. In any event, no fee payable to any other financial advisor by the Company or any other person in connection with the subject matter of this Engagement shall reduce or otherwise affect any amounts payable hereunder to Cleary Gull.

3. **Compensation**

A. **ISR Fee**

The Company is paying Cleary Gull a fee for initial advisory services rendered ("ISR Fee") in three (3) installments as follows:

| Amount | Payable Upon |
|--------|--------------|
| $37,500 | Execution of this letter agreement |
| $25,000 | Receipt of proposed initial indication of interest, letter of intent, memorandum of understanding or other proposal for a Transaction from an Interested Party |
| $25,000 | Acceptance by the Company or the owner(s) of a majority of its outstanding shares of a letter of intent, memorandum of understanding or other agreement in principle or proposal for a Transaction from an Interested Party |

Such ISR Fee will be non-refundable except that (i) Cleary Gull shall refund Twelve Thousand Five Hundred Dollars ($12,500) of the ISR Fee if the Information Memorandum is not ready for distribution to Interested Parties before the earlier of March 1, 2014 or the date the Company files for protection under Chapter 11 of the Federal bankruptcy laws, and (ii) any portion of the ISR Fee that is paid and not refunded shall be credited against the Transaction Fee as described below.

B. **Transaction and Incentive Fees**

Cleary Gull's compensation for these services is largely dependent on the outcome of this assignment. If a Transaction is consummated, then the Company shall pay Cleary Gull a success fee (the "Transaction Fee"), in cash via wire transfer at consummation of the Transaction, of Four Hundred Thousand Dollars ($400,000), less the amount of the ISR Fee paid by the Company, plus an incentive fee (the "Incentive Fee") equivalent to Five percent (5%) of the Aggregate Consideration (as defined below) equal to or in excess of Eighteen Million Dollars ($18,000,000).

C. **Definition of Aggregate Consideration**

For purposes of this letter agreement, the term "Aggregate Consideration" shall mean an amount computed in accordance with the following:

Case: 14-40015   Doc# 52   Filed: 10/06/20   Entered: 10/06/2018 14:45   Page 580 of
Three of Three   699   Page 2 of 22
580

(i)    Aggregate Consideration includes (a) the total consideration received or to be received directly or indirectly by the Company, its shareholders and any holders of stock options or other equity-linked contractual rights or securities of the Company ("Equity Interests") as a result of the Transaction, including cash, property, securities, and amounts placed in escrow; and (b) the total amount of indebtedness of the Company for money borrowed and similar non-trade liabilities and other long term obligations (including, without limitation or duplication, the amount that would be reflected in financial statements of the Company prepared in accordance with generally accepted accounting principles ("GAAP") as of the date of closing for a Transaction with respect to any liabilities for pension, retirement or deferred compensation plans, or any guarantees or capitalized leases) directly or indirectly assumed, forgiven, repaid, refinanced, restructured, retired, extinguished or acquired as a result of the Transaction or that otherwise remain outstanding as of the closing of a Transaction. Aggregate Consideration also includes (without duplication of amounts otherwise included in Aggregate Consideration) the aggregate amount by which any Equity Interests are "in-the-money" based on the consideration paid in the Transaction, as well as the amount payable as the result of a Transaction under any shadow stock, stock appreciation rights or other incentive compensation plan or agreement. Aggregate Consideration only includes any past due amounts with respect to leases which are not capitalized leases under GAAP.

(ii)    Aggregate Consideration includes (without duplication of amounts otherwise included in Aggregate Consideration) all cash or other dividends or other distributions declared, paid or distributed by the Company to its shareholders in contemplation or as a result of the Transaction other than normal quarterly or annual distributions to cover shareholder taxes on the Company's taxable income which is not due to a Transaction. For purposes of this letter agreement, if there is a transfer of capital stock of the Company (a) constituting a majority of the equity in the Company, or (b) possessing a majority of the voting power of the equity in the Company, then all of the equity in (including any Equity Interests of) the Company shall be deemed to have been acquired at an assumed price equivalent to the average per share price at which the controlling interest is acquired.

(iii)    Aggregate Consideration will also include (without duplication of amounts otherwise included in Aggregate Consideration) (a) any fees and expenses relating to the Transaction which are incurred by the Company, its shareholders before consummation of the Transaction, or their affiliates and paid by the Company or any other party to such Transaction, and (b) the maximum face amounts of all current or deferred payments and benefits to be made under non-competition, consulting, licensing, lease, royalty or similar agreements with any directors, executives or shareholders of the Company or under any employment contracts with such individuals to the extent payments thereunder are in amounts in excess of existing levels or, are due more then one (1) year after closing.

(iv)    If all or a portion of the consideration payable in connection with the Transaction includes contingent future payments, then Aggregate Consideration will include the present value of the reasonably expected maximum amount of such payments (as such amount is determined in good faith between the Company and Cleary Gull).

(v)    If the Transaction involves the disposition of assets, then Aggregate Consideration will include the fair market value of any assets of which the Company does not dispose in the Transaction.

(vi)    If Aggregate Consideration for the Transaction includes securities, then the fair market value of such securities will be (a) if there is a public trading market therefor, equal to the

Case 14-10457 Doc 525 Filed 10/06/20 Entered 10/06/20 18:14:05 Page 3 of
Three of Three 699 Page 3 of 22

581

average of the last sale prices on each of the ten trading days ending with the second trading day preceding the closing of the Transaction and (b) in the absence of a public trading market therefor, the fair market value thereof on the day preceding the closing of the Transaction. Consideration or assets other than cash or securities shall be valued at fair market value as of the date of consummation of the Transaction.

(vii)    The fair market value or present value of any component of Aggregate Consideration other than cash shall be such amount as may be agreed by the Company and Cleary Gull. However, if the parties are unable to agree upon a fair market value or present value, then each will select an investment banking firm respected in the mergers and acquisitions field to objectively determine a bona fide fair market value or present value. The midpoint between the two bona fide fair market values or present values established by such firms will be the fair market value or present value for purposes of this letter agreement. The fees of such investment bankers relating to such determination will be shared equally by the Company and Cleary Gull.

### 4.    Term and Termination

Upon ninety (90) days' written notice, the Company or Cleary Gull may terminate the Engagement effective at any time more than twelve (12) months after the date hereof (the earliest such a termination notice may be given is ninety (90) days prior to the end of this twelve (12) month period). Cleary Gull also may terminate the Engagement upon five (5) days' written notice after Cleary Gull has determined, in its sole discretion, that there has been a material adverse change in the business, prospects, market value or financial condition of the Company. Any such termination shall be without any continuing obligation of the Company or Cleary Gull except that: (a) the Company shall remain obligated to pay for any compensation earned and expenses incurred by Cleary Gull to the date of termination; (b) the Indemnification Provisions (as defined below) and the provisions of Paragraphs 3 through 8 will remain in effect, and (c) if the Company initiates any Transaction within eighteen (18) months following such termination with any party that prior to such termination: (i) Cleary Gull identified to the Company as a potential participant in a Transaction or (ii) contacted or was contacted by the Company or Cleary Gull with respect to a potential Transaction, then Cleary Gull shall be entitled to all fees payable under Paragraph 3 with respect to such Transaction regardless of whether Cleary Gull is involved in initiating or consummating the Transaction.

### 5.    Expenses

Whether or not a Transaction hereunder is consummated, in addition to the fees described above and exclusive of any amounts otherwise payable pursuant to the Indemnification Provisions, but subject to the limitation below, the Company agrees to reimburse Cleary Gull from time to time upon its request for all properly documented expenses incurred by Cleary Gull in connection with the performance of its services hereunder. Generally these expenses will represent travel, document procurement and delivery, other expenses reasonably allocable to Cleary Gull's performance of its services under this letter agreement and related matters, but they will also include the fees and expenses of Cleary Gull's attorneys and other professional advisors should Cleary Gull determine that their advice is required in connection with the Engagement or in order to complete a Transaction. Upon execution of this letter agreement the Company shall deposit with Cleary Gull Seven Thousand Five Hundred Dollars ($7,500) as a fund for payment of such expenses as incurred, which fund shall be replenished by the Company within ten (10) days of receipt of a monthly statement from Cleary Gull of expenses incurred until such time that the cumulative amount deposited by the Company with Cleary Gull is equal to Thirty Thousand Dollars ($30,000). The Company shall reimburse any such expenses of Cleary Gull in excess of Thirty Thousand Dollars ($30,000) at the same time, and only if, a Transaction fee is payable. For the sake of clarity, Cleary Gull's Engagement shall not include giving tax, legal, regulatory, accounting or other specialist or technical advice or

Case: 14-4051   Document: 25-5   Filed: 10/06/20   Entered: 10/06/2018 14:05   Page 582 of
Three of Three   Page 4 of 22

582

associated services; instead, the Company will retain appropriate advisors experienced with this type of transaction, take their advice and be responsible for all fees and expenses, as well as all other costs and expenses associated with the Transaction.

6.   **Disclosure of Information**

The Company will furnish Cleary Gull with such information concerning the Company and its industry as Cleary Gull reasonably requests in connection with this Engagement. The Company will ensure, and hereby warrants and represents that such information will not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company further will ensure, and hereby warrants and represents that any financial forecasts and projections that it makes available or provides to Cleary Gull will be prepared in good faith and will be based upon assumptions that reflect the then best currently available estimates and judgments of the management of the Company as to the matters covered thereby and, in light of the circumstances under which they are made, are reasonable. In addition, the Company will keep Cleary Gull advised of all material developments affecting the Company or its financial position. The Company recognizes and agrees that Cleary Gull (a) will rely solely on such information and other information available from generally recognized public sources in performing the services contemplated hereunder; and (b) will not undertake independent verification of, and does not assume responsibility for the accuracy or completeness of, such information.

The Company acknowledges that all opinions and advice (written or oral) given by Cleary Gull to the Company in connection with Cleary Gull's Engagement will be treated by the Company as confidential, are intended solely for the use of the Board of Directors and senior management of the Company in considering the Transaction to which they relate and are not for the use of, and cannot be relied upon, by any other person or be used or relied upon for any other purpose. Without limitation, no such opinions or advice shall constitute a recommendation to any shareholder, creditor or creditors' committee of the Company concerning action that such persons might or should take in connection with the Transaction. Except as required by law or by order of a court of competent jurisdiction, the Company agrees that no such opinions or advice may be used to solicit shareholder, creditor or creditors' committee approval of any Transaction or for any other purpose or reproduced, disseminated, quoted or referred to at any time or otherwise disclosed to any third party, in any manner or for any purpose, nor shall any public references to Cleary Gull be made by the Company (or such persons), without the prior written consent of Cleary Gull. Without prior consultation with Cleary Gull, the Company shall not make any disclosure of such opinions or advice except as required by law or by order of a court of competent jurisdiction or make any announcement or filing that is so required in which Cleary Gull's name appears. Cleary Gull is not responsible or liable to any recipient of advice provided by Cleary Gull as a result of a court order requiring disclosure thereof.

7.   **Indemnification**

The Company agrees to the indemnification and contribution provisions set forth on Annex A attached to this letter agreement and incorporated herein in their entirety (the "Indemnification Provisions").

8.   **Miscellaneous**

Each of Cleary Gull and the Company represents that this letter agreement has in all respects been duly authorized, executed and delivered by and on behalf of itself. This letter agreement and the Indemnification Provisions embody the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, written and oral, relating to the subject matter hereof and may not be modified or amended, or any term or provision hereof waived or discharged, except in writing signed by the party against whom such modification, waiver or discharge is sought to be enforced. This letter

agreement, all rights and obligations in connection herewith and any claim related directly or indirectly to this letter agreement (including any claim concerning advice provided pursuant to this letter agreement) shall be governed and shall be interpreted, construed and enforced in accordance with and governed by the applicable laws of Wisconsin without regard to principles of conflict of laws.

The Company agrees to seek the appointment of Cleary Gull as its investment banker in any chapter 11 bankruptcy case filed by the Company under the standards permitted in 11 U.S.C. §327(a) and §328(a) pursuant to which the Incentive Fee is a contingent fee payable upon the closing of a sale of assets of the Company. The Company's fees and expenses shall be subject to review by the Bankruptcy Court only under the standard of review provided in 11 U.S.C. §328(a) and shall not be subject to review under 11 U.S.C. §330(a). Review shall be under the standard that provides that compensation awarded by the Court may differ from the compensation provided in this agreement only if, "the terms and conditions prove to have been improvident in light of development not capable of being anticipated at the time of the fixing of such terms and conditions." The Company shall not be required to adhere to the Guidelines for Compensation and Expense Reimbursement of Professionals and Trustees promulgated in the Northern District of California Bankruptcy Courts.

Nothing in this letter agreement or Engagement shall limit Cleary Gull's ability to consult and conduct business for and with others, including competitors of the Company, and to engage in activities similar to these contemplated hereunder whether for its own account or for the account of others or buy, sell or hold securities in or for others.

Cleary Gull may refer to the Transaction and the Company, after it is otherwise public knowledge, in traditional "tombstone" announcements or any of its professional promotional materials. Further, if requested by Cleary Gull, the Company shall include a mutually acceptable reference to Cleary Gull in any press release or other public announcement made by the Company regarding the matters described in this letter agreement.

The Company acknowledges and agrees that (a) this letter agreement does not constitute a commitment or undertaking on the part of Cleary Gull to provide any financing and does not ensure the successful completion of the Transaction; (b) Cleary Gull is acting as an independent contractor hereunder, and neither anything in this letter agreement nor the nature of Cleary Gull's services shall be deemed to create a partnership or fiduciary relationship between Cleary Gull and the Company or any other party; and (c) Cleary Gull has no duties or obligations to the employees, equity holders or creditors of the Company by virtue of this letter agreement or the retention of Cleary Gull hereunder, and no such person shall be deemed a third party beneficiary of this letter agreement or have any rights by virtue of this letter agreement or the retention of Cleary Gull hereunder.

9.  **Signatures**

This letter agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same agreement. Facsimile, portable document format (a/k/a ".PDF") and any other electronic signature within the meaning of the Uniform Electronic Transactions Act, as amended (or any similar state law), on any counterpart hereof shall be deemed to be a true and legally binding signature with the same force and effect as an original. Upon the reasonable request of any party hereto, all parties hereto agree to execute and deliver to the requesting party an original of this Agreement.

Pacific Steel Casting Company
January 29, 2014
Page 7

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Cleary Gull the duplicate signed copy of this letter agreement enclosed herewith.

Regards,

CLEARY GULL INC.

By: _____
John R. Peterson
Managing Director

Accepted and agreed to, as of the date of this letter:

PACIFIC STEEL CASTING COMPANY

By: _Katie Delsol_____
Name: _Katie Delsol_____
Title: _CEO_____

164178.591857v4

ANNEX A

Indemnification Provisions

In connection with the engagement of Cleary Gull by Pacific Steel Casting Company pursuant to a letter agreement dated January 29, 2014, between the Company and Cleary Gull as it may be amended from time to time (the "Letter Agreement"), the Company hereby agrees as follows:

The Company agrees to indemnify Cleary Gull, its present and former controlling persons (as such term is defined in the Securities Act of 1933), affiliates, directors, officers, employees, agents and representatives (Cleary Gull and each such person being an "Indemnified Party") from and against any and all losses, claims, damages, judgments, assessments, liabilities, costs and expenses (including reasonable attorneys' fees and disbursements), joint or several, to which such Indemnified Party may become subject under any Federal or state law or otherwise (collectively, "Liabilities"), and will reimburse each Indemnified Party for all fees and expenses (including reasonable attorneys' fees and disbursements) (collectively, "Expenses") as they are incurred in investigating, preparing for (including preparing to present testimony or evidence), pursuing, presenting testimony or evidence relating to or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation, whether or not the Company has initiated such action and whether or not the Company or any Indemnified Party is a party (collectively, "Actions"), (a) caused by, or arising out of or in connection with, any untrue statement or alleged untrue statement of a material fact contained in any sale or offering memorandum provided to third parties or in any proxy statement or similar document, if any, provided to the Company's shareholders (including any amendments thereof and supplements thereto, collectively, the "Disclosure Documents") or by any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (other than untrue statements or alleged untrue statements in, or omissions or alleged omissions from, information relating to an Indemnified Party furnished in writing by or on behalf of such Indemnified Party expressly for use in the Disclosure Documents) or (b) otherwise relating to, arising out of or in connection with the Letter Agreement or this Annex A (including the enforcement thereof), advice or services rendered or to be rendered by any Indemnified Party pursuant to the Letter Agreement, the transactions contemplated thereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions, except that, in the case of clause (b) only, the Company shall have no such obligation in respect of any Liabilities or Expenses of any Indemnified Party that are finally judicially determined to have arisen solely and directly out of the intentional misconduct, bad faith, gross negligence or recklessness of such Indemnified Party.

The Company also agrees that no Indemnified Party shall have any liability to the Company in connection with any matter relating to the engagement of Cleary Gull under the Letter Agreement, except to the extent finally judicially determined that such liability resulted solely and directly from the intentional misconduct, bad faith, gross negligence or recklessness of such Indemnified Party. Accordingly, Cleary Gull shall not be liable to the Company for its own negligence, if any, in the performance of the services related to or arising from this Letter Agreement.

The Company in its discretion may assume the defense of any Action. If the Company assumes the defense of an Action, then the Company shall not be liable for any Expenses subsequently incurred by an Indemnified Party in connection with such Action (other than Expenses incurred in investigation, to prepare to present testimony or evidence or to present testimony or evidence) unless (a) the Company has failed to provide legal counsel reasonably satisfactory to such Indemnified Party in a timely manner or (b) such Indemnified Party shall have reasonably concluded that the representation of such Indemnified Party by legal counsel selected by the Company would be inappropriate due to actual or potential conflicts of interest or that there may be legal defenses available to such Indemnified Party that are different from or additional to those available to the Company or any other Indemnified Party represented by such legal counsel. Cleary Gull also has the right to employ separate counsel and to participate in the defense thereof at its own expense. Whether or not Cleary Gull participates in such defense, the Company will not enter into any settlement agreement or compromise with respect to any such Action without the written consent of Cleary Gull, unless such settlement or compromise includes an unconditional release of Cleary Gull and all other Indemnified Parties from all Liabilities with respect to such Action.

If any Indemnified Party is requested or required to appear as a witness in any Action, then the Company agrees to pay the Indemnified Party's a per diem fee of $1,500 per person for each half day of testimony and $750 per person

164178.591857v4

for each half day of preparation for any time such Indemnified Party expends in connection with appearing and/or preparing to appear as a witness in such Action.

If for any reason the foregoing indemnification is unavailable or insufficient, then the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Party to the extent such indemnification is unavailable or insufficient in such proportion as is appropriate to reflect (a) the relative benefits to the Company and its shareholders, on the one hand, and to Cleary Gull, on the other hand, of the matters contemplated by the Letter Agreement received, or sought to be received (whether or not a Transaction is consummated) or (b) if the allocation provided by the immediately preceding clause is not permitted by the applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Cleary Gull, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations; provided that in no event shall the Company contribute less than the amount necessary to ensure that all Indemnified Parties, in the aggregate, are not liable for any Liabilities and Expenses in excess of the amount of fees actually received by Cleary Gull pursuant to the Letter Agreement. For purposes of the foregoing, relative benefits to the Company and Cleary Gull (and any other Indemnified Party) shall be deemed to be in the same proportion that the total value paid or contemplated to be paid in connection with a Transaction bears to the fees paid to Cleary Gull pursuant to its engagement in respect of such Transaction.

If multiple claims are asserted against an Indemnified Party in any Action, and indemnification as to at least one of such claims is permitted under applicable law and provided for under this Annex A, then the Company agrees that any judgment or award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or award expressly states that the judgment or award, or any portion thereof, is based solely on a claim or claims as to which indemnification is not available.

Any dispute, controversy or claim arising out of or relating to this Indemnification Agreement and/or Engagement shall be submitted to and settled by binding arbitration held before FINRA. Cleary Gull and the Company shall use their respective best efforts to maintain complete confidentiality with respect to, and shall not disclose to any person, the existence of positions taken in or resolution of any such dispute, controversy or claim, except as authorized in writing by the other party or as necessary to the prosecution or defense thereof, provided, however, that the foregoing will not prevent either party from disclosing any such information, which would otherwise be confidential hereunder, to any regulatory or self regulatory body which regulates each party. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having in personam and subject matter jurisdiction.

## SCHEDULE 5.01(q)

## Matters Relating to Benefit Plans

1.      On or around May 8, 2014, Seller became aware of an error contained in the Adoption Agreement for the restated plan document for the Pension Plan for Employees of Pacific Steel Casting Company (referred to herein as "the Plan") effective as of April 1, 2011. The error relates to an indication in the Adoption Agreement that the Plan provides an unreduced early retirement subsidy to all participants. The Plan does not provide an early retirement benefit without reduction to the participants (except with respect to certain participants who commence benefits after attaining age 62) as indicated by the document in effect for the Plan immediately prior to the 2011 restatement. Buyer is in the process of correcting this error, in addition to several other subsequently identified errors made by a third party in the preparation of the Adoption Agreement for the 2011 restatement. A draft corrective amendment addressing these errors is attached.

2.      With respect to Seller's representation in Section 5.01(q)(ii)(12), Seller discloses that it has ERISA Affiliates which include (a) Tri-Pacific, Inc. and (b) Berkeley Properties, LLC.

164178.591857v4

**AMENDMENT TO THE**
**PENSION PLAN FOR EMPLOYEES OF**
**PACIFIC STEEL CASTING COMPANY**

This Amendment (Amendment) to the Pension Plan for Employees of Pacific Steel Casting Company (Plan) is adopted by Pacific Steel Casting Company (Employer) to be effective on and as of the date(s) set forth below.

<u>RECITALS</u>

Whereas:

A.   The Employer originally established the Plan effective as of August 28, 1961 as a defined benefit pension plan for the Employer's non-union employees who satisfy the Plan's eligibility requirements.

B.   The Plan is intended to be a tax qualified plan under section 401(a) of the Internal Revenue Code (Code) and a pension plan under the Employee Retirement Income Security Act of 1974 (ERISA).

C.   The Plan operates on a plan year ending on March 31 each year.

D.   The Employer relies on third party service providers to maintain the Plan in compliance with the requirements of both the Code and ERISA, including, but not limited to, the preparation of the plan and trust documents, the preparation of amendments to the plan and trust documents, the annual actuarial valuations, the administration of the benefits under the Plan, and the preparation and filing of the annual reports with the Internal Revenue Service and the Department of Labor.

E.   For many years, the Employer has used, and continues to use, the services of Nicholas & Hicks as the third party administrator for the Plan and Robert Haness of Haness & Associates as the actuary for the Plan.

F.   The Employer understands and believes that Nicholas & Hicks and Robert Haness are very experienced in assisting employers with plans such as the Plan.

G.   The Employer has amended the plan and trust documents and restated the plan and trust documents from time to time over the years since the Plan's inception.

H.   In 2003, Nicholas & Hicks prepared a restatement of the plan and trust document in order to update the Plan for changes in the Code and ERISA.

I.    On December 19, 2003, Nicholas & Hicks sent the restatement of the plan and trust document to the Employer with an indication that it had been reviewed by Robert Haness as well.

J.    The Employer adopted the 2003 restatement in December 2003.

K.    On March 15, 2006, the Employer adopted an amendment, prepared by Nicholas & Hicks, that ceased all benefit accruals under the Plan effective as of March 31, 2006, and the Employer gave the notice, also prepared by Nicholas & Hicks, that is required to be given, by both the Code and ERISA, to all of the participants in the Plan regarding the cessation of future benefit accruals under the Plan.

L.    Between 2006 and 2011, the Employer adopted other amendments to the 2003 restatement of the plan and trust document, all prepared by Nicholas & Hicks.

M.    In 2011, Nicholas & Hicks prepared a restatement of the plan and trust document in order to update the Plan for changes in the Code and ERISA since the 2003 restatement, and sent the restatement of the plan and trust document to the Employer with an indication that the 2011 restatement made no substantive changes to the way in the Plan was operated.

N.    The Employer adopted the 2011 restatement in June 2011, effective as of April 1, 2011, in reliance on the representations made by Nicholas & Hicks regarding the restatement of the Plan.

O.    The Employer has just recently learned that Nicholas & Hicks made a number of errors when preparing the 2011 restatement of the plan and trust document as evidenced by communications from both Nicholas & Hicks and Robert Haness, which errors were not caught previously by the Employer because of the Employer's reliance on both Nicholas & Hicks and Robert Haness in the preparation of the 2011 restatement documents.

