1  STEVEN T. GUBNER – Bar No. 156593
   JASON B. KOMORSKY – Bar No. 155677
2  JESSICA L. BAGDANOV – Bar No. 281020
   **BRUTZKUS GUBNER**
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone: (818) 827-9000
   Facsimile: (818) 827-9099
5  Emails:    sgubner@bg.law
              jkomorsky@bg.law
6              jbagdanov@bg.law

7  Special Litigation Counsel for
   Sarah L. Little, Chapter 7 Trustee
8

9              **UNITED STATES BANKRUPTCY COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11                   **OAKLAND DIVISION**

12  In re                                    Case No. 4:19-bk-40193-RLE

13  PACIFIC STEEL CASTING COMPANY LLC,       Chapter 7

14              Debtor,                       Adv. No. 19-04057

15  _____

16  SARAH L. LITTLE, Chapter 7 Trustee,      **DECLARATION OF JASON B.
                                             KOMORSKY IN SUPPORT OF THE
17              Plaintiff,                    TRUSTEE'S MOTION FOR PARTIAL
    v.                                       SUMMARY JUDGMENT**

18  SPEYSIDE FUND, LLC, a Delaware limited
    liability company, et al.,               **Hearing:**
19
                Defendants.                   Date:  November 12, 2020
20                                            Time:  11:00 a.m.
                                              Place: Conducted by Court Call or Zoom
21                                            Judge: Hon. Roger L. Efremsky

22

23

24

25

26

27

28

# DECLARATION OF JASON B. KOMORSKY

I, JASON B. KOMORSKY, declare as follows:

1.      I am an attorney licensed to practice before all courts of the State of California and this Court. I am a partner in the firm Brutkzus Gubner, special litigation counsel of record for the Trustee in the above-entitled action The matters stated in this declaration are true and correct and are within my personal knowledge and based on my review of relevant books and records and other documents of the Debtors, as well as documents provided by the defendants, and if called upon to testify as a witness, I could and would testify competently thereto.

2.      I am generally familiar with how Brutzkus Gubner maintains its documents and records. On or about October 10, 2019, my office received books and records of the Debtor from Bachecki Crom &Co., the estate's employed accountants. Each and every document filed in support of the motion with the bate stamp prefix "TR_PS," or that has been provided in native format from the Debtor's records noted below, originates from the documents my office received from the estate's accountants. Since Brutzkus Gubner received these documents, they have been maintained in the same manner in which they were received and Brutzkus Gubner has maintained the original content of the files, and continues to do so.

3.      Attached hereto as Exhibit A is a true and correct summary of the Initial Transfers from the Debtor (or of the Debtor's assets) to Alcast Company, Eric Wiklendt, Jeffrey Stone, Krishnan Venkatesan, and Speyside Fund, LLC. The detailed support for these Initial Transfers can be found in Exhibit 31 attached hereto and the Trustee has previously provided the defendants with the detailed backup supporting the summary found in Exhibit A. The support for the transfers from Speyside Fund to RataxasCo, Speyside Equity, Kevin Daugherty as trustee of the TD 2011 Trust and PD 2011 Trust, and Robert Sylvester and Jeffrey Stone can be found at Exhibit 94-97 attached hereto.

4.      Attached hereto as Exhibit B is a true and correct summary of the contributions made by Alcast Company, Krishnan Venkatesan, and Speyside Fund, LLC to the Debtor. The detailed support for these contributions can be found in Exhibit 81 attached hereto and the Trustee has

previously provided the defendants with the detailed backup supporting the summary found in Exhibit B.

5. Attached hereto as Exhibit C is a true and correct summary of the Subsequent Transfers made to Alcast Company, Krishnan Venkatesan, and Speyside Fund, LLC from the Debtor. The detailed support for these Subsequent Transfers can be found in Exhibit 76 attached hereto and the Trustee has previously provided the defendants with the detailed backup supporting the summary found in Exhibit C. The support for the transfers from Speyside Fund to RataxasCo, Speyside Equity, Kevin Daugherty as trustee of the TD 2011 Trust and PD 2011 Trust, and Robert Sylvester and Jeffrey Stone can be found at Exhibit 94-97 attached hereto.

6. Attached hereto as Exhibit D is a summary of the pre-judgment interest associated with each of the Initial Transfers and Subsequent Transfers calculated from the date of the particular transfer through September 30, 2020 using a 7% interest rate.

7. Attached hereto as Exhibit 1 is a true and correct copy of an e-mail from Jeff Stone to Robert Sylvester, Eric Wiklendt, Kevin Daugherty, Oliver Maier dated February 26, 2014 attaching a letter dated February 26, 2014 from Cleary Gull to Jeffrey Stone, which attaches a confidential descriptive memorandum. Exhibit 1 is bates stamped TR_PS_00023597-TR_PS_000253642. The "TR_PS" prefix reflects documents my office produced on behalf of the Trustee as part of her initial disclosure in this action. The TR_PS documents are part of the documents turned over to the Debtor in the form of three servers maintained by the Debtor during its operations and/or documents turned over by defendants after the Trustee was appointed. In turn, these documents were produced to the defendants as part of the Trustee's initial disclosures. Nevertheless, and for the avoidance of doubt, Jerry Johnson confirmed under oath in the 341(a) hearing that Defendant Alcast has a full set of the documents that were maintained on the Debtor's servers.

8. Attached hereto as Exhibit 2 is a true and correct copy of a letter to Ryan Olsta from Jeffrey Stone with the subject line "Preliminary Non-binding Proposal for the Acquisition of Pacific Steel Casting Company Assets" dated March 19, 2014 and bearing bates stamp SPEY0006485-6487. The "SPEY" prefix reflects documents produced by the Speyside Defendants as part of their initial

disclosure. The SPEY documents were downloaded on to my firm's server and then uploaded into a searchable database.

9. Attached hereto as Exhibit 3 is a true and correct copy of an email from Kevin Daugherty to Jeffrey Stone and copies to Robert Sylvester, and Erick Wiklendt with the subject line "Project Bear" dated March 25, 20145 and bates stamped SPEY0006365.

10. Attached hereto as Exhibit 4 is a true and correct copy of a letter from John Peterson and Ryan Olsta of Cleary Gull to Jeffrey Stone dated April 11, 2014 and bates stamped SPEY0006376-SPEY0006378.

11. Attached hereto as Exhibit 5 is a true and correct copy of an email from Kevin Daugherty to Eric Wiklendt and copied to Jeff Stone, Rob Sylvester, and Oliver Maier with the subject line "Pacific Steel" dated April 27, 2014 and bates stamped SPEY0006589-SPEY0006592.

12. Attached hereto as Exhibit 6 is a true and correct copy of an email from Kevin Daugherty to Eric Wiklendt and copied to Jeff Stone, Rob Sylvester and Oliver Maier with the subject line "Pacific Steel" date April 27, 2014 and bates stamped TR_PS_000255397-TR_PS_000255402.

13. Attached hereto as Exhibit 7 is a true and correct copy of an email from Kevin Daugherty to Rob Sylvester, Jeff Stone, and Eric Wiklendt with the subject line "Pacific Steel" and with attachments dated May 6, 2014 and bates stamped TR_PS_000255930-TR_PS_255938.

14. Attached hereto as Exhibit 8 is a true and correct copy of an email from Jeffrey Stone to Ryan Olsta and copied to Kevin Daugherty, Robert Sylvester, Eric Wiklendt, and Oliver Maier with subject line "Pacific Steel" and attachments dated May 9, 2014 and bates stamped SPEY0006766-SPEY0006773.

15. Attached hereto as Exhibit 9 is a true and correct copy of the Chapter 11 Monthly Operating Report for the month ended March 14, 2014 dated April 22, 2014 and bates stamped TR_PS_000222470. Exhibit 9 was produced in its native excel form such that there is no bates number affixed to the printed version attached hereto.

16. Attached hereto as Exhibit 10 is a true and correct copy of an email from Kevin Daugherty to Jeff Stone, Robert Sylvester, Oliver Maier, and Eric Wiklendt dated June 1, 2014 and bates stamped TR_PS_000256740-TR_PS_000256747.

17. Attached hereto as Exhibit 11 is a true and correct copy of an email from Kevin Daugherty to Jeff Stone, Robert Sylvester, Oliver Maier, and Eric Wiklendt dated June 1, 2014 and bates stamped TR_PS_000256708-TR_PS_000256739.

18. Attached hereto as Exhibit 12 is a true and correct copy of an email from Jeff Stone to Eric Wiklendt, Robert Sylvester and Oliver Maier dated May 17, 2014 and bates stamped SPEY0006776-SPEY0006778.

19. Attached hereto as Exhibit 13 is a true and correct copy of an email with attachments from Carol Lampson to Jeffrey Stone, Krishnan Venkatesan, Steve Wessels, and Eric Wiklendt with the subject heading "Second set of PSC LLC financial statement, September 2014" dated October 23, 2014 and bates stamped SPEY0003240-SPEY0003248. The last page, SPEY0003248, was produced in its native excel format (and consists of multiple pages) such that there is no bates number affixed to the printed version attached hereto.

20. Attached hereto as Exhibit 14 is a true and correct copy of an email with attachment from Carol Lampson to Jeffrey Stone and copied to Steve Wessels, Krishnan Venkatesan, and Eric Wiklendt with the subject heading "October Financial Statements" dated December 8, 2014 and bates stamped SPEY0003252-SPEY0003277. The last page, SPEY0003277, was produced in its native excel format (and consists of multiple pages) such that there is no bates number affixed to the printed version attached hereto.

21. Attached hereto as Exhibit 15 is a true and correct copy of an email with attachments from Carol Lampson to Jeffrey Stone Eric Wiklendt, Krishnan Venkatesan, and Eric Wiklendt with the subject heading "PSC LLC – November 2014 Financial Statements" dated January 6, 2015 and bates stamped SPEY0003280-SPEY0003306. The last page, SPEY0003306, was produced in its native excel format (and consists of multiple pages) such that there is no bates number affixed to the printed version attached hereto.

22.     Attached hereto as Exhibit 16 is a true and correct copy of an email with attachments from Carol Lampson to Jeffrey Stone and Steve Wessels and copied to Eric Wiklendt and Krishnan Venkatesan with the subject heading "Draft December 12-31-2014 Financial Statements" dated February 5, 2015 and bates stamped SPEY0003316-SPEY0003344. The last four pages, SPEY0003341-SPEY0003344, were produced in their native excel format (and consists of multiple pages) such that there is no bates number affixed to the printed version attached hereto.

23.     Attached hereto as Exhibit 17 is a true and correct copy of Pacific Steel Casting Co. LLC Income Statement dated June 15, 2015 for the "MTD and YTD ended May 31, 2015 for the month ended December 31, 2014" and bates stamped TR_PS_000104040-TR_PS_000104041.

24.     Attached hereto as Exhibit 18 is a true and correct copy of an email with attachments from Anthony MeCree to LaRae Mirovsky with the subject line "Pacific Steel" dated February 27, 2015 and bates stamped UHY0029224-UHY0029227. The "UHY" prefix refers to documents produced by defendant UHY LLP as part of its initial disclosures. The UHY documents were downloaded on to my firm's server and then uploaded into a searchable database.

25.     Attached hereto as Exhibit 19 is a true and correct copy of the Asset Purchase Agreement by and between Speyside Fund, LLC and Pacific Steel Casting Company dated as of June 19, 2014 and bates stamped UHY0006090-UHY0006136.

26.     Attached hereto as Exhibit 20 is a true and correct copy of CMTA – Glass, Molders, Pottery, Plastics & Allied Workers Local #164B Pension Trust Withdrawal Liability Valuation as of June 30, 2013 prepared by Segal Consulting and bates stamped UHY0007140-7165.

27.     Attached hereto as Exhibit 21 is a true and correct copy of Pacific Steel Casting Company, LLC Audited Financial Statements for the period August 29, 2014 to December 31, 2014 and bates stamped UHY0020454-UHY0020471.

28.     Attached hereto as Exhibit 22 is a true and correct copy of Pacific Steel Casting Company, LLC and Subsidiary Audited Consolidated Financial Statements Year ended December 31, 2015 and the period from August 29, 2014 (date of acquisition) to December 31, 2014 and bates stamped TR_PS_000201217-TR_PS_000201238.

29.     Attached hereto as Exhibit 23 is a true and correct copy of Pacific Steel Casting Company, LLC and Subsidiary Audited Consolidated Financial Statements Years ended December 31, 2016 and 2015 and bates stamped SPEY0005782-SPEY0005805.

30.     Attached hereto as Exhibit 24 is a true and correct copy of an email from Jeff Stone to Robert Sylvester, Kevin Daugherty, Oliver Maier, Krishnan Venkatesan, and Eric Wiklendt dated January 15, 2015 with subject heading "Fwd: PSC Distribution" and bates stamped SPEY0002773-SPEY0002774.

31.     Attached hereto as Exhibit 25 is a true and correct copy of an email with attachments from Krishnan Venkatesan to Jerry Johnson, Brian Holt, Eric Wiklendt, Jeffrey Stone, Kevin Daugherty, Oliver Maier, Robert Sylvester, Steve Wessels, Thottathil Anish, Jorge Costa, Dagoberto Aguayo, and Ryan Costa dated May 20, 2015 with subject titled "Re: PSC Financial Statements – April 2015" and bates numbered SPEY0008391-SPEY0008348.

32.     Attached hereto as Exhibit 26 is a true and correct copy of an email with attachments from Kishnan Venkatesan to Jeffrey Stone, Eric Wiklendt, Kevin Daugherty, Oliver Maier, Robert Sylvester, Brian Holt, Steve Wessels, Jerry Johnson, Thottathil Anish, Jorge Costa, and Dagoberto Aguayo dated August 19, 2015 with subject title "Board Package" and bates stamped SPEY0004376-SPEY0004422.

33.     Attached hereto as Exhibit 27 is a true and correct copy of Pacific Steel Casting Company Inventory Appraisal dated November 9, 2015 prepared by Sector3 and bates stamped TR_PS_000135481-TR_PS_000135518.

34.     Attached hereto as Exhibit 28 is a true and correct copy of an email with attachments from Jeff Stone to Kevin Daugherty, Steve Wessels, Robert Sylvester, and Eric Wiklendt dated February 24, 2015 with subject title "Fwd: 2015 Market Outlook Feb 2015" and bates stamped SPEY0006286-SPEY0006289.

35.     Attached hereto as Exhibit 29 is a true and correct copy of an email with attachments from Krishnan Venkatesan to Jeffrey Stone, Kevin Daugherty, Steve Wessels, Robert Sylvester, Eric Wiklendt, Oliver Maier, Thottathil Anish, Jorge Costa, Ryan Costa, Dagoberto Aguayo, and Jerry

Johnson dated February 8, 2015 with subject title "Re: BOD Meeting PSC" and bates stamped SPEY0003999-SPEY0004046.

36.     Attached hereto as Exhibit 30 is a true and correct copy of an email with attachments from Krishnan Venkatesan to Jeff Stone, Eric Wiklendt dated January 22, 2015 with subject title "FW: 2015 Orange Market Outlook" and bates stamped SPEY0006223-SPEY0006224.

37.     Attached hereto as Exhibit 31 is a true and correct copy of the documents identified in Attachment A to the Memorandum of Points and Authorities that consist of Wells Fargo Bank records, a journal voucher and e-mail w/attachment evidencing the Initial Transfers and bates stamped TR_PS_000137780-783, TR_PS_000177875-881, TR_PS_000138025, TR_PS_000138038-044; TR_PS_000333623-24; TR_PS_000106425

38.     Attached hereto as Exhibit 32 is a true and correct copy of Loan and Security Agreement dated as of August 29, 2014 between Siena Lending Group LLC, as Lender, and Pacific Steel Casting Company, LLC, as Borrower and bates stamped TR_PS_000174700-TR_PS_000174783.

39.     Attached hereto as Exhibit 33 is a true and correct copy of a Forbearance Agreement entered into as of July 19, 2017, by and between Pacific Steel Casting Company LLC and Wells Fargo Bank and bates stamped TR_PS_000247751-TR_PS_00247763.

40.     Attached hereto as Exhibit 34 is a true and correct copy of an email with attachments from Rob Sylvester to Eric Wiklendt dated July 20, 2017 with subject title "FW: PS situation" and bates stamped SPEY0007265-SPEY0007269.  The last two pages, SPEY0007268-SPEY0007269, were produced in their native excel format (and consists of multiple pages) such that there is no bates number affixed to the printed version attached hereto.

41.     Attached hereto as Exhibit 35 is a true and correct copy of an email from Jeffrey Stone to Oliver Maier, Kevin Daugherty, Rob Sylvester, Steve Wessels, Eric Wiklendt and copied to Krishnan Venkatesan dated January 24, 2017 with subject title "Pacific Steel" and bates stamped SPEY0006148-SPEY0006149.

42.     Attached hereto as Exhibit 36 is a true and correct copy of the Operating Agreement of Pacific Steel Casting Company LLC effective as of August 15, 2014 and bates stamped SPEY0002129-SPEY0002165.

43.     Attached hereto as Exhibit 37 is a true and correct copy of the Unanimous Written Consent of Managers of Pacific Steel Casting Company LLC dated as of October 28, 2016 but executed on November 2, 2016, as explained in paragraph 42, below, and bates stamped TR_PS_000247733-TR_PS_000247736.

44.     Attached hereto as Exhibit 38 is a true and correct copy of the Subordinated Secured Note in the amount of $1,000,000 dated as of October 28, 2016 but executed on November 2, 2016, as explained in paragraph 42, below, and bates stamped SPEY0002020-SPEY0002026.

45.     Attached hereto as Exhibit 39 is a true and correct copy of the Security Agreement entered into as of October 28, 2016 but executed on November 2, 2016 as explained in paragraph 42, below, and bates stamped SPEY0001504-SPEY0001513.

46.     Attached hereto as Exhibit 40 is a true and correct copy of the Agency Agreement dated as of October 28, 2016 but executed on November 2, 2016 as explained in paragraph 42, below, and bates stamped SPEY0001496-SPEY0001503.

47.     In the course of examining the Debtor's documents, those produced by UHY and those produced by the Speyside Defendants, I conduced a Boolean search for all versions of Exhibits 37-40 identified above. In conducting that search, I looked for but could find no e-mails which contained these documents as attachments even though such emails should exist.  However, all of the versions of Exhibits 37-40, including those produced by the Defendants, contained metadata. During the early meeting of counsel under Rule 26(f), counsel for each of the parties agreed to produce documents in "native" format in this case, which explicitly included metadata.  With respect to Exhibits 37-40, the metadata evidenced that these documents dated as of October 28, 2016 were not created, provided to the Debtor and signed until November 2, 2016. As an example, the parties exchanged multiple copies of the various "loan" documents in the course of their initial disclosures. However, the earliest date found for Exhibit 37, the Unanimous Written Consent of Managers of

Pacific Steel Casting Company LLC, in the metadata for the versions produced by the Trustee and UHY (there was no version produced by Speyside) identify the creation date, as follows:

**TR_PS_000247733-TR_PS_000247736:**
Created Date Time: 2016-11-02 21:42:47
Modified Date Time: 2016-11-02 20:48:47
File Path: WIND DOWN/BK/Speyside Items/Issue 1 - Sub Debt/C. Unanimous Written Consent of Managers.pdf
Root Folder: Jjohnson
App Name: Adobe PSL 1.2e for Canon
Encrypted: False
Shortcut: WIND DOWN/BK/Speyside Items/Issue 1 - Sub Debt/C. Unanimous Written Consent of Managers.pdf
Subject/Title: C. Unanimous Written Consent of Managers.pdf

**UHY0000654-UHY0000657**
Created Date Time: 2016-11-02 00:00:00
Modified Date Time: 2016-11-02 00:00:00
File Path: \Perm\23000 Contracts and Agreements\23500 Loan agreements
Begattach: UHY0000654
Endattach: UHY0000657
File Type: Portable Document Format
Md5hash: D908210d4320dd2975f252610ef84e3b
Shortcut: UHY0000654

48. Attached hereto as Exhibit 41 is a true and correct copy of the Unanimous Written Consent of Managers of Pacific Steel Casting Company LLC dated of December 30, 2016, but executed on June 28, 2017 as explained in paragraph 46, below, and bates stamped SPEY0002027-SPEY0002030.

49. Attached hereto as Exhibit 42 is a true and correct copy of the Subordinated Secured Note dated December 30, 2016, but executed on June 28, 2017, as explained in paragraph 46, below, and bates stamped SPEY0002013-SPEY0002019.

50. Attached hereto as Exhibit 43 is a true and correct copy of the Amended and Restated Agency Agreement dated as of December 30, 2016, but executed on June 28, 2017, as explained in paragraph 46, below, and bates stamped UHY0023622-UHY0023628.

51. In the course of examining the Debtor's documents, those produced by UHY and those produced by the Speyside Defendants, I conduced a Boolean search for all versions of Exhibits 41-43 identified above. In conducting that search, I looked for but could find no e-mails which contained these documents as attachments even though such emails should exist. However, all of

the executed versions of Exhibits 41-43, including those produced by the Defendants, contained

metadata. That metadata evidenced that these documents dated as of December 30, 2016 were not

executed until June 28/June 29, 2017.  As an example, the parties exchanged multiple copies of the

various "loan" documents in the course of their initial disclosures.  However, the earliest date found

for Exhibit 42, the Secured Subordinated Note in the metadata for the versions produced by the

Speyside and UHY identify the creation date, as follows:

**SPEY0002013-SPEY0002019**
Created Date Time: 2017-06-28 00:00:00
Modified Date Time: 2017-06-28 00:00:00
File Path: \Speyside Fund/Pacific Steel\Issue 1 - Sub Debt
Begattach: SPEY0002013
Endattach: SPEY0002019
File Type: Portable Document Format
Md5hash: 1ae0fc60abfb73fcee054ad762174b9f
Fileext: Pdf
Shortcut: SPEY0002013

**UHY0023629-UHY0023635**
Created Date Time: 2017-06-28 00:00:00
Modified Date Time: 2017-07-24 00:00:00
File Path: \2016 Audit\5000 Liabilities\5300 Notes payable and long-term debt
Begattach: UHY0023629
Endattach: UHY0023635
File Type: Portable Document Format
Md5hash: 97123c5360370317ee05e2d99b15deed
Shortcut: UHY0023629

52.    Attached hereto as Exhibit 44 is a true and correct copy of the Pacific Steel Casting

Company Year ended December 31, 2014 Planning Meeting Agenda for UHY dated February 11,

2015 and bates stamped UHY0000774-UHY0000776.

53.    Attached hereto as Exhibit 45 is a true and correct copy of Credit Agreement by and

between Pacific Steel Casting Company LLC and Wells Fargo entered into as of June 2, 2015 and

bates stamped UHY0000658-UHY0000701.

