

The following constitutes the Memorandum Decision of
the Court.  Signed: August 17, 2022

**Roger L. Efremsky**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 19-40193-RLE |
| PACIFIC STEEL CASTING COMPANY LLC | Chapter 7 |
| Debtor, | |
| _____ | |
| SARAH L. LITTLE, Chapter 7 Trustee | Adversary Proceeding |
| Plaintiff, | No. 19-4057-RLE |
| v. | |
| SPEYSIDE FUND, LLC, a Delaware limited liability company, et al., | |
| Defendants. | |
| _____ | |

**Memorandum Decision re Speyside Defendants' Motion for Partial
Summary Judgment and Trustee's and Second Street's Joint Motion
for Partial Summary Judgment**

**I. Introduction**

In 2014, Second Street Properties, f/k/a Pacific Steel

194057 msj                              -1-

Casting Company ("Second Street") and its wholly owned subsidiary Berkeley Properties, LLC ("Berkeley Properties") filed chapter 11 cases. At the time, Second Street had a collective bargaining agreement (the "CBA") with its union employees and participated in a multiemployer pension plan ("Local 164B" and the "MEP"). The court approved Second Street's sale of its steel foundry business to a new entity referred to here as Pacific Steel or the Debtor.

The sale was documented by an asset purchase agreement (the "APA") which was structured to comply with ERISA §4204 so that Second Street could avoid paying the large withdrawal liability to the MEP that it otherwise faced, then estimated to be between $20 million and $27 million (the "Contingent Withdrawal Liability"). To take advantage of this special treatment, ERISA required both parties to the transaction to do certain things. As buyer, Pacific Steel had to post and maintain a bond payable upon default to the MEP and perform in a certain manner for the five pension plan years following the sale - the contingency period. As seller, Second Street had to provide a deed of trust on the real property owned by its wholly owned subsidiary. Second Street's chapter 11 plan was also structured to comply with these provisions and to satisfy the concerns of the trustees of the MEP (the "MEP Trustees").

Before the contingency period had elapsed, Pacific Steel failed to maintain the conditions for eliminating the Contingent Withdrawal Liability. Pacific Steel later stopped contributing to the MEP and then filed this chapter 7 case.

The chapter 7 trustee for Pacific Steel's estate (the "Trustee") has sued the Speyside Defendants - former owners and

194057 msj                    -2-

managers of Pacific Steel - alleging, in brief, that (1) under the APA, Pacific Steel agreed to either assume the Contingent Withdrawal Liability or to indemnify Second Street for it; and (2) Pacific Steel's financial statements failed to properly account for the Contingent Withdrawal Liability, in effect concealing the fact that it was insolvent from inception, and inflated the value of its inventory. These theories are the factual premise for each of the Trustee's fraudulent transfer and breach of fiduciary duty claims.

## II. The Competing Motions for Partial Summary Judgment

Before the court are competing motions for summary judgment that turn on the interpretation of the APA.

### A. The Speyside Motion

The Speyside Fund LLC ("Speyside"), the Alcast Company, Krishnan Venkatesan, Jeffrey Stone, Eric Wiklendt, Jerry Johnson, Brian Holt, Steve Wessels, RataxasCo LLC, Speyside Equity LLC, Kevin Daugherty, individually and as Trustee of the TD 2011 Trust and the PD 2011 Trust, and Robert C. Sylvester (collectively, the "Speyside Defendants") have filed their Motion for Partial Summary Judgment as to Fact of Liability (the "Speyside Motion"). Docket Nos. 176-183.

The Speyside Motion is directed at the following claims alleged in the First Amended Complaint. Docket No. 70 (the "FAC"):

The second claim for breach of the fiduciary duty owed to Pacific Steel against Krishnan Venkatesan, Jeffrey Stone, Jerry Johnson, Brian Holt, Steve Wessels, and Kevin Daugherty (identified in the FAC as the Management Defendants).

194057 msj                                      -3-

The seventh claim for avoidance of four-year intentionally fraudulent transfers against Speyside, the Alcast Company, Krishnan Venkatesan, Jeffrey Stone, Eric Wiklendt, RataxasCo LLC, Speyside Equity LLC, Kevin Daugherty, the TD 2011 Trust, the PD 2011 Trust, and Robert C. Sylvester (identified in the FAC as the Owner Defendants).

The eighth claim for avoidance of four-year constructively fraudulent transfers against the Owner Defendants.

The ninth claim for avoidance of seven-year intentionally fraudulent transfers against the Owner Defendants.

The eleventh claim for recovery of the four-year and seven-year avoided transfers against the Owner Defendants.

The fourteenth claim for aiding and abetting breach of fiduciary duty by the Management Defendants against the Owner Defendants.

The Trustee seeks compensatory damages of $40 million for the breach of fiduciary duty claims and recovery of $14 million in allegedly fraudulent transfers.

The Speyside Motion is made on the grounds that the Trustee cannot meet her burden of proof with respect to these claims because the underlying premise for each of them is fatally flawed. Each of these claims requires proof that, under the APA, Pacific Steel became obligated to pay the Contingent Withdrawal Liability owed by Second Street to the MEP - either directly, because it was assumed, or by agreeing to indemnify Second Street for it. The Speyside Defendants argue that Pacific Steel has no such obligation to the MEP or to Second Street under the proper interpretation of the APA and this liability belongs to Second

194057 msj                         -4-

Street.

The Speyside Motion is supported by Declarations of Todd Toral, Jeffrey Stone, Kevin Daugherty, and Israel Goldowitz. Docket Nos. 180-183. The Trustee and Second Street have filed a Joint Opposition supported by the Declaration of Jessica Bagdanov. Docket Nos. 195, 199. They have also objected to evidence in the supporting declarations of Jeffrey Stone, Kevin Daugherty, and Israel Goldowitz. Docket Nos. 196-198. The Speyside Defendants have filed a Reply. Docket No. 208.[1]

**B. The Trustee's and Second Street's Joint Motion**

The Trustee and Second Street have filed their Joint Motion for Partial Summary Judgment Regarding Pacific Steel's Assumption of Second Street's Contingent Withdrawal Liability (the "Joint Motion"). Docket Nos. 172-174.

The Joint Motion argues that the Trustee's and Second Street's interpretation of the APA is the only reasonable one. They claim that the APA obligated Pacific Steel to pay Second Street's Contingent Withdrawal Liability. They contend that this obligation rendered Pacific Steel insolvent at all relevant times and Pacific Steel failed to properly account for this liability on its financial statements. Because of this, the distributions made by Pacific Steel to the Speyside Defendants were fraudulent

---

[1] The Trustee's and Second Street's objection to the Speyside Defendants' evidence is overruled. The Stone and Daugherty Declarations do not offer legal conclusions, nor are they clearly and unambiguously inconsistent with their deposition testimony and thus are not "sham" declarations. They also provide appropriate context. The Goldowitz Declaration and report are proper rebuttal testimony.

194057 msj                                    -5-

transfers or the Speyside Defendants breached their fiduciary duties in enabling these transfers to be made. They also urge the court to find that the doctrines of judicial and equitable estoppel bar the Speyside Defendants from claiming that Pacific Steel did not agree to assume or to indemnify Second Street for the Contingent Withdrawal Liability. The Joint Motion is supported by the Declaration of Jason Komorsky. Docket No. 174. The Speyside Defendants have filed Opposition to the Joint Motion. Docket No. 203. The Trustee and Second Street have filed a Reply. Docket No. 205.