P.    The Employer has determined that these errors made changes to the terms of the Plan that were never intended by the Employer, never expected to be made by the participants, and never communicated to the participants in the summary plan description for the Plan, a summary of material modifications to the summary plan description for the Plan, or in any other manner.

Q.    The Employer has also determined that Robert Haness has been performing the actuarial valuations for the Plan and coordinating the administration of the Plan with Nicholas & Hicks in a manner that is consistent with the way in which the 2011 restatement should have been

PA0051.011
21V305903
SN/11

164178.591857v4

prepared rather than in accordance with the erroneous documents prepared by Nicholas & Hicks.

R.     The Employer wishes to correct these errors in the plan and trust documents by the adoption of this corrective amendment so that (i) the plan and trust documents are worded as they should have been worded by Nicholas & Hicks when it prepared the 2011 restatement, (ii) the plan and trust documents are consistent with the understanding of the Plan by the Employer, the participants and Robert Haness, and (iii) the plan and trust documents are consistent with the manner in which the Plan has been administered by Nicholas & Hicks and Robert Haness on behalf of the Employer.

<u>OPERATIVE PROVISIONS</u>

Now, therefore, the Employer amends the Plan by correcting the following provisions in the Adoption Agreement that was signed on June 5, 2011, effective as of April 1, 2011:

1.     Part II Section D1, "Normal Form of Benefit," is amended and restated to read as follows:

> *The benefits determined in this Section are payable at Normal Retirement Date as follows:*

>> *For Tier 1 Participants, an annuity guaranteed payable for one hundred twenty (120) monthly payments and continued thereafter for the life of the Participant. The first monthly payment shall be made as of the first day of the month coincident with or next following the Participant's Normal Retirement Date with the last payment as of the first day of the month in which the Participant's death occurs or the one hundred twenty (120) month payment period expires, whichever occurs later. Tier 1 Participants include Salaried Employees, Hourly Shipping Department Managers, Hourly Production Schedulers and Administrative Assistants.*

>> *For Tier 2 Participants, an annuity payable monthly for the life of the Participant. The first monthly payment shall be made as of the first day of the month coincident with or next following the Participant's Normal Retirement Date with the last payment as of the first day of the month in which the Participant's death occurs. Tier 2 Participants include Hourly Paid Employees other than those classified as Tier 1 Participants.*

2.     Part II Section D11, "Plan Actuarial Equivalence," item (a), "Plan/Code Section 415 Assumptions," is amended and restated to read as follows:

164178.591857v4

Case: 19-04053   Doc# 35-2   Filed: 10/02/20   Entered: 10/02/20 13:24:43   Page 591 of Three of Three Page 13 of 22
699   Page 13 of 22

591

           *a.1  Pre-retirement interest rate:  eight percent (8%)*
           *a.2  Pre-retirement mortality table:  UP84 Unisex*
           *a.4  Post-retirement interest rate:  eight percent (8%)*
           *a.5  Post-retirement mortality table:  UP84 Unisex*

3.      Part II Section D13, "Determination of Top-Heavy Status," item (b) is amended and restated to read as follows:

        *b.    The actuarial assumptions to be used in determining the Top-Heavy Ratio shall be:*

            *b.1  Pre-retirement interest rate:  eight percent (8%)*
            *b.2  Pre-retirement mortality table:  UP84 Unisex*
            *b.4  Post-retirement interest rate:  eight percent (8%)*
            *b.5  Post-retirement mortality table:  UP84 Unisex*

4.      Part II Section F1, "Early Retirement Benefit," is amended and restated to read as follows:

*For Tier 1 Participants, the Accrued Benefit is actuarially reduced for early commencement. For Tier 2 Participants, the Accrued Benefit is not actuarially reduced for early commencement if the Annuity Starting Date is on or after age sixty-two (62). For Tier 2 Participants, if the Annuity Starting Date is prior to age sixty-two (62), the Accrued Benefit is reduced for early commencement by zero and five tenths percent (0.50%) for each month that the Participant's Annuity Starting Date precedes the Participant's sixty-second (62nd) birthday. For all Participants, whether Tier 1 Participants or Tier 2 Participants, the Early Retirement Benefit shall commence as of the day of the month coincident with or next following the Participant's elected Annuity Starting Date.*

5.      Part II Section G1, "Method of Distribution," is amended and restated to read as follows:

| | *Tier 1 Participants* | *Tier 2 Participants* |
|---|---|---|
| *Lump Sum not to exceed $5,000* | *Yes* | *Yes* |
| *Life Annuity* | *Yes* | *Yes* |
| *50%/75%/100% Joint & Survivor Annuity* | *Yes* | *Yes* |

|                                           | Yes | No |
|-------------------------------------------|-----|-----|
| Life Annuity with a certain period of 10 years | | |

6. Part II Section G9, "Required Minimum Distributions," is amended by unmarking items (k) and (k2), so that a joint and survivor annuity is not a form of payment for Required Minimum Distributions.

7. Part II Section H6, "Multiple Plan Provisions," is amended and restated to read as follows:

> The Employer which maintains a qualified defined contribution plan in which any Participant is, was, or could become a Participant adds the following provision which it deems necessary to satisfy section 416 of the Code because of the required aggregation of multiple plans:
>
> f. Other – Specify: a minimum contribution allocation of three percent (3%) of each non-key Participant's total Compensation shall be provided in a defined contribution plan of the Employer.

All other provisions of the Plan as in effect prior to this Amendment shall remain unchanged by this Amendment.

Executed this _____ day of June, 2014.

Pacific Steel Casting Company

By: _____

Title: _____

Case: 19-10053 Doc# 85-2 Filed: 10/02/20 Entered: 10/02/20 13:14:49 Page 15 of Three of Three 89 Page 15 of 22

593

## SCHEDULE 6.01(a)

### Jurisdictions where Buyer is qualified to do business

**None.**

[Note of Explanation - Speyside Fund LLC is a Delaware LLC, with no offices , operations or assets in other states requiring foreign state qualification. It will form a subsidiary, either domesticated in California, or qualified to do business in California, to take title to the assets and operations as Buyer at Closing.]

164178.591857v4

## SCHEDULE 8.01(b)

### Excluded Employees

**To be completed no later than one day prior to the Closing Date**

164178.591857v4

## SCHEDULES

2.02(g) ............................................................................. Deposits and Prepaid Amounts Funded by PS
2.03(b)(iii) ............................................................................................. Buyer assumed Benefit Plans
2.03(b)(iv) ................................................................................. Transferable licenses, permits, etc.
2.03(b)(v) ...................................................... Employees With Accrued and Unpaid Vacation Benefits
2.03(b)(vi) ............................................................................ Accounts payable assumed by Buyer
2.04(a) .......................................................... Executory contracts and Unexpired Leases to Assumed
3.01(c)(ii) ................................................................................................... Net Working Capital
5.01(a) .......................................................................... Jurisdictions where Seller is qualfied
5.01(h) ......................................................................... Problem Receivables (previously 5.01(g)
5.01(i)(iii) ...................................................................................... Agreements with tax authorities
5.01(j) .................................................................... Intellectual Property  (previously 5.01(i))
5.01(k) .......................................................................... Real property used in the business
5.01(l) ............................................................................................. Litigation and Disputes
5.01(m) .......................................................................... Compliance with Laws Exceptions
5.01(n)(i) .................................................................. Environmental Law Compliance Exceptions
5.01(n)(ii) ..................................................... Environmental , H&S reports (previously (n)(ii)(2)
5.01(n)(iii) ............................................................................... Environmental, etc. permits
5.01(o) ........................................................................................... Insurance Policies
5.01(p) .......................................................................................................... Brokers
5.01(q) ................................................................... Matters Relating to Benefit Plans
6.01(a) ................................................... Jurisdicions where Buyer is qualfied to do buiness
8.01(b) ........................................................................................... Excluded Employees

164178.591857v4

Exhibit 9.03(h)

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
**STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET**
**(DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)**

1. **Basic Provisions ("Basic Provisions").**

    1.1 **Parties:** This Lease ("**Lease**"), dated for reference purposes only _____2014_____ ,
    is made by and between _Berkeley Properties, LLC, a California limited liability company_
    _____ ("**Lessor**")
    and _[to be inserted; Lessee will be an affiliate of Speyside Fund, LLC]_
    _____ ("**Lessee**"),
    (collectively the "**Parties**," or individually a "**Party**").

    1.2 **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
    and commonly known as _1333 2nd Street, 1310 3rd Street, and 640 Gilman Street, Berkeley_ ,
    located in the County of _Alameda_ , State of _California_
    and generally described as (describe briefly the nature of the property and, if applicable, the "**Project**", if the property is located within a Project)
    _____
    _____
    _____ ("**Premises**"). (See also Paragraph 2)

    1.3 **Term:** _15_ years and _0_ months ("**Original Term**") commencing _____
    ("**Commencement Date**") and ending _____ ("**Expiration Date**"). (See also Paragraph 3)

    1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
    _N/A_ ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

    1.5 **Base Rent:** $_89,554.00_ per month ("**Base Rent**"), payable on the _first_ day of
    each month commencing _on the Commencement Date_ . (See also Paragraph 4)

    ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _51_

    1.6 **Security Deposit:** $89,554.00 ("**Security Deposit**").

    ~~1.6~~ ~~Base Rent and Other Monies Paid Upon Execution:~~
        ~~(a)~~ ~~Base Rent: $0.00~~ ~~for the period~~ _____
        _____
        ~~(b)~~ ~~Security Deposit: $270,884.00~~ ~~("Security Deposit"). (See also Paragraph 5)~~
        ~~(c)~~ ~~Association Fees: $0.00~~ ~~for the period~~ _____
        ~~(d)~~ ~~Other: $N/A~~ ~~for~~ _____
        _____
        ~~(e)~~ ~~Total Due Upon Execution of this Lease: $0.00~~ _____ .

    1.7 **Agreed Use:** _cast steel foundry operation, related office functions and any other_
    _legally permitted uses_ . (See also Paragraphs 6
    and 53)

    1.8 **Insuring Party:** ~~Lessor~~ _Lessee_ is the "**Insuring Party**" unless otherwise stated herein. (See also Paragraph 8)

    1.9 **Real Estate Brokers:** (See also Paragraph 15)
        (a) **Representation:** The following real estate brokers (the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes):
    ☐ _N/A_ represents Lessor exclusively ("**Lessor's Broker**");
    ☐ _N/A_ represents Lessee exclusively ("**Lessee's Broker**"); or
    ☐ _N/A_ represents both Lessor and Lessee ("**Dual Agency**").
        (b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to
    in their separate written agreement (or if there is no such agreement, the sum of _N/A_ or _N/A_ % of the total Base Rent)
    for the brokerage services rendered by the Brokers.

    1.10 **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____
    _____ ("**Guarantor**"). (See also Paragraph 37)

    1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
    ☑ ~~an Addendum~~ _Addendums_ consisting of Paragraphs _51_ through _56_ ;
    ☐ a plot plan depicting the Premises;
    ☐ a current set of the Rules and Regulations;
    ☐ a Work Letter;
    ☐ other (specify): _____
    _____
    _____ .

**PAGE 1 OF 18**

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-11-8/08E

2. **Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs (**"Start Date"**), ~~and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that~~ Lessor makes no representation or warranty that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems (**"HVAC"**), loading doors, sump pumps, if any, and all other such elements in the Premises, ~~other than those constructed by Lessee,~~ shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the **"Building"**) shall be free of material defects, or ~~and~~ that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. ~~If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.~~

2.3    **Compliance.** *Lessor represents and warrants that use of the Premises as a foundry with related office and warehouse use is a permitted use within the zone wherein the Premises is located under the City of Berkeley ordinances. Lessor shall obtain and deliver to Lessee prior to occupancy a Zoning Research Letter from the City of Berkeley confirming that such use is permitted. If required by the City of Berkeley, Lessor shall also obtain a certificate of occupancy with respect to the Premises issued by the City of Berkeley in connection with Lessee's occupancy of the Premises, and shall at Lessor's expense address and correct any matters required by the City in order to obtain the Certificate of Occupancy. Except as provided above.* Lessor makes no representation or warranty that ~~warrants that to the best of its knowledge~~ the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances (**"Applicable Requirements"**) ~~that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.~~ **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** ~~If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.~~ If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building (**"Capital Expenditure"**), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, whether or not such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) ~~If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessee reasonably determines that it is not economically feasible to pay its share thereof, Lessee shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessor notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.~~

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor ~~and/or Brokers~~ to satisfy itself with respect to the size and condition of the Premises (including but not limited to the

INITIALS                                                                                                                                                      INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                FORM STN-11-8/08E

electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation ~~regarding as to the size~~ of the Premises made by ~~Brokers or Lessor,~~ except for the representations set forth in this Lease, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, ~~nor Lessor's agents, nor Brokers~~ have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. ~~In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.~~

2.5 ~~Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.~~

3. **Term.**

3.1 **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2 ~~Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.~~

3.3 **Delay in Possession.** Lessor ~~shall~~ agrees to use its ~~best~~ commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor ~~shall not~~ be subject to any liability therefor, ~~nor shall such failure affect the validity of this Lease.~~ In addition to any other remedies available to Lessee, Lessee shall not, ~~however,~~ be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing ~~within 10 days~~ after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. ~~If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.~~

3.4 **Lessee Compliance.** Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4. **Rent.**

4.1 **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent (**"Rent"**).

4.2 **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3 ~~Association Fees. In addition to the Base Rent, Lessee shall pay to Lessor each month an amount equal to any owners association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.~~

5. **Security Deposit.** Lessee shall deposit with Lessor on or prior to the Commencement Date ~~upon execution hereof~~ the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. ~~If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.~~ Lessor shall not be required to keep the

PAGE 3 OF 18

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

Case: 19-10053 Doc: 35-2 Filed: 10/02/20 Entered: 10/02/20 13:44:43 Page 22 of
99 Page 21 of 22

Three of Three

599

Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6. **Use.**

6.1 **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, ~~creates damage,~~ or waste ~~or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.~~ Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2 **Hazardous Substances.**

(a) **Reportable Uses Require Consent.** The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit. Notwithstanding anything to the contrary in the foregoing, Lessor is deemed to consent to Reportable Uses of a kind and character made in the operation of the steel castings foundry business acquired by Lessee concurrently with this Lease, subject to Lessee's continuing obligations to comply with all Applicable Requirements in connection therewith.

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party during the term hereof (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from *"Undisclosed Hazardous Substances" as defined below in paragraph 56,* ~~Hazardous Substances which existed on the Premises prior to Lessee's occupancy~~ or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. Lessor shall be entitled to a credit against its indemnification obligations under this Paragraph 6.2(e) equal to the amount of any purchase price reduction or other economic benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's indemnification obligation.

---

PAGE 4 OF 18

---

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Undisclosed Hazardous Substances on the Premises prior to Lessee's occupancy, ~~unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment~~. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities. *Lessor shall be entitled to a credit against its payment obligations under this Paragraph 6.2(f) equal to the amount of any purchase price reduction or other comparable benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's payment obligation.*

(g) **Lessor Termination Option.** If a Hazardous Substance Condition involving an Undisclosed Hazardous Substance (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor shall may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds ~~12~~ 18 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to ~~12~~ 18 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether such Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. ~~Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors~~ ~~that might indicate the presence of mold in the Premises.~~ *Notwithstanding anything to the contrary in the foregoing, Lessee shall not be required to remedy or to expend funds to correct any violation of Applicable Requirements existing on the Commencement Date insofar as such remedy or correction would require repair, alteration, or improvement of the Premises, which shall be Lessor's sole responsibility.*

6.4 **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority *as a result of Lessee's specific use of the Premises*. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7. **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1 **Lessee's Obligations.**

(a) In General. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.1(d) (Replacement), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, roof drainage systems, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, ~~specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below~~. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in good ~~a first-class~~ condition (including, e.g. graffiti removal) consistent with ~~past~~ practices and the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the Building. *Notwithstanding anything to the contrary in the foregoing, Lessee has accepted the Premises without Lessor warranties as to condition and repair and intends to operate its steel castings business in the current condition and state of repair of the Premises. Lessee reserves discretion to conduct maintenance and repair in accordance with its own operating needs and practices and need not comply with any Lessor requests for repair, replacement or and maintenance of particular items as*

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

they exist on the Commencement Date, except to the extent the requested items are reasonably expected to adversely affect health and safety of occupants and invitees of the Premises.

~~(b) Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.~~

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1 after written notice and a reasonable opportunity to cure, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to ~~115%~~ 100% of the cost thereof. Notwithstanding anything to the contrary in the foregoing, Lessor shall not have the right to make maintenance or repairs of any item which Lessee, in the proper exercise of its discretion under Section 7.1(a), chooses not to make or to defer to a later time.

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item ~~described in Paragraph 7.1(b)~~ cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2 **Lessee's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 7.1(a) (Replacement), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3 **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term "**Utility Installations**" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, ~~will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year.~~ Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. ~~For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.~~

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. ~~If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.~~

7.4 **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** ~~Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all~~ All Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. ~~Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all~~ All Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

~~(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of~~

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

the term of this Lease, Lessor may require that any or all Lessee-Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, but no better than the condition and state of repair on the Commencement Date, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party during the term hereof (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the extent required by Applicable Law even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    **Insurance; Indemnity.**

8.1    **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor within 10 days following receipt of an invoice.

8.2    **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "**insured contract**" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor may, at its sole cost and expense, shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor and Lessee, with loss payable to Lessor, Lessee, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $125,000 $250,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) Adjacent Premises. If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4    **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $125,000,000 $250,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

_____
INITIALS

_____
INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                                      FORM STN-11-8/08E

Case: 19-41053    Doc# 255    Filed: 10/03/20    Entered: 10/05/20 13:34:49    Page 623 of
of Five) on Page 3 of 7

**603**

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    **Indemnity.** Except for Lessor's ~~gross~~ negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. ~~Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.~~

9.    **Damage or Destruction.**

9.1    **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event *covered by insurance* or required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance , in, on, or under the Premises which requires remediation.

9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then *Lessee* ~~Lessor shall, at Lessor's expense,~~ repair such damage ~~(but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations)~~ as soon as reasonably possible and this Lease shall continue in full force and effect~~; provided, however, that Lessee shall, at Lessee's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event,~~ Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance

INITIALS                                                                                                                                    INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                    FORM STN-11-8/08E

**604**

proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds ~~(except as to the deductible which is Lessee's responsibility)~~ as and when required to complete said repairs. ~~In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10-day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.~~ Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, ~~notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.~~

      9.3     **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a ~~negligent or willful misconduct act of Lessee (in which event Lessee shall make the repairs at Lessee's expense),~~ Lessee Lessor may either: (i) repair such damage as soon as reasonably possible at ~~Lessor's~~ Lessee's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to ~~Lessee~~ Lessor within 30 days after receipt by ~~Lessor~~ Lessee of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event ~~Lessor~~ Lessee elects to terminate this Lease, ~~Lessee~~ Lessor shall have the right within 10 days after receipt of the termination notice to give written notice to ~~Lessor~~ Lessee of ~~Lessee's~~ Lessor's commitment to pay for the repair of such damage without reimbursement from ~~Lessor~~ Lessee. ~~Lessee~~ Lessor shall provide ~~Lessor~~ Lessee with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and ~~Lessor~~ Lessee shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If ~~Lessee~~ Lessor does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

      9.4     **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, Lessee ~~may elect to terminate~~ this Lease ~~shall terminate~~ 60 days following a Premises Total Destruction ~~such Destruction~~. If Lessee does not elect to terminate this Lease, Lessee shall repair and restore the Premises in accordance with Section 9.2. ~~If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.~~

      9.5     **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, ~~Lessee~~ Lessee may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to ~~Lessee~~ Lessor within 30 days after the date of occurrence of such damage. ~~Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend the Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.~~

      9.6     Abatement of Rent; Lessee's Remedies.

          (a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition **for which Lessee is not responsible under this Lease,** the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, ~~but not to exceed the proceeds received from the Rental Value insurance.~~ All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

          (b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

      9.7     **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.     **Real Property Taxes.**

      10.1     **Definition.** As used herein, the term **"Real Property Taxes"** shall mean all real property taxes and general, special district assessments, rental receipts tax or other governmental impositions imposed on the Premises or Project. Real Property Taxes shall not include any taxes imposed on the net income of Lessor, any franchise or corporate taxes imposed on Lessor, any business license fees imposed on Lessor or any transfer taxes assessed on a sale or transfer of the Premises or Project, ~~include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein; (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership~~

of the Premises; and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2 **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3 **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4 **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11. **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12. **Assignment and Subletting.**

12.1 **Lessor's Consent Required.**

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

(h) Notwithstanding the foregoing, in the event of any proposal by Lessee to assign this Lease to (a) an entity controlling, controlled by or under common control with Lessee, (b) a successor entity related to Lessee by merger, acquisition, consolidation, reorganization, or (c) a purchaser of substantially all of Lessee's assets located in the Premises, Lessor may not withhold or condition its consent provided that, the net worth of the assignee shall be equal to or greater than 100% of the net worth of Lessee at the time of such assignment. Lessee shall provide the Lessor with not less than twenty (20) business days advance notice of any such proposed assignment and Lessee shall provide Lessor with reasonable financial information regarding the net worth of the Lessee and the proposed assignee.

12.2 **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee, provided that upon an assignment of this Lease to an entity of equal or superior creditworthiness as Lessee at the time of such assignment, Lessee will be released from all further liability under this Lease.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-11-8/08E

Case: 19-41053    Doc# 255    Filed: 10/03/20    Entered: 10/03/20 13:34:12    Page 626 of 699 (Page 6 of 7)

**606**

INITIALS

INITIALS

disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3 **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13. **Default; Breach; Remedies.**

13.1 **Default; Breach.** A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 35 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 35 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination pursuant to this Lease, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 30 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a **"debtor"** as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other

INITIALS ___

INITIALS ___

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E

judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

~~(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.~~

~~(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor. (ii) the termination of a Guarantor's liability with respect to the Lease other than in accordance with the terms of such guaranty. (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing. (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.~~

13.2    **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within ~~10~~ 30 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

~~13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving of paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.~~

13.4    **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessee by any Lender. Accordingly, if any Rent shall not be received by Lessor within ~~5~~ 10 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to ~~10%~~ 5% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    **Breach by Lessor.**

(a) Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after

INITIALS _____                                                                                       INITIALS _____

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM STN-11-8/08E

receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that all such offsets shall not cumulatively exceed an amount equal to three (3) times the initial month's Base Rent under this Lease, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. ~~provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.~~ Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    **Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively **"Condemnation"**), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    **Brokerage Fees.**  N/A

~~15.1    Additional Commission.  In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option; (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located; (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease; or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.~~

~~15.2    Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.~~

~~15.3    Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.~~

16.    **Estoppel Certificates.**

(a) Each Party (as **"Responding Party"**) shall within 10 days after written notice from the other Party (the **"Requesting Party"**) execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current **"Estoppel Certificate"** form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    **Definition of Lessor.**  The term **"Lessor"** as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                                                   FORM STN-11-8/08E

Case: 19-40053    Doc# 25-5 Filed: 10/02/20    Entered: 10/02/20 13:24:19    Page 2 of (Page 2 of Five) of 693    Page 2 of 9

**609**

performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.     **Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.     **Days.**  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     **Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     **Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     **No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     **Notices.**

     23.1    **Notice Requirements.**  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by ~~regular,~~ certified or registered mail or U.S. Postal Service Express Mail ~~or other nationally recognized overnight courier,~~ with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

     23.2    **Date of Notice.**  Any notice sent by ~~registered or~~ certified mail, return receipt requested, ~~U.S. Postal Service Express Mail or other nationally recognized overnight courier~~ shall be deemed given on the date of delivery shown on the receipt card or the delivery records ~~of the Express Mail or other courier, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.~~ Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.**

     (a)    No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

     (b)    The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

     (c)    THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     ~~Disclosures Regarding The Nature of a Real Estate Agency Relationship.~~

     ~~(a)    When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:~~

     ~~(i)    Lessor's Agent. A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.~~

     ~~(ii)    Lessee's Agent. An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.~~

     ~~(iii)    Agent Representing Both Lessor and Lessee. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as~~

INITIALS                             INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STN-11-8/08E

~~stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.~~

        ~~(b)      Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.~~

        ~~(c)      Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.~~

26.     **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. *So long as Lessor's current bankruptcy case remains open (Northern District of California, Oakland Division, Case No. 14-41048-RLE), any litigation between the Parties hereto concerning this Lease shall be initiated in the United State Bankruptcy Court for the Northern District of California, Oakland Division. Following such time as Lessor's current bankruptcy case has been closed, any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.*

30.     Subordination; Attornment; Non-Disturbance.

        30.1     **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, **"Security Device"**), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as **"Lender"**) shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

        30.2     **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) ~~be subject to any offsets or defenses which Lessee might have against any prior lessor,~~ (c) be bound by prepayment of more than one month's rent, ~~or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.~~

        30.3     **Non-Disturbance.** *Lessor represents and warrants that no Security Devices currently affect the Premises.* With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a **"Non-Disturbance Agreement"**) from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. ~~Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.~~

        30.4     **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.     **Attorneys' Fees.** If any Party ~~or Broker~~ brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party ~~or Broker~~ who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party ~~or Broker~~ of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.     **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers,

INITIALS                                                                                                                        INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM STN-11-8/08E

lenders, or, ~~during the last six months of the term hereof,~~ tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor and Lessee agree are ~~may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises~~ as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33. **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34. **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35. **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36. **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37. **Guarantor.**

37.1 **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2 **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38. **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39. **Options.** If Lessee is granted an Option, as defined below, then the following provisions shall apply:

39.1 **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

~~39.2 Options Personal To Original Lessee. Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.~~

39.3 **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4 **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, ~~(ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee),~~ (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

~~(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.~~

~~40. Multiple Buildings. If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.~~

41. **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

~~42. Reservations. Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents~~

INITIALS _____                                                                 INITIALS _____

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                    FORM STN-11-8/08E

Case: 19-44053   Doc# 255-5 Filed: 10/02/20  Entered: 10/02/20 13:24:49   Page 12 of (Part 2 of Five) Page 5 of 9

**612**

43.  **Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" with 6 months shall be deemed to have waived its right to protest such payment.