54.    Attached hereto as Exhibit 46 is a true and correct copy of a letter from Wells Fargo

re: "Notice of Event of Default" dated August 30, 2016 and bates stamped TR_PS_000244994.

55.    Attached hereto as Exhibit 47 is a true and correct copy of a Subordination

Agreement by Speyside Fund, LLC to Wells Fargo Bank dated as of December 30, 2016, but

executed on June 22, 2017, as set forth in the metadata of the document, which is bates stamped

UHY0023636—UHY00023644. In fact, there were two signed versions of this document produced by the parties as part of the initial disclosures. Both contained metadata reflecting that the document had been signed on June 22, 2017.

56. Attached hereto as Exhibit 48 is a true and correct copy of a Subordination Agreement by Speyside Fund, LLC to Wells Fargo Bank identical to the one executed on June 22, 2017, but dated July 19, 2017 (consistent with the Forbearance Agreement) and bates stamped TR_PS_000137601-TR_PS_000137609.

57. Attached hereto as Exhibit 49 is a true and correct copy of an email with attachments from Ericka Ledesma to Nora Oribio and copied to Eric Wiklendt with subject title "FW: Cost Reduction Weatherford" dated February 13, 2015 and bates stamped SPEY0006232-SPEY0006233.

58. Attached hereto as Exhibit 50 is a true and correct copy of a letter from Krishnan Venkatesan to Bruce Smith dated February 25, 2016 and bates stamped SPEY0010212.

59. Attached hereto as Exhibit 51 is a true and correct copy of an email from Krishnan Venkatesan to Brenda Scotland, Butch Carter, and copied to Yolanda Torres and Jerry Johnson with subject title "Request for Concessions" dated June 20, 2016 and bates stamped SPEY0008240-SPEY0008241.

60. Attached hereto as Exhibit 52 is a true and correct copy of an email with attachments from Krishnan Venkatesan to Jeffrey Stone with subject title "FW: Concessions for Pacific Steel" dated February 3, 2017 and bates stamped SPEY0000486-SPEY0000489.

61. Attached hereto as Exhibit 53 is a true and correct copy of a February 5, 2017 letter from Jeffrey Stone to Brenda Scotland with subject title "GMP and Pacific Steel ("PSC") Request for Information" and bates stamped SPEY0010172-SPEY0010173.

62. Attached hereto as Exhibit 54 is a true and correct copy of a February 14, 2017 from Krishnan Venkatesan to Brenda Scotland and bates stamped SPEY0008228-SPEY0008229.

63. Attached hereto as Exhibit 55 is a true and correct copy of a July 18, 2017 from Bruce Smith to Krishnan Venkatesan and bates stamped SPEY0010131-SPEY0010133.

64. Attached hereto as Exhibit 56 is a true and correct copy of a July 18, 2017 from Krishnan Venkatesan to Butch Carter and bates stamped SPEY0008230.

65. Attached hereto as Exhibit 57 is a true and correct copy of an email from Tracy Green to Richard Hill, Michael Cooper, Krishnan Venkatesan, Jerry Johnson, and Robert Riiska with a copy to Joshua Elefant dated February 27, 2018 with subject title "Re: Pacific Steel Casting" and bates stamped WRBD002042-WRBD002043. "WRBD" and "WRS" refers to documents produced by the law firm of Wendel Rosen LLP.

66. Attached hereto as Exhibit 58 is a true and correct copy of an email from Tracy Green to Conchita Lozano-Batista, Jerry Johnson and copied to Rich Lappin, Richard Hill, Joshua Elefant, Michael Cooper, Krishnan Venkatesan, Robert Riiska, Robert Schwartz, and Kristina Zinnen dated March 14, 2018 with subject title "Re: Pacific Steel: Wells Fargo credit agreement and security agreement" and bates stamped TR_Union_000000462-000000467.

67. Attached hereto as Exhibit 59 is a true and correct copy of an email from Michael Cooper to Nicholas Lardo, Rich Hill, and Joshua Elefant with a copy to Jerry Johnson, Jeffrey Stone, Krishnan Venkatesan, and Tracy Green dated November 13, 2017 with a subject title "Re: Pacific Steel/Health & Welfare Trust" and bates stamped WRBD002635-WRBD002637.

68. Attached hereto as Exhibit 60 is a true and correct copy of a February 15, 2017 letter from Matthew English to Jeffrey Stone with subject title "Notice of Default, Receipt of Partial Payment, Non-Waiver of Defaults and Reservation of Rights Under AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Least – Net, Dated August 29, 2014 (the "Lease"), by and between Berkeley Properties, LLC ("Lessor") and Pacific Steel Casting Company LLC ("Lessee") and bates numbered TR_PS_000129985-TR_PS_00129986.

69. Attached hereto as Exhibit 61 is a true and correct copy of a Rent Deferral Agreement dated as of March 2017 by and between Berkeley Properties, LLC, and Pacific Steel Casting Company, LLC and bates stamped TR_PS_000129993-TR_PS_000129998.

70. Attached hereto as Exhibit 62 is a true and correct copy of an October 18, 2017 letter from Matthew English to Jerry Johnson with subject title "Notice of past due rent under: (i) that certain Lease Agreement dated August 29, 2014 (the "Lease") between Berkeley Properties, LLC ("Berkeley Properties"), as lessor, and Pacific Steel Casting Company LLC ("PSCC"), as lessee; and (ii) that certain Rent Deferral Agreement dated March, 2017 (the "Rent Deferral Agreement"), by

and between Berkeley Properties and PSCC" and bates stamped TR_PS_000130013-TR_PS_000130014.

71. Attached hereto as Exhibit 63 is a true and correct copy of a November 2, 2017 letter from Matthew English to Jerry Johnson with subject title "Notice of past due rent under: (i) that certain Lease Agreement dated August 29, 2014 (the "Lease") between Berkeley Properties, LLC ("Berkeley Properties"), as lessor, and Pacific Steel Casting Company LLC ("PSCC"), as lessee; and (ii) that certain Rent Deferral Agreement dated March, 2017 (the "Rent Deferral Agreement"), by and between Berkeley Properties and PSCC" and bates stamped TR_PS_000130015-TR_PS_000130016.

72. Attached hereto as Exhibit 64 is a true and correct copy of a November 22, 2017 letter from Matthew English to Jerry Johnson wit subject title "Notice of Unpaid Property Taxes and Undelivered Financial Reporting Package under: (i) that certain lease Agreement dated August 29, 2014 (the "Lease") between Berkeley Properties. LLC ("Berkeley Properties"), as lessor, and Pacific Steel Casting Company LLC ("PSCC"), as lessee; and (ii) that certain Rent Deferral Agreement dated March, 2017 (the "Rent Deferral Agreement"), by and between Berkeley Properties and PSCC" and bates stamped SPEY0000400-SPEY0000401

73. Attached hereto as Exhibit 65 is a true and correct copy of an email from Jerry Johnson to Rich Hill, Michael Cooper, and Jeffrey Stone with copies to Robert Wolford, Rob Sylvester, Robert Riiska, Tracy Green, Krishnan Venkatesan, and Jerry Johnson with subject title "Notice of Event of Default Under Deed of Trust/Second Street Properties/Pacific Steel Casting Company, LLC and bates stamped WRB005519-WRBD005524.

74. Attached hereto as Exhibit 66 is a true and correct copy of January 23, 2018 letter from Michael Lauter to Jeffrey Stone and Gary Kaplan with subject title "Notification and Demand Regarding Indemnity Obligations Under Asset Purchase Agreement dated June 19, 2014 (the "APA") by and between Second Street Properties fka Pacific Steel Casting Company, a California corporation ("Second Street") and Speyside Fund, LLC, a Delaware limited liability company ("Speyside") and bates numbered SPEY0000982-SPEY0000988.

75.     Attached hereto as Exhibit 67 is a true and correct copy of an email from Krishnan Venkatesan to Douglas Lee and copied to Eric Wiklendt with subject title "PSC – meet Krishnan Venkatesan" and bates numbered TR_PS_000358719-TR_PS_000368724.

76.     Attached hereto as Exhibit 68 is a true and correct copy of an email from Jeff Stone to Krishnan Venkatesan and copied to Jerry Johnson and Eric Wiklendt dated March 14, 2015 with a subject title "Re: Union Vote" and bates stamped TR_PS_000366758.

77.     Attached hereto as Exhibit 69 is a true and correct copy of an October 17, 2018 letter from Tracy Green to Krishnan Venkatesan with subject title "Engagement for Legal Services" and bates stamped TR_PS_000247682-TR_PS_000247686.

78.     Attached hereto as Exhibit 70 is a true and correct copy of an email from Michael Cooper to Jeffrey Stone, Nicholas Lardo, Jerry Johnson and Krishnan Venkatesan with a copy to Tracy Green with subject title "Re: Pacific Steel Casting Company" and bates stamped WRBD001576-WRBD001578.

79.     Attached hereto as Exhibit 71 is a true and correct copy of an email from Michael Cooper to Jeffrey Stone, Jerry Johnson, Krishnan Venkatesan, Nicholas Lardo and copied to Tracy Green dated October 17, 2017 with subject title "Fwd: Pacific Steel Casting Company" and bates stamped WRBD001540-WRBD001542.

80.     Attached hereto as Exhibit 72 is a true and correct copy of Notice of Attachment Lien dated January 16, 2018 with attached Write of Attachment and bates stamped TR_PS_000249044-TR_PS_000249046.

81.     Attached hereto as Exhibit 73 is a true and correct copy of an email with attachments from Tracy Green to Conchita Lozano-Batista, Rich Lapping, Richard Hill, Joshua Elefant, Michael Cooper, Jerry Johnson, Krishnan Venkatesan, and Robert Riska dated February 28, 2018 with subject title: "Pacific Steel: Wells Fargo credit agreement and security agreement" and bates stamped WRBD001975-WRBD002033.

82.     Attached hereto as Exhibit 74 is a true and correct copy of an email from Richard Hill to Conchita Lozano-Batista and copied to Tracy Mainguy dated June 30, 2018 with a subject title "Pacific Steel" and bates stamped TR_UNION_000000586-TR_UNION_000000588.

83. Attached hereto as Exhibit 75 is a true and correct copy of an email from Tracy Green to Rich Hill, Krishnan Venkatesan, and Jerry Johnson date July 2, 2018 with a subject title "Pacific Steel" and bates stamped WRBD001848-WRBD001850.

84. Attached hereto as Exhibit 76 is a true and correct copy of a January 11, 2019, 19-page excel spreadsheet entitled "Copy of Subordinated Note Interest Calc" and bates stamped TR_PS_000135238

85. Attached hereto as Exhibit 77 is a true and correct copy of an email (w/o attachments) from Jeffrey Stone to Steve Wessels, Kevin Daugherty, Robert Sylvester, Krishnan Venkatesan, Oliver Maier, Eric Wiklendt dated September 11, 2014 and subject title "PSC – Siena" and bates stamped TR_PS_000278578-TR_PS_000278579.

86. Attached hereto as Exhibit 78 is a true and correct copy of an April 30, 2019 letter from Tracy Green to Eric Nyberg with subject title "Pacific Steel Casting Company, LLC, Debtor, Case No. 19-40193-RLE-7" and bates numbered WRS001159-WRS001162.

87. Attached hereto as Exhibit 79 is a true and correct copy of the Debtor's A/P Aged Trial Balance as of 12/31/2017 and bates numbered TR_PS_000141280-TR_PS_000141286.

88. Attached hereto as Exhibit 80 is a true and correct copy of an email with attachments from Rob Sylvester to Eric Wiklendt dated July 20, 2017 with subject title "Fwd: PS Situation" and bates stamped SPEY0007260-SPEY0007264. SPEY0007264 consisted of excel spreadsheets that were produced in native format and therefore appear without bates numbers.

89. Attached hereto as Exhibit 81 is a true and correct copy of

90. Attached hereto as Exhibit 82 is a true and correct copy of Pacific Steel Casting Co, LLC, Balance Sheet – PSC as of 12/31/2017, 05/31/2018, and 06/30/2018 and bates stamped TR_PS_00221431. Because the document was produced in native format, the bates stamp does not appear on the two-page document.

91. Attached hereto as Exhibit 83 is a true and correct copy of Pacific Steel Casting Co, LLC, Balance Sheet – PSC as of 12/31/2017, 06/30/2018, and 07/31/2018and bates stamped TR_PS_000120448. Because the document was produced in native format, the bates stamp does not appear on the two-page document.

92.     Attached hereto as Exhibit 84 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2017, 07/31/2018, and 08/31/2018 and bates stamped
TR_PS_000221437.  Because the document was produced in native format, the bates stamp does not
appear on the two-page document.

93.     Attached hereto as Exhibit 85 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2017, 08/31/2018, and 09/31/2018 and bates stamped
TR_PS_000221440.  Because the document was produced in native format, the bates stamp does not
appear on the two-page document.

94.     Attached hereto as Exhibit 86 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2017, 10/31/2018, and 11/31/2018 and bates stamped
TR_PS_000220526.  Because the document was produced in native format, the bates stamp does not
appear on the two-page document.

95.     Attached hereto as Exhibit 87 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2017, 11/31/2018, and 12/31/2018 and bates stamped
TR_PS_000120885.  Because the document was produced in native format, the bates stamp does not
appear on the four-page document.

96.     Attached hereto as Exhibit 88 is a true and correct copy of an email with attachments
from Jason Shapiro to Yolanda Torres with subject title "FW: FedEx for Today" and bates stamped
TR_PS_000489779-TR_PS_000489804.

97.     Attached hereto as Exhibit 89 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2016, 3/31/2017, and 04/30/2017 and bates stamped
TR_PS_000201204.  Because the document was produced in native format, the bates stamp does not
appear on the four-page document.

98.     Attached hereto as Exhibit 90 is a true and correct copy of Pacific Steel Casting Co,
LLC, Balance Sheet – PSC as of 12/31/2016, 05/31/2017, and 06/30/2017 and bates stamped
TR_PS_000221430.  Because the document was produced in native format, the bates stamp does not
appear on the two-page document.

99. Attached hereto as Exhibit 91 is a true and correct copy of an email from Jeffrey Stone to Krishnan Venkatesan and copied to Eric Wiklendt and Rob Sylvester dated April 7, 2019 with subject title "PSC Bankruptcy Subpoena" and bates stamped TR_PS_000491354-TR_PS_000491355.

100. Attached hereto as Exhibit 92 is a true and correct copy of an email from Krishnan Venkatesan to Jeffrey Stone and copied to Steve Wessels, Jerry Johnson, Neil Brunner, and Eric Wiklendt dated April 4, 2015 with subject title "Siena Perpetual Report" and bates stamped TR_PS_000374277-TR_PS_000374281.

101. Attached hereto as Exhibit 93 is a document entitled "Pacific Steel Casting Company, LLC, Inventory Analytics, December 31, 2015 and bates numbered UHY0010544-UHY0010547.

102. Attached hereto as Exhibit 94 is a true and correct copy of Speyside Fund LLC Distribution of Net Cash Flow spreadsheets (with a metadata creation date of April 10, 2013 and a modification date of January 19, 2015) and bates stamped TR_PS_000084996. Exhibit 94 was produced in its native excel form such that there is no bates number affixed to the printed version attached hereto.

103. Attached hereto as Exhibit 95 is a true and correct copy of a letter from Scott Earls to Pacific Steel Casting Company LLC dated August 23, 2015 enclosing 2014 U.S. Return of Partnership Income, 2014 California Limited Liability Company Return of Income, and 2014 California Nonresident Return and bates stamped TR_PS_000242848-TR_PS_000242951. Personal identification information, such as social security numbers, addresses and taxpayer identifications have been redacted.

104. Attached hereto as Exhibit 96 is a true and correct copy of a letter from Scott Earls to Pacific Steel Casting Company LLC dated July 26, 2016 enclosing a copy of the 2015 Partnership Form 1065 Schedule K-1 and bates numbered TR_PS_000243021-TR_PS_000243076. Personal identification information, such as social security numbers, addresses and taxpayer identifications have been redacted.

105. Attached hereto as Exhibit 97 is a true and correct copy of Pacific Steel Casting Company LLC 2018 Partnership Form 1065 Schedule K-1 (marked draft) undated (although

metadata indicates that it was created on April 12, 2019 and modified on May 9, 2019) and bates stamped TR_PS_000088266-TR_PS_000088372. Personal identification information, such as social security numbers, addresses and taxpayer identifications have been redacted.

106. Attached hereto as Exhibit 98 is a true and correct copy of Pacific Steel Casting Co., LLC Balance Sheet – PSC as of 8/29/2014 (Inception) and 11/30/2014 and bates numbered UHY0005315-UHY0005316.

107. Attached hereto as Exhibit 99 is a true and correct copy of Pacific Steel Casting Co., LLC Balance Sheet – PSC as of 12/31/14, 11/30/15 and 12/31/15 and bates numbered TR_PS_000109467. Exhibit 99 was produced in its native excel form such that there is no bates number affixed to the printed version attached hereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on this 2nd day of October 2020 at Woodland Hills, California.

_____
Jason B. Komorsky

# EXHIBIT "A"

## EXHIBIT A

## INITIAL TRANSFERS

| Bank Date | Payee / Payor | Amount |
|---|---|---|
| 01/16/15 | Alcast Co. | 1,325,093.00 |
| 01/22/15 | Alcast Co. | 793,800.00 |
| 04/14/15 | Alcast Co. | 1,190,700.00 |
| 06/04/15 | Alcast Co. | 496,125.00 |
| **Alcast Co. Total** | | **3,805,718.00** |
| 01/16/15 | Eric Wiklendt | 77,823.00 |
| 01/22/15 | Eric Wiklendt | 100,000.00 |
| 04/14/15 | Eric Wiklendt | 104,036.00 |
| 06/04/15 | Eric Wiklendt | 58,125.00 |
| **Eric Wiklendt Total** | | **339,984.00** |
| 09/12/14 | Jeffrey Stone | 62,460.55 |
| 01/16/15 | Jeffrey Stone | 155,646.00 |
| 01/22/15 | Jeffrey Stone | 200,000.00 |
| 04/14/15 | Jeffrey Stone | 208,072.00 |
| 06/04/15 | Jeffrey Stone | 116,250.00 |
| **Jeffrey Stone Total** | | **742,428.55** |
| 01/21/15 | Krishnan Venkatesan | 116,344.00 |
| 01/22/15 | Krishnan Venkatesan | 112,400.00 |
| 04/14/15 | Krishnan Venkatesan | 109,688.00 |
| 06/04/15 | Krishnan Venkatesan | 65,332.50 |
| **Krishnan Venkatesan Total** | | **403,764.50** |
| 09/12/14 | Speyside Fund, LLC | 280,935.48 |
| 01/16/15 | Speyside Fund, LLC | 1,325,093.00 |
| 01/22/15 | Speyside Fund, LLC | 793,800.00 |
| 01/31/15 | Speyside Fund, LLC | 1,141,392.58 |
| 04/14/15 | Speyside Fund, LLC | 648,247.00 |
| 04/30/15 | Speyside Fund, LLC | 752,647.00 |
| 06/04/15 | Speyside Fund, LLC | 461,396.25 |
| 07/03/15 | Speyside Fund, LLC | 52,771.00 |
| **Speyside Fund, LLC Total** | | **5,456,282.31** |

Komorsky Decl., Exh. 31, TR_PS_000137780-783, TR_PS_000177875-881,

TR_PS_000138025, TR_PS_000138038-044; TR_PS_000333623-24; TR_PS_000106425.

# EXHIBIT "B"

# EXHIBIT B

## CONTRIBUTION

| Bank Date | Payee / Payor | Amount |
|---|---|---|
| 10/28/16 | Alcast Co. | 294,000.00 |
| 12/15/16 | Alcast Co. | 196,000.00 |
| 12/30/16 | Alcast Co. | 73,500.00 |
| 12/30/16 | Alcast Co. | 73,500.00 |
| 01/05/17 | Alcast Co. | 171,500.00 |
| 01/13/17 | Alcast Co. | 171,500.00 |
| 01/26/17 | Alcast Co. | 196,000.00 |
| 02/14/17 | Alcast Co. | 196,000.00 |
| 03/13/17 | Alcast Co. | 147,000.00 |
| 03/21/17 | Alcast Co. | 196,000.00 |
| 05/23/17 | Alcast Co. | 122,500.00 |
| 07/27/17 | Alcast Co. | 98,000.00 |
| **Alcast Co. Total** | | **1,935,500.00** |
| 10/28/16 | Krishnan Venkatesan | 12,000.00 |
| 12/19/16 | Krishnan Venkatesan | 8,000.00 |
| 01/09/17 | Krishnan Venkatesan | 13,000.00 |
| 01/17/17 | Krishnan Venkatesan | 7,000.00 |
| 01/27/17 | Krishnan Venkatesan | 8,000.00 |
| 02/15/17 | Krishnan Venkatesan | 8,000.00 |
| 03/20/17 | Krishnan Venkatesan | 6,000.00 |
| 03/27/17 | Krishnan Venkatesan | 8,000.00 |
| 06/06/17 | Krishnan Venkatesan | 5,000.00 |
| **Krishnan Venkatesan Total** | | **75,000.00** |
| 10/28/16 | Speyside Fund, LLC | 294,000.00 |
| 12/16/16 | Speyside Fund, LLC | 196,000.00 |
| 12/30/16 | Speyside Fund, LLC | 73,500.00 |
| 12/30/16 | Speyside Fund, LLC | 73,500.00 |
| 01/05/17 | Speyside Fund, LLC | 171,500.00 |
| 01/17/17 | Speyside Fund, LLC | 171,500.00 |
| 01/27/17 | Speyside Fund, LLC | 196,000.00 |
| 02/16/17 | Speyside Fund, LLC | 196,000.00 |
| 03/13/17 | Speyside Fund, LLC | 147,000.00 |
| 03/21/17 | Speyside Fund, LLC | 196,000.00 |
| 05/23/17 | Speyside Fund, LLC | 122,500.00 |
| 07/28/17 | Speyside Fund, LLC | 98,000.00 |
| 08/04/17 | Speyside Fund, LLC | 4,000.00 |
| **Speyside Fund, LLC Total** | | **1,939,500.00** |
| **Grand Total - Capital Contribution** | | **3,950,000.00** |

Komorsky Decl., Exh. 81, TR_PS_000200166-170, TR_PS_000082511-514,
TR_PS_000082519-522, TR_PS_000201024-27, TR_PS_000138515-517, TR_PS_000201028-
031, TR_PS_000138518-520, TR_PS_000138567-571, TR_PS_000201017-020,
TR_PS_000138528-539.