## III. Background Facts

The Speyside Defendants, the Trustee and Second Street refer to and rely on the following background events and documents. As necessary for context, the court takes judicial notice of certain documents filed in the Second Street chapter 11 case and the docket in the chapter 7 case of Pacific Steel and this adversary proceeding.

### A. Second Street's 2014 Bankruptcy Case

Second Street manufactured steel castings at its plant in Berkeley, California. Berkeley Properties owned the real property on which Second Street operated. Many of Second Street's former employees were represented by Local 164B, operating under the CBA pursuant to which Second Street contributed to the MEP.

In March 2014, Second Street and Berkeley Properties filed their jointly administered chapter 11 cases (Case Nos. 14-41045 and 14-41048). In its list of the twenty largest unsecured creditors, Second Street identified the MEP as having a $27 million contingent and unliquidated claim for Second Street's

194057 msj                                    -6-

withdrawal liability. Second Street Docket No. 1 at 4.

Second Street retained an investment banker to help it find a purchaser for its steel foundry business. Second Street Docket No. 157. Speyside was contacted as a potentially interested party. Docket no. 181, Stone Dec., Ex. 5 (2/24/24 summary from investment banker). Speyside submitted an initial indication of interest. *Id.* Ex. 7. The investment banker informed Speyside that participation in the MEP was a condition to purchasing the Second Street foundry business. *Id.* Ex. 8. After a period of negotiation, Speyside and Second Street signed the APA. Docket No. 180, Toral Dec., Ex. F, APA.

During these negotiations, counsel for the MEP provided a memo to its Trustees and Second Street's chapter 11 counsel regarding Second Street's withdrawal liability as it affected potential purchasers of Second Street's foundry business. Docket No. 180, Toral Dec., Ex. E, 5/1/14 memo re pension plan withdrawal liability issues "helpful to a potential purchaser assessing a potential transaction". This analysis necessarily informed Second Street's understanding of this issue for the drafting of the APA and Second Street's Chapter 11 Plan.

This memo explained the withdrawal liability issue as follows:

First, Second Street's share of the MEP's unfunded vested liabilities was approximately $27 million which would become due in installments if Second Street withdrew from the MEP. The actual present value of this was approximately $20 million due to special rules limiting a withdrawing employer's liability.

Second, ERISA §4204 provided a special rule that, subject to

194057 msj                    -7-

certain conditions, would allow Second Street to sell its
business and be exempt from paying the withdrawal liability that
otherwise arose as a result of such a sale. These included, (1) a
buyer obligates itself to contribute to the MEP on terms similar
to Second Street's; (2) a buyer obligates itself to pay whatever
withdrawal liability Second Street would have paid based on the
year of the sale and the four preceding years but has no
obligation to assume seller's full withdrawal liability under
§4204, only that portion that relates to the last five years of
operations estimated at $8 million; (3) a buyer posts and
maintains a surety bond for the five plan years after the sale,
estimated to be in the amount of $1.4 million; (4) if a buyer
withdraws during the first five years after the sale, and does
not timely pay its own withdrawal liability, then Second Street
must be contractually and secondarily liable for the withdrawal
liability that it would have incurred for the years a buyer
participated in the plan; (5) if a buyer withdraws during the
five plan years after the sale and does not timely pay its own
withdrawal liability, then Second Street would be statutorily
liable to pay the withdrawal liability Second Street would have
had "but for the operation of ERISA §4204 (e.g., $20 million);"
(6) if Second Street were to be liquidated or its assets
distributed after such a sale, it must post and maintain a bond
equal to the amount of its withdrawal liability for the five
years after the sale; and (7) if all these conditions are met,
Second Street "will escape all withdrawal liability if a §4204
sale occurs, the conditions of the rule are met, and buyer
remains in the plan and current with its own contributions

194057 msj                          -8-

through the close of the fifth plan year." Docket no. 180, Toral Dec., Ex. E, 5/1/14 MEP Trustee Memo at 2-3.

The MEP Trustees filed a proof of claim in Second Street's bankruptcy case (the "Local 164B Claim"). Docket No. 180, Toral Dec., Ex. C. The Local 164B Claim attached a memo dated June 20, 2014 from The Segal Company, the MEP's actuary, stating that (1) $26.7 million was an estimate of Second Street's withdrawal liability assuming a complete withdrawal from the MEP during the plan year ending June 30, 2014; (2) this liability could be paid in quarterly installments the number of which is limited to a maximum of 20 years by ERISA; (3) the annual payment for a withdrawal in the 2013-2014 plan year was $1.865 million; (4) the $26.7 million net assessment would not be fully amortized at this rate and ERISA's 20-year limitation would apply reducing the net assessment of $26.7 million to its present value of $21.1 million. *See* Ex. A to Local 164B Claim.

**B. The Bidding Procedures and the Sale Process**

On June 19, 2014, Second Street filed a Motion to Approve Overbid Procedures and Related Relief (the "Bid Procedures Motion"). Second Street Docket No. 201. Speyside's bankruptcy counsel reviewed the language in the Bid Procedures Motion before it was filed and requested certain changes which Second Street's bankruptcy counsel agreed to make. Docket No. 174, Komorsky Dec., Ex. 27, 6/8/14 email from counsel with suggested revisions. The initial version of the Bid Procedures Motion stated that under the APA, Speyside's bid was "$11.3 million in cash for certain assets." The language Second Street agreed to add at Speyside's request after that phrase was:

194057 msj                           -9-

plus assumption of certain liabilities (collectively, the "Assumed Liabilities"), including (i) [Second Street's] multiemployer pension plan with contingent liability estimated at $27.8 million; (ii) [Second Street's] nonunion pension plan, with liability estimated at $2.2 million; (iii) specified accounts payable aggregating $2 million; (iv) specified accrued expenses for customer rebates and goods/materials aggregating $1 million; and (v) a lease of real property with [Berkeley Properties], providing for rent payments aggregating approximately $16 million.

Second Street Docket No. 201.

The court entered an order approving the Bid Procedures Motion and thereafter approved the sale to Pacific Steel, as assignee of Speyside. Second Street Docket Nos. 220, 225, and 269. The sale closed on August 29, 2014.

**C. The Asset Purchase Agreement**

Certain provisions of the APA are critical to the issues raised by these competing motions. Docket No. 180, Toral Dec., Ex. F, APA. First, the APA is a fully integrated contract to which California law applies. *See* §10.03, APA supersedes any prior understandings, agreements, representations by or between parties that relate in any way to its subject matter; §10.09, APA governed by California law and where applicable the Bankruptcy Code.

Section 2.03 is entitled "Liabilities." Section 2.03(a) begins:

Other than the Assumed Liabilities, Buyer shall not assume or agree to pay, perform or discharge, any debts, liabilities ... or commitments of any kind or character, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undetermined (collectively, "Liabilities").

Section 2.03(b) defines the Assumed Liabilities as follows:

At closing Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy in accordance with their respective terms) the following liabilities (the "Assumed

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 10 of 41

Liabilities")...