44.  **Authority; Multiple Parties; Execution.**

(a)  If either Party hereto is a corporation, trust, limited liability company,  partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)  If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)  This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.  **Conflict.**  Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.  **Offer.**  Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.  **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.  **Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.  **Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50.  **Americans with Disabilities Act.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:**  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:**  IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: _____ | Executed at: _____ |
| On: _____ | On: _____ |
| **By LESSOR:** | **By LESSEE:** |
| Berkeley Properties, LLC | _____ |
| A California limited liability company | _____ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |

_____
**INITIALS**

PAGE 17 OF 18

_____
**INITIALS**

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM STN-11-8/08E

| Telephone:(____) _____ | Telephone:(____) _____ |
| Facsimile:(____) _____ | Facsimile:(____) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

**BROKER:**                          **BROKER:**

_____            _____

| Attn: _____ | Attn: _____ |
| Title: _____ | Title: _____ |
| Address: _____ | Address: _____ |

| Telephone:(____) _____ | Telephone:(____) _____ |
| Facsimile:(____) _____ | Facsimile:(____) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  800 W 6th Street, Suite 800, Los Angeles, CA 90017.  Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

© Copyright 2001 - By AIR Commercial Real Estate Association.  All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

INITIALS ____

INITIALS ____

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-11-8/08E



# ADDENDUM

**Date:** _____

**By and Between (Lessor)** <u>Berkeley Properties, LLC, a California limited liability company</u>
       **(Lessee)** _____

**Address of Premises:** <u>1333 2nd Street, 1310 Third Street and 640 Gilman Street</u>
                     <u>Berkeley, CA</u>

Paragraphs <u>53 - 56</u>

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

53. AGREED USE. Notwithstanding any other provision of the Lease, during the first five (5) years of the Original Term, the Agreed Use shall be limited to cast steel foundry operations and related office uses. No other use of the Premises shall be permitted during such period of time.

54. SHARING OF BONUS RENT. If Lessee sublets any part of the Premises, then with respect to the subleased space, Lessee shall pay to Lessor fifty percent (50%) of the positive difference, if any, between (a) all consideration paid by the sublessee to Lessee attributable to the sublet space (after deducting therefrom reasonable real estate broker fees, tenant improvement allowances, legal fees and other out-of-pocket costs paid by Lessee in connection with such subletting, which for purposes of this calculation shall be amortized on a straight-line basis over the term of such sublease), less (b) the Rent payable under this Lease allocable to the space sublet for the term of the sublet. Such amount shall be paid to Lessor on the same basis, whether periodic or in lump sum, that such consideration is paid to Lessee by its sublessee, and shall be paid within ten (10) business days after receipt of same by Lessee.

55. Lessor agrees that any amount determined to be due to Lessee (as Buyer) under Section 10.01 of that certain Asset Purchase Agreement (the "Asset Purchase Agreement") dated as of _____ by and between Lessee (as successor in interest to Speyside Fund, LLC), and Pacific Steel Casting Company, a California corporation ("Seller"), on account of any breach of a representation, warranty or covenant by Seller under the Asset Purchase Agreement shall be paid to Lessee through an abatement in the amount of rent otherwise payable by Lessee to Lessor under this Lease until the amount of such rent abatement equals the amount determined to be due to Lessee under the Asset Purchase Agreement, after which the rent under the Lease shall be fully payable pursuant to the terms of this Lease.

56. Pursuant to the terms of the Asset Purchase Agreement, Seller provided to Lessee due diligence materials, including without limitation certain environmental reports relating to the Premises (collectively "Asset Purchase Agreement Disclosures"), and Lessee has also had an opportunity to conduct its own physical and regulatory environmental investigations of the Premises ("Lessee's Environmental Due Diligence") prior to the closing of the transaction under the Asset Purchase Agreement. The Asset Purchase Agreement provides for a purchase price adjustment in the event any contamination by Hazardous Materials not disclosed in the Asset Purchase Agreement Disclosures is discovered at any time up to ninety (90) days following the closing. For purposes of this Lease, the term "Undisclosed Hazardous Substances" means any Hazardous Substances which (i) existed on the Premises prior to Lessee's occupancy, (ii) was not disclosed in any of the Asset Purchase Agreement Disclosures, and (iii) the existence of which was made aware to Lessee or any of Lessee's employees or agents as a result of Lessee's Environmental Due Diligence before the closing or within ninety (90)

Case: 19-44057    Doc# 355-5 Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 15 of
         of Five)   Page 8 of 9

days thereafter.

Lessor shall have no responsibility or payment obligation for the investigation or remediation of any Hazardous Substances except with respect to Undisclosed Hazardous Substances as expressly provided in Paragraphs 6.2(e), 6.2(f), and 6.2(g), unless required by law or governmental authority.

INITIALS

INITIALS

# FIRST AMENDMENT TO
# ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement ("Amendment") is entered into by and between Pacific Steel Casting Company, a California corporation (the "Debtor" or "Seller") and Speyside Fund, LLC (the "Buyer" including any assignee of Buyer) as of this 21st day of August, 2014 ("Amendment Date") (Seller and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".)

## Recitals

A.    The Parties previously entered into an Asset Purchase Agreement dated June 19, 2014 (" Original Agreement") pursuant to which Buyer agreed to purchase and Seller agreed to sell substantially all of Seller's business and assets and Buyer agreed to assume certain specified liabilities of Seller (collectively the "Asset Sale"). (All capitalized terms used herein shall have the same meaning as that ascribed to such term in the Agreement.)

B.    A Sale Order was entered by the Bankruptcy Court, approving the Asset Sale.

C.    Disputes have arisen between the Parties concerning the application of the terms of the Agreement to certain items, which the Parties have resolved but which require changes to be made to the Agreement.

NOW, THEREFORE, in consideration of the mutual promises of the Parties and other consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Original Agreement as follows:

1.    Exhibit A is amended by adding the following definition:

"Agreement" means the Asset Purchase Agreement by and between Speyside Fund LLC and Pacific Steel Casting Company dated June 19, 2014, as amended by the First Amendment to Asset Purchase Agreement by and between Speyside Fund LLC and Pacific Steel Casting Company dated August 21, 2014.

2.    Section 2.03 (b) of the Original Agreement is amended to delete clauses (vi) and (vii) therefrom.

3.    Schedule 2.03(b)(vi)  is deleted.

4.    Section 2.04(a) and Schedule 2.04(a) of the Original Agreement are amended to conform to the revised list of Assumed Contracts and the related Cure Amounts filed with the Bankruptcy Court on July 28, 2014 as described in the Supplemental Declaration of Charles H. Bridges, Jr. In Support of Motion to Assume and Assign Executory Contracts and Leases in

EXHIBIT A

Case: 19-41057   Doc# 85   Filed: 11/08/21   Entered: 11/08/21 12:34:40   Page 617 of 699

to APA   Page 1 of 26

617

Connection with Proposed Sale of Assets (docket #261). Seller and Buyer have further determined and agreed that with respect to certain equipment leases in such Supplemental Declaration which are mutually agreed to be disguised finance leases, Seller will pay and retire all remaining amounts due thereunder, acquire and transfer to Buyer the equipment leased thereunder.

5.    Subsections 3.01(a) and (b) are amended to provide in their entirety as follows:

**3.01    Purchase Price.**

(a)    Good Faith Deposit.    Upon execution of this Agreement the Buyer shall pay $500,000 for deposit into the Binder & Malter LLP Client Trust Account in escrow on behalf of Seller and Buyer by delivery of a cashier's check to Binder & Malter LLP or wire transfer into said account.  This is the "Good Faith Deposit."

(b)    The purchase price for the Acquired Assets (the "Purchase Price") shall consist of the following:

(i)    $9,800,000.00;

(ii)    the Good Faith Deposit; and

(iv)    any additional amount the Buyer chooses, in its sole discretion, to over-bid at the Auction.

The Parties agree that, as of the Amendment Date, the Purchase Price is approximately $10,300,000.00.

6.    Section 3.01(c)(i) is amended to add the following provision at the end of the Section:

" Net Working Capital on the Closing Date will include the PACCAR account receivable without regard to any possible setoff rights PACCAR may assert or have arising from its prepetition claim in the Bankruptcy case."

7.    Section 4.01 shall be amended to provide in its entirety as follows:

**4.01    Closing**.  The consummation of the Transaction (the "Closing") shall take place on August 29, 2014 at the offices of Seller's counsel, unless otherwise mutually agreed by the Parties.

8.    Section 5.01(o) is amended to provide in its entirety as follows:

(o) Insurance.   Schedule 5.01(o) hereto sets forth a summary of each insurance policy carried by Seller (including any self-insurance programs) (collectively "Insurance Policies").  All such insurance policies are valid and binding and in full force and effect. Except as provided in the following sentences, all premiums due under the Insurance Policies have been paid in full

Case: 19-40057   Doc# 85   Filed: 07/10/20   Entered: 07/10/20 18:34:49   Page 618 of
Case: 19-40057   Doc# 2   Filed: 07/18/19   Entered: 07/18/19 17:04:11   Amendment 2
to APA   Page 2 of 26
699

**618**

and Seller has not received any notice of cancellation or termination in respect of any such policy nor is Seller in default thereunder. Sentry Insurance has made unsecured claims based on alleged nonpayment of charges for Seller's workers compensation policies, substantially all of which relate to the 2012/2013 policy year. Further, Sentry Insurance has expressed its intention to terminate the Seller's workers compensation policy for the 2014/2015 policy year effective with the Closing. Certain premiums and charges invoiced by Sentry to Seller for the current policy year have not been paid.

9.      A new Section 7.13 is added to provide in its entirety as follows:

**7.13    Workers Compensation**.    Seller and Buyer have determined that Seller's workers compensation insurer, Sentry Insurance, is unwilling to consent to the assignment of Seller's worker's compensation insurance policies to Buyer and intends to terminate such policies effective with the Closing. Buyer shall be entitled to receive and retain any overfunding amounts received by Seller from Sentry Insurance with respect to Seller's workers compensation insurance coverage. Buyer shall also be entitled to receive and retain all premium rebates received by Seller from Sentry Insurance on account of the termination of Seller's workers compensation coverage. Seller shall fully cooperate with Buyer as necessary: (a) to assign and pay to Buyer all cash amounts received by Seller from Sentry Insurance on account of such overfunding and premium rebates, and (b) in all of Buyer's interactions with Sentry Insurance. Buyer shall have no obligation to pay to Sentry any amount for alleged underfunding for workers compensation insurance coverage arising from any pre-Closing Date periods, including but not limited to Sentry Insurance's pending claim of $890,000, and any adjustments Sentry may propose to Seller's policies after the Closing Date.

With respect to all pending claims under Seller's workers compensation insurance policies with Sentry Insurance, after the Closing Date Seller shall use its best efforts to assure that Sentry Insurance continues to defend all such claims. Buyer shall take over administration of such pending claims from and after the Closing Date. Buyer and Seller shall cooperate and share information with regard to the administration of such claims on a regular basis.

10.      Section 9.01(d) is added to provide in its entirety as follows:

(d)      <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have issued an order approving the modification of the Agreement by the Amendment.

11.      Section 9.03(h) is amended to add the following sentence at the end of the Section:

"The base rent under the Lease shall be abated (but not Buyer's obligations under the Lease to pay the security deposit, real estate taxes, insurance and common area maintenance) beginning on the Lease commencement date and continuing until the amount of base rent otherwise due but abated equals $1,000,000.  Base rent shall thereafter be payable by Buyer in accordance with the terms of the Lease."

3

Exhibit 9.03(h) is hereby replaced with the form of Lease attached hereto.

12.     Section 10.01 is amended to provide in its entirety as follows:

**10.01 Survival of Representations, Warranties and Covenants and Liability Limitation.**

(a)     <u>Survival</u>.  The representations and warranties of Buyer and Seller contained in this Agreement and the covenants and agreements of Buyer and Seller contained in this Agreement shall survive for a period of ninety (90) days following the Closing Date and any claim of breach by either Party shall be made in writing delivered to the breaching Party on or before the end of such ninety (90) day period.  Any dispute arising out of a claimed breach shall be submitted to and resolved by the Bankruptcy Court pursuant to Section 10.08 hereof.

(b)     <u>Source of Payment of Liability</u>.  Any amount determined to be due to Buyer (either by agreement of the Parties or by order of the Bankruptcy Court) on account of any breach of a representation, warranty or covenant by Seller shall be paid to Buyer through a reduction in the amount of base rent otherwise payable by Buyer to Berkeley Properties LLC under the Lease until the amount of such base rent abatement equals the amount determined to be due to Buyer, after which the base rent under the Lease shall be fully payable pursuant to the Lease terms.  Buyer's sole and exclusive remedy after the Closing Date for any Seller's breach of a representation, warranty or covenant shall be such rent abatement.  Buyer's obligations under the Lease to pay the security deposit, real estate taxes, insurance and common area maintenance shall not be subject to abatement for any such Buyer's claims.  The Lease shall provide for Berkeley Properties LLC's consent to and recognition of Buyer's rights of offset and base rent abatement hereunder.

(c)     <u>Limitation on Buyer's Liability</u>.  The aggregate liability of Seller (which shall be satisfied solely by a base rent abatement as described in Section 10.01(b)) for Buyer's claims for breaches of Seller's representations, warranties or covenants shall not exceed one million five hundred thousand dollars ($1,500,000); provided, however, that such limitation on Seller's liability shall not apply to claims made by Buyer for remedial costs incurred resulting from Seller's noncompliance with the requirements of (i) the Americans with Disabilities Act, (ii) applicable fire safety laws, regulations, ordinances and codes, or (iii) any unresolved notices of violation from the City of Berkeley regarding claimed violations of municipal ordinances or codes by Seller or Berkeley Properties LLC.

13.     <u>Assignment of Buyer's Rights</u>.  Buyer hereby assigns its right, title and interest in and to the Agreement to Pacific Steel Casting Company LLC, a Delaware limited liability company in which Buyer is a principal owner.  Seller hereby consents to such assignment pursuant to Section 10.04 of the Original Agreement.

Except as expressly amended herein, all terms and conditions of the Agreement shall continue in full force and effect, and are ratified and approved by the Parties.

4

Case: 19-40057   Doc# 85   Filed: 11/08/21   Entered: 10/08/20 18:34:59   Page 620 of
to APA   Page 4 of 26   699

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _Katie Delsol_____

Katie Delsol, President


BUYER

SPEYSIDE FUND, LLC

By: _____

Jeffrey A. Stone, Manager


The undersigned, as Assignee of Buyer's rights under the Agreement, joins in the execution and delivery hereof and acknowledges that it is bound by the liabilities and obligations of the Buyer hereunder.

PACIFIC STEEL CASTING COMPANY LLC

By: _____

Jeffrey A. Stone, Manager

5

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Agreement as of the date first set forth above.

SELLER

PACIFIC STEEL CASTING COMPANY

By: _____
      Katie Delsol, President

BUYER

SPEYSIDE FUND, LLC

By: _____
      Jeffrey A. Stone, Manager

The undersigned, as Assignee of Buyer's rights under the Agreement, joins in the execution and delivery hereof and acknowledges that it is bound by the liabilities and obligations of the Buyer hereunder.

PACIFIC STEEL CASTING COMPANY LLC

By: _____
      Jeffrey A. Stone, Manager

5

# STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE – NET

### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1. Basic Provisions ("Basic Provisions").**

**1.1 Parties:** This Lease ("**Lease**"), dated for reference purposes only _____ August 29, 2014 _____, is made by and between Berkeley Properties, LLC, a California limited liability company _____ ("**Lessor**") and Pacific Steel Casting Company LLC, a Delaware limited liability company _____ ("**Lessee**"), (collectively the "**Parties,**" or individually a "**Party**").

**1.2 Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as 1333 2nd Street, 1310 3rd Street, and 640 Gilman Street, Berkeley _____ located in the County of Alameda _____, State of California _____ and generally described as (describe briefly the nature of the property and, if applicable, the **Project**", if the property is located within a Project) _____ _____ _____ _____ _____ ("**Premises**"). (See also Paragraph 2)

**1.3 Term:** 15 years and 0 months ("**Original Term**") commencing August 29, 2014 ("**Commencement Date**") and ending August 28, 2029 ("**Expiration Date**"). (See also Paragraph 3)

**1.4 Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing N/A _____ ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

**1.5 Base Rent:** $89,554.00 per month ("**Base Rent**"), payable on the first _____ day of each month commencing on the Commencement Date _____ _____. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph 51 _____

**1.6 Security Deposit: $89,554.00 ("Security Deposit")**

~~**1.6 Base Rent and Other Monies Paid Upon Execution:**~~

~~(a)~~ ~~**Base Rent:** $ 0.00 _____ for the period _____~~ _____.

~~(b)~~ ~~**Security Deposit: $270,884.00** _____ ("**Security Deposit**"). (See also Paragraph 5)~~

~~(c)~~ ~~**Association Fees:** $ 0.00 _____ for the period _____~~ _____

~~(d)~~ ~~**Other:** $ N/A _____ for _____~~ _____

~~(e)~~ ~~**Total Due Upon Execution of this Lease:** $ 0.00 _____~~.

**1.7 Agreed Use:** Cast steel foundry operation, related office functions and any other legally permitted uses _____. (See also Paragraphs 6 and 53)

**1.8 Insuring Party:** Lessor ~~Lessee~~ is the "**Insuring Party**" unless otherwise stated herein. (See also Paragraph 8)

**1.9 Real Estate Brokers:** (See also Paragraph 15)

(a) **Representation:** The following real estate brokers (the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes):

☐ N/A _____ represents Lessor exclusively ("**Lessor's Broker**");
☐ N/A _____ represents Lessee exclusively ("**Lessee's Broker**"); or
☐ N/A _____ represents both Lessor and Lessee ("**Dual Agency**").

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the fee agreed to in their separate written agreement (or if there is no such agreement, the sum of N/A _____ or N/A _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

**1.10 Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by _____ _____ ("**Guarantor**"). (See also Paragraph 37)

**1.11 Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum *Addendum* consisting of Paragraphs 51 _____ through 60 _____;
☐ a plot plan depicting the Premises;
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☐ other (specify): _____ _____ _____ _____

©2014 AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                                 FORM STN-23-08/14E

Case 15-41045    Doc# 88-6    Filed 10/02/15    Entered 10/02/15 13:34:58    Page 623 of
Case: 14-41045    Doc# 289-3    Filed 08/21/14    Entered 08/21/14 15:18:04    Page 7
to APA    694    Page 7 of 26

**623**

**2. Premises.**

    **2.1  Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **Note: Lessee is advised to verify the actual size prior to executing this Lease.**

    **2.2  Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("**StartYDate**"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that, *Lessor makes no representation or warranty that* the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "**Building**") shall be free of material defects, or and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

    **2.3  Compliance.** *Lessor represents and warrants that use of the Premises as a foundry with related office and warehouse use is a permitted use within the zone wherein the Premises is located under the City of Berkeley ordinances. Lessor shall obtain and deliver to Lessee prior to occupancy a Zoning Research Letter from the City of Berkeley confirming that such use is permitted. If required by the City of Berkeley, Lessor shall also obtain a certificate of occupancy with respect to the Premises issued by the City of Berkeley in connection with Lessee's occupancy of the Premises, and shall at Lessor's expense address and correct any matters required by the City in order to obtain the Certificate of Occupancy. Except as provided above.* Lessor makes no representation or warranty that warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

        (a) Subject to Paragraph 2.3(c) below, *whether or not* the Capital Expenditure is required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which require such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

        (b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

        (c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises, then in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not, however, have any right to terminate this Lease.

    **2.4  Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the

    INITIALS

    INITIALS

© 2011 AIR COMMERCIAL REAL ESTATE ASSOCIATION    FORM MTN-8-4/11E

Case 14-41045 Doc# 289-3 Filed 08/21/14 Entered 08/21/14 15:18:04 Page 8 of APA

**624**

electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation *regarding as to the size of the Premises made by Brokers or Lessor, except for the representations set forth in this Lease*, (e) the square footage of the Premises was not materially to Lessee's decision to lease the Premises, (f) neither the Rent stated herein, and (f) neither Lessor, nor *Lessor's agents, nor* Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5   **Lessee as Prior Owner/Occupant.**   The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.   **Term.**

3.1   **Term.**   The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   **Early Possession.**   Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3   **Delay In Possession.**   Lessor shall agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. *In addition to any other remedies available to Lessee,* Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of Rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4   **Lessee Compliance.**   Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).   Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.   **Rent.**

4.1   **Rent Defined.**   All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2   **Payment.**   Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of such month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent, Insurance and Real Property Taxes, and any remaining amount to any other outstanding charges or costs.

4.3   **Association Fees.**   In addition to the Base Rent, Lessee shall pay to Lessor each month any amount equal to any owner's association or condominium fees levied or assessed against the Premises. Said monies shall be paid at the same time and in the same manner as the Base Rent.

5.   **Security Deposit.**   Lessee shall deposit with Lessor *on or prior to the Commencement Date* upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use the Security Deposit to apply or retain all or any portion of the Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following any such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.   Lessor shall not be required to keep the

© 2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                                   FORM STN-9-6/09E

Case 14-41045   Doc# 289-3   Filed 08/27/14   Entered 08/27/14 15:18:04   Page 9

Case 19-11157-CMA   Doc 1023   Filed 10/02/20   Entered 10/02/20 13:34:58   Page 625 of 694

625

Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.  **Use.**

    6.1  **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, or waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

    6.2  **Hazardous Substances.**

    (a) **Reportable Uses Require Consent.**  The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a permit, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.  **Notwithstanding anything to the contrary in the foregoing, Lessor is deemed to consent to Reportable Uses of a kind and character made in the operation of the steel castings foundry business acquired by Lessee concurrently with this Lease, subject to Lessee's continuing obligations to comply with all Applicable Requirements in connection therewith.**

    (b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as  previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

    (c) **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and/or for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

    (d) **Lessee Indemnification.**  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party **during the term hereof**  (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. **No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.**

    (e) **Lessor Indemnification.**  Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and Lenders, harmless from and against any and all environmental damages, including the cost of remediation,  which result from "Undisclosed Hazardous Substances" as defined below in paragraph 56,  Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  Lessor shall be entitled to a credit against its indemnification obligations under this Paragraph 6.2(e) equal to the amount of any purchase price reduction or other economic benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's indemnification obligation.