# EXHIBIT "C"

# EXHIBIT C

## SUBSEQUENT TRANSFERS

| Transfer Date | Transferee | Amount |
|---|---|---|
| 06/18/18 | Alcast Co. | 12,250.00 |
| 06/25/18 | Alcast Co. | 147,000.00 |
| **Alcast Co. Total** | | **159,250.00** |
| 06/18/18 | Krishnan Venkatesan | 500.00 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 |
| **Krishnan Venkatesan Total** | | **6,500.00** |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 |
| 08/06/18 | Speyside Fund, LLC | 300,000.00 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 |
| 10/9/18 | Speyside Fund, LLC | 100,000.00 |
| 10/22/18 | Speyside Fund LLC | 100,000.00 |
| 10/31/18 | Speyside Fund LLC | 50,000,00 |
| 1/9/19 | Speyside Fund LLC | 30,000.00 |
| **Speyside Fund, LLC Total** | | **3,780,000.00** |

Komorsky Decl., Exh. 76, at TR_PS_000135238.

# EXHIBIT "D"

## EXHIBIT D

## INITIAL TRANSFERS (pre-judgment interest calculations)

| Transfer Date | Transferee | Amount | 7% Interest |
|---|---|---|---|
| 01/16/15 | Alcast Co. | 1,325,093.00 | 529,093 |
| 01/22/15 | Alcast Co. | 793,800.00 | 316,041 |
| 04/14/15 | Alcast Co. | 1,190,700.00 | 455,337 |
| 06/04/15 | Alcast Co. | 496,125.00 | 184,871 |
| **Alcast Co. Total** | | **$3,805,718.00** | **$1,485,342** |
| 01/16/15 | Eric Wiklendt | 77,823.00 | 31,074 |
| 01/22/15 | Eric Wiklendt | 100,000.00 | 39,219 |
| 04/14/15 | Eric Wiklendt | 104,036.00 | 39,785 |
| 06/04/15 | Eric Wiklendt | 58,125.00 | 21,569 |
| **Eric Wiklendt Total** | | **$339,984.00** | **$131,647** |
| 09/12/14 | Jeffrey Stone | 62,460.55 | 26,078 |
| 01/16/15 | Jeffrey Stone | 155,646.00 | 62,148 |
| 01/22/15 | Jeffrey Stone | 200,000.00 | 79,627 |
| 04/14/15 | Jeffrey Stone | 208,072.00 | 79,569 |
| 06/04/15 | Jeffrey Stone | 116,250.00 | 43,318 |
| **Jeffrey Stone Total** | | **$742,428.55** | **$290,740** |
| 01/21/15 | Krishnan Venkatesan | 116,344.00 | 46,343 |
| 01/22/15 | Krishnan Venkatesan | 112,400.00 | 44,751 |
| 04/14/15 | Krishnan Venkatesan | 109,688.00 | 41,946 |
| 06/04/15 | Krishnan Venkatesan | 65,332.50 | 24,345 |
| **Krishnan Venkatesan Total** | | **$403,764.50** | **$157,385** |
| 09/12/14 | Speyside Fund, LLC | 280,935.48 | 117,292 |
| 01/16/15 | Speyside Fund, LLC | 1,325,093.00 | 529,093 |
| 01/22/15 | Speyside Fund, LLC | 793,800.00 | 316,041 |
| 01/31/15 | Speyside Fund, LLC | 1,141,392.58 | 452,460 |
| 04/14/15 | Speyside Fund, LLC | 648,247.00 | 247,897 |
| 04/30/15 | Speyside Fund, LLC | 752,647.00 | 285,511 |
| 06/04/15 | Speyside Fund, LLC | 461,396.25 | 171,930 |
| 07/03/15 | Speyside Fund, LLC | 52,771.00 | 19,360 |
| **Speyside Fund, LLC Total** | | **$5,456,282.31** | **$2,139,584** |

**SUBSEQUENT TRANSFERS (pre-judgment interest calculations)**

| Transfer Date | Transferee | Amount | 7% Interest |
|---|---|---|---|
| 06/18/18 | Alcast Co. | 12,250.00 | 1,959 |
| 06/25/18 | Alcast Co. | 147,000.00 | 23,315 |
| **Alcast Co. Total** | | **$159,250.00** | **$25,274** |
| 06/18/18 | Krishnan Venkatesan | 500.00 | 80 |
| 06/28/18 | Krishnan Venkatesan | 6,000.00 | 948 |
| **Krishnan Venkatesan Total** | | **$6,500.00** | **$1,028** |
| 06/18/18 | Speyside Fund, LLC | 12,250.00 | 1,959 |
| 06/25/18 | Speyside Fund, LLC | 147,000.00 | 23,315 |
| 07/02/18 | Speyside Fund, LLC | 100,000.00 | 944 |
| 07/09/18 | Speyside Fund, LLC | 100,000.00 | 15,592 |
| 07/16/18 | Speyside Fund, LLC | 100,000.00 | 15,458 |
| 07/23/18 | Speyside Fund, LLC | 200,000.00 | 30,647 |
| 07/30/18 | Speyside Fund, LLC | 300,000.00 | 45,567 |
| 08/06/18 | Speyside Fund, LLC | 300,000.00 | 45,164 |
| 08/13/18 | Speyside Fund, LLC | 250,000.00 | 37,301 |
| 08/20/18 | Speyside Fund, LLC | 150,000.00 | 22,179 |
| 08/27/18 | Speyside Fund, LLC | 200,000.00 | 29,304 |
| 09/04/18 | Speyside Fund, LLC | 350,000.00 | 50,812 |
| 09/10/18 | Speyside Fund, LLC | 250,000.00 | 36,007 |
| 09/17/18 | Speyside Fund, LLC | 325,000.00 | 46,373 |
| 09/26/18 | Speyside Fund, LLC | 200,000.00 | 28,192 |
| 10/01/18 | Speyside Fund, LLC | 350,000.00 | 49,000 |
| 10/9/18 | Speyside Fund, LLC | 100,000.00 | 13,847 |
| 10/22/18 | Speyside Fund LLC | 100,000.00 | 13,597 |
| 10/31/18 | Speyside Fund LLC | 50,000,00 | 6,712 |
| 1/9/19 | Speyside Fund LLC | 30,000.00 | 3,625 |
| **Speyside Fund, LLC Total** | | **3,780,000.00** | **$515,595** |

# EXHIBIT "1"

**From:** Jeff Stone <jeffrey.stone@speysideequity.com>
**Sent:** Wed, 26 Feb 2014 13:03:14 -0500
**To:** "Robert Sylvester" <robert.sylvester@speysideequity.com>, "Eric Wiklendt"
<eric.wiklendt@speysideequity.com>, "Kevin Daugherty" <kevin.daugherty@speysideequity.com>,
"Oliver Maier" <oliver.maier@speysideequity.com>
**Subject:** Fwd: Project Bears Confidential Descriptive Memorandum
**Attachments:**
· attached_file_1.pdf *(57 kb)*
· attached_file_2.html *(300 b)*
· attached_file_3.pdf *(1187 kb)*
· attached_file_4.html *(234 b)*

---

Jeffrey A Stone

Managing Director/Partner

Speyside Equity

T 212-994-0308 x204

F 855-269-3979

C 248-890-5225


Begin forwarded message:

> **From:** "Olsta, Ryan" <rolsta@clearygull.com>
> **Date:** February 26, 2014 at 11:56:12 AM EST
> **To:** "jeffrey.stone@speysideequity.com" <jeffrey.stone@speysideequity.com>
> **Subject: Project Bears Confidential Descriptive Memorandum**
>
>
> See attached Confidential Descriptive Memorandum and corresponding cover letter.
>
>
> Thank you.
>
>
> **Ryan A. Olsta** | **Managing Director**
>
> **Cleary Gull**
> 100 East Wisconsin Avenue, Suite 2400
>
> Milwaukee, Wisconsin 53202
> 414-291-4555 Office | 414-291-4558 Fax
>
> rolsta@clearygull.com | clearygull.com

This email may contain confidential information for the sole use of the intended recipient. Any review, use or disclosure by others is strictly prohibited. If you received this in error, please contact the sender and delete all copies of this message. In accordance with applicable regulations, Cleary Gull reserves the right to monitor, review and retain all electronic communications, including emails. Cleary Gull is the trade name of Cleary Gull Inc. and its affiliate Cleary Gull Advisors Inc. Securities and brokerage services are offered by Cleary Gull Inc., member FINRA. Cleary Gull does not accept any trade instructions by email.



February 26, 2014

PRIVATE & CONFIDENTIAL

Jeffrey Stone
Managing Director
Speyside Equity
1741 Tomlinson Road
Philadelphia, PA 19116

Dear Mr. Stone:

Cleary Gull Inc. ("Cleary Gull") has been retained to sell Pacific Steel Casting Company ("Pacific Steel" or the "Company"). The Company is one of the largest independent steel foundries in the United States. The enclosed Confidential Descriptive Memorandum is intended to provide sufficient information to allow you to determine your interest in exploring a transaction with Pacific Steel.

To allow us to use your time more efficiently, we have established the following process:

> Interested parties should review the Confidential Descriptive Memorandum and provide Cleary Gull with a written, non-binding initial indication of interest ("Initial Indication") **no later than Wednesday, March 19, 2014.** Initial Indications should be sent to Cleary Gull Inc., 100 East Wisconsin Avenue, 24th Floor, Milwaukee, Wisconsin 53202, Attention: Ryan Olsta. Faxed or emailed copies of your proposal will also be accepted at 414-291-4558 or rolsta@clearygull.com.

Your Initial Indication should address the following topics:

- The assets of the Company and the liabilities of the Company that buyer is willing to assume;

- The purchase price for such assets and liabilities;

- A description of any important assumptions used to arrive at your estimate of value;

- A description of any financial or other issues that could significantly affect (either positively or negatively) your estimated valuation;

- The source of financing and the expected capital structure for your proposal;

- A description of any approvals, filings or other steps you will need to take prior to executing a definitive agreement and any material conditions or contingencies other than due diligence which would have to be resolved before closing; and

- A list of the names and telephone numbers (including weekend numbers) of personnel whom Cleary Gull may contact to discuss or clarify any aspect of your proposal.

Based on the Initial Indications and discussions with the Company's board, interested parties will be selected to meet with management in Berkeley, California in March or April. We will provide interested parties with access to a data room as well as any additional information needed to submit a final indication.

The above procedures have been developed to insure the equitable treatment of all potential purchasers. However, the procedures are to some extent necessarily subjective. Therefore, neither the Company nor its advisors will be obligated to state any reason for declining consideration of any proposal. Furthermore, the

CLEARY GULL INC.
100 EAST WISCONSIN AVENUE, SUITE 2400
MILWAUKEE, WI 53202
414-291-4500

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 32 of 116

TR_PS_000253599
CONFIDENTIAL

Company expressly reserves the right, without giving reasons therefore, at any time and in any respect, to amend or terminate these procedures, to terminate discussions with any or all parties, to reject any or all proposals, or to negotiate with any party with respect to a transaction involving the Company.

The identity of Pacific Steel and your participation in these discussions are extremely sensitive. We appreciate your careful diligent maintenance of strict confidentiality. Please direct all questions regarding the Company or the transaction process to Cleary Gull. If you do not wish to submit a preliminary indication of interest in the Company, please return all related documents to the attention of Patrick Ringsred at Cleary Gull.

On behalf of the Company and its shareholders, we would like to thank you for your interest in pursuing a transaction.

Best regards,

**CLEARY GULL INC.**

| | | |
|---|---|---|
| John R. Peterson | Ryan A. Olsta | Patrick H. Ringsred |
| Managing Director | Managing Director | Analyst |
| 414-291-4551 | 414-291-4555 | 414-291-4553 |
| jpeterson@clearygull.com | rolsta@clearygull.com | pringsred@clearygull.com |

attachment

TR_PS_00253600
CONFIDENTIAL

TR_PS_000253601





TR_PS_000253602
CONFIDENTIAL

# PACIFIC STEEL CASTING COMPANY

### Confidential Descriptive Memorandum

*Pacific Steel Casting Company ("Pacific Steel" or the "Company") has retained Cleary Gull Inc. ("Cleary Gull") as the Company's financial advisor to review strategic alternatives including a possible sale of the Company. This Confidential Descriptive Memorandum (the "Memorandum") has been prepared by Pacific Steel and Cleary Gull from materials supplied by Pacific Steel. The sole purpose of this Memorandum is to assist the recipient in deciding whether to proceed with a further investigation of the Company. This Memorandum does not purport to contain all information that a prospective purchaser of the Company may need or desire. Cleary Gull and Pacific Steel expressly disclaim any and all liability for representations or warranties, expressed, implied, or contained in, or for omissions from, this Memorandum or any other written or oral communication transmitted or made available. Pacific Steel will have legal responsibility only for the representations and warranties set forth in a definitive written agreement when, as, and if executed and subject to the limitations and restrictions set forth therein. Cleary Gull has not independently verified any of the information contained in this Memorandum or any other information about the Company, has not made and will not make representations or warranties concerning the Company, and has not made and will not make an independent evaluation or appraisal of the Company or any of its assets or liabilities.*

*This Memorandum is being provided to the recipient pursuant to a confidentiality agreement, the terms of which govern the obligations of the recipient with regard to confidentiality of the information herein and certain other matters. As more fully described in the confidentiality agreement, the recipient agrees to return all material received from Pacific Steel or Cleary Gull (including this Memorandum) promptly upon request without retaining any copies thereof. In furnishing this Memorandum, Pacific Steel and Cleary Gull undertake no obligation to provide the recipient with access to any additional information or to update any of the information contained herein.*

*This Memorandum includes certain historical and projected financial and operating data derived from internal management reports and, with respect to projected financial data, from projections prepared by Pacific Steel reflecting certain assumptions by the Company concerning anticipated results, which may or may not prove to be correct, accurate or reasonable. The assumptions underlying the estimates and projections contained herein are subject to significant contingencies and uncertainties including economic, competitive, and regulatory factors beyond the control of Pacific Steel. Past performance may not be indicative of future performance or industry standards. Consequently, no assurances are made or implied as to the reliability of such estimates or projections, and the inclusion of estimates and projections herein should not be regarded as a representation or warranty that the estimated or projected results will be achieved. Neither Cleary Gull nor any independent accounting firm has examined or reviewed financial estimates or projections contained herein.*

*This Memorandum has been prepared for introductory and informational purposes only and with the assumption that any person or entity who wishes to purchase the Company will be a knowledgeable and sophisticated party that will pursue its own independent investigation and analysis of the Company and its prospects. This Memorandum shall not be deemed an indication of the condition (financial or otherwise) of the Company, nor shall it constitute an indication that there has been no change in the business or affairs of the Company since the date hereof. No person has been authorized by Pacific Steel to give any information, other than that contained herein, or make any representation and, if given or made, such other information or representation must not be relied upon as having been authorized.*

*Throughout this Memorandum opinions are expressed concerning the business of the Company and its prospects. The matters described in such opinions may or may not occur or be achieved and you agree that neither the Company nor Cleary Gull shall have any liability arising there from.*

*The foregoing terms are a condition of your use of this Memorandum. If you do not accept the foregoing terms of use, please return this Memorandum immediately.*

*Please direct all questions regarding the Company or the transaction process to:*

**CLEARY GULL INC.**
100 East Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202

**Ryan A. Olsta**
Managing Director
*(414) 291-4555 / rolsta@clearygull.com*

**John R. Peterson**
Managing Director
*(414) 291-4551 / jpeterson@clearygull.com*

**Patrick H. Ringsred**
Associate
*(414) 291-4553 / pringsred@clearygull.com*



TABLE OF CONTENTS

**EXECUTIVE SUMMARY**

Company Overview ................................................. 1

Investment Highlights ........................................... 5

Opportunities ................................................... 7

Transaction Overview ............................................ 11

**INDUSTRY OVERVIEW**

Industry Overview ............................................... 13

End Markets ..................................................... 14

Industry Participants ........................................... 17

**BUSINESS DESCRIPTION**

Products and Applications ....................................... 18

Customer Relationships .......................................... 19

Supplier Relationships .......................................... 20

Go-to-Market Strategy ........................................... 21

Manufacturing and Operations .................................... 22

**ORGANIZATION**

Senior Leadership ............................................... 27

Employees and Benefits .......................................... 29

Regulation, Insurance, and Legal Matters ....................... 30

**FINANCIAL INFORMATION**

Income Statements ............................................... 32

Selling and Administrative Expenses ............................. 33

Addbacks and Adjustments ........................................ 34

Balance Sheet ................................................... 37

CLEARY GULL

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 37 of 116

TR_PS_000253604
CONFIDENTIAL



*This summary highlights certain information contained elsewhere in this Memorandum, which interested parties are urged to read in its entirety. In this Memorandum the terms "Pacific Steel" or "the Company" refer to Pacific Steel Casting Company.*

## COMPANY OVERVIEW



Pacific Steel is one of the largest independent steel foundries in the United States and the largest steel foundry in the United States west of Rocky Mountains. The Company has an impressive 80-year history. It is a key supplier to the oil drilling equipment and heavy-duty truck industries. The Company also has selected customers in the off-shore exploration, construction, valve and pipe fitting, mining, and defense industries. Pacific Steel has 418 employees and three facilities covering almost 200,000 square feet of manufacturing space. The Company's facilities are conveniently located adjacent to each other on approximately nine acres in a heavy industrial area in Berkeley, California. The Company has a strong reputation for environmental compliance and an excellent working relationship with federal, state and local authorities.

Pacific Steel's three manufacturing facilities each utilize a unique molding process: shell mold, green sand, and air set. The diversity of the manufacturing processes allows Pacific Steel to produce an extremely broad range of product types, order quantities, and casting sizes from one ounce to as large as 7,000 pounds.

### Pacific Steel Facilities

| Plant | Year Opened | Square Feet | Casting Sizes | Monthly Capacity | Utilization Range | Utilization 2013 Average |
|---|---|---|---|---|---|---|
| Shell Mold | 1975 | 25,458 | 1 oz. - 60 lbs. | 900 tons | 16% - 60% | 33% |
| Green Sand | 1934 | 65,665 | 1 lb. - 1,500 lbs. | 650 tons | 38% - 57% | 50% |
| Air Set | 1981 | 102,410 | Up to 7,000 lbs. | 650 tons | 42% - 90% | 64% |



The Company has earned an impressive reputation for quality. It specializes in the production of large, complex castings and has few competitors with the ability to cast parts greater than 1,000 pounds, automated molding lines, and quality procedures to meet the exacting specification of its customers. Pacific Steel also provides design and engineering assistance on the front end and heat treating, machining and other processing on the back end to provide a full set of capabilities. The Company's broad range of casting processes also allow for the selection of the most efficient method for various production quantities and can reduce overall shipping costs by providing many different types of castings in a consolidated bundle.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 38 of
116

TR_PS_000253605
CONFIDENTIAL





The Company has several other competitive advantages including its geographic location, its long-term customer relationships, and dedicated team of managers. Pacific Steel's location on the west coast of the United States places it in close proximity to several OEMs, which require large castings and wish to limit lead times and shipping costs. Pacific Steel has formed deep, long-lasting relationships with several of these OEMs and serves as a sole- or dual-source for the vast majority of its products. The Company's location on a western port also allows it to provide to its customers an overseas import solution for less complex parts. The Company sources the parts from established relationships in Asia and provides quality inspection and back-up production. The entire management team of Pacific Steel which oversees the functions of finance, operations, quality, and sales, other than its CEO, a fourth generation owner of the Company, intends to remain with the Company after it is sold.

The Company is prepared to file for protection under chapter 11 of the U.S. Bankruptcy Code with a potential filing occurring in February or March 2014, and seek a purchaser for its assets under Section 363 of the Bankruptcy Code (a "363 Sale") as part of its plan of recapitalization. Although the Company's operations and operating cash flow have been relatively stable or positive, the Chapter 11 filing was largely necessitated by a class action lawsuit that is explained in more detail in the legal section of this memorandum. The Company has received a proposal for debtor in possession financing during this Chapter 11 proceeding, which it believes will be adequate to allow it sufficient time to pursue a 363 Sale in an orderly fashion.



Pacific Steel has several opportunities for substantial financial improvement. The Company has just recently installed, but not fully implemented, a new ERP system which it expects to dramatically improve available data and decision making based on product cost. Pacific Steel has a number of expenses that have negatively impacted recent profitability, which will be eliminated through the bankruptcy proceeding or which it plans to be greatly reduced in a relatively short period of time. The largest of these expenses are related to worker productivity and workers' compensation expenses, both of which were adversely affected by, but have been steadily improving since, a massive turnover of its employee base in 2011 resulting from action by the U.S. Department of Homeland Security ("DHS").

Workers' compensation expenses are expected to decrease in FY 2016P and FY 2017P as a one-time spike in workers' compensation claims caused by the fallout from the DHS enforcement action is no longer utilized in the Company's experience modification rate calculation. The expected reduction of these expenses should dramatically improve Pacific Steel's future profitability. The Company could also be combined with an industry participant to accelerate the reduction in these expenses.

CLEARY GULL

TR_PS_000253606
CONFIDENTIAL





The Company has historically produced greater levels of sales and profitability than in recent years and believes it has the ability to improve its current financial results. Pacific Steel has a considerable amount of available capacity. The average utilization for FY 2013 was 33%, 50%, and 64%, respectively, for the shell, green sand, and air set foundries. Due to its current financial situation, the Company has focused on streamlining its costs and reduced its sales expenses and other investments. The Company believes a modest investment in sales, training, and operational resources could dramatically improve sales and profitability.

The following charts provide selected financial data for the Company for its fiscal years ended March 31, 2006, through March 31, 2013 and the Company's forecast for its fiscal years ended March 31, 2014 and March 31, 2015. Financial data for FY 2006 through FY 2013 are based on the Company's audited financial statements. Data for 2014E is based on year-to-date performance through December 31, 2013 and management's forecast for the fourth quarter through March 31, 2014. Data for 2015P is based on management's forecast. The Company's financial performance is discussed in further detail in the financial section of this memorandum below.