(ii) all Liabilities of Seller arising under the Assumed Contracts to the extent that such Liabilities first accrue on or after the Closing Date...;

(iii) the obligations to administer or to provide benefits [...] under the Benefit Plans that Buyer assumes as listed on Schedule 2.03(b)(iii) (the "Assumed Plans") after the Closing Date, and all Liability arising from Buyer's termination of or withdrawal from any Assumed Plan ...

Section 2.04 is entitled "Assumption of Contracts; Cure Amounts." This section deals with the assumption of certain executory contracts by Second Street and their assignment to Pacific Steel. Schedule 2.04 lists the CBA as an Assumed Contract.

Section 7.10(a) is entitled "Multiemployer Plan." It provides in relevant part:

(a) The Parties intend to comply with the requirements of Section 4204 of the Employment Retirement Income Security Act of 1974, as amended ("ERISA") in order to ensure that the transactions contemplated by this Agreement shall not be deemed a complete or partial withdrawal from [the Multiemployer Plan]. Accordingly, Seller and Buyer agree:

(i) After the Closing Date, Buyer shall contribute the same number of contribution base units for which Seller had an obligation to contribute.

(ii) Buyer shall provide to the Multiemployer Plan, for a period of five consecutive plan years commencing with the first plan year beginning after the Closing Date, either a bond issued or an amount held in escrow ...

(iii) If Buyer completely or partially withdraws from the Multiemployer Plan prior to the end of the fifth plan year ... and Buyer's liability ... with respect to the Multiemployer Plan is not paid, then Seller shall be secondarily liable for any withdrawal liability Seller would have had to the Multiemployer Plan with respect to Buyer's operations during such five-year period but for Section 4204 of ERISA. Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii).

//

194057 msj                          -11-

### D. Second Street's Chapter 11 Plan

On April 30, 2015, Second Street, Berkeley Properties, and their Creditors' Committee filed their Second Amended Joint Chapter 11 Plan of Reorganization (the "Chapter 11 Plan" and the "Plan Proponents"). Second Street Docket No. 535. The Chapter 11 Plan stated that the Plan Proponents had agreed with the MEP Trustees on the treatment of Local 164B's Claim. The Chapter 11 Plan provided that (1) on the effective date, the Plan Administrator shall execute a deed of trust that encumbers the Berkeley real property (the "Deed of Trust") to secure payment of the Local 164B Claim; (2) if Pacific Steel had not withdrawn from Local 164B before July 1, 2020, or if it had withdrawn and completely satisfied all resulting withdrawal liability obligations to Local 164B, then the Deed of Trust would be reconveyed; (3) if Pacific Steel withdrew before July 1, 2020, Local 164B would deliver notice to the Plan Administrator with its calculation of Second Street's withdrawal liability under ERISA §4204; (4) thereafter, only the Plan Administrator could contest Local 164B's calculation of the amount of Second Street's withdrawal liability that may have been triggered in accordance with ERISA §4219(b) and §4221; (5) if the "withdrawal liability is uncontested and/or confirmed" through ERISA's dispute resolution procedures, the Local 164B Claim "shall be an Allowed Claim;" (6) if Pacific Steel withdrew prior to July 1, 2020 and failed to make any withdrawal liability payment, and Pacific Steel or the Plan Administrator failed to cure it, then Local 164B was entitled to exercise any and all remedies available to it under the Deed of Trust; and (7) the Chapter 11 Plan's

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 12 of 41

provisions regarding the Deed of Trust were the sole source of recovery for the Local 164B Claim and the Deed of Trust satisfied Second Street's requirement to post a bond under ERISA §4204(a)(3).[2] Second Street Docket No. 535, Chapter 11 Plan, §VI. D.

Second Street, its Creditors' Committee, and the MEP Trustees also entered into a stipulation regarding the treatment of the Local 164B Claim (the "Stipulation"). Second Street Docket No. 559. The Stipulation recited that it was intended to clarify what was perceived to be an ambiguity in the Chapter 11 Plan's treatment of the Local 164B Claim and its rights under the Deed of Trust. The Stipulation (1) defined Pacific Steel's failure to post the bond required for §4204 treatment by the June 30, 2015 deadline as a "Buyer's Withdrawal;" (2) stated the Chapter 11 Plan was to be construed so that Local 164B's rights and remedies "upon the triggering of withdrawal liability under ERISA, applied to a Buyer Withdrawal;" and (3) the rights of the Second Street Plan Administrator applied to a Buyer Withdrawal in the same manner as they would to "any other withdrawal liability triggered." [3]

In June 2015, the court entered an order confirming the

_____

[2] ERISA §4204(a)(3) provides that if substantially all of the seller's assets are distributed, or it is liquidated before the end of the 5 year period, then the seller shall provide a bond or amount in escrow equal to the present value of the withdrawal liability the seller would have had but for this subsection.

[3] Second Street's confirmation brief stated that, pursuant to ERISA, if its case were converted to ch. 7, it would be liable for the Contingent Withdrawal Liability owed to the MEP. Second Street Docket No. 581, ¶25. It is silent as to the APA.

194057 msj                    -13-

Chapter 11 Plan. Second Street Docket No. 589.

## E. Pacific Steel's Operations and its Chapter 7 Case

Pacific Steel obtained the bond required for its compliance with ERISA §4204(a)(1)(B) and contributed to the MEP pursuant to the CBA which it had assumed under the APA. Pacific Steel operated the steel foundry business from August 2014 until late 2018.

In December 2017, the surety that had provided the bond canceled it. The MEP Trustees then gave notice to Pacific Steel and Second Street that this was an event of default ending the ERISA §4204 exemption and the MEP intended to exercise its rights under the Deed of Trust. Docket No. 180, Toral Dec., Ex. D, 12/28/17 MEP Trustees' demand letter. This prompted Second Street to send a demand letter to Pacific Steel stating that the indemnity obligation under §7.10 of the APA had been triggered. Docket No. 181, Stone Dec., Ex. 18, 1/23/18 Second Street demand letter.

In January 2019, Pacific Steel filed its chapter 7 case and the Trustee was appointed. Second Street timely filed its proof of claim asserting Pacific Steel owed it $24.2 million on the grounds that Pacific Steel had agreed to indemnify Second Street for the Contingent Withdrawal Liability by the APA. Claim 2-1 on Pacific Steel Claims Register.[4]

On November 4, 2019, the Trustee filed the complaint commencing this Adversary Proceeding and thereafter filed the

---

[4] The precise amount of the Contingent Withdrawal Liability is the subject of another motion. Docket Nos. 178, 200, 201, 207.

194057 msj                          -14-

FAC. The Defendants have answered and completed discovery.

**IV. Discussion**

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, applicable here by Bankruptcy Rule 7056, provides that a party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought. Fed. R. Civ. P. 56(a). Further, Rule 56(a) provides that the court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Summary adjudication may be granted as to a single issue of law based on undisputed facts or a single issue which is part of a larger claim. *Robi v. Five Platters, Inc.,* 918 F.2d 1439 (9th Cir. 1990) (summary judgment granted based on application of collateral estoppel); *Van Curen v. Bank of the West (In re Hat),* No. 04-32497, 2007 WL 2580688 (Bankr. E.D. Cal. Sept. 4, 2007) (summary adjudication granted on issue of perfection of security interest).