© 2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STG-8-3/07E MULTI-TENANT
626

(f)ÿ **InvestigationsÿandÿRemediations.** ÿ Lessorÿshallÿretainÿtheÿresponsibilityÿandÿpayÿforÿanyÿinvestigationsÿorÿremediation measuresÿrequiredÿbyÿgovernmentalÿentitiesÿhavingÿjurisdictionÿwithÿrespectÿtoÿtheÿexistenceÿofÿaÿ**Undisclosed** ÿHazardousÿSubstanceÿonÿtheÿPremises priorÿtoÿLessee'sÿoccupancy,ÿunlessÿsuchÿremediationÿmeasureÿisÿrequiredÿasÿaÿresultÿofÿLessee'sÿuseÿ(includingÿ"Alterations",ÿasÿdefinedÿinÿparagraph 7.3(a)ÿbelow)ÿofÿtheÿPremises,ÿinÿwhichÿeventÿLesseeÿshallÿbeÿresponsibleÿforÿsuchÿpayment.ÿLesseeÿshallÿcooperateÿfullyÿinÿanyÿsuchÿactivitiesÿatÿthe requestÿofÿLessor,ÿincludingÿallowingÿLessorÿandÿLessor'sÿagentsÿtoÿhaveÿreasonableÿaccessÿtoÿtheÿPremisesÿatÿreasonableÿtimesÿinÿorderÿtoÿcarryÿout Lessor'sÿinvestigativeÿandÿremedialÿresponsibilities. **Lessor shall be entitled to a credit against its payment obligations under this Paragraph 6.2(f) equal to the amount of any purchase price reduction or other economic benefit received by Lessee under or pursuant to the Asset Purchase Agreement (as described in Paragraph 56) with respect to the event or circumstance giving rise to Lessor's payment obligation.**

(g)ÿ**Lessor'sÿTerminationÿOption.** ÿIfÿaÿHazardousÿSubstanceÿConditionÿinvolvingÿanÿ**Undisclosedÿ Hazardousÿ Substance** (seeÿParagraphÿ9.1(e))ÿoccursÿduringÿtheÿtermÿofÿthisÿLease,ÿunlessÿLesseeÿisÿlegallyÿresponsibleÿthereforÿ(inÿwhichÿcaseÿLesseeÿshallÿmakeÿthe investigationÿandÿremediationÿthereofÿrequiredÿbyÿApplicableÿRequirementsÿandÿthisÿLeaseÿshallÿcontinueÿinÿfullÿforceÿandÿeffect,ÿbutÿsubjectÿto Lessor'sÿrightsÿunderÿParagraphÿ6.2(d)ÿandÿParagraphÿ13),ÿLessorÿshallÿmay,ÿatÿLessor'sÿoption,ÿeitherÿ(i)ÿinvestigateÿandÿremediateÿsuchÿHazardous SubstanceÿCondition,ÿifÿrequired,ÿasÿsoonÿasÿreasonablyÿpossibleÿatÿitsÿexpense,ÿinÿwhichÿeventÿthisÿLeaseÿshallÿcontinueÿinÿfullÿforceÿandÿeffect, orÿ(ii)ÿifÿtheÿestimatedÿcostÿtoÿremediateÿsuchÿconditionÿexceedsÿ~~12~~ ÿ~~6~~ ÿtimesÿtheÿthenÿmonthlyÿBaseÿRentÿorÿ$100,000,ÿwhichever isÿgreater, giveÿwrittenÿnoticeÿtoÿLessee,ÿwithinÿ30ÿdaysÿafterÿreceiptÿbyÿLessorÿofÿknowledgeÿofÿtheÿoccurrenceÿofÿsuchÿHazardousÿSubstance Condition,ÿofÿLessor'sÿdesireÿtoÿterminateÿthisÿLeaseÿasÿofÿtheÿdateÿ60ÿdaysÿfollowingÿtheÿdateÿofÿsuchÿnotice.ÿInÿtheÿeventÿLessorÿelectsÿtoÿgiveÿaÿsuch terminationÿnotice,ÿLesseeÿmay,ÿwithinÿ10ÿdaysÿthereafter,ÿgiveÿwrittenÿnoticeÿtoÿLessorÿofÿLessee'sÿcommitmentÿtoÿpayÿtheÿamountÿbyÿwhichÿtheÿcostÿof theÿremediationÿofÿsuchÿHazardousÿSubstanceÿConditionÿexceedsÿanÿamountÿequalÿtoÿ~~12~~ ÿ~~6~~ ÿtimesÿtheÿthenÿmonthlyÿBaseÿRentÿor $100,000,ÿwhicheverÿisÿgreater.ÿLesseeÿshallÿprovideÿLessorÿwithÿtheÿfundsÿorÿsatisfactoryÿassuranceÿthereofÿwithinÿ30ÿdaysÿfollowingÿsuch commitment.ÿInÿsuchÿevent,ÿthisÿLeaseÿshallÿcontinueÿinÿfullÿforceÿandÿeffect,ÿandÿLessorÿshallÿproceedÿtoÿmakeÿsuchÿremediationÿasÿsoonÿas reasonablyÿpossibleÿafterÿtheÿrequiredÿfundsÿareÿavailable.ÿIfÿLesseeÿdoesÿnotÿgiveÿsuchÿnoticeÿandÿprovideÿtheÿrequiredÿfundsÿorÿassuranceÿthereof withinÿtheÿtimeÿprovided,ÿthisÿLeaseÿshallÿterminateÿasÿofÿtheÿdateÿspecifiedÿinÿLessor'sÿnoticeÿofÿtermination.

6.3ÿ **Lessee'sÿComplianceÿwithÿApplicableÿRequirements.** ÿExceptÿasÿotherwiseÿprovidedÿinÿthisÿLease,ÿLesseeÿshall,ÿatÿLessee's soleÿexpense,ÿfully,ÿdiligentlyÿandÿinÿaÿtimelyÿmanner,ÿmateriallyÿcomplyÿwithÿallÿApplicableÿRequirements,ÿtheÿrequirementsÿofÿanyÿapplicableÿfire insuranceÿunderwriterÿorÿratingÿbureau,ÿandÿtheÿrecommendationsÿofÿLessor'sÿengineersÿand/orÿconsultantsÿwhichÿrelateÿinÿanyÿmannerÿtoÿtheÿsuch Requirements,ÿwithoutÿregardÿtoÿwhetherÿsuchÿRequirementsÿareÿnowÿinÿeffectÿorÿbecomeÿeffectiveÿafterÿtheÿStartÿDate.ÿLesseeÿshall,ÿwithinÿ10ÿdays afterÿreceiptÿofÿLessor'sÿwrittenÿrequest,ÿprovideÿLessorÿwithÿcopiesÿofÿallÿpermitsÿandÿotherÿdocuments,ÿandÿotherÿinformationÿevidencingÿLessee's complianceÿwithÿanyÿApplicableÿRequirementsÿspecifiedÿbyÿLessor,ÿandÿshallÿimmediatelyÿuponÿreceiptÿ,ÿnotifyÿLessorÿinÿwritingÿ(withÿcopiesÿofÿany documentsÿinvolved)ÿofÿanyÿthreatenedÿorÿactualÿclaim,ÿnotice,ÿcitation,ÿwarning,ÿcomplaintÿorÿreportÿpertainingÿtoÿorÿinvolvingÿtheÿfailureÿofÿLesseeÿorÿthe PremisesÿtoÿcomplyÿwithÿanyÿApplicableÿRequirements. ~~Likewise,ÿLesseeÿshallÿimmediatelyÿgiveÿwrittenÿnoticeÿtoÿLessorÿofÿ(i)ÿanyÿwaterÿdamageÿtoÿthe Premisesÿandÿanyÿsuspectedÿseepage,ÿpooling,ÿdampnessÿorÿotherÿcondition~~ ~~conduciveÿtoÿtheÿproductionÿofÿmold;ÿorÿ(ii)ÿanyÿmustinessÿorÿotherÿodors thatÿmightÿindicateÿtheÿpresenceÿofÿmoldÿinÿtheÿPremises.~~ **Notwithstanding anything to the contrary in the foregoing, Lessee shall not be required to remedy or to expend funds to correct any violation of Applicable Requirements existing on the Commencement Date insofar as such remedy or correction would require repair, alteration, or improvement of the Premises, which shall be Lessor's sole responsibility.**

6.4ÿ **Inspection;ÿCompliance.** ÿLessorÿandÿLessor'sÿ**"Lender"** ÿ(asÿdefinedÿinÿParagraphÿ30)ÿandÿconsultantsÿshallÿhaveÿtheÿrightÿto enterÿintoÿPremisesÿatÿanyÿtime,ÿinÿtheÿcaseÿofÿanÿemergency,ÿandÿotherwiseÿatÿreasonableÿtimesÿafterÿreasonableÿnotice,ÿforÿtheÿpurposeÿofÿinspecting theÿconditionÿofÿtheÿPremisesÿand/orÿverifyingÿcomplianceÿbyÿLesseeÿwithÿthisÿLease.ÿTheÿcostÿofÿanyÿsuchÿinspectionsÿshallÿbeÿpaidÿbyÿLessor,ÿunless aÿviolationÿofÿApplicableÿRequirements,ÿorÿaÿHazardousÿSubstanceÿConditionÿ(seeÿparagraphÿ9.1)ÿisÿfound,ÿtoÿexistÿorÿbeÿimminent,ÿorÿtheÿinspectionÿis requestedÿorÿorderedÿbyÿaÿgovernmentalÿauthority **as a result of Lessee's specific use of the Premises.** ÿInÿsuchÿcase,ÿLesseeÿshall,ÿuponÿrequest reimburseÿLessorÿforÿtheÿcostÿofÿsuchÿinspection,ÿsoÿlongÿasÿsuchÿinspectionÿisÿreasonablyÿrelatedÿtoÿtheÿviolationÿorÿcontamination.ÿInÿaddition,ÿLessee shallÿprovideÿcopiesÿofÿallÿrelevantÿmaterialÿsafetyÿdataÿsheetsÿ(MSDS)ÿtoÿLessorÿwithinÿ10ÿdaysÿofÿtheÿreceiptÿofÿaÿwrittenÿrequestÿtherefor.ÿ ÿ

7.ÿ **Maintenance;ÿRepairs;ÿUtilityÿInstallations;ÿTradeÿFixturesÿandÿAlterations.**

7.1ÿ **Lessee'sÿObligations.**

(a)ÿ**InÿGeneral.** ÿSubjectÿtoÿtheÿprovisionsÿofÿParagraphÿ2.2ÿ(Condition),ÿ2.3ÿ(Compliance),ÿ6.3ÿ(Lessee'sÿComplianceÿwithÿApplicable Requirements),ÿ7.1(d) ÿ(Replacement),ÿ7.2ÿ(Lessor'sÿObligations),ÿ9ÿ(DamageÿorÿDestruction),ÿandÿ14ÿ(Condemnation),ÿLesseeÿshall,ÿatÿLessee's soleÿexpense,ÿkeepÿtheÿPremises,ÿUtilityÿInstallationsÿ(intendedÿforÿLessee'sÿexclusiveÿuse,ÿnoÿmatterÿwhereÿlocated),ÿandÿAlterationsÿinÿgoodÿorder,ÿcondition andÿrepairÿ(whetherÿorÿnotÿtheÿportionÿofÿtheÿPremisesÿrequiringÿrepairs,ÿorÿtheÿmeansÿofÿrepairingÿtheÿsame,ÿareÿreasonablyÿorÿreadilyÿaccessibleÿto Lessee,ÿandÿwhetherÿorÿnotÿtheÿneedÿforÿsuchÿrepairsÿoccursÿasÿaÿresultÿofÿLessee'sÿuse,ÿanyÿpriorÿuse,ÿtheÿelementsÿorÿtheÿageÿofÿsuchÿportionÿofÿthe Premises),ÿincluding,ÿbutÿnotÿlimitedÿto,ÿallÿequipmentÿorÿfacilities,ÿsuchÿasÿplumbing,ÿHVACÿequipment,ÿelectrical,ÿlightingÿfacilities,ÿboilers,ÿpressure vessels,ÿfireÿprotectionÿsystem,ÿfixtures,ÿwallsÿ(interiorÿandÿexterior),ÿfoundations,ÿceilings,ÿroofs,ÿroofÿdrainageÿsystems,ÿdoors,ÿwindows,ÿplate glass,ÿskylights,ÿlandscaping,ÿdriveways,ÿparkingÿlots,ÿfences,ÿretainingÿwalls,ÿsigns,ÿsidewalksÿandÿparkwaysÿlocatedÿin,ÿon,ÿorÿadjacentÿtoÿthe Premises.ÿLessee,ÿinÿkeepingÿtheÿPremisesÿinÿgoodÿorder,ÿconditionÿandÿrepair,ÿshallÿexerciseÿandÿperformÿgoodÿmaintenanceÿpractices,ÿspecifically includingÿtheÿprocurementÿandÿmaintenanceÿofÿtheÿserviceÿcontractsÿrequiredÿbyÿParagraphÿ7.1(b)ÿbelow.ÿLessee'sÿobligationsÿshallÿincludeÿrestorations, replacementsÿorÿrenewalsÿwhenÿnecessaryÿtoÿkeepÿtheÿPremisesÿandÿallÿimprovementsÿthereonÿorÿaÿpartÿthereofÿinÿgoodÿorder,ÿconditionÿandÿstateÿof repair.ÿLesseeÿshall,ÿduringÿtheÿtermÿofÿthisÿLease,ÿkeepÿtheÿexteriorÿappearanceÿofÿtheÿBuildingÿin good aÿfirst-class ÿconditionÿ(including,ÿe.g.ÿgraffiti removal)ÿconsistentÿwith past practices ÿandÿtheÿexteriorÿappearanceÿofÿotherÿsimilarÿfacilitiesÿofÿcomparableÿageÿandÿsizeÿinÿtheÿvicinity,ÿincluding, whenÿnecessary,ÿtheÿexteriorÿrepaintingÿofÿtheÿBuilding. **Notwithstanding anything to the contrary in the foregoing, Lessee has accepted the Premises without Lessor warranties as to condition and repair and intends to operate its steel castings business in the current condition and state of repair of the Premises. Lessee reserves discretion to conduct maintenance and repair in accordance with its own operating needs and practices and need not comply with any Lessor requests for repair, replacement or and maintenance of particular items as**

ÿ ÿ
ÿ ÿ
ÿ ÿ

INITIALSÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ INITIALS

©2001ÿ-ÿAIRÿCOMMERCIALÿREALÿESTATEÿASSOCIATIONÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ ÿ FORMÿMTG-12-6/10E

Case 19-12220-KBOÿÿÿDoc 633-17ÿÿÿFiled 10/02/20ÿÿÿEntered 10/02/20 13:34:56ÿÿÿExhibit 17 to APAÿÿÿPage 11 of 27

**627**

they exist on the Commencement Date, except to the extent the requested items are reasonably expected to adversely affect health and safety of occupants and invitees of the Premises.

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form, and with substance, for, and with contractor(s) specializing and experienced in, the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, and (vi) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1 *after written notice and a reasonable opportunity to cure*, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to ~~115%~~ **100%** of the cost thereof. **Notwithstanding anything to the contrary in the foregoing, Lessor shall not have the right to make maintenance or repairs of any item which Lessee, in the proper exercise of its discretion under Section 7.1(a), chooses not to make or to defer to a later time.**

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item of "Basic Elements" described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month). Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2 **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 7.1(d) (Replacement), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3 **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term "**Utility Installations**" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4 **Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all ~~all~~ Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all ~~all~~ Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of

Case 14-41045  Doc# 289-3  Filed 08/21/14  Entered 08/21/14 15:18:04  Page 12 of
664

628

the term of this Lease, Lessor may require that any or all Lessee-Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee-Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, in good operating order, condition and state of repair, ~~but no better than the condition and state of repair on the Commencement Date~~, ordinary wear and tear excepted. Ordinary wear and tear shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee-owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party during the term hereof (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the extent required by Applicable Law even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessee, as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8. **Insurance; Indemnity.**

8.1 **Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payments shall be made by Lessee within 10 days following receipt of an invoice.

8.2 **Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessor shall be named as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy (ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor may, at its sole cost and expense, shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3 **Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor *and Lessee,* with loss payable to Lessor, *Lessee,* any ground-lessor, and/or any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee-Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessor *not by Lessee.* If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed ~~$125,000~~ $250,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4 **Lessee's Property; Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee-Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed ~~$125,000.000~~ $250,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee-Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-8-4/01E

Case 14-41045 Doc# 289-3 Filed 08/21/14 Entered 08/21/14 15:18:04 Page 13 of 26
Case: 14-41045 Doc# 289-3 Filed 08/21/14 Entered 08/21/14 15:18:04 Page 13 of 26
to APA

**629**

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

**8.5 Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

**8.6 Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

**8.7 Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be so defended or indemnified.

**8.8 Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) Lessee is required to maintain pursuant to the provisions of paragraph 8.

**8.9 Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month (or portion thereof) that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

## 9. Damage or Destruction.

**9.1 Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event covered by insurance or required to be covered by insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires remediation.

**9.2 Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessee ~~Lessor~~ shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures, Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee ~~Lessor~~ shall, at Lessee's option, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, ~~Lessor~~ shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance

© 2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM STG-8-4/09E          MUST BE USED WITH ...

INITIALS

INITIALS



Case 14-41045   Doc# 289-1   Filed 10/02/20   Entered 10/02/20 13:34:58 AttachmentADocument 630 of
Case: 14-41045   Doc# 289-1   Filed 08/21/14   Entered 08/21/14 15:18:04   Page 14
to APA   Page 14 of 26
630

proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to that fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and/or available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3 **Partial Damage - Uninsured Loss.** If any Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful misconduct act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessee Lessor may either: (i) repair such damage as soon as reasonably practicable at Lessor's Lessee's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee Lessor within 30 days after receipt by Lessor Lessee of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor Lessee elects to terminate this Lease, Lessee Lessor shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor Lessee of Lessee's Lessor's commitment to pay for the repair of such damage without reimbursement from Lessor Lessee. Lessee Lessor shall provide Lessor Lessee such funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor Lessee shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee Lessor does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4 **Total Destruction.** Notwithstanding any other provision hereof, if any Premises Total Destruction occurs, Lessee may elect to terminate this Lease within terminate 60 days following a Premises Total Destruction such Destruction. If Lessee does not elect to terminate this Lease, Lessee shall repair and restore the Premises in accordance with Section 9.2. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5 **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor Lessee may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee Lessor within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6 **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7 **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10. **Real Property Taxes.**

10.1 **Definition.** As used herein, the term "Real Property Taxes" shall mean all real property taxes and general, special, district assessments, rental receipts tax or other governmental impositions imposed on the Premises or Project. Real Property Taxes shall not include any taxes imposed on the net income of Lessor, any franchise or corporate taxes imposed on Lessor, any business license fees imposed on Lessor or any transfer taxes assessed on a sale or transfer of the Premises or Project. include any form of assessment; real estate; general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-9-4/07E

INITIALS

INITIALS

of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2ÿ **Payment of Taxes.** In addition to Base Rent, Lessee shall pay to Lessor an amount equal to the Real Property Tax installment due at least 20 days prior to the applicable delinquency date. If any such installment shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such installment shall be prorated. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that such taxes be paid in advance. Such monthly payments shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessor is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sum as is necessary. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.

10.3ÿ **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4ÿ **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee-Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee-Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.ÿ **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered with other premises. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions. ÿ ÿ

12.ÿ **Assignment and Subletting.**

12.1ÿ **Lessor's Consent Required.**

(a)ÿ Lessee shall not voluntarily or by operation of law assign, ÿ transfer, ÿ mortgage or ÿ encumber (collectively, ÿ "**assign** ÿ or **assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

ÿ (b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results (or will result) in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, i.e. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

**(h) Notwithstanding the foregoing, in the event of any proposal by Lessee to assign this Lease to (a) an entity controlling, controlled by or under common control with Lessee, (b) a successor entity related to Lessee by merger, acquisition, consolidation, reorganization, or (c) a purchaser of substantially all of Lessee's assets located in the Premises, Lessor may not withhold or condition its consent provided that, the net worth of the assignee shall be equal to or greater than 100% of the net worth of Lessee at the time of such assignment. Lessee shall provide the Lessor with not less than twenty (20) business days advance notice of any such proposed assignment and Lessee shall provide Lessor with reasonable financial information regarding the net worth of the Lessee and the proposed assignee.**

12.2ÿ **Terms and Conditions Applicable to Assignment and Subletting.**

(a) Regardless of Lessor's consent, no assignment or sublease shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee, **provided that upon an assignment of this Lease to an entity of equal or superior creditworthiness as Lessee at the time of such assignment, Lessee will be released from all further liability under this Lease.**

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or

Case 14-41045   Doc# 289-3   Filed 08/21/14   Entered 08/21/14 15:18:04   Page 16 of 26

**632**

disapproval of any assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of any Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any security held by Lessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to any assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination of the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request, plus whatever reasonable professional fees Lessor expended or additional information and/or documentation as may be provided Lessor with such further and detailed information concerning said assignee or sublessee or the proposed assignment or sublease as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to in writing. (See Paragraph 39.2)

**12.3** **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.** **Default; Breach; Remedies.**

**13.1** **Default; Breach.** A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination *pursuant to this Lease*, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require to confirm Lessee's compliance with the terms of this Lease, where any such failure continues for a period of 30 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a **"debtor"** as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM MTG-11-4/11E

Case 14-41045   Doc# 289-1   Filed 08/21/14   Entered 08/21/14 15:18:04   Page 17
to APA   Page 17 of 26

**633**

judicial seizure or substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

ÿ  (g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

ÿ  (h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2ÿ  **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. If the event of a Breach of this Lease by Lessee, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

ÿ 13.3ÿ  **Inducement Recapture.**  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions,**" shall be deemed conditioned upon Lessee's full and faithful performance of all the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an inducement Provision shall be immediately due and payable by Lessee to Lessor, and recoverable by Lessor, as additional rent due under this Lease, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4ÿ  **Late Charges.**  Lessee hereby acknowledges that a late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessee by any Lender. Accordingly, if any Rent shall not be received by Lessor within 10 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 5% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5ÿ  **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6ÿ  **Breach by Lessor.**

(a) **Notice of Breach.**  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after

INITIALS

INITIALS

Case 14-41045  Doc# 289-3  Filed 08/21/14  Entered 08/21/14 15:18:04  Page 18 of 26

**634**

receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessee's obligation of Lessor's such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

       (b)  **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that all such offsets shall **not cumulatively exceed an amount equal to three (3) times the initial month's Base Rent under this Lease, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.** ~~provided, however, that such offset shall not exceed any amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.~~ Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.       **Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs, If more than 10% of the Building, or more than 25% of that portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. If Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.       **Brokerage Fees.**  N/A

       15.1  **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, if Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

       15.2  **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

       15.3  **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder in connection with this Lease, except as named Brokers, if any, in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.       **Estoppel Certificates.**

       (a) Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

       (b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute any Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

       (c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.       **Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM MTN-8-4/10E

635

Case 14-41045 Claim 3-1 Part 2 Filed 10/02/20 Entered 10/02/20 13:34:56 Amendment 1 to APA Page 19 of 26

Case: 14-41045 Doc# 289-3 Filed: 08/21/14 Entered: 08/21/14 15:18:04 Page 19 of 26

performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18. **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19. **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20. **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of the individual partners, members, directors, officers or shareholders of Lessee, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21. **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22. **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23. **Notices.**

    23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by handor by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail or other nationally recognized overnight courier, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in any manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

    23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, U.S. Postal Service Express Mail or other nationally recognized overnight courier shall be deemed given on the date of delivery shown on the receipt card or the delivery records of the Express Mail or other courier; if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24. **Waivers.**

    (a) No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

    (b) The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

    (c) THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25. **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

    (a) When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

        (i) **Lessor's Agent.** A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Lessor. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

        (ii) **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

        (iii) **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. b. Other duties to the Lessor and the Lessee as

Case 14-41045    Doc# 289-3    Filed 08/21/14    Entered 08/21/14 15:18:04    Page 20
to APA

636

stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not, without the express permission of the respective Party, disclose to the other Party that the Lessee will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b) Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker pursuant to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c) Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26. **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27. **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28. **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a party of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29. **Binding Effect; Choice of Law.** This Lease shall bind the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. So long as Lessor's current bankruptcy case remains open (Northern District of California, Oakland Division, Case No. 14-41048-RLE), any litigation between the Parties hereto concerning this Lease shall be initiated in the United States Bankruptcy Court for the Northern District of California, Oakland Division. Following such time as Lessor's current bankruptcy case has been closed, any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30. **Subordination; Attornment; Non-Disturbance.**

30.1 **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, consolidations, replacements and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, regardless of the relative dates of the documentation or recordation thereof.