### Summary Income Statements FY 2005 – FY 2010

| ($'s in thousands) | For the Fiscal Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| Net Sales | $ 68,935 | $ 109,772 | $ 138,534 | $ 126,674 | $ 104,393 | $ 49,589 |
| Cost of Goods Sold | (59,084) | (90,667) | (110,329) | (104,006) | (88,457) | (45,801) |
| Gross Profit | $ 9,851 | $ 19,105 | $ 28,205 | $ 22,668 | $ 15,936 | $ 3,788 |
| Operating Expenses | (5,931) | (9,492) | (9,372) | (8,567) | (8,279) | (5,661) |
| EBIT | $ 3,920 | $ 9,613 | $ 18,833 | $ 14,100 | $ 7,657 | $ (1,873) |
| Depreciation and Amortization | 348 | 406 | 535 | 1,199 | 1,268 | 1,417 |
| EBITDA | $ 4,268 | $ 10,019 | $ 19,368 | $ 15,299 | $ 8,925 | $ (456) |
| | | | | | | |
| Capital Expenditures | $ 555 | $ 1,702 | $ 4,744 | $ 3,160 | $ 1,079 | 435 |
| ***Operating Data:*** | | | | | | |
| Total Net Sales (growth) | NA | 59.2% | 26.2% | (8.6%) | (17.6%) | (52.5%) |
| Gross Profit (as % of Sales) | 14.3% | 17.4% | 20.4% | 17.9% | 15.3% | 7.6% |
| Operating Expenses (as % of Sales) | 8.6% | 8.6% | 6.8% | 6.8% | 7.9% | 11.4% |
| EBIT (as % of Sales) | 5.7% | 8.8% | 13.6% | 11.1% | 7.3% | (3.8%) |
| EBITDA (as % of Sales) | 6.2% | 9.1% | 14.0% | 12.1% | 8.5% | (0.9%) |



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 40 of
116

TR_PS_000253607
CONFIDENTIAL





## Summary Income Statements FY 2010 – FY 2015P

| ($'s in thousands) | For the Fiscal Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014E** | **2015P** |
| Net Sales | $ 49,589 | $ 90,451 | $ 124,961 | $ 112,890 | $ 87,864 | $ 90,187 |
| Cost of Goods Sold | (45,801) | (79,454) | (114,843) | (105,102) | (83,128) | (77,210) |
| Gross Profit | $ 3,788 | $ 10,997 | $ 10,118 | $ 7,789 | $ 4,736 | $ 12,977 |
| Operating Expenses | (5,661) | (6,988) | (9,476) | (9,026) | (8,283) | (8,928) |
| EBIT | $ (1,873) | $ 4,009 | $ 642 | $ (1,237) | $ (3,547) | $ 4,049 |
| Addbacks and Adjustments[1] | - | - | 2,159 | 8,008 | 9,002 | 3,385 |
| Depreciation and Amortization | 1,417 | 1,443 | 1,569 | 1,752 | 1,556 | 1,556 |
| Adjusted EBITDA | $ (456) | $ 5,452 | $ 4,370 | $ 8,523 | $ 7,011 | $ 8,990 |
| | | | | | | |
| Capital Expenditures | $ 435 | $ 454 | $ 2,326 | $ 1,685 | $ 2,000 | $ 2,000 |
| | | | | | | |
| ***Operating Data:*** | | | | | | |
| Total Net Sales (growth) | (52.5%) | 82.4% | 38.2% | (9.7%) | (22.2%) | 2.6% |
| Gross Profit (as % of Sales) | 7.6% | 12.2% | 8.1% | 6.9% | 5.4% | 14.4% |
| Operating Expenses (as % of Sales) | 11.4% | 7.7% | 7.6% | 8.0% | 9.4% | 9.9% |
| EBIT (as % of Sales) | (3.8%) | 4.4% | 0.5% | (1.1%) | (4.0%) | 4.5% |
| Adjusted EBITDA (as % of Sales) | (0.9%) | 6.0% | 3.5% | 7.5% | 8.0% | 10.0% |

**Notes:**
(1) Addbacks and adjustments are explained in the financial section





Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 41 of
116

TR_PS_000253608
CONFIDENTIAL



## INVESTMENT HIGHLIGHTS

### Reputation for Manufacturing Complex, High Quality Castings



Pacific Steel has developed an excellent reputation as a preferred supplier for complex, difficult-to-manufacture steel castings used in critical applications. The castings are complex and difficult-to-manufacture because they are typically heavily cored and require significant engineering skill to design and build to the desired specifications. Since its founding in 1934, the Company has focused on manufacturing complex castings and providing them to its customers on-time with high quality. By successfully delivering on its on-time delivery, high-quality focus, the Company has differentiated itself from its competitors and developed strong long-term relationships with its largest customers. As a testament to the quality castings the Company manufactures, Pacific Steel has received several certifications and achievement awards including ISO:9001, ABS Certificate of Casting, ABS Certificate of Conformance, Det Noreske Veritas Approval of Manufacturing Certificate, and PACCAR's Quality Achievement Award. Pacific Steel has also differentiated itself by carving out a niche in large castings from 1,000 pounds to 7,000 pounds because it is one of a few foundries that can manufacture castings of that size in its region.

### Broad Capabilities Create "One-Stop-Shop" for Steel Castings



Pacific Steel started its operations with its green sand facility and subsequently added a shell mold facility in 1975 and an air set facility in 1981. With its diverse capabilities, the Company can manufacture steel castings from one ounce to 7,000 pounds and can match type and quantity of castings desired to the most cost-efficient method. This broad set of capabilities makes the Company a "one-stop-shop" for many steel castings and helps simplify its customers' procurement processes. In addition to its foundry capabilities, the Company also has in-house pattern making and heat treating, which allows it more control over its production processes and helps it provide on-time delivery to its customers. The Company has further expanded its capabilities by actively developing a Chinese import solution for its customers whereby the Company works with certain Chinese foundries to supply its customers with imported castings and provides a backup solution with its own operation. Customers value this arrangement because they benefit from lower cost castings without the risk of losing supply should logistical or other issues occur with an offshore supplier.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 42 of 116

TR_PS_000253609
CONFIDENTIAL



### Long-Term Customer Relationships

Pacific Steel has proactively sought to create collaborative, mutually beneficial relationships with its customers. As a result of this approach, the Company has built a successful track-record for customer service and developed relationships in multiple levels of its customers' organizations from sales to engineering. The Company's customer base is largely comprised of blue-chip companies that have had relationships of over 20 years with Pacific Steel. Pacific Steel is also extremely experienced and familiar in dealing with design or manufacturing problems related to



its customer's parts. The value Pacific Steel provides to its customers is reflected in the longevity of the relationships it has with its customers and the fact that it is typically either the sole- or a dual-source supplier of the castings it manufactures. Pacific Steel is strategically located near a number of its customers' operations, which is a key logistical advantage.

### Significant Barriers to Entry

Pacific Steel benefits from a number of barriers to entry as a result of the Company's capabilities, prior and current investments, factors inherent to the foundry industry, and its geographic location. The Company's broad set of foundry capabilities allows it to meet a variety of customer needs and provide a "one-stop-shop" for many steel castings. The Company's ability to make complex, difficult-



to-manufacture castings has been honed and improved over many years as result of investment and experience. Pacific Steel has built long-term relationships with its customers because of its collaborative, customer service approach and its manufacturing capabilities. Pacific Steel is also one of the few steel foundries operating in its region because of the capital and environmental investment required. Additionally, the Company benefits from the high switching costs in the foundry industry due to the significant investment required for patterns and tooling. The Company estimates the replacement cost for building and starting up a similar foundry operation would be greater than $50 million. The Company has benefited from its geographic location and proximity to several large customers.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 43 of 116



TR_PS_000253610
CONFIDENTIAL



**OPPORTUNITIES**

### ERP Development

Pacific Steel has just recently installed, but not fully implemented, a new ERP system. The Company believes that implementation and usage of the new system will dramatically improve available data and decision making based on product cost. The new system is Odyssey ERP software from B&L Information Systems and is specifically tailored to foundry companies and utilized extensively throughout the industry. When fully implemented, the ERP system can manage product costing for quoting, margin tracking and reviews, and scheduling. Currently Pacific Steel is utilizing a Lotus Approach-based pricing tool for quoting, which does not have in place a method to systematically review customer or product profitability, and is manually scheduling production. The full implementation and usage of the new ERP system will provide the Company with valuable insight into product costing. The enhanced tracking of product costs should dramatically improve quoting, customer and job selection, and provide data so that low margin or negative margin products could be repriced or eliminated.

### Elimination of Non-Recurring Expenses

Pacific Steel had significant expenses in recent years that are not expected to reoccur in the future, that will be eliminated through the bankruptcy proceeding, or that are expected to be greatly reduced in a relatively short period of time. Non-recurring expenses of the Company in recent years include an I-9 audit settlement, productivity losses due to employees lost as a result of the I-9 audit, excessive workers' compensation expenses, environmental settlements and related legal fees, and expenses related to the Company's bankruptcy filing and financing and sale transactions. Expenses expected to be greatly reduced over the next several years include workers' compensation expenses and productivity losses due to the I-9 audit. The amount of these expenses is explained in the financial section of this memorandum below.

In late 2011, as a result of the I-9 audit by the DHS, the Company terminated over 200 employees, many of whom subsequently filed workers' compensation claims. This caused the Company to incur higher than historical levels of workers' compensation expenses for FY 2012 and FY 2013 and is expected to continue to impact FY 2014E and FY 2015P expenses. In FY 2014E, the number of workers' compensation claims has returned to historical levels. Pacific Steel expects workers' compensation claims to continue at historical levels going forward, however workers' compensation expenses are calculated on a backward-looking basis using the Company's experience modification rate. The Company expects workers' compensation expenses to begin to decline in FY 2016P and return to historical levels in FY 2017P as a result of the decline in workers' compensation claims.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 44 of 116



TR_PS_000253611
CONFIDENTIAL



Annual Workers' Compensation Claims History and Forecast



Experience Modification Rate History and Forecast



**Improved Productivity through Training**

The I-9 audit caused the Company to immediately lose over 200 employees, which at the time represented approximately one-half of its production workforce. The process of hiring, training, and managing the relatively new and inexperienced employees has led to considerable labor and management inefficiencies which are still being addressed. Pacific Steel has reviewed, tested, and improved its hiring and training of employees to better attract and retain industrious and well-suited employees. The Company believes it has started to see the improvements in many areas and expects that a continuation of these methods will positively impact future efficiency. The implementation of the new ERP system will also help to track, monitor, and improve worker productivity. The Company believes that

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 45 of
116

TR_PS_00253612
CONFIDENTIAL

increasing worker productivity is the largest single opportunity to improve the financial results of the Company.



**Plant Efficiency (Labor Hours per Ton)**

### Available Capacity and Operating Leverage

Pacific Steel has a considerable amount of available capacity. The average utilization for FY 2013 was 33%, 50%, and 64% for the shell, green sand, and air set foundries. The Company has historically operated at 70 hours of labor per ton of steel castings. The Company recently generated sales of greater than $125 million and EBITDA of greater than $15 million in FY 2008. The facility and the current operating lines are still fully capable of  delivering the previously achieved levels of sales and profitability. Due to its current legal and financial situation, the Company has focused on streamlining its costs and reduced its sales investments. A better financed entity effectively investing in sales resources would have the potential to dramatically improve sales. Pacific Steel has tremendous operating leverage and modest increases in sales should lead to significant improvements in profitability.

### Broaden Industry and Customer Base through Business Development

Pacific Steel has a long, successful history producing oil drilling equipment and heavy-duty trucks. These two end markets comprise 68% of Pacific Steel's sales. The Company has also manufactured parts for off-shore exploration, construction, valve and pipe fitting, mining, and defense. If Pacific Steel could gain sufficient traction in these other end markets, it would serve to broaden the Company's industry and customer base. A more diverse Company would provide greater opportunities for growth, be less dependent on its largest customers, and less cyclical. Pacific Steel's sales expenses as a percentage of revenues are approximately 1%, which is considerably less than the industry average of 3-5%.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 46 of
116

TR_PS_00253613
CONFIDENTIAL



The Company believes there would be a high return on further investment in sales resources, but has not been able to invest at this time.

### Grow Import Business

Pacific Steel has successfully developed relationships in Asia to build and grow its import solution for less complex parts to customers and believes it is well-positioned to continue to develop this opportunity.  In FY 2013, approximately 10% of Pacific Steel's sales were internationally sourced parts.  The Company is ideally located on a western port to receive, inspect, and ship product from Asian sources.  Pacific Steel has over 10 years of experience and long-established relationships internationally sourcing components.  The Company has invested time and capital to identify, train, and continuously audit its sources to ensure quality to its customers.  Pacific Steel also utilizes its extensive quality control procedures to inspect parts before shipment.  The Company will also provide final finishing if necessary and serves as a back-up source, at Pacific Steel prices, if there is an interruption or quality issue.

### Acquisition Opportunities

Pacific Steel has the critical mass to be a key component in an industry consolidation.  The foundry industry is fragmented and rapidly consolidating therefore it would be possible for either a strategic or financial group to buy Pacific Steel as a platform to consolidate a segment of the industry.  Pacific Steel would bring its abilities to produce complex parts for oil drilling and heavy-duty trucks, the capabilities to produce physically large parts in an automated fashion, and an established foreign sourcing infrastructure.  Pacific Steel would significantly benefit from a combination that could provide top level leadership; assistance implementing an ERP system for cost control, quoting, margin reviews; and access to additional sales resources with experience in other suitable markets.





TR_PS_000253614
CONFIDENTIAL



## TRANSACTION OVERVIEW

The Company has retained Cleary Gull as its exclusive financial advisor in connection with the sale of the stock or substantially all of the assets of the Company, all as defined in an engagement letter between the Company and Cleary Gull (a "Sale Transaction" which includes a 363 Sale), and intends to seek immediate approval from the bankruptcy court of the continued employment of Cleary Gull in that capacity. Certain parties have already been in contact with the Company and/or Cleary Gull regarding a Sale Transaction and have received information from the Company in that regard. In light of the Company's planned Chapter 11 filing, Cleary Gull has recommended the Company pursue a 363 Sale as follows:

A. Certain qualified parties that have been in contact with the Company recently regarding a Sale Transaction and additional qualified parties identified by the Company or Cleary Gull must enter into a confidentiality agreement with the Company ("Qualified First-Round Bidders") will receive this Confidential Descriptive Memorandum and will be provided access to an electronic data room.

B. Qualified First Round Bidders will be asked to submit an initial indication of interest ("IOI") in a 363 Sale describing:

- the assets of the Company they wish to purchase and the liabilities of the Company they are willing to assume,

- the purchase price for such assets and liabilities,

- the source of their financing, and

- their requirements for further due diligence and any consents or approvals needed to consummate a 363 Sale.

C. A to be determined number of Qualified First Round Bidders that have submitted the most favorable IOI's will be provided an opportunity to meet with management of the Company, to review additional information about the Company in the electronic data room, and to submit a revised proposal for a 363 Sale based on a form of definitive agreement the Company intends to provide for that purpose (a "Final Bid").

D. The Company intends to negotiate the terms of one or more Final Bids with the objective of entering into a definitive agreement with the party that will be subject to the approval of the bankruptcy court and such further procedures and approvals as the court may require.

E. The Company shall have no obligation to continue negotiations or discussions with any party, regardless of whether a Proposal contains the highest proposed purchase price. Selection will be based, at the sole discretion of the Company, on a variety of factors, including the terms and conditions of each individual Proposal, as well as assessments of a given bidder's ability to successfully and expeditiously complete its Proposal. The Company expressly reserves the right, in its sole discretion, to evaluate the terms and conditions of any Proposal and to reject any or all



Case: 19-04057   Doc# 86   Filed: 10/02/20   Entered: 10/02/20 14:29:05   Page 48 of 116

TR_PS_00253615
CONFIDENTIAL



Proposals and shall have no obligation to determine or disclose any reasons therefore.  The Company further expressly reserves the right, in its sole discretion, to alter or terminate this process at any time.  The existence and content of this letter are subject to the Confidentiality Agreement you previously executed.  This invitation shall not constitute a waiver or modification of any of the terms of such Confidentiality Agreement, the terms of which shall continue in full force and effect in their entirety.

The Company's legal counsel for bankruptcy matters, including a 363 Sale, is Binder & Malter LLP located in Santa Clara, CA.





TR_PS_00253616
CONFIDENTIAL



## INDUSTRY OVERVIEW

The U.S. metal casting industry is a $32 billion market comprised of just over 2,000 foundries. The recession caused industry volumes to decline from $28.2 billion in 2007 to $21.6 billion in sales in 2009, and capacity utilization to decline from 75% in 2007 to 51% in 2009. From 2010 to 2013, the industry grew to $32.8 billion as it rebounded along with the U.S. economy. Capacity utilization increased to 75% in 2011 and improved to 82% in 2013. Demand for metal castings is largely driven by the demand for capital equipment, construction, and transportation. The continued recovery in the U.S. economy and continued growth in housing, construction, and capital equipment are expected to drive growth in the U.S. metal casting industry at a 3.5% CAGR to $35.1 billion in 2015.

**U.S. Metal Casting Industry**



Source: Modern Casting

**U.S. Metal Casting Capacity Utilization**



Source: American Foundry Society

The steel segment of the metal castings industry is expected to grow at a CAGR of 5.1% from 2009 through 2015P.

**U.S. Steel Casting Shipments**



Source: American Foundry Society



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 50 of
116
TR_PS_000253617
CONFIDENTIAL


<u>END MARKETS</u>

Pacific Steel supplies many of its castings to the oil drilling equipment and heavy-duty truck end markets. The Company's sales by end market for FY 2013 are summarized in the chart below.

**FY 2013 End Market Sales**

Other 12%

Oil Drilling Equipment 55%

Heavy Duty Truck 33%

### Oil Drilling

The oil drilling market is expected to grow rapidly for the foreseeable future due to the following factors: (i) robust demand for oil, (ii) increasing capital intensity for oil exploration, (iii) challenges replacing reserves and growing U.S. based production due to shale oil from horizontal fracturing and continued offshore development of oil reserves in the Gulf of Mexico, (iv) accelerating capital spending, and (v) continued growth in worldwide rig counts. From 2009 through forecasted 2015P, oil drilling equipment steel casting shipments are projected to grow annually at a rate of 9.7% and 7.1% annually from 2013 through 2015P. Pacific Steel is well positioned for continued orders arising from (a) its specialized expertise in manufacturing specific parts that are in continual demand, (b) the long economic lives of the manufactured components, (c) long-term relationships as a dependable supplier, (d) reluctance of oil drilling companies to change suppliers of critical components essential to their operations, (e) high profitability of oil companies which reduces risk of seeking lower cost alternatives, (f) limited number of competitors that have the expertise to manufacturer a competing part or component, and (g) history of manufacturing substantially all component upgrades.






Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 51 of
116

TR_PS_000253618
CONFIDENTIAL



**Oil Drilling Equipment Steel Casting Shipments**

Source: American Foundry Society

### Heavy-duty Truck



The heavy-duty truck market is experiencing solid growth in the U.S., primarily due to (i) improving carrier profitability, (ii) ongoing replacement demand for aging fleets, and (iii) fleet expansion arising from increased shipping activity. From 2011 through forecasted 2014P, North American Class 5-8 Production increased at an annual rate of 7.6%. In 2013, Class 8 truck sales accounted for 212,000 of the 500,000 total industry units, PACCAR's primary classification and which it has a 28% market share. According to PACCAR, their recent record revenues have been favorably impacted by higher truck deliveries and higher fleet utilization. The continued growth is driven by ongoing fleet replacement and some expansion of industry fleet capacity reflecting modest economic growth. PACCAR has a positive outlook regarding heavy-duty trucks in North America and has forecasted to investors expected growth of 3% annually from 2013-2018.





Case: 19-04057   Doc# 86   Filed: 10/02/20   Entered: 10/02/20 14:29:05   Page 52 of 116

TR_PS_000253619
CONFIDENTIAL



North American Class 5-8 Production

Source: ACT Research







Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 53 of
116

TR_PS_000253620
CONFIDENTIAL


## INDUSTRY PARTICIPANTS

The following chart provides information about Pacific Steel's principal competitors that produce steel castings in various size ranges for a variety of end markets. Based on the competitors' capabilities and end market focus, they typically only compete against one of the three manufacturing plants that Pacific Steel operates; air set, green sand, or shell mold. Pacific Steel's value proposition is based on quality, delivery, and value–add to highly complex, custom castings. Many of its competitors cannot compete across the wide breadth of products that Pacific Steel offers due to the complexity and size ranges that Pacific Steel produces. In addition, Pacific Steel is geographically located in close proximity to its key customers, specifically in the oil and gas markets, making for quick lead times. Pacific Steel also sources approximately 10% of its business from Asia. Not only is Pacific Steel strategically located to efficiently receive imports, it also offers low-cost products with Pacific Steel inspection, quality, and support to customers, which its competitors do not offer. Pacific Steel's unique capabilities greatly reduce the number of viable competitors for most of its work.

### Competitor Matrix

| ($'s millions) Competitor | Estimated Revenue | Casting Type | Competing Plant | Casting Sizes | End Market |
|---|---|---|---|---|---|
| Atchison Casting Corporation | $340 | Carbon Steel Low-alloy Steel Stainless Steel | Green Sand | 300 lbs. - 600 lbs. | Automotive, Power Generation, Mining, Oil & Gas, Marine, Railcar |
| Atlas Castings & Technology LP | $35 | Carbon Steel Low-alloy Steel Stainless Steel | Green Sand | 10 lbs. - 48,000 lbs. | Pump, Valve, Turbine, Nuclear, Marine, Offshore Drilling |
| Eagle Alloy, Inc. | $55 | Carbon Steel Stainless Steel | Shell Mold | 1 lb. - 1,000 lbs. | No specialization |
| Electro Aco Altona S.A. | $100 | Carbon Steel Low-alloy Steel High-alloy Steel Manganese Steel | Air Set | 20 lbs. - 20,000 lbs. | Automotive, Construction Equipment, Mining, Heavy Transportation, Power Generation, Marine |
| Friedrich Wilhelms-Hutte Eisenguss GmbH | $40 | Carbon Steel Low-alloy Steel | Air Set | 350 lbs. - 80,000 lbs. | Wind Power, Turbines, Engines, Oil Field |
| Harrison Steel Castings Company | $60 | Carbon Steel Low-alloy Steel Medium-alloy Steel | Air Set Green Sand | 350 lbs. - 12,500 lbs. | Agriculture, Heavy Equipment, Mining, Oil & Gas |
| Huron Castings, Inc. | $30 | Carbon Steel Low-alloy Steel Stainless Steel | Shell Mold | 1 lb. - 400 lbs. | Limited specialization |
| Matrix Metals LLC | $155 | Carbon Steel Stainless Steel Manganese Steel Low-alloy Steel | Green Sand | 1 lb. - 7,000 lbs. | Valve, Oil Field, Nuclear, Military, Construction, Mining, Railcar |
| Quality Electric Steel Castings Inc. | $85 | Carbon Steel Low-alloy Steel Medium-alloy Steel High-alloy Steel | Air Set | 10 lbs. - 17,000 lbs. | Oil & Gas, Military, Petrochemical |
| Spokane Industries | $20 | Carbon Steel Low-alloy Steel | Green Sand | 10 lbs. - 5,550 lbs. | Mining, Construction Equipment, Wear Parts |



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 54 of 116

TR_PS_000253621
CONFIDENTIAL


## PRODUCTS AND APPLICATIONS

Pacific Steel manufactures carbon, low-alloy, and stainless steel castings in sizes ranging from one ounce to 7,000 pounds. The Company primarily focuses on difficult-to-manufacture, complex castings used in critical applications. The two primary end-markets the Company serves are oil drilling equipment and heavy-duty trucks.