Where the moving party has the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for it. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party will have the burden of proof on an issue, the movant need only demonstrate that there is an absence of evidence to support the claims of the non-moving party. *Id.* at 324. If the moving party meets its initial burden, the non-moving party must set forth specific facts showing there is a genuine issue for trial. *Anderson* v.

194057 msj                                    -15-

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Where the parties have filed cross-motions for summary judgment, the court evaluates each motion independently, viewing the non-moving party's evidence in the most favorable light and giving the non-moving party in each instance the benefit of all reasonable inferences. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quoting *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)).

The motions currently before the court are not styled as cross-motions but they are in effect cross-motions and the court has dealt with them as such. With respect to the Speyside Motion, the court has viewed the Trustee's and Second Street's opposition evidence in its most favorable light and viewed all reasonable inferences drawn from this opposition evidence in the same manner. The converse is also true. With respect to the Joint Motion, the court has viewed the Speyside Defendants' opposition evidence and reasonable inferences drawn from it in the most favorable light.

The Speyside Defendants seek summary judgment on the FAC's fraudulent transfer and breach of fiduciary duty claims on the grounds that the Trustee's liability theory is fatally flawed because she cannot meet her burden of proof on the core part of each of them. They argue their record establishes they are entitled to judgment as a matter of law because the Trustee and Second Street misinterpret the APA and misunderstand applicable law.

The Trustee and Second Street seek summary judgment without pointing to any particular claim alleged in the FAC. Instead,

194057 msj                          -16-

they contend that they are entitled to summary judgment because, under what they contend is the correct interpretation of three provisions of the APA and the parties' course of dealing, Pacific Steel agreed "to assume by way of indemnification" the Contingent Withdrawal Liability. They also contend that the principles of judicial and equitable estoppel support summary judgment in their favor.

### B. Contract Interpretation Principles

The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting. *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002); Cal. Civ. Code §1636 (contract is to be interpreted to give effect to mutual intent of parties as it existed at time of contracting so far as same is ascertainable). The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. Cal. Civ. Code §1638. The parties' intent is to be ascertained from their writing alone if that is possible. Cal. Civ. Code §1639. The court is to view the entire contract and give effect to every part of it with each clause helping to interpret the others. Cal. Civ. Code §1641. If particular clauses are inconsistent with general clauses, the particular are to control. Cal. Civ. Proc. Code §1859; *Kashmiri v. Regents of University of California*, 156 Cal.App.4th 809, 834 (2007) (specific promise not to raise fees controls over general statement that fees may be raised at any time without notice; interpretation that renders one provision meaningless is to be avoided).

194057 msj                            -17-

Generally speaking, the execution of a contract supersedes all negotiations and stipulations concerning its subject matter which preceded its execution. Cal. Civ. Code §1625. In addition, as codified in California, the parol evidence rule provides that the terms of an integrated contract, such as the APA, may not be contradicted by evidence of a prior agreement but they may be explained by course of dealing, or course of performance, and evidence of the circumstances under which the contract was made or to which it relates may be admissible. Cal. Civ. Proc. Code §1856. Finally, for the proper construction of a contract, the circumstances under which it was made, including the situation of its subject and the parties, may be shown so the court may be placed in the position of those whose language it is interpreting. Cal. Civ. Proc. Code §1860.

While the parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary, alter or add to the terms of an integrated contract, it does not prohibit the introduction of extrinsic evidence to explain the meaning of a written contract if the meaning urged is one to which the contract terms are reasonably susceptible. *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 343 (2004). Extrinsic evidence is not admissible to create ambiguities where none exist and a contract is not made ambiguous because parties disagree as to its meaning. *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1044 (9th Cir. 2020); *Wei Suen v. Yan*, *(In re Yan),* 381 B.R. 747, 755 (N.D. Cal. 2007) (explaining parol evidence rule, noting extrinsic evidence especially improper where contract is integrated).

194057 msj                                    -18-

Under California law, when the parties dispute the meaning of the words used in a contract, the court may first provisionally receive any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the contract is reasonably susceptible. *Pacific Gas & E. Co. v. G.W. Thomas Drayage, etc. Co.*, 69 Cal.2d 33, 39-40 (1968). If, in light of the extrinsic evidence, the language is reasonably susceptible to an interpretation urged by one party, the extrinsic evidence may be admitted to aid the court in interpreting the contract. *Id.*

When there is no material conflict in the relevant extrinsic evidence, the court interprets the contract as a matter of law. If there is a conflict in the extrinsic evidence, the factual conflict is to be resolved at trial and summary judgment or adjudication may not be appropriate. *Lust v. Animal Logic Ent.*, 2021 WL 6618677, at *5 (C.D. Cal. Aug. 25, 2021).

**C. Parties' Positions on the Use of Extrinsic Evidence**

The parties agree that the interpretation of the APA will determine the outcome of these competing motions. The Speyside Defendants argue that the APA is clear and explicit and extrinsic evidence need not be considered other than to provide context. Nevertheless, they claim that if the court does consider it, it fails to accomplish what the Trustee and Second Street suppose. Docket No. 203 at 24-33. They also protest that the Trustee and Second Street want their proffered extrinsic evidence to rewrite the APA by adding language to reach the result they desire. Docket No. 176 at 30.

The position of the Trustee and Second Street is somewhat baffling. They claim the APA is clear and unambiguous but they

194057 msj                              -19-

also urge the court to consider their proffered extrinsic evidence. Docket No. 172 at 2, APA is not ambiguous; *id.* at 21:8-13, APA clearly provides that Pacific Steel must indemnify Second Street and competent extrinsic evidence is offered to support this reasonable interpretation; *id.* at 29:11-15, at a minimum the language of APA §7.10(a)(iii) is ambiguous and should be informed by extrinsic evidence. They do not explain how §7.10(a)(iii) of the APA is ambiguous - if they do in fact contend that it is. They simply insist their extrinsic evidence shows they are correct.

The Trustee and Second Street urge the court to consider the following extrinsic evidence: (1) the Bid Procedures Motion and the Kevin Daugherty Declaration supporting it; (2) the Speyside letter of intent and the evolution of the offers made by Speyside and the fact that Speyside became the stalking horse bidder; (3) the Speyside Defendants' internal discussions regarding the transaction and the MEP withdrawal liability issues, including the anticipated chapter 7 filing; (4) the ownership structure for Pacific Steel adopted by the Speyside Defendants; (5) the Stipulation regarding the Chapter 11 Plan's treatment of the Local 164B Claim. Docket No. 172 at 29-35; Docket No. 195 at 20-25; Docket No. 205 at 22-23; Docket No. 174, Komorsky Dec., Exs. 2, 8, 10, 11, 13-15, 18, 19, 21, 23, 25-29, 31-35, 37-39, 43-46, 48-50, 55, 58;[5] Docket No. 195, Bagdanov Dec.

The Trustee's and Second Street's apparent misunderstanding

---

[5] Several of these exhibits were referred to by counsel at oral argument rather than these briefs. The court has considered them.

194057 msj                          -20-

of California law and their internally inconsistent position on the need for extrinsic evidence has made this a more difficult task than it should be. Because their position appears to be that §7.10(a)(iii) of the APA is ambiguous, the court has provisionally accepted the extrinsic evidence offered by the Trustee and Second Street and considered whether it shows a meaning to which §7.10(a)(iii) of the APA is reasonably susceptible.