30.2 **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Devise to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor; (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3 **Non-Disturbance.** *Lessor represents and warrants that no Security Devices currently affect the Premises.* With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any Options, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate the execution and delivery of a Non-Disturbance Agreement.

30.4 **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31. **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services) and/or consultation.

32. **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of any emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers,

INITIALS

INITIALS

Case 14-41048 Doc 289-3 Filed 08/06/20 Entered 08/21/74 15:18:04 Page 21
Case: 14-41048 Doc# 289-3 Filed 08/06/20 Entered 08/06/20 13:34:59 Page 637 of 699

Case 19-51026 Doc# 40 Filed 10/02/20 Entered 10/02/20 13:34:59 Desc Amendment to APA Page 21 of 26

**637**

lenders, or, during the last six months of the term hereof, tenants, and, making such alterations, repairs, improvements or additions to the Premises as Lessor and Lessee agree are may deem necessary or desirable, and the erecting, using, and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there occurs no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.ÿ  **Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. ÿ Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.ÿ  **Signs.**  Lessor may place on the Premises ordinary "**For Sale**" signs at any time, and ordinary "**For Lease**" signs during the last 6 months of the term hereof. ÿ Except for ordinary "for sublease" signs, Lessee not place any signs on the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.ÿ  **Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any or all existing subtenancies, by Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.ÿ  **Consents.**  Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. ÿ Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by a Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. ÿ Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. ÿ The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request. ÿ ÿ

37.ÿ   **Guarantor.**

37.1ÿ   **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2ÿ   **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: ÿ (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, ÿ (b) current financial statements, ÿ (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.ÿ   **Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.ÿ   **Options.**  If Lessee is granted an Option, as defined below, then the following provisions shall apply:

39.1ÿ   **Definition.**ÿ "Option" shall mean: ÿ (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; ÿ (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; ÿ (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2ÿ   **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting. ÿ ÿ

39.3ÿ   **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4ÿ   **Effect of Default on Options.**  ÿ

(a) Lessee shall have no right to exercise an Option: ÿ (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, ÿ (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), ÿ (iii) during the time Lessee is in Breach of this Lease, or ÿ (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

ÿ        (c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i), Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.ÿ  **Multiple Buildings.**  If the Premises are part of a group of buildings controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.ÿ  **Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.ÿ  **Reservations.**  Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. ÿ Lessee agrees to sign any documents

INITIALSÿ

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION      FORM STN-11-4/10E      MUST BE USED

Case 14-41045  Doc 269-3 Filed 10/02/20  Entered 10/02/20 13:34:39  Page 638 of 699
Case: 14-41045  Doc# 289-1  Filed: 08/21/14  Entered: 08/21/14 15:18:04  Page 22
to APA  of 26

638

reasonably requested by Lessor to effectuate any such easement rights, dedication, map, or restrictions.

43. **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

44. **Authority; Multiple Parties; Execution.**

    (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that such person is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

    (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

    (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45. **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46. **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47. **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48. **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49. **Arbitration of Disputes.** Any Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50. **Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

**WARNING:** IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| Executed at: | | Executed at: | |
|---|---|---|---|
| On: | | On: | |
| By LESSOR: | | By LESSEE: | |

_Berkeley Properties, LLC_        _Pacific Steel Casting Company LLC_

_A California limited liability company_   _A Delaware limited liability company_

| By: | | By: | |
|---|---|---|---|
| Name Printed: | | Name Printed: | |
| Title: | | Title: | |
| By: | | By: | |
| Name Printed: | | Name Printed: | |
| Title: | | Title: | |
| Address: | | Address: | |

© 2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION FORM STN-8-4/01E LAST EDITED: 10/02/2013 1:34 PM MUST BE USED IN CONJUNCTION WITH SECURITY DEPOSIT ADDENDUM

Case 15-1034, Document 35, Filed 10/02/15, Entered 10/02/15 13:34 PM, Exhibit C - Amendment to APA

| | |
|---|---|
| Telephone:(  ) | Telephone:(  ) |
| Facsimile:(  ) | Facsimile:(  ) |
| Federal ID No. | Federal ID No. |

**BROKER:**     **BROKER:**

| | |
|---|---|
| | |
| Attn: | Attn: |
| Title: | Title: |
| Address: | Address: |
| | |
| Telephone:(  ) | Telephone:(  ) |
| Facsimile:(  ) | Facsimile:(  ) |
| Federal ID No. | Federal ID No. |

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA  90017. Telephone No. (213) 687-8777. Fax No. (213) 687-8616.

© Copyright 2001 By AIR Commercial Real Estate Association. All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

Case: 14-41045   Doc# 289-3   Filed: 08/21/14   Entered: 08/21/14 15:18:04   Page 24
of 26

640

# ADDENDUM

**Date:** August 29, 2014

**By and Between (Lessor)** Berkeley Properties, LLC, a California limited liability company
     **(Lessee)** Pacific Steel Casting Company LLC, a Delaware limited liability company

**Address of Premises:** 1333 2ⁿᵈ Street, 1310 Third Street and 640 Gilman Street, Berkeley, CA

**Paragraphs 55-60**

55.     Lessor agrees that any amount determined to be due to Lessee (as Buyer) under Section 10.01 (the "10.01 Amount") of that certain Asset Purchase Agreement  dated as of June 19, 2014 by and between Speyside Fund, LLC, and Pacific Steel Casting Company, a California corporation ("Seller"), as amended by the First Amendment to Asset Purchase Agreement dated August __, 2014 (as so  amended, the "Asset Purchase Agreement"), on account of any breach of a representation, warranty or covenant by Seller under the Asset Purchase Agreement shall be paid to Lessee through an abatement in the amount of base rent otherwise payable by Lessee to Lessor under this Lease.  The abatement shall commence on the later of (i) the end of the rent abatement provided for in Section 57 below or (ii) the final determination of the 10.01 Amount, and shall continue until the amount of such base rent abatement equals the 10.01 Amount., after which the rent under the Lease shall be fully payable pursuant to the terms of this Lease.

56.     Pursuant to the terms of the Asset Purchase Agreement, Seller provided to Lessee due diligence materials, including without limitation certain environmental reports identified in Schedule 5.01(n)(ii) thereto relating to the Premises (collectively "Asset Purchase Agreement Disclosures"), and Lessee has also had an opportunity to conduct its own physical and regulatory environmental investigations of the Premises ("Lessees's Environmental Due Diligence") prior to the closing of the transaction under the Asset Purchase Agreement. The Asset Purchase Agreement provides for a rent abatement in the event any contamination by Hazardous Materials not disclosed in the Asset Purchase Agreement Disclosures is discovered at any time up to ninety (90) days following the closing.  For purposes of this Lease, the term "Undisclosed Hazardous Substances" means any Hazardous Substances which (i) existed on the Premises prior to Lessee's occupancy, (ii) was not disclosed in any of the Asset Purchase Agreement Disclosures, and (ii) the existence of which was made aware to Lessee or any of Lessee's employees or agents as a result of Lessee's Environmental Due Diligence before the closing or within ninety (90) days thereafter.

Lessor shall have no responsibility or payment obligation for the investigation or remediation of any Hazardous Substances except with respect to Undisclosed Hazardous Substances as expressly provided in Paragraphs 6.2(e), 6.2(f), and 6.2(g), unless required by law or governmental authority.

57.     Lessee shall be entitled to an abatement in the amount of base rent otherwise payable by Lessee to Lessor under this Lease commencing on the Commencement Date of the Lease and continuing until the amount of such rent abatement equals $1,000,000, after which the rent under the Lease shall be fully payable pursuant to the terms of this Lease, subject to any other provisions hereof expressly permitting abatement of base rent.

58.     The Property Condition Assessment prepared by Atwell, LLC for Lessee identifies certain areas of possible current noncompliance of the Premises with the Americans With Disabilities Act ("Possible ADA Noncompliance").  Notwithstanding anything to the contrary in Sections 8.7 and 50 of this Lease, Lessor shall indemnify, protect, defend and hold harmless  Lessee, its members, managers, officers, agents and lenders from and against any and all claims, damages, judgments, penalties attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with (i) notices of

Case: 19-40057    Doc#: 25-1  Filed: 10/02/2019    Entered: 10/02/2019 13:34:19  Page 641 of
Case: 19-40057  Doc#: 231  Filed: 10/02/2019  Entered: 10/02/2019 13:34:19  1st Amendment
to APA    Page 25 of 26

**641**

violation or other regulatory compliance actions or proceedings relating to Possible ADA Noncompliance, and (ii) future private claims or legal proceedings under the ADA based in whole or in part on areas of Possible ADA Noncompliance. If Lessor defaults or unreasonably delays paying or peforming the indemnity in this Section, after written notice from Lessee, Lessee may pay or perform the liabilities and obligations for which indemnity is sought and recover the reasonable amounts so paid by Lessee., by means of an abatement of base rent hereunder, in addition to abatements described in Sections 55, 57 and 59 hereof. Notwithstanding the foregoing, Lessor shall have no obligation of indemnity and to the extent such liabilities arise from any application by Lessee to make changes to the Premises or changes made by Lessee to the Premises.

59.     The Property Condition Assessment prepared by Atwell, LLC for Lessee identifies certain areas of possible current noncompliance of the Premises with the Applicable Requirements with regards to fire prevention and safety ("Possible Fire Safety Noncompliance"). Notwithstanding anything to the contrary in Section 8.7 of this Lease Lessor shall indemnify, protect, defend and hold harmless Lessee, its members, managers officers, agents and lenders from and against any and all claims, damages, judgments, penalties attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with notices of violation or other regulatory compliance actions or proceedings relating to Possible Fire Safety Noncompliance. In the event that officials of the City of Berkeley require any repairs or alteration of the Premises to remedy any of the areas of Possible Fire Safety Noncompliance ("Required Work"), Lessor agrees to perform the Required Work in a timely fashion at Lessor's expense. If Lessor defaults or unreasonably delays in performing the Required Work or otherwise to indemnify Lessee hereunder after written notice from Lessee, Lessee may perform the Required Work and recover the reasonable amounts paid by Lessee to unaffiliated third parties to perform the Required Work, by means of an abatement of base rent hereunder, in addition to abatements described in Sections 55, 57 and 58 hereof. Notwithstanding the foregoing, Lessor shall have no obligation to make any repairs or alterations to the Premises if the requirement is related to any application by Lessee to make changes to the Premises, or changes made by Lessee to the Premises and this Section 59 in no way constitutes a representation or warranty by Lessor with respect to the safety of the Premises.

60.     The Premises  includes that certain real property, including all improvements thereon, owned by Lessor, commonly known as 648 Page Street, 1314, 1320, 1333, 1420 and 1421 2nd Street, 1310 3rd Street, 640 Gilman St. and 1305 and 1401 Eastshore Highway in the City of  Berkeley, located in Alameda County, State of California, more particularly described on Exhibit A, attached hereto.

Case: 19-40057    Doc# 231-5  Filed: 10/02/20   Entered: 10/02/20 13:34:43    Page 642 of
to APA    699
Case: 19-40057    Doc# 231-1  Filed: 10/02/20   Entered: 10/02/20 13:15:04    1st Amended 26
Page 26 of 26

642



# TRUCKER ✦ HUSS

### A PROFESSIONAL CORPORATION
### ERISA AND EMPLOYEE BENEFITS ATTORNEYS

December 28, 2017

*Via Facsimile, Email and First Class Mail*

| | |
|---|---|
| Berkeley Properties, LLC<br>c/o Arch & Beam Global LLC, Plan Administrator<br>7 West 41st Avenue - #523<br>San Mateo, CA 94403<br><br>Attn: Matthew English<br><br>F: (415) 358-4486<br><br>sp.bp.pa@arch-beam.com | Michael M. Lauter<br>Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111<br><br>F: (415) 403-6071<br><br>mlauter@sheppardmullin.com |
| First America Title Insurance Company<br>a Nebraska Corporatin<br>1 First American Way<br>Santa Ana, CA 92707<br><br>Attn: Michael Hickey | Krishnan Venkatesan<br>Pacific Steel Casting LLC<br>1333 Second Street<br>Berkeley, CA 94710<br><br>F: (510) 524-4673<br><br>kvenkatesan@pacificsteel.com |
| Richard N. Hill, Esq.<br>Littler Mendelson APC<br>650 California Street, 20th Floor<br>San Francisco, CA 94108<br><br>F: (415) 399-8490<br><br>rhill@littler.com | Gary M. Kaplan, Esq.<br>Farella Braun & Martell LLP<br>Russ Building<br>235 Montgomery Street, 17th Floor<br>San Francisco, CA 94104<br><br>F: (415) 954-4480<br><br>gkaplan@fbm.com |

Gentlemen:

Our office represents the CMTA-Glass, Molders, Pottery, Plastics and Allied Workers Local 164B Pension Trust (the "Trust"). This letter service as formal written notice that an "Event of Default" has occurred under the terms of the Deed of Trust executed for the benefit of the Trust on September 29, 2015; namely, Pacific Steel Casting Company, LLC (the "Buyer"), has failed to satisfy the requirements of the sale of assets exemption to withdrawal liability set forth in ERISA § 4204(a)(1), 29 U.S.C. § 1384(a)(1), by failing to maintain the required bond or escrow arrangement for five plan years following the asset sale. This constitutes both an " Event of Default" under the Deed of Trust as well as a "Buyer Withdrawal" under the Stipulation Clarifying Treatment of Local

Case 19-40193   Doc 35-1   Part 40   Filed 01/17/19   Entered 01/17/19 23:34:49   Default Letter<br>from Pension Trust re Withdrawal Liability    Page 1 of 4

**643**

164B Claim Under Debtors' and Committee's Second Amended Joint Chapter 11 Plan of Reorganization Dated April 30, 2015 (the "Stipulation" and "Plan of Reorganization" respectively).

ERISA § 4204(a)(1)(B) requires that a purchaser in a Section 4204 asset sale provide to a pension plan for a period of five plan years an acceptable bond or escrow arrangement. In this case, the Buyer provided a cancellable bond from Berkley Surety Group, effective on or about July 1, 2015, and the Trust has received notification from Berkley that the bond was cancelled effective December 14, 2017, well before the expiration of the statutory five-year period. Buyer is therefore in violation of the ERISA bond requirement, rendering the sale of assets to Buyer no longer eligible for the special treatment afforded under Section 4204. *See Central States, Southeast & Southwest Areas Health & Welfare Fund v. Cullum Cos.*, 973 F.2d 1333 (7th Cir. 1992) (noting that requirement to post purchaser's bond for five years is a "continuing obligation" under Section 4204); *see also* PBGC Opinion Letter 85-31 and 83-8 (stating that failure to maintain purchaser's bond or escrow at any time during five-year period constitutes failure to comply with Section 4204).

The Trust intends to exercise all of its rights and remedies under the Deed of Trust and Plan of Reorganization, as well as any other applicable law. Please see the attached calculation of the amount of Second Street Properties' withdrawal liability as the result of the failure to satisfy the requirements of Section 4204.

Very truly yours,

Robert F. Schwartz

RFS:jh

Enclosures
cc:    Board of Trustees (Email Only)
       Rich Lapping, Esq. (Email Only)
       Conchita Lozano-Batista, Esq. (Email Only)
       Kristina Zinnen, Esq. (Email Only)

171246.v1
Case 19-40757 Doc#85-2 Filed 10/02/20 Entered 10/02/20 13:34:49 Default Letter
Case 19-40757 Doc#85-2 Filed 10/02/20 Entered 10/02/20 13:34:49 Page 644 of
from Pension Trust re Withdrawal Liability     Page 2 of 4     699

644

| | | |
|---|---|---:|
| 1 | 6/30/2002 Unfunded Vested Benefits for Withdrawal Liability | $1,226,156 |
| 2 | 6/30/2003 Unfunded Vested Benefits for Withdrawal Liability | $9,041,202 |
| 3 | 6/30/2004 Unfunded Vested Benefits for Withdrawal Liability | $8,036,879 |
| 4 | 6/30/2005 Unfunded Vested Benefits for Withdrawal Liability | $13,120,198 |
| 5 | 6/30/2006 Unfunded Vested Benefits for Withdrawal Liability | $2,360,583 |
| 6 | 6/30/2007 Unfunded Vested Benefits for Withdrawal Liability | $5,611,185 |
| 7 | 6/30/2008 Unfunded Vested Benefits for Withdrawal Liability | $8,165,529 |
| 8 | 6/30/2009 Unfunded Vested Benefits for Withdrawal Liability | $27,726,749 |
| 9 | 6/30/2010 Unfunded Vested Benefits for Withdrawal Liability | $32,409,144 |
| 10 | 6/30/2011 Unfunded Vested Benefits for Withdrawal Liability | $34,251,338 |
| 11 | 6/30/2012 Unfunded Vested Benefits for Withdrawal Liability | $37,591,448 |
| 12 | 6/30/2013 Unfunded Vested Benefits for Withdrawal Liability | $37,991,270 |
| 13 | 6/30/2014 Unfunded Vested Benefits for Withdrawal Liability | $34,248,083 |
| | | |
| 14 | 6/30/2002 Pool Balance at 6/30/2014 | $490,462 |
| 15 | 6/30/2003 Pool Balance at 6/30/2014 | $3,544,359 |
| 16 | 6/30/2004 Pool Balance at 6/30/2014 | -$274,599 |
| 17 | 6/30/2005 Pool Balance at 6/30/2014 | $3,031,041 |
| 18 | 6/30/2006 Pool Balance at 6/30/2014 | -$6,033,840 |
| 19 | 6/30/2007 Pool Balance at 6/30/2014 | $2,243,148 |
| 20 | 6/30/2008 Pool Balance at 6/30/2014 | $2,049,102 |
| 21 | 6/30/2009 Pool Balance at 6/30/2014 | $15,060,398 |
| 22 | 6/30/2010 Pool Balance at 6/30/2014 | $4,964,584 |
| 23 | 6/30/2011 Pool Balance at 6/30/2014 | $3,124,443 |
| 24 | 6/30/2012 Pool Balance at 6/30/2014 | $4,821,771 |
| 25 | 6/30/2013 Pool Balance at 6/30/2014 | $2,550,855 |
| 26 | 6/30/2014 Pool Balance at 6/30/2014 | -$1,323,641 |
| | | |
| 27 | Total Affected Benefits Pools | $6,851,802 |

| | Employer name | PACIFIC STEEL CASTING COMPANY |
|---|---|---:|
| | Employer number | 240000000 |
| 28 | Contributions from July 1, 1997 - June 30, 1998 | $798,491.93 |
| 29 | Contributions from July 1, 1998 - June 30, 1999 | $553,975.38 |
| 30 | Contributions from July 1, 1999 - June 30, 2000 | $385,886.67 |
| 31 | Contributions from July 1, 2000 - June 30, 2001 | $547,779.26 |
| 32 | Contributions from July 1, 2001 - June 30, 2002 | $591,471.06 |
| 33 | Contributions from July 1, 2002 - June 30, 2003 | $464,746.50 |
| 34 | Contributions from July 1, 2003 - June 30, 2004 | $567,032.25 |
| 35 | Contributions from July 1, 2004 - June 30, 2005 | $890,691.48 |
| 36 | Contributions from July 1, 2005 - June 30, 2006 | $1,198,953.95 |
| 37 | Contributions from July 1, 2006 - June 30, 2007 | $1,262,836.45 |
| 38 | Contributions from July 1, 2007 - June 30, 2008 | $1,172,388.50 |
| 39 | Contributions from July 1, 2008 - June 30, 2009 | $858,677.24 |
| 40 | Contributions from July 1, 2009 - June 30, 2010 | $639,558.88 |
| 41 | Contributions from July 1, 2010 - June 30, 2011 | $1,159,198.10 |
| 42 | Contributions from July 1, 2011 - June 30, 2012 | $1,586,462.19 |
| 43 | Contributions from July 1, 2012 - June 30, 2013 | $1,368,073.00 |
| 44 | Contributions from July 1, 2013 - June 30, 2014 | $1,177,327.26 |
| | | |
| 45 | Employer contributions from July 1, 1997 - June 30, 2002 - sum of items (28) - (32) | $2,877,604.30 |
| 46 | Employer contributions from July 1, 1998 - June 30, 2003 - sum of items (29) - (33) | $2,543,858.87 |
| 47 | Employer contributions from July 1, 1999 - June 30, 2004 - sum of items (30) - (34) | $2,556,915.74 |
| 48 | Employer contributions from July 1, 2000 - June 30, 2005 - sum of items (31) - (35) | $3,061,720.55 |
| 49 | Employer contributions from July 1, 2001 - June 30, 2006 - sum of items (32) - (36) | $3,712,895.24 |
| 50 | Employer contributions from July 1, 2002 - June 30, 2007 - sum of items (33) - (37) | $4,384,260.63 |
| 51 | Employer contributions from July 1, 2003 - June 30, 2008 - sum of items (34) - (38) | $5,091,902.63 |
| 52 | Employer contributions from July 1, 2004 - June 30, 2009 - sum of items (35) - (39) | $5,383,547.62 |
| 53 | Employer contributions from July 1, 2005 - June 30, 2010 - sum of items (36) - (40) | $5,132,415.02 |
| 54 | Employer contributions from July 1, 2006 - June 30, 2011 - sum of items (37) - (41) | $5,092,659.17 |
| 55 | Employer contributions from July 1, 2007 - June 30, 2012 - sum of items (38) - (42) | $5,416,284.91 |
| 56 | Employer contributions from July 1, 2008 - June 30, 2013 - sum of items (39) - (43) | $5,611,969.41 |
| 57 | Employer contributions from July 1, 2009 - June 30, 2014 - sum of items (40) - (44) | $5,930,619.43 |

M:\CMTA_MOL.CLI\WITHLIAB\2014\withliab2014

| | | |
|---|---|---|
| 58 | Total plan contributions from July 1, 1997 - June 30, 2002 | $5,426,816.00 |
| 59 | Total plan contributions from July 1, 1998 - June 30, 2003 | $4,960,020.00 |
| 60 | Total plan contributions from July 1, 1999 - June 30, 2004 | $4,921,647.00 |
| 61 | Total plan contributions from July 1, 2000 - June 30, 2005 | $5,474,336.00 |
| 62 | Total plan contributions from July 1, 2001 - June 30, 2006 | $6,330,769.00 |
| 63 | Total plan contributions from July 1, 2002 - June 30, 2007 | $8,077,453.00 |
| 64 | Total plan contributions from July 1, 2003 - June 30, 2008 | $8,862,892.00 |
| 65 | Total plan contributions from July 1, 2004 - June 30, 2009 | $9,063,826.00 |
| 66 | Total plan contributions from July 1, 2005 - June 30, 2010 | $8,549,181.00 |
| 67 | Total plan contributions from July 1, 2006 - June 30, 2011 | $8,593,803.00 |
| 68 | Total plan contributions from July 1, 2007 - June 30, 2012 | $8,810,384.00 |
| 69 | Total plan contributions from July 1, 2008 - June 30, 2013 | $8,975,908.00 |
| 70 | Total plan contributions from July 1, 2009 - June 30, 2014 | $9,443,092.00 |
| | | |
| 71 | Employer fraction of item (58) - item (45) divided by item (58) | 53.025647% |
| 72 | Employer fraction of item (59) - item (46) divided by item (59) | 51.287270% |
| 73 | Employer fraction of item (60) - item (47) divided by item (60) | 51.952441% |
| 74 | Employer fraction of item (61) - item (48) divided by item (61) | 55.928619% |
| 75 | Employer fraction of item (62) - item (49) divided by item (62) | 58.648408% |
| 76 | Employer fraction of item (63) - item (50) divided by item (63) | 54.277761% |
| 77 | Employer fraction of item (64) - item (51) divided by item (64) | 57.451931% |
| 78 | Employer fraction of item (65) - item (52) divided by item (65) | 59.395973% |
| 79 | Employer fraction of item (66) - item (53) divided by item (66) | 60.033996% |
| 80 | Employer fraction of item (67) - item (54) divided by item (67) | 59.259669% |
| 81 | Employer fraction of item (68) - item (55) divided by item (68) | 61.476150% |
| 82 | Employer fraction of item (69) - item (56) divided by item (69) | 62.522582% |
| 83 | Employer fraction of item (70) - item (57) divided by item (70) | 62.803787% |
| | | |
| 84 | Allocated share of item (14) - item (14) times item (71) | 260,071.00 |
| 85 | Allocated share of item (15) - item (15) times item (72) | 1,817,805.00 |
| 86 | Allocated share of item (16) - item (16) times item (73) | -142,661.00 |
| 87 | Allocated share of item (17) - item (17) times item (74) | 1,695,219.00 |
| 88 | Allocated share of item (18) - item (18) times item (75) | -3,538,751.00 |
| 89 | Allocated share of item (19) - item (19) times item (76) | 1,217,531.00 |
| 90 | Allocated share of item (20) - item (20) times item (77) | 1,177,249.00 |
| 91 | Allocated share of item (21) - item (21) times item (78) | 8,945,270.00 |
| 92 | Allocated share of item (22) - item (22) times item (79) | 2,980,438.00 |
| 93 | Allocated share of item (23) - item (23) times item (80) | 1,851,535.00 |
| 94 | Allocated share of item (24) - item (24) times item (81) | 2,964,239.00 |
| 95 | Allocated share of item (25) - item (25) times item (82) | 1,594,860.00 |
| 96 | Allocated share of item (26) and (27) - item [(26) + (27)] times item (83) | 3,471,894.00 |
| | | |
| 97 | Allocated amount - sum of items (84) to (96) | $24,294,699.00 |
| | | |
| 98 | Preliminary de minimis amount (deductible) - smaller of $50,000 and item (97) | $50,000.00 |
| 99 | Reduction in de minimis amount - item (97) minus item $100,000, but not less than $0 | $24,194,699.00 |
| 100 | Final de minimis amount - item (98) minus item (99), but not less than $0 | $0.00 |
| | | |
| 101 | Allocated Unfunded Vested Benefits - item (97) minus item (100) | $24,294,699.00 |

Case 19-40573 Doc 85-2 Filed 10/02/20 Entered 10/02/20 13:34:49 Default Letter
from Pension Trust re Withdrawal Liability    Page 4 of 4

646

# EXHIBIT "13"

Fill in this information to identify the case:

Debtor 1        Pacific Steel Casting Company LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern _____ District of  California
                                                                              (State)

Case number    19-40193

# Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Pension Benefit Guaranty Corporation |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Office of the General Counsel, Attn: Louisa Soulard
Name

1200 K Street, N.W., Suite 340
Number      Street

Washington, DC 20005-4026
City                State              ZIP Code

Contact phone   202-326-4020, x3278

Contact email   soulard.louisa@pbgc.gov

Where should payments to the creditor be sent? (if different)

Name

Number      Street

City                State              ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____  Filed on ___/___/___ <br> MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. **How much is the claim?**    $ <u>1,709,146</u> . **Does this amount include interest or other charges?**

     ☑ No

     ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Statutory Liability to the Pension Plan for Employees of Pacific Steel Casting Company for unpaid minimum funding contributions under 26 U.S.C. §§ 412 and 430, 29 U.S.C. §§ 1082, 1342 and 1362(c). See attached statement.