### Pacific Steel Products

| Category | Application | Product Examples |
|---|---|---|
| Carbon | Structural<br>Trucking<br>Valves | |
| Low-Alloy Steel | Oil Field Equipment<br>Structural<br>Trucking | |
| Stainless Steel | Valves | |



Case: 19-04057   Doc# 86   Filed: 10/02/20   Entered: 10/02/20 14:29:05   Page 55 of 116
TR_PS_00253622
CONFIDENTIAL





## CUSTOMER RELATIONSHIPS

Pacific Steel has long-term relationships with nearly all of its major customers. From FY 2012 through third quarter FY 2014, National Oilwell Varco and PACCAR have accounted for 65% to 75% of net sales. With the strong relationships and customer reliance on Pacific Steel's products, the Company is in a comfortable position with these highly concentrated customers. Pacific Steel is often the sole-source supplier for the parts its supplies National Oilwell Varco and is a dual-source supplier to Paccar.

### Top Customers

| ($'s in thousands) Customer | End Market | Years in Relationship | FY2012 Net Sales | FY2013 Net Sales | Thru Q3 2014 Net Sales | Thru Q3 2014 % of Total |
|---|---|---|---|---|---|---|
| National Oilwell Varco, Inc. | Oil Drilling Equipment | 43 | $ 46,717 | $ 42,308 | $ 26,573 | 41.6% |
| PACCAR Inc. | Heavy Duty Truck | 79 | 45,271 | 32,487 | 16,887 | 26.4% |
| Oerlikon/Fairfield Energy | Oil Drilling Equipment | 20 | 1,864 | - | 3,594 | 5.6% |
| GE Oil & Gas Inc. | Oil Drilling Equipment | 30 | - | - | 1,711 | 2.7% |
| Cameron International Corporation | Oil Drilling Equipment | 20 | 3,796 | 3,886 | 1,565 | 2.4% |
| Meritor Inc. | Heavy Duty Truck | 10 | 1,760 | 2,216 | 1,254 | 2.0% |
| Joy Global Inc. | Mining Equipment | 25 | - | - | 971 | 1.5% |
| Gillig Corporation | Heavy Duty Truck | 16 | - | - | 940 | 1.5% |
| McKissick | Oil Drilling Equipment | 15 | - | - | 913 | 1.4% |
| Cavins Oil Well Tools | Oil Drilling Equipment | 20 | - | 1,447 | 872 | 1.4% |
| Top Ten Sales | | | $ 99,408 | $ 82,344 | $ 55,280 | 86.5% |
| All Others | | | 25,364 | 31,207 | 8,608 | 13.5% |
| Total Net Sales | | | $ 124,772 | $ 113,551 | $ 63,888 | 100.0% |

Pacific Steel has developed relationships at multiple levels of its major customers from sales to engineering. This has helped it provide a high level of customer service and expand its sales with those customers. The long-term relationships the Company has developed and grown speaks to the value Pacific Steel provides to its customers.





Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 56 of 116

TR_PS_00253623
CONFIDENTIAL



## SUPPLIER RELATIONSHIPS

The Company has developed an extensive network of domestic and international suppliers that supply raw materials, finishing and powder coating, machine shop capabilities, utilities, and finished products. Pacific Steel's outsourced finished products from Asia account for 10% of sales with the remainder of sales from in-house production. The Company has longstanding relationships with many of its suppliers.

### Top Suppliers

| ($'s in thousands) Supplier | Description | Thru Q3 2014 Purchases | Thru Q3 2014 % of Total |
|---|---|---|---|
| Pyro Minterals Inc. | Modling, Melting, and C&F Materials | $ 4,213 | 11.2% |
| Pacific Gas & Electric Co. | Utilities | 3,822 | 10.2% |
| Porter Warner Industries Inc. | Molding and Coring Materials | 3,684 | 9.8% |
| Eckman Industries Inc. | Machining Services | 1,378 | 3.7% |
| AMG Resources Corporation | Steel Scrap | 1,065 | 2.8% |
| Hickman, Williams & Company, Inc. | Alloys | 1,008 | 2.7% |
| Ningbo Daming Precision Casting Co. | Import Castings | 904 | 2.4% |
| Professional Finishing Inc. | Painting Services | 733 | 2.0% |
| Universal Refractories Inc. | Melting and Pouring Materials | 678 | 1.8% |
| The Hong Kong and Shanghai Banking | Import Materials | 589 | 1.6% |
| Top Ten Purchases | | $ 18,073 | 48.2% |
| All Other Purchases | | 19,395 | 51.8% |
| Total Purchases | | $ 37,468 | 100.0% |





Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 57 of
116



TR_PS_00253624
CONFIDENTIAL



## GO-TO-MARKET STRATEGY

### Sales and Marketing

Pacific Steel's sales effort is led by Chris Garlieb, Senior VP Sales and Customer Service, who is supported internally by three technical service representatives and one customer service representative. Mr. Garlieb also manages seven external sales representatives that are located strategically across the United States and are paid on commission. The sales representatives are exclusive to Pacific Steel for the castings the Company manufactures.

Pacific Steel is an active member in several trade organizations including the Steel Founders' Society of America. The Company also uses its regularly updated website and brochure to market the Company's capabilities.

### Quoting Process

The quoting process is also managed by Mr. Garlieb. When Pacific Steel receives a request for a quote the Company evaluates the design and feasibility of manufacturing. If there are opportunities to improve the design the Company will make recommendations with respect to casting design. Design recommendations are made by the Company's Methods department. The Company uses a number of different factors to determine the cost of an opportunity including size, type of molding, number of cores, welding rate, castings per mold, flask size, and expected yield. The Company also incorporates pattern making and heat treating costs as well as any outside service costs into the quotation. Since Mr. Garlieb joined the Company he has refined the quoting strategy to focus on winning business that allows the Company to leverage its core competencies. He also instituted review procedures to determine less profitable parts by analyzing information across the production process as well as scrap and return rates.

The Company manages metal and energy cost fluctuations by charging its smaller customers a commodity surcharge that incorporates cost adjustments for metal and energy costs. For its two largest customers, the Company manages metal and energy cost fluctuations through price changes.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 58 of 116

TR_PS_000253625
CONFIDENTIAL



## MANUFACTURING AND OPERATIONS

### Manufacturing Operations

Pacific Steel's manufacturing operations are divided into three plants covering almost 200,000 square feet of manufacturing space and are conveniently located together on approximately nine acres in Berkeley, California. The Company's three manufacturing facilities each utilize separate molding processes: shell mold, green sand, and air set. The diversity of its manufacturing processes allows Pacific Steel to produce an extremely broad range of product types and sizes. The Company is capable of serving a wide variety of industries including oil and gas equipment, heavy truck, mining, construction, and defense. Pacific Steel can also manufacture an extensive range of casting sizes from one ounce to as large as 7,000 pounds. The flexibility of Pacific Steel's operations also creates many cost benefits to its customers. The Company works to select the most efficient method available for various production quantities and can reduce overall shipping costs by providing many different types of parts in a consolidated bundle. Pacific Steel has significant capacity available in its operations and could increase sales with minimal capital expenditures needed.

### Overview of Manufacturing Process

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 59 of 116

TR_PS_000253626
CONFIDENTIAL



Pacific Steel has created an impressive reputation for producing complex, quality castings (of all sizes) and has the unique ability to manufacture large castings (greater than 1,000 pounds.) in an automated, high-volume process. Pacific Steel manages the manufacturing process from design and development through heat treating (including any value-added steps or processes). The Company's wide-ranging design development, manufacturing, and finishing capabilities are critical in providing a quality casting with a low total cost to the customer.

**Collaborative Design Development**



The Company uses its considerable experience and knowledge to supply customers with design and manufacturing recommendations. These recommendations are designed to decrease waste and improve yields in an effort to effectively reduce the total cost of manufacturing and to the customer. Pacific Steel uses its in-house methods engineer, three technical sales people, and the quality manager to propose design suggestions. The Company also utilizes visual simulation and modeling software to review in detail the proposed design steps. The computer assistance tools also allow the Company to rapidly prototype and shorten the development cycles through the critical analysis of process steps.

Pacific Steel has a small pattern shop which provides approximately 25% of its customer's patterns. The pattern making group consists of one master pattern maker, an apprentice, and two assistants. The Company generally has outside pattern makers bid new patterns and selects the in-house option when appropriate based on cost and availability. Pacific Steel has strong, long-lasting relationships with several local outside pattern-making sources and believes they provide a quick and low cost solution to its customers.

**Mold and Core**

The shell molding operation features one of the industry's most efficient and automated plant designs. Its streamlined process allows Pacific Steel to deliver intricate lightweight castings with extremely short lead times. The shell mold foundry is currently operating one shift for melting and pouring and one shift for cleaning and finishing.

The green sand plant offers a wide range of casting options. Pacific Steel operates two sets of squeezer production lines and three sets of cope-and-drag production lines. The Company's manufacturing flexibility allows it to move production to the most appropriate, cost efficient, and available methodology. The green sand foundry is currently operating one shift for melting and pouring and one shift for cleaning and finishing.

The air set facility is one of the most efficient, high-volume plants for large castings. Pacific Steel's operations are unique with few competitors able to provide an automated solution for castings in this size range. The automated line which includes a 1,500 pound per minute continuous mixer can easily mold castings up to 3,500 pounds. Pacific Steel also possesses impressive floor molding capabilities that increase the potential size to over 7,000 pounds. The air set facility is currently operating one shift for melting and pouring and two shifts for cleaning and finishing.

CLEARY GULL

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 60 of
116
TR_PS_00253627
CONFIDENTIAL



## Facilities

| Plant | Year Opened | Square Feet | Casting Sizes | Monthly Capacity | Utilization Range | Utilization 2013 Average |
|---|---|---|---|---|---|---|
| Shell Mold | 1975 | 25,458 | 1 oz. - 60 lbs. | 900 tons | 16% - 60% | 33% |
| Green Sand | 1934 | 65,665 | 1 lb. - 1,500 lbs. | 650 tons | 38% - 57% | 50% |
| Air Set | 1981 | 102,410 | Up to 7,000 lbs. | 650 tons | 42% - 90% | 64% |

### Melt and Pouring

Pacific Steel has three electric arc furnaces with one dedicated to each facility. The green sand facility has a seven foot wide diameter furnace which can pour approximately 6,500 pounds. The shell molding facility has an eight foot wide diameter furnace which can pour approximately 8,500 pounds. The air set foundry has an eight foot wide diameter furnace which can pour approximately 10,000 – 12,000 pounds.



### Cooling and Shake Out

There are separate shake out operations for each facility. The green sand and air set foundries reclaim between 85-90% of the previously used sand. The shell mold plant uses a thermal reclaimer which burns off the bonds in the sand and allows the Company to reclaim more than 90% of the available sand. The cooling time varies considerably based on the size of the casting. The average cooling time for the large castings in the air set foundry is one to two days. Pacific Steel has available space on its cooling lines and cooling time is not a limiting factor in production.

### Blasting and Heat Treating

Pacific Steel operates a wide variety of blasting equipment to remove particles that adhere to castings. The Company's equipment includes three table blast machines, six cabinet type blast machines, and an assortment of other blasting equipment which is tailored to specific types of castings.



The heat treating process is centralized in the air set foundry. The Company has one car bottom furnace which is approximately 12 by 20 feet and heats to 1,800° F. Pacific Steel also has two additional furnaces for quenching and tempering and four lower temperature ovens which heat to 1250° F. After castings are heat treated they can be sent back to blasting for further cleaning.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 61 of
116

TR_PS_000253628
CONFIDENTIAL



### Cleaning and Upgrading and Value Add Services

Cleaning and upgrading and value added services are important steps in the manufacturing process which require substantial knowledge and experience. Pacific Steel has 10 grinding stations and over 60 weld repair stations. Each part has different specifications, but most require some combination of pre heating, grinding, welding, and magnaflux inspection. It is also common for  parts to revisit grinding or welding to remove imperfections uncovered in the magnaflux inspection. Pacific Steel has achieved success cross training its employees in these functions to streamline the process. Several employees are capable of magnaflux inspecting and then working to grind or weld smaller issues that arise. Pacific Steel will also perform any tests required by the customer to certify the quality of the part. These tests can include tensile tests and ultrasound inspection. The Company contracts with outside third parties for liquid penetration or radiographic tests.

### Quality Control and Inspection

Pacific Steel has built an impressive reputation as a source for quality parts and has earned several certifications and achievement awards including ISO:9001, ABS Certificate of Casting, ABS Certificate of Conformance, Det Noreske Veritas Approval of Manufacturing Certificate, and PACCAR's Quality Achievement Award. Pacific Steel's quality control and inspection department is managed by the VP of Quality. The VP of Quality has an impressive background in metallurgy and is deeply involved in technical research and various industry organizations. The  department also employs four level two magnaflux inspectors, a quality auditor, and a quality clerk. The Company utilizes an inspection lab located in each facility to test the chemical analysis of the metals and sand processed. For parts sourced through the global service option, inspection is generally handled at a receiving warehouse in Oakland, California. If the parts require further processing, that is handled at the Company's facilities. All parts are ultimately packaged and shipped from Pacific Steel's facility in Berkeley.






Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 62 of
116

TR_PS_000253629
CONFIDENTIAL



Historically, the Company has averaged 70 hours of labor per ton of steel castings. As a result of the I-9 audit employee terminations the Company has seen a decrease in productivity, exhibited in its hours per ton production rate, which was 90 hours per ton of steel ton castings in FY Q2 2014. The Company expects through training and increased experience of new workers to improve that production rate and return to its historical level of 70 hours of labor per ton. The Company also saw an increase in its scrap rate after the I-9 audit terminations, but has since seen a significant improvement.

| Plant Efficiency (Labor Hours per Ton) | Scrap Rate |
|---|---|




### IT Systems

Pacific Steel has installed, but has not fully implemented, an Odyssey ERP system. Odyssey is an industry-specific ERP system for foundries and die casters provided by B&L Information Systems. Odyssey was recently installed and the Company is in the process of implementing all of the functions and features Odyssey offers. The system provides financials, electronic storage of documentation, analytic tools, cost accounting, production planning, and accounts receivable and payable management. Currently, the Company operates a dated Lotus Approach-based product costing tool which is not being updated. The chart below identifies the Company's technology infrastructure:

### Technology Infrastructure

| Servers & Services | Network | Dat Circuits | Voice |
|---|---|---|---|
| Odyssey ERP | SonicWALL NSA 2400MX | Cogent 100 Mbps | Avaya PBX |
| Microsoft Office 365 Exchange Online and Outlook | SonicWALL NSA 240 | AT&T 20 Mbps IP Flex | |
| VMware vSphere Essentials | Cisco, HP, and Dell for data and VoIP | WiLine 2 Mbps | |
| Kaspersky Business Space Security | Cisco Aironet 1240AG Series | AT&T DSL | |
| Vembu StoreGrid | ITWatchDogs SuperGoose II | | |
| Smartersign Express | | | |
| Citrix ShareFile | | | |



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 63 of 116

TR_PS_000253630
CONFIDENTIAL



## SENIOR LEADERSHIP

Pacific Steel is led by a strong senior management team consisting of professionals with significant industry and operational experience. Ms. Delsol plans to retire when the Company is sold. The remainder of the management team wishes to continue with the Company.

### Senior Management Team

|  | Age | Position | Years of Experience |
|---|---|---|---|
| Katie Delsol | 41 | Chief Executive Officer | 20 |
| Chuck Bridges | 61 | Chief Financial Officer | 30 |
| Chris Garlieb | 54 | Senior Vice President, Sales and Customer Service | 30 |
| Dave Standafer | 64 | Vice President, Manufacturing | 38 |
| Anish Thottathil | 34 | Vice President, Quality | 12 |

**Katie Delsol, Chief Executive Officer**

Ms. Delsol joined Pacific Steel in 2003 and is the fourth generation of her family to run the Company. Prior to Pacific Steel, Ms. Delsol held positions in technical sales and financial management, and owned a real estate company. Ms. Delsol has a Bachelor of Arts degree in Communications from California State University, Chico.

**Chuck Bridges, Chief Financial Officer**

Mr. Bridges joined the Company in 2010 as Chief Financial Officer and served as Pacific Steel's Chief Operating Officer and Chief Financial Officer from April, 2011 through November, 2012. Mr. Bridges is responsible for the Company's financial reporting. Before joining the Company, Mr. Bridges was a partner in Tatum, the largest executive services firm in the U. S. Mr. Bridges has nearly thirty years of managerial experience in industries ranging from snack food and soft drinks (PepsiCo, Inc.) to software (SPL WorldGroup and Tiburon, Inc.) and semiconductors (Microchip Technology Inc. and Burr-Brown Corporation). Mr. Bridges has a Bachelor of Arts from Cornell University in economics and government and a Masters of Business Administration in finance, management policy and international business from the Kellogg School of Management, Northwestern University. Mr. Bridges is licensed as a CPA in the state of Arizona.

**Chris Garlieb, Senior Vice President, Sales and Customer Service**

Mr. Garlieb joined Pacific Steel in 2011. He is responsible for Pacific Steel's sales, marketing, and customer service activities associated with the customer base. Mr. Garlieb is an accomplished senior sales and marketing executive, having served as Regional Vice President for Grainger Industrial Supply, Vice President of Sales and Distribution for Nestle/Haagen-Dazs Ice Cream Company, and Area Director of Sales for Frito-Lay, Inc. before joining Pacific Steel. Mr. Garlieb has a Bachelor of Science degree from Illinois State University.

**Dave Standafer, Vice President, Manufacturing**

Mr. Standafer rejoined Pacific Steel in 2009. He is responsible for leading the Company's manufacturing effort. He is a seasoned foundryman who started his career in 1975 as a Foundry Engineer at National Supply Company in Torrance,



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 64 of
116

TR_PS_000253631
CONFIDENTIAL



California. In 1980, Mr. Standafer joined Pacific Steel as Metallurgist and Melting Manager. Later, Mr. Standafer moved to Cleveland, Ohio where he worked as the Product Development Manager for Foseco Metallurgical and to Sacramento, California where he was Foundry Manager for Technikon LLC. Mr. Standafer earned a Bachelor of Science Degree from Miami University in Oxford, Ohio. He has held numerous positions with the American Foundry Society and Steel Founders' Society of America.

**Anish Thottathil, Vice President, Quality**

Mr. Thottathil joined Pacific Steel in 2007. He started his tenure in Pacific Steel as a Metallurgist, helping improve heat treatment and material testing operations. Mr. Thottathil was given additional responsibilities of managing melting operations in 2010. In 2013, Mr. Thottathil was promoted to his current role. Before joining Pacific Steel, Mr. Thottathil was a Senior Projects Engineer for a major automotive company. Mr. Thottathil holds a Bachelor Degree in Metallurgy from NIT, India and a Master's Degree in Metallurgy from Missouri School of Science and Technology. He has authored various research papers which he has presented at technical conferences sponsored by the American Foundry Society and Steel Founders' Society of America. Mr. Thottathil is a member of the SFSA's Future Leaders Group and the local AFS chapter's board of directors.





TR_PS_00253632
CONFIDENTIAL



## EMPLOYEES AND BENEFITS

Pacific Steel has a dedicated employee base with an impressive work ethic. Despite losing over 200 employees in late 2011 and early 2012 due to the I-9 situation, the employees still hold an average tenure of nine years with Pacific Steel. As of February 1, 2014, Pacific Steel employed 418 full-time workers, 359 of which are members of the Glass, Molders, Pottery, Plastics and Allied Workers International Union. The Company's hourly personnel earn an average hourly wage of $19.82.

The following charts show the number of employees by function:

### Employees by Function

| Job Category | Salaried | Hourly | Total |
|---|---|---|---|
| Management | 5 | 0 | 5 |
| Finance, Administration, HR, & IT | 15 | 2 | 17 |
| Sales & Marketing | 4 | 2 | 6 |
| Manufacturing: | | | |
| Cleaning & Finishing | 0 | 121 | 121 |
| Core Room | 0 | 21 | 21 |
| Heat Treating | 1 | 9 | 10 |
| Melting | 0 | 20 | 20 |
| Molding | 0 | 53 | 53 |
| Pouring | 0 | 18 | 18 |
| Engineering | 4 | 0 | 4 |
| Environmental | 0 | 2 | 2 |
| Indl General | 0 | 26 | 26 |
| Import Inspection | 0 | 4 | 4 |
| Mag Inspector | 0 | 14 | 14 |
| Maintenance | 3 | 40 | 43 |
| Plant Manager | 9 | 0 | 9 |
| Shipping | 1 | 15 | 16 |
| Technicians | 0 | 6 | 6 |
| Upgrade Cell | 0 | 23 | 23 |
| **Total** | 42 | 376 | 418 |

### Employee Benefits

Employee benefits for non-union employees include health, dental and life insurance as well as and 401-K plans. Employee benefits for union employees are determined by the union contract. The Company is a participant in multi-employer pension plan for its union employees.

### Hiring and Training Practices

Pacific Steel has developed a rigorous hiring and training process in order to develop high-quality employees. As part of the training process, new employees participate in an orientation that is focused on worker safety. Employees are incentivized to cross-train across multiple business operations by offering higher wages and promotion opportunities, increasing the production flexibility and efficiency throughout the Company.

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 66 of
116

TR_PS_00253633
CONFIDENTIAL



REGULATION,
INSURANCE, AND
LEGAL MATTERS

### Regulation

Management believes that Pacific Steel is in material compliance with all applicable Federal and State regulations regarding the manufacture and sale of the Company's products.

### Insurance

Pacific Steel is covered under a general liability insurance policy, which has a per-occurrence and aggregate limit of $1 million and $2 million, respectively, and a $20 million general liability umbrella policy. The Company also maintains customary property, casualty, and other commercial insurance policies.

### Legal Matters

Pacific Steel has reached a tentative settlement in a class action lawsuit brought against the Company in Alameda County Superior Court on behalf of former and current union-represented employees (Rodriguez v. Pacific Steel Casting Co., Case No. RG11609595) for $5.4 million. The lawsuit was filed on December 23, 2011 and alleges, among other things, violations of various provisions of the California labor code regarding the timing and location of employee meal breaks as well as claims pertaining to pay practices regarding the donning and doffing of equipment. The Company has disputed the allegations and is currently being represented by the national law firm, Littler Mendelson, P.C. The Company had the support of union representative Igancio De La Fuente, International Vice President of the Glass, Molders, Pottery, Plastics, and Allied Workers International Union, AFL-CIO, Local 164B for several defenses raised by the Company.