The court concludes that the APA is not reasonably susceptible to the interpretation the Trustee and Second Street desire: that Pacific Steel agreed to "take on" the Contingent Withdrawal Liability either directly, by assuming it, or indirectly, by agreeing to indemnify Second Street for it. (Nor does their proffered extrinsic evidence establish that Pacific Steel or the Speyside Defendants are subject to judicial or equitable estoppel.)

The pre-deal negotiations and the offers are simply not relevant. *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 344 (2004) (written contract supersedes communications that preceded its execution). The Speyside Defendants' pre-deal communications amongst themselves are also irrelevant; they were not shared with Second Street or its professionals. *Steller v. Sears, Roebuck & Co.*, 189 Cal.App.4th 175, 184-85 (2010) (undisclosed intent or understanding of a party is irrelevant). This proffered extrinsic evidence does not support their contention that Pacific Steel agreed to "take on" the Contingent Withdrawal Liability in order to become the stalking horse bidder. *See* APA §7.02, Bankruptcy Court Matters; Docket No. 181, Stone Dec., Ex. 15, 5/16/14 email

194057 msj                           -21-

re agreement between buyer and seller to cooperate in obtaining stalking horse status; Bid Procedures Motion at 16-18, Second Street explaining that protection of stalking horse bidders is the price paid for enjoyment of best of both worlds - a contractually bound purchaser on one hand and potential for better bids with enhanced benefit to estate on other hand.

The language added to the Bid Procedures Motion by Speyside's counsel merely stated what the court views as an accurate description - the buyer *was* agreeing to assume the CBA and participate in the MEP, and there *was* a seller's Contingent Withdrawal Liability of $27 million as Second Street's own schedules showed. There was no "representation" by Speyside in this language, as the Trustee and Second Street argue, and it was not designed to chill bidding in the sale process. (If anything, it appears to have been designed to justify the potential break-up fee the parties had negotiated. See Bid Procedures Motion at 16.)

The ownership structure adopted by the Speyside Defendants for the Pacific Steel entity reflects risk averse business planning, it does not show an awareness of a liability and a design to evade it. *See* Docket No. 181, Stone Dec., ¶19, explaining reasons to "adopt legally cognizable deal structures to prudently manage the risk of potential control group liability relating to Pacific Steel's potential *buyer* withdrawal liability".

The court has considered whether this proffered extrinsic evidence shows the APA is reasonably susceptible to the meaning urged by the Trustee and Second Street and concludes it does not.

194057 msj

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 22 of 41

If the court had gone beyond provisionally admitting it, the
result would be the same. The court now considers the parties'
respective views on the interpretation of the APA.

**D. Section 2.03 of the APA**

**1. Section 2.03(a)**

Section 2.03(a) of the APA provides:

> Other than the Assumed Liabilities, Buyer shall not assume
> or agree to pay any debts, liabilities, obligations, claims,
> expenses, taxes, commitments of any kind of character,
> whether accrued or fixed, absolute or contingent, matured or
> unmatured or determined or undetermined (collectively,
> Liabilities) of Seller or become liable to Seller or any
> other Person, for any liabilities of Seller.

The Trustee and Second Street argue that this provision
"necessarily provides" an indemnification flowing from Pacific
Steel to Second Street for any Assumed Liability, and if an
Assumed Liability were triggered, Second Street had the right to
seek to have Pacific Steel "protect it" from such an Assumed
Liability. Docket No. 172 at 22. From this starting point, they
contend that whether Pacific Steel agreed to indemnify Second
Street for the Contingent Withdrawal Liability turns on whether
the Contingent Withdrawal Liability "is subsumed" in any of the
subsections of §2.03. *Id.* Oddly, they claim §2.03(b)(ii) deals
with the CBA and §2.03(b)(iii) deals with the MEP but they also
claim there is no redundancy in this.

The court disagrees with their interpretation of §2.03(a).
This section does not *necessarily* provide for *any* indemnification
for any liability. It merely establishes what is excluded from
the Assumed Liabilities.

//

194057 msj                              -23-

**2. Section 2.03(b)(ii)**

Section 2.03(b)(ii) of the APA provides, "[a]t Closing, Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy...) all Liabilities of Seller arising under the Assumed Contracts to the extent that such Liabilities first accrue on or after the Closing Date..."

The Trustee and Second Street posit that (1) the CBA was an Assumed Contract and the CBA required Pacific Steel to accept and be bound by the terms of the MEP; (2) pursuant to §2.03(b)(ii), Pacific Steel agreed to pay all Liabilities arising under the CBA that accrued post-closing; (3) this necessarily included the Contingent Withdrawal Liability because it *accrued* in 2017 when the bond was canceled, ending Second Street's ERISA §4204 exemption.

They claim their interpretation is in line with the position of the MEP Trustees as stated in the proof of claim filed in Pacific Steel's case. Docket no. 174, Komorsky Dec., Ex. 49, Proof of Claim 23-2 ($30 million claim "arises under ERISA and the CBA" and Pacific Steel "became subject to all the terms and conditions of the Trust Agreement establishing the Pension Fund by assuming and entering into the CBA").[6]

In response, the Speyside Defendants point out that the Trustee has vacillated on this point. The FAC relied on this "direct assumption" theory as did the Trustee's first motion for

---

[6] As originally filed, this claim was for Pacific Steel's own $6 million withdrawal liability. It was later amended to add $24 million described as a "pre-acquisition" withdrawal liability "assumed by" Pacific Steel under the APA.

194057 msj                                          -24-

summary judgment. *See, inter alia,* FAC ¶12, Pacific Steel responsible for full amount of withdrawal liabilities in excess of $32 million per APA; ¶53, Pacific Steel assumed liability per APA; Docket No. 83, MSJ at 7-10, Pacific Steel assumed but failed to account for Contingent Withdrawal Liability of $27 million and was primarily liable for it under §7.10 of APA. The Trustee later disclaimed this theory in her interrogatory responses, stating that Pacific Steel did not directly assume Second Street's pre-acquisition withdrawal liabilities, and her prior approach was based on a mistaken reading of the APA. Docket No. 180, Toral Dec., Ex. A at 27, "Neither the APA nor any other agreement made [Pacific Steel] directly liable for the pre-acquisition withdrawal liabilities. Rather, the obligation remained with [Second Street] and was secured by the deed of trust. But [Second Street] protected itself by means of the contractual indemnification and hold harmless provision...".

The Trustee is bound by the more recent description of her understanding of the APA in her verified interrogatory answers. Second Street is not so constrained but the Trustee may not simply ride Second Street's coat-tails on this point.

The Speyside Defendants argue that while the CBA was an Assumed Contract listed on Schedule 2.04(a), the MEP was not. The CBA only obligated Pacific Steel to contribute to the MEP which it did. Docket No. 176 at 25. They also argue that the Contingent Withdrawal Liability does not *arise under* the CBA; it arises under the provisions of ERISA governing Second Street's withdrawal from the MEP. Docket No. 203 at 23:11-12. This is perhaps too fine a distinction and the court notes that the

194057 msj                          -25-

Speyside Defendants also argue that the MEP was assumed. Docket No. 203 at 28:18-21; Docket No. 181, Stone Dec. ¶8, ¶39.