9. **Is all or part of the claim secured?**

   ☐ No

   ☑ Yes.   The claim is secured by a lien on property.

     **Nature of property:**

     ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

     ☐ Motor vehicle

     ☑ Other. Describe:    All property and rights to property (personal)

     **Basis for perfection:**    See attached statement.

     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

     **Value of property:**      $ unknown

     **Amount of the claim that is secured:**    $1,709,146

     **Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

     **Amount necessary to cure any default as of the date of the petition:**    $ _____

     **Annual Interest Rate** (when case was filed) _____%

     ☐ Fixed

     ☐ Variable

10. **Is this claim based on a lease?**

   ☑ No

   ☐ Yes. Amount necessary to cure any default as of the date of the petition.    $ _____

11. **Is this claim subject to a right of setoff?**

   ☑ No   See attached statement.

   ☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. *Check all that apply:* | **Amount entitled to priority** |

☑ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ unliquidated

☑ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ unliquidated

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies.  $ unliquidated

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  2 / 28 / 2019
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Stephanie | | Thomas |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Assistant General Counsel

Company    Pension Benefit Guaranty Corporation
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1200 K Street, N.W., Suite 340
Number    Street
Washington, DC 20005-4026
City    State    ZIP Code

Contact phone    202-326-4020 x 3457    Email thomas.stephanie@pbgc.gov

# Exhibit 1

Case 19-44057   Doc # 851   Filed 10/02/20   Entered 10/02/20 13:34:49   Page 651 of
699

Case 19-44057   Doc # 851   Filed 10/02/20   Entered 10/02/20 13:34:49   Page 651 of
property and rights to property (personal)   Page 1 of 2

**651**

19–7693771797

01/24/2019 17:00

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

76267890002   UCC 3 FILING

Please return a copy of the recorded original to:
LOUISA SOULARD, ESQ.
OFFICE OF THE GENERAL COUNSEL
PENSION BENEFIT GUARANTY CORPORATION
1200 K ST., N.W.
WASHINGTON, DC 20005-4026
PHONE NO. (202) 326-4020, EXT.3278



**PBGC**
Protecting America's Pensions

### NOTICE OF FEDERAL LIEN UNDER
### IRC § 412(n) AND/OR § 430(k)*
### PENSION BENEFIT GUARANTY CORPORATION

As provided by Internal Revenue Code (IRC) §412(n) (2007) and/or §430(k) (2008), notice is given by the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation created by Title IV of the Employee Retirement Income Security Act of 1974, that the pension plan named below has a lien on all property and rights to property of the person named below because that person failed to make contributions to the pension plan required under IRC §§ 412 and/or 430 by the due date specified below. The amount of the lien was determined under IRC §412(n)(3) (2007) and/or §430(k)(3) (2008) and shall be treated as taxes due and owing the United States. The priority of the lien imposed shall be determined in the same manner as for federal taxes under IRC §6323. *See* IRC §412(n)(4)(C) (2007) and §430(k)(4)(C) (2008), and 29 U.S.C. §1368(c).
* *IRC §412(n) (2007) applies to pension plan years beginning on or before Dec. 31, 2007. IRC §430(k) (2008) applies to pension plan years beginning after Dec. 31, 2007.*

---

IMPORTANT FILING INFORMATION:
1. As provided by IRC §412(n)(4)(C) (2007), §430(k)(4)(C) (2008), and 29 U.S.C. §1368(c)(4), this notice shall be filed in the same manner as a lien for federal taxes under IRC §6323(f).
2. As provided by IRC §412(n)(5) (2007) and §430(k)(5) (2008), the Pension Benefit Guaranty Corporation may perfect a lien that arises under IRC §412(n)(1) (2007) or §430(k)(1) (2008).
3. All prior notices of lien under IRC §412(n) (2007) or §430(k) (2008) filed against this person are listed in columns (d) and (e).
4. WITHDRAWAL INFORMATION: Unless a notice of lien is re-filed by the date given in column (b), this notice shall, on the day following such date, be deemed withdrawn.

---

| Name and Address of Person Liable for Contributions (**DEBTOR**): | Name of Pension Plan (**SECURED PARTY**): |
|---|---|
| **Pacific Steel Casting Company LLC**<br>1333 2ND St.<br>Berkeley, CA 94710-1317 | **Pension Plan for Employees of<br>Pacific Steel Casting Company**<br>c/o Pension Benefit Guaranty Corporation<br>1200 K Street, N.W.<br>Washington, DC 20005 |

| Due Date (a) | Last Day for Refiling (b) | Amount Under IRC §412(n)(3) and/or §430(k)(3) at Due Date** (c) |
|---|---|---|
| 1/15/2019 | 2/1/2025 | $1,709,146.00 |

** Excludes amounts attributable to any other lien notices listed in columns (d) and (e).

*Interest accrues until required contributions are made.*

| Place of Filing:<br>Secretary of State of California<br>UCC Section<br>1500 11th Street, Room 255<br>Sacramento, CA 95814 | Prior IRC §412(n) and/or §430(k) Notice of Lien Filing Dates (d) | Recording Office File Stamp Number (e) |
|---|---|---|
| | | |

This notice was prepared and signed at Washington, D.C., on January 22, 2019.

*Kartar Khalsa*
Kartar Khalsa            Deputy General Counsel, Pension Benefit Guaranty Corporation

PBGC Lien No. 19L-5705                                    Form 412(n)/430(k)

Case 19-40057   Doc# 851   Filed 10/02/20   Entered 10/02/20 13:44:49   Page 652 of 699
property and rights to property (personal)   Page 2 of 2

652

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| PACIFIC STEEL CASTING COMPANY LLC | ) | Case No. 19-40193 |
| | ) | |
| | ) | Judge Roger L. Efremsky |
| Debtor. | ) | |

## PENSION BENEFIT GUARANTY CORPORATION'S STATEMENT IN SUPPORT OF ITS CLAIM FOR MINIMUM FUNDING CONTRIBUTIONS DUE TO THE PENSION PLAN FOR EMPLOYEES OF PACIFIC STEEL CASTING COMPANY

The Pension Benefit Guaranty Corporation ("PBGC"), on behalf of the Pension Plan for Employees of Pacific Steel Casting Company (the "Pension Plan"), hereby submits its Statement in Support of its claim for minimum funding contributions that are due to the Pension Plan, against Pacific Steel Casting Company LLC ("Debtor"), stating:

1.     PBGC is a wholly-owned United States government corporation, and an agency of the United States, that administers the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2017) ("ERISA").  PBGC guarantees the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA.  When an underfunded plan terminates, PBGC generally becomes trustee of the plan and, subject to certain statutory limitations, pays the plan's unfunded benefits with its insurance funds.  *See* 29 U.S.C. §§ 1321-1322, 1342, 1361.

2.     The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of ERISA.  *See* 29 U.S.C. § 1321.

Case: 19-40193   Doc# 851   Filed: 10/02/20   Entered: 10/02/20 13:34:40   Page 652 of 699

Case: 19-40193   Claim #5-1 Part 2   Filed: 10/02/20   Desc PBGC's Statement in Support of Its Claim For Minimum Funding Contributions   Page 1 of 4     653

3.      The Debtor is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13),

or a member of a contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14).

4.      On January 25, 2019, the Debtor filed a voluntary petition under Chapter 7 of the

Bankruptcy Code.

5.      The contributing sponsor of the Pension Plan and each member of its controlled

group are jointly and severally liable to the Pension Plan for contributions necessary to satisfy the

minimum funding standards under sections 412 and 430 of the Internal Revenue Code ("IRC")

and sections 302 and 303 of ERISA.  IRC § 412(c)(11) (2007) (effective for pension plan years

beginning on or before Dec. 31, 2007); *see also* 29 U.S.C.A. § 1082(c)(11) (2007) (same); and

IRC § 412(b)(1) & (2) (2009) (effective for pension plan years beginning after Dec. 31, 2007); *see

also* 29 U.S.C.A. § 1082(b)(1) & (2) (2009) (same).[1]  If the Pension Plan terminates, this liability

may be owed to PBGC as the trustee appointed under 29 U.S.C. § 1342.  *See* 29 U.S.C. §

1342(d)(1)(B)(ii) (a trustee appointed under § 1342(b) has the power "to collect for the plan any

amounts due the plan, including but not limited to the power to collect from the persons obligated

to meet the requirements of section 1082 of this title or the terms of the plan") and 29 U.S.C. §

1362(c).  Also, the Debtor may be contractually obligated to contribute to the Pension Plan.

6.      If the contributing sponsor of the Pension Plan and each member of its controlled

group fail to pay a required minimum funding contribution installment or other required payment

before the due date for such installment or payment, and the unpaid balance of such installment or

other payment (including interest), when added to the aggregate unpaid balance of all preceding

---

[1]  References to the IRC, or to 29 U.S.C.A. §§ 1082 and 1083, with a date of 2007 refer
to the pre-PPA 2006 provisions in effect for pension plan years beginning *on or before*
December 31, 2007.  References with a date of 2009 refer to the PPA 2006 provisions in effect
for pension plan years beginning *after* December 31, 2007.

2

Case: 19-40057   Doc# 85   Filed: 10/02/20   Entered: 10/02/20 13:34:49   Page 654 of
699

Case 19-40057   Claim 1 Part 1   Filed 10/02/20   Desc Statement in Support
of Its Claim For Minimum Funding Contributions   Page 2 of 4

**654**

such installments and payments (including interest), exceeds $1 million, a statutory lien arises in favor of the Pension Plan against the contributing sponsor and each member of its controlled group upon all property and rights to property, whether real or personal, belonging to such person. 29 U.S.C. § 1083(k); 26 U.S.C. §§ 412(n), 430(k). This lien is enforceable by PBGC. 26 U.S.C. §§ 412(n)(5), 430(k)(5).

7.      On January 24, 2019, PBGC filed a Notice of Federal Lien under 26 U.S.C. § 412(n) and/or § 430(k) in the amount of $1,709,146 against the Debtor for past due unpaid minimum funding contributions and interest owed to the Pension Plan. By filing the Notice of Federal Lien, PBGC perfected a lien described in 29 U.S.C. § 1083(k) and 26 U.S.C. §§ 412(n), 430(k) against all real and personal property of the Debtor. PBGC lacks sufficient information at this time to determine the value of all such collateral and property belonging to or owned by the Debtor. A true and correct copy of the Notice of Federal Lien is attached to this Statement in Support as Exhibit 1 and is incorporated by reference.

8.      PBGC files this claim to preserve its rights as a secured creditor in the amount of $1,709,146.

9.      If any portion of the secured claim is found to be unsecured, PBGC asserts priority under 11 U.S.C. § 507(a)(8).

10.      This is an estimated claim for contributions that are owed to the Pension Plan in the amount of $1,709,146. In addition to the secured and priority status mentioned above, it is separately entitled to priority as follows:

> (a)      The normal cost portions of contributions attributable to the post-petition period are entitled to administrative priority as ordinary course business expenses. 11 U.S.C. §§ 503(b), 507(a)(2).

> (b)      The normal cost portion of contributions attributable to the 180-days immediately preceding the petition filing date (or cessation of the debtor's business

3

**655**

if earlier) are entitled to priority under 11 U.S.C. § 507(a)(5).

11.     If any portion of this claim is found to be both unsecured and not entitled to priority, the PBGC asserts such portion as a general unsecured claim.

12.     Documents supporting this claim include the Pension Plan document with applicable amendments; relevant collateral agreements, if any; United States Internal Revenue Service Form 5500s; and annual actuarial valuation reports for the Pension Plan.  On information and belief, Debtor or a member of its controlled group has in its possession and control copies or originals of these documents.

13.     PBGC is not aware of any other claim for these contributions having been filed by any person with responsibility for administering the affairs of the Pension Plan.

14.     PBGC's investigation of this matter is continuing.  The agency reserves the right to amend, modify and supplement this proof of claim and/or to file additional proofs of claim.  The filing of this proof of claim is not intended to be and shall not be construed as (1) an election of remedy or (2) a waiver or limitation of any rights of PBGC, the Pension Plan or any of its beneficiaries or participants.

Dated:  February 28, 2019

STEPHANIE THOMAS
Assistant Chief Counsel
LOUISA A. SOULARD
Attorney
PENSION BENEFIT GUARANTY
CORPORATION
Office of the General Counsel
1200 K Street, NW
Washington, D.C.  20005-4026
Telephone:  (202) 326-4020 ext. 3278
FAX:  (202) 326-4112
Emails: soulard.louisa@pbgc.gov *and*
         efile@pbgc.gov

3

Case: 19-01057   Doc #: 85   Filed: 10/03/22   Entered: 10/03/22 13:34:49   Page 656 of
699

Case: 19-01057   Claim #: 1   Filed: 10/02/22   Desc: PBGC's Statement in Support
of Its Claim For Minimum Funding Contributions    Page 4 of 4

656

## Fill in this information to identify the case:

Debtor 1    Pacific Steel Casting Company LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern    District of   California
                                                                  (State)

Case number   19-40193

## Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Pension Benefit Guaranty Corporation <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Office of the General Counsel, Attn: Louisa Soulard <br> Name <br> 1200 K Street, N.W., Suite 340 <br> Number    Street <br> Washington, DC 20005-4026 <br> City        State        ZIP Code <br><br> Contact phone   202-326-4020, x3278 <br> Contact email   soulard.louisa@pbgc.gov <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | **Where should payments to the creditor be sent?** (if different) <br><br> Name <br><br> Number    Street <br><br> City        State        ZIP Code <br><br> Contact phone _____ <br> Contact email _____ |
| 4. **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ <br> MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ | |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|---------------------------------------------------------------------|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 322,546.65 _____ . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>Statutory Liability under 29 U.S.C. § 1307 on account of the</u> Pacific Steel Casting Company Defined Benefit Pension Plan. See attached statement.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                 $_____
Amount of the claim that is secured:    $_____
Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

**11. Is this claim subject to a right of setoff?**

☑ No See attached statement.
☐ Yes. Identify the property: _____

242

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check all that apply:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ unliquidated

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies.    $ unliquidated

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   4 / 8 / 2019
                  MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Stephanie | | Thomas |
|---|---|---|---|
| | First name | Middle name | Last name |

Title   Assistant General Counsel

Company   Pension Benefit Guaranty Corporation
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   1200 K Street, N.W., Suite 340
Number     Street
Washington, DC 20005-4026
City                State    ZIP Code

Contact phone   202-326-4020        Email   thomas.stephanie@pbgc.gov

243

IN THE UNITED STATES BANKRUPTCY COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| PACIFIC STEEL CASTING COMPANY LLC | ) | Case No. 19-40193 |
| | ) | |
| | ) | |
| Debtor. | ) | |

## STATEMENT OF THE PENSION BENEFIT GUARANTY CORPORATION IN SUPPORT OF ITS CLAIM FOR PENSION INSURANCE PREMIUMS

The Pension Benefit Guaranty Corporation ("PBGC") hereby submits this Statement in Support of its claim against Pacific Steel Casting Company LLC (the "Debtor") for pension insurance premiums with respect to the Pacific Steel Casting Company Defined Benefit Pension Plan (the "Pension Plan"), stating:

1.     PBGC is a wholly owned United States government corporation, and an agency of the United States, that administers the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2017) ("ERISA"). PBGC guarantees the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA. When an underfunded plan terminates, PBGC generally becomes trustee of the plan and, subject to certain statutory limitations, pays the plan's unfunded benefits with its insurance funds. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361

2.     The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321

3.     The Debtor is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13), or a member of a contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14).

1

4.	On January 25, 2019, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code.

5.	The contributing sponsor of the Pension Plan or the Pension Plan's Plan Administrator is the designated payor of PBGC insurance premiums.  29 U.S.C. § 1307(a), (e).

6.	Each member of the contributing sponsor's controlled group is jointly and severally liable to PBGC for insurance premiums, interest, and penalties (collectively, "Premiums") with respect to the Pension Plan.  29 U.S.C. § 1307(e)(2).  These Premiums include:

(a)	Flat-Rate and Variable-Rate Premiums, *see* 29 U.S.C. § 1306(a)(3), 29 C.F.R. § 4006.3, and

(b)	If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(B)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, Termination Premiums at the rate of $1,250 per plan participant per year for three years. *See* 29 U.S.C. § 1306(a)(7), *as amended* by § 8101(b) the Deficit Reduction Act of 2005 (Pub. L. 109-171) and by §§ 401(b) and 402(g)(2)(B) of the Pension Protection Act of 2006 (Pub. L. 109-280).

7.	This is an estimated claim for Premiums that the Debtor owes or will owe to PBGC in the total amount of $322,546.65, apportioned as follows:

(a)	Flat- Rate and Variable-Rate Premiums arising after the petition date are administrative expenses entitled to priority under 11 U.S.C. §§ 503(b)(1) and 507(a)(2). This claim includes Flat- Rate and Variable-Rate Premiums arising after the petition date in an unliquidated amount.  Alternatively, this claim is entitled to tax priority under 11 U.S.C. § 507(8).

2

(b)     Flat- Rate and Variable-Rate Premiums arising before the petition date are general unsecured claims.  This claim includes Flat-Rate and Variable-Rate Premiums arising before the petition date in an unliquidated amount.

(c)     Termination Premiums are asserted as general unsecured claims.

8.     Documents supporting this claim include the Pension Plan document with applicable amendments; relevant collateral agreements, if any; United States Internal Revenue Service Form 5500s; PBGC Annual Premium Payment forms; and annual actuarial valuation reports for the Pension Plan.  On information and belief, the Debtor or a member of its controlled group has in its possession and control copies or originals of these documents.

**[Remainder of This Page Intentionally Left Blank]**

3

Case 19-40193 Doc# 510 Filed 12/02/20 Entered 10/03/20 13:34:49 in Support of Claim Statement in Support Page 662 of 699 Page 3 of 4

662

9.      PBGC's investigation of this matter is continuing. The agency reserves the right to amend, modify, and supplement this proof of claim and/or to file additional proofs of claim.  This claim may be subject to a right of setoff by PBGC as an agency of the United States government, and the right of the United States to withhold subject to offset amounts due from other federal entities.  The filing of this proof of claim is not intended to be and shall not be construed as (1) an election of remedy or (2) a waiver or limitation of any rights of PBGC, the Pension Plan or any of its beneficiaries or participants.

Dated:  Washington, D.C.
          April 5, 2019

Stephanie Thomas
Assistant General Counsel
Louisa A. Soulard
Attorney
Office of the General Counsel
PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, D.C.  20005-4026
(202) 326-4020 ext. 3278
FAX:  (202) 326-4112

Case 19-40103   Doc 851-10   Filed 12/02/20   Entered 12/02/20 13:24:49   Desc Statement in Support of Page 4 of 4

663

**Fill in this information to identify the case:**

Debtor 1    Pacific Steel Casting Company LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern    District of   California
                                                    (State)

Case number    19-40193

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | Pension Benefit Guaranty Corporation <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☑ No <br> ☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Office of the General Counsel, Attn: Louisa Soulard <br> Name <br> 1200 K Street, N.W., Suite 340 <br> Number    Street <br> Washington, DC 20005-4026 <br> City      State      ZIP Code <br><br> Contact phone   202-326-4020, x3278 <br> Contact email   soulard.louisa@pbgc.gov <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent? (if different)** <br><br> Name <br><br> Number    Street <br><br> City      State      ZIP Code <br><br> Contact phone _____ <br> Contact email _____ |
| 4. Does this claim amend one already filed? | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ <br> MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ | |

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

---

**7. How much is the claim?**  $ 6,959,456 _____ . Does this amount include interest or other charges?

         ☑ No

         ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>Statutory Liability under 29 U.S.C. §§ 1362 and 1368 for unfunded</u> benefit liabilities of the Pacific Steel Casting Company Defined Benefit Pension Plan.  See attached statement.

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

     **Nature of property:**

     ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

     ☐ Motor vehicle

     ☐ Other. Describe: _____

     **Basis for perfection:** _____

     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

     **Value of property:**  $_____

     **Amount of the claim that is secured:**  $_____

     **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

     **Amount necessary to cure any default as of the date of the petition:**  $_____

     **Annual Interest Rate (when case was filed)_____%**

     ☐ Fixed

     ☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No  See attached statement.

☐ Yes. Identify the property: _____

Case 19-40523  Doc# 85-11  Filed 10/02/20  Entered 10/02/20 13:34:49  Page 2 of 3

699

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. *Check all that apply:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ unliquidated

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies.  $ unliquidated

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  4 / 8 / 20 19  
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Stephanie | | Thomas |
|---|---|---|---|
| | First name | Middle name | Last name |

Title  Assistant General Counsel

Company  Pension Benefit Guaranty Corporation  
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  1200 K Street, N.W., Suite 340  
Number  Street  
Washington, DC 20005-4026  
City  State  ZIP Code

Contact phone  202-326-4020  Email  thomas.stephanie@pbgc.gov

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PACIFIC STEEL CASTING COMPANY LLC | ) | Case No. 19-40193 |
| | ) | |
| | ) | |
| Debtor. | ) | |

### STATEMENT OF THE PENSION BENEFIT GUARANTY CORPORATION IN SUPPORT OF ITS CLAIM FOR UNFUNDED BENEFIT LIABILITIES

The Pension Benefit Guaranty Corporation ("PBGC") hereby submits this Statement in Support of its claim against Pacific Steel Casting Company LLC (the "Debtor") for the unfunded benefit liabilities of the Pacific Steel Casting Company Defined Benefit Pension Plan ("Pension Plan"), stating:

1.     PBGC is a wholly-owned United States government corporation, and an agency of the United States, that administers the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2017).  PBGC guarantees the payment of certain pension benefits upon the termination of a single-employer pension plan covered by Title IV of ERISA.  When an underfunded plan terminates, PBGC generally becomes trustee of the plan and, subject to certain statutory limitations, pays the plan's unfunded benefits with its insurance funds. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361.