In February 2011, the U.S. Department of Homeland Security ("DHS") began an audit of Pacific Steel's Forms I-9. Employment eligibility verification forms or I-9 forms are the form that all new employees must complete to establish their eligibility to work in the U. S. The purpose of the audit was to determine if the Company had all of the required forms on file, if the forms were completed correctly, and if any of the employees had submitted fraudulent supporting documentation and were ineligible to work in the U. S. The Company was able to present Forms I-9 and copies of the supporting documentation for virtually all employees subject to the audit.

In October 2011, the Company resolved several unfair labor practice complaints relating to the DHS audit that were filed with the NLRB by the union representing the Company's factory workforce, and DHS presented the Company with the results of its audit. DHS indicated that over 200 of the Company's 600 factory workers had submitted documents that did not properly match records maintained by DHS and as such were ineligible to work in the U. S. and were to be terminated at the end of a ten-day "cure" period. The Company negotiated a two-month termination period with DHS and termination procedures with the union. The last worker was terminated during the first week of January, 2012.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 67 of
116

TR_PS_000253634
CONFIDENTIAL



In May 2013, DHS served the Company with a notice of its intention to fine the Company $401,000 for alleged violations of the immigrations laws. The Company has reached an agreement in principle with DHS to settle the matter for $300,000 and is working on finalizing a written settlement agreement. Going forward, the company has enrolled in the DHS's E-Verify program which allows the Company to better screen for fraudulent supporting documents at the time the Forms I-9 are completed.

Pacific Steel was informed of potential litigation by receipt of preliminary lien notices and two mechanics' lien notices in February 2014 from a creditor collectively stating the sum of $282,500. Pacific Steel is not aware of any civil action commenced against the Company to foreclose upon these lien notices.

According to management, Pacific Steel is not party to or aware of any threatened or pending litigation that is expected to have a negative material impact on the Company or its operations beyond the disclosed legal matters above.





TR_PS_000253635
CONFIDENTIAL

## INCOME STATEMENTS

The following charts provide selected financial data for the Company for its fiscal years ended March 31, 2006, through March 31, 2013 and the Company's forecast for its fiscal years ended March 31, 2014 and March 31, 2015. Financial data for FY 2006 through FY 2013 are based on the Company's audited financial statements. Data for 2014E is based on year-to-date performance through December 31, 2013 and management's forecast for the fourth quarter through March 31, 2014. Data for 2015P is based on management's forecast.

### Summary Income Statements 2005-2010

| ($'s in thousands) | For the Fiscal Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| Net Sales | $ 68,935 | $ 109,772 | $ 138,534 | $ 126,674 | $ 104,393 | $ 49,589 |
| Cost of Goods Sold | (59,084) | (90,667) | (110,329) | (104,006) | (88,457) | (45,801) |
| Gross Profit | $ 9,851 | $ 19,105 | $ 28,205 | $ 22,668 | $ 15,936 | $ 3,788 |
| Operating Expenses | (5,931) | (9,492) | (9,372) | (8,567) | (8,279) | (5,661) |
| EBIT | $ 3,920 | $ 9,613 | $ 18,833 | $ 14,100 | $ 7,657 | $ (1,873) |
| Depreciation and Amortization | 348 | 406 | 535 | 1,199 | 1,268 | 1,417 |
| EBITDA | $ 4,268 | $ 10,019 | $ 19,368 | $ 15,299 | $ 8,925 | $ (456) |
| Capital Expenditures | $ 555 | $ 1,702 | $ 4,744 | $ 3,160 | $ 1,079 | $ 435 |
| ***Operating Data:*** | | | | | | |
| Total Net Sales (growth) | NA | 59.2% | 26.2% | (8.6%) | (17.6%) | (52.5%) |
| Gross Profit (as % of Sales) | 14.3% | 17.4% | 20.4% | 17.9% | 15.3% | 7.6% |
| Operating Expenses (as % of Sales) | 8.6% | 8.6% | 6.8% | 6.8% | 7.9% | 11.4% |
| EBIT (as % of Sales) | 5.7% | 8.8% | 13.6% | 11.1% | 7.3% | (3.8%) |
| EBITDA (as % of Sales) | 6.2% | 9.1% | 14.0% | 12.1% | 8.5% | (0.9%) |

### Summary Income Statements 2010-2015P

| ($'s in thousands) | For the Fiscal Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014E | 2015P |
| Net Sales | $ 49,589 | $ 90,451 | $ 124,961 | $ 112,890 | $ 87,864 | $ 90,187 |
| Cost of Goods Sold | (45,801) | (79,454) | (114,843) | (105,102) | (83,128) | (77,210) |
| Gross Profit | $ 3,788 | $ 10,997 | $ 10,118 | $ 7,789 | $ 4,736 | $ 12,977 |
| Operating Expenses | (5,661) | (6,988) | (9,476) | (9,026) | (8,283) | (8,928) |
| EBIT | $ (1,873) | $ 4,009 | $ 642 | $ (1,237) | $ (3,547) | $ 4,049 |
| Addbacks and Adjustments[(1)] | - | - | 2,159 | 8,008 | 9,002 | 3,385 |
| Depreciation and Amortization | 1,417 | 1,443 | 1,569 | 1,752 | 1,556 | 1,556 |
| Adjusted EBITDA | $ (456) | $ 5,452 | $ 4,370 | $ 8,523 | $ 7,011 | $ 8,990 |
| Capital Expenditures | $ 435 | $ 454 | $ 2,326 | $ 1,685 | $ 2,000 | $ 2,000 |
| ***Operating Data:*** | | | | | | |
| Total Net Sales (growth) | (52.5%) | 82.4% | 38.2% | (9.7%) | (22.2%) | 2.6% |
| Gross Profit (as % of Sales) | 7.6% | 12.2% | 8.1% | 6.9% | 5.4% | 14.4% |
| Operating Expenses (as % of Sales) | 11.4% | 7.7% | 7.6% | 8.0% | 9.4% | 9.9% |
| EBIT (as % of Sales) | (3.8%) | 4.4% | 0.5% | (1.1%) | (4.0%) | 4.5% |
| Adjusted EBITDA (as % of Sales) | (0.9%) | 6.0% | 3.5% | 7.5% | 8.0% | 10.0% |

**Notes:**
(1) Addbacks and adjustments are explained in the financial section

Case: 19-04057 Doc# 86 Filed: 10/02/20 Entered: 10/02/20 14:29:05 Page 69 of 116
TR_PS_000253636
CONFIDENTIAL



SELLING AND
ADMINISTRATIVE EXPENSES

Selling and Administrative Expenses




| ($'s in thousands) | For the Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013E | 2014P | 2015P |
| Selling and Shipping | $ 2,219 | $ 3,274 | $ 4,556 | $ 4,235 | $ 4,035 | $ 4,263 |
| General and Administrative | 3,442 | 3,714 | 4,920 | 4,791 | 4,560 | 4,665 |
| Total | $ 5,661 | $ 6,988 | $ 9,476 | $ 9,026 | $ 8,595 | $ 8,928 |
| **Operating Expenses (% of Net Sales)** | | | | | | |
| Selling and Shipping | 4.5% | 3.6% | 3.6% | 3.8% | 4.9% | 4.7% |
| General and Administrative | 6.9% | 4.1% | 3.9% | 4.2% | 5.5% | 5.2% |
| Total | 11.4% | 7.7% | 7.6% | 8.0% | 10.4% | 9.9% |



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 70 of 116

TR_PS_000253637
CONFIDENTIAL



**ADDBACKS AND
ADJUSTMENTS**

The following chart summarizes the Company's addbacks and adjustments.

Addbacks and Adjustments

| ($'s in thousands) | For the Fiscal Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014E | 2015P |
| I-9 Productivity Loss | $ - | $ - | $ - | $ 4,970 | $ 4,872 | $ - |
| Excessive Workers' Compensation | - | - | 1,492 | 1,925 | 3,461 | 3,385 |
| Environmental Settlements | - | - | 556 | 176 | - | - |
| I-9 Settlement | - | - | - | 300 | 30 | - |
| Excessive Legal Fees | - | - | 111 | 631 | 361 | - |
| Transaction Costs | - | - | - | 6 | 278 | - |
| | $ - | $ - | $ 2,159 | $ 8,008 | $ 9,002 | $ 3,385 |

**I-9 Productivity Loss**

Pacific Steel has historically averaged approximately 70 hours of labor per ton of steel castings produced. Since the loss of 200 experienced employees in October 2011, as a result of a DHS I-9 audit, the Company went from an average of 72 hours per ton in FY 2011 to 91 hours per ton in FY 2013. This reduction had a significant negative impact on the Company's labor expenses per ton. Since the third quarter of FY 2013 the Company has experienced improvement in its hours per ton production and expects to achieve 85 hours per ton in the fourth quarter FY 2014. The Company believes that this production rate is an accurate reflection of its current operational capabilities and has adjusted FY 2013 and FY 2014E labor expenses per ton to reflect production at this rate. The Company expects to continue to make improvements and increase productivity to move Pacific Steel towards its historical rate of 70 hours of labor per ton.



**Estimated Profit Impact of Improvement in Hours per Ton Production**



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 71 of
116

TR_PS_000253638
CONFIDENTIAL



**Excessive Workers' Compensation**

The workers that were terminated as a result of the I-9 audit filed a large number of workers' compensation claims at the time of their departure. As a result of those claims the Company has experienced and expects to experience significantly higher workers' compensation premium expenses from FY 2012 to FY 2016P. The Company has estimated the incremental premium expenses incurred or to be incurred relative to its cost during FY 2012 in an effort to normalize its expenses. The Company expects its workers' compensation experience modification rate will decrease going forward as a result of a normalization of workers' compensation claims, which on an annual basis has already displayed significant improvement in FY 2014

**Annual Workers' Compensation Claims History and Forecast**



**Experience Modification Rate History and Forecast**



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 72 of
116

TR_PS_000253639
CONFIDENTIAL



### Environmental Settlements

In 2012, the Company favorably settled a long-standing private lawsuit brought on behalf of nearby residents alleging, among other things, odor, negligence, battery, and trespass. The Company incurred legal expenses and settlement costs. Pacific Steel has continued to invest in and improve its air emissions pollution controls and does not anticipate material air emissions issues going forward.

In 2013, Pacific Steel incurred settlement expenses related to a private lawsuit alleging violations of the Clean Water Act and the Company's storm water permit. The Company continues to update its processes and controls to ensure compliance with the effluent limits in its storm water permit.

### I-9 Settlement

Pacific Steel reached a tentative settlement agreement with the DHS for alleged violations of immigrations laws in March 2013. The Company is now enrolled in the DHS E-Verify program, which allows the Company to screen for fraudulent information and documents in employee I-9 form submissions.

### Excessive Legal Fees

As a result of a class action lawsuit that was filed in December 2011, the Company has incurred significant legal expenses. The lawsuit alleged certain violations of the California labor code regarding the timing and location of employee meal breaks as well as claims pertaining to pay practices regarding putting on and taking off protective equipment. The legal expenses related to the Company's class action lawsuit occurred in FY 2012, FY 2013, and FY 2014E.

The class action lawsuit also led the Company to hire a bankruptcy counsel to help in its negotiations for a potential settlement as well as prepare the Company to file for bankruptcy. Expenses related to these legal fees occurred in FY 2014E.

### Transaction Expenses

Transaction fees include expenses incurred for the recent financing transaction, the current sales transaction, and bankruptcy consultant fees.



CLEARY GULL




TR_PS_00253640
CONFIDENTIAL



## BALANCE SHEET

The following chart summarizes the Company's audited balance sheet as of March 31, 2013 and December 31, 2013.

**Balance Sheet**

| ($'s in thousands) | March 31, 2013 | December 31, 2013 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash | $ 242 | $ 164 |
| Accounts Receivable | 16,902 | 16,315 |
| Inventory | 7,586 | 7,101 |
| Prepaid Expenses | 116 | 131 |
| Deferred Income Taxes | 1,689 | 1,983 |
| Total Current Assets | 26,535 | 25,694 |
| Net Fixed Assets | 9,535 | 7,203 |
| Deferred Income Taxes | 1,011 | 394 |
| Total Assets | $ 37,081 | $ 33,291 |
| **LIABILITIES** | | |
| Current Liabilities | | |
| Accounts Payable | 3,019 | 5,533 |
| Accrued Expenses | 6,019 | 6,678 |
| Income Taxes | (674) | (1,735) |
| Total Current Liabilities | 8,364 | 10,476 |
| Total Debt | 3,994 | 808 |
| Pension Fund Liability | 2,606 | 2,120 |
| Shareholders' Equity | 22,117 | 19,887 |
| Total Liabilities and Shareholders' Equity | $ 37,081 | $ 33,291 |

### Equipment

In October 2013, an appraisal firm valued the Company's equipment and machinery at $4.7 million (Fair Market Value), $3.4 million (Orderly Liquidation Value), and $2.1 million (Forced Liquidation Value).

### Real Estate

In October 2012, an appraisal was conducted on all warehouses, manufacturing plants, and improvements located on ten parcels totaling 8.3 acres. The properties are owned by Berkeley Properties LLC, a wholly owned subsidiary of the Company. The value of the real estate was appraised at $13.2 million.

### Pension Fund Liability

The pension fund liability on the Company's balance sheet is for a non-union pension fund that was frozen in 2006. The Company annually contributes to this plan and incurs expenses that flow through its income statement. Pacific Steel also participates in a multi-employer pension plan for its union employees. The Company's contributions for this pension plan are determined by the union agreement. As of July 2012 (most recent available report), the multi-employer pension fund was 100.5% funded and in the green zone.



Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 74 of 116

TR_PS_000253641
CONFIDENTIAL

TR_PS_000253642

# EXHIBIT "2"



Speyside Equity LLC
55 Bridge St. Lambertville, NJ 08530 USA
Tel +1-800-897-9721
www.speysideequity.com

*Wednesday, March 19, 2014*

*STRICTLY PRIVATE AND CONFIDENTIAL*

Ryan Olsta
Cleary Gull Inc.
100 East Wisconsin Ave
24th Floor
Milwaukee, WI 53202

**Subject: Preliminary Non-binding Proposal for the Acquisition of Pacific Steel Casting Company Assets**

Dear Mr. Olsta:

Thank you for providing us with the Information relating to Pacific Steel ("Target"). We have read the information and are sending this letter to you in order to outline, generally the terms and conditions upon which Speyside Equity ("Buyer") is interested in pursuing further the acquisition of Target assets.

**<u>Transaction Structure/Valuation</u>**

Speyside Equtiy will acquire 100% of the the assets of Pacific Steel Casting Company via an appropriate legal entity ("Newco"), including but not limited to accounts receivable, inventory, machinery and equipment, all real property held by Pacific Steel and its subsidiary Berkley Properties LLC and intellectual property for $22.7 million. This price is reflective of a transaction that does not include the assumption of any of Target liabilities by Newco.

- Upon further due diligence, we may determine certain trade liabilities need to be assumed in the transaction to prevent an interruption of operations post closing.
- Newco would not assume any union contracts or liabilities related to such contracts
- Upon further review of the contracts with customers, we will determine whether such contracts will be assumed. The assumption of customer contracts will not affect the price of the transaction.
- Newco would not assume any of the agency/sales representative contracts
- Upon further review, we will determine whether certain lease contracts will be assumed by Newco.

**<u>Financing</u>**
- Sources
  - Committed capital from Speyside Fund.
  - Senior debt facilities customary for this type of transaction

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 77 of
116

SPEY0006485



SPEYSIDE EQUITY

**Assumptions**

- Final closing balances for accounts receivable and inventory are similar to the 12/31 AR Summary in the data room and the inventory appraisal provided in the data room respectively.
- The real estate appraisal is materially accurate
- The business will continue to operate normally until closing.
- The customers value the capabilities of Pacific Steel enough to work through this process without resourcing a significant amount of their parts.

**Due Diligence Focus**

- Meetings with largest customers
- Meetings with potential employees and management
- Verify sales and associated costs (details of price and cost per part, customer contracts, supplier costs and terms, any management costing data available, etc…)
- Understand capital expenditure requirements and condition of current operating assets
- Evaluate Target's working capital needs
- Full legal, regulatory and environmental due diligence

**Required Approvals and Other Information**

- This transaction has been reviewed by all of the principals within Buyer.
- Speyside confirms all necessary internal approvals have been obtained prior to the submission of this letter.
- Speyside is not aware of, nor anticipates becoming aware of any governmental and/or regulatory approvals that will be required in order for Speyside to enter into a definitive acquisition agreement.

**Identity of Purchaser**

- Target assets will be acquired by one or more entities formed by Speyside for the purposes of the contemplated acquisition.
- Name and contact information of principals and advisors potentially involved in the transaction follow. For the sake of brevity, mailing addresses have been omitted but are available upon request. Further potential advisors to be selected.

| Name | Firm | e-mail | Telephone |
|------|------|--------|-----------|
| Jeff Stone | Speyside Equity | jeffrey.stone@speysideequity.com | +1-248-890-5225 |
| Kevin Daugherty | Speyside Equity | kevin.daugherty@speysideequity.com | +1-267-377-9605 |
| Rob Sylvester | Speyside Equity | robert.sylvester@speysideequity.com | +1-734-674-1865 |
| Eric Wiklendt | Speyside Equity | eric.wiklendt@speysideequity.com | +1-956-648-7484 |

SPEY0006486



- As we continue in the process, we may engage additional advisors to assist with reviews subjects requiring specific expertise, such as legal and environmental matters. We will advise you of any additional advisors we intend to retain.
- We confirm that our advisors are aware of and have agreed to be bound by the terms of the Confidentiality Agreement previously executed by us.

## Specific Conditions and Board Approval

This non-binding expression of interest does not represent a firm offer to purchase any of the Target assets. Consummation of a transaction would be subject to the following:

- Completion of financial, operational and legal due diligence to the satisfaction of Buyer.
- Execution of various agreement and documents, such as a definitive purchase agreement and related documents.
- Identification and retention of key management personnel to operate the business post-closing.

## Qualifications of Buyer

- Speyside's previous acquisitions have included several manufacturing businesses. The acquisitions were completed on terms that met the sellers' financial, environmental and corporate governance objectives.
  - Acquisition of Fruit Systems Business from Evonik Degussa
  - Acquisition of Stahl Specialty Company (aluminum casting) from ThyssenKrupp
  - Acquisition of United Initiators from Evonik Degussa
  - Acquisition of Syrgis Performance Initiators from Edgewater Capital Partners (bolt-on acquisition for United Initiators)

*************************

If you are interested in moving forward with us, please be so kind as to contact us as soon as possible so that we can make appropriate arrangements to visit the facilities and meet the management team.

Regards,

Jeffrey A Stone
Managing Director

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 79 of 116

SPEY0006487

# EXHIBIT "3"

| | |
|---|---|
| **From**: | Kevin Daugherty [kevin.daugherty@speysideequity.com] |
| **Sent**: | 3/25/2014 11:35:46 AM |
| **To**: | Jeffrey Stone [jeffrey.stone@speysideequity.com] |
| **CC**: | Robert Sylvester [robert.sylvester@speysideequity.com]; Eric Wiklendt [eric.wiklendt@speysideequity.com] |
| **Subject**: | Re: Project Bear |

Our position at SO was mixed. PA had a very underfunded plan, while CA was fully funded. Given the strength of the Teamsters Grocery Workers in CA and the fully funded status of the pension, we mostly focused on keeping the healthcare costs competitive and the pension increases minimal in CA. For healthcare, it was actually cheaper for us to put the nonunion employees in the multi employer plan (which the union allowed).

My general view is that we should agree to accept the union and their plans if that's what we need to get the deal done. It looks like a good business if it can get out from under the legal and regulatory issues.

Kevin Daugherty
267 377 9605

On Mar 25, 2014, at 11:04 AM, Jeffrey Stone <jeffrey.stone@speysideequity.com> wrote:

Kevin, IBankers called back today and said my proposal to withdrawal from the multi-employer plan would kick us out of the transaction at this point as many bidders have agreed to remain in the plan. I told them I would consider remaining in the plan but freezing it, and they are checking whether this would trigger the withdrawal liability ($27mm calculated by the company for the bankruptcy filing). I was hoping you have some insight into this issue, left you a voice mail. The plan itself reports to be 103% funded, but I have not seen the assumptions. The other bidders do intend to negotiate some points with the union, but we are the only ones proposing to discard the entire agreement and pension plan.

Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T: 212-994-0308 x204
C: 248-890-5225
F: 855-269-3979

www.speysideequity.com

SPEY0006365

# EXHIBIT "4"



April 11, 2014

**PRIVATE AND CONFIDENTIAL**

Jeffrey Stone
Managing Director
Speyside Equity
1741 Tomlinson Road
Philadelphia, PA 19116

Dear Mr. Stone:

Thank you for your continued interest in a possible transaction (the "Transaction") involving Pacific Steel Casting Company ("Pacific Steel" or the "Company"). We hope you have found the management discussions productive and informative. Cleary Gull Inc. ("Cleary Gull") will continue to be available to address any follow-up due diligence requests. In order to enable Pacific Steel to select a limited number of partners to enter into final negotiations over an asset purchase agreement, Cleary Gull has been asked to solicit from you and certain other parties firm, detailed bids (each a "Proposal"), outlining the terms and conditions of a Transaction. The Company's objective is to enter into a definitive agreement for a Transaction with no, or as few as possible, conditions to closing other than court approval, no later than Friday, May 30, 2014.

Your Proposal must include, in addition to any other factors you would like to be considered, the following:

1. **Assets and Liabilities Assumed:** Please list in detail the assets and liabilities of the Company that you plan to assume. Specifically, address your proposed treatment of the multi-employer pension plan, frozen non-union pension plan, and pre- and post-petition normal course liabilities, payables, and accrued liabilities.

2. **Purchase Price:** The total purchase price of the assets and liabilities you are proposing to assume. We are requesting that your purchase price represent a specific cash amount and not a range of values. Please include a description of the material assumptions upon which you based your purchase price.

3. **Sources of Financing:** Your Proposal should discuss the availability and certainty of financing for a Transaction including a table of the expected sources and uses of funds, a discussion of any financing conditions or contingencies, and copies of term sheets, commitment letters or other indications from third party providers of financing of their level of interest in financing a Transaction. Please also include the contact information for all financing sources. In evaluating your Proposal the Company will consider the certainty and speed of closing as well as any financing contingency.