The Trustee's and Second Street's argument regarding §2.03(b)(ii) is not convincing. The language of §2.03(b)(ii) itself does not support their expansive interpretation - the Contingent Withdrawal Liability did not *arise under* an Assumed Contract and did not *first accrue* after the Closing date. It is not an Assumed Liability as that term is defined in the APA. The Contingent Withdrawal Liability had *accrued* before the APA was signed - i.e., it was properly chargeable to Second Street - but it was not yet payable because its payment was dependent on a future event that may never have happened. ERISA §4204 allowed its payment to be deferred and possibly eliminated. It is not an Assumed Liability that first accrued post-closing.

### 3. Section 2.03(b)(iii)

Section 2.03(b)(iii) provides "[a]t Closing, Buyer shall assume from Seller (and pay, perform, discharge, and otherwise satisfy...) the obligations to administer or to provide benefits, ... under the [Assumed Plans] after the Closing Date, and all Liability arising from Buyer's *termination of* or *withdrawal* from any Assumed Plan." Schedule 2.03(b)(iii) lists the "Local 164B Pension Trust" along with several other benefit plans as Assumed Plans.

The Trustee and Second Street argue that the "ordinary meaning" of this section is that the MEP was an Assumed Plan and the Contingent Withdrawal Liability *arose* from the cancellation of the bond in December 2017 which then eliminated Second Street's ERISA §4204(a) treatment and "triggered" the Contingent

194057 msj                                        -26-

Withdrawal Liability. Docket No. 172 at 25-26. They contend that the Speyside Defendants want to give a "hyper-technical" interpretation to the "indemnification obligation" in this section by reading ERISA terminology into the phrase "Buyer's termination of or withdrawal from" an Assumed Plan. Docket No. 172 at 25:20-21.

The Speyside Defendants counter that this section merely states that Pacific Steel agreed it would be liable for its termination of its *own* participation in, or its *own* withdrawal from, any of the several benefit plans it had assumed in the transaction. This point is confirmed by the fact that, in May 2019, the Pension Trust filed a proof of claim, based on its authority under ERISA §4201, asserting Pacific Steel owed it $6 million (calculated under ERISA §4202 and §4219 for time period 2014 - 2018) resulting from Pacific Steel's "complete withdrawal" from the MEP which occurred when it ceased to operate in 2018 and filed its chapter 7 case in January 2019.

After considering their respective arguments, the court concludes that Pacific Steel's withdrawal liability *arose* when Pacific Steel withdrew from the CBA and stopped contributing to the MEP. Second Street's withdrawal liability arose during, and had accrued during, the time it participated in the MEP. It had fully accrued as of 2014 when it sold its foundry business to Pacific Steel; its payment was made contingent by operation of ERISA §4204. The Contingent Withdrawal Liability did not *arise from* Pacific Steel's termination of or withdrawal from any Assumed Plan; it arose from - it originated from - Second Street's participation in the MEP and remained contingent under

194057 msj                              -27-

ERISA §4204's safe-harbor provision until the bond was canceled in December 2017. It did not *arise from* Pacific Steel's *withdrawal* from the MEP. Second Street was relieved of paying its own withdrawal liability in 2014 and would have been permanently relieved if the conditions for the §4204(a) exemption had been maintained for the five-year statutory period. However, in 2017 when the bond was canceled, the §4204 exemption ended. The contingency was not removed by Pacific Steel's withdrawal from or termination of any Assumed Plan.

The Trustee and Second Street argue that Stipulation between Second Street, its Creditors' Committee, and the MEP shows that the Speyside Defendants' interpretation is wrong. Under the Stipulation, Pacific Steel's failure to post the bond by June 30, 2015 is defined as a "Buyer Withdrawal." The Trustee and Second Street claim this Stipulation was served on Defendants and they failed to respond to contest this definition. They claim this now defeats Defendants' argument that Pacific Steel's withdrawal liability arose in 2019 when it filed bankruptcy and Second Street's seller withdrawal liability was "triggered" in 2014 when the sale took place and then became non-contingent in 2017 when Pacific Steel's bond was canceled.

The court does not find this argument compelling. First, the Speyside Defendants had no obligation to respond to the Stipulation or contest its provisions and they are not, in any sense, bound by it. The transaction documented by the APA had closed in August 2014 and Pacific Steel's (and Speyside's) active participation in Second Street's chapter 11 case had essentially ended. Second, the Stipulation was executed in connection with

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 28 of 41

obtaining the MEP Trustees' support for confirmation of the
Chapter 11 Plan. If the bond had not been provided by the
deadline, Second Street's withdrawal liability would have become
an immediate liability and the MEP Trustees could have exercised
their rights under the Deed of Trust. Confirmation of the Chapter
11 Plan would have been in jeopardy if this had transpired. The
definition in the Stipulation made sense for the context for
which it was drafted but it is not binding on the Speyside
Defendants and it is not helpful in the interpretation of the APA
or the relevant provisions of ERISA. The Stipulation does nothing
to advance the Trustee's and Second Street's case.

The Trustee and Second Street argue there are three
indemnification provisions in the APA. Docket No. 172 at 21:8-13.
This argument has no merit. If §2.03(b)(ii) and (b)(iii) are
interpreted as broad indemnification provisions as they contend,
this offends core principles of contract interpretation. First,
it makes §7.10(a)(iii) meaningless. *Zalkind v. Ceradyne, Inc.*,
194 Cal.App.4th 1010, 1027 (2011) (court is to give effect to all
contract terms, and avoid rendering some meaningless). Second, it
makes §7.10(a)(iii) superfluous or redundant. *Pauma Band of
Luiseno Mission Indians v. California*, 813 F.3d 1155, 1171 (9th
Cir. 2015) (court declines interpretation that would render a
clause superfluous). Third, the more specific indemnity provision
in §7.10(a)(iii) controls over the general provisions of
§2.03(b)(ii) and (b)(iii) which are focused on an entirely
different subject matter. Reading the APA as a whole, with each
provision in mind, shows that this interpretation does not hold
up. There are not three indemnification provisions in this APA.

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 29 of
41

**E. ERISA §4204 and APA §7.10(a)**

Under ERISA §4201, Second Street's sale of its foundry business to Pacific Steel would have been treated as a complete withdrawal from the MEP, making Second Street immediately liable for the $27 million shown in the Pension Trust's proof of claim filed in Second Street's bankruptcy case. To avoid this result, the parties structured the sale to comply with ERISA §4204(a). In order to achieve this result, §4204 required the following:

First, Pacific Steel had to contribute to the MEP for substantially the same number of "contribution base units" as Second Street had. §4204(a)(1)(A). Section 7.10(a)(i) stated "after the Closing Date, Buyer shall contribute" as so required. Pacific Steel made these payments while it operated. This is not in dispute.

Second, Pacific Steel had to provide the bond payable to the MEP in the requisite amount and maintain it for a period of five plan years. §4204(a)(1)(B). Section 7.10(a)(ii) tracked the language of §4204(a)(1)(B). Pacific Steel timely obtained the bond in the required amount but did not maintain it for the requisite number of years. There is no dispute as to this. When the bond was canceled in December 2017, the §4204 exemption ceased to apply. There is no dispute as to this.