2.     The Pension Plan is a single-employer defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321.

3.     The Debtor is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13), or a member of a contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14).

4.     On January 25, 2019, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

5.     This claim is contingent on termination of the Pension Plan. *See* 29 U.S.C. §§ 1341-1342. For purposes of this claim, it is assumed that the Pension Plan terminated on September 30, 2018. If and when the Pension Plan terminates, PBGC will amend this claim as necessary.

6.     If the Pension Plan terminates, the assets of the Pension Plan may be insufficient to cover the benefit liabilities of the Pension Plan. This insufficiency is the amount of the Pension Plan's unfunded benefit liabilities. *See* 29 U.S.C. § 1362(b).

7.     Upon termination of the Pension Plan, its contributing sponsor and each member of the contributing sponsor's controlled group become jointly and severally liable to PBGC for the total amount of the Pension Plan's unfunded benefit liabilities. 29 U.S.C. § 1362(a), (b); *see* 29 U.S.C. § 1301(a)(18).

8.     The estimated amount of the Pension Plan's unfunded benefit liabilities is $6,959,456.

9.     If any person liable to PBGC under 29 U.S.C. § 1362 fails to pay the liability after demand, a lien arises in favor of PBGC as of the termination date of the plan. The amount of the lien is limited to 30% of the collective net worth of all the liable parties. 29 U.S.C. § 1368(a). For purposes of the Bankruptcy Code, the lien is "treated in the same manner as a tax due and owing to the United States." 29 U.S.C. § 1368(c)(2).

10.     This claim is an administrative expense entitled to priority as a tax incurred by the estate, in an amount up to 30% of the controlled group's collective net worth. 11 U.S.C. §§ 503(b)(1)(B), 507(a)(2); 29 U.S.C. § 1368(a), (c)(2). Independently, it also meets the

2

definition of a "tax" for bankruptcy purposes because it is an involuntary pecuniary burden imposed on individuals or their property for public purposes, including to defray the government's expenses.

11.     Alternatively, this claim is entitled to tax priority under 11 U.S.C. § 507(a)(8), in an amount up to 30% of the controlled group's collective net worth.

12.     Any amount not entitled to priority is asserted as a general unsecured claim.

13.     By filing this claim, PBGC asserts its contingent claim and demands payment of the unfunded benefit liabilities of the Pension Plan upon the Pension Plan's termination date.

14.     Documents supporting this claim include the Pension Plan document, with applicable amendments; relevant collateral agreements, if any; United States Internal Revenue Service Forms 5500; and annual actuarial valuation reports for the Pension Plan.  On information and belief, the Debtor or a member of its controlled group has in its possession and control copies or originals of these documents.

**[Remainder of This Page Intentionally Left Blank]**

3

Case 19-40503   Doc 851   Filed 12/02/20   Entered: 12/02/20 13:34:49   Page 669 of 699   Part 2 Statement in Support of Page 3 of 4

669

15.     PBGC's investigation of this matter is continuing.  The agency reserves the right to amend, modify, and supplement this proof of claim and to file additional proofs of claim.  This claim may be subject to a right of setoff by PBGC as an agency of the United States government, and the right of the United States to withhold subject to offset amounts due from other federal entities.  The filing of this proof of claim is not intended to be and shall not be construed as an election of remedy or a waiver or limitation of any rights of PBGC, the Pension Plan, or any of its beneficiaries or participants.


Dated:  Washington, D.C.
        April 5, 2019


Stephanie Thomas
Assistant General Counsel
Louisa A. Soulard
Attorney
Office of the General Counsel
PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, D.C.  20005-4026
(202) 326-4020 ext. 3278
FAX:  (202) 326-4112

4

Case 19-40503  Doc# 851-1  Filed 12/02/20  Entered 12/02/20 13:34:49  Page 670 of
Case 19-40503  Claim 511  Part 2  Filed 05/08/19  Desc Statement in Support
Page 4 of 4

**670**

# EXHIBIT "14"

**Fill in this information to identify the case:**

Debtor 1  Pacific Steel Casting Company LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court  **Northern District of California**

Case number: **19–40193**

FILED

**U.S. Bankruptcy Court**
**Northern District of California**

5/29/2019

**Edward J. Emmons, Clerk**

Official Form 410
# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:  Identify the Claim

| | |
|---|---|
| 1.**Who is the current creditor?** | Speyside Fund, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |
| 2.**Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| 3.**Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Speyside Fund, LLC<br>Name<br><br>24 Frank Lloyd Wright Drive<br>Ann Arbor, MI 48106<br><br>Contact phone _____<br>Contact email _____<br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_____ | **Where should payments to the creditor be sent?** (if different)<br><br>Name<br><br><br>Contact phone _____<br>Contact email _____ |
| 4.**Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |
| 5.**Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

Official Form 410                    Proof of Claim                    page 1

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ 828761.90  **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Secured Notes and Security Agreement/Money Loaned |
| 9. **Is all or part of the claim secured?** | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>   **Nature of property:**<br>   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>   ☐ Motor vehicle<br>   ☑ Other. Describe:  All assets<br><br>   **Basis for perfection:**  UCC Financing Statement<br><br>   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>   **Value of property:**  $ 82876190.00<br>   **Amount of the claim that is secured:**  $ 828761.90<br>   **Amount of the claim that is unsecured:**  $ 0.00   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>   **Amount necessary to cure any default as of the date of the petition:**  $ _____<br><br>   **Annual Interest Rate** (when case was filed)  10  %<br>   ☑ Fixed<br>   ☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Case 19-40057 Doc 527 Filed 10/05/20 Entered 10/02/20 18:44:49 Page 2 of 3

Case 19-40057 Claim 527 Filed 05/29/19 Desc Main Page 2 of 699

**673**

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies   $ _____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   5/29/2019
                   MM / DD / YYYY

/s/  Rachel L. Hillegonds

Signature

Print the name of the person who is completing and signing this claim:

Name   Rachel L. Hillegonds

       First name    Middle name    Last name

Title

Company   Miller Johnson

          Identify the corporate servicer as the company if the authorized agent is a servicer
Address   Miller Johnson, PO Box 306

          Number   Street
          Grand Rapids, MI 49501

          City   State   ZIP Code
Contact phone   6168311711         Email

---

Official Form 410                    Proof of Claim                    page 3

Case 19-04093-swd   Claim 6-527   Filed 05/29/19   Entered 04/02/20 18:34:49   Page 6 of 7

Case 19-04093-swd   Doc 1657   Filed 04/02/20   Desc Main Document   Page 674 of 699

**674**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Attachment 1

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
GAYE GREENWALD (908)252-4248

**B. E-MAIL CONTACT AT FILER (optional)**
GLGREENWALD@NMMLAW.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

NORRIS, MCLAUGHLIN & MARCUS
721 ROUTE 202-206, SUITE 200
BRIDGEWATER, NJ 08807
US

Delaware Department of State
U.C.C. Filing Section
Filed: 03:07 PM 10/28/2016
U.C.C. Initial Filing No: 2016 6652315

Service Request No: 20166407997

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| PACIFIC STEEL CASTING COMPANY LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1333 SECOND STREET | BERKELEY | CA | 94710 | | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| SPEYSIDE FUND LLC, AS AGENT | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 24 FRANK LLOYD WRIGHT DRIVE, PO BOX 484 | ANN ARBOR | MI | 48106 | | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
All Assets, now owned and hereafter acquired.    The security interests of the Secured Party are subject and subordinate in priority to all security interests in the Collateral in favor of Wells Fargo Bank, National Association, its successors and assigns.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
119689-1

Attachment 2

**THIS SECURITY AGREEMENT AND THE SECURITY INTERESTS GRANTED HEREUNDER IS SUBORDINATE TO THE SENIOR SECURITY INTERESTS AS DESCRIBED IN THAT CERTAIN SUBORDINATION AGREEMENT DATED AS OF OCTOBER  , 2016 BY AND AMONG PACIFIC STEEL CASTING COMPANY LLC, SPEYSIDE FUND LLC, AS AGENT; WELLS FARGO BANK, NATIONAL ASSOCATION (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "<u>SUBORDINATION AGREEMENT</u>"), ON THE TERMS AND CONDITIONS THEREIN AND ALL HOLDERS OF SECURITY INTERESTS HEREUNDER SHALL BE SUBJECT TO AND BOUND BY THE TERMS THEREOF.**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "<u>Agreement</u>") is entered into as of October  28 , 2016, by and between **PACIFIC STEEL CASTING COMPANY LLC**,  a Delaware limited liability company ("<u>Grantor</u>") and **SPEYSIDE FUND LLC**, a Delaware limited liability company, as agent ("<u>Administrative Agent</u>") for itself and for the account of **ALCAST COMPANY**, an Illinois corporation and **KRISHNAN VENKATESAN,** an individual (each individually, a "<u>Lender</u>" and all collectively, the "<u>Lenders</u>").

Pursuant to a Subordinated Secured Note of even date herewith from Grantor to the Lenders in the maximum principal amount of  $1,000,000 (as amended, restated or otherwise modified or replaced from time to time, the "<u>Note</u>"), Lender has made certain advances and other extensions of credit to Grantor.

As a condition to making advances and other extensions of credit under the Note, Lenders have required the execution and delivery of this Agreement by Grantor.

1.    DEFINITIONS.

(a)    All capitalized terms not otherwise defined in this Agreement shall have the meanings given them in the Note.

(b)    The following terms, when used in this Agreement (whether or not capitalized), shall have the meanings given them in the Code, except that (i) for purposes of this Agreement, the meaning of such terms will not be limited by reason of any limitation on the scope of the Code, and (ii) to the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision: "Accession", "Account", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Deposit Account", "Document", "Equipment", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Investment Property", "Letter-of-Credit Right", "Letter of Credit", "Money", "Securities Account" and "Supporting Obligations".

2.    GRANT OF SECURITY INTEREST.  Grantor grants and transfers to Administrative Agent, for the benefit of Lenders, a continuing security interest (the "<u>Security Interest</u>") in all of the following property of Grantor or in which Grantor has rights, whether presently existing or acquired after the date of this Agreement (collectively, together with all Proceeds, the "<u>Collateral</u>")

(a)    Accounts;

(b)     Chattel Paper;

(c)     Commercial Tort Claims;

(d)     Deposit Accounts;

(e)     Documents;

(f)     General Intangibles;

(g)     Goods, including Equipment and Fixtures;

(h)     Instruments;

(i)     Inventory;

(j)     Investment Property;

(k)     Letters of Credit and Letter-of-Credit Rights;

(l)     Money and other assets of Grantor that now or later come into possession, custody, or control of Lender;

(m)     all Accessions and Supporting Obligations; and

all books and records relating to the above property and all proceeds (as such term is defined in the Code) and products, whether tangible or intangible of any of the above property, all proceeds of any condemnation award relating to any of the above property, all proceeds of insurance covering or relating to any or all of the above property and all rebates and returns relating to any of the above property (all such proceeds, collectively, "Proceeds").

3.      OBLIGATIONS SECURED.  The obligations secured by the Security Interest are the payment and performance of:

(a)     all now existing and subsequently arising  liabilities and obligations of Grantor to the Lenders evidenced by the Note;   and

(b)     all now existing or subsequently arising obligations of Grantor and rights of Lenders under this Agreement; and

(c)     all subsequently arising liabilities and obligations of Grantor to the Lenders in the form of future loans, advances, guarantees, extensions of credit.

All of the foregoing liabilities and obligations shall be referred to collectively as the "Obligations".

4.      AUTHORIZATION TO FILE FINANCING STATEMENTS.  Grantor authorizes Administrative Agent to file financing statements describing the Collateral to perfect Lenders' Security Interest in the Collateral, and Lender may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including without limitation any Commercial Tort Claims. All

2

financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by Grantor and are ratified.

5.  [RESERVED].

6.  REPRESENTATIONS AND WARRANTIES OF GRANTOR.  Grantor represents and warrants to Lender that:

(a)  Grantor has legal title to and has possession or control of the Collateral;

(c)  Grantor has the exclusive right to grant a security interest in the Collateral;

(d)  all Collateral is genuine, free from Liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the Security Interest created by this Agreement and Senior Liens (as such term is defined in the Subordination Agreement);

(e)  all statements contained in this Agreement and, where applicable, regarding the Collateral are true and complete in all material respects;

(f)  no financing statement covering any of the Collateral, and naming any secured party other than Lender and holders of Permitted Liens, is on file in any public office other than in favor of Wells Fargo Bank, National Association (the "Senior Lender");

(g)  all Persons appearing to be obligated on Collateral have authority and capacity to contract and are bound as they appear to be;

(h)  all property subject to Chattel Paper has been properly registered and filed in compliance with law and to perfect the interest of Grantor in such property;

(i)  all Accounts and other rights to payment comply with all applicable laws concerning form, content and manner of preparation and execution, including where applicable Federal Reserve Regulation Z and any state consumer credit laws;

7.  COVENANTS OF GRANTOR.

(a)  Grantor covenants and agrees:

(i)  to permit Administrative Agent to exercise the rights, remedies, and powers of the Lenders under the Note and this Agreement and under law;

(ii)  not to change the places where Grantor keeps any Collateral or Grantor's records concerning the Collateral without (A) giving Administrative Agent 30 days prior written notice of the address to which Grantor is moving same, and (B) delivering to Administrative Agent a fully executed Collateral Access Agreement with respect to such location if not owned by Grantor; and

(iii)  to cooperate with Administrative Agent in perfecting all security interests granted by this Agreement and in obtaining such agreements from third parties as Administrative Agent deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights with regard to Collateral or access to Collateral.

(b)     Grantor agrees with regard to the Collateral, unless Administrative Agent agrees otherwise in writing:

(i)     not to use any Collateral for any unlawful purpose or in any way that would void any insurance required to be carried on such Collateral;

(ii)    to insure the Collateral, with Administrative Agent named as lender loss payee and additional insured, in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to Administrative Agent;

(iii)   not to sell, pledge or dispose of, nor permit the transfer by operation of law of, any of the Collateral or any interest in the Collateral, except sales of Inventory to buyers in the ordinary course of Grantor's business;

(iv)    not to permit any lien on the Collateral, including without limitation, liens arising from the storage of Inventory, except for Liens in favor of Senior Lender and Permitted Liens;

(v)     to deliver to Administrative Agent (i) notice of any Commercial Tort Claim it may have against any Person, including a detailed description of such Commercial Tort Claim and, upon receipt of such description by Administrative Agent the description of Collateral set forth in Section 1 of this Agreement shall be deemed to be amended to include such description of each such Commercial Tort Claim, and (ii) such documents as Administrative Agent may require to grant Administrative Agent a security interest in Grantor's rights in such Commercial Tort Claim; and

(vi)    to provide any service and do any other acts which may be necessary to maintain, preserve and protect all Collateral and, as appropriate and applicable, to keep all Collateral in good and saleable condition, to deal with the Collateral in accordance with the standards and practices adhered to generally by users and manufacturers of like property, and to keep all Collateral free and clear of all defenses, rights of offset and counterclaims.

8.     POWERS OF ADMINISTRATIVE AGENT. Grantor appoints Administrative Agent its attorney in fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Administrative Agent's officers and employees, or any of them, whether or not an Event of Default has occurred:

(a)     to perform any obligation of Grantor hereunder in Grantor's name or otherwise;

(b)     to give notice to Account Debtors or others of Administrative Agent's rights in the Collateral, to enforce or forebear from enforcing the same and to make extension or modification agreements;

(c)     to release Persons liable on Collateral and to give receipts and compromise disputes;

(d)     to release or substitute security;

(e)     to resort to security in any order;

4

(f)     to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, initial financing statements and amendments, continuation statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release Administrative Agent's interest in the Collateral;

(g)     to receive, open and read mail addressed to Grantor;

(h)     to take cash, instruments for the payment of money and other property to which Administrative Agent is entitled;

(i)     to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to Collateral;

(j)     to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Administrative Agent, at Administrative Agent's sole option, toward repayment of the Obligations or replacement of the Collateral;

(k)     to enter onto Grantor's premises to inspect the Collateral;

(l)     to preserve or release the interest evidenced by chattel paper to which Administrative Agent is entitled hereunder and to endorse and deliver any evidence of title to such interest; and

(m)     to do all acts and things and execute all documents in the name of Grantor or otherwise, deemed by Administrative Agent as necessary, proper and convenient in connection with the preservation, perfection, priority or enforcement of Administrative Agent's rights.

9.     PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS. Grantor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral, and upon the failure of Grantor to do so, Administrative Agent at its option may pay any of them and shall be the sole judge of the legality or validity and the amount necessary to discharge the same. Any such payments made by Administrative Agent shall be Obligations under the Note. Any such payments made by Administrative Agent shall be obligations of Grantor to Administrative Agent, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of the Note, and shall be secured by the Collateral, subject to all terms and conditions of this Agreement.

10.     EVENTS OF DEFAULT. The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)     any default in the payment or performance of any obligation, or any defined or described event of default, under (i) the Note, or any other contract or instrument evidencing any Obligation, or (ii) any agreement between Grantor and Senior Lender, including without limitation any loan agreement promissory note, letter of credit reimbursement agreement or security agreement relating to or executed in connection with any Obligation;

(b)     any representation or warranty made by a Grantor in this Agreement shall prove to be incorrect, false or misleading in any material respect when made; and

5

(c)     Grantor shall fail to timely observe or perform any covenant or other obligation or agreement set forth in this Agreement.

11.     REMEDIES.  Upon the occurrence and during the continuation of any Event of Default, Administrative Agent shall have the right to declare immediately due and payable all or any Obligations secured by this Agreement and to terminate any commitments to make loans or otherwise extend credit under the Note. Administrative Agent shall have all other rights, powers, privileges and remedies granted to a secured party upon default under the Code or otherwise provided by law, including without limitation, the right to:

(a)     contact all Persons obligated to Grantor on any Collateral and to instruct such Persons to deliver all Collateral directly to Administrative Agent;

(b)     sell, lease, license or otherwise dispose of any or all Collateral;

(c)     notify the United States Postal Service to change the address for delivery of mail of Grantor to any address designated by Administrative Agent;

(d)     with regard to any Deposit Account, instruct the bank maintaining such Deposit Account to pay the balance of such Deposit Account to Administrative Agent or take such other action as Administrative Agent shall instruct; and

(e)     with regard to any Securities Account or Commodity Account, instruct the securities intermediary maintaining such Securities Account or the commodity intermediary maintaining such Commodity Account, as applicable, to pay the balance of such Securities Account or such Commodity Account, as applicable, to Administrative Agent or take such other action as Administrative Agent shall instruct;  and

(f)     without regard to the occurrence of waste or the adequacy of security, apply  for the appointment of a receiver for Grantor or for the assets of Grantor and Grantor waives any objection to such appointment or to the right to have a bond or security posted by Administrative Agent.  Grantor hereby waives any objection or defense to the appointment of any such receiver and any right that Grantor has or may have to seek the posting of a bond or other security by Administrative Agent.

While an Event of Default exists:

(1)     Grantor will deliver to Administrative Agent from time to time, as requested by Administrative Agent, current lists of all Collateral;

(2)     Grantor will not dispose of any Collateral except on terms approved by Administrative Agent;

(3)     at Administrative Agent's request, Grantor will assemble and deliver all Collateral, and books and records pertaining thereto, to Administrative Agent at a reasonably convenient place designated by Administrative Agent; and

(4)     Administrative Agent may, without notice to Grantor, enter onto Grantor's premises and take possession of the Collateral.

6

12.     CUMULATIVE RIGHTS.  All rights, powers, privileges and remedies of Administrative Agent shall be cumulative.  No delay, failure or discontinuance of Administrative Agent in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise or the exercise of any other right, power, privilege or remedy.

13.     WAIVERS AND CONSENTS OF ADMINISTRATIVE AGENT.  Any waiver, permit, consent or approval of any kind by Administrative Agent of any default, or any such waiver of any provisions or conditions, must be in writing and shall be effective only to the extent set forth in writing.

14.     DISPOSITION    OF    COLLATERAL    AND    PROCEEDS;    TRANSFER    OF INDEBTEDNESS.  In disposing of Collateral, Administrative Agent may disclaim all warranties of title, possession, quiet enjoyment and the like.  Any proceeds of any disposition of any Collateral, may be applied by Administrative Agent to the payment of expenses incurred by Administrative Agent, including reasonable attorneys' fees, and the balance of such proceeds may be applied by Administrative Agent toward the payment of the Obligations in such order of application as Administrative Agent may from time to time elect. Upon the transfer of all or any part of the Obligations, Administrative Agent may transfer all or any part of the Collateral and shall be fully discharged from all liability and responsibility with respect to such transferred Collateral, and the transferee shall be vested with all rights and powers of Administrative Agent hereunder; but with respect to any Collateral not so transferred, Administrative Agent shall retain all rights, powers, privileges and remedies. It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions. Grantor agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and such notice shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. Administrative Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Administrative Agent may adjourn any public or private sale from time to time, and such sale may be made at the time and place to which it was so adjourned. Grantor agrees that the internet shall constitute a "place" for purposes of Section 9-610(b) of the Code. Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the Code.  Grantor grants to Administrative Agent a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all intellectual property rights of Grantor for the purpose of: (a) completing the manufacture of any in-process materials following any Event of Default so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Grantor for its own manufacturing; and (b) selling, leasing or otherwise disposing of any or all Collateral following any Event of Default.

15.     STATUTE OF LIMITATIONS.  Until all Obligations shall have been paid in full, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to Administrative Agent shall continue to exist and may be exercised by Administrative Agent at any time and from time to time irrespective of the fact that the Obligations or any part thereof may have become barred by any statute of limitations, or that the personal liability of Grantor may have ceased, unless such liability shall have ceased due to the payment in full of all Obligations and Indebtedness secured by this Agreement.

Case:19-40057  Doc#25-1 Filed:10/02/19 Entered:10/02/20 18:34:29  Page 682 of
699

682

16.     WAIVERS OF GRANTOR.  Grantor waives any right to require Administrative Agent to (a) proceed against Grantor or any other Person, (b) marshal assets or proceed against or exhaust any security from Grantor or any other Person, (c) perform any obligation of Grantor with respect to any Collateral; and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds.  Grantor further waives any right to direct the application of payments or security for any Indebtedness of such Grantor or indebtedness of customers of such Grantor.

17.     FURTHER ASSURANCES.  At any time upon the request of Administrative Agent, Grantor will execute or deliver to Administrative Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements, certificates of title, mortgages, deeds of trust and all other documents (the "Additional Documents") that Administrative Agent may request and in form and substance satisfactory to Administrative Agent, to create, perfect, and continue perfection or to better perfect Administrative Agent's Liens in all of the assets of Grantor (whether now owned or subsequently arising of acquired, tangible or intangible, real or personal), and in order to fully consummate all of the transactions contemplated under this Agreement and under the other Loan Documents.  If Grantor refuses or fails to execute or deliver any requested Additional Documents, Grantor authorizes Administrative Agent to execute such Additional Documents in Grantor's name, and authorizes Administrative Agent to file such executed Additional Documents in any appropriate filing office. Grantor acknowledges that Grantor is not authorized to file any financing statement or amendment with respect to any financing statement filed in connection with this Agreement without the prior written consent of Administrative Agent, subject to Grantor's rights under Section 9-509(d)(2) of the Code.

18.     SUBROGATION RIGHTS.  Until all Obligations shall have been paid in full and all commitments by Administrative Agent to extend credit under the Note have been terminated, Grantor shall not have any right of subrogation or contribution or similar right, and Grantor waives any benefit of or right to participate in any of the Collateral or any other security now or subsequently held by Administrative Agent.

19.     NOTICES.  All notices, requests and demands required under this Agreement must be given, and shall be deemed received, as provided in Section 7.3 of the Note at the address set forth below each party's name on the signature page of this Agreement or to such other address as any party may designate by written notice to all other parties.

20.     COSTS, EXPENSES AND ATTORNEYS' FEES.  Grantor shall pay to Administrative Agent immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Administrative Agent's in-house counsel), expended or incurred by Administrative Agent in connection with or related to this Agreement.  Further, Grantor indemnifies Administrative Agent against all losses, claims, demands, liabilities and expenses of every kind caused by property subject to this Agreement.