4. **Agreement:** A proposed form of Asset Purchase Agreement for the Transaction (the "Draft Agreement") has been placed in the data room. The Draft Agreement specifies terms upon which the Company would be willing to complete a Transaction. Your Proposal should include a copy of the Draft Agreement marked to show any changes that you require. Please

SPEY0006376

do not retype the Draft Agreement. Instead, all changes should be clearly marked (redlined) on the original document. In evaluating your Proposal the Company will consider the extent and nature of your proposed revisions.

5. **Real Estate:** Note if your Proposal includes the purchase of the Company's facilities and real estate. If your Proposal does not include the purchase of the Company's facilities and real estate, please outline the general terms, duration, and lease rates proposed in your analysis.

6. **Due Diligence and Timing:** Please include a specific timetable that you will require to (a) complete your remaining due diligence; (b) sign a final Purchase Agreement; and (c) close the Transaction. Also, please identify any important due diligence issues you would need to resolve prior to executing the Draft Agreement. It is Pacific Steel's intention to negotiate and execute the final Purchase Agreement as soon as possible following final selection of the party with whom Pacific Steel intends to enter into a Transaction.

7. **Contacts:** Your offer should indicate the names, telephone numbers, and e-mail addresses of appropriate contacts who will be prepared to answer questions regarding your Proposal.

8. **Other Approvals and Conditions:** Your Proposal should indicate any internal or third party approvals that you must obtain and any other facts or circumstances that can reasonably be foreseen that might affect your timing and/or certainty of closing a Transaction. Please outline your firm's approval process, including the steps already satisfied and those that are still outstanding, and identify any other material conditions or contingencies that must be resolved to close a Transaction.

Cleary Gull will be available to consult with interested parties prior to the submission of Proposals to clarify information and procedures and to answer questions.

**Your Proposal, including your proposed comments on the Draft Agreement, must be in writing and must be received no later than 5:00pm CT on <u>Wednesday, April 30, 2014</u>.** Your Proposal should be submitted to:

<div align="center">

Ryan A. Olsta, Managing Director
**CLEARY GULL INC.**
100 E. Wisconsin Ave., 24th Floor
Milwaukee, WI 53202
Fax: 414-291-4558
rolsta@clearygull.com

</div>

The Company shall have no obligation to continue negotiations or discussions with any party, regardless of whether a Proposal contains the highest proposed purchase price. Selection will be based, at the sole discretion of the Company, on a variety of factors, including the terms and conditions of each individual Proposal, as well as assessments of a given bidder's ability to successfully and expeditiously complete its Proposal. The Company expressly reserves the right, in its sole discretion, to evaluate the terms and conditions of any Proposal and to reject any or all Proposals and shall have no obligation to determine or disclose any reasons therefore. The Company further expressly reserves the right, in its sole discretion, to alter or terminate this process at any time. The existence and content of this letter are subject to the

Confidentiality Agreement you previously executed. This invitation shall not constitute a waiver or modification of any of the terms of such Confidentiality Agreement, the terms of which shall continue in full force and effect in their entirety.

**DO NOT CONTACT THE COMPANY UNDER ANY CIRCUMSTANTCES.** If you have any questions, please contact John Peterson (414-291-4551) or Ryan Olsta (414-291-4555).

On behalf of Pacific Steel, we wish to thank you for your interest in pursuing a Transaction and look forward to continuing to work with you.

Best regards,

**CLEARY GULL INC.**

John R. Peterson
Managing Director
jpeterson@clearygull.com

Ryan A. Olsta
Vice President
rolsta@clearygull.com

# EXHIBIT "5"

| From: | Kevin Daugherty [kevin.daugherty@speysideequity.com] |
|---|---|
| Sent: | 4/27/2014 10:29:29 PM |
| To: | Eric Wiklendt [eric.wiklendt@speysideequity.com] |
| CC: | Jeff Stone [jeffrey.stone@speysideequity.com]; Rob Sylvester [robert.sylvester@speysideequity.com]; Oliver Maier [oliver.maier@speysideequity.com] |
| Subject: | Re: Pacific Steel |
| Importance: | High |

Eric,

Thanks for sending this, although it looks almost identical to the last draft. Other than noting the importance of the SLB, I don't think any of my questions were addressed.

We will need clarity from Jeff on how this proposal will be further modified and presented.

Kevin Daugherty
267 377 9605

On Apr 27, 2014, at 9:36 PM, Eric Wiklendt <eric.wiklendt@speysideequity.com> wrote:

This is updated for commentary, sans the S&U tables. It seems like we want to think about that a little more based on how Jeff wants to play his cards. I can update those based on the way we go optimizing the aesthetics of the offers/options.

--ew

---

**From:** Jeffrey Stone [mailto:jeffrey.stone@speysideequity.com]
**Sent:** Saturday, April 26, 2014 5:44 PM
**To:** Kevin Daugherty
**Cc:** Eric Wiklendt; Robert Sylvester; Oliver Maier
**Subject:** Re: Pacific Steel

What we put in the proposal to position ourselves as the SH is not the same as what we will pay or we are willing to pay. As stated in a previous email, the debt and equity portions of the sources and uses are provided to demonstrate our financial ability to do the deal under those terms, but in no way does that mean we will. It is irrelevant to the estate what portion of equity we pay frankly, once they are confident we can fund the deal the way we describe it in the proposal.

Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T: 212-994-0308 x204
C: 248-890-5225
F: 855-269-3979

www.speysideequity.com

SPEY0006589

On Apr 26, 2014, at 11:14 AM, Kevin Daugherty <kevin.daugherty@speysideequity.com> wrote:

I am not suggesting that we pay any of these amounts in my email. I'm mostly focused on how we position ourselves in the process.

I like the deal at $13m plus a SLB valued at $10-13m and bank financing approaching $11m. I agree with Rob that I don't want to buy the real estate and I don't think $8 million of equity is justified.

Kevin Daugherty
267 377 9605

On Apr 26, 2014, at 12:28 PM, Kevin Daugherty <kevin.daugherty@speysideequity.com> wrote:

Thanks Eric.

My thoughts:

- should indicate up front that the long term use of the real estate is needed, as we intend to operate long term in Berkeley as an important local employer.

- if we are going to accept a rent cost of $800k- $1m per year, then we need to get credit for the market value that this represents: $10 - 13m.

- this means that we either buy the assets and assume a rent obligation or we buy the assets without a rent obligation.

- the value of our offer is the cash paid plus the value of the obligations assumed.

- $23m was the initial indication with no liabilities other than the contingent multi employer pension. I think Jeff assumed an initial value of $6m for the real estate. If we now add in the non contingent pension liability and rent, we should show the value of those obligations in our LOI.

Would this mean that we are offering:
- $17m in cash for assets excluding real estate
- $6m to purchase the real estate
- $2m for the nonunion pension
- $28m for the union pension
for a total EV of $53m?

If we did a SLB for $13m, would we then increase the value assigned to the real estate by $7m for a cash value of $30m and a total EV of $60m? This assumes a true SLB transaction where the family pays us $13m, from which we would pay $7m additional to the credit committee.

In our discussions, Jeff has talked about a $10m value for the real estate with a SLB and making our offer $13m for the non real estate assets and financing $11m of that from the bank. The term sheet doesn't support this so we might get screened out of the process if this isn't fixed.

It's not clear to me how the real estate purchase would work or how it should be presented. Will we pay $13m for non real estate assets and $6m for real estate, bringing the cash offer up to $19m?

SPEY0006590

Are we saying that we would not buy the real estate in any scenario and only assume market rents? This would be good for reducing equity, but I don't know if $13m cash gets us the stalking horse position.

- we should incentivize the credit committee to push the family to do the SLB at some point in the process. This will require that we place a low value on our purchase of real estate and a high value on a SLB.

- alternatively we could only show value assuming a SLB and not break out the components at this stage, although then we would not be following the process letter.

Other notes:
- term sheet doesn't support current sources-uses (e.g. real estate term loan is capped at $5m).

- what evidence of available cash is needed? If I need to supply bank statements, I can provide Monday morning, but not later as I'll be traveling.

Kevin Daugherty
267 377 9605

On Apr 26, 2014, at 6:59 AM, "Eric Wiklendt" <eric.wiklendt@speysideequity.com> wrote:

See attached draft for review.


**Eric Wiklendt**
Director
Speyside Equity
T:  212-994-0308 x206
C: 956-648-7484
F:  800-928-2781
eric.wiklendt@speysideequity.com



**From:** Jeffrey Stone [mailto:jeffrey.stone@speysideequity.com]
**Sent:** Thursday, April 24, 2014 3:21 PM
**To:** Eric Wiklendt
**Cc:** Robert Sylvester; Kevin Daugherty; Oliver Maier
**Subject:** Pacific Steel

Eric, can you prepare a draft proposal for the April 30th deadline and provide it by SAT.  I can then tweak it for our Speyside meeting on Monday afternoon for Committee approval.  Following are some notes on the approach:

- Total Consideration $23mm (just a number right now)
- All assets acquired
- Assumption of Multi-Employer Plan $XX (may apply a number)
- Assumption of Non-Union Pension Plan $xx (will apply a conservatively high number)
- Assumption of accrued liabilities (need to detail these and understand if we want to assume any)

- We need some language relating to $100K non-refundable deposit in exchange for an exclusive right to become the SH over the next 3 weeks (eliminating further negotiations with other parties).

SPEY0006591

- Sources & Uses Table: summarizes the above, and then shows our intended amount of equity. I think we should show a decent equity check, even if we intend to reduce the equity as we get to closing. For this proposal, it isn't about keeping the equity check at a certain amount, it is confirming #1 if the structure is reasonable or if it is a flyer that the financial advisors will view as unrealistic (hence the large equity amount) and #2 confirming if the bidder has the funds. It will benefit us to show a high amount that does not seem unrealistic and we should have no problem confirming we have the funds (possibly provide bank references that hold large amounts of liquid assets).

- We will provide a copy of The Private Bank term sheet, with some tweaks I will ask for from them before Tue. The Private Bank is credible and known by both Cleary Gull and the Fin Advisor for the Creditors Committee.

- Real Estate: We should say we can acquire the Real Property or not, and provide a different set of Surces and Uses for each. The key here is to provide a lower total consideration for the deal with the real property, as we want the sale leaseback. However, we also show flexibility and willingness to close without it if they view the sale leaseback as a risk to the deal for some reason we are not aware of.

- DD: we need to be aggressive here, like 3 weeks to a non-refundable deposit of a higher amount. Activities: Meetings with top 4 customers, meeting with Union representation, further confirmatory DD of management business plan. With Real Property - DD will likely be longer period and involve more actions (I need to speak with TPB about their specific requirements).

- We need to discuss the key points of why we should be the SH:
1) Have the funding - brief listing/history of our deals
2) Going concern intent in Berkley
3) Experience in the industry, at larger scale, and with very similar issues and customer base
4) Experience operating a business in CA with union contract
5) Flexibility, speed and long term nature of our funding (no constraints from LP's to return capital in set period, giving us ability to sign long term SLB agreement without worrying about affecting a short term exit event).
6) Current presence in China with greenfield plant = ability to provide assistance to management in executing/accelerating import business
7) We should reference our counsel: Gary is local and known, shows our commitment and seriousness


Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T: 212-994-0308 x204
C: 248-890-5225
F: 855-269-3979

www.speysideequity.com

<2014 04 25 Pacific Steel Bid Proposal.docx>

<2014 04 27 Pacific Steel Bid Proposal om.docx>

SPEY0006592

# EXHIBIT "6"

**From:** Kevin Daugherty <kevin.daugherty@speysideequity.com>
**Sent:** Sun, 27 Apr 2014 22:29:29 -0400
**To:** "Eric Wiklendt" <eric.wiklendt@speysideequity.com>
**CC:** "Jeff Stone" <jeffrey.stone@speysideequity.com>, "Rob Sylvester"
<robert.sylvester@speysideequity.com>, "Oliver Maier" <oliver.maier@speysideequity.com>
**Subject:** Re: Pacific Steel

Eric,

Thanks for sending this, although it looks almost identical to the last draft. Other than noting the importance of the SLB, I don't think any of my questions were addressed.

We will need clarity from Jeff on how this proposal will be further modified and presented.

Kevin Daugherty
+1 267 377 9605

On Apr 27, 2014, at 9:36 PM, Eric Wiklendt <eric.wiklendt@speysideequity.com> wrote:

> This is updated for commentary, sans the S&U tables. It seems like we want to think about that a little more based on how Jeff wants to play his cards. I can update those based on the way we go optimizing the aesthetics of the offers/options.
>
> --ew

**From:** Jeffrey Stone [mailto:jeffrey.stone@speysideequity.com]
**Sent:** Saturday, April 26, 2014 5:44 PM
**To:** Kevin Daugherty
**Cc:** Eric Wiklendt; Robert Sylvester; Oliver Maier
**Subject:** Re: Pacific Steel

What we put in the proposal to position ourselves as the SH is not the same as what we will pay or we are willing to pay. As stated in a previous email, the debt and equity portions of the sources and uses are provided to demonstrate our financial ability to do the deal under those terms, but in no way does that mean we will. It is irrelevant to the estate what portion of equity we pay frankly, once they are confident we can fund the deal the way we describe it in the proposal.

Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T:  +1-212-994-0308 x204
C: 248-890-5225
F:  855-269-3979


[www.speysideequity.com](http://www.speysideequity.com)


On Apr 26, 2014, at 11:14 AM, Kevin Daugherty <[kevin.daugherty@speysideequity.com](mailto:kevin.daugherty@speysideequity.com)> wrote:



I am not suggesting that we pay any of these amounts in my email. I'm mostly focused on how we position ourselves in the process.


I like the deal at $13m plus a SLB valued at $10-13m and bank financing approaching $11m. I agree with Rob that I don't want to buy the real estate and I don't think $8 million of equity is justified.

Kevin Daugherty

+1 267 377 9605

On Apr 26, 2014, at 12:28 PM, Kevin Daugherty <[kevin.daugherty@speysideequity.com](mailto:kevin.daugherty@speysideequity.com)> wrote:

Thanks Eric.


My thoughts:


- should indicate up front that the long term use of the real estate is needed, as we intend to operate long term in Berkeley as an important local employer.


- if we are going to accept a rent cost of $800k- $1m per year, then we need to get credit for the market value that this represents: $10 - 13m.


- this means that we either buy the assets and assume a rent obligation or we buy the assets without a rent obligation.

- the value of our offer is the cash paid plus the value of the obligations assumed.

- $23m was the initial indication with no liabilities other than the contingent multi employer pension. I think Jeff assumed an initial value of $6m for the real estate. If we now add in the non contingent pension liability and rent, we should show the value of those obligations in our LOI.

Would this mean that we are offering:

- $17m in cash for assets excluding real estate

- $6m to purchase the real estate

- $2m for the nonunion pension

- $28m for the union pension

for a total EV of $53m?

If we did a SLB for $13m, would we then increase the value assigned to the real estate by $7m for a cash value of $30m and a total EV of $60m? This assumes a true SLB transaction where the family pays us $13m, from which we would pay $7m additional to the credit committee.

In our discussions, Jeff has talked about a $10m value for the real estate with a SLB and making our offer $13m for the non real estate assets and financing $11m of that from the bank. The term sheet doesn't support this so we might get screened out of the process if this isn't fixed.

It's not clear to me how the real estate purchase would work or how it should be presented. Will we pay $13m for non real estate assets and $6m for real estate, bringing the cash offer up to $19m?

Are we saying that we would not buy the real estate in any scenario and only assume market rents? This would be good for reducing equity, but I don't know if $13m cash gets us the stalking horse position.

- we should incentivize the credit committee to push the family to do the SLB at some point in the process. This will require that we place a low value on our purchase of real estate and a high value on a SLB.

- alternatively we could only show value assuming a SLB and not break out the components at this stage, although then we would not be following the process letter.

Other notes:

- term sheet doesn't support current sources-uses (e.g. real estate term loan is capped at $5m).

- what evidence of available cash is needed? If I need to supply bank statements, I can provide Monday morning, but not later as I'll be traveling.

Kevin Daugherty

+1 267 377 9605

On Apr 26, 2014, at 6:59 AM, "Eric Wiklendt" <eric.wiklendt@speysideequity.com> wrote:

See attached draft for review.

**Eric Wiklendt**
Director

Speyside Equity
T:  +1-212-994-0308 x206
C: +1-956-648-7484
F:  +1-800-928-2781

eric.wiklendt@speysideequity.com

---

**From:** Jeffrey Stone [mailto:jeffrey.stone@speysideequity.com]
**Sent:** Thursday, April 24, 2014 3:21 PM
**To:** Eric Wiklendt
**Cc:** Robert Sylvester; Kevin Daugherty; Oliver Maier
**Subject:** Pacific Steel

Eric, can you prepare a draft proposal for the April 30th deadline and provide it by SAT.  I can then tweak it for our Speyside meeting on Monday afternoon for

Committee approval.  Following are some notes on the approach:

- Total Consideration $23mm (just a number right now)

- All assets acquired

- Assumption of Multi-Employer Plan $XX (may apply a number)

- Assumption of Non-Union Pension Plan $xx (will apply a conservatively high number)

- Assumption of accrued liabilities (need to detail these and understand if we want to assume any)

- We need some language relating to $100K non-refundable deposit in exchange for an exclusive right to become the SH over the next 3 weeks (eliminating further negotiations with other parties).

- Sources & Uses Table:  summarizes the above, and then shows our intended amount of equity.  I think we should show a decent equity check, even if we intend to reduce the equity as we get to closing.  For this proposal, it isn't about keeping the equity check at a certain amount, it is confirming #1 if the structure is reasonable or if it is a flyer that the financial advisors will view as unrealistic (hence the large equity amount) and #2 confirming if the bidder has the funds. It will benefit us to show a high amount that does not seem unrealistic and we should have no problem confirming we have the funds (possibly provide bank references that hold large amounts of liquid assets).

- We will provide a copy of The Private Bank term sheet, with some tweaks I will ask for from them before Tue.  The Private Bank is credible and known by both Cleary Gull and the Fin Advisor for the Creditors Committee.

- Real Estate:  We should say we can acquire the Real Property or not, and provide a different set of Surces and Uses for each.  The key here is to provide a lower total consideration for the deal with the real property, as we want the sale leaseback.  However, we also show flexibility and willingness to close without it if they view the sale leaseback as a risk to the deal for some reason we are not aware of.

- DD: we need to be aggressive here, like 3 weeks to a non-refundable deposit of a higher amount.  Activities:  Meetings with top 4 customers, meeting with Union representation, further confirmatory DD of management business plan. With Real Property - DD will likely be longer period and involve more actions (I need to speak with TPB about their specific requirements).

- We need to discuss the key points of why we should be the SH:

1) Have the funding - brief listing/history of our deals

2) Going concern intent in Berkley

3) Experience in the industry, at larger scale, and with very similar issues and customer base

4) Experience operating a business in CA with union contract

5) Flexibility, speed and long term nature of our funding (no constraints from LP's to return capital in set period, giving us ability to sign long term SLB agreement without worrying about affecting a short term exit event).

6) Current presence in China with greenfield plant = ability to provide assistance to management in executing/accelerating import business

7) We should reference our counsel: Gary is local and known, shows our commitment and seriousness

Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T: +1-212-994-0308 x204
C: 248-890-5225
F: 855-269-3979

www.speysideequity.com

<2014 04 25 Pacific Steel Bid Proposal.docx>

<2014 04 27 Pacific Steel Bid Proposal om.docx>

# EXHIBIT "7"

**From:** Kevin Daugherty <kevin.daugherty@speysideequity.com>
**Sent:** Tue, 06 May 2014 16:32:28 -0500
**To:** "Rob Sylvester" <robert.sylvester@speysideequity.com>, "Jeff Stone" <jeffrey.stone@speysideequity.com>, "Oliver Maier" <oliver.maier@speysideequity.com>, "Eric Wiklendt" <eric.wiklendt@speysideequity.com>
**Subject:** Fwd: Pacific Steel
**Attachments:**
· attached_file_1.vnd.openxmlformats-officedocument.wordprocessingml.document *(92 kb)*
· attached_file_2.html *(490 b)*

---

Option B thoughts:


Increasing the monthly rent from $75,833 to $89,554 is an increase of $164,652. At a 7% cap rate, that additional rent is worth $2.35 million in additional SLB value. If you use the 7.5% cap rate per the appraisal, it's worth $2.2 million in additional SLB price. Note that while the appraisal uses 7.5%, it includes charts showing current cap rates at less than 7%.


Removing $2.2 of in-transit casting liabilities and replacing it with the incremental SLB value of higher rent results in the same value to the seller.


If you then add up to $1m each of post petition A/P Accrued Liabilities, the value of our offer has increased by up to $2m.


Kevin Daugherty

+1 267 377 9605


Begin forwarded message:


> **From:** "Olsta, Ryan" <rolsta@clearygull.com>
> **Date:** May 6, 2014 at 10:16:01 AM CDT
> **To:** "Jeff Stone (jeffrey.stone@speysideequity.com)" <jeffrey.stone@speysideequity.com>, "Kevin Daugherty (kevin.daugherty@speysideequity.com)" <kevin.daugherty@speysideequity.com>, "Robert Sylvester (robert.sylvester@speysideequity.com)" <robert.sylvester@speysideequity.com>
> **Subject: Pacific Steel**
>
>
> Gentlemen,
>
>
> Attached is the markup. Talk to you soon.
>
>
> **Ryan Olsta | Managing Director**

**Cleary Gull**
100 East Wisconsin Avenue, Suite 2400

Milwaukee, Wisconsin 53202
414-291-4555 Office | 414-291-4558 Fax

rolsta@clearygull.com | clearygull.com

This email may contain confidential information for the sole use of the intended recipient. Any review, use or disclosure by others is strictly prohibited. If you received this in error, please contact the sender and delete all copies of this message. In accordance with applicable regulations, Cleary Gull reserves the right to monitor, review and retain all electronic communications, including emails. Cleary Gull is the trade name of Cleary Gull Inc. and its affiliate Cleary Gull Advisors Inc. Securities and brokerage services are offered by Cleary Gull Inc., member FINRA. Cleary Gull does not accept any trade instructions by email.

~~Wednesday, April 30th~~, *2014*

*STRICTLY PRIVATE AND CONFIDENTIAL*

Ryan Olsta
Cleary Gull Inc.
100 East Wisconsin Ave
24th Floor
Milwaukee, WI 53202

**Subject: Proposal for the Acquisition of Pacific Steel Casting Company Assets**

Dear Mr. Olsta:

Thank you for providing us with the information relating to Pacific Steel Casting Company and Berkeley Properties, LLC (collectively, "Target" or "Seller"). We have reviewed the information and are sending this letter to you in order to outline specifically the terms and conditions upon which Speyside Equity ("Buyer") is interested in pursuing the acquisition of Target further. Speyside Equity is interested in operating the business over the long term, and therefore we prefer to acquire the business under option B, with a long term lease and focus on building the operating business without the distractions of real property ownership. However, we are providing two options for the acquisition of the Target assets: with the real property included in the acquisition and without the real property in the acquisition (we understand there is a party interested in a long term sale leaseback of the real property) including the high level lease terms we would consider.