Third, under §4204(a)(1)(C), the APA had to provide that,

> if the purchaser withdraws during such first 5 plan years, the seller is secondarily liable for any withdrawal liability it would have had to the plan with respect to the operations (but for this section) if the liability of the purchaser with respect to the plan is not paid.

Section 7.10(a)(iii) also tracked this language in its first sentence:

194057 msj                                    -30-

> if Buyer ... withdraws [from the MEP] ... prior to the end
> of the fifth plan year ... and Buyer's liability [to the
> MEP]... is not paid, then Seller shall be secondarily liable
> for any withdrawal liability Seller would have had [to the
> MEP] ... with respect to Buyer's operations during such
> five-year period but for Section 4204 of ERISA.

However, §7.10(a)(iii) added the following sentence: "Buyer shall indemnify Seller and hold Seller harmless from and against any liability incurred by Seller pursuant to Section 4204 of ERISA and this subsection (iii)."

This last sentence of §7.10(a)(iii) is the focus of the parties' dispute. However, there are two other provisions of §4204 that inform the outcome of this dispute.

Section 4204(a)(2) provides that -

> If the purchaser -
> (A) withdraws before the last day of the fifth plan year
> beginning after the sale,
> and
> (B) fails to make any withdrawal liability payment when due,
> then the seller shall pay to the plan an amount equal to the
> payment that would have been due from the seller but for
> this section.

There is also no dispute regarding the fact that Pacific Steel failed to make a "withdrawal liability payment when due" as shown by the $6 million proof of claim filed by the MEP Trustees in this case. This section also indicates there remains a seller obligation.

Section 4204(b)(1) defines the amount of the purchaser liability as follows:

> For the purposes of this part, the liability of the
> purchaser shall be determined as if the purchaser had been
> required to contribute to the plan in the year of the sale
> and the 4 plan years preceding the sale the amount the
> seller was required to contribute for such operations for

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 31 of
41

such 5 plan years.[7]

According to the Speyside Defendants, under §4204(a)(1)(C), Second Street had secondary liability for Pacific Steel's purchaser liability as defined in §4204(b)(1). They argue that the indemnification obligation imposed on Pacific Steel by the last sentence of §7.10(a)(iii) extends only to Second Street's secondary liability for that "five plan year" piece, not the entire $27 million Contingent Withdrawal Liability. Docket No. 176 at 30.[8]

The Speyside Defendants also argue that Second Street's secondary liability under §4204(a)(1)(C) - for which there is indemnification - only exists where Pacific Steel, as the buyer, withdraws while the §4204(a) conditions are in still in effect. Here, the parties agree that the conditions for the §4204 exemption ended in 2017 and there appears to be no dispute that Pacific Steel withdrew from the MEP months after that. The Speyside Defendants contend "since Pacific Steel never incurred a *purchaser* liability under §4204(a)(1)(C) by withdrawing when the

---

[7] See *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 530 (4th Cir. 1992) (explaining background regarding ERISA rules for multiemployer plan withdrawal liability; for purposes of determining the purchaser's withdrawal liability at some time after the sale, the statute treats the purchaser "as if" it had been required to contribute to the plan in the plan year of the sale and the four preceding plan years in the amount that the seller was required to contribute, thus shifting primary liability from the seller to the purchaser).

[8] They also point out that the indemnification only applies to liability incurred by Second Street "pursuant to §4204" and §4204 itself does not impose the seller liability on Second Street. The seller liability is based on ERISA §4201 and §4203.

194057 msj                                    -32-

exemption was in force, Second Street cannot be secondarily liable for any such *purchaser* liability (and cannot have *any* liability that Pacific Steel must indemnify)." Docket No. 176 at 31:13-16; Docket No. 183, Goldowitz Report, ¶33-35.

The MEP counsel's June 2014 memo provided to Second Street and its Creditors' Committee supports this analysis. Docket No. 180, Toral Dec., Ex. E, buyer has "no obligation to assume" Second Street's "full withdrawal liability under §4204, only that portion of it that relates to the last five years of operations." The Segal memo of March 2014 provided to Speyside as part of its due diligence process is in accord. Docket No. 181, Stone Dec., Ex. 3, seller's unfunded vested benefits assigned to buyer are between $3.4 million and $11 million based on certain assumptions; noting there could be residual responsibility for seller. Jeffrey Stone, Speyside's lead negotiator in this transaction, confirms this was his understanding as well. Docket No. 181, Stone Dec., ¶6, explaining his understanding was that the APA's indemnification provision did not apply or extend to any withdrawal liability, contingent or otherwise, resulting from Second Street's operations pre-dating Pacific Steel's acquisition of Second Street's foundry business; ¶12, noting that if the exemption criteria were not met "Second Street would be liable for its pre-acquisition withdrawal liability..." [9]

The Speyside Defendants also argue that the plain meaning of

_____

[9] Docket No. 174, Komorsky Dec., Ex. 35 (8/14/14 email Stone to Wessels) does not contradict this, it simply indicates awareness of calculations for *seller's* withdrawal liability and potential *buyer's withdrawal* liability.

194057 msj                    -33-

the last sentence of §7.10(a)(iii) is that Pacific Steel agreed to indemnify Second Street for any liability that Second Street could have incurred pursuant to *both* §4204 *and* subsection (iii). Only one liability could meet that definition - Second Street's secondary liability for Pacific Steel's theoretical purchaser withdrawal liability that would arise under §4204 if Pacific Steel withdrew within five plan years.

The Trustee and Second Street have suggested that the last sentence of §7.10(a)(iii) should be read as "pursuant to §4204 *and/or* this subsection (iii)" rather than "*and* this subsection (iii)." Docket No. 180, Toral Dec., Ex. B, hearing transcript 40:19-25, suggesting "and" be read as "and/or." The court rejects this suggestion as it would amount to a significant change to the APA. The Trustee and Second Street also argue that the "and" in this sentence "reaffirms" that Pacific Steel will be liable for the Contingent Withdrawal Liability and the "going forward liability."[10] Docket No. 172 at 28:16-21. The court finds this interpretation untenable. The language "reaffirms" no such thing.

The Trustee and Second Street also argue that this last sentence was "plainly intended to cover the only two liabilities that could have been incurred" by Second Street - those in §7.10(a)(ii) and (a)(iii). Docket No. 172 at 27:22-27. Section 7.10(a)(ii) does not impose a liability, it simply conforms to the requirement in §4204(a)(1)(B) that Pacific Steel maintain the bond for five plan years. They urge the court to interpret

---

[10] The use of this vague terminology when ERISA provides definitions that cover this situation is not helpful.

Case: 19-04057   Doc# 231   Filed: 08/17/22   Entered: 08/18/22 08:52:15   Page 34 of 41

"pursuant to §4204 and this subsection (iii)" as a reference to §7.10(a)(ii) because it "identifies §4204" and "embraces" the Contingent Withdrawal Liability. Docket No. 172 at 28:16-21. Section 7.10(a)(ii) "identifies" §4204 only in that tracks the language of §4204(a)(1)(B). Finally, they contend that unless "pursuant to Section 4204" is read as a reference to §7.10(a)(ii) it is rendered meaningless.