21.     SUCCESSORS; ASSIGNS; AMENDMENT.  This Agreement will be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided that Grantor may not assign or transfer its interests, rights, or obligations under this Agreement without Administrative Agent's prior written consent.  Administrative Agent may sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Administrative Agent's rights and benefits under this Agreement and the other Loan Documents. This Agreement may be amended or modified only in writing signed by Administrative Agent and Grantor, except as provided in Section 7(b)(xi) and Section 19 of this Agreement.

8

22.     SEVERABILITY OF PROVISIONS.  If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

23.     GOVERNING LAW. The validity of this Agreement and the construction, interpretation, and enforcement of this Agreement, and the rights of the parties, as well as all claims, controversies or disputes arising under or related to this Agreement will be determined under, governed by and construed in accordance with the laws of the State of Delaware without regard conflicts of laws principles.

24.     JURISDICTION.  All actions or proceedings arising in connection with this Agreement may be tried and litigated in the United States District Court for the Eastern District of Michigan, or any Court of the State of Michigan sitting in Ann Arbor, Michigan and provided that any suit seeking enforcement against any Collateral or other property may be brought, at Administrative Agent's option, in the courts of any jurisdiction where Administrative Agent elects to bring such action or where such Collateral or other property may be found. Grantor and Administrative Agent waive, to the extent permitted under applicable law, any right they may have to assert the doctrine of forum non conveniens or to object to venue to the extent any proceeding is brought.

25.     **WAIVER OF JURY TRIAL**.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, GRANTOR AND ADMINISTRATIVE AGENT WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE LOAN DOCUMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "CLAIM"). GRANTOR AND ADMINISTRATIVE AGENT REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[SIGNATURE PAGES FOLLOW]

Case: 19-40057   Doc # 25-1   Filed 10/02/20   Entered 10/02/20 18:34:29   Page 684 of 699

This Agreement has been duly executed as of the date set forth on page 1.

GRANTOR:
PACIFIC STEEL CASTING COMPANY LLC

By: _____
Name: Jeffrey A. Stone
Title: CEO

Address:

Pacific Steel Casting Company LLC
1333 Second Street
Berkeley, California 94710
Attn: Chief Financial Officer

LENDER AND COLLATERAL AGENT

SPEYSIDE FUND LLC

By: _____
Jeffrey A. Stone, Manager

Address:

24 Frank Lloyd Wright Drive
PO Box 484
Ann Arbor, MI 48106
Attn: Jeffrey A. Stone

10

Attachment 3

**THIS NOTE AND THE INDEBTEDNESS HEREUNDER IS SUBORDINATE TO THE SENIOR LIABILITIES AS DEFINED IN THAT CERTAIN SUBORDINATION AGREEMENT DATED AS OF OCTOBER , 2016 BY AND AMONG PACIFIC STEEL CASTING COMPANY LLC, SPEYSIDE FUND LLC, AS AGENT; WELLS FARGO BANK, NATIONAL ASSOCATION (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT"), ON THE TERMS AND CONDITIONS THEREIN AND ALL HOLDERS OF THE DEBT HEREUNDER SHALL BE SUBJECT TO AND BOUND BY THE TERMS THEREOF.**

## SUBORDINATED SECURED NOTE

$1,000,000

October 28, 2016
Berkeley, California

FOR VALUE RECEIVED, PACIFIC STEEL CASTING COMPANY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to SPEYSIDE FUND LLC, a Delaware limited liability company, as agent ("Administrative Agent") for itself and for the account of ALCAST COMPANY, an Illinois corporation and KRISHNAN VENKATESAN, an individual (in the respective amounts set forth in Exhibit A) (each, a "Lender" and, collectively, the "Lenders"), at its office located at on or before December 31, 2017 (the "Maturity Date"), or such earlier date as the principal amount of this Note may become due in accordance with the provisions hereof, the principal sum of One Million Dollars ($1,000,000) or such lesser amount as shall equal the aggregate unpaid principal amount of the loans made by the Lenders to the Borrower, with interest thereon, in lawful money of the United States of America and in immediately available funds, in accordance with the following terms and provisions. In no event shall interest hereunder exceed the maximum rate allowed under Delaware law.

1.    This Note shall be payable as follows:

(a)    The Borrower shall pay to the Administrative Agent for the account of each Lender the outstanding principal amount due hereunder on the Maturity Date.

(b)    The Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate interest on the outstanding principal amount due hereunder for the period from and including the date hereof to but excluding the date such principal amount of this Note shall be paid in full at the rate (the "Interest Rate") of ten percent (10.00%) per annum.

(c)    The Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate, a prepayment of the outstanding principal amount in the amount of one twentieth (1/20) of the original principal amount of each loan advanced hereunder. Such payments shall be due and payable quarterly, within one calendar month after the close of each fiscal quarter of the Borrower, commencing with the quarter ending March 31, 2017; provided however, that as of the Borrower's fiscal quarter

immediately preceding such payment date, the Borrower is in default of any covenant under the Senior Credit Agreement, or would be in default by reason of making the principal payment due hereon, then such principal prepayment shall be suspended.

(d)     Notwithstanding the provisions of clause (b) above, if an Event of Default (as such term is defined in that certain Credit Agreement dated as of June 2, 2015 by and between the Borrower  and Wells Fargo  Bank, National Association (the "Senior Lender") as heretofore and hereafter amended (such agreement, as amended, supplemented or otherwise modified and in effect from time to time, hereinafter referred to as the "Senior Credit Agreement") shall occur and be continuing beyond any applicable notice and cure period, and shall not have been waived by the lenders under the Senior Credit Agreement, the Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate interest at the Post-Default Rate (as hereinafter defined) on the then outstanding principal amount of this Note and (to the fullest extent permitted by law) and on any other amount payable by the Borrower hereunder which shall not be paid in full when due (whether at stated maturity, by acceleration or otherwise), for the period from and including the due date thereof to but excluding the date the same is paid in full; provided, any such interest calculated at the Post-Default Rate shall only accrue so long as an Event of Default (as defined in the  Senior Credit Agreement) shall then be continuing beyond any applicable notice and cure period and shall not have been waived under the Senior Credit Agreement.  For purposes hereof, the term "Post-Default Rate" shall mean a rate per annum equal to four percent (4.00%) above the Interest Rate.

(e)     Accrued interest on the outstanding principal amount due hereunder shall be payable in arrears on the first business day in each calendar month subsequent to the date hereof (each, an "Interest Payment Date") commencing with December 1, 2016, and on the Maturity Date; provided, that interest payable at the Post-Default Rate shall be payable from time to time on demand.  All interest hereunder shall be computed on the basis of a year of 365 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)     The amounts and timing of advances of principal amount of the loan evidenced hereby is in the discretion of the Administrative Agent, on behalf of the Lenders.  This is not a revolving note. The principal amount of loans hereunder, once repaid, may not be reborrowed.

2.     Upon (i) the occurrence and during the continuation of an Event of Default (as defined in the Senior Credit Agreement) beyond any applicable notice and cure period, (ii) the failure of the Borrower to pay the principal or interest on the loans made hereunder, when and as the same shall become due and payable, which failure continues for three (3) business days following the due date thereof, or (iii) the failure of the Borrower to observe or perform any covenant, condition or agreement contained herein which failure referred to in this clause (iii) continues for ten (10) days following written notice thereof from the Lender to the Borrower (each, an "Event of Default"), the Administrative Agent may, at its option, by notice to the Borrower declare the entire outstanding principal amount of this Note, together with all accrued

and unpaid interest thereon and any other amounts payable hereunder, to be immediately due and payable and the Administrative Agent may proceed to exercise any rights or remedies it may have hereunder, at law, in equity or otherwise. Notwithstanding anything to the contrary in the foregoing, if any event described in clause (i) above shall occur and is subsequently cured or waived by the Senior Lender during the Standstill Period (as such terms are defined in the Subordination Agreement), then, upon payment to the Administrative Agent of installments of principal hereof or accrued and unpaid interest hereon which would otherwise have become due during the Standstill Period had such Event of Default not occurred, then the corresponding Event of Default hereunder shall automatically be cured and waived hereunder.

3.     The Borrower shall have the right at any time and from time to time to prepay the outstanding principal amount due hereunder, in whole or in part, without premium or penalty.

4.     The Borrower, for itself and its successors and assigns, hereby waives presentment, protest, demand, diligence, notice of dishonor and of nonpayment and waives and renounces all rights to the benefits of any statute of limitations and any moratorium, appraisement or exemption now provided or which may hereafter be provided by any Federal or state statute, including but not limited to exemptions provided by or allowed under the Bankruptcy Code (as now or hereafter in effect), both as to itself personally and as to all of its successors and assigns, whether real or personal, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals and modifications hereof.

5.     Each and every covenant or condition for the benefit of the Administrative Agent and each Lender contained herein may be waived only by a writing signed by the Administrative Agent on its own behalf and on behalf of each Lender; provided, however, that any such waiver by the Administrative Agent or such Lender shall be a waiver only with respect to the instance for which such waiver is granted and shall not be deemed to be a waiver by the Administrative Agent or such Lender of the obligation of the Borrower thereafter to perform any other or the same covenant or condition. No failure by the Administrative Agent to accelerate the indebtedness evidenced hereby by reason of the occurrence of any Event of Default hereunder, acceptance of a past due installment or indulgence granted from time to time shall be construed to be a waiver of the right to insist upon the prompt payment thereafter or shall be deemed to be a novation of this Note, a reinstatement of the debt evidenced hereby, or a waiver of such right of acceleration or any other right, or be construed so as to preclude the exercise of any right which the Administrative Agent or such Lender may have, whether by the laws of the state governing this Note, by agreement or otherwise, and the Borrower hereby expressly waives the benefit of any statute or rule of law or equity which would produce a result contrary to or in conflict with the foregoing.

6.     This Note may be amended or modified only by an instrument in writing signed by the Borrower and the Administrative Agent on its own behalf and on behalf of each Lender.

7.     The Borrower will furnish to the Administrative Agent copies of (i) all reports and other information provided under the Senior Credit Agreement, and (ii) any

3

amendment or other modification occurring after the date hereof relating to the Senior Credit Agreement.

8.   Other than (i) Obligations (as such term is defined in the Senior Credit Agreement), and (ii) any indebtedness of the Borrower existing on the date hereof, the Borrower will not, and will not permit any subsidiary thereof to, create, incur, assume or permit to exist any indebtedness which by its express terms ranks in priority senior to the loans made hereunder without the Lender's prior written consent.

9.   The payment of this Note by the Borrower, including any principal and interest thereon, is hereby expressly made subordinate and subject in right of payment to the prior payment in full of the obligations of the Borrower under the Senior Credit Agreement, pursuant to the terms of that certain Subordination Agreement dated October__, 2016 related hereto.

10.   The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, the Borrower shall not assign or transfer its rights hereunder without the prior written consent of the Administrative Agent on its own behalf and on behalf of each Lender. Each Lender may at any time assign or sell all or any part of its rights and obligations under this Note to (i) any of its affiliates without notice to or approval by the Borrower, and (ii) to any other persons approved in advance by the Borrower, which approval shall not be unreasonably withheld, provided, in each case, such party agrees to become party hereto.  Any actions taken by the Administrative Agent on behalf of any Lender, including without limitation any amendments of this Note or waiver of the terms thereof, shall be binding on such Lender.  Without limiting the foregoing, payments by the Borrower to the Administrative Agent in accordance with the terms of this Note shall constitute the satisfaction and discharge in full of the Borrower's obligations to the Lenders with respect to such payment, and it shall be the sole responsibility of the Administrative Agent to allocate such payment among the Lenders in the proper manner.

11.   **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE.**  The Borrower hereby submits to the nonexclusive jurisdiction of the United States District Court for the Eastern District of Michigan and of any Michigan State Court sitting in Ann Arbor, Michigan for the purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby.  The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

12.   The Borrower hereby irrevocably waives, to the fullest extent permitted by law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note.

13.   If any provision hereof is invalid and unenforceable in any applicable jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the

Administrative Agent and the Lenders in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

14.     The Borrower shall pay or reimburse the Lender for paying all reasonable out of pocket expenses incurred by the Administrative Agent and the Lenders, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with this Note and any other document executed in connection therewith (whether or not the transactions contemplated hereby or thereby shall be consummated), including any amendment, modification or waiver thereof; and all reasonable costs and expenses of the Administrative Agent and the Lenders (including the reasonable fees and expenses of counsel) in connection with any Event of Default hereunder and any enforcement or collection proceedings resulting therefrom.

15.     This Note is secured by the Security Agreement dated the date hereof between the Borrower and the Administrative Agent, as collateral agent for the Lenders, and the Lenders are entitled to the rights and benefits thereof.

[SIGNATURE PAGE FOLLOWS]

5

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed by its authorized officers on the day and year first above written.

**PACIFIC STEEL CASTING COMPANY LLC.**

By _____

Jeffrey A. Stone, CEO

## EXHIBIT A

| Lender | Commitment Amount |
|---|---|
| SPEYSIDE FUND LLC | $ 490,000 |
| ALCAST COMPANY | $ 490,000 |
| KRISHNAN VENKATESAN | $   20,000 |
| | $1,000,000 |

**THIS NOTE AND THE INDEBTEDNESS HEREUNDER IS SUBORDINATE TO THE SENIOR LIABILITIES AS DEFINED IN THAT CERTAIN SUBORDINATION AGREEMENT BY AND AMONG PACIFIC STEEL CASTING COMPANY LLC, SPEYSIDE FUND LLC, AS AGENT; WELLS FARGO BANK, NATIONAL ASSOCATION (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT"), ON THE TERMS AND CONDITIONS THEREIN AND ALL HOLDERS OF THE DEBT HEREUNDER SHALL BE SUBJECT TO AND BOUND BY THE TERMS THEREOF.**

## SUBORDINATED SECURED NOTE

$4,000,000

December 30, 2016
Berkeley, California

FOR VALUE RECEIVED, PACIFIC STEEL CASTING COMPANY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to SPEYSIDE FUND LLC, a Delaware limited liability company, as agent ("Administrative Agent") for itself and for the account of ALCAST COMPANY, an Illinois corporation and KRISHNAN VENKATESAN, an individual (in the respective amounts set forth in Exhibit A) (each, a "Lender" and, collectively, the "Lenders"), at its office located at on or before June 30, 2019 (the "Maturity Date"), or such earlier date as the principal amount of this Note may become due in accordance with the provisions hereof, the principal sum of Four Million Dollars ($4,000,000) or such lesser amount as shall equal the aggregate unpaid principal amount of the loans made by the Lenders to the Borrower, with interest thereon, in lawful money of the United States of America and in immediately available funds, in accordance with the following terms and provisions. In no event shall interest hereunder exceed the maximum rate allowed under Delaware law.

1.　　This Note shall be payable as follows:

(a)　　The Borrower shall pay to the Administrative Agent for the account of each Lender the outstanding principal amount due hereunder on the Maturity Date.

(b)　　The Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate interest on the outstanding principal amount due hereunder for the period from and including the date hereof to but excluding the date such principal amount of this Note shall be paid in full at the rate (the "Interest Rate") of ten percent (10.00%) per annum.

(c)　　The Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate, a prepayment of the outstanding principal amount in the amount of one twentieth (1/20) of the original principal amount of each loan advanced hereunder. Such payments shall be due and payable quarterly, within one calendar month after the close of each fiscal quarter of the Borrower, commencing with the quarter ending March 31, 2017; provided however, that as of the Borrower's fiscal quarter immediately preceding such payment date, the Borrower is in default of any covenant

under the Senior Credit Agreement, or would be in default by reason of making the principal payment due hereon, or if the conditions to payment under the Subordination Agreement aren't satisfied, then such principal prepayment shall be suspended.

(d)     Notwithstanding the provisions of clause (b) above, if an Event of Default (as such term is defined in that certain Credit Agreement dated as of June 2, 2015 by and between the Borrower  and Wells Fargo Bank, National Association (the "Senior Lender") as heretofore and hereafter amended (such agreement, as amended, supplemented or otherwise modified and in effect from time to time, hereinafter referred to as the "Senior Credit Agreement") shall occur and be continuing beyond any applicable notice and cure period, and shall not have been waived by the lenders under the Senior Credit Agreement, the Borrower will pay to the Administrative Agent for the account of all Lenders in the aggregate interest at the Post-Default Rate (as hereinafter defined) on the then outstanding principal amount of this Note and (to the fullest extent permitted by law) and on any other amount payable by the Borrower hereunder which shall not be paid in full when due (whether at stated maturity, by acceleration or otherwise), for the period from and including the due date thereof to but excluding the date the same is paid in full; provided, any such interest calculated at the Post-Default Rate shall only accrue so long as an Event of Default (as defined in the  Senior Credit Agreement) shall then be continuing beyond any applicable notice and cure period and shall not have been waived under the Senior Credit Agreement. For purposes hereof, the term "Post-Default Rate" shall mean a rate per annum equal to four percent (4.00%) above the Interest Rate.

(e)     Accrued interest on the outstanding principal amount due hereunder shall be payable in arrears on the first business day in each calendar month subsequent to the date hereof (each, an "Interest Payment Date") commencing with January 1, 2017, and on the Maturity Date; provided, that interest payable at the Post-Default Rate shall be payable from time to time on demand. All interest hereunder shall be computed on the basis of a year of 365 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)     The amounts and timing of advances of principal amount of the loan evidenced hereby is in the discretion of the Administrative Agent, on behalf of the Lenders. This is not a revolving note. The principal amount of loans hereunder, once repaid, may not be reborrowed.

2.     Upon (i) the occurrence and during the continuation of an Event of Default (as defined in the Senior Credit Agreement) beyond any applicable notice and cure period, (ii) the failure of the Borrower to pay the principal or interest on the loans made hereunder, when and as the same shall become due and payable, which failure continues for three (3) business days following the due date thereof, or (iii) the failure of the Borrower to observe or perform any covenant, condition or agreement contained herein which failure referred to in this clause (iii) continues for ten (10) days following written notice thereof from the Lender to the Borrower (each, an "Event of Default"), the Administrative Agent may, at its option, by notice to the Borrower declare the entire outstanding principal amount of this Note, together with all accrued

and unpaid interest thereon and any other amounts payable hereunder, to be immediately due and payable and the Administrative Agent may proceed to exercise any rights or remedies it may have hereunder, at law, in equity or otherwise. Notwithstanding anything to the contrary in the foregoing, if any event described in clause (i) above shall occur and is subsequently cured or waived by the Senior Lender (as such term is defined in the Subordination Agreement), during the Standstill Period (as such term is defined below) then, upon payment to the Administrative Agent of installments of principal hereof or accrued and unpaid interest hereon which would otherwise have become due during the Standstill Period had such Event of Default not occurred, then the corresponding Event of Default hereunder shall automatically be cured and waived hereunder. As used herein, the term "Standstill Period" means the period beginning on the date of the Event of Default under the Senior Credit Agreement, and ending on the date which such Event of Default is cured under the express provisions of the Senior Credit Agreement allowing for the right of cure, if any, or waived in writing by the Senior Lender.

3.    The Borrower shall have the right at any time and from time to time to prepay the outstanding principal amount due hereunder, in whole or in part, without premium or penalty.

4.    The Borrower, for itself and its successors and assigns, hereby waives presentment, protest, demand, diligence, notice of dishonor and of nonpayment and waives and renounces all rights to the benefits of any statute of limitations and any moratorium, appraisement or exemption now provided or which may hereafter be provided by any Federal or state statute, including but not limited to exemptions provided by or allowed under the Bankruptcy Code (as now or hereafter in effect), both as to itself personally and as to all of its successors and assigns, whether real or personal, against the enforcement and collection of the obligations evidenced by this Note and any and all extensions, renewals and modifications hereof.

5.    Each and every covenant or condition for the benefit of the Administrative Agent and each Lender contained herein may be waived only by a writing signed by the Administrative Agent on its own behalf and on behalf of each Lender; provided, however, that any such waiver by the Administrative Agent or such Lender shall be a waiver only with respect to the instance for which such waiver is granted and shall not be deemed to be a waiver by the Administrative Agent or such Lender of the obligation of the Borrower thereafter to perform any other or the same covenant or condition. No failure by the Administrative Agent to accelerate the indebtedness evidenced hereby by reason of the occurrence of any Event of Default hereunder, acceptance of a past due installment or indulgence granted from time to time shall be construed to be a waiver of the right to insist upon the prompt payment thereafter or shall be deemed to be a novation of this Note, a reinstatement of the debt evidenced hereby, or a waiver of such right of acceleration or any other right, or be construed so as to preclude the exercise of any right which the Administrative Agent or such Lender may have, whether by the laws of the state governing this Note, by agreement or otherwise, and the Borrower hereby expressly waives the benefit of any statute or rule of law or equity which would produce a result contrary to or in conflict with the foregoing.

6.      This Note may be amended or modified only by an instrument in writing signed by the Borrower and the Administrative Agent on its own behalf and on behalf of each Lender.

7.      The Borrower will furnish to the Administrative Agent copies of (i) all reports and other information provided under the Senior Credit Agreement, and (ii) any amendment or other modification occurring after the date hereof relating to the Senior Credit Agreement.

8.      Other than (i) Obligations (as such term is defined in the Senior Credit Agreement), and (ii) any indebtedness of the Borrower existing on the date hereof, the Borrower will not, and will not permit any subsidiary thereof to, create, incur, assume or permit to exist any indebtedness which by its express terms ranks in priority senior to the loans made hereunder without the Lender's prior written consent.

9.      The payment of this Note by the Borrower, including any principal and interest thereon, is hereby expressly made subordinate and subject in right of payment to the prior payment in full of the obligations of the Borrower under the Senior Credit Agreement, pursuant to the terms of that certain Subordination Agreement between the Lender and the senior lender.

10.     The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, the Borrower shall not assign or transfer its rights hereunder without the prior written consent of the Administrative Agent on its own behalf and on behalf of each Lender. Each Lender may at any time assign or sell all or any part of its rights and obligations under this Note to (i) any of its affiliates without notice to or approval by the Borrower, and (ii) to any other persons approved in advance by the Borrower, which approval shall not be unreasonably withheld, provided, in each case, such party agrees to become party hereto. Any actions taken by the Administrative Agent on behalf of any Lender, including without limitation any amendments of this Note or waiver of the terms thereof, shall be binding on such Lender. Without limiting the foregoing, payments by the Borrower to the Administrative Agent in accordance with the terms of this Note shall constitute the satisfaction and discharge in full of the Borrower's obligations to the Lenders with respect to such payment, and it shall be the sole responsibility of the Administrative Agent to allocate such payment among the Lenders in the proper manner.

11.     **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE.** The Borrower hereby submits to the nonexclusive jurisdiction of the United States District Court for the Eastern District of Michigan and of any Michigan State Court sitting in Ann Arbor, Michigan for the purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby. The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

12.     The Borrower hereby irrevocably waives, to the fullest extent permitted by law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note.

13.     If any provision hereof is invalid and unenforceable in any applicable jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Administrative Agent and the Lenders in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

14.     The Borrower shall pay or reimburse the Lender for paying all reasonable out of pocket expenses incurred by the Administrative Agent and the Lenders, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with this Note and any other document executed in connection therewith (whether or not the transactions contemplated hereby or thereby shall be consummated), including any amendment, modification or waiver thereof; and all reasonable costs and expenses of the Administrative Agent and the Lenders (including the reasonable fees and expenses of counsel) in connection with any Event of Default hereunder and any enforcement or collection proceedings resulting therefrom.

15.     This Note amends and Restates the Subordinated Secured Note dated as of October 28, 2016 from the Borrower to the Administrative Agent in the original principal amount of $1,000,000 (the "Superseded Note"), and evidences $1,000,000 of debt heretofore evidenced by the Superseded Note.   Nothing herein shall be construed as a novation or termination of such indebtedness, or otherwise to interrupt or adversely affect the existence or priority of any security interests or liens securing such indebtedness.

16.     This Note is secured by the Security Agreement dated October 28, 2016 between the Borrower and the Administrative Agent, as collateral agent for the Lenders, and the Lenders are entitled to the rights and benefits thereof.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed by its authorized officers on the day and year first above written.

PACIFIC STEEL CASTING COMPANY LLC.

By _____
Jeffrey A. Stone, CEO

# EXHIBIT A

| Lender | Commitment Amount |
|---|---|
| SPEYSIDE FUND LLC | $ 1,960,000 |
| ALCAST COMPANY | $ 1,960,000 |
| KRISHNAN VENKATESAN | $    80,000 |
|  | $ 4,000,000 |