**Option A: Buyer will acquire ~~100% of the~~specific assets of Target including the real property, and assume specific liabilities.**

~~*Total Consideration*~~*Cash Purchase Price*: $~~17.8~~23 million, plus the amount of prepaid workers' compensation insurance premium as of Closing (based on the excess premiums paid through Closing over the pro rata annual premium), plus amounts on deposit as of Closing with utilities or other vendors for a total cash purchase price of approximately $20.8 million.

*Assets Purchased*
- All assets other than "Excluded Assets" as described in the enclosed Asset Purchase Agreement draft

*Liabilities Assumed*
- Multi-employer pension plan: $27 million (contingent)
- Non-union pension plan: ~~$3 million~~
- ~~Import Castings In-Transit: $2.2mm~~
- Ordinary course of business post-petition accounts payable (estimated<$1.0 million)



- Ordinary course of business post-petition accrued expenses for customer rebates and for goods or materials received or in transit or services provided but not yet invoiced as of the Closing Date (estimated <$1.0 million)

(~~We also assessed a~~ $1 million of the cash purchase price would be deposited in escrow for pre-Closing ~~mm deduction for~~ environmental related risks associated with acquiring the real property that arise within six (6) months after Closing)

~~Total Cash at  Closing: $16.8 million~~

*Major Assumptions:*

1) Pacific Steel Casting continues to operate normally during the bankruptcy process – backlog is within normal levels, orders are met with normal timeliness, working capital stays at normal levels, no major customers pull patterns from Pacific Steel, etc…

2) The price is based on the 3/31/2014 AR and inventory balances and mix as evidenced by the ~~3/31/2014 A/R Aged Trial Balance~~ Seller's audited financial statements for the year ended, the equipment appraisal in the data room and the real property appraisal in the data room.

3) Pacific Steel Casting has made 100% of the minimum required contribution to the Non-Union pension plan for the March 31, 2014 Fiscal Year before closing.

4) The import castings in-transit on the accrued liabilities list in the data room are not in the possession of Pacific Steel, have not already been sold, and have customer orders for 100% of the parts (we would assume if they were in possession or sold, they would be in accounts payable)

**Option B:  Buyer will acquire ~~100% of the~~ specific assets of Target *excluding* the real property assets of Berkeley Properties (and also excluding the membership interest in Berkeley Properties held by Pacific Steel Casting), enter into a long term lease, and assume specific liabilities.**

~~Total Consideration:  $16mm~~ *Cash Purchase Price:*  $11.8 million, plus the amount of prepaid workers' compensation insurance premium as of Closing (based on the excess premiums paid through Closing over the pro rata annual premium), plus amounts on deposit as of Closing with utilities or other vendors for a total cash purchase price of approximately $14.8 million.

*Assets Purchased*

- All Assets of Pacific Steel Casting Company, ~~excluding~~ other than membership interest in Berkley Properties and other "Excluded Assets" as described in the enclosed Asset Purchase Agreement draft

*Liabilities Assumed*

- Multi-employer pension plan valued at $27 million (contingent)
- Non-union pension plan ~~valued at $3 million~~
- ~~Import Castings In-transit:  $2.2 million~~
- Ordinary course of business post-petition accounts payable (estimated<$1.0 million)

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 102 of 116
**100B**
TR_PS_000255933



*Ordinary course of business post-petition accrued expenses for customer rebates and for goods or materials received or in transit or services provided but not yet invoiced as of the Closing Date (estimated <$1.0 million)*

*~~Total Cash at Closing: $10.8 million~~*

*Lease Terms*
- o Monthly rent of $89,554.00, subject to annual cost of living increases not less than 2% or greater than 4% per year~~75,833.33~~
- o Triple net lease
- o 15 year term, 5 year extension option

(Based on ~~an assumed $13 million valuation and 7% cap rate, resulting in $910K per annum~~current lease)

*Major Assumptions:*
1) Pacific Steel Casting continues to operate normally during the bankruptcy process – backlog is within normal levels, orders are met with normal timeliness, working capital stays at normal levels, no major customers pull patterns from Pacific Steel, etc…
2) The price is based on the 3/31/2014 AR and inventory balances and mix as evidenced by the ~~3/31/2014 A/R Aged Trial Balance~~Seller's audited financial statements for the year then ended, the equipment appraisal in the data room and the real property appraisal in the data room.
3) Pacific Steel Casting has made 100% of the minimum required contribution to the Non-Union pension plan for the March 31, 2014 Fiscal Year before closing.
4) The import castings in-transit on the accrued liabilities list in the data room are not in the possession of Pacific Steel Casting, have not already been sold, and have customer orders for 100% of the parts (we would assume if they were in possession or sold, they would be in accounts payable)

**Financing**

For this transaction, Speyside Equity will partner with a bank for a normal senior debt facility. Enclosed is a term sheet from The PrivateBank And Trust Company and the primary contact is Robert Corsentino, Managing Director (#312–564-6969). Estimated sources and uses are summarized below. The Sources and Uses have not been adjusted to reflect changes in the purchase price.

*Sources & Uses – Including Real Estate*

| Sources | Uses |
|---|---|
| $7 million Term Loans | $16.8 million Cash to Seller |
| $5 million Drawn LOC | $500K transaction expenses |

Case: 19-04057   Doc# 86   Filed: 10/02/20   Entered: 10/02/20 14:29:05   Page **103**c of 116

TR_PS_000255934



$5.3 million Speyside Cash
$17.3 million                               $17.3 million

*Sources & Uses – Excluding Real Estate (Lease Scenario)*

Sources                               Uses
$2 million Term Loans                 $10.8 million Cash to Seller
$5 million Drawn LOC                  $500K transaction expenses
$4.3 million Speyside Cash
$11.3 million                         $11.3 million

Speyside Equity has committed capital from its four principals with ample liquid assets to fund this transaction. Proof of funds is available upon request. You can contact either Kevin Daugherty or Jeff Stone for this purpose.


**Due Diligence Focus**
Speyside Equity has performed considerable due diligence at this point. The final due diligence efforts would be focused on a few key areas:

- Meetings with the four largest customers
- Meetings with union representatives
- Confirmatory DD of the assets purchased (primarily AR, INV, equipment), and the liabilities assumed

Speyside expects to sign an asset purchase agreement (Speyside's revised draft of the Asset Purchase Agreement from the data room is enclosed) and complete the final due diligence within 3 weeks of acceptance of our proposal. If real property is purchased by Speyside, it will likely take slightly longer to complete due diligence due to regulatory requirements the bank must meet in order to finance the purchase. Speyside expects to be in a position to close the transaction by July 21, 2014, assuming timely approval by the Bankruptcy Court.

**Identity of Purchaser**
Below are the names and contact information of principals involved in the transaction. For the sake of brevity, mailing addresses have been omitted but are available upon request.

| **Name** | **Firm** | **e-mail** | **Telephone** |
|---|---|---|---|
| Jeff Stone | Speyside Equity | jeffrey.stone@speysideequity.com | +1-248-890-5225 |
| Kevin Daugherty | Speyside Equity | kevin.daugherty@speysideequity.com | +1-267-377-9605 |
| Oliver Maier | Speyside Equity | oliver.maier@speysideequity.com | +1.917.575.6866 |
| Rob Sylvester | Speyside Equity | robert.sylvester@speysideequity.com | +1-734-674-1865 |

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 104 of 116

TR_PS_000255935



Eric Wiklendt        Speyside Equity        eric.wiklendt@speysideequity.com        +1-956-648-7484

As we continue in the process, we may engage additional advisors to assist with reviews of subjects requiring specific expertise, such as legal and environmental matters.

<u>**Required Approvals and Other Information**</u>
This transaction has been reviewed by all of the principals within Buyer. Speyside Equity confirms all necessary internal approvals have been obtained prior to the submission of this letter. Speyside Equity is not aware of, nor anticipates becoming aware of any governmental and/or regulatory approvals that will be required in order for Speyside Equity to enter into a definitive asset purchase agreement.

<u>**Qualifications of Buyer**</u>
Speyside Equity is well positioned to consummate a transaction that is optimally beneficial to the Seller, creditors, and the community. The firm has the motivation, flexibility, funding and track record to complete the acquisition in a timely manner.  Speyside Equity has retained Gary Kaplan of Farella Braun + Martel LLP as bankruptcy counsel in order to facilitate and expedite the proposed transaction.

Speyside Equity funding is provided solely by its principles, which offers flexibility and speed that other private equity firms generally are unable to match as they usually have constraints related to their Limited Parter arrangements requiring certain approvals, certain transaction guidelines and a defined investment period to return invested capital. Speyside Equity does not have maximum hold periods, and therefore, for example, Speyside can enter into long term lease agreements and make long term investment decisions.  In this particular case, **Speyside intends to operate Pacific Steel for the long term at the current location**.

Speyside Equity's previous acquisitions have included several manufacturing businesses.

- Acquisition of Fruit Systems Business, later renamed Sweet Ovations, from Evonik Degussa ($100 million in revenue fruit processing business, with plant locations in Philadelphia and Gardena, CA). ***Sweet Ovations had union workforces in both Gardena and Philadelphia, and was a participant in Multi-employer pension plans.***
- Acquisition of Stahl Specialty Company from ThyssenKrupp ($130 million in revenue aluminum casting business)
- Acquisition of United Initiators from Evonik Degussa ($300 million in revenue chemicals business, plants in Munich, Sweden, Ohio, Arkansas, China, Australia)
- Acquisition of Syrgis Performance Initiators from Edgewater Capital Partners (bolt-on acquisition for United Initiators)
- Acquisition of Magic Valley Fresh Frozen from the Oscar Wyatt Family Office ($20 million in revenue vegetable processing business)

Speyside Equity has previously owned a foundry of similar revenue size and scope to the Target, named Stahl Specialty Company. This business produced large castings in size similar to the Target and shared a similar customer base. Speyside Equity's deep operational knowledge of foundries will allow it to operate the Target profitably as a going concern for years to come in Berkeley, California.  In addition, Speyside Equity has experience operating businesses located in California with union contracts.  Speyside Equity also has a current portfolio company that has operations in China.  The firm believes that this local operating knowledge will be



beneficial for accelerating the import business of the Target. All of these factors combined will allow Speyside Equity to work quickly and flexibly to complete the transaction, and successfully operate the business post closing.

If you are interested in moving forward with us, please be so kind as to contact Speyside Equity as soon as possible so that we can make appropriate arrangements to move forward with this transaction.

Regards,


Jeffrey A Stone
Managing Director
Speyside Equity

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 106 OF 116

TR_PS_000255937

# EXHIBIT "8"

**From**: Jeffrey Stone [jeffrey.stone@speysideequity.com]
**Sent**: 5/9/2014 10:59:31 AM
**To**: Olsta, Ryan [rolsta@clearygull.com]
**CC**: Kevin Daugherty [kevin.daugherty@speysideequity.com]; Robert Sylvester [robert.sylvester@speysideequity.com]; Eric Wiklendt [eric.wiklendt@speysideequity.com]; Oliver Maier [oliver.maier@speysideequity.com]
**Subject**: Re: Pacific Steel
**Attachments**: 2014 05 09 Pacific Steel Bid Proposal.pdf; Untitled attachment 00207.htm

SPEY0006766

Sincerely,

Jeffrey A. Stone
Managing Director
Speyside Equity
T:  +1-212-994-0308 x204
C:  248-890-5225
F:  855-269-3979

www.speysideequity.com

On May 9, 2014, at 9:05 AM, "Olsta, Ryan" <rolsta@clearygull.com> wrote:

> Jeff,
>
> Please let me know when you have a minute to discuss.  Thanks.
>
> **Ryan Olsta | Managing Director**
> **Cleary Gull**
> 100 East Wisconsin Avenue, Suite 2400
> Milwaukee, Wisconsin 53202
> 414-291-4555 Office | 414-291-4558 Fax
> rolsta@clearygull.com | clearygull.com

This email may contain confidential information for the sole use of the intended recipient. Any review, use or disclosure by others is strictly prohibited. If you received this in error, please contact the sender and delete all copies of this message. In accordance with applicable regulations, Cleary Gull reserves the right to monitor, review and retain all electronic communications, including emails. Cleary Gull is the trade name of Cleary Gull Inc. and its affiliate Cleary Gull Advisors Inc. Securities and brokerage services are offered by Cleary Gull Inc., member FINRA. Cleary Gull does not accept any trade instructions by email.



Speyside Equity LLC
55 Bridge St. Lambertville, NJ 08530 USA
Tel +1-800-897-9721
www.speysideequity.com

*Wednesday, May 7, 2014*

*STRICTLY PRIVATE AND CONFIDENTIAL*

Ryan Olsta
Cleary Gull Inc.
100 East Wisconsin Ave
24th Floor
Milwaukee, WI 53202

**Subject: Proposal for the Acquisition of Pacific Steel Casting Company Assets**

Dear Mr. Olsta:

Thank you for providing us with the information relating to Pacific Steel Casting Company and Berkeley Properties, LLC (collectively, "Target" or "Seller"). We have reviewed the information and are sending this letter to you in order to outline specifically the terms and conditions upon which Speyside Equity ("Buyer") is interested in pursuing the acquisition of Target further. Speyside Equity is interested in operating the business over the long term, and therefore we prefer to acquire the business under option B, with a long term lease and focus on building the operating business without the distractions of real property ownership. However, we are providing two options for the acquisition of the Target assets: with the real property included in the acquisition and without the real property in the acquisition (we understand there is a party interested in a long term sale leaseback of the real property) including the high level lease terms we would consider.

**<u>Option A: Buyer will acquire specific assets of Target including the real property, and assume specific liabilities.</u>**

*Cash Purchase Price:* $17.3 million

*Assets Purchased*
- All assets
- Specifically excluding Utility Deposits

*Liabilities Assumed*
- Multi-employer pension plan: $27 million (contingent)
- Non-union pension plan
- Specific ordinary course of business accounts payable of approximately $2 million
- Specific ordinary course accrued expenses for customer rebates and for goods or materials received in transit but not yet invoiced as of the Closing Date of approximately $1 million

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 110 of
116

SPEY0006768



*Major Assumptions:*

1) Pacific Steel Casting continues to operate normally during the bankruptcy process – backlog is within normal levels, orders are met with normal timeliness, working capital stays at normal levels, no major customers pull patterns from Pacific Steel, etc…

2) The price is based on the 3/31/2014 AR and inventory balances and mix as evidenced by the Seller's audited financial statements for year ended, the equipment appraisal in the data room and the real property appraisal in the data room.

3) Pacific Steel Casting has made 100% of the minimum required contribution to the Non-Union pension plan for the March 31, 2014 Fiscal Year before closing.

4) The import castings in-transit on the accrued liabilities list in the data room are not in the possession of Pacific Steel, have not already been sold, and have customer orders for 100% of the parts (we would assume if they were in possession or sold, they would be in accounts payable)

**Option B:  Buyer will acquire specific assets of Target *excluding* the real property assets of Berkley Properties (and also excluding the membership interest in Berkeley Properties held by Pacific Steel Casting), enter into a long term lease, and assume specific liabilities.**

*Cash Purchase Price:*  $11.3mm

*Assets Purchased*
- All Assets of Pacific Steel Casting Company, other than membership interest in Berkley Properties and other "Excluded Assets" as described in the enclosed Asset Purchase Agreement draft
- Specifically excluding Utility Deposits

*Liabilities Assumed*
- Multi-employer pension plan valued at $27 million (contingent)
- Non-union pension plan
- Specific ordinary course of business accounts payable of approximately $2 million
- Specific ordinary course accrued expenses for customer rebates and for goods or materials received in transit but not yet invoiced as of the Closing Date of approximately $1 million

*Lease Terms*
  - Monthly rent of $89,554.00 subject to annual cost of living increases to be negotiated.
  - Triple net lease
  - 15 year term, 5 year extension option

(Based on current lease)

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page **105**

SPEY0006769



**SPEYSIDE** EQUITY

*Major Assumptions:*

1) Pacific Steel Casting continues to operate normally during the bankruptcy process – backlog is within normal levels, orders are met with normal timeliness, working capital stays at normal levels, no major customers pull patterns from Pacific Steel, etc…

2) The price is based on the 3/31/2014 AR and inventory balances and mix as evidenced by the Seller's audited financial statements for the year ended, the equipment appraisal in the data room and the real property appraisal in the data room.

3) Pacific Steel Casting has made 100% of the minimum required contribution to the Non-Union pension plan for the March 31, 2014 Fiscal Year before closing.

4) The import castings in-transit on the accrued liabilities list in the data room are not in the possession of Pacific Steel Casting, have not already been sold, and have customer orders for 100% of the parts (we would assume if they were in possession or sold, they would be in accounts payable)

**Financing**

For this transaction, Speyside Equity will partner with a bank for a normal senior debt facility. Enclosed is a term sheet from The PrivateBank And Trust Company and the primary contact is Robert Corsentino, Managing Director (#312–564-6969). Estimated sources and uses are summarized below.

*Sources & Uses – Including Real Estate*

| Sources | Uses |
|---|---|
| $7 million Term Loans | $17.3 million Cash to Seller |
| $5 million Drawn LOC | $500K transaction expenses |
| $5.8 million Speyside Cash | |
| $17.8 million | $17.8 million |

*Sources & Uses – Excluding Real Estate (Lease Scenario)*

| Sources | Uses |
|---|---|
| $2 million Term Loans | $11.3 million Cash to Seller |
| $5 million Drawn LOC | $500K transaction expenses |
| $4.8 million Speyside Cash | |
| $11.8 million | $11.8 million |

Speyside Equity has committed capital from its four principals with ample liquid assets to fund this transaction. Proof of funds is available upon request. You can contact either Kevin Daugherty or Jeff Stone for this purpose.

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 112 of 116

SPEY0006770



## Due Diligence Focus

Speyside Equity has performed considerable due diligence at this point. The final due diligence efforts would be focused on a few key areas:

- Meetings with the four largest customers
- Meetings with union representatives
- Confirmatory DD of the assets purchased (primarily AR, INV, equipment), and the liabilities assumed

Speyside expects to sign an asset purchase agreement (Speyside's revised draft of the Asset Purchase Agreement from the data room is enclosed) and complete the final due diligence within 3 weeks of acceptance of our proposal. If real property is purchased by Speyside, it will likely take slightly longer to complete due diligence due to regulatory requirements the bank must meet in order to finance the purchase. Speyside expects to be in a position to close the transaction by July 21, 2014, assuming timely approval by the Bankruptcy Court.

## Identity of Purchaser

Below are the names and contact information of principals involved in the transaction. For the sake of brevity, mailing addresses have been omitted but are available upon request.

| Name | Firm | e-mail | Telephone |
|------|------|--------|-----------|
| Jeff Stone | Speyside Equity | jeffrey.stone@speysideequity.com | +1-248-890-5225 |
| Kevin Daugherty | Speyside Equity | kevin.daugherty@speysideequity.com | +1-267-377-9605 |
| Oliver Maier | Speyside Equity | oliver.maier@speysideequity.com | +1.917.575.6866 |
| Rob Sylvester | Speyside Equity | robert.sylvester@speysideequity.com | +1-734-674-1865 |
| Eric Wiklendt | Speyside Equity | eric.wiklendt@speysideequity.com | +1-956-648-7484 |

As we continue in the process, we may engage additional advisors to assist with reviews of subjects requiring specific expertise, such as legal and environmental matters.

## Required Approvals and Other Information

This transaction has been reviewed by all of the principals within Buyer. Speyside Equity confirms all necessary internal approvals have been obtained prior to the submission of this letter. Speyside Equity is not aware of, nor anticipates becoming aware of any governmental and/or regulatory approvals that will be required in order for Speyside Equity to enter into a definitive asset purchase agreement.

## Qualifications of Buyer

Speyside Equity is well positioned to consummate a transaction that is optimally beneficial to the Seller, creditors, and the community. The firm has the motivation, flexibility, funding and track record to complete the



SPEYSIDE EQUITY

acquisition in a timely manner. Speyside Equity has retained Gary Kaplan of Farella Braun + Martel LLP as bankruptcy counsel in order to facilitate and expedite the proposed transaction.

Speyside Equity funding is provided solely by its principles, which offers flexibility and speed that other private equity firms generally are unable to match as they usually have constraints related to their Limited Parter arrangements requiring certain approvals, certain transaction guidelines and a defined investment period to return invested capital. Speyside Equity does not have maximum hold periods, and therefore, for example, Speyside can enter into long term lease agreements and make long term investment decisions. In this particular case, **Speyside intends to operate Pacific Steel for the long term at the current location**.

Speyside Equity's previous acquisitions have included several manufacturing businesses.

- Acquisition of Fruit Systems Business, later renamed Sweet Ovations, from Evonik Degussa ($100 million in revenue fruit processing business, with plant locations in Philadelphia and Gardena, CA). ***Sweet Ovations had union workforces in both Gardena and Philadelphia, and was a participant in Multi-employer pension plans.***
- Acquisition of Stahl Specialty Company from ThyssenKrupp ($130 million in revenue aluminum casting business)
- Acquisition of United Initiators from Evonik Degussa ($300 million in revenue chemicals business, plants in Munich, Sweden, Ohio, Arkansas, China, Australia)
- Acquisition of Syrgis Performance Initiators from Edgewater Capital Partners (bolt-on acquisition for United Initiators)
- Acquisition of Magic Valley Fresh Frozen from the Oscar Wyatt Family Office ($20 million in revenue vegetable processing business)

Speyside Equity has previously owned a foundry of similar revenue size and scope to the Target, named Stahl Specialty Company. This business produced large castings in size similar to the Target and shared a similar customer base. Speyside Equity's deep operational knowledge of foundries will allow it to operate the Target profitably as a going concern for years to come in Berkeley, California. In addition, Speyside Equity has experience operating businesses located in California with union contracts. Speyside Equity also has a current portfolio company that has operations in China. The firm believes that this local operating knowledge will be beneficial for accelerating the import business of the Target. All of these factors combined will allow Speyside Equity to work quickly and flexibly to complete the transaction, and successfully operate the business post closing.

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 11408 of
116

SPEY0006772



If you are interested in moving forward with us, please be so kind as to contact Speyside Equity as soon as possible so that we can make appropriate arrangements to move forward with this transaction.

Regards,

Jeffrey A Stone
Managing Director
Speyside Equity

Case: 19-04057    Doc# 86    Filed: 10/02/20    Entered: 10/02/20 14:29:05    Page 115 of
116

SPEY0006773

# EXHIBIT "9"