This interpretation defies common sense, ignores the language of these provisions, and is contrary to basic rules of contract interpretation. Saying §7.10(a)(ii) "embraces" the Contingent Withdrawal Liability is wishful thinking. By the last sentence of §7.10(a)(iii), Pacific Steel agreed to indemnify Second Street for any liability that Second Street could have incurred pursuant to *both* §4204 *and* subsection (iii). The only liability that meets that definition is Second Street's secondary liability for Pacific Steel's purchaser withdrawal liability that could have arisen if Pacific Steel withdrew within the five-year period while the §4204 exemption was in place.

The Speyside Defendants point out that the Chapter 11 Plan provided that only the Second Street Plan Administrator could object to the amount of the Local 164B Claim. Second Street Docket No. 535, Chapter 11 Plan, §VI. D. This weighs against the Trustee's and Second Street's argument that the Contingent Withdrawal Liability - upon which the Local 164B Claim is based - belonged exclusively to Pacific Steel.

The APA was signed in June 2014 and the Chapter 11 Plan was confirmed in June 2015. The court may consider the subsequent acts and conduct of the parties in order to determine their

194057 msj                    -35-

intent. *Warner v. City of Los Angeles*, 2 Cal.3d 285, 296 (1970) (construction given by acts of parties with knowledge of contract terms before controversy arises). If the Contingent Withdrawal Liability were solely Pacific Steel's under the APA, as the Trustee and Second Street now contend, precluding Pacific Steel from being involved in resolving the actual amount makes little sense. In fact, Second Street has objected to the face amount of the Contingent Withdrawal Liability asserted by the MEP Trustees. Docket No. 180, Toral Dec., Ex. D, 12/28/17 MEP Trustees' default letter; Ex. H, 1/29/18 Second Street response to default letter disputing amount of the assessment.

After careful consideration of the parties' arguments regarding ERISA §4204 and §7.10(a)(iii) of the APA, the court concludes that §4204(a)(1)(C) only imposes a single liability subject to indemnification - Pacific Steel's purchaser liability calculated under §4204(b)(1). However, the obligation to save Second Street from its secondary liability for this purchaser liability would only exist if the §4204 safe-harbor conditions remained in place at the time Pacific Steel withdrew from the MEP in 2019. But these safe-harbor conditions had ended in 2017 when the bond was canceled. The indemnification provision in the last sentence of §7.10(a)(iii) only covers Second Street's secondary liability for this theoretical purchaser liability for which Pacific Steel was primarily liable. If Second Street had become secondarily liable to the MEP by statute, it could have sought indemnification from Pacific Steel by contract. The court finds the Speyside Defendants' interpretation of §7.10(a) far sounder than the Trustee's and Second Street's.

194057 msj                    -36-

**F. Estoppel Issues**

The Trustee and Second Street argue that judicial and equitable estoppel apply in this case to preclude the Speyside Defendants from prevailing in their interpretation of the APA. Docket No. 172 at 15-20; Docket No. 195 at 6-10; Docket No. 205 at 6-10. The Speyside Defendants contend that these estoppel theories have no merit. Docket No. 176 at 34-35; Docket No. 203 at 33-35; Docket No. 208 at 13-15.

Judicial estoppel is an equitable doctrine which the court has discretion to apply in certain circumstances. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). In general, it may be applied where (1) the party's later position is clearly inconsistent with its earlier position; (2) a court has been persuaded to accept the party's earlier position; and (3) the party will derive an unfair advantage or impose an unfair detriment on the other party if not estopped. *Id.* at 751.

The Trustee and Second Street argue the inconsistent position and court acceptance elements of judicial estoppel are present because Speyside's counsel asked to add language to the Bid Procedures Motion and the court approved the Motion. Docket No. 172 at 16:5-25, referring to counsel's email suggesting changes to Bid Procedures Motion and stating six times on one page that Defendants "took on" a $27 million liability based on this added language. They claim the court accepted this "representation."

The court finds this argument meritless. The Speyside Defendants' current interpretation of the APA is not clearly inconsistent with this language added to the Bid Procedures

194057 msj                                    -37-

Motion. Speyside suggested adding this language and Second Street's chapter 11 counsel agreed. This did not amount to a representation that was accepted by the court. While Speyside may have been a party in interest with respect to the Bid Procedures Motion, with a right to be heard under Bankruptcy Code §1109(b), the other Speyside Defendants were not and none of them were parties to the chapter 11 case in the true sense of the word. The added language simply stated what the MEP Trustees had said: The Contingent Withdrawal Liability was estimated at the time to be roughly $27 million. The added language was purely descriptive; it does not provide "evidence of their affirmative misconduct" as the Trustee and Second Street claim. Docket No. 205 at 9:2-6. This language does not amount to a representation by Speyside that it "took on" the Contingent Withdrawal Liability and in approving the Bid Procedures Motion the court did not accept the Trustee's and Second Street's interpretation of this language. The Speyside Defendants' current position is not "clearly inconsistent" with a prior position. The Trustee's and Second Street's reliance on *In re CFB Liquidating Corp.,* 581 B.R. 317 (Bankr. N.D. Cal. 2017), *aff'd,* 591 B.R. 396 (N.D. Cal. 2018) is misplaced on both the facts and the law.

The Trustee and Second Street next contend that Speyside will obtain an unfair advantage if its current position is accepted. They posit that the added language served to chill the bidding, and they claim it effectively did so because there were no other bidders. The court disagrees. There may have been many reasons why there were no other bidders. Their reliance on the deposition testimony of Jeffrey Stone as support for this

194057 msj                        -38-

proposition is misplaced. Docket No. 172 at 17; Docket No. 174,
Ex. 48, Stone Tr. 70-74.

The Trustee's and Second Street's argument for equitable
estoppel is equally flawed. *City of Oakland v. Oakland Police and
Fire Retirement Svs.*, 224 Cal.App.4th 210, 239-40 (2014) (listing
four elements generally required). In the exercise of its
discretion, the court declines to apply either estoppel theory
here.

**III. Conclusion**

For the foregoing reasons, the court grants summary judgment
in favor of the Speyside Defendants as to the second, seventh,
eighth, ninth, eleventh and fourteenth claims for relief stated
in the First Amended Complaint. The Speyside Defendants have
shown there are no genuine issues of material fact as to the
proper construction of the APA. Pacific Steel did not directly
assume an obligation to pay the Contingent Withdrawal Liability
and its indemnification obligation was limited as the Speyside
Defendants contend. As a matter of contract interpretation they
have negated an essential element of the Trustee's case: that the
APA required Pacific Steel to indemnify Second Street for its
Contingent Withdrawal Liability or that the APA required Pacific
Steel to assume the Contingent Withdrawal Liability. Accordingly,
the court denies the Joint Motion of the Trustee and Second
Street. The court requests that the Speyside Defendants submit an
order conforming to this decision.

The court also notes that this ruling provides a basis for
granting the pending motion for summary judgment by UHY, LLP as
it effectively disposes of the aiding and abetting breach of

194057 msj                        -39-

fiduciary duty claim asserted in the FAC against UHY, LLP. The court requests that UHY, LLP submit an order conforming to this decision.

The court will hold a status conference regarding resolution of the remaining claims in the First Amended Complaint and the pending motions at 11:00 a.m. on September 29, 2022. The parties shall submit status conference statements explaining their views on resolution of the remaining claims in this adversary proceeding at least seven days before the status conference.

* * * * **End of Memorandum Decision** * * * *

1 <u>Court Service List</u>

2

3 None required.

194057 msj

-41-